**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| BANDOL LIM, Individually and On Behalf of All Others Similarly Situated, <br><br>                     Plaintiff, <br><br>          v. <br><br> EDWARD HIGHTOWER and ADAM KROLL, <br>                    Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Bandol Lim ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following against Edward Hightower ("Hightower"), who served as Chief Executive Officer ("CEO") of Lordstown Motors Corp. ("Lordstown," or the "Company") during the Class Period (defined below), and Adam Kroll ("Kroll"), Lordstown's Chief Financial Officer ("CFO") during the Class Period. Plaintiff's allegations are based upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Lordstown with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases issued by and disseminated by Lordstown; and (c) review of other publicly available information concerning Lordstown, including media reports concerning Lordstown and filings made by and/or concerning Lordstown in Lordstown's Bankruptcy.[1]

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal securities class action on behalf of a proposed class (the "Class") consisting of all persons and entities that acquired Lordstown securities during the period from August 4, 2022 through and including June 26, 2023 (the "Class Period"). Plaintiff pursues claims against the Defendants Hightower and Kroll, who were Lordstown's two most senior officers during the Class Period, for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      Lordstown, a Delaware corporation headquartered in Lordstown, Ohio, is an

---

[1] The "Bankruptcy" refers to *In re: Lordstown Motors Corp*, 1:23-BK-10831 (Bankr. D. Del.).

automotive company founded for the purpose of developing, engineering, manufacturing, and selling light duty electric vehicles targeted for sale to fleet customers.

3.     In September 2021, in need of financing, Lordstown decided to forge a partnership with Hon Hai Technology Group ("Foxconn").

4.     On May 11, 2022, Lordstown announced the sale of its Lordstown manufacturing facility to Foxconn and further executed a joint venture agreement (the "JV Agreement") with Foxconn to co-design and develop vehicle programs for the global commercial fleet market. The JV Agreement contemplated that the JV's first vehicle program would be based on certain vehicle designs that a Foxconn affiliate had already largely developed. Under the JV Agreement, Foxconn agreed to make, or to advance on Lordstown's behalf, capital contributions to the JV of up to $100 million—money needed by Lordstown to continue to operate.

5.     During the Class Period, Defendants repeatedly made and/or caused Lordstown to make false and/or misleading statements about Lordstown's relationship with Foxconn suggesting, or in some instances, representing that Foxconn was working cooperatively with Lordstown when in fact, the partnership had stalled soon after the execution of the JV Agreement and quickly soured. Due to Foxconn's breach of the JV Agreement, Lordstown executed a second agreement with Foxconn to replace the original agreement (the "Investment Agreement") in an attempt to salvage the relationship.

6.     As the investing public would only learn fully after the Class Period, Lordstown believed throughout the Class Period that Foxconn was acting in bad faith, failing to live up to its commercial and financial commitments to the Company, and even working in direct competition with Lordstown despite Foxconn's purported commitment to the Company. Specifically, Foxconn failed to provide Lordstown access to design data, never participated in budget or timeline negotiations for the project, and generally failed to meaningfully engage with the Company even on the most basic items.

Lordstown knew but failed to disclose that the financial life of the Company was imperiled by its strained relationship with Foxconn and if the partnership failed, the Company faced bankruptcy.

7.     By early 2023, the undisclosed conduct by Foxconn began to take a material toll on Lordstown's business and financial health.

8.     On March 7, 2023, Lordstown's stock dropped below the $1.00 per share threshold set forth in NASDAQ Listing Rule 5450(a)(1) and on April 19, 2023, NASDAQ issued a notice to Lordstown notifying the Company that it had a 180-day period to return the stock price to $1.00 per share (the "NASDAQ Notice").

9.     On May 1, 2023, Lordstown revealed that it had received a notice of default (the "Foxconn Notice") from Foxconn on April 21, 2023, stating that Foxconn would terminate the Investment Agreement effective May 21, 2023, in the event the Company failed to cure the default as described in the NASDAQ Notice. Moreover, Lordstown revealed that although the Company was in discussions with Foxconn to seek resolution, Foxconn declined to revoke its termination notice and failed to confirm that it would proceed with closing the agreement and any preferred stock closing.

