**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW STRICKLAND and JOSHUA STRICKLAND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EDWARD HIGHTOWER, ADAM KROLL and DANIEL A. NINIVAGGI,<br><br>Defendants. | Case No. 4:23CV1454<br><br>JUDGE BENITA Y. PEARSON<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

NATURE AND SUMMARY OF THE ACTION ........................................................ 1

JURISDICTION AND VENUE ............................................................................... 8

THE PARTIES........................................................................................................ 9

    A.    Plaintiffs ..................................................................................... 9

    B.    Defendants .................................................................................. 9

    C.    Relevant Non-Party ..................................................................... 10

    D.    Confidential Witnesses ................................................................ 11

BACKGROUND OF THE CLAIMS ...................................................................... 12

I.     BACKGROUND OF LORDSTOWN ............................................................. 12

II.    LORDSTOWN ENTERS INTO AN AGREEMENT IN PRINCIPAL WITH FOXCONN ..................................................................................................... 12

III.   FOLLOWING THE AIP, LORDSTOWN AND FOXCONN ENTER INTO THE AGREEMENT TO SELL THE LORDSTOWN FACILITY (THE APA), WHICH ALSO CONTEMPLATED ENTERING INTO THE CONTRACT MANUFACTURING AGREEMENT AND THE JOINT VENTURE .......................... 15

IV.   LORDSTOWN DID NOT DISCLOSE TO INVESTORS THAT IT BELIEVED FOXCONN INTENTIONALLY SABOTAGED ITS PARTNERSHIP WITH LORDSTOWN TO MISAPPROPRIATE LORDSTOWN'S RESOURCES ................. 16

    A.    Foxconn Stalled Entering Into The Joint Venture and Contract Manufacturing Agreement ...................................................... 16

    B.    Foxconn's Actions That Stymied Development of the Electric Vehicle Platform That Lordstown Claimed Breached the Terms of the JVA .................... 19

    C.    Foxconn Insists that The Parties Restructure Their Relationship ........................ 24

    D.    Foxconn Further Delayed Action in Order to Avoid Paying Its Commitments Under the Investment Agreement ........................................................ 28

    E.    Lordstown Claims That Foxconn Improperly Attempted To Terminate The Investment Agreement Because of the NASDAQ Letter ..................................... 30

MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD........................................................................................... 35

THE TRUTH BEGINS TO EMERGE ................................................................. 67

    A.    Lordstown Proposed a Reverse Stock Split ...................................... 67

i

B.      Lordstown Received A Delisting Letter From NASDAQ ................................... 67

C.      Lordstown Was Forced To Partially Disclose The True State of Its Relationship With Foxconn ..................................................................... 68

THE TRUTH IS FINALLY DISLCOSED ................................................................... 71

ADDITIONAL SCIENTER ALLEGATIONS ............................................................. 73

A.      *Respondeat Superior* and Agency Principles Apply ............................... 73

B.      Defendants Knew Or Were Reckless In Not Knowing That Foxconn Was Not a Viable Partner and Was Not Acting in Good Faith .................................... 73

1.      Defendants Were Aware of The Conditions of the JVA and the Investment Agreement ............................................................... 75

2.      Defendants Were Aware of the Hugely Negative Implications of Foxconn's Breaches of the JVA and the Investment Agreement ............ 76

3.      Defendants Were Aware that Foxconn Was Stymieing the Commercial Launch of the Endurance ...................................... 80

4.      The Poor Relationship Between Lordstown and Foxconn Was Known Internally at Lordstown ................................................................ 83

5.      Foxconn's Investment Was Vital To Lordstown's Operating Costs and Balance Sheet ................................................................................. 85

C.      Foxconn's Partnership Was a Core Operation of Lordstown ............................. 87

D.      Defendants Were Motivated To Conceal Foxconn's Wrongdoing In Order To Lure In Potential Investors ......................................................................... 88

E.      Defendants' Certifications Pursuant to the Sarbanes-Oxley Act of 2002 Demonstrate Scienter ..................................................................... 91

LOSS CAUSATION ........................................................................................... 91

CONTROL PERSON LIABILITY .......................................................................... 94

APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE ................................... 95

THE AFFILIATED UTE PRESUMPTION ................................................................ 96

NO SAFE HARBOR .......................................................................................... 96

CLAIMS FOR RELIEF ....................................................................................... 98

COUNT I ........................................................................................................ 98

COUNT II ..................................................................................................... 100

CLASS ACTION ALLEGATIONS ......................................................................... 101

PRAYER FOR RELIEF .......................................................................................................... 103

JURY TRIAL DEMAND ....................................................................................................... 104

Lead Plaintiffs Andrew Strickland and Joshua Strickland ("Plaintiffs"),[1] individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters. Plaintiffs' information and belief is based on the substantial investigation by Plaintiffs' counsel into the facts and circumstances alleged herein, including the following:  (i) a review and analysis of public filings referenced herein made by Lordstown Motors Corp. ("Lordstown" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) a review and analysis of press releases, analyst reports, public statements, news articles, and other publications referenced herein disseminated by or concerning Lordstown and Defendants named herein, including the dissemination of information on the Internet; (iii) a review and analysis of public filings in the Lordstown bankruptcy and adversary proceedings in Bankruptcy Court in the District of Delaware; (iv) a review and analysis of Company conference calls, press conferences, and related statements and other materials referenced herein; and (v) review and analysis of those other documents referenced herein.

Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Lordstown securities between August 4, 2022 through June 26, 2023, both dates inclusive (the "Class

---

[1]      Pursuant to Rule 10(a) of the Federal Rules of Civil Procedure, Plaintiffs have amended the case caption to reflect the Stricklands' appointment as Lead Plaintiffs to represent the putative class.

Period") to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      This case arises from the difference between the "collaborative" and "transformative" business relationship that Defendants claimed to exist between Lordstown – an electronic vehicle ("EV") startup – and Foxconn[2] – the large Taiwanese electronics manufacturer that had purportedly agreed to desperately needed financing and other commitments – and the truth of the relationship, which was in fact so contentious and difficult that Lordstown initiated litigation claiming that Foxconn's actions were fraudulent, in breach of numerous agreements with the Company and effectively drove the Company into bankruptcy.

3.      Lordstown was established to develop an all-electric, full-size pickup truck for the North American Market called the Endurance.  In 2019, the Company structured a deal to buy one of the largest automotive assembly plants in North America, located in Lordstown Ohio, from General Motors.  Lordstown then went public on October 26, 2020, listing under the ticker symbol RIDE on the NASDAQ.  The Company touted that its prospects were "exciting and attractive."  After its IPO, Lordstown had a market capitalization of over $5.3 billion.  Lordstown was among several EV startups labeled by certain wall street analysts as "EV darlings" as its stock traded at nearly $30 per share.

4.      By June 2021, the Company claimed in its SEC quarterly report that it was on track to begin early production units in late September 2021 and complete vehicle validation and regulatory approvals by January 2022 followed by deployments to selected early customers in the

---

[2]      The term "Foxconn" refers to Hon Hai Precision Industry Co. Ltd. The agreements described herein were entered into by Lordstown Motors Corp. and/or an affiliate of Lordstown and affiliates and/or subsidiaries of Foxconn. The specific entities entering into these agreements are described fully below.

first quarter of 2022 in advance of commercial production and launch in the second quarter of 2022 with the ramp planned to accelerate in the second half of 2022. However, the Company faced "daunting challenges" including the need for "adequate financing," which was significant: Lordstown reported significant increases in expenses in the first half of 2021.  It had agreements with battery cell suppliers that obligated it to make purchases of approximately $16.3 million, $139.4 million and $273.6 million in 2021, 2022, and 2023, respectively.  The Company reported that it was considering numerous financing options to "alleviate these conditions".

5.      To address these daunting challenges, the Company announced in September 2021, that it had reached an agreement in principle ("AIP") with Foxconn to work jointly on the Company's EV program out of the Lordstown facility (the joint venture, "JV").  The parties would use commercially reasonable best efforts for Foxconn to buy Lordstown's manufacturing plant for $230 million (the asset purchase agreement, "APA"), and as a condition of the plant purchase, they would negotiate the terms under which Foxconn would manufacture the Endurance at the Lordstown plant using Lordstown employees ( the contract manufacturing agreement, "CMA").  Foxconn would buy approximately $50 million in Lordstown common stock, and Lordstown would issue warrants to Foxconn that would be convertible to 1.7 million additional shares.  In the press release announcing the AIP, executives from Lordstown and Foxconn referred to this agreement as a "partnership" to integrate resources and allow Lordstown to accelerate overall scaled vehicle production.

6.      Initially, the relationship with Foxconn appeared to proceed pursuant to the AIP. Foxconn made its $50 million common stock purchase in October 2021 and on November 10, 2021, the APA was executed.  According to Lordstown's complaint that was later filed against Foxconn in its Bankruptcy Adversary Proceeding, the APA (pursuant to which the Lordstown

facility was sold to Foxconn at a fraction of its replacement cost) was not a standalone deal but was an initial step to reposition the Company around the Foxconn partnership.  On May 11, 2022, Lordstown announced that it had closed the APA and that the JV and CMA had been executed.

7.      The JV with Foxconn called for the parties to co-design and develop vehicle programs for the global commercial fleet market of all-electric trucks. The JV Agreement contemplated that the JV's first vehicle program would be based on certain vehicle designs that a Foxconn affiliate had already largely developed.  Under the JV Agreement, Foxconn agreed to make capital contributions to the JV of up to $100 million—money needed by Lordstown to continue to operate.

8.      However, in November 2022, the Company disclosed that it had entered into a new Investment Agreement with Foxconn for Foxconn to invest an "additional" $170 million into Lordstown. Only upon being directly asked during a conference call by an analyst about the status of the JV did Hightower and Kroll admit that the JV had been replaced and disbanded. Kroll described the new Investment Agreement as "better, simpler, easier structure. So I think it is very favorable." Hightower claimed that the work "will be by the Lordstown team in collaboration with Foxconn . . . ." Similarly, Defendants claimed that Foxconn's additional investment in Lordstown was a strong sign of confidence in Lordstown's product development and engineering capabilities and would help accelerate the EV ambitions of both companies.

9.      The positive statements to the market described above were lies.  Unbeknownst to investors, the abandonment of the JV was, according to Lordstown's bankruptcy adversary filing, caused by Foxconn's failure to provide Lordstown with the necessary engineering drawings, data, and essential licensing agreements for vehicle models proposed through their future EV

program, which Lordstown had alleged in a letter to Foxconn constituted a breach of the JV. Furthermore, the "better, simpler, easier structure" of the Investment Agreement was according to Lordstown claims in the adversary proceeding renegotiated within weeks of the public disclosure of the new investment agreement and then renegotiated again in December 2022 from pressure by Foxconn imposing more restrictive terms on Lordstown.

10. Indeed, Lordstown later admitted in its adversary proceeding against Foxconn that during the time of the Class Period in this case:

- Foxconn stymied the Company's attempts to move forward with the partnership to develop future Lordstown vehicles under the JV Agreement (¶ 37);[3]

- Foxconn stonewalled Lordstown's efforts regarding the JV at each and every turn. Foxconn and its affiliate's actions were driven by Foxconn, which was determined to maliciously and in bad faith destroy Lordstown's business in an effort to strip Lordstown's assets and poach its talent at little cost (¶ 42)

- Lordstown had sent Foxconn a letter on October 14, 2022 that Foxconn had breached the JVA and CMA (¶ 41), which resulted in the parties having to renegotiate their relationship and Lordstown having to abandon the JVA (¶ 44);

- From the very beginning, Foxconn had been continually moving the goal posts on development of Lordstown's next generation products, constantly shifting the nature of the product, failing to meet funding commitments, and absolutely

---

[3] References to "¶ " are to the Adversary Complaint filed by Lordstown Motors Corp. and Lordstown EV Corporation in *Lordstown v. Hon Hai Precision Industry Co., Ltd., et al.*, No. 23-bk-50414 (Bankr. D. Del. June 27, 2023), ECF No. 1 ("Bankruptcy Complaint" or "Bankr. Compl."), attached as Exhibit 1 hereto.

refusing to engage with Lordstown on any of the various initiatives that Foxconn directed Lordstown to pursue and purported to support (¶ 6);

- Foxconn continuously misled Lordstown about its own ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing Lordstown to devote substantial resources to the same cause (¶ 4);

- Foxconn consistently failed to honor its agreements and caused its affiliates and instrumentalities to do the same. ¶ 7.

11.     On March 7, 2023, Lordstown's stock price dropped below the $1.00 per share threshold set forth in NASDAQ Listing Rule.  On April 11, 2023, anticipating that NASDAQ would issue the Company a delisting notice, the Company proposed in its annual meeting proxy to approve a reverse stock split of its common stock at a ratio ranging from 1:3 to 1:15 in order to meet the NASDAQ minimum bid offer requirement of $1.00 per share. The market was shocked to discover the financial distress facing Lordstown and, on this news, the price of Lordstown's shares reached a record low of $0.54 and closed at a price approximately 7.83% lower from the close price on April 10, 2023.

12.     On April 19, 2023, NASDAQ issued a letter to Lordstown threatening to delist its stock.  On this news, the price of Lordstown's shares dropped to $0.53 at close on April 19, 2023.  The close price was approximately 6.01% lower than April 18, 2023, and dropped approximately 8.28% the next day on April 20, 2023.

13.     The concealed risks surrounding the true nature of Lordstown's business relationship with Foxconn and the Company's dependence on the Foxconn funding began to materialize on May 1, 2023, when Defendants' disclosed in an SEC filing that Foxconn had sent

it a letter on April 21, 2023, claiming it was in breach of the Investment Agreement because Lordstown's stock price had fallen below $1.00 per share and was threatened with delisting by NASDAQ and threatened not to provide the additional funding it had agreed to in the Investment Agreement.  Lordstown's SEC filing also disclosed that it considered FoxConn's termination notice to be invalid and that Foxconn declined to revoke its "invalid" termination notice. Lordstown also disclosed without Foxconn's funding, they would be "deprived of critical funding necessary for its operations."

14.     The completely unexpected revelation that Lordstown was dependent on the funding from the Investment Agreement to continue operating once again caused shock to the market and on this news, the price of Lordstown's shares dropped to $0.40, or approximately 23.33% at the close on May 1, 2023.

15.     On June 9, 2023, Lordstown partially disclosed  the true nature of the relationship with Foxconn by stating their belief that Foxconn's various breaches of the Investment Agreement and pattern of bad faith had caused material and irreparable harm to Lordstown who also disclosed their intention to enforce their rights through litigation.

16.     On this news, the price of Lordstown's shares dropped to $3.08, or an approximate 3.75% decrease at the close on June 9, 2023.

17.     Finally, on June 27, 2023, Lordstown announced a restructuring process, and filed a voluntary petition for Chapter 11 Bankruptcy and an adversarial complaint against Foxconn in the United States Bankruptcy Court for the District of Delaware.  The Bankruptcy adversarial complaint finally revealed the full the details of Foxconns' actions actions and accused Foxconn of intentionally raiding Lordstown's business and driving the Company into bankruptcy.

18. On this news, the price of Lordstown's shares dropped approximately 17.18%, from $2.77 at the close on June 26, 2023 to $2.29 at the close on June 27, 2023.

19. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities when the true facts came to light, Plaintiff and other Class Members suffered significant losses and damages.

## JURISDICTION AND VENUE

20. This action arises under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) & 78t(a)), and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21. This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) as the alleged misstatements entered and subsequent damages took place in this Judicial District. Pursuant to Lordstown's most recent annual report on Form 10-K, as of March 3, 2023, there were 238,985,109 shares of the Company's Class A common stock outstanding. Lordstown's common stock trades on the NASDAQ Stock Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in Lordstown stock located in the U.S., some of whom undoubtedly reside in this District.

23. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

### A.    Plaintiffs

24.    As evidenced by their certification, *see* ECF No. 20-1 at 7-140 (Exhibit B),
Plaintiffs purchased Lordstown securities at artificially inflated prices during the Class Period
and were damaged thereby.

### B.    Defendants

25.    Defendant Edward Hightower ("Hightower") has served as Lordstown's Chief
Executive Officer ("CEO") and Chairman of the Board of Directors since July 2022.

26.    Defendant Adam Kroll ("Kroll") has served as Lordstown's Chief Financial
Officer since October 2021.

27.    Defendant Daniel A. Ninivaggi ("Ninivaggi") served as CEO of Lordstown from
August 2021 to July 2022, and has served as the Company's Executive Chairman since May
2022.

28.    Defendants Hightower, Kroll and Ninivaggi are collectively referred to herein as
"Defendants."

29.    Defendants, because of their positions with the Company, possessed the authority to
control, correct, and/or update the contents of Lordstown's public disclosures to the market.  Each
of the Defendants had the duty to exercise due care and diligence and the duty of full and candid
disclosure of all material facts relating to the Company's financial results and operations.
Defendants further had the duty to correct and/or update any previously issued statements that were
untrue or became materially misleading or untrue, so that the market price of the Company's public
securities would be based upon truthful, complete, and accurate information.  To discharge their
duties, Defendants were required to exercise reasonable and prudent supervision over the

dissemination of information concerning the Company's financial results and operations. By virtue of such duties, these officers and directors were required, *inter alia*, to:

    a)    conduct and supervise the business of Lordstown in accordance with federal laws;

    b)    supervise the preparation of Lordstown's SEC filings and approve any reports concerning Lordstown's financial reporting and results; and

    c)    ensure that Lordstown established and followed adequate internal controls.

30.    As officers, directors, and/or controlling persons of a publicly-held company which is registered with the SEC under the federal securities laws and the securities of which were traded on the NASDAQ and governed by the provisions of the federal securities laws, Defendants each had a duty to (1) promptly disseminate complete, accurate and truthful information with respect to the Company's financial statements and operations; (2) correct any previously issued statements that were materially misleading or untrue so that the market could accurately price the Company's publicly traded securities based upon truthful, accurate, and complete information; and (3) update any previously-issued statements that became materially misleading or untrue so that the market could accurately price the Company's publicly traded securities based upon truthful, accurate, and complete information.

31.    Defendants are each primarily liable for the misrepresentations and misleading statements alleged herein and are also liable as controlling persons of Lordstown. The scheme deceived the investing public regarding Lordstown's financial condition, which caused Plaintiffs and other members of the Class to purchase Lordstown securities at artificially inflated prices during the Class Period and suffer damages as a result.

**C.    Relevant Non-Party**

32.    Lordstown is an electric vehicle innovator developing high-quality light duty commercial fleet vehicles. Lordstown is incorporated in Delaware, with its headquarters located at

2300 Hallock Young Road, Lordstown, Ohio 44481.  During the Class Period, Lordstown common stock traded on the NASDAQ under the ticker symbol "RIDE."

33.     Lordstown EV Corporation is a Delaware corporation and an affiliate of Lordstown.

**D.     Confidential Witnesses**

34.     Confidential Witness One ("CW-1") worked at Lordstown, and then Foxconn as a Manufacturing Engineering Manager from January 2021 to January 2023.  CW-1 then worked as a Manufacturing Engineering/Facility Planning Manager for Foxconn from January 2023 to April 2023.  While employed by Lordstown and then Foxconn, CW-1 was supervised by Shane Brown ("Brown"), who was the Director of Paint Operation at Lordstown Motors from October 2019 to March 2023, and has served as the Plant Manager for Foxconn EV Systems from January 2022 to the present.  Brown was supervised by Rick Rajale who has served as the Vice President of Product & Business Development—Electric Business Initiatives at Foxconn from March 2021 to the present.