10.    On this news, the Company's share price fell $0.13 per share, or more than 25%, to close at $0.40 per share on May 1, 2023.

11.    On May 23, 2023, Lordstown announced that the Company approved a proposal to effect a 1:15 reverse split of the Company's outstanding shares of Class A common stock (the "Reverse Stock Split"). The Reverse Stock Split would automatically cause each 15 shares of the Company's issued and outstanding Class A common stock to be combined into one issued and outstanding share, reducing the numbers of outstanding shares in the market. The Reverse Stock Split was intended to increase the per share market price of the Class A common stock to avoid being delisted from the NASDAQ.

12.     On this news, the Company's share price fell $0.53 per share, or approximately 13%, to close at $3.73 per share on May 24, 2023.[2]

13.     Finally, on June 27, 2023, before the market opened, Lordstown revealed in a court filing that, contrary to Lordstown's Class Period representations, the partnership had long been in jeopardy and Foxconn's conduct toward Lordstown had been anything but cooperative. Lordstown filed litigation against Foxconn (the "Foxconn Litigation") and several of its subsidiaries in the U.S. Bankruptcy Court for the District of Delaware alleging Foxconn's fraud, bad faith, and failure to live up to its commercial and financial commitments to the Company. Investors learned that Foxconn: (a) failed to grant the Company access to designs it committed to provide; (b) stalled agreement to a budget and timeline for the project as contemplated under the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed-upon commitments. Moreover, Foxconn failed to make minimum monthly payments to the JV and even refused to provide information about the JV's bank accounts to Lordstown. Lordstown further revealed that the Company was pursuing a restructuring through a voluntary petition filed under chapter 11 of the U.S. Bankruptcy Code the same day.

14.     On this news, the Company's share price fell $0.54 per share, over 21%, to close at $2.29 per share on June 27, 2023.

15.     As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of the Company's securities, Plaintiff and other class members have suffered significant losses and damages.

---

[2] When the market opened on May 24, 2023, Lordstown common stock began trading on a split-adjusted basis on the NASDAQ.

5

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18.     This Court has jurisdiction over each Defendants named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

### A.     Plaintiff

21.     Plaintiff Bandol Lim acquired shares of Lordstown at artificially inflated prices during the Class Period, as is detailed in the sworn certification filed herewith, and has been damaged

by the revelation of the Company's material misrepresentations and material omissions herein.

### B. Defendants

22.     Defendant Edward Hightower has served as Lordstown's Chief Executive Officer and Chairman of the Board of Directors since July 2022.

23.     Defendant Adam Kroll has served as Lordstown's Chief Financial Officer since October 2021.

24.     Collectively, Defendants Hightower and Kroll are referred to throughout this complaint as the "Defendants."

25.     Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with the Company and access to material non-public information available to them but not to the public, Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. Defendants are liable for the false statements pleaded herein.

### C. Relevant Non-Party

26.     Lordstown is an automotive company founded for the purpose of developing and manufacturing light duty electric trucks targets for sale to fleet customers. Lordstown is incorporated in Delaware, with principal and executive offices located at 2300 Hallock Young Road, Lordstown, Ohio 44481. During the Class Period, Lordstown stock traded on the

NASDAQ under the ticker symbol "RIDE." Lordstown voluntarily entered into bankruptcy under Chapter 11 of United States Bankruptcy Code on June 27, 2023. Claims against Lordstown were automatically stayed upon Lordstown's filing of the Bankruptcy.

## SUBSTANTIVE ALLEGATIONS

27.     In September 2021, Lordstown agreed to forge a partnership with Foxconn to address the Company's funding needs.

28.     On September 30, 2021, Lordstown and an affiliate of Foxconn entered into an Agreement in Principle (the "AIP") to form a partnership and work jointly on electric vehicle programs. The AIP contemplated that Foxconn and the Lordstown would (a) enter into an asset purchase agreement to buy the Company's manufacturing plant in Lordstown, Ohio, (b) enter into a manufacturing supply agreement, and (c) jointly collaborate on the development of future vehicle programs. According to Lordstown itself, the AIP was crucial to the Company's go-forward plan, as selling the manufacturing plant would bring in necessary capital while lowering go-forward operational costs.