35.     Confidential Witness Two ("CW-2") worked at the Lordstown Motors plant in Farmington Hills, Michigan as the Product Lifecycle Management/Configuration, Bill of Materials Specialist from October 2022 to July 2023.  CW-2 was primarily supervised by Laura Brdak, who served as the Senior Product Lifecycle Administrator/Project Manager for Lordstown and then Foxconn from March 2020 to July 2023, as well as Product Lifecycle Management/Change Management Supervisor from June 2021 to July 2023.

36.     Confidential Witness Three ("CW-3") served as a Senior Design Engineer—Restraints, Steering Wheels & ADAs at Lordstown's facility in Farmington Hills, Michigan from December 2021 to July 2023.

## BACKGROUND OF THE CLAIMS

### I.  Background of Lordstown

37.   Lordstown was founded in 2018 with the purpose of developing and manufacturing light duty electric trucks targeted for sale to fleet customers.  In 2019, the Company purchased a 6.2 million square foot manufacturing facility located in Lordstown, Ohio, which is one of the largest automotive manufacturing facilities in North America.  *See* ¶ 2.

38.   Since the Company's inception, it has been developing its flagship vehicle, the Endurance, an electric full-size pickup truck.  The Endurance was publicly introduced in June 2020 and the Company planned that it would launch for sale in 2021.  ¶ 20.  However, Lordstown experienced challenges that delayed the launch of the Endurance.  ¶ 21.

39.   By June 2021, the Company was claiming that it was on track to begin early production units in late September 2021 and complete vehicle validation and regulatory approvals by January 2022 followed by deployments to selected early customers in the first quarter of 2022 in advance of commercial production and launch in the second quarter of 2022 with the ramp planned to accelerate in the second half of 2022.  However, the Company also reported that it faced "daunting challenges" including the need for "adequate financing," which was significant: Lordstown reported significant increases in expenses in the first half of 2021.  It had agreements with battery cell suppliers that obligated it to make purchases of approximately $16.3 million, $139.4 million and $273.6 million in 2021, 2022, and 2023, respectively.  The Company reported that it was considering numerous financing options to "alleviate these conditions".

### II.  Lordstown Enters Into An Agreement in Principal With Foxconn

40.   In September 2021, Lordstown signed the Agreement in Principle ("AIP") with Hon Hai Precision Industry Co., Ltd., doing business under the name "Foxconn." ¶¶ 1, 4.  The

AIP was executed by Lordstown's affiliate Lordstown EV Corporation and Foxconn affiliate

Foxconn Asset Management LLC.  *See* Bankr. Compl. at Ex. A.

41.     Foxconn is based in Taiwan and purports to be the world's largest electronics

manufacturer.  With extensive resources and large economies of scale, Foxconn has established

R&D and manufacturing centers in numerous markets around the world including China, India,

Japan, Vietnam, Malaysia, Czech Republic, the U.S., and more.   In 2022, Foxconn's annual

revenue reached a massive $219 billion.

42.     In 2021, Foxconn declared its intention to expand its capabilities in the

development of electric vehicles.  ¶ 22.  As part of that effort, Foxconn established the Mobility-

in Harmony ("MIH") Consortium, which was designed to bring together the talent and resources

of hundreds of automotive companies to accelerate electric vehicle growth.  *Id.*  Foxconn

disclosed that it hoped to gain 5% of overall electric vehicle market share by 2025 and produce

500,000 to 700,000 electric vehicles per year.  *Id.*

43.     As part of its initiative to develop electric vehicles, Foxconn sought out a partner

in the United States to establish a presence in the U.S. Market.  Foxconn represented to

Lordstown that its scale and expertise would be of great benefit to Lordstown.  *Id.*  Thus, the

goal of Lordstown's partnership with Foxconn was to combine Foxconn's resources and

efficiencies with Lordstown's innovation, technology, manufacturing plant, and human resources

to jointly develop the next generation of electric vehicles.  ¶ 3.

44.     In the AIP, Lordstown and Foxconn agreed to the following future agreements as

part of their "partnership": (a) Lordstown and Foxconn would enter into an asset purchase

agreement (the "APA") to buy Lordstown's manufacturing plant for a purchase price of $230

million, to purchase $50 million in shares of Lordstown's common stock, and to procure

Lordstown warrants exercisable for 1.7 million shares of common stock; (b) Lordstown and Foxconn would enter into a manufacturing supply agreement (referred to in the Bankruptcy Complaint as the "Contract Manufacturing Agreement" or "CMA")"), and (c) Lordstown and Foxconn would enter into a joint venture agreement (the "JVA") in order to form a joint venture called MIH EV Design LLC through which the companies would collaborate on the development of future electric vehicle programs. ¶ 23; Bankr. Compl. at Ex. A.

45.    The parties also entered into a subscription agreement, under which Foxconn would purchase approximately $50 million of Lordstown common stock directly from Lordstown Motors at a price of $6.8983 per share. Bankr. Compl. at Ex. A.

46.    The AIP procured funding that Lordstown needed to continue to develop its fleet of electric vehicles. *Id.* at ¶ 23 Bankr. Compl. at Ex. A. In the press release announcing the AIP, Daniel Ninivaggi, Chief Executive Officer of Lordstown at the time stated "We are excited about the prospect of joining forces with a world-class smart manufacturer like Foxconn and believe the relationship would provide operational, technology and supply chain benefits to our company and accelerate overall scaled vehicle production and increase employment in the Lordstown facility. The partnership would allow Lordstown Motors to take advantage of Foxconn's extensive manufacturing expertise and cost-efficient supply chain, while freeing up Lordstown Motors to focus on bringing the Endurance to market, developing service offerings for our fleet customers and designing and developing innovative new vehicle models."

47.    Foxconn's Chairman, Young Liu, also publicly touted the deal stating "We have high expectations through this partnership that we will be able to successfully integrate our resources with Lordstown Motors. In addition to achieving the goal of moving ahead our timeline to establish electric vehicle production capacity in North America, it also reflects

Foxconn's flexibility in providing design and production services for different EV customers. This mutually beneficial relationship is an important milestone for Foxconn's EV business and our transformation strategy. I believe that the innovative design of the Endurance pickup truck, with its unique hub motors, delivers an advantageous user experience and has manufacturing efficiencies. It will undoubtedly thrive under our partnership and business model."

**III.** **Following the AIP, Lordstown and Foxconn Enter into the Agreement to Sell the Lordstown Facility (the APA), Which Also Contemplated Entering into the Contract Manufacturing Agreement and the Joint Venture**

48.      Pursuant to the AIP, on November 10, 2021, Lordstown and two affiliates of Foxconn, Foxconn EV Technology and Foxconn (Far East) Limited, executed the APA for the Lordstown Plant.  ¶ 28.  As part of the agreement, the manufacturing plant would be sold to Foxconn EV Technology and the hundreds of talented Lordstown employees who worked there would become employees of Foxconn EV Systems LLC.  *Id.*

49.      The APA also provided that the parties would use all commercially reasonable efforts to, among other things, enter into the CMA by April 30, 2022 and enter into the JV to formalize the joint venture arrangement.  ¶ 29.  The purpose of the JVA was to: (a) allocate engineering resources to jointly design, engineer, develop, validate, industrialize, and launch vehicle programs for commercial sale using Foxconn's MIH platform; (b) grant Lordstown the right to commercialize vehicle programs in North America, subject to satisfying reasonable volume requirements and certain other conditions; (c) grant Foxconn the right to manufacture any vehicles in the Lordstown facility, subject to the CMA; and (d) grant Foxconn the right to commercialize vehicle programs outside North America, subject to the payment of reasonable licensing fees.  *Id*.

50.      As alleged by Lordstown, the Company would never have sold its most valuable asset for a fraction of its replacement cost without the CMA and without assurances from

15

Foxconn that they would support the Endurance, enter into a JV Agreement and follow through on their commitments to joint vehicle development leveraging the Foxconn EV Ecosystem. ¶ 30.

IV. **Lordstown Did Not Disclose to Investors that It Believed Foxconn Intentionally Sabotaged Its Partnership With Lordstown To Misappropriate Lordstown's Resources**

A. **Foxconn Stalled Entering Into The Joint Venture and Contract Manufacturing Agreement**

51. After signing the APA on November 10, 2021, Lordstown disclosed in its Bankruptcy Complaint that there were numerous serious issues with Foxconn meeting its contractual obligations to Lordstown to enter into the CMA and JV.

52. According to Lordstown's Bankruptcy Complaint, following entry into the APA, Foxconn began dragging its feet in developing the company's joint venture platform. ¶ 32. Lordstown quickly circulated term sheets providing more detailed plans for the partnership, although Foxconn was very slow to engage. *Id.* Eventually, in April 2022, five months after the APA was signed, Foxconn senior executives, including Chairman Liu, informed Lordstown that Foxconn would not even discuss the joint venture before closing the APA. *Id.*

53. According to Lordstown, Foxconn finally agreed to sign the CMA and the JV Agreement because it was eager to secure ownership of the Lordstown Plant by closing on the sale. Therefore, on May 11, 2022, Foxconn "relented and agreed to enter into the JV" Agreement. ¶ 33; Bankr. Compl. at Ex. D. On the same day, the parties closed the APA and executed the CMA. ¶ 33; Bankr. Compl. at Ex. C.

54. Pursuant to the CMA, Lordstown outsourced all of the manufacturing of the Endurance to an affiliate of Foxconn, Foxconn EV System LLC ("Foxconn EV"), which would manufacture the Endurance at the Lordstown facility for a per-vehicle fee. *Id.*

55.     Additionally, the CMA provided that Foxconn EV would use all commercially reasonable efforts: (a) to improve commercial terms with Lordstown's suppliers; (b) to transition procurement of components to Foxconn as expeditiously as possible, but no later than October 15, 2022; and (c) during the transition period, to assist the Company with purchasing efforts, managing and communicating with suppliers, and improving the commercial terms with suppliers.  *Id.*  However, according to Lordstown's adversarial complaint in bankruptcy court, Foxconn never intended to achieve these initiatives.  They were simply empty promises designed to procure Lordstown's plant and people and starve the Company out of existence.  *Id.*  Indeed, according to CW-3, Foxconn's continued delays in providing funding to Lordstown (set forth more fully below) were negatively impacting Lordstown's relationship with suppliers and those relationships were "going south."

56.     The JV Agreement ("JVA") also was executed on May 11, 2022.  ¶ 33; Bankr. Compl. at Ex. D.  The JVA involved the formation of a limited liability company called MIH EV Design LLC involving Foxconn EV Technology, Inc. ("Foxconn EV") and Lordstown EV Corporation. *Id.* The JVA provided that Foxconn would make a capital contribution of $100 million to the joint venture.  ¶ 40.  However, the capital contribution would not be required until the parties agreed upon a budget for the joint venture.  *Id*.

57.     Foxconn EV owned 55% of the joint venture and Lordstown owned 45% of the joint venture.  ¶ 34.  Despite this ownership structure, Lordstown provided nearly all of the personnel required to operate the venture, including the chief executive.  *Id.*

58.     As claimed by Lordstown, given that the JV was largely dependent on Lordstown's personnel, it was necessary to put in place a Management Services Agreement between the JV (i.e., the MIH EV Design LLC, *id.* at Ex. D) and Lordstown. The parties

acknowledged that a Management Services Agreement was required to operate the joint venture. *Id.* However, Foxconn did not respond to an initial draft of the agreement for more than a month. *Id.*

59. Once it did enter discussions, Foxconn attempted to shoehorn in a spending approval clause that would require a Foxconn representative to approve every dollar spent by the joint venture. *Id.* This was directly contrary to the JVA, which provided that the parties would agree upon an annual budget, and only expenditures that exceed 5% of the budgeted amount would require Foxconn's approval. *Id.*

60. Foxconn ultimately never agreed to a Management Services Agreement, and the joint venture was eventually dissolved after five months at Foxconn's request, as explained more fully below.

61. Around this time, it became apparent to CW-1, who was a Manufacturing Engineering Manager at the Lordstown plant, that from the Director-level and above that Foxconn personnel were planning to "do what Foxconn does" meaning to starve out Lordstown and misappropriate its assets. According to CW-1, in essence, Foxconn will offer financing to a company like Lordstown, but withhold financing until the company goes bankrupt in order to acquire the proprietary resources from the company for "pennies on the dollar" in bankruptcy.

62. CW-1 and other Foxconn personnel with whom CW-1 worked were of the personal belief that Foxconn intended to "let Lordstown fail." CW-1 and other Foxconn employees formed this belief because Foxconn "made it hard for Lordstown to do work in the plant." More specifically, starting in late 2022, CW-1's supervisor told him, "don't help Lordstown" and to "let them figure it out" when problems emerged that Lordstown needed Foxconn's help to resolve. When Foxconn acquired the Lordstown plant, almost all of

Lordstown's employees went to work for Foxconn.  Therefore, Lordstown was forced to hire new, inexperienced employees to fill the void   The Foxconn managers who instructed CW-1 and others to not assist these new employees included Directors, Vice Presidents, and the President, including Shane Brown and Rick Rajale.

63.     Thus, according to CW-1, from late 2022 onward, Foxconn "put roadblocks in the way" and would not help Lordstown when, for example, equipment broke down or other manufacturing issues arose at the Lordstown plant, even though Foxconn personnel knew how to fix and resolve the issues.  CW-1 explained that when CW-1 asked CW-1's managers why Foxconn was "causing [Lordstown] so much trouble[,] we were told that we were not Lordstown employees anymore" and therefore, whatever issues Lordstown was experiencing, they were "not your problem."  CW-1 discussed with other Foxconn employees "around the plant" that Foxconn's plan was likely to deliberately drive Lordstown into bankruptcy.

**B.     Foxconn's Actions That Stymied Development of the Electric Vehicle Platform That Lordstown Claimed Breached the Terms of the JVA**

64.     The JVA provided that the joint venture's first vehicle program would be largely based on certain vehicle designs that Foxtron, a Foxconn affiliate in Taiwan, had already developed.  ¶ 35.  The vehicles were known as the Model C, a mid-size crossover, and the Model E, a large sedan.  *Id.*  According to Lordstown's Bankruptcy Complaint, Foxconn committed to Lordstown that it would grant full access to the data and information regarding the Model C and Model E vehicle designs that were necessary for the joint venture management team to decide what modifications would be required to manufacture the vehicles in North America.  *Id*.

65.     However, once again, Foxconn failed to live up to its end of the bargain.  Foxconn was slow to respond, or failed to respond at all, to the Model C commitments that it made under the JVA.  *Id.*  Foxconn also stalled Lordstown's attempts to agree on a budget and timeline for the

project as contemplated by the JVA. ¶ 37. Additionally, Foxconn failed to meaningfully engage with Lordstown during weekly board meetings on the development of a business plan, no-showed at meetings, and failed to provide approvals on even the most basic items. *Id.* Foxconn delayed the appointment of the joint venture's chief financial officer, failed to make minimum monthly payments to the joint venture that were required under the JVA, and refused to provide information to Lordstown about the joint venture's bank accounts. *Id.*

66.     Despite dragging its feet on the joint venture with Lordstown, after taking over the Lordstown plant, Foxconn quickly implemented plans to develop its own products. ¶ 36. The day after closing the APA, Foxconn announced that it was in talks to develop an electric vehicle with Fisker, Inc. *Id.* Lordstown supported this initiative and spent four weeks meeting with and developing a proposal for Fisker. *Id.* Fisker ultimately decided that it did not have the funds to proceed with the electric vehicle program at the Lordstown plant. *Id.*

67.     Also during this time, Lordstown claims that Foxconn stymied the Company's attempts to move forward with the partnership to develop future Lordstown vehicles under the JVA. Among other things, Foxconn: (a) failed to grant the Company access to the Model C and Model E vehicle designs that it committed to provide; (b) stalled the Company's attempts to agree on a budget and timeline for the project as contemplated by the JVA; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon commitments. ¶ 37. Foxconn also caused Foxconn EV System LLC to fail to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good

faith to reduce the production cost of the Endurance.  *Id.*  Moreover, Foxconn caused Foxconn EV Technology to delay the appointment of the JV's chief financial officer and to fail to make minimum monthly payments to the JV, each as required by the JV Agreement. Foxconn even refused to provide information about the JV's bank accounts. *Id.*

68.     Despite Foxconn's stonewalling Lordstown continued to develop its fleet.  The Company began predevelopment work on the Model C design modifications and outreach to potential customers.  ¶ 38.  In furtherance of this effort, Lordstown repeatedly asked Foxconn for the required engineering drawings and data relating to the Model C and Model E designs.  *Id.* However, by July 2022, Foxconn had failed to share any drawings or design data with Lordstown. *Id.*

69.     In a meeting held during that time period, Chairman Liu told Lordstown executives that Foxconn would provide the necessary information regarding the Model C and Model E to Lordstown if the executives travelled to Taiwan.  *Id.*  As a result, Hightower travelled to Taiwan to meet with Foxconn and Foxtron management in order to procure the data promised to Lordstown. *Id.*  While Liu did meet with Hightower, Foxtron's CEO refused to meet with him.  *Id.*  Foxconn and Foxtron also continued to refuse to provide any engineering drawings, data, and essential licensing agreements needed to get the project going.  *Id.*

70.     Therefore, after wasting several months, and gaining no benefit Foxconn's existing vehicle designs, Lordstown was forced to return to its own internal vehicle platform.  ¶ 39.  Despite Foxconn's commitment in the JVA to use Lordstown as Foxconn's primary North American vehicle partner, Lordstown later learned that Foxtron intended to sell its own vehicles, including the Model C, directly into the United States market, in direct competition with Lordstown.  *Id.*

71.     In order to secure the $100 million capital contribution under the JVA, on July 11, 2022, Lordstown submitted a draft budget for the JV to Foxconn.  ¶ 40.  Foxconn once again stalled progress, and for more than two months, Foxconn refused to even engage with Lordstown on the proposed budget, let alone approve it.  *Id.*  Therefore, on September 28, 2022, Lordstown recirculated the budget to Foxconn.  *Id.*  Two days later, Foxconn replied that it disagreed with the budget and attempted to exert more control over the joint venture by proposing that Foxconn's internal spending controls should apply and that Chairman Liu should have veto rights over any expenditure that exceeds $150,000.  *Id.*

72.     On October 14, 2022, more than five months after the JVA and CMA were signed, Foxconn had still not made its promised capital contribution.  Therefore, Lordstown sent a letter to Foxconn memorializing Foxconn's breaches to the JVA and the CMA.  ¶ 41.  In the letter, the Company noted that Foxconn failed to provide the designs and data for the Model C and Model E vehicles as required by the JVA.  *Id.*  Due to Foxconn's refusal to provide this information, Lordstown had to defer purchase discussions with one of the largest fleet managers in North America, which then made its purchases from another electric vehicle manufacturer.  *Id.*

73.     CW-1 believed that Foxconn invested in the Lordstown plant but was not committed to making the plant a successful operation, because Foxconn was attempting to use Lordstown to develop Foxconn's own electric vehicles for the Taiwanese and Chinese markets. Foxconn lacked the personnel with the requisite knowledge of the automotive industry, especially when it came to obtaining government approvals in countries like the United States for components and brakes.  Therefore, Foxconn was trying to misappropriate Lordstown's know-how and technology to develop its own vehicles in the United States.  According to CW-1, Foxconn had attempted this scheme with other vehicle manufacturers.  For example, Foxconn

sent English-speaking employees from China and Malaysia who had purportedly previously worked at Tesla and Rivian to the Lordstown plant.  These employees informed CW-1 that, while working at these other companies, they had set up cameras and cell phones and "downloaded all of the [programmable logic controller] codes" and had taken videos of engines, which Foxconn then tried to copy.