29.     On November 10, 2021, Lordstown announced that shortly after the AIP, Foxconn purchased $50 million of common stock directly from the Company. The definitive Asset Purchase Agreement ("APA") implemented the terms of the AIP and provided that Lordstown and Foxconn would pursue a joint venture agreement to co-design and develop vehicle programs for the global commercial fleet market. The closing of the transactions contemplated by the APA were subject to certain closing conditions, including regulatory approvals, among other closing conditions.

30.     On May 11, 2022, Lordstown announced that it had closed the APA, selling the Lordstown manufacturing facility, and executed the JV Agreement with Foxconn. The JV was owned 55% by Foxconn and 45% by Lordstown. Under the JV Agreement, Foxconn agreed to make, or to

advance on Lordstown's behalf, capital contributions to the JV of up to $100 million. A large portion of the capital contributions would not be required until the parties agreed upon a budget. The JV Agreement also contemplated that the JV's first vehicle program would be based on certain vehicle designs that a Foxconn affiliate had already largely developed, known as the Model C.

31.     However, the partnership soon stalled. Foxconn: (a) failed to grant the Company access to the Model C designs that it committed to provide; (b) stalled agreement to a budget and timeline for the project as contemplated under the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; (e) otherwise failed to fulfill other agreed-upon commitments. Moreover, Foxconn failed to make minimum monthly payments to the JV and even refused to provide information about the JV's bank accounts to Lordstown.

32.     Lordstown subsequently learned that a Foxconn affiliate intended to sell its own vehicles, including the Model C, directly into the United Stated in direct competition with the Company, despite Foxconn's commitment in the JV Agreement to utilize the JV as their primary North American vehicle development partner.

33.     On July 11, 2022, Lordstown provided a draft budget for the JV to Foxconn. For more than two months thereafter, Foxconn refused to provide feedback to Lordstown. Finally, on September 30, 2022, Foxconn indicated that it disagreed with the proposed budget, failing to provide further comments or guidance.

34.     On October 14, 2022, Lordstown sent a letter to Foxconn advising that Foxconn had breached the JV Agreement.

35. Soon after receiving Lordstown's letter setting forth Foxconn's breach of the JV Agreement, Foxconn proposed a direct investment by a Foxconn entity 55% owned by Foxconn and 45% owned by SoftBank, a large multi-national technology investor. The Chairman of SoftBank was interested in developing electric vehicle programs in North America and Foxconn told Lordstown that it should re-focus resources to these new programs.

36. On November 7, 2022, Lordstown agreed to pivot away from the JV Agreement and instead enter into the new Investment Agreement. The same day, Lordstown announced an agreement with Foxconn pursuant to which Foxconn agreed to make additional equity investments in Lordstown in the form of $70 million of Lordstown's Class A common stock, and up to $100 million of a newly created Series A Convertible Preferred Stock, subject to certain conditions. The net proceeds from the sale of the Preferred Stock were to be used to fund development and design activities for the new SoftBank vehicles or any substitute programs.

37. The Investment Agreement contemplated: (a) an initial closing (the "Initial Closing") at which Foxconn would purchase $22.7 million in common stock and $30 million in preferred stock; (b) a subsequent closing (the "Subsequent Common Closing") at which Foxconn would purchase $47.3 million in common stock, and (c) additional closings in connection with which Foxconn would purchase up to $70 million in additional shares of preferred stock (the "Subsequent Preferred Closings"), subject to an agreement on the funding milestones and budget for the new vehicle program.

38. Within days of entering into the Investment Agreement, Foxconn indicated to Lordstown that SoftBank's commitment was no longer clear and that the Company should not rely on the SoftBank program. The parties subsequently entered into an amendment to the Investment Agreement, effective November 15, 2022, (the "Investment Agreement Amendment") allowing the

Company to use the net proceeds from the purchases of Preferred Stock for the substitute program, a program similar to the previous internal program first discussed in November 2021.