74.     CW-1 stated that at this time, Volkswagen was also considering partnering with Foxconn on manufacturing vehicles at the Lordstown plant.  In order to sufficiently produce vehicles for Volkswagen, the plant's paint shop had to be significantly expanded.  CW-1 began working on the plans to expand the paint shop at the plant.  As part of its proposal to Volkswagen, Foxconn projected that the paint shop, which was the most expensive part of the buildout, would cost less than $1 billion.  However, this number was far below the cost estimates CW-1 had modeled for the paint shop construction.  Apparently, Volkswagen personnel also knew that $1 billion was far below the likely cost of the paint shop, as Volkswagon had projected that the entire project would cost $3 to $4 billion.  Volkswagen declined the partnership, and later, CW-1 heard second-hand from a Volkswagen employee that, either Foxconn "is ignorant of what it takes to put a factory together or you're trying to steal our technology" and "to entice us [Volkswagen]" by using "such low numbers."

75.     CW-1 also attended a meeting of Foxconn directors and managers, including Chairman Liu and the Foxconn Vice-Chairman.  At the meeting, Liu told the participants that Foxconn would only fund the Lordstown plant through 2025, and if by 2026, the facility was not generating $8 billion in profit, then funding would be cut off.  However, according to CW-1, it would take three years to build out the paint shop, which meant that purchase orders for the necessary equipment had to be issued no later than January 2023 in order to meet the anticipated

timeline of going into operation by July 2025.  Not only would this timeline require working "24/7" to achieve, no purchase orders had been issued as of December 2022.

### C. Foxconn Insists that The Parties Restructure Their Relationship

76.     Shortly after receiving the October 14, 2022 letter from Lordstown, Foxconn contacted the Company and expressed its interest in restructuring the joint venture relationship. ¶ 43.  Foxconn proposed that an entity, called FVP, would increase its share ownership in Lordstown.  FVP was 55% owned by Foxconn and 45% owned by Softbank, a large multi-national technology investor.  *Id.*  According to Foxconn, Softbank was interested in developing electric vehicle programs in North America.  Therefore, Lordstown attended several meetings with Foxconn and Softbank executives to discuss the new programs (the "EV Program").  *Id.*

77.     According to Lordstown, since Foxconn had failed to live up to its commitments under the JVA, the Company agreed to move away from the JVA and instead enter into a new direct investment agreement with FVP (the "Investment Agreement").  ¶ 44. The Investment Agreement was executed on November 7, 2022.  Bankr. Compl. at Ex. E.  Under the Investment Agreement, FVP committed to purchase $70 million of Lordstown common stock and up to $100 million in Series A convertible preferred stock.

78.     The Investment Agreement provided the following funding schedule: (a) an initial closing at which FVP would purchase $22.7 million in common stock and $30 million in preferred stock; (b) a subsequent closing at which FVP would purchase $47.3 million in common stock; and (c) additional closings based upon the completion of certain milestones, at which FVP would purchase up to an additional $70 million in preferred stock.  ¶ 45.

79.     More specifically:

1.      12,917,274 shares of common stock for a purchase price of $1.76 per share, for an aggregate purchase price of $22,734,402 (the "Initial Common Purchase");

2.      300,000 shares of Series A Preferred Stock for a purchase price of $100 per share, for an aggregate purchase price of $30,000,000 (the "Initial Preferred Purchase");

3.      26,855,453 shares of common stock for a purchase price of $1.76 per share, for an aggregate purchase price of $47,265,597 (the "Subsequent Common Purchase");

4.      300,000 shares of Series A Preferred Stock for a purchase price of $100 per share, for an aggregate purchase price of $30,000,000 (the "Second Tranche Preferred Purchase"); and

5.      400,000 shares of Series A Preferred Stock for a purchase price of $100 per share, for an aggregate purchase price of $40,000,000 (the "Third Tranche Preferred Purchase").

Bankr. Compl. Ex. E at 10-11.

80.      The Investment Agreement also restricted how Lordstown was allowed to use FVP's investment funds. *See id.* at 41. The proceeds from the preferred stock purchases were only to be used on the EV Program, while proceeds from the common stock purchases could be used for general corporate purposes. *Id.* In other words, the $22.7 million from the Initial Common Purchase and the $47.3 million from the Subsequent Common Purchase could be used for Lordstown's operating expenses, but the other $100 million from the Initial Preferred Purchase, the Second Tranche Preferred Purchase, and the Third Tranche Preferred Purchase was

only to be used for the electric vehicle program.  *Id.* at 10-11, 41; *see also* Lordstown Motors, Corp., FQ3 2022 Earnings Call, 5 (Nov. 8, 2022) (transcript on file with S&P Global, audio recording on file with Seeking Alpha) ("$10 million of the investment will be in the form of LMC convertible preferred stock and will be used to fund in 3 phases our team's work in developing future electric vehicles in collaboration with Foxconn and its partners.").

81.     The Investment Agreement provided that FVP must have obtained Committee on Foreign Investment in the United States ("CFIUS") clearance for the agreement within a reasonably practical amount of time, but in any event within 20 business days from the execution of the Investment Agreement, or December 7, 2022.[4]  ¶ 48.  FVP must also use reasonable best efforts to agree upon the Preferred Funding Milestones and the EV Program Budget no later than May 7, 2023.  ¶ 46.

82.     The Investment Agreement was signed by Lordstown's authorized signatory, Hightower, and FVP's authorized signatory, Jerry Hsiao, on November 7, 2022.  *See* Bankr. Compl. at Ex. E at 57.

83.     After entering into the Investment Agreement, Foxconn executed the Initial Common Purchase and the Initial Preferred Purchase, providing $52 million to Lordstown.

84.     The purpose of entering into the Investment Agreement was to shift focus on developing the EV Program backed by Softbank.  However, within days of entering into the

---

[4]     CFIUS is an interagency committee of the US government tasked with reviewing the national security implications of foreign acquisitions of and direct investments in US businesses. *See CFIUS Overview*, Cooley, https://www.cooley.com/services/practice/cfius/cfius-overview#:~:text=Conditional%20clearance%3A%20CFIUS%20approves%20the,prohibit%20or%20unwind%20the%20transaction).  Depending on the type of transaction, U.S. companies are required to have an agreement with a foreign entity approved by CFIUS.  CFIUS clearance occurs when CFIUS formally approves the transaction, giving the parties "safe harbor" protection into the future.

Investment Agreement, Foxconn informed Lordstown that Softbank's commitment to the program was no longer clear, so Lordstown should move away from the Softbank program.  ¶ 47.  Foxconn instructed Lordstown to instead resume work on the internal vehicle program that it began in November 2021.  *Id.*

85.     As a result of this shift, Lordstown and FVP entered into an amended Investment Agreement (the "AIA"), which allowed Lordstown to use the net proceeds of the purchases of Preferred Stock on the substitute program.  *Id.*  The AIA was signed by Hightower and Hsiao on November 15, 2022.  *See* Bankr. Compl. at Ex. F at 2.

86.     While preparing the CFIUS filing, Lordstown claims that Foxconn executives in Taiwan apparently became aware for the first time of the AIA and demanded that Lordstown agree to its immediate rescission, with retroactive effect.  ¶ 49.  Indeed, on December 14, 2022, a week after the CFIUS filing was due, FVP's Chief Product Officer advised Lordstown that Foxconn's CFO in Taiwan "insists to have [rescission document] signed before filing CFIUS this week."  *Id.*  Lordstown also claims that "[s]imilarly, Foxconn's outside legal counsel  indicated that they would be prepared to file the CFIUS application but only after the rescission agreement was executed.  *Id.*

87.     Lordstown claims that with a tremendous need for the financing FVP promised and the looming holiday season, it agreed to execute the rescission and enter into a new, more restrictive amendment document called the Rescission and First Amendment (the "RFA").  ¶ 50.  The RFA was signed by Hightower and Hsiao on December 22, 2022.  *See* Bank. Compl. at Ex. G at 2.

88.     As a result, Foxconn finally filed the CFIUS application on December 23, 2022, two weeks after the absolute deadline.  ¶ 50.  Lordstown claims that FVP's breach of the CFIUS

covenant not only demonstrates extreme bad faith but it ultimately held up CFIUS Clearance and therefore the date of the Subsequent Common Closing, likely by several weeks at least, at a time when the Company was in need of critical funding. *Id.*

### D. Foxconn Further Delayed Action in Order to Avoid Paying Its Commitments Under the Investment Agreement

89.     Between December 2022 and March 2023, Lordstown completed the first phase of the new vehicle development work.  ¶ 51.  On January 24, 2023, Lordstown sent Foxconn its proposed program budget, development milestones, and deliverables.  ¶ 52.  The following day, the Company held a meeting with Chairman Liu to discuss these items as well as opportunities for collaboration and the status of the Endurance.  *Id.*   During the meeting, Liu stressed four topics that he wanted to see covered in the milestone reviews: (a) total addressable market; (b) compound annual growth rate of the segment; (c) unique selling proposition; and (d) key attributes of the product that would allow Lordstown to secure a path to profitability.  *Id.*

90.     On March 22, 2023, Lordstown delivered the first set of program deliverables contemplated by the Investment Agreement.  ¶ 54.  Once those deliverables were approved by FVP, FVP was required to fund the Second Tranche Preferred Purchase of $30,000,000.  ¶ 55.

91.     However, according to Lordstown, Foxconn continued its longstanding pattern of delay.   Foxconn cancelled the meeting scheduled for March 23, 2023 to discuss deliverables. *Id.*  To date, Foxconn has still not provided Lordstown a response on the Company's proposals for budgeting and milestones in order to trigger the Second Tranche Preferred Purchase.  *Id.*

92.     Then, on April 24, 2023, FVP received CFIUS approval.  ¶ 56.  According to Lordstown, CFIUS approval would have been secured much earlier if FVP had not improperly delayed the CFIUS filing.  *Id.*  CFIUS approval was one condition that had to be satisfied before Foxconn was obligated to execute the Subsequent Common Purchase of $47,265,597 worth of

common stock.  *Id.*  The other conditions that triggered the Subsequent Common Purchase were agreement on the Preferred Funding Milestone and EV Program Budget, and satisfaction of the Preferred Funding Milestones.  ¶ 57.  But as claimed by Lordstown, Foxconn "refused to use commercially reasonable efforts to reach agreement on the Preferred Funding Milestones and the EV Project Budget; indeed, it has refused to engage at all."  *Id.*

93.     According to Lordstown, FVP asserts that its obligation to develop the Preferred Funding Milestones and EV Program Budget was contingent upon the execution of engineering and program agreements with SoftBank, which, days after entering into the Investment Agreement, Foxconn had instructed Lordstown to abandon in favor of the first amendment to the Investment Agreement (Bankr. Compl. at Ex. F) that was rescinded by the Recission and First Amendment (Bankr. Compl. at Ex. G).  ¶ 58.

94.     During this time, CW-2 and CW-3 were working at Lordstown's Farmington Hills, Michigan location.  Between October 2022 to July 2023, CW-2 was assigned to create engineering change notices for the bill of materials related to the vehicles and to enter those change orders into the management software, *Teamcenter* Product Lifecycle Management application.  However, due to the lack of funding from Foxconn, there was not much work for CW-2 to do.  For example, at the end of 2022, work from another employee was supposed to be transferred to CW-2, but the transfer never occurred since it was "all contingent" on Foxconn's funding.  During the time between December 2022 and March 2023, CW-3 was working as a Senior Design Engineer on the Endurance and observed "plenty of milestones getting dropped for lack of funds."  These delays further negatively impacted Lordstown's relationships with suppliers and that those relationships were "going south."

**E.**  **Lordstown Claims That Foxconn Improperly Attempted To Terminate The Investment Agreement Because of the NASDAQ Letter**

95.  According to Lordstown's Bankruptcy Complaint, on March 7, 2023, with increasing uncertainty regarding the strength of the Company's partnership with Foxconn, the common stock dropped below the $1.00 per share threshold set forth in NASDAQ Listing Rule 5450(a)(1).  ¶ 60.  On April 19, 2023, the Listing Qualifications Department of NASDAQ, where the Common Stock is listed, issued a notice ("NASDAQ Notice", Bankr. Compl. at Exhibit H) to the Company.  *Id.*  The NASDAQ Notice notified the Company that it had a 180-day period to return the stock price to above $1.00 per share.  *Id.*  The Company, having anticipated that its stock price could drop below the $1.00 level, had already included a proposal for a reverse stock split in the agenda for its annual meeting to be held on May 22, 2023. *Id*.

96.  Seizing on the NASDAQ Notice, by letter dated April 21, 2023, just 17 days before the anticipated Subsequent Common Closing, FVP sent a notice of default under the Investment Agreement.  ¶ 61; Bankr. Compl. at Ex. I.  The Notice of Default provided that FVP would terminate the Investment Agreement effective May 21, 2023, one day prior to the Company's shareholders' meeting and the approval of the reverse stock split, in the event the Company failed to cure such default. ¶ 61.

97.  On April 25, 2023, the Company responded to the Notice of Default. The Company (i) disputed that the NASDAQ Notice constituted a breach under the Investment Agreement, (ii) noted that the Investment Agreement, by its terms, does not permit Defendant to terminate it following the Initial Closing (which occurred on November 22, 2022), and (iii) in any event, Defendant cannot exercise termination rights because FVP breached the Investment Agreement by failing to use necessary efforts to agree upon the budget and milestones to facilitate the Subsequent Preferred Funding.  ¶ 62.  The Company's response noted that if the

30

termination notice was not immediately retracted, the Company would be forced to publicly disclose the purported termination which would result in material harm and damage. *Id*.

98.     Foxconn did not respond to the Company's letter. ¶ 63. As a result, the Company was forced to file a Current Report on Form 8-K with the Securities and Exchange Commission on May 1, 2023, announcing FVP's purported termination.  *Id.*  While the Company made clear that it did not agree the termination was proper, the disclosure nevertheless caused the Company's stock price to plummet and caused unfavorable media coverage. *Id.*  The announcement also materially and negatively impacted the Company's customer, employee, supplier and other business relationships.  *Id.*  Within hours of the filing, several customers, including one of the largest fleet managers in North America, cancelled or deferred discussions regarding the purchase of Lordstown vehicles.  *Id.*  Since then, the impact of the Foxconn dispute on the Company has been severe.  *Id.*

99.     On May 2, 2023, after forcing the Company to publicly disclose FVP's purported termination, causing a significant drop in the Company's stock price and uncertainty about its future, Foxconn acknowledged both in correspondence to the Company and publicly that it agreed that it had no legal right to terminate the Investment Agreement after the Initial Closing. ¶ 64.  Foxconn nonetheless asserted in correspondence with the Company that the NASDAQ Notice constituted a breach of a representation that is a condition to the Subsequent Common Closing and, therefore, Foxconn was not obligated to consummate the Subsequent Common Closing until such breach was cured.  *Id.*

100.     On May 3, 2023, Lordstown sent Foxconn a letter recognizing the retraction of its purported termination of the Investment Agreement.  ¶ 65.  But the Company disputed Foxconn's assertion that the NASDAQ Notice constituted a failure of a condition of the

Subsequent Common Closing. *Id*.

101.    Under NASDAQ Marketplace Rule 5810(c)(3)(A), the Company was given 180 calendar days, or until October 16, 2023, to return the stock price above the $1.00 per share minimum.  ¶ 68.  Only if the Company failed to return the stock price above $1.00 per share by the end of that period would it be at risk of a potential termination of its listing.  *Id.*

102.    As Lordstown explained in its May 3 letter, Lordstown's representations in section 3.13 were true when made, were true on the date of the letter and would be true on the Subsequent Common Closing Date.  ¶ 69.  The Company reiterated that the Company would be ready, willing and able to close the transaction on the Subsequent Common Closing Date, May 8, 2023.  *Id.*  But FVP refused to close on the Subsequent Common Closing Date, further harming the Company and ultimately requiring it to seek chapter 11 relief.  *Id.*

103.    FVP's further asserted in SEC filings that the Nasdaq Notice constituted a "breach" of the Investment Agreement. Lordstown claims that even if FVP's position were correct, and the closing condition were not satisfied, the NASDAW Notice would not have constituted a breach of the Investment Agreement.  ¶ 70.  On May 3, Defendant demanded a correction to FVP's false public disclosure.  *Id.*  FVP has failed to do so.  *Id.*

104.    Lordstown also claims that FVP's refusal to file the CFIUS application until the Company rescinded an amendment to the Investment Agreement that the parties had executed (despite the Investment Agreement's covenants to the contrary) is the only reason that the NASDAQ Notice was received before the Subsequent Common Closing Date, as the application would have been approved weeks earlier absent FVP's breach.  ¶ 71.  In other words, absent FVP's breach of its contractual obligations regarding CFIUS Clearance, the entire NASDAQ Notice issue would have been moot.  *Id.*

32

105.    On May 23, 2023, the Company executed a reverse stock split to improve the marketability and liquidity of the Common Stock.  ¶ 72.  As of June 7, 2023, the Common Stock price had remained above $1.00 per share for 10 consecutive trading days following the reverse stock split.  *Id.*  As a result, even under FVP's flawed interpretation of the agreement, all conditions to closing would have been satisfied and FVP's pretext for not closing was gone.  *Id.*

106.    Knowing that its most recent excuse for failing to meet its contractual obligation was about to disappear, on June 5, FVP asserted for the first time in a letter (Bankr. Compl. at Ex. J) that because of the company's 1:15 reverse stock split, it was now entitled to purchase not the 10% of the Common Stock of the Company that had been agreed, but 62.7% for the same $47.3 million price.  ¶ 73.

107.    FVP's assertion ignores several provisions of the Investment Agreement, which makes clear that following the Subsequent Common Closing, FVP and its affiliates would not own more than 19.99% of the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of the Company and at no point would it own anywhere near 65.9%, which is the percentage of the voting interest that FVP would hold on an as-converted basis when combining the stock that FVP asserts it has the right to purchase in the Subsequent Common Closing with its existing holdings of the Company's capital stock and warrants.  ¶ 74.  In fact, FVP had agreed that, until at least December 31, 2024, it and its affiliates would not acquire, offer or seek to acquire or make a proposal to acquire (a) more than 19.99% of the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of the Company prior to a vote of the Company's stockholders allowing FVP to acquire more than 19.99% of such capital stock and (b) more than 24% of the capital stock of the Company that is entitled to vote generally in any election of directors of the

33

board of directors of the Company even after the Subsequent Common Closing and a vote of the Company's stockholders approving an acquisition by FVP of more than 19.99% of such capital stock, if such vote were obtained. *Id.*

108. Lordstown claims that FVP's newest position also contradicts the terms of its own certifications to CFIUS, where it represented to the United States government that the transactions contemplated by the Investment Agreement, together with FVP's existing holdings of the Company's capital stock and warrants on an as-converted basis, could not result in FVP owning anywhere near a 65.9% voting interest in the Company. FVP's position would mean that the Company could have effectuated a 30:1 stock dividend (which is has the right to do under the Investment Agreement) and FVP would have been required to pay $47.3 million for a mere fraction of the capital stock of the Company, which is an absurd interpretation of the Investment Agreement. ¶ 75. Further, Lordstown claims that it is unclear whether this newly concocted position was just one more effort to sabotage the deal or to capture a windfall by stealing control of the Company for what it was supposed to pay for 10% of the stock. But either way, FVP's position was in clear violation of the Investment Agreement. ¶ 76. The Company demanded that FVP withdraw its absurd argument and close the transaction on the agreed terms. FVP refused. *Id.*

109. The Company also now claims that even if FVP's earlier reliance on the NASDAQ Notice were valid—and it was not—NASDAQ sent a notice (Bankr. Compl. at Ex. K) closing the matter on June 7, 2023. ¶ 77. Under Section 2.03(a) of the Investment Agreement, the Subsequent Common Closing shall occur on the tenth business day after all of the conditions to the closing have been satisfied. *Id.* Thus, even if the NASDAQ Notice had been an impediment to closing, the Subsequent Common Closing should have occurred on June 26, 2023,

but FVP refused—and continues to refuse—to close.  *Id.*

110.    Lordstown claims that FVP's actions, driven by Foxconn, have had a devastating effect on the Company's business.  ¶ 78.  Upon information and belief, the decision to breach the Investment Agreement was made by Young Liu, CEO and Chairman of Foxconn as part of Foxconn's scheme to starve the Company and destroy its business.  *Id.*  Rather than embracing Lordstown as its partner in "a trillion-dollar business opportunity for electric vehicles," Foxconn has maliciously and in bad faith sabotaged the ability of Lordstown to execute its business plan for scalable electric vehicle production in North America.  *Id.*  The Company has recently laid off a substantial number of its employees, and its ability to continue its operations is now in question.  *Id.*  Meanwhile, Foxconn is hiring Lordstown employees and continues to refuse to provide financing and cooperation that is essential for Lordstown to sustain its ongoing operations.  *Id.*  Foxconn thus far has succeeded in executing its plan to force the Company to shut down so that it can take over the Company's remaining assets and talent, while evading liability for its repeated breaches.  *Id.*

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

111.    Despite the numerous serious, and potentially disastrous, issues with the Foxconn relationship, during the Class Period, Lordstown and Defendants continuously misrepresented to investors that the Company's relationship with Foxconn was thriving.  What Lordstown and Defendants failed to disclose was that Foxconn was, as claimed in Lordstown's Bankruptcy Complaint, acting in bad faith, breached agreements with the Company and stymied production of the Endurance, making it impossible to develop a successful electric vehicle platform, and arbitrarily withholding monetary contributions that Lordstown required to continue operations.