39.     The Initial Closing occurred on November 22, 2022.

40.     In early December 2022, Foxconn executives in Taiwan became aware for the first time of the Investment Agreement Amendment and demanded that Lordstown agree to its immediate recission.

41.     In desperate need for the financing promised by Foxconn, Lordstown agreed to execute the recission and enter into a new, more restrictive amendment (the "Recission Amendment") that also identified the substitute program.

42.     On January 24, 2023, Lordstown sent Foxconn its proposed program budget, development milestones and deliverables.

43.     On March 7, 2023, Lordstown's stock dropped below the $1.00 per share threshold set forth in NASDAQ Listing Rule 5450(a)(1) following increased uncertainty regarding the strength of the Company's partnership with Foxconn.

44.     On March 22, 2023, Foxconn delivered the first set of program deliverables contemplated by the Investment Agreement. However, a meeting to discuss the deliverables scheduled for March 23, 2023 was cancelled by Foxconn and never rescheduled. Lordstown never received any subsequent response from Foxconn on its proposals for budgeting and milestones.

45.     On April 19, 2023, NASDAQ issued a notice to Lordstown notifying the Company that it had a 180-day period to return the stock price to $1.00 per share.

46.     On April 21, 2023, Lordstown received a notice of default from Foxconn providing that Foxconn would terminate the Investment Agreement effective May 21, 2023, in the event the Company failed to cure the default as described in the NASDAQ Notice.

47.     On April 24, 2023, Foxconn received approval to complete the Subsequent Common Closing pursuant to the Investment Agreement and therefore purchase $47.3 million of common stock.

48.     On April 25, 2023, Lordstown responded to the Foxconn Notice (1) disputing that the NASDAQ Notice constituted a breach under the Investment Agreement, (2) noting that the Investment Agreement, by its terms, does not permit Foxconn to terminate it following the Initial Closing, and (3) in any event, Foxconn cannot exercise termination rights because Foxconn breached the Investment Agreement by failing to use necessary efforts to agree upon the budget and milestones to facilitate the Subsequent Preferred Closing. Foxconn did not respond to this letter.

**MATERIALLY FALSE AND MISLEADING STATEMENTS**

49.     The Class Period starts on August 4, 2022. On that day, Lordstown held a conference call with investors to discuss the Company's second quarter earnings for 2022. On that call, Defendant Hightower stated, in relevant part:

> As I also served as CEO of the Foxconn joint venture, I recently spent 2 weeks in Taiwan with Foxconn Chairman, Young Liu and his team. While in country, we had several meetings on how to best operationalize the JV and leverage our concept through launch vehicle development capabilities in concert with the Foxconn EV ecosystem. We also had several discussions about the first vehicle program of the JV, which we hope to announce in the coming months.

50.     The statement in ¶ 49 above was materially false and misleading for failure to disclose that when Hightower traveled to Taiwan to meet with Chairman Liu, Foxconn refused to provide access to engineering drawings or vehicle design data or establish a licensing deal, notwithstanding their representations in the JV Agreement. As a result, this statement misled the investing public into believing Foxconn and Lordstown were working cooperatively when that was anything but the case.

51.     On November 7, 2022, Lordstown published a press release titled, "Lordstown

Motors and Foxconn Broaden Strategic Partnership." Therein, Lordstown announced an agreement with Foxconn pursuant to which Foxconn agreed to make additional equity investments in Lordstown in the form of $70 million of Lordstown's Class A common stock, and up to $100 million of a newly created Series A Convertible Preferred Stock, subject to certain conditions.

52.     In the same press release, Defendant Hightower commented, ***"Over the last year, the LMC and Foxconn teams have worked collaboratively to bring the Endurance into commercial production, despite numerous external challenges."***

53.     On November 8, 2022, Lordstown held a conference call with investors to discuss the Company's third quarter earnings for 2022. On that call, Defendant Hightower stated, in relevant part:

> Yesterday we announced that Foxconn has agreed to make an additional investment in Lordstown Motors of approximately $170 million, subject to certain terms and conditions. $10 million of the investment will be in the form of LMC convertible preferred stock and will be used to fund in 3 phases our team's work in developing future electric vehicles in collaboration with Foxconn and its partners.
>
> This direct investment in LMC replaces the $100 million originally earmarked for the Foxconn LMC joint venture that we discussed on our last call.