112.    The Class Period begins on August 4, 2022, during Lordstown's earnings conference call for the second quarter of 2022, Hightower and Ninivaggi made the following statements:

Hightower:

**Our manufacturing partners at the Foxconn plant in Ohio are ready for March**. While we are starting commercial release production of the first batch of Endurances in Q3, we are ramping up slowly to mitigate these issues. We expect production to accelerate in Q4 with the majority of the initial 500 vehicles built in the first part of 2023.

\*\*\*

I'd now like to discuss our growing relationship with Foxconn and our product development joint venture. Our 55/45 joint venture announced in mid-May, in which Foxconn committed an additional $100 million in capital, **is another action in support of the EV ambitions of both companies.**

Of this $100 million commitment, the first 30 million was funded at the end of Q2. As Foxconn is primary commercial vehicles development partner in North America, the JV will collaborate with Foxconn's growing global EV ecosystem, including the MIH Consortium to co-develop new EV programs for Lordstown's commercial fleet customers, and potentially for other OEMs. These new vehicles would be built for North America at Foxconn's Lordstown, Ohio facility and at other Foxconn contract manufacturing locations around the world.

Under this innovative business model, utilizing a more flexible development platform and manufacturing footprint, smaller OEMs have the opportunity to achieve the benefits of scale with lower volumes and reduce costs and experiences a faster time-to-market.

As I also served as CEO of the Foxconn joint venture, I recently spent 2 weeks in Taiwan with Foxconn Chairman, Young Liu and his team. ***While in country, we had several meetings on how to best operationalize the JV and leverage our concept through launch vehicle development capabilities in concert with the Foxconn EV ecosystem. We also had several discussions about the first vehicle program of the JV, which we hope to announce in the coming months.***

Ninivaggi:

Second, in Q2, we closed our transactions with Foxconn, providing us with a flexible and less capital-intensive business model, **a world-class contract manufacturing partner, and a more scalable vehicle development platform as well as additional capita**l.

36

Third, over the past year, our team has implemented a rigorous and disciplined program management process that has significantly improved operational execution. During the second quarter and into July, we conducted a number of constructive and largely positive gateway reviews to assess launch readiness.

Fourth, our business strategy requires strong partnerships. Smaller OEMs can't do without them in my view. In addition to **further developing our broad partnership with Foxconn and the MIH consortium,** we're actively seeking partners including other OEMs to jointly scale the Endurance.

113.     The statements by Lordstown, Hightower and Ninivaggi in ¶ 112 above were materially false and/or misleading when made because Lordstown, Hightower and Ninivaggi knowingly and/or recklessly made the statements while failing to disclose the following facts that, would have been highly material to investors and which facts existed at the time the statements were made, as revealed in Lordstown's Bankruptcy Complaint:

a.   That Hightower spent nearly two weeks attempting to meet with Foxtron and Foxconn to discuss obtaining requested vehicle design materials for the Model C and E that Foxtron had developed, that Foxtron stated that it could not provide access to the data or establish licensing deal, notwithstanding the JVA terms providing that those materials would be provided to Lordstown; **the Foxtron CEO refused to even meet with Hightower to discuss the requested data** (¶ 38);

b.   After entering into the APA, Foxconn stonewalled Lordstown and dragged its feet in working to develop the parties' agreed upon joint development platform. Notwithstanding their obligations under the APA and that five months after the APA was signed, Foxconn refused to even discuss the JV before closing the APA (¶ 32);

c.   That Foxconn used the opportunity of negotiating a management services agreement for the JV (which agreement was never executed) to impose a new spending

authority structure that would require a Foxconn representative to approve every dollar spent by the JV, which veto right directly conflicted with the JVA (¶ 34);

d.  Foxconn was slow to respond, or failed to respond at all, to the Model C commitments it made in the JVA (¶ 35);

e.  While Foxconn moved forward to use the Lordstown facility with other EV manufacturers after closing the APA on May 11, 2022, Foxconn stymied the Company's attempts to move forward with the partnership to develop future Lordstown vehicles under the JV Agreement. Among other things, Foxconn: (a) failed to grant the Company access to the Model C and Model E vehicle designs that it committed to provide; (b) stalled the Company's attempts to agree on a budget and timeline for the project as contemplated by the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon commitments. Foxconn also caused Foxconn EV System LLC to fail to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance. Moreover, Foxconn caused Foxconn EV Technology to delay the appointment of the JV's chief financial officer and to fail to make minimum monthly payments to the JV, each as required by the JV Agreement. Foxconn even refused to provide information about the JV's bank accounts (¶ 37);

38

f.  Foxconn stonewalled Lordstown's efforts regarding the JV at each and every turn. Foxconn and its affiliate's actions were driven by Foxconn, which was determined to maliciously and in bad faith destroy Lordstown's business in an effort to strip Lordstown's assets and poach its talent at little cost (¶ 42)

g.  From the very beginning, Foxconn had been continually moving the goal posts on development of the Lordstown's next generation products, constantly shifting the nature of the product, failing to meet funding commitments, and absolutely refusing to engage with Lordstown on any of the various initiatives that Foxconn directed Lordstown to pursue and purported to support (¶ 6);

h.  Foxconn continuously misled Lordstown about its own ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing Lordstown to devote substantial resources to the same cause (¶ 4);

i.  Foxconn consistently failed to honor its agreements and caused its affiliates and instrumentalities to do the same. ¶ 7.

114.  On November 7, 2022, Lordstown issued a press release titled "Lordstown Motors and Foxconn Broaden Strategic Partnership." Therein, Lordstown announced an agreement with Foxconn pursuant to which Foxconn agreed to make additional equity investments in Lordstown in the form of $70 million of Lordstown's Class A common stock, and up to $100 million of a newly created Series A Convertible Preferred Stock, subject to certain conditions. The press release also provided:

> Daniel Ninivaggi, Executive Chairman of LMC commented, "***Since announcing our first transaction with Foxconn more than a year ago, it has been our objective to develop a broad strategic partnership that leverages the capabilities***

*of both companies. Foxconn's latest investment is another step in that direction*. . . .

Edward Hightower, CEO and President of LMC commented: "***Over the last year, the LMC and Foxconn teams have worked collaboratively to bring the Endurance into commercial production***, despite numerous external challenges. ***We acknowledge and appreciate the confidence in our team that is shown by this investment. The combination of LMC's experienced vehicle development team, Foxconn's growing EV ecosystem, the MIH platform, and our asset-light business model will allow us to bring great EVs to market faster and more efficiently***."

115.     That same day, investor website, Seeking Alpha published an article entitled, "Lordstown and Foxconn broaden partnership with new investment, board deal." The article included a quote from Ninivaggi, in which he stated:

> *Our Board of Directors and management team strongly believe that deep collaboration with the Foxconn EV ecosystem, including the Mobility-in-Harmony open-source platform, offers tremendous opportunities to meet our mutual ambition to accelerate EV adoption globally.*

116.     The statements by Lordstown, Hightower and Ninivaggi in ¶¶ 114 and 115  above were materially false and/or misleading when made because they knowingly and/or recklessly made the statements while failing to disclose the following facts that, would have been highly material to investors and which facts existed at the time the statements were made, as revealed in Lordstown's Bankruptcy Complaint:

     a.  After entering into the APA, Foxconn stonewalled Lordstown and dragged its feet in working to develop the parties' agreed upon joint development platform. Notwithstanding their obligations under the APA and that five months after the APA was signed, Foxconn refused to even discuss the JV before closing the APA (¶ 32);

     b.  That Foxconn used the opportunity of negotiating a management services agreement for the JV (which agreement was never executed) to impose a new spending

authority structure that would require a Foxconn representative to approve every dollar spent by the JV, which veto right directly conflicted with the JVA (¶ 34);

c. Foxconn was slow to respond, or failed to respond at all, to the Model C commitments it made in the JVA (¶ 35);

d. While Foxconn moved forward to use the Lordstown facility with other EV manufacturers after closing the APA on May 11, 2022, Foxconn stymied the Company's attempts to move forward with the partnership to develop future Lordstown vehicles under the JV Agreement. Among other things, Foxconn: (a) failed to grant the Company access to the Model C and Model E vehicle designs that it committed to provide; (b) stalled the Company's attempts to agree on a budget and timeline for the project as contemplated by the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon commitments. Foxconn also caused Foxconn EV System LLC to fail to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance. Moreover, Foxconn caused Foxconn EV Technology to delay the appointment of the JV's chief financial officer and to fail to make minimum monthly payments to the JV, each as required by the JV Agreement. Foxconn even refused to provide information about the JV's bank accounts (¶ 37);

41

e.  Foxconn stonewalled Lordstown's efforts regarding the JV at each and every turn. Foxconn and its affiliate's actions were driven by Foxconn, which was determined to maliciously and in bad faith destroy Lordstown's business in an effort to strip Lordstown's assets and poach its talent at little cost (¶ 42);

f.  Lordstown had sent Foxconn a letter on October 14, 2022 that Foxconn had breached the JVA and CMA (¶ 41), which resulted in the parties having to renegotiate their relationship and Lordstown having to abandon the JVA (¶ 44);

g.  From the very beginning, Foxconn had been continually moving the goal posts on development of the Lordstown's next generation products, constantly shifting the nature of the product, failing to meet funding commitments, and absolutely refusing to engage with the Debtors on any of the various initiatives that Foxconn directed the Debtors to pursue and purported to support (¶ 6);

h.  Foxconn continuously misled the Lordstown about its own ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing the Debtors to devote substantial resources to the same cause (¶ 4);

i.  Foxconn consistently failed to honor its agreements and caused its affiliates and instrumentalities to do the same. ¶ 7.

117.  On November 8, 2022, Lordstown issued a press release announcing its financial results for the third quarter of 2022.  The press release stated, in relevant part:

> Yesterday, LMC announced that Foxconn has agreed to make additional equity investments in LMC (collectively, the "Investment Transactions") of up to $170 million in the form of $70 million of LMC's Class A common stock and up to $100 million of a newly created Series A Convertible Preferred Stock ("Preferred Stock"). . . . ***Foxconn's additional investment in LMC is a strong sign of confidence in our team's product development and engineering capabilities and***

*will help accelerate the EV ambitions of both companies. We continue to believe that deep collaboration with Foxconn, as its preferred North American vehicle development partner, and Foxconn's EV ecosystem, including MIH, is key to our company's long-term success.*

"*We are proud of the accomplishments of the Lordstown and Foxconn EV Technology teams in bringing the Endurance into commercial production*. While we have more work to do, our entire team cannot wait to get the vehicle in the hands of our customers. *We are also extremely excited by the additional investment and expanding relationship with Foxconn and the opportunities it provides beyond our first vehicle*," said Edward Hightower, Lordstown Motors' CEO and President.

118.    That same day, Lordstown held an earnings conference call to discuss the financial results from the third quarter of 2022.  During the conference call, Hightower and Kroll made the following statements:

[Hightower]: I would like to begin by congratulating the team at Lordstown Motors, *our partners at Foxconn EV Technology* and all of our supplier partners around the world for bringing the Endurance into commercial production. *Thank you for all of your hard work and diligence towards our mission of accelerating the adoption of electric vehicles*. . . .

[Hightower]: *While launching the Endurance, we are also expanding our focus to the next vehicle program with Foxconn. In this regard, we continue to make progress in the planning and predevelopment work on our next vehicle that we are co-creating with Foxconn and the MIH consortium*. . . .

[Hightower]: *Foxconn's additional investment in LMC is a strong sign of confidence in our team's capabilities and will help accelerate the EV ambitions of both companies. We continue to believe that deep collaboration with Foxconn as its preferred North American vehicle development partner and its EV ecosystem, including MIH is key to our company's long-term success*.

In closing, I'm proud of the accomplishments of the Lordstown and Foxconn EV Technology teams in bringing the Endurance into commercial production. While we have more work to do, our entire team cannot wait to get the vehicle in the hands of our customers. *We're also extremely excited by our expanding relationship with Foxconn and the opportunities it provides beyond our first vehicle*.

[Kroll]: *I started right after we announced the agreement in principle with Foxconn that has led us to where we are today, a more flexible and less capital-intensive automotive OEM with a strong strategic partner at Foxconn*.

43

[Kroll]: *In addition to a strong show of confidence in our team, yesterday's announcement regarding the capital injection from Foxconn is an important step in addressing our capital needs*.

\* \* \*

[Kroll]: Yes. *And the joint venture,* with standard obagi [sic], *is being disbanded. We kind of think the direct investment in Lordstown is a better, simpler, easier structure. So I think it's very favorable*.

[Hightower]: *I believe we have great potential opportunities ahead of us with our growing relationship with Foxconn, and I look forward to our team executing and realizing them*.

119.    The statements by Lordstown, Hightower, and Kroll in ¶¶ 117-118 above were materially false and/or misleading when made because they knowingly and/or recklessly made the statements while failing to disclose the following facts that would have been highly material to investors and which facts existed at the time the statements were made, as revealed in Lordstown's Bankruptcy Complaint:

    a.  After entering into the APA, Foxconn stonewalled Lordstown and dragged its feet in working to develop the parties' agreed upon joint development platform. Notwithstanding their obligations under the APA and that five months after the APA was signed, Foxconn refused to even discuss the JV before closing the APA (¶ 32);

    b.  That Foxconn used the opportunity of negotiating a management services agreement for the JV (which agreement was never executed) to impose a new spending authority structure that would require a Foxconn representative to approve every dollar spent by the JV, which veto right directly conflicted with the JVA (¶ 34);

    c.  Foxconn was slow to respond, or failed to respond at all, to the Model C commitments it made in the JVA (¶ 35);

    d.  While Foxconn moved forward to use the Lordstown facility with other EV manufacturers after closing the APA on May 11, 2022, Foxconn stymied the

Company's attempts to move forward with the partnership to develop future Lordstown vehicles under the JV Agreement. Among other things, Foxconn: (a) failed to grant the Company access to the Model C and Model E vehicle designs that it committed to provide; (b) stalled the Company's attempts to agree on a budget and timeline for the project as contemplated by the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon commitments. Foxconn also caused Foxconn EV System LLC to fail to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance. Moreover, Foxconn caused Foxconn EV Technology to delay the appointment of the JV's chief financial officer and to fail to make minimum monthly payments to the JV, each as required by the JV Agreement. Foxconn even refused to provide information about the JV's bank accounts (¶ 37);

e. Foxconn stonewalled Lordstown's efforts regarding the JV at each and every turn. Foxconn and its affiliate's actions were driven by Foxconn, which was determined to maliciously and in bad faith destroy Lordstown's business in an effort to strip Lordstown's assets and poach its talent at little cost (¶ 42);

    f.   Lordstown had sent Foxconn a letter on October 14, 2022 that Foxconn had breached the JVA and CMA (¶ 41), which resulted in the parties having to renegotiate their relationship and Lordstown having to abandon the JVA (¶ 44);

    g.   From the very beginning, Foxconn had been continually moving the goal posts on development of the Lordstown's next generation products, constantly shifting the nature of the product, failing to meet funding commitments, and absolutely refusing to engage with the Debtors on any of the various initiatives that Foxconn directed the Debtors to pursue and purported to support (¶ 6);

    h.   Foxconn continuously misled the Lordstown about its own ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing the Debtors to devote substantial resources to the same cause (¶ 4);

    i.   Foxconn consistently failed to honor its agreements and caused its affiliates and instrumentalities to do the same. ¶ 7.

120.   On November 14, 2022, Hightower participated in a President's Speaker Series at Bentley University.  During the discussion, Hightower stated, in relevant part:

[Interviewer]:  How [do] you approach a pressure situation?

[Hightower]: ***Well, it was very important to me that anything I said publicly be true. That's it. It has to be true.*** So I had to take a very close look at where the product was when I joined the company: in its development phase, what work has been completed. What worked from both an engineering standpoint and from a plant readiness standpoint and from a supply chain standpoint. What has been completed and what was left to be done. And then calling on my experience in leading programs at Ford and GM and BMW. What does it look like, the roadmap or the timeline is to get to the point where we could get into production and then get into sales. So as we looked at that, and as we implemented the necessary additional processes and people and changes to the culture, it felt reasonable that we can make those predictions on timeline. And then the other thing we did was, ***when I joined, I told the team we have two objectives. That's it, two, not three,***

46

*two: launch the Endurance and build this relationship with Foxconn, our partner. And then we were going to focus on three priniciples to do that, integrity, discipline, and collaboration. We were going to focus on those three principles and those two objectives. And we realized that we needed to focus on greater transparency, both internally and externally, and that helped us to rebuild our reputation, externally from what Google had been saying, Google does a little more than a year ago, saying what we were going to do and then actually delivering on those.*

121. The statements by Lordstown and Hightower in ¶ 120 above were materially false and/or misleading when made because they knowingly and/or recklessly made the statements while failing to disclose the following facts that, would have been highly material to investors and which facts existed at the time the statements were made, as revealed in Lordstown's Bankruptcy Complaint:

    a. After entering into the APA, Foxconn stonewalled Lordstown and dragged its feet in working to develop the parties' agreed upon joint development platform. Notwithstanding their obligations under the APA, five months after the APA was signed, Foxconn refused to even discuss the JV before closing the APA (¶ 32);

    b. That Foxconn used the opportunity of negotiating a management services agreement for the JV (which agreement was never executed) to impose a new spending authority structure that would require a Foxconn representative to approve every dollar spent by the JV, which veto right directly conflicted with the JVA (¶ 34);

    c. Foxconn was slow to respond, or failed to respond at all, to the Model C commitments it made in the JVA (¶ 35);

    d. While Foxconn moved forward to use the Lordstown facility with other EV manufacturers after closing the APA on May 11, 2022, Foxconn stymied the Company's attempts to move forward with the partnership to develop future Lordstown vehicles under the JV Agreement. Among other things, Foxconn: (a)

47

failed to grant the Company access to the Model C and Model E vehicle designs that

it committed to provide; (b) stalled the Company's attempts to agree on a budget and

timeline for the project as contemplated by the JV Agreement; (c) failed to

meaningfully engage with the Company during weekly board meetings on the

development of a business plan; (d) no-showed meetings and failed to provide

approvals on even the most basic items; and (e) otherwise failed to fulfill other

agreed upon commitments. Foxconn also caused Foxconn EV System LLC to fail to

honor several material commitments under the CMA, including its promises to

assume responsibility for procurement, use its commercially reasonable efforts to

improve commercial terms with suppliers, take advantage of sourcing synergies and

otherwise work in good faith to reduce the production cost of the Endurance.