54.     On that same call, in response to an analyst's question about the mechanics of the Investment Agreement and whether there was still a joint venture, Defendants Hightower and Kroll stated, in part:

> Hightower: So yes. The investment will be into Lordstown, and it will focus on the first product that we will do in combination or in collaboration with Foxconn. So it will replace what was going to be funding of the JV, and the work will be by the Lordstown team in collaboration with Foxconn and the investment will be in 3 tranches to Lordstown.
>
> Kroll: Yes. The joint venture, with standard obagi [*sic*], is being disbanded. We kind of think the direct investment in Lordstown is a better, simpler, easier structure. So I think it's very favorable.

55.     The same day, Lordstown issued a press release entitled, "Lordstown Motors

Reports Third Quarter 2022 Financial Results." Therein, the Company stated, in relevant part:

> Yesterday, LMC announced that Foxconn has agreed to make additional equity investments in LMC (collectively, the "Investment Transactions") of up to $170 million in the form of $70 million of LMC's Class A common stock and up to $100 million of a newly created Series A Convertible Preferred Stock ("Preferred Stock"). Upon completion of the Investment Transactions, Foxconn is expected to hold all of LMC's outstanding Preferred Stock and 18.3% of its Common Stock on a pro forma basis, and will have the right to designate two members of LMC's Board of Directors.

> Lordstown Motors will use the proceeds from the sale of Common Stock for general corporate purposes and the proceeds from the sale of the Preferred Stock to fund development and design activities for a new electric vehicle program in collaboration with Foxconn (the "EV Program"). The $100 million direct Preferred Stock Investment replaces the joint venture funding previously announced by Foxconn and LMC.

> Foxconn's Common Stock investment will be funded in two tranches. The first tranche of approximately $22.7 million is expected to close on or about November 22, 2022, subject to customary closing conditions. The second tranche of approximately $47.3 million is subject to regulatory approvals, including clearance by the Committee on Foreign Investment in the United States ("CFIUS"), as well as other customary closing conditions.

> Foxconn's Preferred Stock investment will be funded in three phases. The first $30 million will be funded, subject to satisfaction of certain closing conditions, simultaneously with the closing of the first tranche of Common Stock. The remaining shares of Preferred Stock will be purchased by Foxconn based on achieving certain EV Program funding milestones to be agreed-upon by the parties.

> ***Foxconn's additional investment in LMC is a strong sign of confidence in our team's product development and engineering capabilities and will help accelerate the EV ambitions of both companies.*** We continue to believe that deep collaboration with Foxconn, as its preferred North American vehicle development partner, and Foxconn's EV ecosystem, including MIH, is key to our company's long-term success.

56.     The above statements identified in ¶¶ 51-55 were materially false and/or misleading and failed to disclose material adverse facts about the Company's critical relationship with Foxconn because Defendants failed to disclose to investors that the Investment Agreement was the result of Foxconn's breach of the JV Agreement, and that Defendants actually believed that the parties' relationship to that point had been anything but "collaborative."

57.     On March 6, 2023, Lordstown held a conference call with investors to discuss the

Company's fourth quarter earnings for 2022. On that call, Defendant Kroll stated, in relevant part:

> Under the terms of the investment agreement we entered into with Foxconn in November and subject to regulatory approval, other conditions and satisfaction of EV program milestones, Foxconn is expected to purchase up to $117 million in additional common and preferred stock.

> \* \* \*

> Turning to our outlook. While our business model is more durable and operational execution has improved, we will continue to execute a capital-constrained business plan, making trade-offs on what and when we spend the funds we have. **Scaling the Endurance, even where we defined a strategic OEM partner, will require substantial additional capital.** While we expect $100 million in preferred stock funding under the Foxconn investment agreement, we'll cover the planned predevelopment work for the new vehicle program in 2023. Significantly, more capital will need to be raised to reach certification, homologation and commercial sales. In addition, our litigation contingencies could be material.