Moreover, Foxconn caused Foxconn EV Technology to delay the appointment of the

JV's chief financial officer and to fail to make minimum monthly payments to the

JV, each as required by the JV Agreement. Foxconn even refused to provide

information about the JV's bank accounts (¶ 37);

e. Foxconn stonewalled Lordstown's efforts regarding the JV at each and every turn.

Foxconn and its affiliate's actions were driven by Foxconn, which was determined to

maliciously and in bad faith destroy Lordstown's business in an effort to strip

Lordstown's assets and poach its talent at little cost (¶ 42);

f. Lordstown had sent Foxconn a letter on October 14, 2022 that Foxconn had

breached the JVA and CMA (¶ 41), which resulted in the parties having to

renegotiate their relationship and Lordstown having to abandon the JVA (¶ 44);

g. From the very beginning, Foxconn had been continually moving the goal posts on development of the Lordstown's next generation products, constantly shifting the nature of the product, failing to meet funding commitments, and absolutely refusing to engage with the Debtors on any of the various initiatives that Foxconn directed the Debtors to pursue and purported to support (¶ 6);

h. Foxconn continuously misled the Lordstown about its own ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing the Debtors to devote substantial resources to the same cause (¶ 4);

i. Foxconn consistently failed to honor its agreements and caused its affiliates and instrumentalities to do the same. ¶ 7.

122. On November 25, 2022, Hightower gave a presentation at the MIH Demo Day.  The presentation was available online via livestream and later on Youtube.  The presentation was accompanied by a slide show, which contained slides stating the following:

*Foxconn and LMC Engineering can share expertise and resources across organizations, globally* . . . .

123. The statements by Lordstown and Hightower in ¶ 122 above were materially false and/or misleading when made because they knowingly and/or recklessly made the statements while failing to disclose the following facts that would have been highly material to investors and which facts existed at the time the statements were made, as revealed in Lordstown's Bankruptcy Complaint:

a. After entering into the APA, Foxconn stonewalled Lordstown and dragged its feet in working to develop the parties' agreed upon joint development platform.

Notwithstanding their obligations under the APA, five months after the APA was signed, Foxconn refused to even discuss the JV before closing the APA (¶ 32);

b.  That Foxconn used the opportunity of negotiating a management services agreement for the JV (which agreement was never executed) to impose a new spending authority structure that would require a Foxconn representative to approve every dollar spent by the JV, which veto right directly conflicted with the JVA (¶ 34);

c.  Foxconn was slow to respond, or failed to respond at all, to the Model C commitments it made in the JVA (¶ 35);

d.  While Foxconn moved forward to use the Lordstown facility with other EV manufacturers after closing the APA on May 11, 2022, Foxconn stymied the Company's attempts to move forward with the partnership to develop future Lordstown vehicles under the JV Agreement. Among other things, Foxconn: (a) failed to grant the Company access to the Model C and Model E vehicle designs that it committed to provide; (b) stalled the Company's attempts to agree on a budget and timeline for the project as contemplated by the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon commitments. Foxconn also caused Foxconn EV System LLC to fail to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance.

Moreover, Foxconn caused Foxconn EV Technology to delay the appointment of the JV's chief financial officer and to fail to make minimum monthly payments to the JV, each as required by the JV Agreement. Foxconn even refused to provide information about the JV's bank accounts (¶ 37);

e. Foxconn stonewalled Lordstown's efforts regarding the JV at each and every turn. Foxconn and its affiliate's actions were driven by Foxconn, which was determined to maliciously and in bad faith destroy Lordstown's business in an effort to strip Lordstown's assets and poach its talent at little cost (¶ 42);

f. Lordstown had sent Foxconn a letter on October 14, 2022 that Foxconn had breached the JVA and CMA (¶ 41), which resulted in the parties having to renegotiate their relationship and Lordstown having to abandon the JVA (¶ 44);

g. From the very beginning, Foxconn had been continually moving the goal posts on development of the Lordstown's next generation products, constantly shifting the nature of the product, failing to meet funding commitments, and absolutely refusing to engage with the Debtors on any of the various initiatives that Foxconn directed the Debtors to pursue and purported to support (¶ 6);

h. Foxconn continuously misled the Lordstown about its own ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing the Debtors to devote substantial resources to the same cause (¶ 4);

i. Foxconn consistently failed to honor its agreements and caused its affiliates and instrumentalities to do the same. ¶ 7.

124.    On December 22, 2022, Foxconn issued a press release entitled, "Lordstown Endurance™ On Site at CES in West Hall Both 5274."  The press release stated, in relevant part:

> "*As Foxconn's preferred vehicle development partner for North America, Lordstown Motors' highly capable team of engineers looks forward to creating additional electric vehicles in collaboration with the MIH Consortium and Foxconn EV ecosystem*," said Edward Hightower, CEO & President of Lordstown Motors Corporation.[5]

125.    The statements by Lordstown and Hightower in ¶ 124 above were materially false and/or misleading when made because they knowingly and/or recklessly made the statements while failing to disclose the following facts that would have been highly material to investors and which facts existed at the time the statements were made, as revealed in Lordstown's Bankruptcy Complaint:

    a.  After entering into the APA, Foxconn stonewalled Lordstown and dragged its feet in working to develop the parties' agreed upon joint development platform. Notwithstanding their obligations under the APA, five months after the APA was signed, Foxconn refused to even discuss the JV before closing the APA (¶ 32);

    b.  That Foxconn used the opportunity of negotiating a management services agreement for the JV (which agreement was never executed) to impose a new spending authority structure that would require a Foxconn representative to approve every dollar spent by the JV, which veto right directly conflicted with the JVA (¶ 34);

    c.  Foxconn was slow to respond, or failed to respond at all, to the Model C commitments it made in the JVA (¶ 35);

---

[5]    A video clip from the CES conference which depicted Hightower stating, in part, that Lordstown was Foxconn's preferred vehicle development partner in North America was posted on Lordstown Motor's LinkedIn profile:
https://www.linkedin.com/posts/lordstownmotorscorp_acceleration-through-collaboration-activity-7017237754967187457-bvU6/.

d.  While Foxconn moved forward to use the Lordstown facility with other EV manufacturers after closing the APA on May 11, 2022, Foxconn stymied the Company's attempts to move forward with the partnership to develop future Lordstown vehicles under the JV Agreement. Among other things, Foxconn: (a) failed to grant the Company access to the Model C and Model E vehicle designs that it committed to provide; (b) stalled the Company's attempts to agree on a budget and timeline for the project as contemplated by the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon commitments. Foxconn also caused Foxconn EV System LLC to fail to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance. Moreover, Foxconn caused Foxconn EV Technology to delay the appointment of the JV's chief financial officer and to fail to make minimum monthly payments to the JV, each as required by the JV Agreement. Foxconn even refused to provide information about the JV's bank accounts (¶ 37);

e.  Foxconn stonewalled Lordstown's efforts regarding the JV at each and every turn. Foxconn and its affiliate's actions were driven by Foxconn, which was determined to maliciously and in bad faith destroy Lordstown's business in an effort to strip Lordstown's assets and poach its talent at little cost (¶ 42);

f. Lordstown had sent Foxconn a letter on October 14, 2022 that Foxconn had breached the JVA and CMA (¶ 41), which resulted in the parties having to renegotiate their relationship and Lordstown having to abandon the JVA (¶ 44);

g. Foxconn had insisted that Lordstown rescind a prior amendment to the Investment Agreement and enter into a new more restrictive document in order for Foxconn to file the CFIUS application (¶¶ 49-50);

h. From the very beginning, Foxconn had been continually moving the goal posts on development of the Lordstown's next generation products, constantly shifting the nature of the product, failing to meet funding commitments, and absolutely refusing to engage with the Debtors on any of the various initiatives that Foxconn directed the Debtors to pursue and purported to support (¶ 6);

i. Foxconn continuously misled the Lordstown about its own ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing the Debtors to devote substantial resources to the same cause (¶ 4);

j. Foxconn consistently failed to honor its agreements and caused its affiliates and instrumentalities to do the same. ¶ 7.

126. On January 4, 2023, Lordstown filed a Regulation FD disclosure on Form 8-K with the SEC. The disclosure document explained that Hightower would be making prepared remarks at the MIH Consortium Press Conference the following day. The disclosure attached Hightower's prepared remarks as an exhibit. The prepared remarks stated, in relevant part, the following:

> ***Worldwide manufacturer Foxconn, together with the MIH consortium and Lordstown Motors, are working together to create a new EV-native model to enable increased collaboration, fast-track innovation and the cost-effectiveness needed for a superior value proposition to specific groups of customers***. . . .

54

*The Foxconn EV ecosystem, including MIH, together with Lordstown Motors, as Foxconn's preferred vehicle development partner in North America, is uniquely positioned to act upon the increased, cross-industry collaboration and rapid innovation that is possible with EVs*. . . .

*Foxconn, MIH and Lordstown Motors are demonstrating that a new era of increased collaboration, rapid innovation and progress is here*. . . .

*It's a reality that underscores the importance of LMC's expertise and involvement in the Foxconn EV ecosystem*, which includes 4 types of companies that collaborate to bring an EV to market:

- Brand Companies
- EV Design Companies
- Platform Engineering Companies
- Component Manufacturing Companies

*Foxconn supplies components, software, supply chain and manufacturing expertise. In the context of an EV, Foxconn can provide the electronics hardware stack of components, everything from screens to modules to inverters. They are also developing capabilities in other core EV components such as motors and battery packs that can be shared across multiple vehicles and multiple OEMs*. . . .

*The sale of the manufacturing plant located in Lordstown, Ohio to Foxconn was much more than a transfer of ownership. It laid the groundwork for the two companies to collaborate on product development*. Foxconn's manufacturing model is operational and effective as evidenced by their manufacture of the ENDURANCE.

*Foxconn will leverage LMC's vehicle design, engineering and development expertise. Purchasing the Ohio plant and becoming an employer of highly skilled automotive professionals enables Foxconn to rapidly scale its component and supply chain capabilities*. . . .

*The Foxconn EV ecosystem, in collaboration with MIH and LMC, is a model that's built for speed and scale to create great EV products of high value. It also creates a unique ability to address new market opportunities that are quickly presenting themselves*. By engaging and investing in this ecosystem, EV makers and investors can enter through multiple pathways, step on the accelerator, innovate and fulfill the world's demand to transition to a broader spectrum of electric vehicles, faster.

Additionally, the following statements appeared in a presentation accompanying the remarks and were also attached to the Form 8-K:

> **The Foxconn & LMC partnership provides the industry with access to the assets and expertise to accelerate innovation, develop and manufacture tailored EVs at scale.**
>
> **Sale of the manufacturing plant located in Lordstown, Ohio to Foxconn laid the groundwork for how the two companies will collaborate.**

127. The statements by Lordstown and Hightower in ¶ 126 above were materially false and/or misleading when made because they knowingly and/or recklessly made the statements while failing to disclose the following facts that would have been highly material to investors and which facts existed at the time the statements were made, as revealed in Lordstown's Bankruptcy Complaint:

   a. After entering into the APA, Foxconn stonewalled Lordstown and dragged its feet in working to develop the parties' agreed upon joint development platform. Notwithstanding their obligations under the APA, five months after the APA was signed, Foxconn refused to even discuss the JV before closing the APA (¶ 32);

   b. That Foxconn used the opportunity of negotiating a management services agreement for the JV (which agreement was never executed) to impose a new spending authority structure that would require a Foxconn representative to approve every dollar spent by the JV, which veto right directly conflicted with the JVA (¶ 34);

   c. Foxconn was slow to respond, or failed to respond at all, to the Model C commitments it made in the JVA (¶ 35);

   d. While Foxconn moved forward to use the Lordstown facility with other EV manufacturers after closing the APA on May 11, 2022, Foxconn stymied the Company's attempts to move forward with the partnership to develop future

56

Lordstown vehicles under the JV Agreement. Among other things, Foxconn: (a) failed to grant the Company access to the Model C and Model E vehicle designs that it committed to provide; (b) stalled the Company's attempts to agree on a budget and timeline for the project as contemplated by the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon commitments. Foxconn also caused Foxconn EV System LLC to fail to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance. Moreover, Foxconn caused Foxconn EV Technology to delay the appointment of the JV's chief financial officer and to fail to make minimum monthly payments to the JV, each as required by the JV Agreement. Foxconn even refused to provide information about the JV's bank accounts (¶ 37);

e.  Foxconn stonewalled Lordstown's efforts regarding the JV at each and every turn. Foxconn and its affiliate's actions were driven by Foxconn, which was determined to maliciously and in bad faith destroy Lordstown's business in an effort to strip Lordstown's assets and poach its talent at little cost (¶ 42);

f.  Lordstown had sent Foxconn a letter on October 14, 2022 that Foxconn had breached the JVA and CMA (¶ 41), which resulted in the parties having to renegotiate their relationship and Lordstown having to abandon the JVA (¶ 44);

g.  Foxconn had insisted that Lordstown rescind a prior amendment to the Investment Agreement and enter into a new more restrictive document in order for Foxconn to file the CFIUS application (¶¶ 49-50);

h.  From the very beginning, Foxconn had been continually moving the goal posts on development of the Lordstown's next generation products, constantly shifting the nature of the product, failing to meet funding commitments, and absolutely refusing to engage with the Debtors on any of the various initiatives that Foxconn directed the Debtors to pursue and purported to support (¶ 6);

i.  Foxconn continuously misled the Lordstown about its own ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing the Debtors to devote substantial resources to the same cause (¶ 4);

j.  Foxconn consistently failed to honor its agreements and caused its affiliates and instrumentalities to do the same. ¶ 7.

128.  On February 13, 2023, Hightower participated in the CEO Panel Discussion from CES 2023, a technology convention.  During the discussion, Hightower stated, in relevant part:

> *We are unique in that we have a partnership with Foxconnn that goes beyond our contract manufacturing of the Endurance at the Foxconn EV Ohio Plant. . . . We have an agreement by which we will be developing future electric vehicle products in collaboration with Foxconn EV ecosystem, including the MIH consortium going forward, so that will allow smaller OEMs like us to gain scale by working a common hardware and software component set for future vehicles. . . . The collaboration will drive scale*

129.  The statements by Lordstown and Hightower in ¶ 128 above were materially false and/or misleading when made because they knowingly and/or recklessly made the statements while failing to disclose the following facts that would have been highly material to investors

and which facts existed at the time the statements were made, as revealed in Lordstown's
Bankruptcy Complaint:

    a. After entering into the APA, Foxconn stonewalled Lordstown and dragged its feet in working to develop the parties' agreed upon joint development platform. Notwithstanding their obligations under the APA and that five months after the APA was signed, Foxconn refused to even discuss the JV before closing the APA (¶ 32);

    b. That Foxconn used the opportunity of negotiating a management services agreement for the JV (which agreement was never executed) to impose a new spending authority structure that would require a Foxconn representative to approve every dollar spent by the JV, which veto right directly conflicted with the JVA (¶ 34);

    c. Foxconn was slow to respond, or failed to respond at all, to the Model C commitments it made in the JVA (¶ 35);

    d. While Foxconn moved forward to use the Lordstown facility with other EV manufacturers after closing the APA on May 11, 2022, Foxconn stymied the Company's attempts to move forward with the partnership to develop future Lordstown vehicles under the JV Agreement. Among other things, Foxconn: (a) failed to grant the Company access to the Model C and Model E vehicle designs that it committed to provide; (b) stalled the Company's attempts to agree on a budget and timeline for the project as contemplated by the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon commitments. Foxconn also caused Foxconn EV System LLC to fail to

honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance. Moreover, Foxconn caused Foxconn EV Technology to delay the appointment of the JV's chief financial officer and to fail to make minimum monthly payments to the JV, each as required by the JV Agreement. Foxconn even refused to provide information about the JV's bank accounts (¶ 37);

e.  Foxconn stonewalled Lordstown's efforts regarding the JV at each and every turn. Foxconn and its affiliate's actions were driven by Foxconn, which was determined to maliciously and in bad faith destroy Lordstown's business in an effort to strip Lordstown's assets and poach its talent at little cost (¶ 42);

f.  Lordstown had sent Foxconn a letter on October 14, 2022 that Foxconn had breached the JVA and CMA (¶ 41), which resulted in the parties having to renegotiate their relationship and Lordstown having to abandon the JVA (¶ 44);

g.  Foxconn had insisted that Lordstown rescind a prior amendment to the Investment Agreement and enter into a new more restrictive document in order for Foxconn to file the CFIUS application (¶¶ 49-50);

h.  From the very beginning, Foxconn had been continually moving the goal posts on development of the Lordstown's next generation products, constantly shifting the nature of the product, failing to meet funding commitments, and absolutely refusing to engage with the Debtors on any of the various initiatives that Foxconn directed the Debtors to pursue and purported to support (¶ 6);

      i.    Foxconn continuously misled the Lordstown about its own ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing the Debtors to devote substantial resources to the same cause (¶ 4);

      j.    Foxconn consistently failed to honor its agreements and caused its affiliates and instrumentalities to do the same. ¶ 7.

130.    On March 6, 2023, Lordstown issued a press release announcing the Company's financial results for the fourth quarter of 2022.  The press release stated, in relevant part:

> ***In Q4 2022, we expanded and strengthened our partnership with Foxconn. We converted our prior $100 million joint venture into a direct investment in Lordstown Motors of up to $170 million***, $52 million of which was funded in November 2022. . . .
>
> ***We continue to work collaboratively with Foxconn and the Mobility-in-Harmony ("MIH") Consortium on the pre-development work and vehicle development process ("VDP") deliverables for our next platform and vehicle program***. The next platform and vehicle program are key to Lordstown Motors' long-term business strategy and are becoming a greater portion of our Company's focus.

131.    That same day, Lordstown held an earnings conference call to discuss the financial results from the fourth quarter of 2022.  During the conference call, Hightower and Kroll stated in relevant part:

> [Hightower]: Switching to our future vehicle program, ***we continue to work collaboratively with Foxconn and the MIH consortium on the pre-development work and vehicle development process, or VDP, deliverables for our next platform and vehicle program***. . . .
>
> [Kroll]: In addition, ***we benefit from substantially lower operating complexity and risk by putting manufacturing in the hands of Foxconn***. And as Ed discussed, ***we advanced our long-term vehicle development partnership with Foxconn and its EV ecosystem***. . . .

[Hightower]: ***With us as Foxconn's preferred vehicle development partner, we plan to leverage common components, common subsystems and share them across, that the plan is for them to be shared across multiple OEMs***.