58. The same day, the Company issued a press release entitled, "Lordstown Motors Reports Fourth Quarter and Fiscal Year 2022 Financial Results." Therein, Defendants stated, in relevant part:

> **We continue to work collaboratively with Foxconn and the Mobility-in-Harmony ("MIH") Consortium on the pre-development work and vehicle development process ("VDP") deliverables for our next platform and vehicle program.** The next platform and vehicle program are key to Lordstown Motors' long-term business strategy and are becoming a greater portion of our Company's focus.

59. The above statements identified in ¶¶ 57-58 were materially false and/or misleading and failed to disclose material adverse facts about the Company's critical relationship with Foxconn because Defendants filed to disclose to investors that Lordstown and Foxconn were engaged in a dispute regarding the validity of an amendment to the Investment Agreement, jeopardizing a vital influx of capital the Company needed to survive.

## MATERIALIZATIONS OF THE STILL-CONCEALED RISK

60. On May 1, 2023 when Lordstown revealed in a regulatory filing that the Company received a letter from Foxconn on April 21, 2023 (1) asserting that the Company was in breach of the

Investment Agreement due to its previously disclosed receipt of a notice from NASDAQ indicating that the Company was no longer in compliance with the $1.00 minimum bid price requirement for continued listing on the NASDAQ and (2) purporting to terminate the Investment Agreement if the breach is not cured within 30 days. Moreover, the filing revealed that although Lordstown is in discussions with Foxconn to seek resolution, Foxconn declined to revoke its termination notice and failed to confirm that it would proceed with closing the agreement and any Preferred Stock closing.

61. On this news, the Company's share price fell $0.13 per share (pre-reverse split), or more than 25%, to close at $0.40 per share on May 1, 2023.

62. On May 23, 2023, Lordstown announced that the Company approved a proposal to effect a 1:15 reverse split of the Company's outstanding shares of Class A common stock. The Reverse Stock Split would automatically cause each 15 shares of the Company's issued and outstanding Class A common stock to be combined into one issued and outstanding share. The Reverse Stock Split was intended to improve the marketability and liquidity of the Class A common stock, as a higher market price can make the Class A common stock more attractive to a broader range of investors. In addition, the Reverse Stock Split was intended to increase the per share market price of the Class A common stock to avoid being delisted from the NASDAQ.

63. On this news, the Company's share price fell $0.43 per share, or approximately 11%, to close at $3.73 per share on a split-adjusted basis on May 24, 2023.

**THE TRUTH EMERGES**

64. On June 27, 2023, before the market opened, Lordstown commenced litigation (the "Foxconn Litigation") against Foxconn and several of its subsidiaries in the U.S. Bankruptcy Court for the District of Delaware alleging that contrary to Defendants' Class Period representations, Foxconn had engaged in fraud, bad faith, and failure to live up to its commercial and financial commitments to the Company throughout the parties' partnership. Specifically, Lordstown revealed

that Foxconn simply used its variety of contractual arrangements with the Company as a tool to "maliciously and in bad faith destroy" Lordstown's business—while leveraging resources gained through the partnership to advance its own business. Lordstown also revealed that the Company was pursuing a restructuring through a voluntary petition filed under chapter 11 of the U.S. Bankruptcy Code the same day.

65.     The same day in the Bankruptcy action, the Company detailed how Foxconn: (a) failed to grant the Company access to designs it committed to provide; (b) stalled agreement to a budget and timeline for the project as contemplated under the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed-upon commitments. Moreover, Foxconn failed to make minimum monthly payments to the JV and even refused to provide information about the JV's bank accounts to Lordstown.

66.     On this news, the Company's share price fell $0.54 per share, over 21%, to close at $2.29 per share on a split-adjusted basis on June 27, 2023.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities that acquired Lordstown securities during the period from August 4, 2022 through June 26, 2023, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

68.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lordstown's shares actively traded on the NASDAQ.