132.    The statements by Lordstown, Hightower, and Kroll in ¶¶ 130-31 and above were materially false and/or misleading when made because they knowingly and/or recklessly made the statements while failing to disclose the following facts that would have been highly material to investors and which facts existed at the time the statements were made, as revealed in Lordstown's Bankruptcy Complaint:

a.  After entering into the APA, Foxconn stonewalled Lordstown and dragged its feet in working to develop the parties' agreed upon joint development platform. Notwithstanding their obligations under the APA and that five months after the APA was signed, Foxconn refused to even discuss the JV before closing the APA (¶ 32);

b.  That Foxconn used the opportunity of negotiating a management services agreement for the JV (which agreement was never executed) to impose a new spending authority structure that would require a Foxconn representative to approve every dollar spent by the JV, which veto right directly conflicted with the JVA (¶ 34);

c.  Foxconn was slow to respond, or failed to respond at all, to the Model C commitments it made in the JVA (¶ 35);

d.  While Foxconn moved forward to use the Lordstown facility with other EV manufacturers after closing the APA on May 11, 2022, Foxconn stymied the Company's attempts to move forward with the partnership to develop future Lordstown vehicles under the JV Agreement. Among other things, Foxconn: (a) failed to grant the Company access to the Model C and Model E vehicle designs that it committed to provide; (b) stalled the Company's attempts to agree on a budget and

62

timeline for the project as contemplated by the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon commitments. Foxconn also caused Foxconn EV System LLC to fail to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance. Moreover, Foxconn caused Foxconn EV Technology to delay the appointment of the JV's chief financial officer and to fail to make minimum monthly payments to the JV, each as required by the JV Agreement. Foxconn even refused to provide information about the JV's bank accounts (¶ 37);

e.  Foxconn stonewalled Lordstown's efforts regarding the JV at each and every turn. Foxconn and its affiliate's actions were driven by Foxconn, which was determined to maliciously and in bad faith destroy Lordstown's business in an effort to strip Lordstown's assets and poach its talent at little cost (¶ 42);

f.  Lordstown had sent Foxconn a letter on October 14, 2022 that Foxconn had breached the JVA and CMA (¶ 41), which resulted in the parties having to renegotiate their relationship and Lordstown having to abandon the JVA (¶ 44);

g.  Foxconn had insisted that Lordstown rescind a prior amendment to the Investment Agreement and enter into a new more restrictive document in order for Foxconn to file the CFIUS application (¶¶ 49-50);

    h.    From the very beginning, Foxconn had been continually moving the goal posts on development of the Lordstown's next generation products, constantly shifting the nature of the product, failing to meet funding commitments, and absolutely refusing to engage with the Debtors on any of the various initiatives that Foxconn directed the Debtors to pursue and purported to support (¶ 6);

    i.    Foxconn continuously misled the Lordstown about its own ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing the Debtors to devote substantial resources to the same cause (¶ 4);

    j.    Foxconn consistently failed to honor its agreements and caused its affiliates and instrumentalities to do the same. ¶ 7.

133.    Lordstown also provided a slide show presentation to accompany the conference call.  The slides contained the following statements:

> ***Progressed pre-development work on the new program in collaboration with Foxconn EV Ecosystem*** . . .
>
> ***Strengthened Partnership: Additional Foxconn Investment in LMC***
>
> ***Transformed the $100 million JV into up to $170 million direct investment in Lordstown Motors Common Stock and Preferred Stock***, subject to certain conditions; initial $52 million funded . . . .

134.    The statements by Lordstown in ¶ 133 above were materially false and/or misleading when made because they knowingly and/or recklessly made the statements while failing to disclose the following facts that:

    a.    After entering into the APA, Foxconn stonewalled Lordstown and dragged its feet in working to develop the parties' agreed upon joint development platform.

Notwithstanding their obligations under the APA and that five months after the APA was signed, Foxconn refused to even discuss the JV before closing the APA (¶ 32);

b.  That Foxconn used the opportunity of negotiating a management services agreement for the JV (which agreement was never executed) to impose a new spending authority structure that would require a Foxconn representative to approve every dollar spent by the JV, which veto right directly conflicted with the JVA (¶ 34);

c.  Foxconn was slow to respond, or failed to respond at all, to the Model C commitments it made in the JVA (¶ 35);

d.  While Foxconn moved forward to use the Lordstown facility with other EV manufacturers after closing the APA on May 11, 2022, Foxconn stymied the Company's attempts to move forward with the partnership to develop future Lordstown vehicles under the JV Agreement. Among other things, Foxconn: (a) failed to grant the Company access to the Model C and Model E vehicle designs that it committed to provide; (b) stalled the Company's attempts to agree on a budget and timeline for the project as contemplated by the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon commitments. Foxconn also caused Foxconn EV System LLC to fail to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance.

65

Moreover, Foxconn caused Foxconn EV Technology to delay the appointment of the JV's chief financial officer and to fail to make minimum monthly payments to the JV, each as required by the JV Agreement. Foxconn even refused to provide information about the JV's bank accounts (¶ 37);

e.  Foxconn stonewalled Lordstown's efforts regarding the JV at each and every turn. Foxconn and its affiliate's actions were driven by Foxconn, which was determined to maliciously and in bad faith destroy Lordstown's business in an effort to strip Lordstown's assets and poach its talent at little cost (¶ 42);

f.  Lordstown had sent Foxconn a letter on October 14, 2022 that Foxconn had breached the JVA and CMA (¶ 41), which resulted in the parties having to renegotiate their relationship and Lordstown having to abandon the JVA (¶ 44);

g.  Foxconn had insisted that Lordstown rescind a prior amendment to the Investment Agreement and enter into a new more restrictive document in order for Foxconn to file the CFIUS application (¶¶ 49-50);

h.  From the very beginning, Foxconn had been continually moving the goal posts on development of the Lordstown's next generation products, constantly shifting the nature of the product, failing to meet funding commitments, and absolutely refusing to engage with the Debtors on any of the various initiatives that Foxconn directed the Debtors to pursue and purported to support (¶ 6);

i.  Foxconn continuously misled the Lordstown about its own ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing the Debtors to devote substantial resources to the same cause (¶ 4);

j.   Foxconn consistently failed to honor its agreements and caused its affiliates and instrumentalities to do the same. ¶ 7.

### THE TRUTH BEGINS TO EMERGE

**A.   Lordstown Proposed a Reverse Stock Split**

135.   On April 11, 2023, Lordstown filed a Definitive Proxy Statement for an annual meeting of stockholders to be held on May 22, 2023 with the SEC on Form DEF 14A ("2023 Form DEF 14A").  One of the proposals was an approval request of a reverse stock split; and two of the reasons listed for the reverse stock split were (1) to continue to satisfy NASDAQ listing standards, and (2) to potentially improve the marketability and liquidity of the Company's Class A common stock.  Form DEF 14A, April 11, 2023, at 29-31.  Notably, Lordstown cautioned stockholders what might happen if the NASDAQ listing standard were not satisfied and gave examples (i.e., the sale agreement with Jefferies LLC, dated November 7, 2022, may not have been upheld if the stock price fell below $1.00 per share).  *Id.* at 29-30.  Lordstown was silent on the potential effect that this same circumstance may have had on the Foxconn Investment Agreement.

136.   Additionally, as part of the Corporate Governance section of the proxy statement, Lordstown stated that if the Subsequent Common Closing occurs, Foxconn will have the right to designate two members of the Board and will retain such right subject to the conditions set forth in the Investment Agreement.  *Id.* at 42.

137.   On this news, the price of Lordstown's shares were at a record low of $0.54 and closed at a price approximately 7.83% lower from the close price on April 10, 2023.

**B.   Lordstown Received A Delisting Letter From NASDAQ**

138.   Following the Fourth Quarter and Fiscal Year 2022 Financial presentation on March 6, 2023, Lordstown's Class A common stock was listed below $1.00 per share for thirty

(30) consecutive days (from March 7, 2023 through April 18, 2023).  On April 19, 2023, Lordstown disclosed that it had received a delisting letter from NASDAQ, informing Lordstown that it had 180 days to comply with the minimum requirement to raise the stock price above $1.00 per share.  Bankr. Compl. at Ex. H.

139.    On this news, the price of Lordstown's shares dropped to $0.53 at close on April 19, 2023.  The close price was approximately 6.01% lower than April 18, 2023, and dropped approximately 8.28% the next day on April 20, 2023.

140.    As a result of the NASDAQ delisting letter, on April 21, 2023, Foxconn sent Lordstown a notice of default for failing to fulfill the representation and warranties condition in the Investment Agreement (specifically, the Listing and Maintenance Requirements of Section 3.13).  Foxconn warned Lordstown that it had until May 21, 2023 to cure said breach, and Foxconn further indicated that it was open to discuss a resolution of the matter.  Bankr. Compl. at Ex. I.

141.    On April 24, 2023, Lordstown received regulatory approval with CFIUS, which set the anticipated Subsequent Common Closing of the Investment Agreement to be no later than 10 business days thereafter (*i.e.*, May 8, 2023)

142.    On April 25, 2023, Lordstown responded to Foxconn's April 21 notice of default contesting Foxconn's assertion that the Company breached the Investment Agreement.  Foxconn did not respond to this letter.

## C.    Lordstown Was Forced To Partially Disclose The True State of Its Relationship With Foxconn

143.    On May 1, 2023, Lordstown disclosed Foxconn's April 21 notice of default by filing a Form 8-K with the SEC.  The form was signed by Kroll and claimed Lordstown was "in discussions" with Foxconn to resolve the matter, but that, without Foxconn's funding, Lordstown

would be "deprived of critical funding necessary for its operations." Form 8-K, May 1, 2023, at 2-3.

144. On this news, the price of Lordstown's shares dropped to $0.40, or approximately 23.33% at the close on May 1, 2023.

145. On May 2, 2023, Foxconn asserted in correspondence with the Company and publicly that the Investment Agreement had been breached and that, unless remedied, Foxconn would not be closing on May 8, 2023. The following day, Lordstown sent a letter to Foxconn acknowledging Foxconn's refusal to close on the anticipated Subsequent Common Closing of the Investment Agreement on May 3, 2023.

146. On May 4, 2023, Lordstown filed a financial report for the fourth quarter of 2022 with the SEC on Form 10-Q. In the Form 10-Q, Lordstown claimed that it was in ongoing discussions with Foxconn. However, Lordstown indicated that it did not "expect Foxconn to provide its approval to the EV Program budget and EV Program milestones," which were conditions required by the Investment Agreement established well before Foxconn's notice of breach. Form 10-Q, May 4, 2023, at 12.

147. On May 7, 2023, two Board members designated by Foxconn were added to the Lordstown Board of Directors. These two seats were appointed pursuant to the anticipated Subsequent Common Closing of the Investment Agreement. In Lordstown's 2023 proxy statement, on Form DEF 14A, the Company represented that the two Board members would be added "[i]n such event" that the Subsequent Common Closing occurred. Thus, the market assumed that, given the appointment of the board members, that the Subsequent Common Closing had been executed (it had not, but Lordstown did not disclose that fact). Form DEF 14A, April 11, 2023, at 42. Given that Lordstown did not disclose Foxconn's failure to close on May

69

8, 2023, and the price of Lordstown's shares closed at approximately 12.42% higher on May 8, 2023 than on open that day.

148.    However, on May 11, 2023, Lordstown finally confirmed in a Form 8-K filed with the SEC that the Subsequent Common Closing had not in fact occurred.  This revelation caused the Company's stock price to drop approximately 2% to close at $0.34 on May 12, 2023.

149.    On May 23, 2023, Lordstown announced a reverse stock split (1:15) and stated that, as of April 30, 2023, it had approximately $165 million of cash, cash equivalents and short-term investments.[6]  Form 8-K, May 23, 2023, at 4.  This was still $15 million more than what Lordstown had indicated it expected to end the first quarter of 2023 with during the March 6, 2023 Earnings Call.  Indeed, during the call, neither Hightower nor Kroll indicated that the additional Foxconn funding would be critical for operations.  *See* Lordstown Motors, Corp., FY 2022 Earnings Call, 8 (Mar. 6, 2023) (transcript on file with S&P Global).

150.    The price of Lordstown's shares closed on May 24, 2023 at $3.73, or approximately 12.44% less than the previous close price.

151.    On June 5, 2023, Foxconn addressed Lordstown's reverse stock split, indicating that it was still open to a potential Subsequent Common Closing but that the Investment Agreement was subject to an applicable stock conversion ratio adjustment.

152.    On June 9, 2023, Lordstown finally disclosed the true state of its relationship with Foxconn with the SEC on Form 8-K.  The form was signed by Kroll and stated, in part:

> In light of Foxconn's conduct, the Company believes that it is unlikely that
> Foxconn will complete the Subsequent Common Closing.  The Company believes

---

[6]    On May 24, 2023, the reverse stock split went into effect, causing stock reporting platforms to adjust Lordstown's historical prices prior to this date.  For example, the S&P Global Compustat Company Research report from March 2, 2023 reported that the closing price on February 28, 2023 was $1.04; however, after May 24, 2023, the stock price for that day is now reported at $15.60, which is 15x greater, reflecting the effect of the reverse stock split.

that Foxconn's **various breaches of the Investment Agreement and pattern of bad faith have caused material and irreparable harm to the Company**. Absent a prompt resolution, the Company intends to enforce its rights through litigation.

Form 8-K, June 9, 2023, at 2.

153.    On this news, the price of Lordstown's shares dropped to $3.08, or approximately 3.75% decrease at the close on June 9, 2023.

## THE TRUTH IS FINALLY DISLCOSED

154.    On June 27, 2023, the risk of Lordstown's financial collapse due to the actions of Foxconn's came to fruition.  That day, Lordstown announced a restructuring process and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code ("Bankruptcy Filing") and an adversarial complaint against Foxconn and certain of its affiliates ("Bankruptcy Complaint") with the United States Bankruptcy Court for the District of Delaware.

155.    On this news, the price of Lordstown's shares dropped approximately 17.18%, from $2.77 at the close on June 26, 2023 to $2.29 at the close on June 27, 2023.

156.    As part of its bankruptcy filing, Lordstown the Bankruptcy Complaint.  In the Bankruptcy Complaint, Lordstown accused Foxconn of engaging in a fraudulent scheme to misappropriate Lordstown's most valuable assets and then intentionally killing Lordstown's business.

157.    Indeed, the complaint alleges that Foxconn "used various assurances of support for the Endurance pick-up truck and future joint product development to secure ownership of [Lordstown's] unique and most valuable asset, its manufacturing plant, and to transfer highly talented and experienced manufacturing and operational employees to the Foxconn team."  ¶ 4. But, "[a]fter getting the valuable assets it desired upfront, [Foxconn] then sabotaged [Lordstown's] business, starving it of cash and causing it to fail.  Instead of building a thriving

business for the benefit of all Lordstown's stakeholders, Foxconn maliciously and in bad faith

destroyed that business, costing Lordstown's creditors and shareholders millions."  ¶ 7.

158.    In fact, "[f]rom the very beginning, Foxconn continually moved the goal posts on

development of [Lordstown's] next generation products, constantly shifting the nature of the

product, failing to meet funding commitments, and absolutely refusing to engage with

[Lordstown] on any of the various initiatives that Foxconn directed [Lordstown] to pursue . . . ."

¶ 6.

159.    On June 28, 2023, when discussing the Company's bankruptcy filing, Hightower

finally revealed the truth about his trip to Taiwan.  He explained that he "made the trip to Taiwan

to break the logjam" with Foxconn, however, the CEO of Foxtron refused to meet with him.

Moreover, Hightower was told that Lordstown would not be doing the crucial work of the new

electric vehicle line, but rather Foxtron, owned by Foxconn, would be in direct competition with

Lordstown.  Hightower also explained that Foxtron and Foxconn refused to provide him with the

engineering drawings, data and essential licensing agreements necessary for the new electric

vehicle project per the JVA.  *See* David Welch and Sean O'Kane, *Lordstown CEO Was Ghosted

by Foxconn Unit a Year Before Collapse*, Bloomberg Law News (June 28, 2023),

https://www.bloomberglaw.com/product/blaw/bloomberglawnews/bloomberg-law-

news/X2NENA3C000000.

160.    On this news, the price of Lordstown's shares dropped to $2.11, or approximately

7.86% decrease at the close on June 28, 2023.

161.    The Bankruptcy Court also entered an interim order approving the Lordstown's

Motion for Entry of Interim and Final Orders (A) Authorizing, but Not Directing, [Lordstown] to

(I) Pay Prepetition Wages and Compensation; (II) Continue Certain Employee Benefits and

Incentive Programs; (III) Continue Certain Health and Insurance Benefits; and (B) Granting

Other Related Relief on June 29, 2023 and a final order on July 25, 2023.

162.    On July 7, 2023, Lordstown's listing was changed from NASDAQ to Over-the-

Counter US Market.  On July 13, 2023, some analysts discontinued coverage of Lordstown for

its removal from NASDAQ listing.  Emmanuel Rosner, Winnie Dong, & Conor Walters,

*Discontinuation of Coverage*, Deutsche Bank (July 13, 2023).

163.    Ultimately, on July 27, 2023, Lordstown was removed from NASDAQ listing.

## ADDITIONAL SCIENTER ALLEGATIONS

### A.    *Respondeat Superior* and Agency Principles Apply

164.    Although Lordstown is not a named Defendant, Lordstown is liable for the acts of

Defendants and other Company officers, directors, employees, and agents under the doctrine of

*respondeat superior* and common law principles of agency as all of the wrongful acts complained

of herein were carried out within the scope of their employment or agency with the authority or

apparent authority to do so.

### B.    Defendants Knew Or Were Reckless In Not Knowing That Foxconn Was Not a Viable Partner and Was Not Acting in Good Faith

165.    All Defendants had possession of or access to information indicating that their

statements regarding the state of Lordstown's finances and partnership with Foxconn were false

and/or misleading.  Foxconn's partnership was so critical to Lordstown's success during the Class

Period that the misrepresented and omitted information at issue would have been readily apparent to

all Defendants, which contributes to a strong inference of scienter.

166.    Defendants' knowledge of, or reckless disregard for, the litany of issues with

Foxconn's partnership discussed herein are readily apparent by declarations made in the

Bankruptcy Complaint and supporting affidavits of Lordstown's bankruptcy petition, Hightower

(the Declaration of Edward T. Hightower in Support of Debtors' Objection to Foxconn's Motion, hereinafter "Decl. of Hightower"), and Kroll (the Declaration of Adam Kroll in Support of Debtors' Chapter 11 Petitions and First Day Motions, hereinafter "Decl. of Kroll") (attached hereto as Exhibits 2 and 3). These declarations stated that Foxconn breached multiple agreements and had a history of poor communication and cooperation with Lordstown throughout the Class Period. Hightower even confirmed in the June 27, 2023, press release that "Foxconn willfully and repeatedly failed to execute on the agreed-upon strategy." According to Kroll, "Foxconn repeatedly failed to engage [with Lordstown]" since November 2021. Decl. of Kroll at ¶¶ 25-26. Additionally, Defendants' knowledge, or reckless disregard, of this throughout the Class Period can be readily inferred because it was widespread knowledge within the Company that Foxconn was going to sabotage the relationship.

167. As detailed herein, Defendants also spoke regularly about the significance of Foxconn's partnership to Lordstown's future growth. For example, on November 7, 2022, Hightower stated, "We acknowledge and appreciate the confidence in our team that is shown by this investment." Then, during the earnings conference call on November 8, 2022, Kroll stated, "In addition to a strong show of confidence in our team, yesterday's announcement regarding the capital injection from Foxconn is an important step in addressing our capital needs."

168. Therefore, Defendants were aware that Foxconn's partnership was significant to Lordstown's finances and success, and knew, or were reckless in disregarding, that a partnership with Foxconn was not viable because they knowingly or recklessly disregarded (1) Foxconn's numerous breaches of different agreements; (2) widespread knowledge that Foxconn was delaying production of Endurance to sabotage Lordstown; and (3) disclosure of the importance of Foxconn's investment to operating costs.

### 1. Defendants Were Aware of The Conditions of the JVA and the Investment Agreement

169.     All Defendants had possession of or access to information about the conditions of the JVA and the subsequent Investment Agreement and either knew or recklessly disregarded the fact that Foxconn repeatedly did not meet those conditions before and after entering new agreements with Foxconn.