While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Lordstown shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Lordstown or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

69. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

71. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

     a. Whether Defendants violated the Exchange Act;

     b. Whether Defendants omitted and/or misrepresented material facts;

     c. Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

     d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

     e. Whether the price of the Company's shares was artificially inflated; and

     f. The extent of damage sustained by Class members and the appropriate measure of damages.

72.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

73.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Lordstown's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Lordstown's business, operations, and prospects as alleged herein.

74.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Lordstown's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

**LOSS CAUSATION**

75.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

76.     During the Class Period, Plaintiff and the Class purchased Lordstown's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**SCIENTER ALLEGATIONS**

77.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Lordstown, their control over, and/or receipt and/or modification of Lordstown's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Lordstown, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

78.     The market for Lordstown's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Lordstown's securities traded at artificially inflated prices during the Class Period.

On August 4, 2022, the Company's share price closed at a Class Period high of $2.98 per share (pre-reverse split). During the Class Period, the average daily trading volume was 552,675 shares. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Lordstown's securities and market information relating to Lordstown and have been damaged thereby.

79.     During the Class Period, the artificial inflation of Lordstown's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of false and/or misleading statements about Lordstown's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Lordstown and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

80.     At all relevant times, the market for Lordstown's securities was an efficient market for the following reasons, among others:

(a)     Lordstown met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Lordstown filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Lordstown regularly communicated with public investors via established market

communication mechanisms, through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Lordstown was followed by securities analysts employed by brokerage firms who wrote reports about the Company, such as Deutsche Bank, BTIG, and R.F. Lafferty, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

81. As a result of the foregoing, the market for Lordstown's securities promptly digested current information regarding Lordstown from all publicly available sources and reflected such information in Lordstown's share price. Under these circumstances, all purchasers of Lordstown's securities during the Class Period suffered similar injury through their purchase of Lordstown's securities at artificially inflated prices and a presumption of reliance applies.

82. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded to some extent on Defendants' material omissions. Insofar as this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that

requirement is satisfied here.

## NO SAFE HARBOR

83.     The statutory safe harbor provided for forward-looking statements under certain

conditions does not apply to any of the allegedly false statements pleaded in this Complaint.  The

specific statements pleaded herein were not identified as forward-looking statements when made.

To the extent there were any forward-looking statements, there were no meaningful cautionary

statements identifying important factors that could cause actual results to differ materially

from those in the purportedly forward-looking statements.

## COUNT ONE
### Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

84.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully

set forth herein.

85.     During the Class Period, Defendants disseminated or approved the false

statements specified above, which they knew or deliberately disregarded were misleading in that

they contained misrepresentations and failed to disclose material facts necessary to make the

statements made, in light of the circumstances under which they were made, not misleading.

Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed

devices, schemes, and artifices to defraud; made untrue statements of material fact and/or omitted

to state material facts necessary to make the statements not misleading; and (iii) engaged in acts,

practices, and a course of business which operated as a fraud and deceit upon those who

purchased or otherwise acquired the Company's securities during the Class Period.

86.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

the market, they paid artificially inflated prices for the Company's shares.  Plaintiff and the Class

would not have purchased the Company's shares at the price paid, or at all, if they had been aware

that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT TWO**
**Violation of § 20(a) of the Exchange Act**
**(Against All Defendants)**

87.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

88.     Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions at the Company, Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. Defendants were provided with or had unlimited access to the documents described above that contained statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

(b)     awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at

trial, including pre-judgment and post- judgment interest thereon.

(c)     awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d)     awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 26, 2023

Respectfully submitted,

**CLIMACO WILCOX PECA & GAROFOLI CO, LPA**

*/s/ Scott D. Simpkins*
Scott D. Simpkins (0066775)
55 Public Square, Suite 1950
Cleveland, OH 44113
Telephone: (216) 621-8484
Email: sdsimp@climacolaw.com

*Local Counsel for Plaintiff*

**KIRBY McINERNEY LLP**
Ira M. Press
Lauren K. Molinaro
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
Email: ipress@kmllp.com
      lmolinaro@kmllp.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100

Los Angeles, CA 90067
Telephone: (310) 914-5007
Email: fcruz@frankcruzlaw.com

*Counsel for Plaintiff*