170.     First, Hightower signed the Investment Agreement, and the AIA, and the RFA. Therefore, there can be no doubt that he was aware of the terms of those agreements.  Additionally, Kroll signed the November 7, 2022 Form 8-K, which disclosed the terms of the Investment Agreement.  By signing on or about November 7, 2022, Hightower and Kroll were acknowledging their understanding and awareness of the contents of the Investment Agreement.

171.     Second, Hightower and Kroll routinely discussed Lordstown's relationship with Foxconn, thus indicating that they were aware of the terms of the agreements, including the JVA, about which they spoke.  Hightower and Kroll were aware of the conditions under both agreements because they frequently discussed what the effect the agreements would have on Lordstown, indicating that they either reviewed the written agreements and knew what they were talking about, or were reckless in speaking about the agreements without reviewing that information.  For example, during the earnings conference call on August 4, 2022, Hightower stated, in part, "As I also served as CEO of the Foxconn joint venture . . . . [w]e had several meetings on how to best operationalize the JV . . . . [w]e also had several discussions about the first vehicle program of the JV . . . ."

172.     Also, during a conference call held on November 8, 2022, Hightower and Kroll made numerous statements about the terms and conditions of the Investment Agreement. Hightower stated, in part, "[The Investment Agreement] will replace what was going to be funding

75

of the JV, and the work will be by the Lordstown team in collaboration with Foxconn and the investment will be in 3 tranches to Lordstown." Kroll followed up, in part, "[T]he joint venture . . . is being disbanded. [ W]e kind of think the direct investment in Lordstown is a better, simpler, easier structure." Although the Investment Agreement was critical for the Lordstown's funding, Hightower misrepresented the investment as a future collaboration: "[it] will be used to fund in 3 phases our team's work in developing future electric vehicles in collaboration with Foxconn and its partners. This direct investment in LMC replaces the $100 million originally earmarked for the Foxconn LMC joint venture that we discussed on our last call." There were no disclosures that Foxconn failed to follow through on the JVA which is why it was replaced with the Investment Agreement.

173.    During a conference call held on March 6, 2023, Kroll also stated, in part:

> The remaining $117 million of Foxconn investments discussed earlier are broken down as follows: approximately $47 million from a second tranche of common stock, following satisfaction of conditions under the investment agreement, followed by tranches of $30 million and $40 million of preferred stock purchases that are each subject to achieving mutually agreed development milestones and satisfying other conditions. We cannot predict at this stage when or if those milestones will be achieved.

**2.    Defendants Were Aware of the Hugely Negative Implications of Foxconn's Breaches of the JVA and the Investment Agreement**

174.    Defendants were aware that Foxconn had breached the JVA and the Investment Agreement because they were intimately involved with the relationship between the two parties. From the onset of the partnership, Defendants each promoted the close working relationship between Lordstown and Foxconn to successfully complete each phase of the partnership.

175.    At the outset, Hightower, through his 30 years of product development experience in the global automotive industry, joined Lordstown with "two objectives" including the launch of Endurance and to build the relationship with Foxconn. In order to facilitate these objectives,

Hightower promoted a focus of integrity, discipline, collaboration and "*greater transparency . . . internally and externally . . . .*" As purported evidence of the promotion of these goals, Hightower stated, at the President's Speaker Series at Bentley University on November 14, 2022, "*we are in constant communication with the chairman of Foxconn*." These statements were not made in hindsight; these statements were affirmations of Defendants' knowledge or reckless disregard during the Class Period.

176.     In a press release, the Company stated that "[Lordstown] continue[s] to work closely with Foxconn to close [the] pending transaction and strengthen [the] manufacturing and product development partnership."

177.     Likewise, on June 28, 2023, Hightower admitted in an interview that he had traveled to Taiwan in the summer of 2022 to meet with Foxconn executives. During that meeting, the CEO of Foxtron refused to meet with him and Foxconn and Foxtron refused to provide him with the engineering drawings, data, and essential licensing agreements necessary for the new EV project. During that interview, Hightower also admitted that before November 2022, he learned Lordstown would not be Foxconn's primary North American vehicle development partner per the terms of the JVA.

178.     Unsurprisingly, Foxconn was still not cooperating with Lordstown per the JVA, and Lordstown sent a letter to Foxconn noting the various breaches on October 14, 2022. Bankr. Compl. ¶ 41. Foxconn's breaches to the JVA included: failure to grant Lordstown access to intellectual property data; refusal to approve a timeline or budget for the EV program; lack of meaningful engagement with Lordstown during *weekly* board meetings; and failure to attend meetings and provide approvals for basic requests. Decl. of Kroll at ¶ 31. Kroll's awareness of this

letter and the breaches can be inferred by his disposal of 83,333 RSU for Class A common stock of which he sold almost half of them on October 13, 2022. Form 4 – Adam Kroll, October 14, 2022.

179. Despite these breaches, Lordstown amended the JVA and entered into yet another agreement with Foxconn on November 7, 2022. Given that Hightower was the CEO of the joint venture and signed the Investment Agreement, and given that Kroll signed the 8-K disclosing the Investment Agreement, they would have been aware of Lordstown's admitted reason for entering into the Investment Agreement: "Foxconn had failed to live up to its commitments in the [JVA]" (Bankr. Compl. ¶ 44); and "[a]s a result of these failures, it became clear that [Lordstown] would not receive the benefits that Foxconn had promised and was legally required to provide in connection with the JV" (Decl. of Kroll at ¶ 33). Hightower also signed the amendments to the Investment Agreement in the following weeks and months. Therefore, he would have been aware of the drama surrounding those agreements, including that: (1) After convincing Lordstown to sign on to Softbank's electric vehicle program, Foxconn backtracked and then instructed Lordstown to pivot away from the SoftBank electric vehicle program and instead focus on the internal program (Bankr. Compl. ¶ 47) only *days* after signing the initial Investment Agreement (Decl. of Kroll at ¶ 35); (2) Foxconn executives demanded that the AIA be rescinded before they would submit the CFIUS filing for the Investment Agreement (Bankr. Compl. ¶¶ 49-50), which Lordstown agreed to the new, more restrictive, amendment due to their "tremendous need for the financing Foxconn promised" (Decl. of Kroll at ¶35); and (3) the CFIUS filing was submitted two weeks after the agreed-upon deadline (¶ 50).

180. However, despite these claims, Hightower's awareness of Endurance's production issues and Foxconn's breaches can be inferred by his disposal of 166,666 RSU for Class A common

stock of which he sold almost half of them on November 9, 2022.  Form 4 – Edward Hightower, November 14, 2022.

181.    Moreover, Hightower's and Kroll's statements regarding Lordstown's relationship with Foxconn indicated that they were actively involved in working with Foxconn and thus would have been aware of Foxconn's "extreme bad faith" in dealing with Lordstown.  ¶ 50.

182.    For example, during the earnings conference call on August 4, 2022, Hightower stated, in part, "As I also served as CEO of the Foxconn joint venture . . . . [w]e had several meetings on how to best operationalize the JV . . . . [w]e also had several discussions about the first vehicle program of the JV . . . ."

183.    During a CEO panel discussion held on February 13, 2023, Hightower stated, in part:

> We are unique in that we have a partnership with Foxconnn that goes beyond our contract manufacturing of the Endurance at the Foxconn EV Ohio Plant . . . . We have an agreement by which we will be developing future electric vehicle products in collaboration with Foxconn EV ecosystem, including the MIH consortium going forward, so that will allow smaller OEMs like us to gain scale by working a common hardware and software component set for future vehicles . . . The collaboration will drive scale.

184.    In a Form 10-K, Hightower and Kroll conditioned the production of their marquee product, Endurance, on various factors by stating that:

> ***The production of the Endurance by Foxconn requires successful coordination among us [Lordstown] and Foxconn, and depends on our ability to, for example, jointly manage a production schedule, coordinate with suppliers and forecast the appropriate quantity of supplies, disseminate proprietary information and technology, conduct product testing and meet quality assurance standards***.

Form 10-K, March 6, 2023 at 30.

185.    Then, in an earnings conference call on March 6, 2023, Hightower stated, in part, "[Lordstown] continue[s] to work collaboratively with Foxconn [on the future vehicle program]."

Kroll stated, in part, "Under the terms of the investment agreement we entered into with Foxconn in November and subject to regulatory approval, other conditions and satisfaction of EV program milestones, Foxconn is expected to purchase up to $117 million in additional common and preferred stock."

186.   Defendants' knowledge of, or reckless disregard in, Foxconn's inability to be a viable partner was affirmed by Kroll and Hightower after the Class Period. On June 27, 2023, in his declaration in support of debtors' chapter 11 petitions and first day motions, Kroll stated, in part, "As part of the JV, Foxconn committed to provide the JV with access to data, information and vehicle designs . . . . Foxconn never followed through on its commitments—indeed, it never intended to . . . . Since it was clear that Foxconn had no intention of satisfying its commitments in the JV Agreement, the Company agreed, on November 7, 2022, to pivot away from the JV Agreement . . . ." Decl. of Kroll at ¶¶ 29, 34.

### 3.    Defendants Were Aware that Foxconn Was Stymieing the Commercial Launch of the Endurance

187.   All Defendants had possession of or access to information regarding Foxconn's repeated efforts to stymie the commercial launch of the Endurance. Defendants' knowledge, or reckless disregard, that Foxconn was frustrating the progress for Endurance's commercial launch can be readily inferred because, despite progress on Endurance's launch being stagnated, Defendants repeatedly made statements to the contrary.

188.   On the same day as the closing of the plant purchase and entering into the CMA, Lordstown claimed that the "[c]ontract manufacture of the Endurance **by Foxconn** at the Lordstown facility **with no interruption in operations**," which was contrary to CW-1's allegations that all production on Endurance was halted during the negotiations of the plant purchase. Later, Hightower and Ninivaggi both touted on August 4, 2022, that Lordstown "**made significant progress**"

towards launching the Endurance in the second quarter.  However, after over four months since Foxconn closed the plant purchase, only two Endurance vehicles had been produced.

189.    Less than six weeks after that press release, Hightower congratulated the Lordstown-Foxconn partnership, stating, in part, "Over the last year, the LMC and Foxconn teams have worked collaboratively to bring the Endurance into commercial production, despite numerous external challenges"; and "I would like to begin by congratulating the team at Lordstown Motors, our partners at Foxconn EV Technology and all of our supplier partners around the world for **bringing the Endurance into commercial production**. . . . I'm proud of the accomplishments of the Lordstown and Foxconn EV Technology teams in **bringing the Endurance into commercial production**[.]"  By November, only ten more Endurance vehicles had been produced.

190.    Based on his statements displaying intimate knowledge of the progress of Endurance production, it can be readily inferred that Hightower would have been aware that only <u>twelve</u> vehicles had been produced, or at the very least, he would have acted recklessly in making these statements without verifying their accuracy.  Given Hightower's close involvement in the production of the Endurance, he would have been aware of Foxconn's repeated efforts to stagnate progress, as that behavior was evident to even lower-level employees working at the Lordstown plant.

191.    One week later, on November 14, 2022, Hightower further expounded upon his personal involvement with Endurance's progress: "I had to take a very close look at where the product was when I joined the company: in its development phase, what work had been completed,. What worked from both an engineering standpoint and from a plant readiness standpoint and from a supply chain standpoint. What has been completed and what was left to be done. . . . I told the team we have two objectives. That's it, two, not three, two: **launch the Endurance and build this**

**relationship with Foxconn, our partner**." Hightower also detailed his knowledge of the plant and the Foxconn collaboration, in relevant part: "we were **looking for a partner who could help us fill that plant**. . . . We were **well along the way with developing the Endurance**. . . . it was a great opportunity for us to **sell the plant to them, form a contract manufacturing agreement for them to basically assemble the Endurance for us, having done all the product design, engineering, testing, obligations work**."

192.    Despite only producing approximately 30 vehicles in 2022 and approximately 10 more in the first couple of months in 2023, Lordstown and Hightower kept reassuring investors about Foxconn's role in manufacturing the Endurance.  *See* Form 8-K, January 4, 2023, Ex. 99.1 at 4 ("The sale of the manufacturing plant located in Lordstown, Ohio to Foxconn was much more than a transfer of ownership. It laid the groundwork for the two companies to collaborate on product development. Foxconn's manufacturing model is **operational and effective as evidenced by their manufacture of the ENDURANCE**.) ("We are **unique in that we have a partnership with Foxconnn that goes beyond our contract manufacturing of the Endurance at the Foxconn EV Ohio Plant . . . .**").

193.    Then, in March 2023, Lordstown halted production of the Endurance citing quality issues.  However, during the conference call that month, Hightower stated, in part, ""we decided to temporarily pause production as we work with our supplier network to root-cause the issues; conduct additional vehicle component and software testing; and as needed, make updates to affected vehicle components and software."  Similar to back in November, Hightower again conveyed that he was intimately involved in the commercial launch of Endurance but attributed all production issues to external sources.  However, according to CW-1, the plant itself was instructed not to help Lordstown if any issues arose.  It can be readily inferred that Hightower would have

been aware what the production challenges were and would have knowledge of, or recklessly disregarded, the lack of cooperation at the plant.

194.    It is not credible that during this time Kroll was unaware of Foxconn's role in frustrating the process to commercially launch the Endurance.  In addition to signing the SEC forms and working extensively with Foxconn on the various financial agreements, Kroll would have needed to review the balance sheet and verify any liabilities associated with Lordstown's biggest assets: the plant and the Endurance.  ("While our business model is more durable and operational execution has improved, we will continue to execute a capital-constrained business plan, making trade-offs on what and when we spend the funds we have. **Scaling the Endurance, even where we defined a strategic OEM partner, will require substantial additional capital.**").  It can be readily inferred that Kroll would have been aware of Foxconn's role in producing the Endurance and would have knowledge of, or recklessly disregarded, the effect that Foxconn's lack of cooperation had on Lordstown's expenses.

### 4.    The Poor Relationship Between Lordstown and Foxconn Was Known Internally at Lordstown

195.    All Defendants had possession of or access to information regarding the poor relationship between Lordstown and Foxconn because Foxconn's pattern of uncooperative behavior was institutional knowledge at Lordstown.

196.    After ownership was transferred to Foxconn, many Lordstown employees became Foxconn employees.  CW-1 stated that, as an employee at the plant, it was apparent that Foxconn was planning to bankrupt Lordstown by "making it hard for Lordstown to do work in the plant." Although CW-1 was not told explicitly that Foxconn wanted Lordstown to fail, Foxconn managers, *i.e.*, directors or other Foxconn plant executives who were legacy Lordstown employees, gave instructions for plant employees not to help Lordstown.  For example, if equipment malfunctioned,

the plant employees would not help, even though they knew how to fix and resolve the issues.
From November 2019 until 2022, this plant and its employees were previously Lordstown
employees; Defendants should have known, or recklessly disregarded, what the capabilities of the
plant and its employees were.  In fact, at the President's Speaker Series at Bentley University on
November 14, 2022, Hightower made many statements intimating that he had thorough knowledge
of the capacity of the plant as well as the progress of the Endurance.  Foxconn's "stonewalling" and
"roadblocking" were readily apparent in these delays in Endurance production at the plant, which
was widespread knowledge within the Company.  Given that numerous lower-level employees
knew of the production delays and the cause for the delays, it is not plausible that Defendants were
not aware.  *See In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 261, 269 (S.D.N.Y. 2014)
(inferring scienter against a defendant when "the transfer was so obvious that [the defendant] must
have been aware of it[.]") (internal quotation marks omitted).

197.    Even according to Kroll, on June 9, 2022, Foxconn restricted Lordstown's access to
the plant (Decl. of Kroll at ¶ 32), corroborating CW-1's impression that Foxconn was "making it
hard for Lordstown to do work in the plant."  Lordstown employees who were permanently
assigned to the plant were burdened by these restrictions (Decl. of Kroll at ¶ 32), and would have
been aware of the poor relationship between Lordstown and Foxconn that was apparent to
employees like CW-1.

198.    CW-3 stated that "plenty of milestones [were] dropped for lack of funds."  CW-2
worked in the same facility as CW-3 since October 2022.  During CW-2's employment, CW-2's
work was held back because funding from Foxconn was not received.  CW-2 stated that work
progress was "all contingent" on Lordstown getting the $170 million in financing from Foxconn.
According to CW-3, the funding delays were not only negatively affecting Lordstown's relationship

with Foxconn but also causing Lordstown's relationship with suppliers to "[go] south."  Suppliers

could see that Lordstown and the Endurance were "not ready" as scheduled and began "losing

faith."  With suppliers losing confidence in Lordstown and employees unable to work due to lack of

funding, it is not plausible that Defendants were not aware of the cumulative effects of the poor

relationship between Lordstown and Foxconn.

### 5. Foxconn's Investment Was Vital To Lordstown's Operating Costs and Balance Sheet

199.    All Defendants had possession of or access to information showing Lordstown's

operating costs and balance sheet.  Defendants' knowledge, or reckless disregard, that Foxconn's

partnership was vital to Lordstown's continued operations are readily apparent in SEC filings

signed by Kroll, which should have been reviewed by Hightower.  For example, during the talk at

Bentley University on November 14, 2022, Hightower discussed how Foxconn was helping reduce

Lordstown's operating cost.  ("It also allows us to transition into an asset-like business model. So

we don't need to carry all of the costs of that asset, that plant against six-and-a-half square feet,

400,000 vehicles a year. You would be surprised at what the electric bill alone on a month.")  Then,

during the SXSW 2023 conference, on March 16, 2023, Hightower discussed how cost was an

important aspect of Lordstown's strategic partnership with Foxconn.

200.    Hightower and Kroll were aware of the costs of operating Lordstown because they

frequently discussed such costs, indicating that they either reviewed those costs and knew what they

were talking about, or were reckless in speaking about operating costs without reviewing that

information.  Every quarter during the Class Period, Hightower and Kroll presented the operational

updates and balance sheets for Lordstown on presentation slides.  Kroll provided these updates with

Hightower present which meant that Kroll was frequently apprising himself of Lordstown's

financial position while apprising Hightower, at the very least, during these meetings.

201.    For example, during the earnings conference call on November 8, 2022, Kroll stated:

> Given our capital constraints, we continue to execute a playbook of prudence and discipline. The actions we took over the course of this year have enabled us to exceed our cash flow expectations.  In addition to the strong show of confidence in our team, yesterday's announcement regarding the capital injection from Foxconn is an important step in addressing our capital needs. . . . The new capital from Foxconn does not change our near-term focus on tightly managing cash and spending.

In response to a question about Lordstown's spending given investments, Hightower responded regarding the investment and funding, while Kroll followed up, in part, "we kind of think the direct investment in Lordstown is a better, simpler, easier structure."  Kroll made numerous detailed statements that he had extensive knowledge about Lordstown's financial position, and the amount of cash Lordstown had on hand during the Class Period.  For example, during the earnings conference call on March 6, 2023, Kroll stated, in part:

> During 2022, we significantly reduced our cash burn, fixed costs and operating complexity as well as raised $263 million in capital… In addition, we benefit from **substantially lower operating complexity and risk**…we **outperformed our cash burn and liquidity targets through spending discipline**… Ending with almost $222 million in cash and short-term investments, the fourth quarter was our most significant beat at $57 million or 34% above the top end of the range in our outlook.

202.    Furthermore, on June 27, 2023, in their declarations in support of Lordstown's Chapter 11 claim, Hightower and Kroll made various statements addressing their role and knowledge of Lordstown's financial standing.  For example, Hightower stated, in part, "At the time I joined the Company, I attempted to address the Company's costs with actions . . . ."  Decl. of Hightower at ¶ 7.  While, Kroll stated, "In my capacity as the Debtors' Chief Financial Officer, I am responsible for [Lordstown's] accounting, treasury, financial reporting, budgeting and planning, investor relations, corporate development and corporate strategy functions.  I am generally familiar

with [Lordstown's] day-to-day operations, business and financial affairs, and books and records."
Decl. of Kroll at ¶ 7.

203.    Defendants' detailed pronouncements on these topics provide strong circumstantial
evidence that they were receiving specific information about such matters.  Alternatively,
Defendants were not knowledgeable about these matters (on which they spoke in detail), and such
severe recklessness demonstrates an inference of scienter.

  **C.**  **Foxconn's Partnership Was a Core Operation of Lordstown**

204.    Because the fraud alleged herein relates to the core business of Lordstown –
developing a successful partnership with Foxconn – knowledge of the facts underlying the
fraudulent scheme may be imputed to Defendants.  Indeed, Lordstown repeatedly touted its new
business model, a strategic partnership, which Lordstown claimed reduced its operating costs and
increased its productivity.  Hightower even acknowledged in his declaration, "To attract new
partners and financing prepetition, the Company needed to demonstrate what it genuinely believed
to be the strength and value of the Foxconn partnership—in particular support on the Endurance
and, even more importantly, the first new jointly developed vehicle platform."  Decl. of Hightower
at ¶ 10.  Without Foxconn's investment, Lordstown would be "deprived of critical funding
necessary for its operations." Form 8-K, May 1, 2023, at 2-3.

205.    Foxconn's partnership was essential to Lordstown's operations because Lordstown
sold its manufacturing plant to Foxconn as part of a series of agreements for Foxconn to produce
Lordstown EVs, including the Endurance.  ¶¶ 28, 30; *see also* Form 8-K, January 4, 2023, Ex. 99.1
at 2-4 ("Foxconn supplies components, software, supply chain and manufacturing expertise… The
sale of the manufacturing plant located in Lordstown, Ohio to Foxconn was much more than a
transfer of ownership. It laid the groundwork for the two companies to collaborate on product
development.").  Without Foxconn's cooperation, Lordstown could not produce the Endurance or

other EV designs.  According to CW-1, the rate production of Endurance at the manufacturing plant was dependent on negotiations with Foxconn; production halted in the midst of selling the plant and stagnated after the transfer.  According to CW-2, limited work on new vehicles was completed throughout the end of 2022 because funding from Foxconn was not received.  In sum, a cooperative and collaborative partnership with Foxconn was essential to Lordstown's ability to sustain operations.

206.    Therefore, Defendants were in such positions at Lordstown to access all material, non-public information concerning the true nature of the relationship between Lordstown and Foxconn.  Given the importance of this partnership to the sustainability of Lordstown's continued operation, Defendants would have been aware of whether Foxconn was a viable business partner.

207.    Lordstown is a relatively small company.  Before the Class Period, Lordstown Motors had approximately 632 employees.  *See Lordstown Motors Corp. (RIDEQ)*, Stock Analysis, https://stockanalysis.com/stocks/rideq/employees/ (lasted visited Dec. 6, 2023).  When the Class Period began, approximately 400 Lordstown manufacturing employees became Foxconn employees, leaving 260 employees remaining at Lordstown as of December 31, 2022. As of June 27, 2023, Lordstown had approximately 243 employees over its three locations.  Decl. of Kroll at ¶ 51. Following the bankruptcy filing, Lordstown has even fewer employees because many employees' positions were eliminated, like CW-2, or they were laid off.  Decl. of Kroll at ¶ 53.

### D.    Defendants Were Motivated To Conceal Foxconn's Wrongdoing In Order To Lure In Potential Investors

208.    All Defendants had possession of or access to information regarding Foxconn's breaches of the various agreements and other wrongdoings.  Foxconn's attempts to sabotage Lordstown were present from the very beginning.  ¶¶ 6-7.  However, Defendants were motivated to

conceal Foxconn's wrongdoings because Lordstown was sorely lacking funding and controversy over Lordstown's reputation was discouraging potential investors. *See* ¶ 21.

209.    Defendants' motivations can be readily inferred from their own statements because, despite Foxconn's consistent lack of cooperation, Defendants portrayed the relationship between Lordstown and Foxconn in an extremely positive light to attract other investors, which would be necessary for its continued operations.  After all, "**[t]o attract new partners and financing prepetition, the Company needed to demonstrate…the strength and value of the Foxconn partnership** . . . ." Decl. of Hightower at ¶ 10.  Defendants needed to rebuild Lordstown's reputation following the 2021 controversies. *See The Lordstown Motors Mirage: Fake Orders, Undisclosed Production Hurdle, And A Prototype Inferno*, Hindenburg Research (Mar. 12, 2021), https://hindenburgresearch.com/lordstown/; *see also* Kaltura MediaUser, *President's Speaker Series – Edward Hightower. November 14, 2022*, Bentley University (Nov. 16, 2022) ("we realized that we needed to focus on greater transparency, both internally and externally, and that helped us to rebuild our reputation, externally from what Google had been saying [whether Lordstown was going to make it or not], Google does a little more than a year ago, saying what we were going to do and then actually delivering on those").

210.    At the beginning of the Class Period, Defendants were concealing Foxconn's actions that are now claimed to have been fraudulent and a breach.  On August 4, 2022, Hightower claimed in a press release that he spent two weeks in Taiwan discussing the JVA.  Again, in November, Hightower painted the trip in a positive manner, claiming "it's a really good partnership. We are in constant communication with the chairman of Foxconn . . . and we are really looking forward to what we're going to do together."

211.     However, after the truth of the relationship was revealed, Hightower admitted that during the trip, Foxconn had already breached two conditions of the JVA: (1) rather than use Lordstown as Foxconn's primary North American vehicle partner, Foxtron intended to sell its own vehicles, directly into the United States market, in direct competition with Lordstown; and (2) Foxtron had the intellectual property necessary for the EV program and were not intending on sharing them with Lordstown. Bankr. Compl. ¶¶ 39, 41. Despite knowing that Foxconn would be directly competing with Lordstown, Hightower repeatedly portrayed Lordstown as "[Foxconn's] preferred North American vehicle development partner . . . ."

212.     Throughout the Class Period, Defendants continued to lure potential investors with false assurances of Foxconn's confidence in Lordstown. In November 2022, Hightower claimed, "Over the last year, the LMC and Foxconn teams have **worked collaboratively** to bring the Endurance into commercial production, **despite numerous external challenges**. We acknowledge and appreciate the **confidence in our team that is shown by [Foxconn's] investment.**" Kroll also touted, "In addition to a **strong show of confidence in our team**, yesterday's announcement regarding the capital injection from Foxconn is an important step in addressing our capital needs."

213.     Still, in March 2023, Hightower asserted during an earning conference call that Lordstown was "continu[ing] to work collaboratively with Foxconn" on the future vehicle program. Kroll reassured potential investors that Lordstown "benefit[s] from **substantially lower operating complexity and risk** by putting manufacturing in the hands of Foxconn."

214.     Thus, while Defendants knew that Foxconn was a precarious financial partner, they made numerous statements touting the relationship in order to bolster Lordstown's reputation to attract new investors.

90

E.   **Defendants' Certifications Pursuant to the Sarbanes-Oxley Act of 2002 Demonstrate Scienter**

215.   Within the Forms 10-Q with the SEC by Lordstown during the Class Period, Defendants certified, pursuant to the Sarbanes-Oxley Act of 2002, that they were "responsible for establishing and maintaining disclosure controls and procedures" and that such controls and procedures were designed "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]"

## LOSS CAUSATION

216.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial damages.

217.   During the Class Period, Plaintiffs and other Class members purchased Lordstown securities at artificially inflated prices and suffered substantial losses and damages when the true facts concealed by Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized.  The price of Lordstown securities declined significantly causing Plaintiffs and other Class members to suffer losses and damages when Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by Defendants materialized.

218.   Defendants made false and misleading statements and material omissions regarding the capitalization of Lordstown's business, the viability of its partnership with Foxconn, and its ability to sustain operations without the investment from Foxconn.  On the strength of these false and misleading statements and material omissions, the price of the Company's securities was

artificially inflated to a Class Period high of $44.70 on August 4, 2022.[7]  Those misrepresentations and omissions that were not immediately followed by an upward movement in the price of the Company's securities served to maintain the share price at artificially inflated levels by maintaining and supporting a false perception of Lordstown's business, operations, performance, and prospects. When these statements were corrected and/or the risks concealed by them materialized, investors suffered losses as the price of Lordstown securities declined.

219.    The true facts and risks regarding Lordstown's capitalization, its partnership with Foxconn, and its ability to sustain operations without Foxconn's investment which were omitted and/or misrepresented by Defendants eventually caused the price of Lordstown's securities to decline on three occasions, thereby causing harm to investors.

220.    First, Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding Lordstown's capitalization, its partnership with Foxconn, and its ability to sustain operations without Foxconn's investment materialized on April 11, 2023, when Lordstown filed a Form DEF 14A with the SEC, disclosing that some investment agreements may not have been upheld if a reverse stock split was not executed and Lordstown became delisted from NASDAQ.  This caused investors to suffer losses as the price of Lordstown securities dropped approximately 7.93% at close on April 11, 2023 to $8.12 per share.[8]  Investors also suffered losses on the date of the execution of the reverse stock split on May 24, 2023 as the price of Lordstown securities dropped approximately 12.44% at close to $3.73 per share.

---

[7]    The value on this date reflects the stock price as a result of the reverse stock split (1:15), which before May 24, 2023 would have been reported as $2.98 per share.
[8]    The value on this date reflects the stock price as a result of the reverse stock split (1:15), which before May 24, 2023 would have been reported as $0.54 per share.

221.     Then, Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding Lordstown's capitalization, its partnership with Foxconn, and its ability to sustain operations without Foxconn's investment materialized on May 1, 2023, when Lordstown filed a Form 8-K with the SEC, disclosing that Foxconn sent a notice of default on April 21, 2023 because Lordstown received a delisting letter from NASDAQ.  This caused investors to suffer losses as the price of Lordstown securities dropped approximately 23.33% at close on May 1, 2023 to $6.02 per share.[9]  *See supra* ¶ 14.

222.     Then, Defendants' statements were further corrected, and the risks concealed by the undisclosed facts regarding Lordstown's capitalization, its partnership with Foxconn, and its ability to sustain operations without Foxconn's investment materialized on June 9, 2023, when Lordstown filed a Form 8-K with the SEC, disclosing that Foxconn had various breaches to the Investment Agreement and a pattern of bad faith.  This caused investors to suffer losses as the price of Lordstown securities dropped $0.12 per share, or 3.75%, to close at $3.08 per share on June 9, 2023. *See supra* ¶¶ 16, 147.

223.     Finally, Defendants' statements were further corrected, and the risks concealed by the undisclosed facts regarding Lordstown's capitalization, its partnership with Foxconn, and its ability to sustain operations without Foxconn's investment materialized on June 27, 2023, when Lordstown filed for bankruptcy and filed the Bankruptcy Complaint detailing Foxconn's bad faith. This caused investors to suffer losses as the price of Lordstown's shares dropped approximately 17.18%, from $2.77 at the close on June 26, 2023 to $2.29 at the close on June 27, 2023.

---

[9]     The value on this date reflects the stock price as a result of the reverse stock split (1:15), which before May 24, 2023 would have been reported as $0.40 per share.

224. Accordingly, as a result of their purchases of Lordstown's publicly traded securities during the Class Period, Plaintiffs and other members of the Class suffered economic losses and damages.

## CONTROL PERSON LIABILITY

225. Defendants are liable as direct participants with respect to the wrongs complained of herein. In addition, Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and each had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, Defendants were able to and did, directly or indirectly, control the conduct of Lordstown's business.

226. Specifically, because of their positions within the Company, Defendants possessed the power and authority to control the contents of Lordstown's SEC filings, annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market, including those containing the materially false and misleading statements and omissions of material fact alleged herein. Each Defendant, by reason of his/her respective management or board position, had the ability and opportunity to review copies of the Company's SEC filings, reports, press releases, and other statements alleged herein to be misleading, prior to, or shortly after their issuance or to cause them to be corrected.

227. By virtue of their positions, Defendants had access to material non-public information. Each Defendant knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed and were being concealed from the public, and that the positive representations which were being made were then materially false and misleading..

## APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE

228.     The false and/or misleading statements alleged herein were material and public and at all relevant times the market for Lordstown's securities was an efficient market for the following reasons, among others:

a.     Lordstown's securities were listed on the NASDAQ, a highly efficient market;

b.     As a registered and regulated issuer of securities, Lordstown filed periodic reports with the SEC, in addition to frequent voluntary dissemination of information;

c.     Lordstown regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d.     The market reacted to public information disseminated by Lordstown; and

e.     At least 5 analysts followed Lordstown's business and wrote reports which were publicly available and affected the marketplace.

229.     As a result of the above, the market for Lordstown's securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' market prices.  The historical trading prices and volumes of Lordstown common stock are incorporated herein by reference.

230.     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to overvalue Lordstown's securities.  Without knowledge of the misrepresented or omitted facts, Plaintiffs and other members of the Class purchased Lordstown common stock

between the time that Defendants made the material misrepresentations and omissions and the time that the truth or concealed risk was revealed, during which time the price of Lordstown's securities were artificially inflated by Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## THE AFFILIATED UTE PRESUMPTION

231.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information the Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

232.    The safe harbor provisions for the forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

233.    First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.

234.    Second, many of the identified false and misleading statements herein were not identified as forward-looking statements.

235.    Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained statements of present or past facts and so are not entitled to protection under the safe harbor.

236.    Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such statements were also not accompanied by cautionary language that was meaningful because such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings call, or other public statements described herein were general, "boilerplate" statements of risk that would affect any technology company, and misleadingly contained no factual disclosure of any of the specific details concerning Lordstown's capitalization, the viability of its partnership with Foxconn, and its ability to sustain operations without the investment from Foxconn, or similar important factors that would give investors adequate notice of such risks.

237.    Fifth, to the extent there were any forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each statement was authorized and/or approved by a director and/or executive officer of Lordstown who actually knew that each such statement was false or misleading when made.

## CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against Defendants**

238.     Plaintiffs re-allege each allegation above as if fully set forth herein.

239.     This claim is brought under Section 10(b) of the Exchange Act (15 U.S.C.

§ 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), against

Defendants.

240.     During the Class Period, Defendants violated Section 10(b) of the Exchange Act and

Rule 10b-5(b) promulgated thereunder by making the false and misleading statements specified

herein, including the statements in SEC filings, presentations, press releases, and analyst reports

concerning Lordstown's capitalization, viability of a partnership with Foxconn, and ability to

sustain operations without Foxconn's investment reviewed by Defendants, whose truth they

knowingly or recklessly disregarded when they failed to disclose material facts necessary to make

the statements made, in light of the circumstances under which they were made, not false and

misleading.

241.     During the Class Period, Defendants violated Section 10(b) of the Exchange Act and

Rule 10b-5(a) & (c) promulgated thereunder by employing devices, schemes, and artifices to

defraud and engaging in acts, practices, and a course of conduct that operated as a fraud or deceit

upon Plaintiffs and other members of the Class in that Defendants concealed Lordstown's

capitalization, viability of a partnership with Foxconn, and ability to sustain operations without

Foxconn's investment.

242.     Defendants, individually and in concert, directly and indirectly, by the use, means or

instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous

course of conduct to conceal non-public, adverse material information about the Company's operations and financial condition as reflected in the misrepresentations and omissions set forth above.

243.    Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

244.    As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiffs and the Class Members were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

245.    Plaintiffs and Class members purchased Lordstown securities without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects.  In so doing, Plaintiffs and Class members relied directly or indirectly on false and misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements.  Plaintiffs and Class members were damaged as a result of their reliance on Defendants' false statements and misrepresentations and omissions of material facts.

246.    At the time of Defendants' false statements, misrepresentations and omissions, Plaintiffs and Class members were unaware of their falsity and believed them to be true.  Plaintiffs and the Class would not otherwise have purchased Lordstown securities had they known the truth about the matters discussed above.

247. Plaintiffs are filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiffs' claims, and within five years after the violations with respect to Plaintiffs' investments.

248. By virtue of the foregoing, Defendants have violated Section10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

249. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their purchase of Lordstown securities.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against Defendants

250. Plaintiffs reallege each allegation above as if fully set forth herein.

251. This Count is asserted against Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

252. As set forth above, Defendants committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period.

253. Each Defendant, by reason of their status as senior executive officers and/or directors of Lordstown, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of Section 20(a) of the Exchange Act. Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiffs' and the Class's investments in Lordstown securitiess within the meaning of Section 20(a) of the Exchange Act. Therefore, Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

254.    Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases.  Because of their close involvement in the every-day activities of the Company, and because of their wide-ranging supervisory authority, Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

255.    Defendants knew or recklessly disregarded the fact that Lordstown's representations were materially false and misleading and/or omitted material facts when made.  In so doing, the Defendants did not act in good faith.

256.    By virtue of their high-level positions and their participation in and awareness of Lordstown's operations and public statements, Defendants were able to and did influence and control Lordstown's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

257.    Defendants had the power to control or influence the statements made, giving rise to the securities violations alleged herein, and as set forth more fully above.

258.    As set forth above, Defendants committed a primary violation of Section 20(a) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period as well as by concealing the fact that Lordstown had insufficient resources to continue to fund the Company's expansion.

259.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of Lordstown securities.

## CLASS ACTION ALLEGATIONS

260.    Plaintiffs bring this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all persons and entities that purchased or otherwise

acquired Lordstown securities between August 4, 2022 and June 26, 2023, both dates inclusive, and were damaged thereby.

261.    Excluded from the Class are Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

262.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Lordstown securities were actively traded on the NASDAQ, which is an efficient market.  While the exact number of Class members cannot be determined at this early stage, Plaintiff believes that thousands of people held Lordstown securities during the Class Period.  Record owners and other members of the Class may be identified from records maintained by Lordstown or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

263.    Plaintiffs' claims are typical of the claims of the other members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

264.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.  Plaintiffs have no interests that are contrary to or in conflict with those of the Class.

265.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, *inter alia*:

a)      Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)      Whether statements made by Defendants during the Class Period contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c)      Whether and to what extent Defendants' material untrue statements and/or omissions of material fact caused the market price of Lordstown securities to be artificially inflated during the Class Period;

d)      Whether Defendants acted with the requisite level of scienter;

e)      Whether Defendants were controlling persons of Lordstown;

f)      Whether reliance may be presumed pursuant to the *Affiliated Ute* presumption, fraud-on-the-regulatory process, or fraud-on-the-market doctrine; and

g)      Whether the Class members have sustained damages, and if so, the proper measure of damages.

266.    Plaintiffs know of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

267.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is impracticable.  In addition, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, prays for relief and judgment, including:

A. Determining that Counts I through II of this action are a proper class action under Federal Rules of Civil Procedure 23, certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs' counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C. Awarding rescissory damages in favor of Plaintiffs and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

D. Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

E. Awarding Plaintiffs and the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

F. Awarding such other and further relief as may be just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated:     December 29, 2023

*/s/ John C. Camillus*
John C. Camillus (0077435)
**LAW OFFICES OF JOHN C. CAMILLUS,
LLC**
P.O. Box 141410
Columbus, Ohio 43214
Telephone: (614) 992-1000
Facsimile: (614) 559-6731
Email: jcamillus@camilluslaw.com

*Attorneys for Lead Plaintiffs Andrew
Strickland and Joshua Strickland and Liaison
Counsel for the Class*

**FARUQI & FARUQI, LLP**

James M. Wilson, Jr., admitted *pro hac vice*
Robert W. Killorin, admitted *pro hac vice*
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com
        rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiffs Andrew
Strickland and Joshua Strickland and Lead
Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 29, 2023, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

By: */s/ John C. Camillus*
    John C. Camillus (0077435)