# EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Lordstown Motors Corp., *et al.*,[1] | Case No. 23-10831 |
| Debtors. | (Joint Administration Requested) |
| Lordstown Motors Corp. and Lordstown EV Corporation, | Adv. Pro. No. 23-_____(___) |
| Plaintiffs, | |
| -against- | |
| Hon Hai Precision Industry Co., Ltd (a/k/a Hon Hai Technology Group), Foxconn EV Technology, Inc., Foxconn Ventures Pte. Ltd., Foxconn (Far East) Limited, and Foxconn EV System LLC | |
| Defendants. | |

## ADVERSARY COMPLAINT

Lordstown Motors Corp. ("**Lordstown**" or "**Company**") and Lordstown EV Corporation (collectively, "**Plaintiffs**"), as debtors and debtors in possession and the plaintiffs in the above-captioned adversary proceeding, allege for their Adversary Complaint, upon knowledge of their own acts and upon information and belief as to other matters, as follows:

---

[1] The debtors and the last four digits of their respective taxpayer identification numbers are: Lordstown Motors Corp. (3239); Lordstown EV Corporation (2250); and Lordstown EV Sales LLC (9101) (collectively, the "**Debtors**"). The Debtors' service address is 27000 Hills Tech Ct., Farmington Hills, MI 48331.

**NATURE OF THE ACTION**

1.     This case arises from, and is based on, the fraudulent conduct of one of the world's largest multinational manufacturing companies, which, over time, had the intended effect of destroying the business of an American start-up.  Promising a grandiose collaboration as the premise for stripping away Plaintiffs' unique and most valuable asset, Defendant Hon Hai Precision Industry Co., Ltd. ("**Foxconn**") then embarked on a course of conduct, which is littered with a series of broken promises and repeated refusals to take any action in furtherance of the initially proffered venture, that bears all the hallmarks of bad faith, fraud and misrepresentation. This course of conduct is nothing new for Foxconn and its affiliates—their modus operandi in the United States is to overpromise and under or never deliver.

2.     Plaintiffs, debtors in possession in the above captioned case, are in the business of developing, engineering, launching, and selling all-electric vehicles to commercial fleet customers.  Lordstown was formed in 2018 to develop an all-electric full-size pickup truck, the Endurance, for the North American market, the first of its kind.  The Debtors had advanced technology and an innovative product design that they believed would revolutionize the commercial pickup truck market for the modern EV age.  In 2019, the Debtors purchased from General Motors a 6.2 million square foot production facility in Lordstown, Ohio, which is one of the largest automotive assembly plants in North America.  Upon doing so, the Debtors' prospects were so exciting and attractive that it was able to become a publicly-traded company with an equity market capitalization of over $5.3 billion.

3.     But like all start-ups, the Debtors faced daunting challenges and would need help making their vision a reality.  That is why, beginning in 2021, the Debtors forged what they thought would be a mutually beneficial partnership with Foxconn, a global manufacturing

2

behemoth with over $215 billion in annual revenue.  It brought deep resources and massive economies of scale, as well as ambitions to grow into the electric vehicle sector, to the partnership. The deal was to combine Foxconn's resources and efficiencies with the Debtors' innovation, technology, manufacturing plant and people to jointly develop the next generation of electric vehicles.  Based on Foxconn's repeated assurances, the Debtors materially and permanently changed their entire business model to support deep integration with Foxconn and its self-described "EV Ecosystem."

       4.     But it turns out that Foxconn was not the partner that it promised to be. Instead, it used various assurances of support for the Endurance pick-up truck and future joint product development to secure ownership of the Debtors' unique and most valuable asset, its manufacturing plant, and to transfer highly talented and experienced manufacturing and operational employees to the Foxconn team.  But once it secured ownership of the plant and obtained a workforce to go with it, Foxconn refused to honor its obligations.  Over a period of over 18 months, Foxconn continuously misled the Debtors about its own ability or willingness to support the Endurance and collaborate and support future product development, while at the same time causing the Debtors to devote substantial resources to the same cause.

       5.     In the most recent transaction with the Debtors, Foxconn caused its affiliate, Defendant Foxconn Ventures Pte. Ltd. ("**FVP**"), to promise to invest approximately $170 million of additional equity capital in the business, and to work closely with the Debtors on a new vehicle development platform.  It did neither.  In fact, within one week after the investment agreement's execution, Foxconn directed the Debtors to abruptly drop the vehicle program then under development with SoftBank, a multibillion-dollar technology investor and a substantial shareholder in FVP, and move to a completely different program.  Then, for almost six months

<div align="center">3</div>

Foxconn failed to engage on the new vehicle platform and programs, after initially requesting that this be the focus instead of the SoftBank program. Then, after the six-month period, Foxconn caused FVP to refuse to fund its remaining equity investments. Instead, Foxconn caused FVP to wrongfully purport to terminate the investment agreement, which it subsequently admitted it had no right to do.

6.     From the very beginning, Foxconn continually moved the goal posts on development of the Debtors' next generation products, constantly shifting the nature of the product, failing to meet funding commitments, and absolutely refusing to engage with the Debtors on any of the various initiatives that Foxconn directed the Debtors to pursue and purported to support.

7.     Foxconn consistently failed to honor its agreements and caused its affiliates and instrumentalities to do the same. After getting the valuable assets it desired upfront, it then sabotaged the Debtors' business, starving it of cash and causing it to fail. Instead of building a thriving business for the benefit of all Lordstown's stakeholders, Foxconn maliciously and in bad faith destroyed that business, costing Lordstown's creditors and shareholders billions.

8.     While the damage Foxconn wrought cannot be undone, it can be made to pay for its wrongdoing. This lawsuit will ensure that it does.

## JURISDICTION AND VENUE

9.     This adversary proceeding arises in and relates to the Debtors' cases pending before this Court under chapter 11 of the Bankruptcy Code.

10.     The Court has jurisdiction to consider this adversary proceeding under 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States*

*District Court for the District of Delaware*, dated February 29, 2012. This Court has subject matter jurisdiction over the claims against Defendant under 28 U.S.C. §§ 157 and 1334.

11.    This is a core proceeding under 28 U.S.C. § 157(b), and pursuant to Bankruptcy Rule 7008, Lordstown consents to the entry of a final order by the Court in connection with this adversary proceeding to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

12.    Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

13.    Lordstown is a Delaware corporation. The Company develops, engineers and sells all-electric vehicles primarily to commercial fleet customers.

14.    Lordstown EV Corporation is a Delaware corporation and an affiliate of Lordstown.

15.    Defendant Foxconn is a global manufacturing company based in Taiwan.

16.    Defendant Foxconn EV Technology, Inc. ("**Foxconn EV Technology**") is an Ohio corporation and an affiliate of Foxconn.

17.    Defendant FVP is a private company limited by shares established under the laws of Singapore and an affiliate of Foxconn. SoftBank Group Corp. owns a significant minority ownership position in FVP.

18.    Defendant Foxconn (Far East) Limited is a Cayman Islands exempted company.

19.     Defendant Foxconn EV Systems LLC (together with Foxconn, Foxconn EV Technology, FVP and Foxconn (Far East) Limited, the "**Defendants**") is an Ohio limited liability company.

## FACTUAL BACKGROUND

**The Company**

20.     The Company was founded for the purpose of developing, engineering, manufacturing and selling electric vehicles primarily to commercial fleet customers. The Company's initial vehicle, the Endurance, is a unique full-size, all-electric pickup truck. The Company initially planned that the Endurance would launch for sale in 2021.

21.     As is typical for most start-up businesses, the Company experienced some initial challenges that delayed its initial product launch. That is when the Company began to look for a strategic partner. This partner would help the Company address its funding needs but, just as importantly, it could help the Company improve the cost structure of the Endurance and develop a scalable vehicle development platform for the next generation of electric vehicles produced by the Company.

**The Company Begins a Partnership with Foxconn**

22.     After exploring a number of potentially attractive options, in September 2021, the Company decided to forge a partnership with Foxconn. While this ultimately turned out to be a mistake based on Foxconn's subsequent conduct, there were many good reasons for the Company to pursue this path at the time. Foxconn is the world's largest electronics manufacturer. In 2022 Foxconn achieved total revenues of $215.84 billion. Foxconn describes itself as the leading technological solution provider, and states that it continuously leverages its expertise in software and hardware to integrate its unique manufacturing systems with emerging technologies.

Foxconn had also declared its intention to significantly expand its capabilities in new technologies, including the development of electric vehicles, which it said was key to driving its long-term growth strategy. To that end, Foxconn established the Mobility-in-Harmony ("**MIH**") Consortium, designed to bring together the talent and resources of hundreds of automotive companies to accelerate EV innovation and vehicle development through open collaboration. Foxconn described electric vehicles as "one of the Company's main growth drivers in the future" and publicly disclosed aggressive targets to gain 5% of overall EV market share by 2025 and produce 500,000 to 750,000 EVs per year. Foxconn represented that its scale and expertise were to be of great benefit to the Company. By pairing the Company's innovation, technology, manufacturing plant and outstanding people with Foxconn's deep resources, manufacturing expertise and supply chain capabilities, the Company would thrive.

23. On September 30, 2021, the Company and an affiliate of Foxconn entered into an Agreement in Principle (the "**AIP**," attached as **Exhibit A**) to form a deep partnership and work jointly on electric vehicle programs. The AIP contemplated that Foxconn and the Company would (a) enter into an asset purchase agreement to buy the Company's manufacturing plant in Lordstown, Ohio (the "**Plant APA**," attached as **Exhibit B**), (b) enter into a manufacturing supply agreement (the "**Contract Manufacturing Agreement**" or "**CMA**," attached as **Exhibit C**), and (c) jointly collaborate on the development of future vehicle programs. The AIP was crucial to the Company's go-forward plan, as selling the Plant would bring in necessary capital while lowering go-forward operational costs. The Company was also in need of a strategic partner to assist in bringing new vehicles to market, and Foxconn, one of the world's leading manufacturers, was eager to fill this role. The Company also relied on the AIP and the new business model that it would enable to recruit new talent that believed in Foxconn's vision for the EV industry.

7

24.     Foxconn touted the benefits of this deal to the Company and to the public. On September 30, 2021, Foxconn Chairman Young Liu said he had "high expectations through this partnership that we will be able to successfully integrate our resources with Lordstown Motors. In addition to achieving the goal of moving ahead our timeline to establish electric vehicle production capacity in North America, it also reflects Foxconn's flexibility in providing design and production services for different EV customers."  Chairman Liu added that "[t]his mutually beneficial relationship is an important milestone for Foxconn's EV business and our transformation strategy.  I believe that the innovative design of the Endurance pickup truck, with its unique hub motors, delivers an advantageous user experience and has manufacturing efficiencies.  It will undoubtedly thrive under our partnership and business model."  Foxconn later expressed hope that it could create "a trillion-dollar business opportunity for electric vehicles."

25.     On the day the parties' agreement was announced, Lordstown's stock jumped significantly.  But skeptics of the deal expressed concern that Foxconn was getting the manufacturing plant too cheap—one noted analyst stated that "[t]he agreed plant value is roughly one-fifth the value we had assumed in our prior price target"—and suggested that Foxconn would not actually follow through on its product development and other commitments.  Unfortunately, the deal's skeptics turned out to be right.

26.     In October 2021, Foxconn made its first investment in the Company, purchasing through an affiliate 7.2 million shares of the Company's Class A common stock ("**Common Stock**") for approximately $50 million.

27.     In early November 2021, representatives of the Company met with senior Foxconn executives to discuss Lordstown's proposed product portfolio leveraging.  Foxconn's MIH platform, including a C/D-segment van, a C-segment pickup truck, and a C-segment chassis

8

cab. The Foxconn team, including Chairman Liu, expressed support for the proposal. Had Foxconn continued with that support and backed it with any meaningful funding, these products could have been completed and launched by late 2024. This timing was critical for partnering with potential fleet customers who were in discussions with the Company.

28.    On November 10, 2021, Lordstown EV Corporation and two affiliates of Foxconn, Foxconn EV Technology and Foxconn (Far East) Limited, executed the Plant APA. Under the Plant APA, the Company's massive and valuable manufacturing plant would be sold to Foxconn EV Technology, subject to several conditions, for a fraction of its replacement cost. In addition, hundreds of highly talented and experienced manufacturing and operational employees at the plant would become employees of Foxconn EV System LLC.

29.    It is important to note that this sale was not a stand-alone transaction. The Company would never have entered into the Plant APA if not for Foxconn's promises that this was simply an initial step in the process of repositioning the Company's business around the Foxconn partnership. Consistent with this approach, the Plant APA provided that the parties would use commercially reasonable efforts to, among other things, enter into the CMA (by April 30, 2022) and a joint product development arrangement through a joint venture (the "**JV**"). Specifically, the Plant APA contains the following covenant in Section 4.1(k):

> Prior to the Closing, Purchaser [Foxconn EV Technology] and Seller [Debtor] shall use their commercially reasonable efforts to enter into a joint venture agreement (the "Joint Venture Agreement") pursuant to which: (A) Seller and Purchaser shall allocate engineering resources to jointly design, engineer, develop, validate, industrialize, and launch vehicle programs ("CV Programs") for the commercial vehicle market in North America and internationally using Purchaser's MIH open platform; (B) Seller shall have the right to commercialize CV Programs in North America, subject to satisfying reasonable volume requirements and other customary conditions as well as the payment of reasonable and mutually agreed-upon licensing fees to Purchaser; (C) Purchaser shall have the right to manufacture any CV Vehicles manufactured in North America at the Facility, subject to negotiation and execution of a competitive contract manufacturing agreement; (D) Purchaser shall have the right to commercialize CV Programs outside North America,

9

subject to satisfying reasonable volume requirements and other customary conditions as well as the payment of reasonable and mutually-agreed upon licensing fees to Seller. In connection with or prior to the execution of the Joint Venture Agreement, Seller or one or more of its Affiliates shall join the MIH Consortium and the Open EV Alliance as a vehicle engineering and development partner OEM. The Joint Venture Agreement shall also provide for the sharing of intellectual property rights commensurate with the parties' respective contributions.

30.     The JV was essential to provide the Company with the strategic partner and the scalable business model it had bargained for.  The Company would never have sold its most valuable asset for a fraction of its replacement cost without the CMA and without assurances from Defendants that they would support the Endurance, enter into the JV Agreement (defined below) and follow through on their commitments to joint vehicle development leveraging the Foxconn EV Ecosystem.  The Company expected to negotiate the exact terms of the CMA and JV Agreement in the interim period between execution and the closing of the Plant APA, which was expected to take several months.  In addition, the Plant APA contemplated that the parties would hold weekly meetings to discuss and review expansion plans and use commercially reasonable efforts to enter into support and license agreements during the interim period.

31.     After entering into the Plant APA, the Company recruited additional experienced automotive professionals.  A key selling point was the opportunity to develop future vehicles and components, including proprietary software, in collaboration with Foxconn and the Foxconn EV Ecosystem.  At all times since the signing of the Plant APA, the Company has devoted enormous resources towards making Foxconn's EV ambitions a reality.

**Defendants Avoid Fulfilling their Commitments to the Company**

32.     Unfortunately, Defendants never had any intent of living up to their commitments.  In the months following entry into the Plant APA, Foxconn dragged its feet in working to develop the parties' agreed upon joint development platform.  Although the Company

quickly circulated term sheets outlining a more detailed plan for the partnership, Defendants were extremely slow to engage, notwithstanding their obligations under the Plant APA. Indeed, in April 2022, five months after the Plant APA was signed, Foxconn senior executives, including Chairman Liu, stated that Foxconn would not even discuss the JV before closing the Plant APA.

33.    On May 11, 2022, Foxconn, eager to secure ownership of the Plant, finally relented and agreed to enter into the JV (the "**JV Agreement**," attached as **Exhibit D**). On the same day, the parties closed the Plant APA and executed the CMA. Under the Plant APA, Foxconn EV Technology purchased the Plant, excluding the Company's hub motor assembly line, battery module and packing line assets, certain intellectual property rights and other excluded assets, for $230 million plus certain reimbursements. Under the CMA, the Company outsourced all the manufacturing of the Endurance to an affiliate of Foxconn, Foxconn EV System LLC, which would manufacture the Endurance at the Plant for a fee per vehicle. In addition, the Foxconn EV System LLC committed to use commercially reasonable efforts: (a) to improve commercial terms of procurement with the Company's suppliers and take advantage of sourcing synergy opportunities, including with a list of identified suppliers, by providing critical strategic support leveraging Foxconn's size and expertise to achieve better pricing and payment terms with suppliers of the Endurance; (b) to transition procurement of components to Foxconn as expeditiously as possible and in any event no later than October 15, 2022; and (c) during the transition period to (i) support the Company's purchasing efforts in relation to components so as to minimize disruptions and inefficiencies, (ii) assist the Company in managing and communicating with suppliers and (iii) assist the Company in improving the commercial terms of procurement with suppliers. Foxconn EV System LLC also agreed to work with the Company in good faith to reduce the production cost of the Endurance, which may have included Foxconn directly participating in Company's value

11

analysis and value engineering and sourcing activities. But Foxconn had no intent of doing anything to achieve these initiatives; they were just promises designed to string the Company along so that Foxconn could starve it out of existence.

34. The JV was owned 55% by Foxconn EV Technology and 45% by the Company. The Company would also provide virtually all the personnel necessary to operate the JV and the Company's Chief Executive Officer was named the chief executive of the JV as well. Given that the JV was largely dependent upon the Company's personnel, it was necessary to put in place a Management Services Agreement between the JV and the Company. Foxconn acknowledged that a Management Services Agreement was needed but did not respond to an initial draft of the agreement for over a month, while the Company was incurring substantial costs. Once it engaged, it used the opportunity to impose a new spending authority structure that would require a Foxconn representative to approve every dollar spent by the JV. This veto right directly conflicted with the JV Agreement, which provided that the parties would agree upon an annual budget and Foxconn's approval would be required only if an expenditure exceeded 5% of the budgeted amount. Ultimately, Foxconn never agreed to a Management Services Agreement, nor a JV budget, and, as further explained below, the JV was ultimately dissolved after five months when Foxconn requested that the JV Agreement be terminated and replaced with a completely different transaction structure and vehicle program.

35. The JV Agreement contemplated that the JV's first vehicle program would be based on certain vehicle designs that a Foxconn affiliate in Taiwan, called Foxtron, had already largely developed. These vehicles were known as the Model C, a mid-size crossover, and the Model E, a large sedan. Foxconn committed that it would provide full access to data and information regarding the Model C and Model E vehicle designs necessary for the JV management

12

team to determine what modifications would be required for the North American market. The JV would then take the Model C, engineer the necessary modifications and develop a production plan for the Plant. Based on Foxconn's representations on the maturity of the Model C, the Company was optimistic that it could tailor the vehicle and move it into production quickly with a significant cost advantage. Moreover, the modified Model C could serve as a base platform for other derivative vehicle programs, which would provide additional benefits in terms of speed and cost. The Company began to market the Model C design to potential customers and publicly supported Foxconn's efforts to promote its EV ambitions, including participation in Foxconn and MIH promotional events in Taiwan and across the United States. But Foxconn was slow to respond, or failed to respond at all, to the Model C commitments it made in the JV Agreement.

36.     Despite its delays with the Company, Foxconn was quick to move forward with its other plans for the Plant in Lordstown. The day after closing the Plant APA, Foxconn announced that it would be manufacturing the PEAR EV with automaker Fisker Inc. at the Plant. Over the coming months, Foxconn announced plans to manufacture INDIEV's electric vehicle (the INDI One) and Monarch's all-electric MK-V tractor at the Plant. The Debtors supported Foxconn's commercial efforts with other vehicle makers and had meetings with both Fisker and INDIEV regarding potential product development collaboration opportunities. For example, at Foxconn's request, the Company spent four weeks meeting with and developing a proposal for Fisker. Fisker ultimately communicated that it did not have the funds to proceed with the requested vehicle program.

37.     At the same time, Foxconn stymied the Company's attempts to move forward with the partnership to develop future Lordstown vehicles under the JV Agreement. Among other things, Foxconn: (a) failed to grant the Company access to the Model C and Model

13

E vehicle designs that it committed to provide; (b) stalled the Company's attempts to agree on a budget and timeline for the project as contemplated by the JV Agreement; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon commitments. Foxconn also caused Foxconn EV System LLC to fail to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance. Moreover, Foxconn caused Foxconn EV Technology to delay the appointment of the JV's chief financial officer and to fail to make minimum monthly payments to the JV, each as required by the JV Agreement. Foxconn even refused to provide information about the JV's bank accounts.

38. Notwithstanding Defendants' lack of engagement, the JV, utilizing Company personnel, began predevelopment work on the Model C design modifications and outreach to potential fleet customers, several of whom were very interested. To advance these efforts, the Company repeatedly requested from Defendants required engineering drawings and data relating to the Model C and Model E vehicle designs that were a fundamental basis for the JV. More than two months after the JV Agreement was entered into, no engineering drawings or vehicle design data had been shared. In a meeting during that time period, Chairman Liu stated that if Company personnel would just come to Taiwan, he would ensure that all necessary information would be shared. On that basis, the CEO of the Company traveled to Taiwan, during the COVID lock-down, and spent nearly two weeks attempting to meet with Foxtron and Foxconn to discuss and obtain the requested materials. Defendants ultimately stated that they could not

14

provide access to the requested data to the Company or establish a licensing deal, notwithstanding their representations in the JV Agreement. Adding insult to injury, the CEO of Foxtron declined to meet with the Company's representatives. Chairman Liu implausibly stated, without explanation, that he could not force Foxtron to share the required information, notwithstanding the fact that that Foxconn, through its affiliate, had committed to provide that information to the JV by a date certain and Chairman Liu is also the Chairman of Foxtron.

39.     Defendants' actions deprived the Company of the enormous cost savings and time advantages of working with an existing vehicle design. Instead, the Company was forced to return to the internal platform that it had discussed with Foxconn in November 2021, nine months earlier. Meanwhile, the Company subsequently learned that Foxtron, majority owned by Foxconn, intended to sell its own vehicles, including the Model C, directly into the United States in direct competition with the Company, despite Defendants' commitment in the JV Agreement to utilize the JV as their primary North American vehicle development partner.

40.     By entering into the JV Agreement, Foxconn EV Technology agreed to make, or to advance on the Company's behalf, capital contributions to the JV of up to $100 million. A large portion of the capital contributions would not be required until the parties agreed upon a budget, which they were required to use their commercially reasonable efforts to do. On July 11, 2022, the Company provided a draft budget for the JV to Foxconn EV Technology. Despite Foxconn EV Technology's agreement to use commercially reasonable efforts to agree upon a budget, for over two months, Defendants refused to even engage with the Company over the proposed budget, let alone approve it. On September 28, 2022, the Company re-sent the budget to Foxconn, and on September 30, 2022, Foxconn indicated that it disagreed with the budget structure, without providing any further comments or guidance, other than to assert that Foxconn's

internal spending controls should apply to the JV and that Chairman Liu should have veto rights over any expenditure that exceeded $150,000.

41.    On October 14, 2022, the Company sent a letter to Foxconn noting Defendants' various breaches of the JV Agreement and the CMA.  Among other things, the Company noted that Foxconn did not provide data and information for the Model C and Model E designs as required by the JV Agreement.  As a result, the Company had to defer promising discussions with one of the largest fleet managers in North America, which subsequently made large electric vehicle purchases from other manufacturers.

42.    In short, Defendants stonewalled the Company's efforts regarding the JV at each and every turn.  Defendants' actions were driven by Foxconn, which was determined to maliciously and in bad faith destroy Plaintiffs' business in an effort to strip Plaintiffs' assets and poach its talent at little cost.  On many occasions, the Company was told that all material decisions, and even many minor ones, required the approval of Foxconn.  Upon information and belief, the decision to enter into this effort to destroy the Company, and to breach the JV Agreement to help achieve that, was made by Young Liu, CEO and Chairman of Foxconn.

**The Parties Alter the Structure of Their Partnership and FVP Commits to Purchase $70 Million of the Company's Common Stock and up to $100 Million in Preferred Stock**

43.    Soon after receiving the Company's letter setting forth Foxconn's breaches of the JV Agreement, Foxconn scheduled a meeting with the Company to discuss a direct investment by a different Foxconn entity, FVP.  Foxconn was interested in the new entity increasing its share ownership in the Company, potentially even taking the Company private. Importantly, the new entity was 55% owned by Foxconn and 45% owned by SoftBank, a large multi-national technology investor.   SoftBank's Chairman was interested in developing proprietary electric vehicle programs in North America and the Company was told by Foxconn

16

that it should re-focus resources to these new programs. Several meetings were held between the Company and representatives of Foxconn and SoftBank, including SoftBank's Chairman, to discuss the new programs.

44. Since Foxconn had failed to live up to its commitments in the JV Agreement, the Company agreed, on November 7, 2022, to pivot away from the JV Agreement and instead Lordstown and FVP entered into a direct investment agreement (the "**Investment Agreement**", attached as <u>**Exhibit E**</u>). Under the Investment Agreement, FVP agreed to make additional equity investments in the Company through the purchase of $70 million of Common Stock and up to $100 million in Series A convertible preferred stock ("**Preferred Stock**"), subject to certain conditions. The net proceeds of the Common Stock sale could be used by the Company for general corporate purposes, while the net proceeds from the sale of the Preferred Stock were to be used specifically for the new SoftBank vehicles or any substitute programs (the "**New Vehicle Programs**").

45. Section 2.01 of the Investment Agreement contemplated: (a) an initial closing (the "**Initial Closing**"), shortly after execution, at which FVP would purchase $22.7 million in Common Stock and $30 million in Preferred Stock; (b) a subsequent closing (the "**Subsequent Common Closing**") at which FVP would purchase $47.3 million in Common Stock, subject to regulatory approval; and (c) additional closings in connection with which FVP would purchase up to $70 million in additional shares of Preferred Stock purchases (the "**Subsequent Preferred Closings**"), subject to an agreement on the funding milestones and budget for the New Vehicle Programs and satisfaction of those milestones. The Initial Closing occurred on November 22, 2022, and the Company immediately began pre-development work on the New Vehicle Programs.

17

RLF1 29221232v.1

46.     The Investment Agreement imposes obligations on FVP to facilitate the fulfillment of conditions precedent to the Subsequent Common Closing and the Subsequent Preferred Closing.  Section 5.02 requires FVP to "use reasonable best efforts to work cooperatively together to, as promptly as reasonably practicable, complete governmental processes . . . in connection with the Subsequent Common Purchase."  Section 5.02(b) further provides the parties will "use their respective reasonable best efforts to, as promptly as practicable, obtain CFIUS Clearance and to prevent impediments to the consummation of the Transactions."  Section 5.20 of the Investment Agreement includes a covenant that FVP will use commercially reasonable good faith efforts to agree upon the Preferred Funding Milestones and the EV Program Budget (each as defined in the Investment Agreement) no later than May 7, 2023.

**Foxconn Tries to Avoid Fulfilling FVP's Promise to Purchase the Company's Common Stock and Preferred Stock**

47.     When Foxconn convinced the Company to terminate the JV Agreement and pivot to the Investment Agreement, Foxconn directed that the new vehicle program would focus on the vehicle platform backed by Softbank.  But within days of entering into the Investment Agreement, Foxconn indicated that SoftBank's commitment was no longer clear, SoftBank's Chairman was sometimes erratic and that the Company should not rely on the SoftBank program.  Instead, Foxconn directed the Company to resume work on the previous internal program that was similar to what was first discussed in November 2021.  The parties then entered into an amendment to the Investment Agreement, effective November 15, 2022 (attached as **Exhibit F**), allowing the Company to use the net proceeds from the purchases of Preferred Stock for the substitute program, which Foxconn claimed to fully support.  The amendment identified the substitute program and broad categories of expenses for which the Company could use the proceeds.

18

48.    While the Company's engineering team pivoted to the substitute program, FVP was dragging its feet on a required regulatory filing with the Committee on Foreign Investment in the United States ("**CFIUS**").  Under Section 5.02(b) of the Investment Agreement, the parties were required to make the filing as promptly as reasonably practicable and in any event within 20 business days from the execution of the Investment Agreement, or December 7, 2022. Section 5.02(b) further provides the parties will "use their respective reasonable best efforts to, as promptly as practicable, obtain CFIUS Clearance and to prevent impediments to the consummation of the Transactions."

49.    In the course of preparing the filing, in early December, Foxconn executives in Taiwan apparently became aware for the first time of the Investment Agreement amendment and demanded that the Company agree to its immediate rescission, with retroactive effect.  On December 14 – when the CFIUS filing was already late – FVP's Chief Product Officer advised the Company that Foxconn's Chief Financial Officer in Taiwan "insists to have [the rescission document] signed before filing CFIUS this week."  Similarly, Foxconn's outside legal counsel indicated that they would be prepared to file the CFIUS application but only after the recission agreement was executed.

50.    Even though FVP had no contractual basis to withhold its cooperation, the Company, with a tremendous need for the financing FVP promised and the looming holiday season, agreed to execute the rescission and enter into a new, more restrictive amendment document (the "**Recission and First Amendment**," attached as **Exhibit G**) that also identified the substitute program, which Foxconn continued to claim to fully support.   The CFIUS application was filed on the evening of December 23 – two weeks after the absolute deadline and after the start of the holiday shutdown.  FVP's breach of the CFIUS covenant not only demonstrates extreme

bad faith but it ultimately held up CFIUS Clearance and therefore the date of the Subsequent Common Closing, likely by several weeks at least, at a time when the Company was in need of critical funding.

51.     Between December 2022 and March 2023, the Company completed the first phase of the new vehicle development work. This work including market analyses to determine the target segments and attributes needed to be successful in the U.S. commercial fleet marketplace, vehicle architecture engineering to create a platform that could yield multiple vehicle model types, studies to determine which components (e.g., batteries, electronics and motors) could be supplied by the Foxconn EV Ecosystem, initial design alternatives, and cost targets needed to ensure program profitability.

52.     The Company also held regular meetings with potential customers, including a major vehicle fleet owner in the United States, to discuss predevelopment collaboration and potentially large purchase orders. On January 24, 2023, the Company sent Foxconn its proposed program budget, development milestones and deliverables. On January 25, the Company held a meeting with Chairman Liu to discuss the budget, program direction, opportunities for collaboration with the Foxconn EV Ecosystem, the status of the Endurance, and Foxconn's expectations for future reviews. In this meeting, Chairman Liu stressed four topics that he wanted to see covered in the milestone reviews – total addressable market (TAM), compound annual growth rate (CAGR) of the segment, unique selling proposition (USP) and key attributes of the product that would allow the Company to secure a path to profitability.

53.     The Company confirmed that these topics would be part of the Company's early phase product development work and that Foxconn would see these topics covered in regular program milestone scorecards and reviews. The Company subsequently provided Foxconn,

20

including Chairman Liu, with regular updates about its work, scorecards on the completion status of each deliverable, and topics where assistance was needed from Foxconn.

54. On March 22, 2023, the Company delivered the first set of program deliverables contemplated by the Investment Agreement. Once those deliverables were approved by FVP, FVP was required to pursue and to fund the Second Tranche Preferred Purchase (as defined in the Investment Agreement).

55. But Defendants continued their longstanding pattern of delay. A meeting to discuss the deliverables scheduled for March 23rd was cancelled by Foxconn and never re-scheduled. To date, the Company still has not received any substantive response from Foxconn on its proposals for budgeting and milestones.

56. On April 24, 2023, in no small part as a result of the Company's continued efforts, FVP received CFIUS approval to complete the Subsequent Common Closing. Under the Investment Agreement, the Subsequent Common Closing—and FVP's purchase of $47.3 million shares of Common Stock—was slated to occur no later than 10 business days from receipt of the CFIUS approval, *i.e.*, on May 8, 2023. As stated earlier, if FVP had not improperly delayed the CFIUS filing, approval would have been received much earlier.

57. Meanwhile, the only other relevant conditions to the Subsequent Preferred Closings were agreement on the Preferred Funding Milestones and the EV Program Budget, and satisfaction of the Preferred Funding Milestones. But Defendant has refused to use commercially reasonable efforts to reach agreement on the Preferred Funding Milestones and the EV Project Budget; indeed, it has refused to engage at all.

58. FVP now asserts that its obligation to develop the Preferred Funding Milestones and the EV Program Budget were contingent on the execution of engineering and

21

program agreements with SoftBank – agreements that, within days after signing the Investment Agreement, Defendants instructed the Company should be abandoned in favor of a pivot to the substitute program, which substitute program is identified in both the first amendment to the Investment Agreement that was rescinded and in the Recission and First Amendment.

59. Thus, while the Company worked in good faith to accommodate Foxconn's ever shifting views with respect to which programs should be developed, Foxconn ensured that FVP never met its contractual obligations and sabotaged the Company's product development efforts. Foxconn caused its affiliate to breach its contractual obligations in furtherance of a plan to maliciously and in bad faith destroy Plaintiffs' business and to strip Plaintiffs' assets and poach their talent. Upon information and belief, the decision to breach the Investment Agreement was made by Young Liu, CEO and Chairman of Foxconn.

**The Improper Attempt to Terminate the Investment Agreement**

60. On March 7, 2023, with increasing uncertainty regarding the strength of the Company's partnership with Foxconn, the Common Stock dropped below the $1.00 per share threshold set forth in Nasdaq Listing Rule 5450(a)(1). On April 19, 2023, the Listing Qualifications Department of Nasdaq, where the Common Stock is listed, issued a notice ("**Nasdaq Notice**", attached as **Exhibit H**) to the Company. The Nasdaq Notice notified the Company that it had a 180-day period to return the stock price to above $1.00 per share. The Company, having anticipated that its stock price could drop below the $1.00 level, had already included a proposal for a reverse stock split in the agenda for its annual meeting to be held on May 22, 2023.

61. Seizing on the Nasdaq Notice, by letter dated April 21, 2023, just 17 days before the anticipated Subsequent Common Closing, Defendant sent a notice of default (the

22

"**Notice of Default**", attached as **Exhibit I**) under the Investment Agreement.  The Notice of Default provided that Defendant would terminate the Investment Agreement effective May 21, 2023, one day prior to the Company's shareholders' meeting and the approval of the reverse stock split, in the event the Company failed to cure such default.

62.    On April 25, 2023, the Company responded to the Notice of Default.  The Company (i) disputed that the Nasdaq Notice constituted a breach under the Investment Agreement, (ii) noted that the Investment Agreement, by its terms, does not permit Defendant to terminate it following the Initial Closing (which occurred on November 22, 2022), and (iii) in any event, Defendant cannot exercise termination rights because FVP breached the Investment Agreement by failing to use necessary efforts to agree upon the budget and milestones to facilitate the Subsequent Preferred Funding.  The Company's response noted that if the termination notice was not immediately retracted, the Company would be forced to publicly disclose the purported termination which would result in material harm and damage.

63.    Foxconn did not respond to the Company's letter.  As a result, the Company was forced to file a Current Report on Form 8-K with the Securities and Exchange Commission on May 1, 2023, announcing FVP's purported termination.  While the Company made clear that it did not agree the termination was proper, the disclosure nevertheless caused the Company's stock price to plummet and caused unfavorable media coverage.  The announcement also materially and negatively impacted the Company's customer, employee, supplier and other business relationships. Within hours of the filing, several customers, including one of the largest fleet managers in North America, cancelled or deferred discussions regarding the purchase of Lordstown vehicles.  Since then, the impact of the Foxconn dispute on the Company has been severe.

64.     On May 2, 2023, after forcing the Company to publicly disclose FVP's purported termination, causing a significant drop in the Company's stock price and uncertainty about its future, Foxconn acknowledged both in correspondence to the Company and publicly that it agreed that it had no legal right to terminate the Investment Agreement after the Initial Closing. Foxconn nonetheless asserted in correspondence with the Company that the Nasdaq Notice constituted a breach of a representation that is a condition to the Subsequent Common Closing and, therefore, Foxconn was not obligated to consummate the Subsequent Common Closing until such breach was cured.

65.     On May 3, 2023, Lordstown sent Foxconn a letter recognizing the retraction of its purported termination of the Investment Agreement.  But the Company disputed Foxconn's assertion that the Nasdaq Notice constituted a failure of a condition of the Subsequent Common Closing.

66.     Section 3.13 sets forth a representation and warranty that:

The Common Stock is registered pursuant to Section 12(b) of the Exchange Act and listed on the Nasdaq, and the Company has taken no action designed to, or which to the Knowledge of the Company is reasonably likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act or delisting the Common Stock from the Nasdaq, nor has the Company received any written notification that the SEC or the Nasdaq is contemplating terminating such registration or listing.

67.     Defendant has not identified any action of the Company "designed to, or which to the Knowledge of the Company is reasonably likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act or delisting the Common Stock from the Nasdaq."  Nor has "the Company received any written notification that the SEC or the Nasdaq is contemplating terminating such registration or listing."

24

68.     Rather, under Nasdaq Marketplace Rule 5810(c)(3)(A), the Company was given 180 calendar days, or until October 16, 2023, to return the stock price above the $1.00 per share minimum.  Only if the Company failed to return the stock price above $1.00 per share by the end of that period would it be at risk of a potential termination of its listing.

69.     Thus, as explained in its May 3 letter, Lordstown's representations in section 3.13 were true when made, were true on the date of the letter and would be true on the Subsequent Common Closing Date. The Company reiterated that the Company would be ready, willing and able to close the transaction on the Subsequent Common Closing Date, May 8, 2023. But FVP refused to close on the Subsequent Common Closing Date, further harming the Company and ultimately requiring it to seek chapter 11 relief.

70.     FVP's further asserted in SEC filings that the Nasdaq Notice constituted a "breach" of the Investment Agreement.  Even if FVP's position were correct, and the closing condition were not satisfied, the Nasdaq Notice would not have constituted a breach of the Investment Agreement.  On May 3, Defendant demanded a correction to FVP's false public disclosure.  FVP has failed to do so.

71.     Moreover, FVP's refusal to file the CFIUS application until the Company rescinded an amendment to the Investment Agreement that the parties had executed (despite the Investment Agreement's covenants to the contrary) is the only reason that the Nasdaq Notice was received before the Subsequent Common Closing Date, as the application would have been approved weeks earlier absent FVP's breach.  In other words, absent FVP's breach of its contractual obligations regarding CFIUS Clearance, the entire Nasdaq Notice issue would have been moot.

25

72.     On May 23, 2023, the Company executed a reverse stock split to improve the marketability and liquidity of the Common Stock.  As of June 7, 2023, the Common Stock price had remained above $1.00 per share for 10 consecutive trading days following the reverse stock split.  As a result, even under FVP's flawed interpretation of the agreement, all conditions to closing would have been satisfied and FVP's pretext for not closing was gone.

73.     Knowing that its most recent excuse for failing to meet its contractual obligation was about to disappear, on June 5, FVP asserted for the first time in a letter (attached as **Exhibit J**) that because of the company's 1:15 reverse stock split, it was now entitled to purchase not the 10% of the Common Stock of the Company that had been agreed, but 62.7% for the same $47.3 million price.

74.     FVP's assertion ignores several provisions of the Investment Agreement, which makes clear that following the Subsequent Common Closing, FVP and its affiliates would not own more than 19.99% of the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of the Company and at no point would it own anywhere near 65.9%, which is the percentage of the voting interest that FVP would hold on an as-converted basis when combining the stock that FVP asserts it has the right to purchase in the Subsequent Common Closing with its existing holdings of the Company's capital stock and warrants.  In fact, FVP had agreed that, until at least December 31, 2024, it and its affiliates would not acquire, offer or seek to acquire or make a proposal to acquire (a) more than 19.99% of the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of the Company prior to a vote of the Company's stockholders allowing FVP to acquire more than 19.99% of such capital stock and (b) more than 24% of the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of

the Company even after the Subsequent Common Closing and a vote of the Company's stockholders approving an acquisition by FVP of more than 19.99% of such capital stock, if such vote were obtained.

75.     FVP's newest position also contradicts the terms of its own certifications to CFIUS, where it represented to the United States government that the transactions contemplated by the Investment Agreement, together with FVP's existing holdings of the Company's capital stock and warrants on an as-converted basis, could not result in FVP owning anywhere near a 65.9% voting interest in the Company.  FVP's position would mean that the Company could have effectuated a 30:1 stock dividend (which is has the right to do under the Investment Agreement) and FVP would have been required to pay $47.3 million for a mere fraction of the capital stock of the Company, which is an absurd interpretation of the Investment Agreement.

76.     It is unclear whether this newly concocted position was just one more effort to sabotage the deal or to capture a windfall by stealing control of the Company for what it was supposed to pay for 10% of the stock.  But either way, FVP's position was in clear violation of the Investment Agreement.  The Company demanded that FVP withdraw its absurd argument and close the transaction on the agreed terms.  FVP refused.

77.     Meanwhile, even if FVP's earlier reliance on the Nasdaq Notice were valid—and it was not—Nasdaq sent a notice (attached as **Exhibit K**) closing the matter on June 7, 2023.  Under Section 2.03(a) of the Investment Agreement, the Subsequent Common Closing shall occur on the tenth business day after all of the conditions to the closing have been satisfied.  Thus, even if the Nasdaq Notice had been an impediment to closing, the Subsequent Common Closing should have occurred on June 26, 2023, but FVP refused—and continues to refuse—to close.

27

78.     FVP's actions, driven by Foxconn, have had a devastating effect on the Company's business.   Upon information and belief, the decision to breach the Investment Agreement was made by Young Liu, CEO and Chairman of Foxconn as part of Foxconn's scheme to starve the Company and destroy its business.   Rather than embracing Lordstown as its partner in "a trillion-dollar business opportunity for electric vehicles," Foxconn has maliciously and in bad faith sabotaged the ability of Lordstown to execute its business plan for scalable electric vehicle production in North America.   The Company has recently laid off a substantial number of its employees, and its ability to continue its operations is now in question.   Meanwhile, Foxconn is hiring Lordstown employees and continues to refuse to provide financing and cooperation that is essential for Lordstown to sustain its ongoing operations. Foxconn thus far has succeeded in executing its plan to force the Company to shut down so that it can take over the Company's remaining assets and talent, while evading liability for its repeated breaches.

**The Debtors' Bankruptcy Proceeding**

79.     On June 27, 2023 (the "Petition Date"), faced with the reality that there were no circumstances under which Foxconn would meet its contractual obligation to close, the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").   The Debtors have filed a separate procedural motion requesting that the Chapter 11 Cases be jointly administered.   The Debtors continue to operate their businesses and manage their properties pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

<div align="center">

**COUNT ONE**

**(Common Law Fraud – Against Foxconn)**

</div>

80.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

<div align="center">28</div>

81. Foxconn has induced Plaintiffs to enter into a series of agreements, including the AIP, the Plant APA, the CMA, the JV Agreement, and the Investment Agreement, based on the false representation that it sought a partnership with Plaintiffs to jointly develop the next generation of electric vehicles.

82. Foxconn knew that it never intended to have a partnership and its statements regarding its interest in a partnership with Plaintiffs were false. Rather than seeking to develop a partnership with Plaintiffs, Foxconn intended to deprive the Company of necessary capital and sabotage its business in an effort to strip Plaintiffs' assets and poach its talent at little cost.

83. Foxconn made its statements regarding its interest in a partnership with Plaintiffs with the intent to induce Plaintiffs to sell their unique and most valuable asset, their manufacturing plant, to transfer highly talented and experienced manufacturing and operational employees to the Foxconn team, and to refrain from pursuing opportunities with other strategic partners. These agreements were the instruments by which Foxconn perpetrated its broader scheme to loot Plaintiffs of their most valuable assets.

84. Plaintiffs, seeking a strategic partner to address their funding needs and to help develop a scalable vehicle development platform for the next generation of electric vehicles, justifiably relied on the statements of Foxconn, one of the world's largest multinational manufacturing companies.

85. As a direct and proximate cause of Foxconn's fraudulent conduct, the Company sold its most valuable asset and refrained from pursuing opportunities with other strategic partners. Deprived of necessary funding and cooperation to develop a scalable vehicle development platform, Plaintiffs' ability to continue operations is in jeopardy, and they have suffered, and will continue to suffer, billions of dollars in damages.

29

## COUNT TWO

**(Breach of Contract - Section 2.01(b) of the Investment Agreement -
Against FVP)**

86.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

87.     The Investment Agreement is a valid agreement governed by Delaware law. It was properly formed and entered into by the Company and FVP.

88.     The Company has fully performed its obligations under the Investment Agreement.

89.     Section 2.01(b) of the Investment Agreement requires that at the Subsequent Common Closing, FVP purchase approximately 10% of the Company's Common Stock for $47.3 million.  In memorializing the parties' agreement, the provision specifies the number of shares that represented this percentage as of the time the Investor Agreement was signed.

90.     On May 23, 2023, the Company executed a 1:15 reverse stock split to improve the marketability and liquidity of its Common Stock.  Reverse stock splits are permissible under the Investment Agreement, and the parties understood that such a split would not change the business terms of the agreement and that FVP would still purchase approximately 10% of the Company's Common Stock at the Subsequent Common Closing.

91.     But for FVP's failure to consummate the Subsequent Common closing as required, the Subsequent Common Closing would have occurred before the reverse stock split occurred.

92.     All of the conditions precedent to the Subsequent Common Closing have occurred.

93.     FVP has breached section 2.01(b) the Investment Agreement by refusing to purchase the Common Stock.  FVP initially claimed that it had no obligation to close due to the Nasdaq Notice, and now claims that it is entitled to purchase a majority interest in the Company due to the reserve stock split.

94.     As a direct and proximate cause of FVP's breaches of its contractual obligations, the Company's ability to continue operations is in jeopardy, and it has suffered, and will continue to suffer, billions of dollars in damages.

95.     FVP is liable to the Company for its breaches of its contractual obligations.

## COUNT THREE

**(Breach of Contract - Section 5.20 of the Investment Agreement -
Against FVP)**

96.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

97.     Section 5.20 of the Investment Agreement provides that both the Company and FVP will "use commercially reasonable good faith efforts to agree upon the Preferred Funding Milestones and the EV Program Budget no later than the 6-month anniversary of the date of this Agreement."

98.     The Company has sent proposals to FVP regarding the Preferred Funding Milestones and the EV Program Budget, but FVP has neither agreed to nor commented upon the proposals.

99.     FVP has breached section 5.20 of the Investment Agreement by failing to use commercially reasonable good faith efforts to agree upon the Preferred Funding Milestones and the EV Program Budget no later than the 6-month anniversary of the date of this Agreement.

100.    Section 6.05 sets forth two conditions precedent to the Second Preferred Closing and the Third Preferred Closing: (i) the Company and the Investor shall have agreed to the EV Program Budget and the Preferred Funding Milestones; and (ii) the Preferred Funding Milestone for such Closing shall have been satisfied.

101.    FVP's failure to comply with its obligations under section 5.20 of the Investment Agreement has the effect of avoiding Defendant's obligation to purchase $70 million of preferred shares from the Company.

102.    As a direct and proximate cause of FVP's breaches of its contractual obligations, the Company's ability to continue operations is in jeopardy, and it suffered, and will continue to suffer, billions of dollars in damages.

103.    Defendant is liable to Lordstown for its breaches of its contractual obligations.

## COUNT FOUR

### (Breach of Contract – Improper Attempt to Terminate the Investment Agreement - Against FVP)

104.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

105.    FVP has breached the Investment Agreement by purporting to terminate the Agreement in contravention of the express provisions of section 7.01.

106.    Section 7.01 provides that the "Agreement may be terminated and the Transactions abandoned at any time prior to the Initial Closing."

107.    The Initial Closing occurred on November 22, 2022.

108.    No provision in the Investment Agreement allows FVP to terminate following the Initial Closing.

32

109.    On April 21, 2023, FVP sent the Notice of Default, citing the Nasdaq Notice.  The Notice of Default provided that FVP would terminate the Investment Agreement effective May 21, 2023 in the event the Company failed to cure such default.

110.    On April 25, 2023, the Company sent a letter noting that FVP had no contractual basis to terminate and requested a retraction of the termination notice.

111.    FVP did not retract the termination notice, thus forcing the Company to announce the purported termination in its SEC filings.

112.    The announcement also materially and negatively impacted the Company's customer, employee, supplier and other business relationships.

113.    Shortly after the filing, FVP admitted that it had no right to terminate the Investment Agreement.

114.    As a direct and proximate cause of FVP's breaches of its contractual obligations, the Company's ability to continue operations is in jeopardy, and it suffered, and will continue to suffer, billions of dollars in damages.

115.    Defendant is liable to Lordstown for its breaches of the Investment Agreement.

## COUNT FIVE

**(Breach of Contract – Section 5.02(b) of the Investment Agreement -
Against FVP)**

116.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

117.    FVP has breached the Investment Agreement by failing to comply with its obligations under section 5.02 of the Investment Agreement.

33

118.    Section 5.02(b) of the Investment Agreement requires the Company and FVP to "as promptly as reasonably practicable, and in any event within twenty (20) Business Days from date of this Agreement, submit a draft joint voluntary notice . . . to CFIUS."  Section 5.02(b) further provides the parties will "use their respective reasonable best efforts to, as promptly as practicable, obtain CFIUS Clearance and to prevent impediments to the consummation of the Transactions."

119.    In December, FVP sought a rescission of an amendment to the Investment Agreement and held up the necessary CFIUS filing until the Company finally agreed.  On December 14 – when the application was already late – FVP indicated to the Company that it would not go forward with the CFIUS filing unless and until the Company agreed to rescind the prior amendment.

120.    Even though FVP had no contractual basis to withhold its cooperation, the Company executed the rescission document, and that CFIUS application was filed on December 23 – two weeks beyond the absolute deadline, and in the middle of the holiday season.

121.    As a result of FVP's breach, CFIUS did not approve the application until April 25, 2023—four days after the issuance of the Nasdaq Notice that FVP now unjustifiably cites as its basis for not fulfilling its commitment to purchase an additional $47.3 million in Common Stock.

122.    As a direct and proximate cause of FVP's breaches of its contractual obligations, the Company's ability to continue operations is in jeopardy, and it suffered, and will continue to suffer, billions of dollars in damages.

123.    FVP is liable to Lordstown for its breaches of the Investment Agreement.

## COUNT SIX

### (Breach of Contract – Limited Liability Company Agreement of MIH EV Design LLC - Against Foxconn EV Technology, Inc.)

124.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

125.    The JV Agreement is a valid agreement governed by Delaware law.  It was properly formed and entered into by Lordstown EV Corporation and Foxconn EV Technology.

126.    Lordstown EV Corporation fully performed its obligations under the JV Agreement.

127.    The JV Agreement imposed a number of obligations on Foxconn EV Technology including (i) using its commercially reasonable efforts to prepare and agree to a Fiscal Year 2022 budget to design and develop its first electric commercial vehicle (section 2.8(a)), (ii) granting the JV perpetual, irrevocable, non-exclusive, worldwide, license to certain intellectual property of Foxconn EV Technology and its affiliates (section 2.10(a)), (iii) causing access to be granted to the joint venture of all information and data necessary for the JV to commence pre-development activities (section 2.10(a)), and (iv) agreeing not to engage in a competing business opportunity unless presented to the JV's board (section 11.2).

128.    Foxconn EV Technology repeatedly breached its obligations under the JV Agreement.  Foxconn EV Technology stymied the Company's efforts to move forward with the development of electric vehicles by refusing to engage on proposed budgets and timelines for EV projects.  Despite repeated assurances, Foxconn EV Technology refused to provide intellectual property rights and access to data and information to allow the project to move forward. Defendants further announced a plan to sell vehicles directly into North America and promoted

35

their own vehicles, notwithstanding Foxconn EV Technology's commitment to utilize the JV as its primary North American development partner.

129.    As a direct and proximate cause of Foxconn EV Technology's breaches of its contractual obligations, Lordstown EV Corporation incurred substantial costs and suffered from lost business opportunities as its vehicle development program was stalled. Lordstown EV Corporation suffered, and will continue to suffer, billions of dollars in damages.

130.    Foxconn EV Technology is liable to Lordstown EV Corporation for its breaches of the Investment Agreement.

## COUNT SEVEN

### (Breach of Contract – Asset Purchase Agreement - Against Foxconn EV Technology, Inc. and Foxconn (Far East) Limited)

131.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

132.    The Plant APA is a valid agreement governed by Delaware law.  It was properly formed and entered into by Lordstown EV Corporation and Foxconn EV Technology, Inc. and Foxconn (Far East) Limited.

133.    Lordstown EV Corporation fully performed its obligations under the Plant APA.

134.    Section 4.1(k) of the Plant APA imposed obligations on Foxconn EV Technology to use its commercially reasonable efforts to enter into a joint venture agreement under which the parties would, among other things, allocate engineering resources to jointly design, engineer, develop, validate, industrialize, and launch vehicle programs for the commercial vehicle market in North America and internationally using Foxconn's MIH open platform.

36

135.    Foxconn EV Technology repeatedly breached its obligations under the Plant APA to use its commercially reasonable efforts to enter into a joint venture agreement. Foxconn EV Technology dragged its feet in working to develop the parties' agreed upon joint development platform.  Although the Company quickly circulated term sheets outlining a more detailed plan for the partnership, Foxconn EV Technology was extremely slow to engage, notwithstanding its obligations under the Plant APA.  Indeed, in April 2022, five months after the Plant APA was signed, Foxconn senior executives, including Chairman Liu, stated that Foxconn would not even discuss the JV before closing the Plant APA.

136.    As a direct and proximate cause of Foxconn EV Technology's breaches of its contractual obligations, Lordstown EV Corporation incurred substantial costs and suffered from lost business opportunities as its vehicle development program was stalled. Lordstown EV Corporation suffered, and will continue to suffer, billions of dollars in damages.

137.    Foxconn EV Technology is liable to Lordstown EV Corporation for its breaches of the Plant APA.

138.    Section 10.18(a) of the Plant APA provides that Foxconn (Far East) Limited "hereby unconditionally and irrevocably guarantees to Seller the due and punctual payment, performance and observance by Purchaser (and any permitted assignees thereof) of any and all of Purchaser's (or such permitted assignee's) obligations pursuant to this Agreement."

139.    Foxconn (Far East) Limited is jointly and severally liable for Foxconn EV Technology's breaches of the Plant APA.

## COUNT EIGHT

### (Common Law Fraud -
### Against Foxconn (Far East) Limited)

140.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

141.    Foxconn (Far East) Limited induced Lordstown EV Corporation to enter into the Plant APA based on the false representation that Foxconn sought a partnership with Plaintiffs to jointly develop the next generation of electric vehicles.

142.    Foxconn (Far East) Limited knew that Foxconn never intended to have a partnership and its statements regarding its interest in a partnership with Plaintiffs were false. Rather than seeking to develop a partnership with Plaintiffs, Foxconn intended to deprive the Company of necessary capital and sabotage its business in an effort to strip Plaintiffs' assets and poach its talent at little cost.

143.    Foxconn (Far East) Limited made its statements regarding Foxconn's interest in a partnership with Plaintiffs with the intent to induce Plaintiffs to enter into the Plant APA and deprive Plaintiffs of their most valuable asset.  The Plant APA was an instrument by which Foxconn and Foxconn (Far East) Limited perpetrated a broader scheme to loot Plaintiffs of their most valuable assets.

144.    Plaintiffs, seeking a strategic partner to address their funding needs and to help develop a scalable vehicle development platform for the next generation of electric vehicles, justifiably relied on the statements of Foxconn (Far East) Limited, an affiliate of one of the world's largest multinational manufacturing companies.

145.    As a direct and proximate cause of Foxconn's fraudulent conduct, the Company sold its most valuable asset and refrained from pursuing opportunities with other

38

strategic partners. Deprived of necessary funding and cooperation to develop a scalable vehicle development platform, Plaintiffs' ability to continue operations is in jeopardy, and they have suffered, and will continue to suffer, billions of dollars in damages.

## COUNT NINE

**(Breach of Contract – Contract Manufacturing Agreement -
Against Foxconn EV System LLC)**

146.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

147.    The CMA is a valid agreement governed by Ohio law. It was properly formed and entered into by Lordstown EV Corporation and Foxconn EV System LLC.

148.    Lordstown EV Corporation fully performed its obligations under the CMA.

149.    Section 2 of the CMA imposed obligations on Foxconn EV System LLC to use commercially reasonable efforts: (a) to improve commercial terms of procurement with the Company's suppliers and take advantage of sourcing synergy opportunities, including with a list of identified suppliers, by providing critical strategic support leveraging Foxconn's size and expertise to achieve better pricing and payment terms with suppliers of the Endurance; (b) to transition procurement of components to Foxconn as expeditiously as possible and in any event no later than October 15, 2022; and (c) during the transition period to (i) support the Company's purchasing efforts in relation to components so as to minimize disruptions and inefficiencies, (ii) assist the Company in managing and communicating with suppliers and (iii) assist the Company in improving the commercial terms of procurement with suppliers. Foxconn EV System LLC also agreed to work with the Company in good faith to reduce the production cost of the Endurance, which may have included Foxconn directly participating in Company's value analysis and value engineering and sourcing activities.

39

150.   Foxconn EV System LLC failed to honor several material commitments under the CMA, including its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance.

151.   As a direct and proximate cause of Foxconn EV System LLC's breaches of its contractual obligations, Lordstown EV Corporation incurred substantial costs and suffered from lost business opportunities as its vehicle development program was stalled. Lordstown EV Corporation suffered, and will continue to suffer, billions of dollars in damages.

152.   Foxconn EV System LLC is liable to Lordstown EV Corporation for its breaches of the CMA.

## COUNT TEN

### (Tortious Interference with Contract -
### Against Foxconn)

153.   Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

154.   Foxconn has knowledge of the JV Agreement, the Investment Agreement, the Plant APA, and the CMA.

155.   Upon information and belief, Foxconn's actions were a significant factor in causing its affiliates, FVP, Foxconn EV Technology, Foxconn (Far East) Limited, and Foxconn EV System LLC, to breach their respective obligations under the JV Agreement, the Investment Agreement, the Plant APA, and the CMA.

40

156.     Foxconn's decision to cause its affiliates to breach their contractual obligation is without justification.  Foxconn has embarked on a plan to maliciously and in bad faith destroy Plaintiffs' business in an effort to strip Plaintiffs' assets and poach its talent at little cost.

157.     As a direct and proximate cause of Foxconn's tortious conduct, the Plaintiffs' ability to continue operations is in jeopardy, and they have suffered, and will continue to suffer, billions of dollars in damages.

158.     Foxconn is liable to Plaintiffs for its tortious conduct.

## COUNT ELEVEN

### (Equitable Subordination - Against All Defendants)

159.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

160.     As detailed above, the Defendants have engaged and continue to engage in grossly inequitable conduct, and have effectively destroyed the Debtors' business, by, among other things, refusing to honor the contractual promises that they made in order to secure the Lordstown plant, failing to invest approximately $170 million of additional equity capital in Lordstown's business, and refusing to work with the Debtors to develop the next generation of electric trucks.

161.     The actions of Defendants complained of herein constitute inequitable misconduct that harmed the Debtors, their estates, and the Debtors' other creditors, and has conferred an unfair advantage on Defendants.

162.     Equitable subordination of any claim that has been or will be filed by the Defendants and any equity interests in the Debtors held by Defendants is not inconsistent with the provisions of the Bankruptcy Code.

163.     As a result of Defendants' inequitable conduct, any and all proofs of claims

41

filed by the Defendants and any equity interests in the Debtors held by Defendants should be equitably subordinated pursuant to 11 U.S.C. § 510(c).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment for Plaintiffs and against Defendants as follows:

a. Finding that Foxconn has committed common law fraud by knowingly making false representations to Plaintiffs with the intent to induce them to enter into a series of agreements that Foxconn did not intend to observe, as part a broader scheme to loot Plaintiffs of their most valuable assets;

b. Finding that FVP has breached the Investment Agreement by failing to purchase 10% of the Company's Common Stock for an aggregate purchase price of $47,265,597 (prior to the subsequent reverse stock split);

c. Finding that FVP breached the Investment Agreement by failing to use commercially reasonable good faith efforts to agree upon the Preferred Funding Milestones and the EV Program Budget no later than the 6-month anniversary of the date of the Investment Agreement;

d. Finding that FVP has breached the Investment Agreement by purporting to terminate the Investment Agreement in contravention of the express provisions of section 7.01;

e. Finding that FVP has breached the Investment Agreement by failing to use its reasonable best efforts to, as promptly as practicable, obtain CFIUS Clearance, in contravention of the express provisions of section 5.02;

f. Finding that Foxconn EV Technology has breached the JV Agreement by refusing to engage on proposed budgets and timelines for EV projects, failing to provide intellectual property rights and access to data and information to allow the EV projects to move forward, and planning to sell its own vehicles directly into North America;

g. Finding that Foxconn EV Technology has breached the Plant APA by refusing to use commercially reasonable efforts to enter into a joint venture agreement;

h. Finding that Foxconn (Far East) Limited is liable for Foxconn EV Technology's breaches of the Plant APA;

i. Finding that Far (Far East) Limited committed common law fraud by knowingly making false representations to Plaintiffs with the intent to induce them to enter

42

into the Plant APA as part a broader scheme to loot Plaintiffs of their most valuable assets;

j.  Finding that Foxconn EV System LLC has breached the CMA by failing to honor its promises to assume responsibility for procurement, use its commercially reasonable efforts to improve commercial terms with suppliers, take advantage of sourcing synergies and otherwise work in good faith to reduce the production cost of the Endurance;

k.  Finding that Foxconn has tortiously interfered with Plaintiffs' contractual rights by causing its affiliates to breach their agreements with Plaintiffs maliciously and in bad faith in an attempt to destroy Plaintiffs' business;

l.  Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses incurred as a result of Defendants' breaches, including without limitation those fees, costs, and expenses incurred in connection with this adversary proceeding;

m.  Awarding Plaintiffs damages in an amount to be determined at trial;

n.  Equitably subordinating any claims filed by Defendants and any equity interests in the Debtors held by Defendants pursuant to 11 U.S.C. § 510(c); and

o.  Awarding such other and further relief as may be just and proper.

Dated: June 27, 2023

Respectfully submitted,

/s/      *Cory D. Kandestin*
**RICHARDS, LAYTON & FINGER, P.A.**

Kevin Gross (No. 209)
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704))
Amanda R. Steele (No. 5530)
Jason M. Madron (No. 4431)
Cory D. Kandestin (No. 5025)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
gross@rlf.com
defranceschi@rlf.com
heath@rlf.com
steele@rlf.com
madron@rlf.com
kandestin@rlf.com

*Proposed Co-Counsel to Debtors and*
*Debtors-in-Possession*

**WHITE & CASE LLP**

Thomas E Lauria (*pro hac vice* application pending)
Matthew C. Brown (*pro hac vice* application pending)
Fan B. He (*pro hac vice* application pending)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
tlauria@whitecase.com
mbrown@whitecase.com
fhe@whitecase.com

David M. Turetsky (*pro hac vice* application pending)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
david.turetsky@whitecase.com

Jason N. Zakia (*pro hac vice* application pending)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
jzakia@whitecase.com

Roberto Kampfner (*pro hac vice* application pending)
Doah Kim (*pro hac vice* application pending)
RJ Szuba (*pro hac vice* application pending)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
rkampfner@whitecase.com
doah.kim@whitecase.com
rj.szuba@whitecase.com

*Proposed Co-Counsel to Debtors and*
*Debtors-in-Possession*

44

**EXHIBIT A**

## AGREEMENT IN PRINCIPLE

THIS **AGREEMENT IN PRINCIPLE**, dated as of September 30, 2021 (this "**Agreement**"), is among Foxconn Asset Management LLC, a California limited liability company ("**Buyer**"), and Lordstown EV Corporation, a Delaware corporation ("**LEVC**"), and solely for purposes of Section 3, Section 9, Section 10, Section 13 and Section 17, Lordstown Motors Corp., a Delaware corporation ("**LMC**"). Buyer and LEVC collectively are referred to as the "**Parties**" and each is referred to as a "**Party**".

## RECITALS:

1.     LEVC is the designer and developer of an electric full-size pickup truck known as the Endurance™ (the "**Endurance**"), and other related technologies, intellectual property and trade secrets related to the design and development of the Endurance and its related components and systems.

2.     LEVC holds title to the 6.2 million square foot manufacturing facility and the approximately 600 acre real property located at 2300 Hallock Young Road, Lordstown, Ohio (the "**Facility**"), which it acquired from General Motors LLC, a Delaware limited liability company ("**GM**"), and its affiliates, in November 2019 pursuant to an Asset Transfer Agreement entered into by LEVC and GM (the "**Asset Transfer Agreement**").

3.     Buyer is a global manufacturer, including a contract manufacturer of complete automotive vehicles.

4.     Buyer desires to purchase from LEVC, and LEVC desires to sell to Buyer, certain assets of LEVC, including the Facility, subject to and in connection with the Parties entering into a contract manufacturing agreement and sourcing agreements relating to the Endurance and potentially other vehicles designed and developed by LEVC.

NOW THEREFORE, the Parties agree as follows:

1.     <u>Asset Purchase Agreement</u>.

(a)     LEVC shall, and Buyer shall arrange itself or through its designated affiliate company to, use their commercially reasonable best efforts to enter into an asset purchase agreement (the "**Asset Purchase Agreement**") on or before October 31, 2021. Subject to the definitive Asset Purchase Agreement, upon the satisfaction of the specified closing conditions therein, including, without limitation, the Parties' execution and delivery of the Contract Manufacturing Agreement (as defined in Section 5) and the Lease (as defined in Section 4) and issuance by LMC of the Warrants (as defined in Section 3), Buyer or its designated affiliate company will acquire all of LEVC's title, right and interest in and to: (i) the Facility; (ii) certain agreements that are scheduled in the Asset Purchase Agreement, including, without limitation, all vehicle and Facility-specific service, utility, supply, inbound logistics and supply agreements, except specified supplier tooling agreements (the "**Assumed Agreements**"); and (iii) certain personal property of LEVC that is scheduled in the Asset Purchase Agreement and that will

expressly exclude the Excluded Assets (as defined herein) (such purchased assets collectively, the "**Purchased Assets**"), in exchange for: (1) a purchase price of $230 million (the "**Purchase Price**"), payable in cash at Closing (as defined below); and (2) Buyer's assumption, at Closing, of the Assumed Agreements and assumed liabilities related to the Facility that are specifically agreed upon by the Parties in the Asset Purchase Agreement, including, without limitation, the Assumed Accounts Payable (as defined in Section 6). The "**Excluded Assets**" will be defined as LEVC's personal property listed on a schedule to the Asset Purchase Agreement and will include, without limitation, the hub motor assembly lines, the battery module assembly lines, the battery pack assembly lines, all LEVC assets not on the grounds of the Facility and intellectual technology assets related to LEVC's continuing business operations such as the intellectual property rights to the hub motor improvements developed by LEVC. The Asset Purchase Agreement will provide that either Party has the right to terminate the Asset Purchase Agreement if the transactions contemplated by the Asset Purchase Agreement are not consummated by September 1, 2022, so long as such Party has not materially breached and is not otherwise in material default of its obligations under the Asset Purchase Agreement.

(b)     Concurrently with the execution and delivery of the Asset Purchase Agreement, Buyer shall make a down payment to LEVC of the Purchase Price in the amount of $100 million (the "**Down Payment**") conditional upon the entering into of a security and mortgage agreement on the Facility with respect to the repayment obligation of such Down Payment by LEVC and reimbursement obligation of Operating Cost and Expansion Cost (as defined in and pursuant to Section 6) by LEVC in favor of Buyer.  Upon Closing, the aggregate amount of the Down Payment will be applied against the Purchase Price.  Subject to the terms of the Asset Purchase Agreement, if the Closing does not occur prior to April 30, 2022, or if the Asset Purchase Agreement is terminated by one of the Parties in accordance with its terms, then LEVC shall repay the Down Payment to Buyer no later than the date that is fourteen days after April 30, 2022 or after the date of such termination, as applicable, plus an interest rate of 5% p.a. accruing from the date the Down Payment is made to the repayment date.  The Asset Purchase Agreement will include covenants restricting LEVC's incurrence of indebtedness that is senior to LEVC's obligation to repay the Down Payment, LEVC's payment of cash dividends or other agreed upon restricted payments and representations given by LEVC that there is no other mortgage, pledge, security interest, encumbrances, liens, or any other similar rights on the Facility in favor of any party other than Buyer; provided, however that LEVC will have the right to incur indebtedness that is secured solely by the Excluded Assets.

(c)     The Asset Purchase Agreement will contain standard representations and warranties and LEVC's representations and warranties regarding the Purchased Assets shall not be narrower than the representations and warranties that LEVC obtained from GM under the Asset Transfer Agreement.  Real estate taxes and assessments will be prorated as of the date that the Asset Purchase Agreement is executed.

(d)     Subject to the definitive Asset Purchase Agreement, upon the closing of the transactions contemplated by the Asset Purchase Agreement (the "**Closing**"), Buyer or its designated affiliate will offer employment to an agreed upon scheduled list of LEVC employees who at the time serve in operations roles, including specific personnel in LEVC's industrial engineering, quality, information technology, human resources, finance and general management functions (the "**Transferred Employees**"), in each case on terms that are substantially similar to

2



such Transferred Employees' current compensation programs, taking into account base salary and wage rate, incentive compensation opportunities and employee benefits provided that such terms are similar to those of other companies in the same industry segments and at comparable seniority levels.

2.    Equity Purchase. Subject to a subscription agreement ("**Subscription Agreement**") between Buyer's affiliate, Foxconn (Far East) Limited ("**Far East**"), and LMC, entered into on the date hereof, as promptly as possible and no later than ten business days after the date hereof, Far East shall purchase $50 million in shares of Class A common stock ("**Common Stock**") of LMC at a purchase price equal to $6.8983 per share, which is the simple average of the daily volume weighted average prices of such Common Stock for the 15 consecutive trading days immediately preceding the date of this Agreement.  Subject to the terms of the Subscription Agreement, Far East shall not sell, transfer, assign, pledge, encumber, hypothecate, hedge or similarly dispose of any shares of Common Stock until the earlier of: (i) December 31, 2021, if the Parties or their affiliates have not entered into the Asset Purchase Agreement as of such date or (ii) April 30, 2022, if the Parties or their affiliates have entered into the Asset Purchase Agreement on or prior to December 31, 2021, but have not entered into the Contract Manufacturing Agreement as of April 30, 2022 (as applicable, the "**Lock-up Period**").  LMC shall agree that, if Far East is unable to resell the Common Stock after the expiration of the Lock-up Period pursuant to Rule 144, LMC shall within 45 days thereafter file with the Securities and Exchange Commission a registration statement registering Far East's resale of the Common Stock, and LMC shall use its commercially reasonable efforts to have such registration statement declared effective.

3.    Warrants. Concurrently with the Closing, LEVC will procure that LMC issue warrants to Buyer or its designated affiliate that are exercisable for 1.7 million shares of Common Stock at an exercise price of $10.50 per share until the third anniversary of the date of the Closing (the "**Warrants**").  LMC's issuance of the Warrants will be a condition to the Closing.

4.    Lease Agreement. In connection with the negotiation of the Asset Purchase Agreement, LEVC shall, and Buyer shall arrange itself or through its designated affiliate company to, use their commercially reasonable best efforts to enter into a lease pursuant to which LEVC shall lease up to 30,000 square feet of office space in the Facility (the "**Lease**") following the consummation of the transactions under the Asset Purchase Agreement for a rental amount determined at arm's length basis. LEVC will be responsible for its pro rata share of real estate taxes, insurance, utilities and common area expenses. Subject to the Lease, LEVC shall have access to the leased premises, 24 hours per day, 7 days per week, 365 days per year for common areas and infrastructure but not to areas of competitive sensitivity to Buyer's interests or non-LEVC vehicle programs. To the extent in compliance with applicable laws and subject to conditions agreed by the Parties or their affiliates in the Lease, LEVC shall have the right to install and maintain signage (i) in the lobby of the main office building and (ii) a pole sign and/or monument sign on Bailey Road and on Hallock Young Road. The installation, maintenance and repair of any such signage shall be at LEVC's sole cost and expense. Subject to the Lease, LEVC shall have the right to three reserve parking spots in the garage, 75 reserved parking spots in the main parking lot, and 25 reserved parking spots for visitors/contractors.  Subject to the Lease, LEVC and its agents, employees, contractors, subtenants, invitees or vendors shall have the nonexclusive right to use all of the common areas associated with the Facility, including without

4831-0539-6220.27
2021TW-L-K-4668        `2


limitations all entrances and exits, roadways, driveways, service drives, loading area, sidewalks, landscaped areas, parking lots, lobbies, hallways, elevators, stairwells, restrooms and security areas (with certain exceptions to be agreed upon). LEVC shall have the right to use the leased premises for general office and administrative use and other ancillary uses associated therewith and any other uses permitted by applicable law. All of the foregoing shall all be subject to the definitive Lease entered into by the Parties.

5.    Contract Manufacturing Agreement.

(a)    LEVC shall, and Buyer shall arrange itself or through its designated affiliate company to, use their commercially reasonable best efforts to enter into a contract manufacturing agreement (the "**Contract Manufacturing Agreement**") on or before April 30, 2022. The Contract Manufacturing Agreement will be a condition to the Closing. Subject to the Contract Manufacturing Agreement, Buyer shall manufacture the Endurance for LEVC on a cost-plus basis with the fee representing the conversion costs of the vehicle, the fully costed material prices and a cost-plus fee using a specified percentage and a target bill of materials ("**BoM**"), each as agreed to by the Parties. The Contract Manufacturing Agreement will include, among others, the service levels and activities required of Buyer, penalties for underperformance on off-standard BoM or conversion costs, late delivery, warranty from manufacturing defects but not warranty from design or LEVC-directed supplier defects, as described in Section 5(c)(iii). Buyer shall be responsible for all inbound and plant logistics. LEVC shall be responsible for all outbound freight related to the Endurance and other LEVC vehicles provided Buyer properly prepares vehicles and makes them available on time for truck or rail shipment from the Facility.

(b)    Subject to the definitive terms agreed by the Parties, the Contract Manufacturing Agreement will provide that: (1) LEVC shall be responsible for sourcing directed supply and supplier tooling for the Endurance, replacement tooling on those components and LEVC requested engineering changes or re-sourcings; (2) Buyer shall be responsible for supplier tooling for components sourced by Buyer to a target price or business case given fit, form and function of the parts and supplier to design intent with the approval of LEVC and (3) on a specified schedule agreed upon by both Parties, substantially all sourcing responsibility will be transitioned to Buyer, intended to coincide with subsequent vehicles. The Contract Manufacturing Agreement will provide that neither Party shall amend, modify or terminate specified Assumed Agreements and LEVC supplier requirements without the prior written approval of the other Party.

(c)    Subject to the Asset Purchase Agreement and the Contract Manufacturing Agreement, as applicable:

(i)    following the Closing, (1) except as provided in clause (2) below, Buyer shall be responsible for all Facility and manufacturing related capital expenditures, including, without limitation, such items as roof maintenance, site preparation, information technology, facility infrastructure and manufacturing equipment across the body, stamping, frame, paint and general assembly areas; and (2) LMC shall be responsible for Endurance specific propulsion capital expenditures, including the hub motor assembly lines, battery module assembly lines and battery pack assembly lines.

4



(ii)     LEVC shall own all right, title and interest in any intellectual property relating to the Endurance and any and all improvements in that intellectual property other than supplier intellectual property on select components.

(iii)     LEVC shall manage the warranty process in a traditional manner of assessing returns and recalls for fault, including potential customer goodwill for "No Trouble Found" issues. Buyer shall be responsible for defects in parts or components it has sourced or caused by the manufacturing process.

(iv)     Buyer shall reserve sufficient manufacturing capacity at the Facility for the production of the Endurance at volumes not less than 120% of those set forth in the 6 month rolling production forecast furnished to Buyer from time to time in accordance with the Contract Manufacturing Agreement.

(v)     The Parties expect there to be significant advantages to working together on future vehicles designed and developed by LEVC. LEVC shall grant Buyer with a right of first offer with respect to the contract manufacturing of any new vehicle designed and developed by LEVC, other than any vehicle designed or developed for the United States military. At such time, Buyer will be entitled to first make an offer for contract manufacturing and the Parties shall consult with each other regarding an extension of their contract manufacturing relationship to such vehicle on terms to be mutually agreed upon.

6.     <u>Interim Covenants</u>. The Asset Purchase Agreement shall further detail Buyer's responsibility for operating costs and expansion costs during the period from September 1, 2021 through the Closing (the "**Interim Period**").  To the extent incurred by Buyer or pursuant to the request or with the approval of Buyer, all costs to maintain, insure, repair and operate the Facility ("**Operating Costs**") during the Interim Period shall be paid by Buyer.  To the extent incurred by Buyer or pursuant to the request or with the approval of Buyer, all costs incurred for any Facility improvements, capacity expansion and any Facility and manufacturing capital expenditures, other than for the hub motor assembly lines, battery module assembly lines and battery pack assembly lines ("**Expansion Costs**") during the Interim Period shall be paid by Buyer. If LEVC chooses to pay, with the prior written approval of Buyer (which approval shall not be unreasonably withheld), for any such Operating Costs or Expansion Costs that are incurred by or at the request or as approved by Buyer, Buyer shall reimburse LEVC for the aggregate amount of any such Operating Costs or such Expansion Costs concurrently with the Closing. Any outstanding accounts payable owed by LEVC for Operating Costs or Expansion Costs that are incurred by or at the request or as approved by Buyer as of the Closing (the "**Assumed Accounts Payable**") shall be assumed by Buyer at the Closing. Subject to the terms of the Asset Purchase Agreement, if the Asset Purchase Agreement is terminated, LEVC shall reimburse Buyer for the aggregate amount of any Operating Costs and Expansion Costs paid for by Buyer within 60 days after such termination. Within ten days following the date hereof, the Parties will review Operating Costs and Expansion Costs incurred by LEVC from September 1, 2021 through the date hereof and Buyer, upon receipt of all necessary evidencing material and documentation, will in good faith review and approve such costs for purposes of this Section 6; provided, however, that Buyer's responsibility for such costs for the period from September 1, 2021 through the date hereof shall not exceed $10 million.

5



7.     <u>Service Agreement; License Agreement</u>.   The Parties shall use their commercially reasonable efforts to enter into an agreement pursuant to which, during the period between the date of the Asset Purchase Agreement and the Closing, the industrialization, facility and operations teams of LEVC will provide support to Buyer on homologation, industrial engineering,  site preparation and other agreed-upon areas in support of Buyer's non-LMC vehicles and non-Endurance-specific investments, new buildings and infrastructure maintenance and improvements on an open book basis at a cost-plus rate subject to a service agreement entered into by the Parties. The Parties may explore a licensing agreement pursuant to which LEVC may license to Buyer LEVC's intellectual property relating to its frame, rolling chassis and other technologies for additional non-LMC programs.

8.     <u>ATVM Loan</u>.   It is contemplated that the Parties will work together to pursue a loan under the Advanced Technology Vehicles Manufacturing Loan Program ("**ATVM Loan**"), if feasible. Subject to the terms of the ATVM Loan program, each Party will seek a proportionate amount of the ATVM Loan and will be responsible for a proportionate amount of any and all expenses incurred in obtaining the ATVM Loan, which proportion will be based upon the eligibility requirements under the program and the Parties' agreement.

9.     <u>Exclusivity</u>.   The Parties and the Third-Party Beneficiaries (as defined in Section 16) agree that there shall be an exclusivity period (the "**Exclusivity Period**") from the date of this Agreement through and including the date that is 60 days after the date of this Agreement. During the Exclusivity Period, Buyer will not, and it will cause its controlled or commonly-controlled affiliates and its and their respective officers, directors, management employees, representatives, and agents not to, directly or indirectly, solicit, initiate, continue, pursue, discuss, or enter into discussions or any agreements or arrangements with respect to, or encourage, or provide any information to, any person, corporation, partnership, or other entity or group (a "**Person**") (other than LEVC and its designees) concerning the acquisition, lease, development or other pursuit of real property or a facility located in North America where Buyer would perform  contract manufacturing or similar services for a vehicle. During the Exclusivity Period, LEVC will not and it will cause its controlled affiliates and its and their respective officers, directors, management employees, representatives, and agents not to, directly or indirectly, solicit, initiate, continue, pursue, discuss, or enter into discussions or any agreements or arrangements with respect to, or encourage, or provide any information to, any Person (other than Buyer and its designees) concerning the sale, disposal or lease of the Facility or the engagement of a contract manufacturer to manufacture the Endurance.  Each Party hereby represents that it is not bound by any agreement with respect to any such transaction other than as contemplated by this Agreement.  The Parties agree and acknowledge that should a Party breach this Section ("**Breaching Party**") in any material respect, the other Party ("**Non-breaching Party**") will have suffered a loss of an incalculable nature and amount, unrecoverable in law, and, in addition to any other rights to which the Non-breaching Party is entitled, the Breaching Party shall pay the Non-breaching Party a fee equal to $50 million in immediately available funds by wire transfer no later than five (5) business days after the Non-breaching Party delivers written notice of such breach, together with written documentation sufficient to substantiate such breach, to the Breaching Party.

10.     <u>Public Announcements</u>. On the date of this Agreement, the Parties or the Third-Party Beneficiaries shall make a public announcement with respect to this Agreement, in a form that



has been mutually agreed upon by the Parties. Except to comply with applicable law, including applicable securities laws and regulations, no other press release, publicity release, public announcement or other public statement or disclosure ("**Announcement**") will be made or released, orally or in writing, by either Party or either Third-Party Beneficiary (as defined in Section 16) regarding the existence, nature, terms or status of any discussions between the Parties, the Third-Party Beneficiaries or this Agreement, without first obtaining the prior written consent of the other Party or other Third-Party Beneficiary (which consent will not be unreasonably withheld or delayed). If either Party or Third-Party Beneficiary seeks the other Party's or other Third-Party Beneficiary's consent to an Announcement, it will upon request, furnish to the other Party or other Third-Party Beneficiary a draft of the Announcement before the Announcement is made or released.

11.    Full Agreement. This Agreement, the Subscription Agreement and the Confidentiality Agreement, dated August 17, 2021, among the Parties and Fisker Group Inc. contain the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, arrangements and communications (written and verbal) between the Parties concerning matters covered by this Agreement. All dollars or denominations thereof in this Agreement refer to the lawful currency of the United States of America.

12.    No Partnership or Agency. The Parties would be independent contractors of each other. Nothing in this Agreement creates or would create any agency, franchise, partnership, joint venture, or fiduciary responsibility.

13.    Governing Law. This Agreement, all acts and transactions hereunder and the rights and obligations of the parties hereto shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of Delaware.

14.    Expenses. Each Party shall bear its own costs and expenses incurred in connection with this Agreement.

15.    Counterparts. This Agreement may be executed and delivered in any number of separate counterparts (including by way of facsimile or other electronic transmission), each of which shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

16.    Assignment; Third-Party Beneficiaries. Neither this Agreement nor any rights or obligations of the Parties hereto may be assigned to any other Person. Each of LMC and Hon Hai Precision Industry Co., Ltd. ("**HH**") shall be a third-party beneficiary of this Agreement (each, a "**Third-Party Beneficiary**" and collectively, the "**Third-Party Beneficiaries**"). Other than LMC and HH, there shall be no third-party beneficiaries of this Agreement, and this Agreement shall not confer on any Person other than the Parties, LMC and HH any claim, cause of action, right or remedy.

17.    Nature of Agreement. Except for Sections 2, 9, 10, 11, 12, 13, 14, 15, 16 and 17 which are binding on the Parties and, as applicable, the Third-Party Beneficiaries in accordance with

4831-0539-6220.27
2021TW-L-K-4668          `2


their terms (the "**Binding Provisions**"), this Agreement is only a non-binding agreement in principle regarding the transactions described herein and does not constitute a legally binding commitment or agreement. As such, except for the Binding Provisions, no Party or Third-Party Beneficiary shall have any liability of any type pursuant to this Agreement and shall only be legally bound to the terms of a definitive agreement signed between the Parties or the Third-Party Beneficiaries, as applicable. The Parties will reasonably cooperate, negotiate in good faith and use commercial reasonable best efforts to reach agreement with respect to each of the definitive agreements described herein.

[Signature page follows.]

8

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement on the date first written above.

**LORDSTOWN EV CORPORATION**

By: _Dan Ninivaggi_

Name:   Daniel Ninivaggi

Title:    Chief Executive Officer

**FOXCONN ASSET MANAGEMENT LLC**

By: _(signature)_

Name:   David Huang

Title:    Authorized Signatory

Solely for purposes of Acknowledging and
Agreeing to Section 3, Section 9, Section 10, Section 13
and Section 17:

**LORDSTOWN MOTORS CORP.**

By: _Dan Ninivaggi_

Name: Daniel Ninivaggi

Title: Chief Executive Officer

9

**EXHIBIT B**

# ASSET PURCHASE AGREEMENT

## BY AND AMONG

## FOXCONN EV TECHNOLOGY, INC.,

## LORDSTOWN EV CORPORATION

## AND

## LORDSTOWN MOTORS CORP.

### Dated as of November 10, 2021

2021TW-L-K-5359                    `2

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................................1

    Section 1.1    Definitions. .....................................................................................1

    Section 1.2    Other Definitional Provisions and Interpretation. ....................15

ARTICLE II SALE AND TRANSFER; ASSUMPTION OF ASSUMED OBLIGATIONS .......15

    Section 2.1    Purchase and Sale of Transferred Assets. .................................15

    Section 2.2    Excluded Assets. ........................................................................16

    Section 2.3    Replacement of Assets. ..............................................................17

    Section 2.5    Retained Obligations. ................................................................17

    Section 2.6    Purchase Price; Reimbursement Payments. ..............................17

    Section 2.7    Allocation of Purchase Price. ....................................................20

    Section 2.8    Withholding. ..............................................................................21

ARTICLE III REPRESENTATIONS AND WARRANTIES OF EACH PARTY......................21

    Section 3.1    Of Each Party. ............................................................................21

    Section 3.2    Seller Representations. ...............................................................22

    Section 3.3    Additional Representations and Warranties of Purchaser. ......29

ARTICLE IV COVENANTS ..............................................................................................31

    Section 4.1    Interim Covenants. .....................................................................31

    Section 4.2    Seller Names. .............................................................................35

    Section 4.3    Taxes. ........................................................................................36

    Section 4.4    Notice Regarding Environmental Covenant and BUSTR Covenant. ......37

    Section 4.5    Consents and Approvals. ...........................................................38

    Section 4.6    Confidentiality. ..........................................................................39

    Section 4.7    No Solicitation of Transactions. ................................................39

    Section 4.8    HSR Act and Other Filings and Consents. ...............................39

    Section 4.9    Regulatory Authorizations. .......................................................40

TABLE OF CONTENTS CONTINUED

                                                                          **Page**

Section 4.10        Non-Solicitation ........................................................41

Section 4.11        Casualty or Condemnation Loss .................................41

ARTICLE V EMPLOYEES AND EMPLOYEE BENEFITS.......................................42

Section 5.1         Transferred Employees. ............................................42

Section 5.2         Timing of Offers to Requested Employees...............42

Section 5.3         Terms of Requested Employee Offers .......................43

Section 5.4         Vacation .....................................................................43

Section 5.5         Post-Hiring Benefits .................................................43

Section 5.6         Termination/Claims of Transferred Employees........44

Section 5.7         No Right to Continued Employment. ......................44

Section 5.8         Employee-Related Liabilities....................................45

Section 5.9         Employee Matters Indemnity....................................45

Section 5.10        Workers' Compensation. ..........................................45

ARTICLE VI CONDITIONS TO CLOSING ...............................................46

Section 6.1         Conditions to Obligations of All Parties..................46

Section 6.2         Conditions to Obligations of Seller. ........................46

Section 6.3         Conditions to Obligations of Purchaser. ..................46

ARTICLE VII CLOSING ......................................................................48

Section 7.1         Closing. .....................................................................48

Section 7.2         Deliveries by Seller...................................................48

Section 7.3         Deliveries by Purchaser. ...........................................49

ARTICLE VIII INDEMNIFICATION .......................................................50

Section 8.1         Survival. ....................................................................50

Section 8.2         Indemnification by Seller..........................................50

Section 8.3         Indemnification by Purchaser. ..................................51

4834-8099-7884.32
2021TW-L-K-5359                    `2

**TABLE OF CONTENTS CONTINUED**

| | | Page |
|---|---|---|

Section 8.4 — Limitations on Liability. .......... 51

Section 8.5 — Claims. .......... 52

Section 8.6 — Notice of Third Party Claims; Assumption of Defense. .......... 52

Section 8.7 — Settlement or Compromise. .......... 53

Section 8.8 — Purchase Price Adjustments. .......... 53

Section 8.9 — Limits on Indemnification. .......... 53

Section 8.10 — Exclusive Remedy. .......... 54

ARTICLE IX TERMINATION .......... 54

Section 9.1 — Termination. .......... 54

Section 9.2 — Effect of Termination. .......... 55

ARTICLE X MISCELLANEOUS .......... 56

Section 10.1 — Expenses. .......... 56

Section 10.2 — Amendment and Waiver. .......... 56

Section 10.3 — Notices. .......... 56

Section 10.4 — Payments in Dollars. .......... 57

Section 10.5 — Assignment. .......... 57

Section 10.6 — No Third Party Beneficiaries or Admissions. .......... 58

Section 10.7 — Publicity. .......... 58

Section 10.8 — Further Assurances. .......... 58

Section 10.9 — Severability. .......... 58

Section 10.10 — Entire Understanding. .......... 58

Section 10.11 — Language. .......... 59

Section 10.12 — Intentionally Omitted. .......... 59

Section 10.13 — Applicable Law. .......... 59

Section 10.14 — Jurisdiction of Disputes; Waiver of Jury Trial. .......... 59

| | | Page |
|---|---|---|
| Section 10.15 | Equitable Relief. | 59 |
| Section 10.16 | Counterparts. | 60 |
| Section 10.17 | Brokers. | 60 |
| Section 10.18 | Guaranty of Purchaser's Obligations. | 60 |
| Section 10.19 | Guaranty of Seller's Obligations. | 61 |

EXHIBITS

| Exhibit A | Bill of Sale and Assignment and Assumption Agreement |
|---|---|
| Exhibit B | Limited Warranty Deed |
| Exhibit C | Notice and Acknowledgement of Conveyance of Environmental Covenant |
| Exhibit D | Warrant Agreement |
| Exhibit E | Form of Security and Mortgage Agreement |

4834-8099-7884.32

2021TW-L-K-5359 `2

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made as of November 10, 2021 (the "Effective Date") by and between Lordstown EV Corporation, a Delaware corporation ("Seller"); Foxconn EV Technology, Inc., an Ohio corporation ("Purchaser"); solely for purposes of Sections 4.7 and 10.19, Lordstown Motors Corp., a Delaware corporation ("Parent"); and solely for purposes of Section 10.18, Foxconn (Far East) Limited, a Cayman Islands exempted company ("Guarantor" and together with Seller, Purchaser and Parent, each, a "Party" and collectively, the "Parties"). Certain capitalized terms used herein are defined in Article I.

## RECITALS

WHEREAS, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, the Facility and certain assets used by Seller at the Facility, and Purchaser desires to assume from Seller, and Seller desires to assign to Purchaser, certain obligations and liabilities relating to the Facility and such assets, all upon the terms and subject to the conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions. The following terms shall have the following meanings for purposes of this Agreement:

"Accounting Firm" has the meaning set forth in Section 2.6(e).

"ACM" has the meaning set forth in Section 3.3(c)(ii).

"Ad Valorem Taxes" means any real property, personal property, ad valorem or other similar Tax imposed on a periodic basis on or with respect to the Transferred Assets.

"Adjustment Amount" has the meaning set forth in Section 2.6(f).

"Affiliate" means, with respect to any specified Person, any other Person that, directly or indirectly, controls, is under common control with, or is controlled by, such specified Person. The term "control" as used in the preceding sentence means, with respect to a corporation, the right to exercise, directly or indirectly, more than 50% of the voting rights attributable to the shares of such corporation, or with respect to any Person other than a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through ownership of securities or partnership or other interests, by contract or otherwise.

"Agreement" means this Asset Purchase Agreement, including all Exhibits and Schedules hereto.

"Allocation Schedule" has the meaning set forth in Section 2.7.

"Approved Operating Costs" has the meaning set forth in Section 4.1(d).

"Assigned Contracts" means (i) each Facility Contract designated by Purchaser to Seller in writing on or prior to the 90th day after the date hereof and (ii) any other Contract designated by Purchaser to Seller in writing pursuant to Section 4.1(e) hereof.

"Assumed Accounts Payable" means any accounts payable owed by Seller and that are outstanding as of the Closing that are for Expansion Costs or Operating Costs that in each case have been approved (or have been deemed approved) in accordance with Section 4.1(b), (c), or (d).

"Assumed Environmental Liabilities" means all Environmental Liabilities, except those that arise from Seller's breach of the representations and warranties contained in Section 3.2(k) of this Agreement, arising from or relating to the Facility whether based on events or occurrences prior or subsequent to the Closing. For the avoidance of doubt, except those that arise from Seller's breach of the representations and warranties contained in Section 3.2(k) of this Agreement, "Assumed Environmental Liabilities" include: (i) compliance with requirements related to or imposed under Environmental Law because of the presence of any remedial system(s), engineering controls or institutional controls pursuant to the BUSTR Covenant and Environmental Covenant recorded or filed against the Facility; (ii) the condition and proper maintenance, handling, repair, removal, abatement, demolition or disposal of any ACM, LBP or ILM at the Facility under Environmental Laws; and (iii) remedial obligations caused by Releases of Hazardous Substances by a third Person that migrate onto the Facility.

"Assumed Obligations" has the meaning set forth in Section 2.4.

"Assumed Vacation Liabilities" has the meaning set forth in Section 5.4(a).

"Bill of Sale and Assignment and Assumption Agreement" means the bill of sale and assignment and assumption agreement to be entered into between Seller and Purchaser in the form attached hereto as Exhibit A.

"Basket" has the meaning set forth in Section 8.9(a).

"Business" means the business operations currently conducted at the Facility.

"Business Day" means any day of the year other than (a) any Saturday or Sunday or (b) any other day on which banks located in Cleveland, Ohio or New York, New York are authorized or required to be closed for business.

"BUSTR" has the meaning set forth Section 4.4(b).

2



"BUSTR Covenant" means that certain environmental covenant, recorded on July 5, 2018 and executed by Seller and the State of Ohio, Division of the State Fire Marshal, Bureau of Underground Storage Tank Regulations, for the purpose of subjecting a portion of the Real Property to the activity and use limitations and to the rights of access described therein.

"Casualty Event" means any loss, damage or destruction of any portion of the Transferred Assets that occurs prior to Closing as a result of any act of God, fire, explosion, collision, earthquake, windstorm, flood or other casualty event, or any condemnation by any Governmental Authority.

"CERCLA" the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C §§ 9601 et seq.

"CFIUS" means the U.S. government's Committee on Foreign Investment in the United States.

"CFIUS Clearance" means Seller or the Purchaser have received from CFIUS a written communication that (a) CFIUS has concluded that the transaction contemplated by this Agreement is not a "covered transaction" and not subject to review under applicable Law; or (b) CFIUS has concluded the review of the transaction contemplated by this Agreement under Section 721 and determined that there are no unresolved national security concerns with respect to the transaction contemplated by this Agreement.

"CFIUS Termination Fee" has the meaning set forth in Section 9.2(b).

"CFIUS Turndown" means (a) CFIUS has informed Purchaser and Seller in writing that it has unresolved national security concerns with respect to the transactions contemplated by this Agreement and that it intends to refer the matter to the President of the United States unless the Parties abandon the transactions contemplated by this Agreement or (b) CFIUS has informed Purchaser and Seller in writing that mitigation is required to address national security concerns with respect to the transactions contemplated by this Agreement and Purchaser does not agree to mitigation that is acceptable to CFIUS.

"Claim Notice" has the meaning set forth in Section 8.5.

"Clean Air Act" means the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C §§ 7401 et seq.

"Clean Water Act" means the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.

"Closing" means the consummation of the transactions contemplated herein in accordance with Article VII.

"Closing Date" has the meaning set forth in Section 7.1.

4834-8099-7884.32
2021TW-L-K-5359     `2


"Closing Payment" means an amount equal to (a) $230,000,000, less (b) any portion of the Down Payments that Seller has not repaid to Purchaser as of the Closing, less (c) the aggregate dollar value of the Assumed Vacation Liabilities.

"Closing Permits" means the Permits necessary for Purchaser to own, operate and maintain the Transferred Assets as of the Closing, as identified by Purchaser and reasonably agreed to by Seller.

"Closing Reimbursement Payment" means all Expansion Costs and Operating Costs that were paid by Seller on or prior to Closing that in each case have been approved (or have been deemed approved) in accordance with Section 4.1(b), (c), or (d); provided, that for the avoidance of doubt, Closing Reimbursement Payment shall not include any Assumed Accounts Payable.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Collateral" has the meaning set forth in Section 2.6(b).

"Collateral Documents" means the Security and Mortgage Agreement and any fixture filings, financing statements or other similar documents filed, recorded or delivered in connection with the foregoing.

"Common Stock" means shares of Class A common stock, par value $0.0001 per share, of Parent.

"Confidentiality Agreement" means the Confidentiality Agreement between Seller, Purchaser, Fisker Group Inc. and the other parties named therein, dated August 17, 2021.

"Consent" means a consent, authorization, approval or waiver of a Person, or a filing or registration with a Person.

"Contract" means a contract, lease, sales order, purchase order, agreement, indenture, mortgage, note, bond, warrant, instrument of conveyance or other similar legally binding instrument.

"Contract Manufacturing Agreement" means a contract manufacturing agreement between Purchaser, or its Affiliate, and Seller, or its Affiliate.

"CV Programs" has the meaning set forth in Section 4.1(k).

"Debris" means discarded materials, including building materials from demolition activities; domestic and industrial trash; tires; automotive parts; used containers which held materials such as paint, antifreeze, gasoline and other household substances; materials painted with lead-based paints or otherwise; wood, and other materials which may have been painted with lead-based paints; roof shingles and other building materials which may contain asbestos-containing materials.

"Determination Date" has the meaning set forth in Section 2.6(e).

4834-8099-7884.32
2021TW-L-K-5359 `2


"Dispute" has the meaning set forth in Section 2.6(e).

"Dollars" or numbers preceded by the symbol "$" mean amounts in United States dollars.

"Down Payments" means the Initial Down Payment, the Second Down Payment and the Third Down Payment.

"Down Payments Repayment Date" means the later of (a) April 30, 2022 and (b) ten (10) days after the date CFIUS Clearance has been obtained.

"Draft CFIUS Notice" has the meaning set forth in Section 4.9(a).

"Emergency Expansion Costs" has the meaning set forth in Section 4.1(c).

"Employee Benefit Plan" means each "employee benefit plan," as defined in Section 3(3) of ERISA, each agreement, plan, program, practice, arrangement or policy providing for compensation or benefits of any kind including without limitation bonuses, profit-sharing, stock option or other stock related rights or other forms of incentive or deferred compensation, vacation benefits, insurance (including any self-insured arrangements), health or medical benefits, employee assistance program, disability or sick leave benefits, supplemental unemployment benefits and post-employment or retirement benefits (including compensation, pension, health, medical or life insurance benefits).

"Employment Laws" has the meaning set forth in Section 3.2(m).

"Enforceability Limitations" means limitations on enforcement and other remedies imposed by or arising under or in connection with applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally from time to time in effect or general principles of equity (including concepts of materiality, reasonableness, good faith and fair dealing with respect to those jurisdictions that recognize such concepts).

"Environment" means and refers to all conditions of soil (surface and subsurface), geologic strata and formations, streams, rivers, bays, ponds, impoundments, estuaries or other surface water, groundwater, occasional or perched water in or on the surface or subsurface, marshes and other wetlands, flood plains, sediments, sludges, air or natural resources.

"Environmental Covenant" means that certain Environmental Covenant, dated as of September 24, 2018, by General Motors LLC, for the purpose of subjecting a portion of the Real Property to the activity and use limitations and to the rights of access described therein.

"Environmental Law" means any applicable Laws concerning the protection of human health and the Environment including Laws (a) imposing Liability in connection with cleanup, investigation or remediation relative to any Release or threatened Release, (b) relating to exposure to Hazardous Substances and protection of worker health and safety, (c) imposing compliance obligations or requirements relative to any manufacturing equipment, processes or operations and (d) otherwise relating to the environmental aspects of the manufacture, processing, distribution, use, treatment, storage, disposal, emission, transportation, management or handling of Hazardous

4834-8099-7884.32
2021TW-L-K-5359                    `2

Substances. "Environmental Law" includes the Clean Air Act, the Clean Water Act, CERCLA, RCRA, and TSCA.

"Environmental Liabilities" means Liabilities that are related to the operations or activities on and use of the Facility and that arise out of: (a) violations of Environmental Laws, including those related to manufacturing equipment, processes, or operations; or (b) the Release of Hazardous Substances to the Environment, including any residual contamination that remains from any prior remediation under Environmental Laws. For the avoidance of doubt, "Environmental Liabilities" include those arising out of: (w) the transportation, recycling, storage, treatment, disposal, use, management or application of any Hazardous Substance; (x) the containment, removal, remediation, response to, clean up, or abatement of any Release or threatened Release of any Hazardous Substance, whether onsite or offsite and whether accidental or deliberate; (y) personal injury or property damage (including damage to natural resources) from exposure to Hazardous Substance whether occurring onsite or offsite; or (z) the excavation, backfill, treatment and disposal of any soil or water containing any Hazardous Substance, where such excavation, backfill, treatment or disposal is associated with the addition or renovation of aboveground or underground storage tanks, including associated piping or other Improvements.

"Environmental Permit" means any Permit required by or issued pursuant to any Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estimated Statement" has the meaning set forth in Section 2.6(c).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Intellectual Property" means Intellectual Property relating to (i) the development, design, use, and/or manufacture of the Endurance vehicle, its motors, batteries and parts or any other vehicles (including concepts and ideas for vehicles) and parts that are in the process of design and/or development or that may be developed by or on behalf of the Seller or its Affiliates, or (ii) the furniture, fixtures and equipment described in clause (a) of Section 2.2.

"Expansion Costs" means all costs incurred for any Facility improvements, capacity expansion and any Facility and manufacturing capital expenditures (other than for the hub motor assembly lines, battery module assembly lines, battery pack assembly lines and any other Excluded Assets).

"Facility" means the Real Property and all Improvements located thereon.

"Facility Contracts" has the meaning set forth in Section 3.2(b).

"Facility FF&E" means the furniture, fixtures and equipment, spare parts, inventory and other personal property located at the Facility (including such furniture, fixtures and equipment and other personal property listed on Schedule 1.1(b) but excluding such furniture, fixtures and equipment and other personal property listed on Schedule 1.1(c)), together with any express or

6



implied warranty (to the extent assignable) by the manufacturer, seller or lessor of any item or component part thereof, and all maintenance records and other documentation relating thereto.

"Final Allocation Schedule" has the meaning set forth in Section 2.7.

"Final Statement" has the meaning set forth in Section 2.6(d).

"Financial Statements" has the meaning set forth in Section 4.1(o).

"Fraud" means any material misrepresentation of past or existing fact made with knowledge of or reckless disregard for the falsity of the statement that is relied upon by another Party to that Party's detriment, which misrepresentation is made in the representations and warranties set forth in Article III.

"Guarantor" has the meaning set forth in the preamble to this Agreement.

"GM Acquisition" means matters related to the acquisition of the Facility on November 7, 2019, by Seller from General Motors LLC, a Delaware limited liability company.

"GM Option" means the "Option" as defined in that certain First Amendment to Purchase Agreement, made as of July 31, 2020, by and between Seller and Ultium Cells LLC.

"Governmental Authority" means any supra-national, national, federal, state, local or foreign government or other political subdivision thereof or any entity, body, authority, agency, commission, court, tribunal or judicial body exercising executive, legislative, judicial, regulatory, taxing or administrative law functions, including quasi-governmental entities established to perform such functions.

"Hazardous Substance" means petroleum or any material or substance that it is regulated or controlled as a hazardous substance, toxic substance, hazardous waste, contaminant or pollutant (or words of similar meaning or intent) under any applicable Environmental Law.

"Hiring Date" means for each Transferred Employee, the date such Transferred Employee becomes an employee of Purchaser in accordance with Article V .

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Hurdle" has the meaning set forth in Section 8.9(e).

"ILM" has the meaning set forth in Section 3.3(c)(ii).

"Improvements" means all buildings, structures and other structural improvements on the Real Property, including all additions, enlargements, extensions, modifications or repairs thereto, or replacements thereof, and all water towers, water tanks, storage tanks, boilers, furnaces, incinerators or cooling towers, together with related valves, meters, switches, pumps, machinery and equipment, and all other items in, on or under the Real Property that constitute improvements on or to the Real Property or fixtures to the Real Property or fixtures to improvements on or to the Real Property, under applicable Laws.

7



"Indebtedness" has the meaning set forth in Section 4.1(f)(x).

"Indemnified Person" means the Person or Persons entitled to, or claiming a right to, indemnification under Article VIII.

"Indemnifying Person" means the Person or Persons claimed by the Indemnified Person to be obligated to provide indemnification under Article VIII.

"Initial Down Payment" means an amount equal to $100,000,000.

"Intellectual Property" means all intellectual property and related rights of any kind or nature anywhere in the world, whether registered or unregistered, including: (a) all Patents, (b) all trademarks, service marks, logos, service names, trade names, business names, trade dress and Internet domain names, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (c) all copyrights (including copyrights in works of authorship and software) and any registrations and applications thereof, (d) all Know-How, (e) all moral rights, name, image, likeness and other publicity rights, and data base rights, and (f) all other technology and intellectual property rights throughout the world.

"Interim Period" has the meaning set forth in Section 4.1(f).

"Joint Venture Agreement" has the meaning set forth in Section 4.1(k).

"Know-How" means trade secrets, inventions, discoveries, formulae, practices, processes, procedures, ideas, specifications, engineering data, databases, data collections, technology, ideas, concepts, designs, developments, methods, techniques, technical data, schematics, research and development information, product roadmaps, customer lists, bill of materials, and other confidential and proprietary information.

"Knowledge of Seller" means the actual or constructive knowledge of Seller's chief executive officer, chief financial officer and general counsel, determined with respect to what they know or could have known had they conducted a reasonable inquiry of their direct reports.

"Law" means any law, statute, regulation, ordinance, rule, code, order, decree, requirement or rule of law (including common law) enacted, promulgated, adopted or imposed by any Governmental Authority.

"LBP" has the meaning set forth in Section 3.3(c)(ii).

"Lease" means a lease, between Purchaser and Seller, pursuant to which Seller shall lease up to 30,000 square feet of office space in the Facility, on terms and conditions consistent with Section 4 of the Agreement In Principle dated September 30, 2021 among Purchaser, Seller and Parent.

"Liability" means any debt, liability, commitment, duty or obligation of any nature, whether pecuniary or not, asserted or unasserted, accrued or unaccrued, absolute or contingent, matured or unmatured, liquidated or unliquidated, determined or determinable, incurred or consequential, known or unknown and whether due or to become due, including those arising

under any Law or Proceeding and those arising under any Contract or otherwise, including any Tax liability or tort liability.

"<u>Lien</u>" means any lien, mortgage, pledge, security interest, imperfection of title, encroachment, lease (other than the Lease), option, easement, right-of-way, covenant, condition, restriction or other encumbrance, other than any non-exclusive license of Intellectual Property entered into in the Ordinary Course of Business.

"<u>Limited Warranty Deed</u>" means the limited warranty deed (or the equivalent thereof in the local jurisdiction) from Seller, as grantor, conveying the Facility to Purchaser, as grantee, in the form attached hereto as <u>Exhibit B</u>.

"<u>Loan Title Commitment</u>" has the meaning set forth in <u>Section 2.6(b)</u>.

"<u>Loan Title Policy</u>" has the meaning set forth in <u>Section 2.6(b)</u>.

"<u>Loss</u>" or "<u>Losses</u>" means any and all losses, Liabilities, claims, damages, reasonable and documented out-of-pocket costs and reasonable and documented out-of-pocket expenses (including reasonable fees and expenses of counsel).

"<u>Mortgage Representation Breach</u>" has the meaning set forth in <u>Section 8.2(i)</u>.

"<u>Notice and Acknowledgement of Conveyance of Environmental Covenant</u>" means the notice and acknowledgement of Environmental Covenant to be entered into between Seller and Purchaser in the form attached hereto as <u>Exhibit C</u>.

"<u>Notice Upon Conveyance</u>" means the notice required in the instrument conveying ownership and the notifications required thereafter under the BUSTR Covenant, in a form reasonably determined by Seller.

"<u>Objections Statement</u>" has the meaning set forth in <u>Section 2.6(e)</u>.

"<u>Operating Costs</u>" means all costs to maintain, insure, repair and operate the Facility (other than for the hub motor assembly lines, battery module assembly lines, battery pack assembly lines and the other Excluded Assets).

"<u>Order</u>" means any order, injunction, judgment, decree, ruling or writ of a Governmental Authority.

"<u>Ordinary Course of Business</u>" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency) or materially consistent with any production plan provided by Seller to Purchaser and acknowledged by Purchaser in writing.

"<u>Outside Termination Date</u>" has the meaning set forth in <u>Section 9.1(c)</u>.

"<u>Owner's Title Commitment</u>" has the meaning set forth in <u>Section 6.3(f)</u>.

4834-8099-7884.32
2021TW-L-K-5359 `2


"Owner's Title Policy" has the meaning set forth in Section 6.3(f).

"Parent" has the meaning set forth in the preamble to this Agreement.

"Parties" and "Party" have the meaning set forth in the preamble to this Agreement.

"Patents" means patents, industrial designs, registrations and pending applications, including utility models, provisionals, continuations, divisionals, continuations in part, extensions, reissues or reexaminations thereof.

"Permit" means any permit, license, approval or other authorization issued or granted by any Governmental Authority.

"Permitted Lien" means (A) taxes, assessments and other governmental levies, fees or charges imposed which are not yet due and payable; (B) mechanics liens and similar liens for labor, materials or supplies provided with respect to such Facility incurred in the Ordinary Course of Business for amounts which are not due and payable; (C) non-preempted zoning, building codes and other land use and Environmental Laws regulating the use or occupancy of the Facility or the activities conducted thereon which are imposed by any governmental authority having jurisdiction over the Facility which are not violated by the Improvements or the Business; (D) the Security and Mortgage Agreement; and (E) Liens shown on the Loan Title Policy (as confirmed by the Survey) and such other imperfections in title, easements, covenants, conditions, restrictions and other similar matters of record affecting title to the Facility which do not or would not materially impair the use of such Facility or the operation of Business.

"Person" means any individual, corporation, proprietorship, firm, partnership, limited partnership, limited liability company, trust, association, Governmental Authority or other entity.

"Post-Signing Tax Period" means any taxable period beginning on or after the date hereof.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date.

"Pre-Signing Tax Period" means any taxable period ending before the date hereof.

"Proceeding" means an action, suit, arbitration, investigation, proceeding or other litigation by or before any Governmental Authority.

"Purchase Price" has the meaning set forth in Section 2.1.

"Purchaser" has the meaning set forth in the preamble to this Agreement.

"Purchaser Benefit Plan" means each Employee Benefit Plan that is maintained, administered or contributed to by Purchaser or its Affiliates in respect of the operation of the Facility after the Closing and that covers the Transferred Employees or any other employees of Purchaser or any of its Affiliates similarly situated to the Transferred Employees.

"Purchaser Fundamental Representations" means the representations and warranties made by Purchaser in Section 3.1(a), Section 3.1(b), Section 3.1(c)(ii)(C) and Section 3.1(e).

10


2021TW-L-K-5359            `2

"Purchaser Guaranteed Obligations" has the meaning set forth in Section 10.18.

"Purchaser Indemnified Party" has the meaning set forth in Section 8.2.

"Purchaser Savings Plan" has the meaning set forth in Section 5.5(c).

"RCRA" means the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C §§ 6901 et seq.

"Real Property" means the real property located at 2300 Hallock Young Road in Lordstown, Ohio and at 2369 Ellsworth Bailey Road, as legally described on Schedule 1.1(d) and as confirmed by the Survey (the "Legal Description") together with all reversions, remainders, easements, rights-of-way, appurtenances, hereditaments, water and mineral rights, and similar interests appertaining to or otherwise benefiting or used in connection with such real property, together with all of Seller's right, title and interest in and to any strips of land, streets, and alleys abutting or adjoining such real property.

"Real Property Laws" has the meaning set forth in Section 3.2(d).

"Related Agreement" means any Contract that is to be entered into at the Closing or otherwise pursuant to this Agreement. The Related Agreements executed by a specified Person shall be referred to as "such Person's Related Agreements," "its Related Agreements" or other similar expression.

"Release" means any release, spill, emission, leaking, pumping, pouring, emptying, leaching, escaping, dumping, migration, injection, deposit, disposal or discharge of any Hazardous Substance in, onto or through the Environment.

"Representatives" means with respect to any Person, such Person's Affiliates and its and their respective directors, officers, employees, agents, attorneys, financial advisors and other advisors.

"Requested Employees" means those employees or former employees of Seller that Purchaser and Seller have agreed will be offered employment by Purchaser in accordance with Article V.

"Required Consents" has the meaning set forth in Section 6.3(b).

"Restricted Area" has the meaning given to such term in the Environmental Covenant and the BUSTR Covenant.

"Retained Obligations" has the meaning set forth in Section 2.5.

"Review Period" has the meaning set forth in Section 2.6(e).

"Second Down Payment" means an amount equal to $50,000,000.

4834-8099-7884.32
2021TW-L-K-5359 `2


"Section 721" means Section 721 of the Defense Production Act of 1950, as amended, and regulations that implement such provision.

"Secured Obligations" has the meaning set forth in Section 2.6(b).

"Securities Act" means the Securities Act of 1933, as amended.

"Security and Mortgage Agreement" has the meaning set forth in Section 2.3(b).

"Seller" has the meaning set forth in the preamble to this Agreement.

"Seller Benefit Plan" means each Employee Benefit Plan that is maintained, administered or contributed to by Seller or its relevant Affiliates that covered or covers any Requested Employee.

"Seller Fundamental Representations" means the representations and warranties made by the Seller in Section 3.1(a), Section 3.1(b), Section 3.1(c)(ii)(C), and Section 3.1(e).

"Seller Guaranteed Obligations" has the meaning set forth in Section 10.19.

"Seller Indemnified Party" has the meaning set forth in Section 8.3.

"Seller Material Adverse Effect" means any event, occurrence, state of facts, development, act, condition, circumstance, effect or change that, individually or in the aggregate, has a material and adverse effect upon (a) the Transferred Assets or (b) the ability of Seller or its Affiliates, as applicable, to consummate the transactions contemplated by this Agreement or by the Related Agreements; provided, however, that the foregoing clause (a) shall not include any such events, occurrences, states of facts, developments, acts, conditions, circumstances, effects or changes resulting from any of the following: (i) changes in general economic or political conditions; (ii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iii) the engagement by the United States in acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (iv) any action expressly required to be taken by Seller or its Affiliate by the terms of this Agreement or any action taken (or omitted to be taken) with the express written consent of or at the express written request of Purchaser or its Affiliate; (v) any changes in applicable Laws or accounting rules or the enforcement, implementation or interpretation thereof; (vi) the public announcement, pendency or completion of the transactions contemplated by this Agreement; (vii) any acts of God (including any hurricane, fire, earthquake or other natural disaster); or (viii) any epidemics, pandemics (including the COVID-19 pandemic), disease outbreaks, or other public health emergency, provided further, that subsections (i) through (v), (vii) and (viii) shall be included for purposes of determining whether a Seller Material Adverse Effect has occurred if such factors have a disproportionate effect on the Seller or the Transferred Assets compared to others in a similar industry.

"Seller Names" means the trademarks "LORDSTOWN MOTORS", "LMC", "ENDURANCE" and the Lordstown Motors logo and all corporate names and domain names containing or incorporating such trademarks.

4834-8099-7884.32<br />2021TW-L-K-5359 `2



"<u>Seller Taxes</u>" means, without duplication, (a) any Taxes of or imposed on Seller or any of its Affiliates for any taxable period, except for any Ad Valorem Taxes for (i) any Post-Signing Tax Period and (ii) any Signing Straddle Period allocable to Purchaser pursuant to this Agreement, (b) any Ad Valorem Taxes imposed on or with respect to the Transferred Assets for (i) any Pre-Signing Tax Period and (ii) any Signing Straddle Period allocable to Seller pursuant to this Agreement, (c) any Taxes (excluding any Ad Valorem Taxes) imposed with respect to the Transferred Assets or the Transferred Employees for (i) any Pre-Closing Tax Period and (ii) any Straddle Period allocable to Seller pursuant to this Agreement, and (d) Seller's liability for Transfer Taxes pursuant to <u>Section 4.3(c)</u>.

"<u>Signing Straddle Period</u>" means any taxable period that begins before and ends on or after the date hereof.

"<u>Specified Operating Costs</u>" has the meaning set forth in <u>Section 4.1(d)</u>.

"<u>Straddle Period</u>" means any taxable period that begins on or before and ends after the Closing Date.

"<u>Subsidiary</u>" of any Person means any corporation, partnership, limited liability company, joint venture or other legal entity of which such Person (either directly or through or together with another Subsidiary of such Person) owns more than 50% of the voting stock, equity interests or general partnership interests of such corporation, partnership, limited liability company, joint venture or other legal entity, as the case may be.

"<u>Support Agreement</u>" means an agreement between Purchaser and Seller, pursuant to which, during the Interim Period, the industrialization, facility and operations teams of Seller will provide support to Purchaser on homologation, industrial engineering, site preparation and other areas, mutually agreed upon by Seller and Purchaser, in support of Purchaser's non-Seller vehicles and non-Endurance-specific investments, new buildings and infrastructure maintenance and improvements on an open book basis at a cost-plus rate.

"<u>Survey</u>" has the meaning set forth in <u>Section 6.3(g)</u>.

"<u>Tax</u>" or "<u>Taxes</u>" means all taxes and similar charges, fees, duties, levies or other assessments (including income, gross receipts, net proceeds, ad valorem, withholding, turnover, real or personal property (tangible and intangible), occupation, customs, import and export, sales, use, franchise, excise, goods and services, value added, stamp, user, transfer, conveyance fees, registration, recording, fuel, profit, excess profits, occupational, interest equalization, windfall profits, severance, payroll, unemployment and social security or other taxes or fees) that are imposed by any Governmental Authority, in each case including any interest, penalties or additions to tax attributable thereto (or attributable to the nonpayment thereof).

"<u>Tax Claim</u>" has the meaning set forth in <u>Section 4.3(d)</u>.

"<u>Tax Return</u>" means any report, return or other information or filing supplied or required to be supplied to a Governmental Authority in connection with any Taxes, including any schedules or attachments thereto and amendments thereof.

13



"Third Down Payment" means an amount equal to $50,000,000.

"Third Party" means any Person or group (as defined in Section 13(d)(3) of the Exchange Act) other than Purchaser or its Affiliates.

"Third Party Claim" has the meaning set forth in Section 8.6.

"Title Commitment" has the meaning set forth in Section 6.3(f).

"Title Company" has the meaning set forth in Section 2.6(b).

"Title Policies" has the meaning set forth in Section 6.3(f).

"Transaction Proposal" means any inquiry, proposal or offer from any Third Party relating to an acquisition or lease of all or substantially all of the Transferred Assets.

"Transaction Proposal Documentation" means any letter of intent, agreement in principle, merger agreement, stock purchase agreement, asset purchase agreement, acquisition agreement, option agreement or similar agreement relating to a Transaction Proposal.

"Transfer Taxes" has the meaning set forth in Section 4.3(c).

"Transferred Assets" has the meaning set forth in Section 2.1.

"Transferred Employee" means any Requested Employee who accepts Purchaser's offer of employment and becomes an employee of Purchaser (or its designated Affiliate).

"Transferred Intellectual Property" means (i) all Intellectual Property rights relating to Facility FF&E that Seller has under the "first sale doctrine" as purchaser of any Facility FF&E, (ii) all Intellectual Property relating to Facility and Facility FF&E used by or in the possession of any Transferred Employee, including all Know-How relating to the Facility or Facility FF&E retained in the unaided memory of any Transferred Employee; provided that such Transferred Employee shall not and shall not be required to breach his/her confidentiality obligations to Seller or use and/or disclose to Purchaser or any third party any Intellectual Property relating to Excluded Assets, including Intellectual Property in such Transferred Employees unaided memory; (iii) Intellectual Property licensed to Seller pursuant to Assigned Contracts (the "Licensed Transferred Intellectual Property") and (iv) any other Intellectual Property owned by Seller that is necessary for the operation of the Facility or the Facility FF&E (the "Owned Transferred Intellectual Property"),  in each case solely to the extent relating to the Transferred Assets and specifically excluding any Excluded Intellectual Property.

"TSCA" means the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.

"UCC" has the meaning set forth in Section 2.6(b).

"UCC Financing Statements" has the meaning set forth in Section 2.6(b).

14



"<u>Warrant Agreement</u>" means a warrant arrangement, pursuant to which Parent shall issue the Warrants to Purchaser in the form attached hereto as <u>Exhibit D</u>.

"<u>Warrants</u>" means warrants that are exercisable, for a three-year period, for 1.7 million shares of Common Stock at an exercise price of $10.50 per share.

"<u>Willful Breach</u>" means a material breach of this Agreement that is a consequence of an act or omission undertaken by the breaching Party with the actual knowledge that the taking of or the omission of taking such act would, or would reasonably be expected to, cause or constitute a material breach of this Agreement.

Section 1.2    <u>Other Definitional Provisions and Interpretation.</u> The headings preceding the text of Articles and Sections included in this Agreement and the headings to Exhibits and Schedules attached to this Agreement are for convenience only and shall not be deemed part of this Agreement or be given any effect in interpreting this Agreement. Unless the context otherwise requires, as used in this Agreement, (a) the use of the masculine, feminine or neuter gender form of words herein shall include other genders and not limit any provision of this Agreement, (b) the meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, (c) the use of "including", "include" or "includes" herein shall in all cases mean "including, without limitation", "include, without limitation," or "includes, without limitation," respectively, (d) the use of "or" is not intended to be exclusive unless expressly indicated otherwise, (e) references to "written" or "in writing" include in electronic form, (f) reference to any Person includes such Person's successors and assigns to the extent such successors and assigns are permitted by the terms of any applicable agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually, (g) reference to any agreement (including this Agreement), document or instrument shall mean such agreement, document or instrument as amended, modified or supplemented and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof, (h) underscored references to Articles, Sections, clauses, Exhibits or Schedules shall refer to those portions of this Agreement, (i) the use of the terms "hereunder," "hereof," "hereto" and words of similar import shall refer to this Agreement as a whole and not to any particular Article, Section, paragraph or clause of, or Exhibit or Schedule to, this Agreement, (j) references to "the date hereof" and words of similar import shall refer to the date of this Agreement (as first written above), (k) references to a statute include any rules and regulations promulgated thereunder and amendments thereto, (l) references to a notice, consent or approval to be delivered under or pursuant to this Agreement shall mean a written notice, consent or approval, and (m) references to "days" shall mean calendar days unless Business Days are expressly specified. All terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

<div align="center">

ARTICLE II
SALE AND TRANSFER;
ASSUMPTION OF ASSUMED OBLIGATIONS

</div>

Section 2.1    <u>Purchase and Sale of Transferred Assets.</u> In consideration of Purchaser's payment of $230,000,000 (the "<u>Purchase Price</u>") and the Closing Reimbursement Payment and its assumption of the Assumed Obligations, and on the terms and subject to the conditions of this

<div align="center">15</div>

Agreement, at and as of the Closing, Seller shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall purchase and acquire and take assignment and delivery from Seller of, all of Seller's and its Affiliates' right, title and interest in and to (a) the Facility, (b) the Assigned Contracts, (c) the Closing Permits, (d) the Facility FF&E, (e) all real property records and files and manuals within Seller's possession, in each case to the extent they relate to the Transferred Assets, (f) the Transferred Intellectual Property, (g) all rights of Seller and its Affiliates under or in connection with handbooks, policies, procedures or agreements with any Transferred Employee pursuant to which and to the extent any Transferred Employee of such Seller or Affiliate may have agreed to: (i) keep information concerning the Business and the Transferred Assets confidential; (ii) assign Transferred Intellectual Property developed or created by them in the course of their work (whether as employees or consultants, or both) with the Business to the Business or its designee(s); or (iii) abide by certain restrictive covenants relating to the Business that may, among other things, limit competition, restrict the solicitation of employees, customers, partners, vendors, consultants or other personnel, and the like, (h) all other rights to causes of action, lawsuits, judgments, claims and demands of any nature in favor of Seller and its Affiliates to the extent related to the Business or the Transferred Assets, including all rights under all guarantees, warranties, indemnities and similar rights in favor of Seller and its Affiliates and all rights to sue and recover and retain damages for past, present and future infringement or misappropriation or other violation of any Transferred Intellectual Property, in each case, except as to any Excluded Asset or Retained Obligation, (i) all rights of Seller under any past or current insurance policy or Contract of insurance, warranty and condemnation benefits, rights and proceeds with respect to damage, nonconformance of or loss to the Transferred Assets or the Assumed Obligations occurring prior to the Closing Date, and (j) all of Sellers' rights under warranties, indemnities, and all similar rights against third parties to the extent related to any Transferred Assets (to the extent assignable) (collectively, the "Transferred Assets"). For avoidance of doubt, the Transferred Assets will not include the hub motor assembly lines, the battery module assembly lines, the battery pack assembly lines and related or associated assets. For purposes of reporting under the rules of any applicable stock exchange, $78,850,000 of the Purchase Price is allocated to the purchase of the Facility and $151,150,000 of the Purchase Price is allocated to the purchase of the remaining Transferred Assets.

Section 2.2    Excluded Assets. Other than the Transferred Assets subject to Section 2.1, none of Seller or any of its Affiliates shall sell, assign, convey, transfer or deliver to Purchaser or any Affiliate of Purchaser, and neither Purchaser nor any of its Affiliates shall purchase, acquire or take assignment or delivery of, any other assets or properties of Seller, and all such assets and properties shall be excluded from the Transferred Assets (collectively, the "Excluded Assets"). The Excluded Assets shall include: (a) all furniture, fixtures and equipment, whether or not located at the Facility, listed on Schedule 1.1(c), including the hub motor assembly lines, the battery module assembly lines, the battery pack assembly lines and related or associated assets; (b) all Contracts of Seller and its Affiliates other than the Assigned Contracts; (c) all Intellectual Property other than Transferred Intellectual Property, including all Excluded Intellectual Property; (d) all claims for and rights to receive refunds, rebates or similar payments of Taxes relating to any taxable period or portion thereof ending on or prior to the date of this Agreement, any Tax incentive arrangements with an applicable Governmental Authority related to any of the Transferred Assets, and all Tax Returns and all notes, worksheets, files or documents relating thereto; (e) all minute books, stock ledgers and similar corporate records of Seller or any of its Affiliates; (f) all personnel, discipline, performance, employee compensation, medical and benefits and labor relations records

relating to employees or past employees of Seller or any of its Affiliates; provided, however, that Seller shall make available to Purchaser copies of such records that are required by Law to be made available to Purchaser or are required for Purchaser to perform its obligations set forth in Article V; (g) any insurance policies or insurance coverage and all rights of any nature with respect thereto (including all insurance recoveries thereunder and rights to assert claims with respect thereto) to the extent not constituting the Transferred Assets described in Section 2.1(h); and (h) all permitting offsets, allocations and favorable permitting credits resulting from reductions in emissions from plant operations, closings and reductions associated with Environmental Permits.

Section 2.3     Replacement of Assets. Purchaser understands and agrees that it and its applicable Affiliates are solely liable and responsible for ensuring that it has the agreements, licenses, services, functions, policies, procedures, tools, systems and other assets necessary to operate and support the Facility from and after the Closing that are not included in the Transferred Assets. Purchaser and its applicable Affiliates shall be liable and responsible for obtaining all Permits, including all Environmental Permits, required for the ownership of the Transferred Assets and the operation of the Facility from and after the Closing that are not included in the Transferred Assets.

Section 2.4     Assumed Obligations. Pursuant to this Agreement and as part of the consideration paid by Purchaser, at and as of the Closing, Purchaser shall assume, be responsible for, waive any and all claims against Seller for, and pay, perform and discharge (or cause its applicable Affiliates to pay, perform and discharge) when due, the following Liabilities of Seller (collectively, the "Assumed Obligations"): (a) all Liabilities to or with respect to the Transferred Employees to be assumed by Purchaser as provided and to the extent set forth in Article V, including Assumed Vacation Liabilities to the extent provided in Section 5.4(a); (b) the Assumed Accounts Payable; (c) all Assumed Environmental Liabilities; (d) any Liabilities for Taxes that are not Seller Taxes; (e) all Liabilities arising under the Assigned Contracts to the extent arising on or after the Closing Date; and (f) all other Liabilities to the extent relating to the Transferred Assets arising after the Closing Date.

Section 2.5     Retained Obligations. Purchaser shall not assume or otherwise be liable in respect of any Liabilities other than the Assumed Obligations (collectively, the "Retained Obligations"), which Retained Obligations shall be retained by Seller, and shall include: (a) any Liabilities to or with respect to the Requested Employees to be retained by Seller or any of its Affiliates as provided and to the extent set forth in Article V; (b) any Liabilities relating to or arising out of the Excluded Assets; (c) any Liabilities for Seller Taxes; (d) any Liabilities to any Governmental Authority resulting from pre-Closing Tax incentives provided to Seller or any of its Affiliates related to any of the Transferred Assets; (e) all Liabilities arising under the Assigned Contracts to the extent arising prior to the Closing Date, other than the Assumed Accounts Payable; and (f) all Liabilities in respect of any pending or threatened Proceeding or investigation by or before any Governmental Authority or arbitration tribunal, whether class, individual or otherwise in nature, in law or in equity, to the extent relating to, or arising out of, the ownership of the Transferred Assets at any time prior to the Closing.

Section 2.6     Purchase Price; Reimbursement Payments.

(a)     As consideration for the Transferred Assets:


2021TW-L-K-5359                `2

(i)        within 5 Business Days following the date hereof, Purchaser shall pay the Initial Down Payment by wire transfer of immediately available funds to Seller;

(ii)       so long as (A) Seller has been and continues to be in compliance with Section 4.1(m), and (B) no occurrence, circumstance or event, or any combination thereof, has occurred which, with the lapse of time or the giving of notice or both, would give Purchaser the right to terminate this Agreement in accordance with Section 4.11(a) or Section 9.1(d), on February 1, 2022, Purchaser shall pay the Second Down Payment by wire transfer of immediately available funds to Seller;

(iii)      so long as (A) Seller has been and continues to be in compliance with Section 4.1(m), and (B) no occurrence, circumstance or event, or any combination thereof, has occurred which, with the lapse of time or the giving of notice or both, would give Purchaser the right to terminate this Agreement in accordance with Section 4.11(a) or Section 9.1(d), on the earlier to occur of  (x) April 15, 2022 and (y) 15 days following the later to occur of (1) the execution by Purchaser and Seller (or any of its respective Affiliates) of the Contract Manufacturing Agreement and (2) February 1, 2022, Purchaser shall pay the Third Down Payment by wire transfer of immediately available funds to Seller; and

(iv)       at the Closing, Purchaser shall pay (x) the Closing Payment, plus (y) the Closing Reimbursement Payment, in each case set forth in the Estimated Statement, by wire transfer of immediately available funds to Seller and shall assume the Assumed Obligations in accordance with Section 2.4.

(b)        As a condition to the payment of the Initial Down Payment, Seller shall deliver to Purchaser on or prior to the date of payment of the Initial Down Payment:

(i)        an Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "Security and Mortgage Agreement"), substantially in form attached hereto as Exhibit E, with respect to the repayment obligation, if any, of the Down Payments and accrued interest thereon (collectively, the "Secured Obligations") in the manner required hereunder, duly executed and notarized by Seller and granting a valid and subsisting first lien on the Facility, subject only to the Permitted Liens;

(ii)       all Uniform Commercial Code ("UCC") financing statements required by Purchaser; Seller hereby authorizes Purchaser to file UCC financing statements (individually and collectively, "UCC Financing Statements") naming Seller as debtor with respect to the Security and Mortgage Agreement and the collateral described in the Security and Mortgage Agreement (the "Collateral"); and

(iii)      a title insurance policy from First American Title Insurance Company (the "Title Company") (which shall be in the form of a mark-up of, or a pro forma, of the commitment for an ALTA Loan Title Insurance Policy 2021 Form for the Real Property issued by the Title Company prior to the Effective Date (the "Loan Title Commitment")), insuring the valid, first priority lien of the Security and Mortgage Agreement in the Real Property as of the date hereof (including all recorded appurtenant easements insured as separate legal parcels) with gap coverage from Seller through the date of recording, subject only to Permitted Liens, in the amount

18

of the Secured Obligations (the "<u>Loan Title Policy</u>"). The title policy shall include an extended coverage endorsement (insuring over the general or standard exceptions), ALTA Form 3.1 zoning (with parking and loading docks), a future disbursement endorsement, a date down and modification endorsement, and all other endorsements reasonably requested by Purchaser, in form and substance reasonably satisfactory to Purchaser. Seller shall deliver to the Title Company all reasonable documents required by the Title Company for the issuance of the Loan Title Policy. Purchaser and Seller shall share equal responsibility for all fees, costs and expenses with respect to the Loan Title Commitment and Loan Title Policy (and all endorsements thereto).

(c)     Not fewer than five Business Days prior to the anticipated Closing Date, Seller shall deliver to Purchaser a statement setting forth Seller's good faith estimates of the Closing Payment, the Closing Reimbursement Payment and the Assumed Vacation Liabilities (the "<u>Estimated Statement</u>"), which shall be accompanied with reasonable supporting documentation for such calculations. Seller shall provide Purchaser and its Representatives with reasonable access during normal business hours to the personnel of, and work papers prepared by, Seller and its Representatives, to the extent they relate to the Estimated Statement and to such financial or other information relating to the Estimated Statement as Purchaser may reasonably request for the purpose of reviewing the Estimated Statement. Seller shall consider in good faith any comments of Purchaser on the Estimated Statement, shall correct and adjust any manifest errors identified by Purchaser and the Parties shall cooperate to resolve any disagreements regarding calculations. No comments provided or review conducted by Purchaser or any of its Representatives with regards to any materials provided by Seller under this <u>Section 2.3(c)</u> shall limit or prevent Purchaser from exercising any of its rights or remedies under this Agreement.

(d)     Within forty five (45) days following the Closing Date, Purchaser shall prepare and deliver to Seller a statement (the "<u>Final Statement</u>") setting forth Purchaser's determination of the Closing Payment, the Closing Reimbursement Payment and the Assumed Vacation Liabilities. Seller shall provide Purchaser and its Representatives with reasonable access during normal business hours to the personnel of, and work papers prepared by, Seller and its Representatives, to the extent they relate to the preparation of the Final Statement and to such financial or other information relating to the Closing Payment and the Closing Reimbursement Payment as Purchaser or its Representatives may reasonably request for the purpose of preparing the Final Statement.

(e)     After receipt of the Final Statement, Seller shall have forty five (45) days (the "<u>Review Period</u>") to review the Final Statement. On or prior to the last day of the Review Period, Seller shall deliver to Purchaser a written statement either accepting the Final Statement or specifying any objections thereto in reasonable detail (an "<u>Objections Statement</u>"). If Seller does not deliver an Objections Statement on or prior to such date, then the Final Statement shall become final and binding upon all Parties. If Seller delivers an Objections Statement on or prior to such date, then Seller, on the one hand, and Purchaser, on the other, shall negotiate in good faith for 15 days following the Purchaser's receipt of such Objections Statement to resolve the Seller's objections. Any such objection that Purchaser, on the one hand, and Seller, on the other, are unable to resolve during such 15-day period is referred to as a "<u>Dispute</u>." After such 15-day period, any matter set forth in the Final Statement that is not in dispute shall become final and binding upon the Parties. If Purchaser and the Seller are unable to resolve all objections during such 15-day period, then after such period has elapsed either Purchaser or Seller may refer any Disputes, and

only such Disputes, to BDO USA LLC for resolution or, if BDO USA LLC is not available for such assignment, Grant Thornton LLP, or if Grant Thornton LLP is not available for such assignment, another nationally recognized accounting firm upon which Purchaser and Seller shall reasonably agree (the "Accounting Firm"). The Accounting Firm shall act as an expert, and not an arbitrator. Purchaser and Seller shall each promptly execute a customary engagement letter with respect to the engagement of the Accounting Firm. The Accounting Firm shall be instructed to resolve any Disputes in accordance with the terms of this Agreement within 30 days after its engagement (or such other time as the Parties shall agree in writing). The resolution of such Disputes by the Accounting Firm (i) shall be set forth in writing, (ii) may not assign a value greater than the greatest value or smaller than the smallest value for each Dispute claimed by either the Seller, on the one hand, or the Purchaser, on the other, (iii) shall be based solely on written submissions and presentations by the Purchaser and the Seller and not on independent review, (iv) shall constitute an arbitral award, and (v) shall be conclusive and binding upon all the Parties upon which a judgment may be rendered by a court having proper jurisdiction over the Party against which such determination is sought to be enforced. Upon delivery of such resolution, the Final Statement, as the same may be modified in accordance with such resolution and any other mutual resolutions of the Parties memorialized in writing, shall become final and binding upon all Parties. Seller and Purchaser will each bear its own legal fees and other costs of presenting its case to the Accounting Firm. The fees and expenses of the Accounting Firm and of any enforcement of the determination of the Accounting Firm shall be borne by Seller and Purchaser in inverse proportion as they may prevail on the matters resolved by the Accounting Firm. The proportionate allocation shall be calculated on an aggregate basis based on the relative dollar values of the amounts in dispute and shall be determined by the Accounting Firm at the time the determination of such firm is rendered on the merits of the matters submitted. The date on which the Closing Payment and the Closing Reimbursement Payment is finally determined in accordance with Section 2.6 is referred to as the "Determination Date."

(f) The "Adjustment Amount," which may be positive or negative, shall mean an amount equal to (i) the sum of (x) the Closing Payment and (y) the Closing Reimbursement Payment (in each case as finally determined in accordance with Section 2.3(e)) minus (ii) the sum of (x) the Closing Payment and (y) the Closing Reimbursement Payment (in each case set forth in the Estimated Statement). If the Adjustment Amount is a positive number, then Purchaser shall promptly (but not later than 5 Business Days after the date hereof) deliver to Seller (by wire transfer of immediately available funds to the account(s) specified in writing by Seller) an amount in cash equal to the Adjustment Amount. If the Adjustment Amount is a negative number, then Seller shall promptly (but not later than 5 Business Days after the Determination Date) deliver to Purchaser (by wire transfer of immediately available funds to the account(s) specified in writing by Purchaser) an amount in cash equal to the absolute value of the Adjustment Amount.

Section 2.7    Allocation of Purchase Price.

Purchaser shall prepare a schedule illustrating the allocation of the Purchase Price, the Closing Reimbursement Payment and the portion of the Assumed Obligations, if any, constituting consideration for U.S. federal income tax purposes, among the Transferred Assets, which shall be prepared consistently with Code Section 1060 and the regulations promulgated thereunder (the "Allocation Schedule"), and shall deliver the Allocation Schedule to Seller within 30 Business Days following the Closing Date. If within twenty (20) days after the delivery of the Allocation

Schedule, Seller notifies Purchaser in writing that it objects to the allocation set forth in the Allocation Schedule, the Parties shall use commercially reasonable efforts to resolve such dispute. In the event that the Parties are unable to resolve such dispute within twenty (20) days after Seller notifies Purchaser in writing of its objection, the dispute shall be resolved by the Accounting Firm in the same manner as disputes are intended to be resolved pursuant to <u>Section 2.6</u>, and the Allocation Schedule shall be adjusted to reflect such resolution. The Allocation Schedule so revised (the "<u>Final Allocation Schedule</u>") shall be conclusive and binding upon the Parties. In the event of any adjustment to the Purchase Price or the Closing Reimbursement Payment (or any other item of consideration for income Tax purposes) requiring an amendment to the Allocation Schedule, Purchaser shall amend the Allocation Schedule in accordance with the principles set forth in this <u>Section 2.7</u> and shall provide such amended allocation to Seller (which, subject to the provisions set forth in this <u>Section 2.7</u>, shall become the Final Allocation Schedule). The Parties agree, unless otherwise required by Law, not to take any position inconsistent with the Final Allocation Schedule for Tax reporting purposes.

Section 2.8 <u>Withholding</u>.

Notwithstanding anything to the contrary in this Agreement, Purchaser will be entitled to deduct and withhold from any amounts payable pursuant to this Agreement any amounts required to be deducted or withheld under applicable Laws of the United States. If the Purchaser determines that an amount is required to be deducted and withheld pursuant to the preceding sentence, Purchaser shall use commercially reasonable efforts to provide prior written notice to Seller describing in reasonable detail the amount and basis for withholding at least five (5) Business Days (or, if sooner, as soon as is reasonably practicable) prior to the date payment is due. To the extent that any such amounts are so deducted or withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF EACH PARTY

Section 3.1 <u>Of Each Party.</u> Each Party represents and warrants to each other Party that the following statements contained in this <u>Section 3.1</u> are true and correct as of the date of this Agreement and shall be true and correct as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this <u>Section 3.1</u>); provided that any reference to Related Agreements includes only Related Agreements that have been executed prior to or on the date that such representation is made:

(a) <u>Organization.</u> Such Party and each Affiliate of such Party that becomes a party to a Related Agreement is validly existing and (where such concept is applicable) in good standing under the Laws of its jurisdiction of organization and has all requisite corporate or other business entity power and authority to own, lease and operate its assets and to conduct its business as currently conducted.

(b) <u>Authorization.</u> Such Party and each Affiliate of such Party that becomes a party to a Related Agreement has all requisite corporate or other business entity power and authority to execute, deliver and perform this Agreement and its Related Agreements (in each case

21



to the extent it is a party thereto) and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by such Party and each of its applicable Affiliates of this Agreement and its Related Agreements (in each case to the extent it is a party thereto), and the consummation by such Party and such Affiliates of the transactions contemplated hereby and thereby, have been authorized by all necessary corporate or other business entity action by such Party and by each of its applicable Affiliates. Such Party has duly and validly executed and delivered this Agreement and each of the Related Agreements shall be duly and validly executed and delivered by such Party or its Affiliate, as applicable. Assuming the due authorization, execution and delivery of this Agreement and the Related Agreements by the other parties hereto and thereto, this Agreement and each Related Agreement constitutes legal, valid and binding obligations of such Party and the Affiliates of such Party thereto, enforceable against each of them in accordance with their respective terms, subject to the Enforceability Limitations.

(c)   Governmental Consents; No Conflicts.

(i)   The execution, delivery and performance of this Agreement and the Related Agreements by such Party and its applicable Affiliates do not and will not require any Consent of or with any Governmental Authority, except for applicable requirements, if any, of (A) the HSR Act and (B) CFIUS Clearance.

(ii)   The execution, delivery and performance of this Agreement and the applicable Related Agreements by such Party and its applicable Affiliates, and the consummation of the transactions contemplated hereby and thereby by such Persons, do not (A) violate any Law applicable to or binding on such Party or any such Affiliate or their respective assets, (B) violate or conflict with, result in a breach, cancellation or termination of, constitute a default under, result in the creation of any Lien upon any of the assets of such Party or any such Affiliate under, or result in or constitute a circumstance that, with or without notice or lapse of time or both, would constitute any of the foregoing under, any Contract to which such Party or any such Affiliate is a party or by which such Party or any such Affiliate or any of their respective assets are bound, except for Permitted Liens or (C) violate or conflict with any provision of the certificate of incorporation or by-laws (or similar organizational documents) of such Party or any such Affiliate.

(d)   Proceedings. There are no Proceedings pending or, to such Party's knowledge, threatened, by or against such Party or any of its Affiliates before any Governmental Authority with respect to this Agreement or in connection with the transactions contemplated hereby.

(e)   Brokers and Finders. Except as identified on Schedule 3.1(e), no broker, investment banker or other firm or Person is or will be entitled to any broker's or finder's fee or any other commission or similar fee in connection with the transactions contemplated by this Agreement or any other document based on arrangements made by such Party or on behalf of such Party or its respective Affiliates.

Section 3.2   Seller Representations.

Seller represents and warrants to Purchaser that the following statements contained in this Section 3.2 are true and correct as of the date of this Agreement and shall be true and correct on the Closing

Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this <u>Section 3.2</u>):

      (a)    <u>Title; Sufficiency; Condition</u>.

          (i)    Seller has good, valid and marketable title to, or a valid leasehold interest in, all of the Transferred Assets, free and clear of all Liens, except for (i) Liens for Taxes not yet due and payable, and (ii) any Permitted Liens.

          (ii)    With respect to the Facility: (A) Seller has good and marketable indefeasible fee simple title to the Facility, free and clear of all Liens, except for the Permitted Liens; (B) except as set forth in <u>Schedule 3.2(a)(ii): (I)</u> Seller has not leased or otherwise granted to any Person the right to use or occupy the Facility or any portion thereon; (II) other than the right of Purchaser pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase the Facility or any portion thereof or interest therein; and (III) Seller is not a party to any agreement or option to purchase any real property or interest therein relating to, or intended to be used in the operation of, the Business.

          (iii)    To Knowledge of Seller, the Transferred Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing.

          (iv)    (a) To Knowledge of Seller, the Facility FF&E included in the Transferred Assets used in the conduct of Business is in good operating condition and repair, subject to routine maintenance and repairs, and is adequate for the uses to which it is being used and (b) the Improvements are sufficient for Seller's operation of the Business as currently conducted thereon.

          (v)    Subject to confirmation by the Survey, the Legal Description contains all real property currently used in the Business and sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing.

      (b)    <u>Facility Contracts</u>.

          (i)    Set forth on <u>Schedule 3.2(b)</u> is a true and complete list of all Contracts material to the ownership, maintenance or operation of the Facility or material to the conduct of the Business, in each case except for Contracts that relate to the Excluded Assets (collectively, the "<u>Facility Contracts</u>"). Seller is not in breach or in violation of any Facility Contract, in any material respect, and, to the Knowledge of Seller, no other party to any Facility Contract is in breach or in violation of any Facility Contract, in any material respect and  each Facility Contract is valid, binding and enforceable against Seller and, to the Knowledge of Seller, against each other party to such Facility Contract, as the case may be, except as such enforceability may be limited by the Enforceability Limitations.

          (ii)    Purchaser has heretofore been supplied with a true, correct and complete copy of all such Facility Contracts, together with all amendments, exhibits, attachments, waivers or other changes thereto.

4834-8099-7884.32


2021TW-L-K-5359 `2

(iii)     Except as set forth on <u>Schedule 3.2(b)(iii)</u>, as of the Closing, no Consent is required for the assignment of any material Assigned Contract to Purchaser at Closing.

(c)     <u>Litigation</u>.

(i)     Except as set forth on <u>Schedule 3.2(c)</u>, there are no Proceedings pending or, to the Knowledge of Seller, threatened against or affecting the Business or the Transferred Assets at law or in equity, or before or by any Governmental Authority, and there is no reasonable basis known to Seller for any of the foregoing. Seller is not subject to or bound by any outstanding Order with respect to the Business or the Transferred Assets.

(ii)     There is no condemnation, expropriation or other Proceeding in eminent domain pending or, to the Knowledge of Seller, threatened, affecting any Real Property or any portion thereof or interest therein. There is no Order outstanding, nor any Proceeding pending or, to the Knowledge of Seller, threatened, relating to the ownership, lease, use or occupancy of the Real Property or any portion thereof, or the operation of the Business.

(d)     <u>Compliance with Laws</u>.

(i)     Except as set forth on <u>Schedule 3.2(d)</u>:

a.     Seller has complied in all material respects with all applicable Laws relating to the operation of the Business and the Transferred Assets, and no written notices have been received by and no claims have been filed against Seller alleging a violation of any such Laws;

b.     Seller has, with respect to the Business, complied in all material respects with all applicable Laws relating to the employment of labor, including provisions thereof relating to wages, hours, equal opportunity, non-discrimination, collective bargaining and the payment of social security and other taxes;

c.     Seller holds all material Permits required for the conduct of the Business and operation of the Facility, as conducted and operated on the date of this Agreement. Seller is in compliance in all material respects with all terms and conditions of any such required Permit. <u>Schedule 3.2(d)(i)</u> sets forth a true and complete list of all such material Permits; and

d.     No officer, director, employee, consultant, advisor or agent of Seller has been or is authorized to make or receive, and Seller does not know of any of its officers, directors, employees, consultants, advisors or agents making or receiving, any bribe, kickback payment or other illegal payment at any time with respect to the Business.

(ii)     Seller has not received any written notice of violation of any applicable building, zoning, subdivision, health and safety and other land use Laws, including The Americans with Disabilities Act of 1990, as amended, and all insurance requirements affecting the Facility (collectively, the "<u>Real Property Laws</u>") and to Seller's actual knowledge and there is no basis for the issuance of any such notice or the taking of any action for such violation.

24



(e)  <u>Mechanic's Liens</u>. All bills and claims for labor performed or materials furnished to or for the benefit of the Facility for the period prior to the date of Closing have been paid in full or will be paid in full upon receipt of invoices and there are no recorded mechanic's liens or materialmen's liens on or affecting the Facility as of the date hereof.

(f)  <u>GM Acquisition</u>. Except as set forth on <u>Schedule 3.2(f)</u>, Seller has satisfied all obligations under the documents entered into by Seller in connection with the GM Acquisition and no liabilities of Seller remain outstanding, other than contingent obligations.

(g)  <u>Mortgage</u>. The Security and Mortgage Agreement, when properly recorded in the appropriate records, together with any UCC Financing Statement (as hereinafter defined) required to be filed in connection therewith, will create (i) a valid, perfected and enforceable Lien on the Facility in the amount of the Secured Obligations, subject only to Permitted Liens and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including any leases), all in accordance with the terms thereof, to the extent such security interests and assignment can be perfected by such recordations or filings, in each case subject only to applicable law, any applicable Permitted Liens.

(h)  [Intentionally Omitted]

(i)  <u>OFAC</u>. (i) Neither Seller, nor to the Knowledge of Seller, any of Seller's partners, officers, directors or employees, is named as a "Specially Designated National and Blocked Person" as designated by the United States Department of the Treasury's Office of Foreign Assets Control or as a person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; (ii) to the Knowledge of Seller, Seller is not controlled, directly or indirectly by the government of any country that is subject to a United States embargo (Iran, Syria, Cuba, North Korea and the Crimea region of the Ukraine); (iii) to the Knowledge of Seller, Seller is not acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by the United States Treasury Department as a "Specially Designated National and Blocked Person", or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and (iv) to the Knowledge of Seller, Seller is not engaged in the transaction contemplated hereby directly or indirectly on behalf of, or facilitating the transaction contemplated hereby directly or indirectly on behalf of, any person, group, entity or nation that is named by the United States Treasury Department as a "Specially Designated National and Blocked Person," or for on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit or supports terrorism .

(j)  [Intentionally Omitted]

(k)  <u>Environmental Matters</u>.

(i)  Since November 7, 2019, Seller has complied in all material respects with all Environmental Laws governing its operations at the Facility, which compliance includes obtaining, maintaining, and complying with all applicable Environmental Permits. <u>Schedule 3.2(k)</u> sets forth a true and complete list of all such Environmental Permits.

(ii)     Since November 7, 2019, Seller has complied in all material respects with all requirements of the BUSTR Covenant and Environmental Covenant.

(iii)    To the knowledge of Seller, since November 7, 2019, there has been no Release of Hazardous Substances at, or, or under the Real Property.

(iv)    There are no notices or claims from a Governmental Authority or other Person alleging a material violation of Environmental Law or material Environmental Liabilities (including with respect to CERCLA liability for non-owned disposal sites) arising out of operations at the Facility that remain unresolved. To the knowledge of Seller, there are no threatened notices or claims alleging material violation of Environmental Law or material Environmental Liabilities.

(v)    To the Knowledge of Seller, since November 7, 2019, the operation of the Facility has not given rise to exposure of employees or third Persons to Hazardous Substances in excess of any applicable Environmental Law limits or standards.

(vi)    Seller has made available to Purchaser all material environmental reports, compliance audits, and site assessments relating to the Facility that were prepared since November 7, 2019 and that are in Seller's possession or under its control, including any surveys of the presence of ACM, LBP and ILM at the Facility.

(l)    <u>Taxes.</u>  Except as set forth in <u>Schedule 3.2(d)</u>:

(i)    Seller has timely and properly filed all income and other material Tax Returns required to be filed by it or with respect to it or the Transferred Assets. All such Tax Returns are accurate and complete in all material respects. All material Taxes required to be paid by Seller or with respect to the Transferred Assets, whether or not shown as due on such Tax Returns, have been timely and properly paid.

(ii)    There are no Liens for Taxes upon the Transferred Assets other than Liens for Taxes not yet due and payable. To the Knowledge of Seller, there is no reasonable basis for the assertion of any claim relating or attributable to Taxes which, if adversely determined, would result in any Lien on any of the Transferred Assets.

(iii)    All material Tax deficiencies that have been claimed, proposed, or asserted by any Governmental Authority against Seller with respect to the Transferred Assets have been fully paid or finally settled. No Tax audits or administrative or judicial Tax Proceedings are being conducted with respect to Seller relating to the Transferred Assets. Seller has not received from any Governmental Authority any (A) written notice indicating an intent to open an audit or other review with respect to material Taxes relating to the Transferred Assets, (B) written request for information related to material Tax matters with respect to the Transferred Assets, or (C) written notice of deficiency or proposed adjustment or assessment for any material amount of Tax relating to the Transferred Assets that has not been resolved or paid in full. Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that, in each case, relates to the Transferred Assets and which remains in effect.

(iv)     Seller has timely withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any Transferred Employee and with respect to the Transferred Assets, and all IRS Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed. Seller has not deferred any obligation to pay Taxes pursuant to Section 2302 of the Coronavirus Aid, Relief, and Economic Security Act or in connection with the Presidential Memorandum on Deferring Payroll Tax Obligations in Light of the Ongoing COVID-19 Disaster (or any corresponding provisions of applicable Law), in either case for which Purchaser or any of its Affiliates would have any responsibility or bear any Liability.

(v)     Seller (A) is not a party to any Tax allocation, Tax sharing or Tax distribution agreement or arrangement that would bind Purchaser or any of its Affiliates after the Closing, and no Transferred Asset or Assumed Obligation constitutes any such agreement or arrangement, (B) does not have any Liability for the Taxes of any other Person as a transferee or successor, as the result of being or having been a member of an affiliated group (as defined in Section 1504 of the Code (or analogous combined, consolidated or unitary group defined under state, local or foreign income Tax Law)) (other than a group the common parent of which is Parent or a predecessor of Parent), by Contract (other than this Agreement), or otherwise, that would bind Purchaser or any of its Affiliates after the Closing Date, and (C) has not requested or received a ruling from any Governmental Authority or signed any binding agreement with any Governmental Authority that might impact the amount of Tax due from Purchaser or any of its Affiliates after the Closing Date.

(vi)     None of the Transferred Assets is an interest in a Person classified as a partnership, a corporation or a disregarded entity for U.S. federal, state or local income Tax purposes.

(vii)     No claim has ever been made by an authority in a jurisdiction where Seller does not file Tax Returns that Seller or any of the Transferred Assets is or may be subject to taxation by that jurisdiction.

(viii)     Purchaser will not have any Liability for any Taxes for any taxable period with respect to the Transferred Assets arising out of any operations or activities of Seller or any of its Affiliates prior to the Closing.

(ix)     Seller is not, nor has it ever been, a "foreign person" within the meaning of Section 1445(a) of the Code.

(m)     Employees and Seller Benefit Plans.

(i)     Seller is and has been, in compliance in all material respects with all applicable Laws respecting labor and employment, including those relating to labor management relations, wages, hours, overtime, pay equity, worker classification, discrimination, sexual harassment, workplace harassment, background checks, civil rights, affirmative action, work authorization, immigration, whistleblower, retaliation, leaves of absence, plant closings, mass layoffs, relocations, safety and health, information privacy and security, workers compensation, and the payment and withholding of employment-related Taxes (collectively, the "Employment

27

Laws"). No material Proceeding has been pending or, to the Knowledge of Seller, threatened against Seller as it relates to the Employment Laws or any other employment-related matter.

(ii) Seller is not and has not been a party to or otherwise bound by, or is currently negotiating in with entering into, any agreement with any labor union, works council or other employee representative body; no employee of Seller is member of a labor union, works council or other employee representative body with respect to his or her employment with Seller; and there has not been any organizational campaign, petition or other unionization activity seeking recognition of a labor union, works council or other employee representative body relating to any employee of Seller. Seller has not been subject to any charge, demand, petition or representation proceeding seeking to compel, require or demand it to bargain with any labor union and there has been no pending or, to the knowledge of Seller, threatened, labor strike, work stoppage, picketing, slowdown, concerted refusal to work overtime or lockout or other material labor dispute involving Seller.

(iii) Schedule 3.2(m)(iii) set forth each "employment loss" as defined in the Worker Adjustment and Retraining Notification Act that has occurred within the ninety days before the date hereof. Prior to the Closing, this schedule shall be updated to reflect all employment losses within the 90-day period ending as of the Closing Date.

(iv) Schedule 3.2(m)(iv) lists each material Seller Benefit Plan. No Seller Benefit Plan is, nor is any other Employee Benefit Plan sponsored or required to be contributed to by Seller, a "multiemployer plan" as defined in Section 3(37) of ERISA; subject to Title IV or Section 302 of ERISA or Section 412 of the Code; or providing post-employment health or death benefits other than continued health coverage required by Code Section 4980B or similar state law. Each Seller Benefit Plan intended to qualify under Section 401(a) of the Code has received a favorable IRS determination letter or is the form of a prototype or volume submitter plan that is the subject of a favorable advisory or opinion letter from the IRS upon which the adopting employer is entitled to rely. To the Knowledge of Seller, nothing has occurred that would reasonably be expected to result in the revocation of such qualified status. The consummation of the transactions contemplated by this Agreement, without regard to any event occurring on or after the Closing Date, will not result in any "excess parachute payment" as defined in Section 280G of the Code.

(n) [Intentionally Omitted].

(o) Intellectual Property.

(i) None of the Owned Transferred Intellectual Property is the subject of an application or registration with a Governmental Authority.

(ii) None of the Owned Transferred Intellectual Property has been found to be invalid or unenforceable under applicable Law. To the Knowledge of Seller, the transactions contemplated under this Agreement will not (i) adversely affect the validity or enforceability of the Owned Transferred Intellectual Property, (ii) subject to obtaining any required consents from the licensors of licensed Transferred Intellectual Property, result in a loss of, or Lien or restriction on, any Transferred Intellectual Property or any license to Transferred Intellectual Property, (iii)

28

result in the release or delivery of any Transferred Intellectual Property to any other Person, or (iv) result in the grant, assignment, or transfer to any other Person of any license or other right or interest under, to, or in any of the Transferred Intellectual Property.

(iii)     Seller exclusively owns all right, title, and interest in and to all Owned Transferred Intellectual Property free and clear of Liens, other than Permitted Liens. Seller has not received any written notice of any claim of infringement or misappropriation from any Person with respect to the Owned Transferred Intellectual Property or the operation of the Facility or Facility FF&E, and to the Knowledge of Seller the use of the Owned Transferred Intellectual Property and the operation of the Facility and Facility FF&E has not and does not infringe or misappropriate the Intellectual Property of any Person. The use of the Owned Transferred Intellectual Property and the operation of the Facility and Facility FF&E is not subject to any pending or, to the knowledge of Seller, threatened litigation by any Person with respect to Owned Transferred Intellectual Property. To the Knowledge of Seller, no Person is infringing or misappropriating any Owned Transferred Intellectual Property.

(iv)     Schedule 3.2(o)(iv)(1) sets forth an accurate and complete list of all Facility Contracts under which the Seller has acquired or obtained, or has been licensed or otherwise granted, any license, permission or other right under or to utilize any material Intellectual Property with respect to the operation of the Facility or Facility FF&E. Schedule 3.2(o)(iv)(2) sets forth an accurate and complete list of all Contracts under which Seller has granted any other Person any license, permission or other right under or to utilize any material Transferred Intellectual Property. Except for (i) the Seller Names, (ii) the Excluded Intellectual Property and (iii) Intellectual Property licensed under any Contract not set forth on Schedule 3.2(o)(iv)(1), the Transferred Intellectual Property and the Licensed Transferred Intellectual Property collectively constitutes all Intellectual Property that is necessary and used for the operation of the Facility or the Facility FF&E.

(v)     Seller has taken commercially reasonable steps to maintain the secrecy and confidentiality of all Know-How that is a part of the Transferred Intellectual Property. Without limiting the foregoing, Seller has not disclosed any such Know-How to any Person, unless such disclosure was under an appropriate written nondisclosure agreement or to a Person subject to a fiduciary duty to maintain the confidentiality thereof. To the Knowledge of Seller, there has been no violation or unauthorized disclosure of any such Know-How by Seller.

(p)     Assumed Accounts Payable. All Assumed Accounts Payable have arisen from bona fide transactions entered into by Seller in the Ordinary Course of Business.

(q)     Absence of Other Representations and Warranties Regarding Transferred Assets. Except for the express representations and warranties of Seller set forth in Sections 3.1 or 3.2, none of Seller, its Affiliates or any other Person has made any representation or warranty as to the Transferred Assets, the Assumed Obligations, this Agreement or the Related Agreements or any other documents or information made available to Purchaser by Seller.

Section 3.3     Additional Representations and Warranties of Purchaser.

29

4834-8099-7884.32
2021TW-L-K-5359          `2


Purchaser represents and warrants to Seller that the following statements contained in this Section 3.3 are true and correct as of the date of this Agreement and shall be true and correct on the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 3.3):

(a)  Organization. Purchaser is validly existing and (where such concept is applicable) in good standing under the Laws of the State of Ohio.

(b)  Compliance with Laws. Purchaser is in compliance with all applicable Laws, including all anti-corruption, anti-bribery, export control, import control and economic sanctions Laws of the United States and any other relevant jurisdiction.

(c)  Independent Investigation; Environmental Disclosure.

(i)  Purchaser has conducted its own independent investigation, analysis, and evaluation to the full satisfaction of Purchaser of the Transferred Assets and the Assumed Obligations and of the physical nature and condition, including the environmental condition, of the Facility. Purchaser acknowledges and agrees that: (A) in making the decision to enter into this Agreement and the Related Agreements and to consummate the transactions contemplated by this Agreement and the Related Agreements, Purchaser has relied solely upon its own investigation, analysis and evaluation and the express representations and warranties of Seller set forth in Section 3.1 and Section 3.2; (B) except for the express representations and warranties of Seller set forth in Section 3.1 and Section 3.2, none of Seller, its Affiliates or any other Person has made any representations or warranty as to the Transferred Assets, the Assumed Obligations, this Agreement or the Related Agreements, including with respect to (1) merchantability or fitness for any particular use or purpose, (2) the operation of the Facility or the ownership of the Transferred Assets, in each case by Purchaser after the Closing, (3) the accuracy or completeness of any information, written or oral, relating to the Transferred Assets or the Assumed Obligations or (4) regarding the physical nature and condition, including the environmental condition, of the Facility or the compliance status with applicable Environmental Laws of any and all equipment, processes, or operations at, on or in the Facility; and (C) except for the express representations and warranties of Seller set forth in Section 3.1 and Section 3.2, Purchaser has not relied on any representations or warranties of any nature made by or on behalf of or imputed to Seller, any of its Affiliates or any other Person. Purchaser confirms to Seller that Purchaser is sophisticated and knowledgeable about the Transferred Assets, the Assumed Obligations, the Related Agreements and the relevant industries and is capable of evaluating the matters set forth above.

(ii)  Without limiting the foregoing, Purchaser acknowledges that: (A) Seller has informed Purchaser that the Facility may contain asbestos insulation and other asbestos-containing material ("ACM"), surfaces coated with lead-based paint ("LBP"), or surfaces including portions of the roof containing imbedded lead material ("ILM"); (B) there may be Debris located on or under the surface of the Facility; and (C) the Real Property may contain wetlands and woodlands that may be subject to regulation under applicable Law, including Environmental Laws.

30

ARTICLE IV
COVENANTS

Section 4.1    Interim Covenants.

(a)    During the period commencing on September 1, 2021 and ending on the Closing Date, the Operating Costs and the Expansion Costs incurred by Seller and approved (or deemed approved) by Purchaser in accordance with Section 4.1(b), (c) or (d) shall be (i) included in the Closing Reimbursement Payment to the extent such Operating Costs or Expansion Costs were paid by Seller prior to Closing or (ii) included in Assumed Accounts Payable to the extent such Operating Costs or Expansion Costs were incurred but not paid by Seller prior to Closing.

(b)    (i) Set forth on Schedule 4.1(b)(i) is a schedule of all Expansion Costs incurred by Seller since September 1, 2021 that have been approved by Purchaser. (ii) Set forth on Schedule 4.1(b)(ii) is a schedule of certain Expansion Costs incurred by Seller since September 1, 2021 that have not, as of the date hereof, been approved by Purchaser; provided, that Purchaser shall notify Seller by no later than December 15, 2021 whether the Expansion Costs listed on Schedule 4.1(b)(ii) are approved.

(c)    During the Interim Period, the Parties shall hold weekly meetings to discuss and review proposed Expansion Costs, which Purchaser shall approve or reject in its sole discretion by no later than the third weekly meeting after such Expansion Costs are first proposed. In advance of each such meeting, Seller shall provide Purchaser with such information as may be reasonably requested by Purchaser to review any proposed Expansion Costs. In the event (i) Seller reasonably determines that any Expansion Costs are required to be incurred in exigent circumstances to prevent an imminent material and adverse impact on the business or operations of the Facility and (ii) such Expansion Costs are less than $100,000, then Seller may request in writing Purchaser's approval of such Expansion Costs (the "Emergency Expansion Costs"), which Purchaser may approve or reject in its sole discretion; provided, that if Purchaser fails to respond to such a request within 5 Business Days of its receipt thereof, such Emergency Expansion Costs shall be deemed approved by Purchaser.    For a written request by Seller for approval of Emergency Expansion Costs to be valid hereunder, Seller must deliver such written request via email to the three Purchaser Representatives designated by Purchaser to Seller for this purpose.

(d)    During the period commencing on September 1, 2021 and ending on the Closing Date, 38% of all Operating Costs incurred by Seller and that are, consistent with past practice, recorded under the departments and GL codes set forth on Schedule 4.1(d)(i) (the "Approved Operating Costs"), are hereby approved by Purchaser; provided, such approval shall be limited to no more than $3,000,000 of Approved Operating Costs per month. By no later than the 10th day of each month, Seller shall provide to Purchaser a monthly forecast of all Operating Costs that, consistent with past practice, would be recorded under the departments and GL codes set forth on Schedule 4.1(d)(i) (the "Specified Operating Costs") for the next succeeding month, which monthly forecast shall be in form and substance as Purchaser may reasonably request. No later than the 20th day after the end of each month, Seller shall provide to Purchaser a statement setting forth the actual Specified Operating Costs incurred by Seller for such prior month. After receipt of such statement, Purchaser shall have 10 Business Days to review the Specified Operating Costs set forth on such statement and deliver to Seller any objection that any costs set forth on

31

such statement are not Specified Operating Costs. If Purchaser delivers any such objection, then Seller and Purchaser shall negotiate in good faith to resolve Purchaser's objection. Seller shall provide Purchaser and its Representatives reasonable access during normal business hours to the personnel of, and work papers prepared by, Seller and its Representatives, to the extent they relate to the preparation of the statement of Specified Operating Costs. During the Interim Period, Purchaser and Seller may update Schedule 4.1(d)(i) from time to time to include additional departments and GL codes that Purchaser and Seller mutually agree, following a good faith review and discussion, are appropriate to be so included, which additional departments and GL code may include those set forth on Schedule 4.1(d)(ii).

(e)     During the Interim Period and subject to Section 4.1(f), if Seller enters into any Contract that would have been a Facility Contract if entered into prior to the date hereof, Seller shall promptly deliver a true and complete copy of such Contract, together with all amendments, exhibits, attachments, waivers or other changes thereto, to Purchaser and Purchaser shall have the right to designate such Contract as an Assigned Contract by delivering written notice thereof promptly thereafter but in no event later than 20 Business Days prior to the Closing.

(f)     During the period from the date of this Agreement through the earlier of the Closing and the termination of this Agreement (the "Interim Period"), except (x) as expressly permitted or contemplated by this Agreement or necessary to effectuate the transactions contemplated by this Agreement, (y) as required by applicable Law or Order (including any action taken, or omitted to be taken, in response to the COVID-19 pandemic, that is required by Law or Order), or (z) as otherwise consented to by Purchaser in writing (which consent shall not be unreasonably withheld, conditioned or delayed), Seller shall (a) operate in the Ordinary Course of Business, (b) maintain the Transferred Assets in substantially the same condition as of the date of this Agreement, ordinary wear and tear, casualty and condemnation excepted and (c) Seller shall not, and shall cause each of its Subsidiaries not to:

(i)     sell, transfer or otherwise dispose of any of the Transferred Assets, other than Transferred Assets that are obsolete or have de minimis value;

(ii)     sell, transfer, dispose, disclose, abandon, dedicate to the public, or license to any other Person any of the Transferred Intellectual Property;

(iii)     enter into any material contract binding on the Transferred Assets (including any lease, sublease, license or other agreement for the use or occupancy of all or any portion of the Facility), or amend, modify, waive, release or assign any material Assigned Contract;

(iv)     terminate or reduce any insurance coverage covering the Transferred Assets;

(v)     declare, set aside, make or pay any cash dividends or other cash distributions in respect of any of its or its Subsidiaries' capital stock, other than any dividends or distributions by a Subsidiary of Seller to Seller or to any other Subsidiary of Seller;

(vi)     remove any personal property from the Facility other than in the Ordinary Course of Business;

32


2021TW-L-K-5359          `2

(vii)     demolish or remove any of the existing Improvements, or erect new Improvements on the Real Property or any portion thereof without the prior approval of Purchaser;

(viii)     in respect of the Transferred Assets, (A) settle or compromise any material Tax Liability or claim,  (B) enter into any closing agreement relating to any Tax, (C) agree to an extension of a statute of limitations in respect of Taxes, or (D) incur any material Liability for Taxes other than in the Ordinary Course of Business consistent with past practice; or

(ix)     incur any Lien on any Collateral other than Permitted Liens;

(x)     incur any indebtedness for borrowed money or issue or sell any debt securities (collectively, "Indebtedness"), other than unsecured Indebtedness that is junior or pari passu to Seller's obligation to repay the Secured Obligations pursuant to Section 9.2;

(xi)     change the compensation, incentive arrangements or other benefits to any Requested Employee, except for increases or bonuses made in the Ordinary Course of Business consistent with past custom and practice;

(xii)     with respect to any Requested Employee:   (1) increase the compensation or benefits of, or grant any severance, retention or termination pay to (or enter into or amend any contract providing for such pay), except as required by applicable Law or in the Ordinary Course of Business consistent with past practice; (2) enter into (or adopt) any new, or amend any existing Employee Benefit Plan, except as required by applicable Law; (3) except for bonuses not to exceed $250,000 in the aggregate or $15,000 for any individual, make any bonus, commission or incentive compensation payment outside the Ordinary Course of Business; or (4) enter into any collective bargaining agreements; or

(xiii)     agree or commit to do any of the foregoing.

(g)     During the Interim Period, Seller shall provide Purchaser and its representatives and contractors access to the Facility for purposes of investigating its physical and environmental condition, including with respect to Releases of Hazardous Substances; compliance with Environmental Law and the BUSTR Covenant and Environmental Covenant; and the presence or potential presence of ACM, LBP, and/or ILM.  Purchaser shall provide Seller with at least two (2) Business Days' prior written notice of its desire to enter upon the Facility for purposes of this investigation.   Any such investigation shall be conducted at a time and manner reasonably approved by Seller and subject to such reasonable workplace health and safety practices which Seller has in place for the Facility. Purchaser shall not be permitted to collect any soil, soil gas, groundwater, or indoor air samples without first (i) providing Seller with a detailed work plan identifying the applicable consultant and the type and specific locations of all proposed testing, and (ii) obtaining Seller's prior written consent thereto, which consent Seller may give or withhold in Seller's sole and absolute discretion. If desired, Purchaser's consultant may, as part of a survey of the potential presence of such materials, collect samples of suspect ACM, LBP, or ILM-containing materials in accordance with industry standards.

(h)     Seller shall, and Purchaser shall, or shall cause its Affiliate to, use their commercially reasonable best efforts to agree upon and finalize the Contract Manufacturing Agreement and the Lease on or before April 30, 2022.

33



(i)     Purchaser and Seller shall use their commercially reasonable best efforts to enter into the Support Agreement during the Interim Period.  Seller and Purchaser shall use their commercially reasonable efforts (which will not include the provision of any financial consideration) to (A) terminate the GM Option on or before the Closing and (B) cause to be released of record each of (x) the Memorandum of Options, dated February 11, 2020, between General Motors LLC and Seller, (y) the Memorandum of Options, dated November 5, 2020, between Ultium Cells LLC and Seller and (z) the Memorandum of Purchase Agreement, dated November 5, 2020, between Ultium Cells LLC and Seller, in each case on or before Closing.

(j)     Purchaser and Seller shall use their commercially reasonable best efforts to enter into a licensing agreement pursuant to which Seller licenses to Purchaser Seller's Intellectual Property relating to its frame, rolling chassis and other technologies, subject to reasonable royalties or licensing fees and other terms mutually agreed to by the Parties.

(k)     Prior to the Closing, Purchaser and Seller shall use their commercially reasonable efforts to enter into a joint venture agreement (the "Joint Venture Agreement") pursuant to which: (A) Seller and Purchaser shall allocate engineering resources to jointly design, engineer, develop, validate, industrialize, and launch vehicle programs ("CV Programs") for the commercial vehicle market in North America and internationally using Purchaser's MIH open platform;  (B) Seller shall have the right to commercialize  CV Programs in North America, subject to satisfying reasonable volume requirements and other customary conditions as well as the payment of reasonable and mutually agreed-upon licensing fees to Purchaser; (C) Purchaser shall have the right to manufacture any CV Vehicles manufactured in North America at the Facility, subject to negotiation and execution of a competitive contract manufacturing agreement; (D) Purchaser shall have the right to commercialize CV Programs outside North America, subject to satisfying reasonable volume requirements and other customary conditions as well as the payment of reasonable and mutually-agreed upon licensing fees to Seller.  In connection with or prior to the execution of the Joint Venture Agreement, Seller or one or more of its Affiliates shall join the MIH Consortium and the Open EV Alliance as a vehicle engineering and development partner OEM. The Joint Venture Agreement shall also provide for the sharing of intellectual property rights commensurate with the parties' respective contributions.

(l)     Seller shall use its commercially reasonable efforts to cooperate with, and support, Purchaser in its efforts to obtain economic and/or Tax incentives from the applicable Governmental Authorities in connection with its ownership and operation of the Business and the Transferred Assets; provided, that Seller shall have no obligation to cooperate or support Purchaser pursuant to this Section 4.1(l) unless Purchaser shall have agreed to reimburse Seller for its reasonable and documented out-of-pocket third party expenses incurred in connection with such efforts.

(m)     Parent and Seller shall maintain a minimum cash balance of at least (i) $100,000,000 from the date of this Agreement through January 1, 2022, (ii) $50,000,000 from January 1, 2022 through March 1, 2022 and (iii) $30,000,000 from March 1, 2022 through the Closing.

(n)     During the Interim Period, Seller shall preserve and maintain the security interests granted under the Collateral Documents, including taking any such action at its cost and

34

expense to promptly discharge any Lien (other than Permitted Liens) on any Collateral and other security from time to time furnished under the Collateral Documents, and undertake all actions which are necessary or appropriate to (i) maintain Purchaser's first priority security interest in and Lien on the Collateral or such other security in full force and effect at all times, and (ii) preserve and protect the Collateral or such other security and protect and enforce Seller's rights and title and the rights of Purchaser to the Collateral or such other security, including the making or delivery of all filings and recordations, the payment of all fees and other charges and the issuance of supplemental documentation requested by Purchaser.

(o)        During the Interim Period, Seller shall (i) within 25 days after the end of each month, furnish to Purchaser the unaudited consolidated statements of income and cash flow and balance sheet as of the end of such month of Parent, which shall be prepared in accordance with generally accepted accounting principles consistently applied (the "<u>Financial Statements</u>") and (ii) afford Purchaser and its Representatives reasonable access during business hours to (x) the officers and employees of Sellers and (y) the books of account, general, financial and operating records, invoices and other documents, records and files of Seller, including bank statements, records and files necessary to review and monitor weekly cash balances and disbursements; provided, that Seller shall not be obligated to provide such access or information if doing so would violate any applicable Law.

(p)        At least 10 Business Days prior to Closing, Seller shall provide to Purchaser a true and correct record of all changes in location to material Facility FF&E since the date of this Agreement so as to permit Purchaser to be able to reasonably locate such Facility FF&E.

(q)        No later than 11:59 p.m. on November 18, 2021, Seller shall provide to Purchaser a budget of weekly cash receipts, disbursements, and net cash flow for the immediately following thirteen (13) week period in a form and with sufficient detail as reasonably agreed by Purchaser (the "<u>Initial Cash Budget</u>").  No later than 11:59 p.m. Eastern Time on the Thursday of the fifth week of the Initial Cash Budget and the fifth week of each Updated Cash Budget during the Interim Period thereafter, Seller shall provide to Purchaser: (i) an updated cash forecast for the following thirteen (13) weeks (an "<u>Updated Cash Budget</u>"), and (ii) a variance analysis comparing (x) the previous 4 weeks of forecast from the respective previously submitted cash budget and (y) the actual cash receipts, disbursements, and net cash flow for the immediately preceding and comparable 4 week period.

Section 4.2        <u>Seller Names.</u>

(a)        Purchaser acknowledges that the Seller Names are and shall remain the property of Seller or its respective Affiliates and that nothing in this Agreement shall transfer or license, or shall operate as an agreement to transfer or license, any right, title or interest in the Seller Names to Purchaser or any Affiliate of Purchaser.

(b)        Purchaser acknowledges and agrees that it is expressly prohibited from making any use of the Seller Names and shall, at its own expense and as soon as practicable, but in no event later than 60 days after the Closing Date, remove, mask, or otherwise obfuscate the Seller Names from all Transferred Assets to the extent it is reasonably possible to do so.

Section 4.3      Taxes.

(a)      After the Closing, Seller and Purchaser shall reasonably cooperate in preparing and filing all Tax Returns to the extent such filing requires one Party to provide necessary information, records and documents relating to the Transferred Assets to the other Party. Seller and Purchaser shall cooperate in the same manner in defending or resolving any audit, examination or litigation relating to Taxes. Purchaser shall deliver to Seller drafts of any Tax Returns with respect to the Transferred Assets for any Tax period (or portion thereof) ending prior to the date of this Agreement at least 30 days prior to the due date for filing any such Tax Returns; provided, however, that if any such Tax Return is due fewer than 45 days after the Closing Date, Purchaser shall deliver such drafts to Seller as soon as reasonably practicable. Purchaser shall consider in good faith any comments provided by Seller in writing prior to the due date for filing with respect to any such Tax Return. Purchaser shall not settle, compromise or otherwise resolve any audit, examination or litigation relating to Taxes for any Tax period (or portion thereof) ending prior to the date of this Agreement without Seller's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed).

(b)      For all purposes under this Agreement (including the determination of Seller Taxes), (i) in the case of any Ad Valorem Taxes, the portion of such Tax attributable to any Pre-Signing Tax Period shall be deemed to be the amount of such Tax for the entire Signing Straddle Period *multiplied by* a fraction the numerator of which is the number of days in the portion of the Signing Straddle Period ending on the end of the date that is one day prior to the date hereof and the denominator of which is the number of days in the entire Signing Straddle Period, and (ii) in the case of any Tax based upon or related to income, sales, payroll, or receipts imposed with respect to the Transferred Assets or the Transferred Employees, the portion of such Tax for a Straddle Period attributable to any Pre-Closing Tax Period shall be deemed equal to the amount which would be payable if the relevant taxable period ended on the end of the Closing Date.

(c)      Each of Purchaser and Seller shall pay one-half of all sales, use, transfer, real property transfer and conveyance fees, value added, recording, registration, stamp, stamp duty or similar Taxes and fees and all formalities and recording costs, arising out of the transfer of the Transferred Assets pursuant to this Agreement and all costs and expenses incurred in connection with the transferring and recording of title to the Transferred Assets (collectively, "Transfer Taxes"). The Tax Returns relating to such Transfer Taxes shall be timely prepared by the Party legally obligated to make such filing. Seller and Purchaser agree to cooperate with each other in connection with the preparation and filing of such Tax Returns, in obtaining all available exemptions from such Transfer Taxes and in timely providing each other with resale certificates and any other documents necessary to satisfy any such exemptions.

(d)      Purchaser shall give written notice to Seller of the receipt of any notice by Purchaser or any of its Affiliates that involves the assertion of any claim for Taxes or the commencement of any Proceeding or audit with respect to Taxes for which Seller could have an indemnification obligation pursuant to this Agreement (each, a "Tax Claim"); provided, however, that the failure of Purchaser to give such prompt notice shall not affect Seller's indemnification obligations under this Agreement except to the extent Seller is materially prejudiced thereby. Seller may (at its own expense), participate fully in and control the defense of a Tax Claim and to employ counsel of its choice for such purpose, provided that (i)  Seller provides such written notice within

36

10 days after receiving notice from Purchaser of such Tax Claim, (ii) Seller shall thereafter consult with Purchaser upon Purchaser's reasonable request for such consultation from time to time with respect to such Proceeding, and (iii) Seller shall not, without the Purchaser's prior written consent (not to be unreasonably withheld, conditioned, or delayed), agree to any settlement of or appeal any adverse determination with respect to such Tax Claim. Purchaser shall have the right to control any Tax Claim that is not controlled by Seller pursuant to this Section 4.3(d); provided, that Purchaser shall not, without Seller's prior written consent (not to be unreasonably withheld, conditioned or delayed), agree to any settlement of or appeal of any adverse determination with respect to such Tax Claim. In the event of any conflict between the provisions of this Section 4.3(d) and Sections 8.5, 8.6, or 8.7 with respect to any audit, Proceeding, or other examination relating to Taxes, the provisions of this Section 4.3(d) shall control.

(e)     Any refunds (or credits for overpayment) of Taxes, including any interest received from a Governmental Authority thereon, attributable to any Tax period (or portion thereof) ending before the Closing Date shall be for the account of Seller. Within ten (10) days of any receipt by Purchaser or any of its Affiliates of any such refund (or credit for overpayment), Purchaser shall pay over any such refund (or the amount of any such credit), including any interest thereon, to Seller.

(f)     Purchaser and its Affiliates shall not amend any Tax Returns, make or change any Tax election, file any Tax Returns in a jurisdiction where Seller has not historically filed Tax Returns, initiate discussions or examinations with any Tax authority, or make any voluntary disclosures, in each case with respect to any Seller Taxes.

Section 4.4    Notice Regarding Environmental Covenant and BUSTR Covenant.

(a)     Purchaser acknowledges and agrees that a portion of the Real Property being conveyed pursuant to this Agreement and the Limited  Warranty Deed is subject to the activity and use limitations and to the rights of access set forth in the Environmental Covenant, and that the Notice and Acknowledgement of Conveyance of Environmental Covenant being delivered at the Closing shall constitute the notice required to be delivered under Section 7 of the Environmental Covenant. Purchaser shall notify the Ohio Environmental Protection Agency and the United States Environmental Protection Agency within 30 days after the date of this Agreement, which notice shall include (i) the name, address and telephone number of Purchaser, (ii) a copy of the Special Warranty Deed, (iii) a legal description of the Real Property, (iv) a survey map of the Real Property, (v) the date of this Agreement and (vi) a written acknowledgment by Purchaser that it is bound by the Environmental Covenant. From and after the Closing, Purchaser shall constitute the "Owner" under the Environmental Covenant, and Purchaser shall, and shall cause any subsequent transferee of any interest in the Restricted Area to, perform all obligations and comply with all requirements applicable to "Owner" set forth therein, including those set forth in Section 7 of the Environmental Covenant with respect to any subsequent conveyance of any interest in the Restricted Area.

(b)     Purchaser acknowledges and agrees that a portion of the Real Property being conveyed pursuant to this Agreement and the Limited  Warranty Deed is subject to the activity and use limitations and to the rights of access set forth in the BUSTR Covenant. Purchaser acknowledges and agrees that the BUSTR Covenant is binding upon Purchaser and runs with the

37

land and that the Limited Warranty Deed shall include a notification substantially in the form provided in Section 9 of the BUSTR Covenant. Purchaser agrees to notify Seller and State of Ohio, Division of the State Fire Marshal, Bureau of Underground Storage Tank Regulations ("BUSTR") within 30 days after the date of this Agreement, which notice shall include (i) the name, address and telephone number of Purchaser, (ii) a copy of the Limited Warranty Deed, (iii) a legal description of the Real Property, (iv) a survey map of the Real Property, and (v) the date of this Agreement. From and after the Closing, Purchaser shall constitute the "Owner" under the BUSTR Covenant, and Purchaser shall, and shall cause any subsequent transferee of any interest in the Restricted Area to, perform all obligations and comply with all requirements applicable to "Owner" set forth therein, including those set forth in Section 9 of the BUSTR Covenant with respect to any subsequent conveyance of any interest in the Restricted Area.

(c)     Purchaser and its applicable Affiliates shall be liable and responsible for obtaining, modifying or transferring all Environmental Permits required for the ownership of the Transferred Assets and the operation of the Facility from and after the Closing, including to the extent applicable obtaining the required Consents with respect to transferring Environmental Permits.

Section 4.5     <u>Consents and Approvals.</u>

(a)     Purchaser acknowledges that the Consents set forth on <u>Schedule 3.2(b)(iii)</u> may be required from third parties with respect to the applicable Assigned Contracts and that such Consents have not been obtained as of the date hereof. Purchaser agrees that neither Seller nor any of its Affiliates shall have any Liability whatsoever to Purchaser arising out of or relating to the failure to obtain any such Consents (other than the Required Consents) except to the extent arising out of Sellers' Fraud, violation of Law, breach of Contract or breach of this Agreement. Seller agrees to exercise commercially reasonable efforts to obtain as soon as practicable after the date of this Agreement the any such Consents contemplated by this <u>Section 4.5</u> in respect of the Assigned Contracts.

(b)     If any third-party Consent has not been obtained prior to the Closing with respect to any Assigned Contract as contemplated by <u>Section 4.5(a)</u>, then until such time as such Consent is obtained, (i) Purchaser shall be entitled to the benefits of the Assigned Contract in question accruing after the Closing to the extent (and only to the extent) that Seller or its applicable Affiliate may provide such benefits (A) without violating the terms of such Assigned Contract or any Law and (B) without incurring any material expense or otherwise taking any material actions or measures (including hiring additional employees), (ii) Purchaser shall perform, at its sole cost and expense, the obligations of Seller or such Affiliate to be performed after the Closing under the Assigned Contract in question and (iii) Purchaser shall indemnify the Seller Indemnified Parties against, be liable to the Seller Indemnified Parties for and hold each Seller Indemnified Party harmless from, any and all Losses incurred or suffered by each Seller Indemnified Party in connection with any such arrangement or any such Assigned Contract; provided, however, that in no event shall Purchaser be entitled to receive such benefits beyond the term of any Assigned Contract and neither Seller nor any of its Affiliates shall have any obligation to renew or replace any Assigned Contract upon the expiration or termination thereof.

Section 4.6     Confidentiality. Except for disclosures expressly permitted by the terms of the Confidentiality Agreement, Purchaser shall hold, and shall cause its Representatives to hold, all information received, directly or indirectly, from Seller or its Representatives in confidence in accordance with the Confidentiality Agreement. The Confidentiality Agreement shall survive any termination of this Agreement; provided, however, to the extent of any conflict between the provisions of the Confidentiality Agreement and this Agreement, the terms of this Agreement shall govern.

Section 4.7     No Solicitation of Transactions.

(a)     Parent agrees that (i) Parent and its Subsidiaries shall not, and (ii) Parent and its Subsidiaries shall use their reasonable best efforts to ensure that their respective Representatives shall not, directly or indirectly, (A) solicit, initiate or knowingly encourage the making of any proposal that constitutes or is reasonably likely to lead to a Transaction Proposal, (B) enter into, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any Person any of Parent's or its Subsidiaries' confidential information with respect to, any Transaction Proposal or (C) enter into any Transaction Proposal Documentation with respect to a Transaction Proposal. Parent shall, shall cause its Subsidiaries to, and shall direct its Representatives to, immediately cease and cause to be terminated all then existing discussions and negotiations with any Person conducted theretofore with respect to any Transaction Proposal.

(b)     In addition to the obligations of Parent and Seller set forth in Section 4.7(a), Parent and Seller shall as promptly as reasonably practicable advise Purchaser of the receipt of any Transaction Proposal after the date of this Agreement and the material terms and conditions of any such Transaction Proposal. Parent and Seller shall keep Purchaser reasonably informed of any material developments with respect to any such Transaction Proposal (including any material changes thereto).

Section 4.8     HSR Act and Other Filings and Consents.

(a)     The Parties shall cooperate with one another in submitting any required filings with any Governmental Authority, or any required actions, consents, approvals or waivers from any party to any Contract, in connection with the consummation of the transactions contemplated by this Agreement, including any filings required under the HSR Act and any other antitrust laws. Purchaser and Seller shall share equal responsibility for all filing fees required under the HSR Act.  The Parties shall submit any filings required under the HSR Act as promptly as practicable, but in no event later than five (5) Business Days following the execution and delivery of this Agreement.

(b)     Each Party shall use its respective commercially reasonable efforts to obtain requisite clearances and approvals under the HSR Act and any other antitrust laws. Each Party shall coordinate and cooperate with the other Parties in connection with such efforts, including keeping the other Parties promptly informed of any material communication received from any Governmental Authority, including the Federal Trade Commission or U.S. Department of Justice, and providing the other Parties with reasonable opportunities to review and comment on proposed communications with any Governmental Authority and consult and participate, if possible, in meetings with any Governmental Authority. Each Party shall promptly provide the other Party

4834-8099-7884.32
2021TW-L-K-5359                    `2

with copies of all written communications from any Governmental Authority relating to antitrust laws.

(c)     Except as specifically required by this Agreement, neither Party shall knowingly take any action, or knowingly refrain from taking any action, the effect of which would be to delay or impede the ability of the Parties to consummate the transactions contemplated by this Agreement.

Section 4.9     Regulatory Authorizations.

(a)     Seller, on the one hand, and Purchaser, on the other hand, shall use reasonable best efforts to work cooperatively together to, as promptly as reasonably practicable, complete governmental processes pursuant to Section 721 in connection with this Agreement. Seller and Purchaser shall: (i) as promptly as reasonably practicable, and in any event within twenty (20) Business Days from date of signing of this Agreement, submit a draft joint voluntary notice ("Draft CFIUS Notice") to CFIUS and complete the consultation process contemplated by 31 C.F.R. § 800.501(g) with respect to the contemplated transaction; (ii) as promptly as practicable and, in any event, within five (5) Business Days of CFIUS notification that the Draft CFIUS Notice meets the requirements of 31 C.F.R. § 800.502 and is, accordingly, complete, file with CFIUS  the formal Joint Voluntary Notice as contemplated by 31 C.F.R. § 800.501(a); (iii) provide CFIUS with additional or supplemental information responsive to any requests from CFIUS or its member agencies during the CFIUS process within the time frame designated by CFIUS; and (iv) use their respective reasonable best efforts to, as promptly as practicable, obtain CFIUS Clearance and to prevent impediments to consummation of the contemplated transactions hereunder, provided, however, that Purchaser shall be required to accept CFIUS mitigation terms so long as the mitigation measures, individually or in the aggregate, would not have a "Material Adverse Effect". Solely for purposes of this Section 4.9(a), a "Material Adverse Effect" means CFIUS mitigation terms that require:

(i)     selling or otherwise disposing of, or holding separate and agreeing to sell or otherwise dispose of, key assets or key categories of assets or businesses of Purchaser or its Affiliates that are material to Purchaser's or its Affiliates' investments and operations in electric vehicle manufacturing;

(ii)     terminating existing key relationships, contractual rights or obligations of Purchaser or its Affiliates that are material to Purchaser's or its Affiliates' investments and operations in electric vehicle manufacturing;

(iii)     terminating any existing or contractually planned key venture or other arrangement of Purchaser or its Affiliates that are material to Purchaser's or its Affiliates' investments and operations in electric vehicle manufacturing; or

(iv)     restricting or adversely impacting in a material manner a key business line or business opportunity of Purchaser or any of its Affiliates that is not focused on electric vehicle manufacturing.

(b)     Each of Purchaser and the Seller shall promptly notify the other Party of any substantive communication it or any of its Affiliates receives from any Governmental

2021TW-L-K-5359                    `2

Authority relating to the matters that are the subject of this Agreement and permit the other party to review in advance any proposed communication by such party to any Governmental Authority to the extent that it does not contain confidential business information, the Government Authority has requested or directed that the communication not be shared, or sharing of the information would waive a privilege. Subject to the Confidentiality Agreement and the requirements of applicable Law, the Parties will provide each other with copies of all substantive correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement so long as that they do not contain confidential business information, the Government Authority has requested or directed that the correspondence, filings or communications not be shared, or sharing of the information would waive a privilege. Purchaser and Seller shall split equally all filing fees in connection with the submission of the CFIUS Notice.

Section 4.10    Non-Solicitation; Non-Competition.

(a)    Commencing from the date hereof and ending on the earlier to occur of (a) the first anniversary of the Closing Date and (b) the first anniversary of the termination of this Agreement in accordance with its terms, except pursuant to Article V, none of Purchaser or any of its Affiliates shall, directly or indirectly solicit for employment or hire any employee of Seller or its Affiliates, or solicit, induce or encourage any employee of Seller or its Affiliates to leave, alter or cease his or her relationship with Seller; provided, however, that this Section 4.10 shall not apply with respect to Purchaser or any of its Affiliates (i) soliciting or employing any employee whose employment with Seller or its Affiliates has been terminated at least six (6) months prior to such solicitation or employment, (ii) causing to be placed any general advertisements in newspapers and/or other media of general circulation (including advertisements posted on the Internet or social media), (iii) engaging any recruiting firm or similar organization to conduct a search on behalf of Purchaser or any of its Affiliates that is not targeted specifically at any employees of Seller or any of its Affiliates.

(b)    During the period from the Closing Date until April 30, 2024, none of Purchaser or any of its Affiliates shall start the production of any commercial full size electric pickup truck at the Facility, other than pursuant to a contact manufacturing agreement between the Parties, so long as a contract manufacturing agreement is in effect between the Parties.

Section 4.11    Casualty or Condemnation Loss.

(a)    If all or any portion of the Transferred Assets shall, prior to the Closing Date, be materially (i.e., more than $75,000,000) damaged or destroyed as a result of a Casualty Event, then Purchaser may elect, in its sole discretion, to terminate this Agreement by written notice to Seller. Such election to terminate must be made within thirty (30) days of the date of the Casualty Event. If Purchaser does not exercise its right to terminate within said thirty (30) day time period, then this Agreement shall remain in force and effect and the terms set forth in Section 4.11(b) shall control.

(b)    If all or any portion of the Transferred Assets shall, prior to the Closing Date, be damaged or destroyed as a result of a Casualty Event to a non-material extent (i.e.,

4834-8099-7884.32
2021TW-L-K-5359                    `2


$75,000,000 or less), Purchaser and Seller shall remain obligated to perform this Agreement. Seller shall provide prompt written notice to Purchaser upon the occurrence of a Casualty Event. Purchaser shall, within 45 days of receiving notice of the Casualty Event, elect in writing to either have (i) Seller cause the Transferred Assets affected by any such Casualty Event to be repaired, replaced or restored to Purchaser's reasonable satisfaction to at least the same condition as such Transferred Assets were in prior to such Casualty Event, at Seller's sole cost (but only to the extent of Seller's receipt of insurance proceeds or awards, as promptly as reasonably practicable, or (ii) Purchaser shall receive all sums paid to Seller by third parties by reason of such Casualty Event to the extent (and only to the extent) attributable to the Transferred Assets and shall assign, transfer and set over to Purchaser or subrogate Purchaser to all of Seller's right, title and interest (if any) in insurance claims, unpaid awards, and other rights against third parties arising out of such Casualty Event to the extent (and only to the extent) attributable to the Transferred Assets; provided, however, that Seller will reserve and retain (and Purchaser will assign to Seller) all rights, title and interests and claims against third parties for the recovery of Seller's costs and expenses incurred prior to the Closing in pursuing or asserting any such insurance claims or other rights against third parties.

(c)     If the Closing or the Outside Termination Date is expected to occur prior to the expiration of the 45 day period referenced in <u>Section 4.11(b)</u>, then the Closing Date and the Outside Termination Date, as applicable, shall be postponed, if necessary, to 30 days after Purchaser's election in <u>Section 4.11(b)</u>.

ARTICLE V
EMPLOYEES AND EMPLOYEE BENEFITS

Section 5.1     <u>Transferred Employees.</u>     Seller shall cooperate with and shall make available to Purchaser, to the extent permitted by applicable Law, all information and documents as may be necessary to assist and coordinate the employment by Purchaser of the Requested Employees; provided, however, that any offer of employment by Purchaser to a Requested Employee shall be expressly contingent upon that Requested Employee executing, in a form reasonably acceptable to Seller, a written general release of claims, including a waiver of any severance, termination or similar benefit that arises from Seller's termination of that Requested Employee's employment (the "<u>Waiver</u>").

Section 5.2     <u>Timing of Offers to Requested Employees</u>.     Commencing after the satisfaction of the condition set forth in <u>Section 6.1(b)</u>, Purchaser may, at any time or from time to time thereafter, offer employment in writing, effective as of such date as may be determined by Purchaser (but in no event later than the Closing Date), to any of the Requested Employees; provided, that (a) if such offer contemplates a Hiring Date prior to the anticipated Closing Date, Purchaser obtains Seller's written consent prior to making such offer (including any such consent obtained on or prior to the date hereof), (b) such offer is subject to the Waiver and (c) such offer of employment shall have been made to all Requested Employees no later than 20 Business Days prior to the Closing. Purchaser agrees that, in the event a Requested Employee declines Purchaser's offer of employment, Purchaser shall not make a subsequent offer of employment to that Requested Employee for at least twelve (12) months after the original offer is declined.

Section 5.3    Terms of Requested Employee Offers.

(a)    Each written offer to a Requested Employee shall:

(i)    advise the Requested Employee of his or her position with Purchaser, which position shall be a position requiring comparable skills and abilities as his or her position immediately prior to the applicable Hiring Date, and at the same geographic work location;

(ii)    state an annual base salary (or base hourly wage rate, as applicable), incentive compensation and benefits, which shall be reasonably competitive with market rates and shall be substantially comparable in value, when taken as a whole, to those to which such Requested Employee was provided or entitled prior to the applicable Hiring Date (excluding equity-based compensation).

(b)    Purchaser shall be responsible for any severance payable to any Transferred Employee whose employment with Purchaser or its Affiliates is terminated after the Hiring Date.

Section 5.4    Vacation.

(a)    Except to the extent otherwise required by applicable Law, Purchaser shall assume (and Seller shall be relieved of) all Liabilities for all accrued but unused vacation benefits of the Transferred Employees (the "Assumed Vacation Liabilities"), which, for each such Transferred Employee, shall be identified by Seller in the form of Schedule 5.4(a) and included as part of the Estimated Statement delivered pursuant to Section 2.3(c). The Purchase Price shall be reduced by the aggregate dollar value of the Assumed Vacation Liabilities, and Purchaser's assumption of the Assumed Vacation Liabilities shall be contingent upon such Purchase Price reduction being provided to Purchaser. Purchaser shall permit each Transferred Employee, during the balance of the calendar year in which such Transferred Employee becomes an employee of Purchaser, (i) to accrue additional vacation days, if any, to which such Transferred Employee would have been entitled for such calendar year under the vacation policy of Seller and its Affiliates covering such Transferred Employee immediately prior to the Closing Date at the rate applicable to such Transferred Employee under such vacation policy and (ii) to take vacation days in respect of the amount of unused vacation assumed by Purchaser with respect to each such Transferred Employee and in respect of the amount of any vacation days accrued during the balance of the calendar year during which such Transferred Employee becomes an employee of Purchaser to the extent any such Transferred Employee could take vacation days under the vacation policy of Seller and its Affiliates covering such Transferred Employee immediately prior to the Closing.

(b)    For the first calendar year following the year in which such Transferred Employee becomes an employee of Purchaser, such Transferred Employee shall receive vacation benefits under the terms of the vacation benefit policies of Purchaser applicable to similarly situated employees of Purchaser and its Affiliates after giving vacation service credit for such Transferred Employee as provided in Section 5.4(a).

Section 5.5    Post-Hiring Benefits.

43

(a)      For each Transferred Employee, as of such Transferred Employee's Hiring Date, Purchaser and its Affiliates shall provide such Transferred Employee with employee benefits that satisfy the requirements of this Section 5.5.

(b)      Purchaser agrees to use commercially reasonable efforts to allow Transferred Employees to be eligible immediately on their Hiring Date to commence participation in the Purchaser Benefit Plans without regard to any eligibility period, waiting period, elimination period, evidence of insurability or medical certification requirements, or pre-existing condition limitations. Purchaser and its Affiliates will recognize all service of the Transferred Employees with Seller or any of its Affiliates and with any predecessor employer (to the extent such predecessor employer service was taken into account under the applicable Seller Benefit Plans) for purposes of eligibility and vesting (excluding vesting for equity-based compensation, change in control, retention and similar benefits) under all Purchaser Benefit Plans and for purposes of calculating vacation accrual under the vacation pay programs of Purchaser and its Affiliates applicable to the Transferred Employees. With respect to each Transferred Employee, Purchaser and its Affiliates further agree to use commercially reasonable efforts to provide credit for deductible, co-payment and out-of-pocket payments incurred by Transferred Employees under the Seller Benefit Plans that provide group health benefits for the year in which the Hiring Date occurs for such Transferred Employee under the Purchaser Benefit Plans that provide group health benefits.

(c)      As soon as practicable after the date of this Agreement, to the extent permitted by applicable Law, Purchaser shall establish or designate one or more Purchaser Benefit Plans that are defined contribution plans for the benefit of the Transferred Employees (the "Purchaser Savings Plan"), and take all necessary action to cause the Purchaser Savings Plan to be tax-qualified under the applicable provisions of the Code (to the extent the Purchaser Savings Plan is not so tax-qualified), and make any and all filings and submissions to the appropriate Governmental Authorities required to be made by Purchaser with respect to the establishment or designation of such Purchaser Savings Plan. Purchaser shall take all actions necessary to allow each Transferred Employee to make eligible rollover contributions to the Purchaser Savings Plan of their account balances, including loans, under the savings plans of Seller and its Affiliates as soon as practicable following such Transferred Employee's Hiring Date.

Section 5.6      Termination/Claims of Transferred Employees.

(a)      Purchaser shall bear the cost and expense of the termination by Purchaser or any of its Affiliates of the employment of any Transferred Employee on and after such Transferred Employee's Hiring Date.

(b)      Purchaser shall bear all Liability for any claims of any Transferred Employee arising out of the employment or termination of such Transferred Employee by Purchaser or any of its Affiliates on and after such Transferred Employee's Hiring Date.

Section 5.7      No Right to Continued Employment. Nothing contained in this Agreement shall confer upon any Transferred Employee any right to employment or continued employment with Purchaser or its Affiliates or interfere with the right of Purchaser or its Affiliates to relocate or terminate the employment of any of the Transferred Employees at any time after the Closing.

Nor shall anything contained in this Agreement be deemed to be an employee benefit plan, program or arrangement or the amendment of an employee benefit plan, program or arrangement.

Section 5.8    <u>Employee-Related Liabilities</u>.

(a)    Except for the Assumed Vacation Liabilities, Seller or its designated Affiliate shall retain all assets and Liabilities related to the Seller Benefit Plans whether incurred before, on or after the applicable Hiring Dates of the Transferred Employees, and neither Purchaser nor any of its Affiliates shall have any Liability with respect thereto. Except as otherwise expressly provided to the contrary in this <u>Article V</u>, Purchaser shall be liable and responsible for all Liabilities and obligations in respect of benefits accrued on and after the applicable Hiring Date by Transferred Employees under the Purchaser Benefit Plans, and neither Seller nor any of its Affiliates shall have any Liability with respect thereto.

(b)    Except as otherwise expressly provided to the contrary in this <u>Article V</u>, Seller and its Affiliates shall, in the Ordinary Course of Business (including with respect to the timing of any payments), retain, bear and discharge all Liabilities for claims of Transferred Employees incurred under the Seller Benefit Plans and Purchaser and its Affiliates shall bear and discharge all Liabilities for claims of Transferred Employees incurred under the Purchaser Benefit Plans.

Section 5.9    <u>Employee Matters Indemnity.</u> Purchaser shall indemnify the Seller Indemnified Parties against, be liable to the Seller Indemnified Parties for and hold each Seller Indemnified Party harmless from, any and all Losses incurred or suffered by each Seller Indemnified Party relating to (a) offers of employment made by Purchaser or its Affiliates to Requested Employees, (b) the hiring, employment or termination of the Transferred Employees by Purchaser or its Affiliates on and after the applicable Hiring Date, (c) all Liabilities and obligations in respect of Purchaser Benefit Plans or (d) any failure of Purchaser or its Affiliates to discharge their respective obligations under this <u>Article V</u> arising either before, on or after the applicable Hiring Date. Seller shall indemnify the Purchaser Indemnified Parties against, be liable to the Purchaser Indemnified Parties for and hold each Purchaser Indemnified Party harmless from, any and all Losses incurred or suffered by each Purchaser Indemnified Party relating to (a) the Seller's and its Affiliates' employment or termination of the Transferred Employees, or (b) except for the Assumed Vacation Liabilities, all Liabilities and obligations in respect of Seller Benefit Plans.

Section 5.10    <u>Workers' Compensation.</u> Except as otherwise provided under an applicable workers' compensation insurance policy or fund or as otherwise determined by an applicable Governmental Authority with respect to workers' compensation, Seller and its Affiliates shall be liable and responsible for all workers' compensation claims by any Transferred Employee arising out of any injuries and diseases first incurred, sustained or resulting from work-related exposures or conditions prior to such Transferred Employee's Hiring Date (regardless of whether the claim related thereto is filed after the applicable Hiring Date). Purchaser shall be liable and responsible for all workers' compensation claims by any Transferred Employee arising out of any injuries and diseases first incurred, sustained or resulting from work-related exposures or conditions on or after the Hiring Date for such Transferred Employee.

45

## ARTICLE VI
## CONDITIONS TO CLOSING

Section 6.1     <u>Conditions to Obligations of All Parties</u>.  The obligations of each Party under this Agreement to be performed at Closing shall be subject to the satisfaction, at or prior to the Closing, of the following conditions:

(a)     No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)     The applicable waiting periods, together with any extensions thereof, under the HSR Act shall have expired or been terminated.

(c)     CFIUS Clearance has been obtained.

Section 6.2     <u>Conditions to Obligations of Seller</u>. The obligations of Seller under this Agreement to be performed at Closing shall be subject to the satisfaction, at or prior to the Closing, of the following conditions:

(a)     The Purchaser Fundamental Representations in this Agreement shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date). The other representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects (without giving effect to any materiality qualifications therein) as of the Closing Date as though made on and as of the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date). Purchaser shall have delivered to Seller a certificate dated as of the Closing Date to that effect, duly executed by an authorized signatory.

(b)     Purchaser shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the Closing Date, and Purchaser shall have delivered to Seller a certificate dated as of the Closing Date to that effect, duly executed by an authorized signatory.

(c)     At Closing, and concurrently with the making of the deliveries by Seller as set forth in <u>Section 7.2</u>, Purchaser shall have delivered to Seller the deliveries contemplated by <u>Section 7.3</u>.

Section 6.3     <u>Conditions to Obligations of Purchaser</u>. The obligations of Purchaser under this Agreement to be performed at Closing shall be subject to the satisfaction, at or prior to the Closing, of the following conditions:

(a)     The Seller Fundamental Representations in this Agreement shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date). The other representations and warranties made by Seller in this Agreement shall be true and correct in all

respects (without giving effect to any materiality or material adverse effect qualifications therein) as of the Closing Date as though made on and as of the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date), except where the failure of such representations to be so true and correct would not have a Seller Material Adverse Effect. Seller shall have delivered to Purchaser a certificate dated as of the Closing Date to that effect, duly executed by an authorized signatory.

(b)     Each Consent set forth on Schedule 6.3(b) (the "Required Consents") shall have been obtained, and shall be in full force and effect.

(c)     Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the Closing Date, and Seller shall have delivered to Seller a certificate dated as of the Closing Date to that effect, duly executed by an authorized signatory.

(d)     At Closing, and concurrently with the making of the deliveries by Purchaser as set forth in Section 7.3, Seller shall have delivered to Purchaser the deliveries contemplated by Section 7.2.

(e)     Since the date of this Agreement, there shall not have been any event or circumstance which has resulted in a Seller Material Adverse Effect, and no event has occurred or circumstances exists that would reasonably be expected to result in a Seller Material Adverse Effect.

(f)     Purchaser shall have obtained a title insurance policy from the Title Company (which may be in the form of a mark-up of a pro forma of a commitment for an ALTA Owner's Title Insurance Policy 2021 Form for the Real Property issued by the Title Company prior to the Closing Date (the "Owner's Title Commitment", collectively with the Loan Title Commitment, the "Title Commitments"), insuring Purchaser's fee simple title to the Real Property as of the date of Closing (including all recorded appurtenant easements insured as separate legal parcels), with gap coverage from the Seller through the date of recording, subject only to Permitted Liens, in the amount that is the lesser of (i) the Purchase Price or (ii) the amount Purchaser reasonably determines to be the value of the Real Property insured thereunder (the "Owner's Title Policy", collectively with the Loan Title Policy, the "Title Policies"). The Owner's Title Policy shall include an extended coverage endorsement (insuring over the general or standard exceptions), ALTA Form 3.1 zoning (with parking and loading docks) and all other endorsements reasonably requested by Purchaser, in form and substance reasonably satisfactory to Purchaser. Each of Purchaser and Seller shall pay one half of all fees, costs and expenses with respect to the Owner's Title Commitment and Owner's Title Policy and endorsements.

(g)     Purchaser shall have obtained a survey for the Facility, dated no earlier than thirty (30) days prior to the date of Closing, prepared by a licensed surveyor reasonably satisfactory to Purchaser, and conforming to 2021 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys, including Table A Items Nos. 1, 2, 3, 4, 6(b), 7(a) and (b)(1), 8, 9, 11(a), 13, 14, 16, 17, and 19, and such other standards as the Title Company requires as a condition to the removal of any survey exceptions from the Owner's Title Policy, and certified to Purchaser, Purchaser's lender and the Title Company, in a form reasonably satisfactory to each of such parties

4834-8099-7884.32
2021TW-L-K-5359                    `2

(the "Survey"). The Survey shall not disclose any material encroachment from or onto any of the Real Property or any portion thereof or any other material survey defect which has not been cured or, provided the Title Company will issue a further assurance endorsement with respect to such defect, insured over to Purchaser's reasonable satisfaction prior to the Closing. Seller shall pay all fees, costs and expenses with respect to the Survey.

(h)    Purchaser shall have obtained a zoning report, at Seller's sole cost and expense, reasonably satisfactory in form and substance to Purchaser, that certifies to Purchaser, among other things, that the Facility complies in all material respects with all zoning and building code ordinances of the Governmental Authority having jurisdiction over the Facility and, if the Facility does not comply, identifies the areas of non-compliance.

## ARTICLE VII
## CLOSING

Section 7.1    Closing. Unless otherwise agreed to by the Parties, the Closing shall take place remotely by exchange of documents and signatures, at 10:00 a.m. (Eastern Time), on the second Business Day after all of the conditions to Closing set forth in Article VI are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Purchaser may mutually agree upon in writing. The date on which the Closing is to occur is referred to herein as the "Closing Date". The Closing may be conducted by overnight mail, e-mail and wire transfer. All transactions and deliveries required to be made or completed at the Closing pursuant to the terms of this Agreement shall be deemed to occur concurrently and none shall be deemed completed unless all are completed or are otherwise waived in a writing signed by Seller and Purchaser.

Section 7.2    Deliveries by Seller. At or prior to the Closing, Seller shall deliver, or cause to be delivered, to Purchaser each of the following:

(a)    the Bill of Sale and Assignment and Assumption Agreement, duly executed by Seller;

(b)    the Notice and Acknowledgement of Conveyance of Environmental Covenant and Notice Upon Conveyance, each duly executed by Seller;

(c)    the Limited Warranty Deed, duly executed and notarized by Seller;

(d)    a certificate from Seller with respect to Seller's status as a non-foreign person pursuant to Section 1445 of the Code;

(e)    an IRS Form W-9, duly completed and executed by the Seller;

(f)    to the extent not previously delivered, the Contract Manufacturing Agreement, duly executed by Seller;

(g)    the Lease, duly executed by Seller;

48


2021TW-L-K-5359                    `2

           (h)      the Warrant Agreement, duly executed by Parent and Parent's transfer agent;

           (i)      all Transfer Tax and other tax declarations as may be required by Law in connection with the transactions contemplated by this Agreement, duly executed and sworn to by Seller and, to the extent required, by the Title Company and all other documents customarily delivered by Seller in the jurisdiction;

           (j)      releases of all Liens, except for the Permitted Liens;

           (k)      such evidence of the authority of Seller to consummate the Closing as the Title Company may reasonably require, delivered to the Title Company;

           (l)      all documents reasonably required by the Title Company for the Closing and issuance of the Owner's Title Policy;

           (m)      a closing statement executed by Seller in form mutually acceptable to Seller and Purchaser, delivered to the Title Company; and

           (n)      a memorandum of lease, duly executed by Seller.

      Section 7.3    <u>Deliveries by Purchaser.</u> At or prior to the Closing, Purchaser shall deliver, or cause to be delivered, to Seller each of the following:

           (a)      the Bill of Sale and Assignment and Assumption Agreement, duly executed by Purchaser;

           (b)      (i) the Notice and Acknowledgement of Conveyance of Environmental Covenant and Notice Upon Conveyance, each duly executed by Purchaser, and (ii) evidence reasonably acceptable to Seller that the Ohio Environmental Protection Agency and the United States Environmental Protection Agency have accepted Purchaser's financial assurances required by the Environmental Covenant;

           (c)      to the extent not previously delivered, the Contract Manufacturing Agreement, duly executed by Purchaser or its Affiliate;

           (d)      the Lease, duly executed by Purchaser;

           (e)      a memorandum of Lease, duly executed by Purchaser;

           (f)      a release of security interest in all Excluded Assets, duly executed by Purchaser;

           (g)      all documents reasonably required by the Title Company for the Closing and issuance of the Owner's Title Policy;

           (h)      a written notice with respect to all Assigned Contracts that Purchaser intends to assume during the time periods set forth in this Agreement; and

4834-8099-7884.32



2021TW-L-K-5359          `2

          (i)      a closing statement executed by Purchaser in a form mutually acceptable to Seller and Purchaser, delivered to the Title Company.

<div align="center">

ARTICLE VIII
INDEMNIFICATION
</div>

Section 8.1    <u>Survival.</u> Except in the case of Fraud, in which case liability and any related representation and warranty shall continue indefinitely, the representations and warranties contained herein shall survive the Closing for a period of fifteen (15) months after the Closing; provided, however, that each of the Purchaser Fundamental Representations, the Seller Fundamental Representations and the representations and warranties contained in <u>Section 3.2(k)</u>, <u>Section 3.2(l)</u> and <u>Section 3.2(m)</u> shall survive the Closing and continue until 60 days after the statute of limitations (giving effect to any waiver, mitigation or extension thereof) applicable to the subject matter of such representations and warranties bars all claims with respect to such subject matter. No Party shall have any Liability with respect to claims first asserted in connection with any representation or warranty after the applicable survival period specified therefor in this <u>Section 8.1</u>. The covenants contained in this Agreement shall remain in full force and effect in accordance with their terms (or, if no survival period is specified, indefinitely); provided, however, that, if the Closing occurs, an Indemnifying Person shall have no Liability for any breach of or failure to perform any covenant or agreement contained herein that by its terms was to be performed prior to the Closing unless a Claim Notice in accordance with <u>Section 8.6</u> or <u>8.7</u> regarding such claim is given to the Indemnifying Person not later than the close of business on the date that is six months after the Closing.

Section 8.2    <u>Indemnification by Seller.</u> From and after the Closing, subject to the provisions of this <u>Article VIII</u> (including the limitations set forth in <u>Sections 8.1</u> and <u>8.4</u>), Seller shall indemnify Purchaser and its Affiliates (each, a "<u>Purchaser Indemnified Party</u>") against, be liable to the Purchaser Indemnified Parties for and hold each Purchaser Indemnified Party harmless from, any and all Losses incurred or suffered by each Purchaser Indemnified Party to the extent arising out of any of the following:

          (a)      any breach of or inaccuracy in any representation or warranty made by Seller in <u>Article III</u>;

          (b)      any breach of or failure by Seller to perform any covenant or obligation of Seller contained in this Agreement;

          (c)      any Excluded Asset or Retained Obligation; or

          (d)      as expressly set forth in <u>Sections 5.9</u> and <u>10.17</u>.

Additionally, from the date hereof until the Closing, subject to the provisions of this <u>Article VIII</u> (including the limitations set forth in <u>Sections 8.4</u> and <u>8.9</u>), Seller shall indemnify the Purchaser Indemnified Parties against, be liable to the Purchaser Indemnified Parties for and hold each Purchaser Indemnified Party harmless from, any and all Losses incurred or suffered by each Purchaser Indemnified Party to the extent arising out of any of the following:

(i)    any breach of or inaccuracy in any representation or warranty made by Seller in the Security and Mortgage Agreement (a "<u>Mortgage Representation Breach</u>"); or

(ii)    any breach of or failure by Seller to perform any covenant or obligation of Seller contained in the Security and Mortgage Agreement.

Section 8.3    <u>Indemnification by Purchaser.</u> From and after the Closing, subject to the provisions of this <u>Article VIII</u> (including the limitations set forth in <u>Sections 8.1</u> and <u>8.4</u>), Purchaser shall indemnify Seller and its Affiliates (each, a "<u>Seller Indemnified Party</u>") against, be liable to the Seller Indemnified Parties for and hold each Seller Indemnified Party harmless from, any and all Losses incurred or suffered by each Seller Indemnified Party to the extent arising out of any of the following:

(a)    any breach of or inaccuracy in any representation or warranty made by Purchaser in <u>Article III;</u>

(b)    any breach of or failure by Purchaser to perform any covenant or obligation of Purchaser contained in this Agreement;

(c)    any Assumed Obligation;

(d)    any Transferred Asset; or

(e)    as expressly set forth in <u>Sections 5.9</u> and <u>10.17</u>.

Section 8.4    <u>Limitations on Liability.</u>

(a)    IN NO EVENT SHALL ANY PARTY HERETO NOR ANY AFFILIATE OF ANY PARTY HAVE ANY LIABILITY UNDER THIS AGREEMENT OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY FOR ANY SPECIAL, PUNITIVE, EXEMPLARY, SPECULATIVE, INDIRECT, REMOTE OR CONSEQUENTIAL DAMAGES, EXCEPT TO THE EXTENT THE SAME IS AWARDED TO A THIRD PARTY IN CONNECTION WITH A THIRD PARTY CLAIM.

(b)    For the purpose of determining the amount of Loss, any "material," "material respects," "materiality," or "Material Adverse Effect" (which shall instead be read as adverse effect or change) qualifiers or words of similar import contained in such representation or warranty shall in each case be disregarded and without effect. If the Closing occurs, in no event shall any Party be entitled to rescission of the transactions consummated hereby.

(c)    For purposes of determining the amount of Losses for each indemnifiable claim against an Indemnifying Person (and any indemnification payments required to be made by such Indemnifying Peron), Losses shall be reduced by (i) any third-party insurance proceeds actually recovered with respect thereto, (ii) any indemnity, contributions or other similar payment actually received from any third party with respect thereto, and (iii) any Tax savings actually realized in the year such Loss is incurred and the subsequent year by any Indemnified Person that is attributable to any deduction or loss resulting from or arising out of such Loss. In any case where an Indemnified Person recovers any such amount described in this clause (c) or any other amount

from a third party, in each case in respect of a matter for which an Indemnifying Person has made any indemnity payment for Losses to an Indemnified Person, such Indemnified Person shall promptly pay over to the Indemnifying Person the amount so recovered. Each Indemnified Person shall use its commercially reasonable efforts to obtain recoveries for indemnification claims through any insurance, indemnities, contributions or similar forms of payment available to that Indemnified Person or its Affiliates.

Section 8.5    Claims. As promptly as is reasonably practicable after becoming aware of a claim for indemnification under this Agreement not involving a Third Party Claim, but in any event no later than 30 Business Days after first becoming aware of such claim, the Indemnified Person shall give written notice to the Indemnifying Person of such claim in accordance herewith (a "Claim Notice"); provided, however, that the failure of the Indemnified Person to give such notice shall not relieve the Indemnifying Person of its obligations under this Article VIII except to the extent (if any) that the Indemnifying Person shall have been materially prejudiced thereby. The Claim Notice shall set forth in reasonable detail (a) the facts and circumstances giving rise to such claim for indemnification, including all relevant supporting documentation, (b) the nature of the Losses suffered or incurred or expected to be suffered or incurred, (c) a reference to the provisions of this Agreement in respect of which such Losses have been suffered or incurred or are expected to be suffered or incurred, and (d) such other information as may be necessary for the Indemnifying Person to determine that the limitations in this Article VIII (including the limitations set forth in Section 8.4) have been satisfied or do not apply.

Section 8.6    Notice of Third Party Claims; Assumption of Defense.

The Indemnified Person shall give a Claim Notice (in the form contemplated by Section 8.5) as promptly as is reasonably practicable, but in any event no later than 30 days after receiving notice thereof, to the Indemnifying Person of the assertion of any claims, or the commencement of any Proceeding, by any Person who is not an Indemnified Person in respect of which indemnity may be sought under this Agreement (a "Third Party Claim"); provided, however, that the failure of the Indemnified Person to give such notice shall not relieve the Indemnifying Person of its obligations under this Article VIII except to the extent (if any) that the Indemnifying Person shall have been materially prejudiced thereby. The Indemnifying Person may, at its own expense, (a) participate in the defense of any such Third Party Claim and (b) upon written notice to the Indemnified Person, within twenty (20) days of receipt of a Claim Notice for such Third Party Claim that contains all of the detail required pursuant to Section 8.5, assume the defense thereof with counsel of its own choice that is reasonably satisfactory to the Indemnified Person, but only if (i) the Indemnifying Person notifies the Indemnified Person in writing within twenty (20) days after receipt of such Claim Notice for such Third Party Claim that the Indemnifying Person will indemnify the Indemnified Person from and against any Losses the Indemnified Person may suffer resulting from, arising out of, relating to, or caused by such Third Party Claim, without any reservation of rights, (ii) the Third Party Claim (x) involves only money damages that would not reasonably be expected to exceed the maximum liability of the Indemnifying Person hereunder and does not seek an injunction or other equitable relief and (y) does not involve criminal or quasi-criminal allegations against the Indemnified Person or an environmental, health or safety matter, and (iii) the Indemnifying Person conducts the defense of the Third Party Claim actively and diligently and in good faith. In the event of such assumption, the Indemnifying Person shall be permitted to settle or compromise such Third Party Claim without the prior written consent of the

52

Indemnified Person; provided, however, that the Indemnified Person's consent shall be required if such settlement or judgment (A) imposed any injunctive or equitable relief or other restriction against any Indemnified Person, (B) does not include as a term thereof the giving by the Person(s) asserting such claim to the Indemnified Persons an unconditional release from all liability with respect to such claim, with prejudice, (C) does not by it terms obligate the Indemnifying Person to pay the full amount of the Losses arising out of, related to or in connection with such claim or (D) requires any Indemnified Person to admit any fault or wrongdoing. If the Indemnifying Person assumes such defense, the Indemnified Person shall have the right (but not the duty) to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Indemnifying Person. Whether or not the Indemnifying Person chooses to defend or prosecute any such Third Party Claim, all of the Parties shall cooperate in the defense or prosecution thereof, including making available all witnesses, pertinent records, materials and information in the Indemnified Person's possession or under the Indemnified Person's control relating thereto (or in the possession or control of any of its Representatives) as is reasonably requested by the Indemnifying Person or its counsel.

Section 8.7    <u>Settlement or Compromise.</u> If the Indemnifying Person elects not to assume the defense of the Third Party Claim, is not permitted to assume the defense of the Third Party Claim by reason of <u>Section 8.6</u>, fails to notify the Indemnified Person of its election as herein provided or contests its obligation to indemnify under this Agreement with respect to such Third Party Claim, the Indemnified Person may pay, compromise or defend such Third Party Claim at the sole cost and expense of the Indemnifying Person if the Indemnifying Person is determined to be liable to the Indemnified Party hereunder; provided, however, that whether or not the Indemnifying Party assumes the defense of a Third Party Claim, the Indemnified Party shall not admit any liability with respect to, or settle, compromise or discharge, or offer to settle, compromise or discharge, such Third Party Claim without the Indemnifying Person's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed).

Section 8.8    <u>Purchase Price Adjustments.</u> To the extent permitted by Law, any amounts payable under <u>Section 8.2</u> or <u>8.3</u> shall be treated by Seller and Purchaser as an adjustment to the Purchase Price.

Section 8.9    <u>Limits on Indemnification.</u>

(a)    A Purchaser Indemnified Party shall not be entitled to make an indemnification claim under <u>Section 8.2(a)</u> (other than for breaches of Seller Fundamental Representations) or for a Mortgage Representation Breach (other than for breaches of Section 4.01 or 4.02 of the Security and Mortgage Agreement) unless and until the aggregate amount of all Losses suffered by the Purchaser Indemnified Parties under <u>Section 8.2(a)</u> or for a Mortgage Representation Breach exceeds $1,150,000 (the "<u>Basket</u>"), in which event the Indemnifying Person shall be required to pay or be liable for all Losses in excess of the Basket.

(b)    A Seller Indemnified Party shall not be entitled to make an indemnification claim under <u>Section 8.3(a)</u> (other than for breaches of Purchaser Fundamental Representations) unless and until the aggregate amount of all Losses suffered by the Seller Indemnified Parties under <u>Section 8.3(a)</u> exceeds the Basket, in which event the Indemnifying Person shall be required to pay or be liable for all such Losses in excess of the Basket.

(c)     The aggregate amount required to be paid by an Indemnifying Person to the Purchaser Indemnified Parties under <u>Section 8.2(a)</u> (other than for breaches of Seller Fundamental Representations) or for a Mortgage Representation Breach (other than for breaches of Section 4.01 or 4.02 of the Security and Mortgage Agreement) shall not exceed $23,000,000.

(d)     The aggregate amount required to be paid by an Indemnifying Person to the Seller Indemnified Parties under Section 8.3(a) (other than for breaches of Purchaser Fundamental Representations) shall not exceed $23,000,000.

(e)     Without limiting the generality of the foregoing, any indemnification claim or series of indemnification claims arising under <u>Section 8.2(a)</u> or <u>Section 8.3(a)</u>, as applicable, or for a Mortgage Representation Breach, in each case involving Losses of less than $25,000 (the "<u>Hurdle</u>") shall not be entitled to indemnification under <u>Section 8.2(a)</u> or <u>Section 8.3(a)</u>, as applicable, or the last paragraph of <u>Section 8.2(a)</u> and shall not count toward satisfaction of the Basket; provided that the Hurdle shall not apply to Losses arising from any breaches of Seller Fundamental Representations or Purchaser Fundamental Representations, as applicable, or breaches of Section 4.01 or 4.02 of the Security and Mortgage Agreement.

(f)     The rights of the Indemnified Person to indemnification or any other remedy under this Agreement shall not be impacted or limited by any knowledge that the Indemnified Person may have acquired, or could have acquired, whether before or after the Closing Date, nor by any investigation or diligence by the Indemnified Person.

Section 8.10     <u>Exclusive Remedy.</u> Except (i) as specifically provided for in <u>Section 10.15</u>, (ii) as contemplated under <u>Section 2.6(f)</u> or (iii) for matters based on Fraud, following the Closing, the Parties acknowledge and agree the provisions of this <u>Article VIII</u> set forth the exclusive rights and remedies of the Parties and Indemnified Persons to seek or obtain damages or any other remedy or relief whatsoever from any Party or Indemnifying Person with respect to matters arising under or in connection with this Agreement.

ARTICLE IX
TERMINATION

Section 9.1     <u>Termination.</u>  This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written consent of Purchaser and Seller, which consent shall have been approved by the action of their respective boards of directors;

(b)     by Purchaser or Seller, if any Governmental Authority shall have issued an Order, or there shall have been enacted any Law, in each case, permanently preventing or prohibiting the transactions contemplated by this Agreement, and such Order shall have become final and nonappealable or such Law remains in effect; provided, however, that a Party shall not have the right to terminate this Agreement pursuant to this <u>Section 9.1(b)</u> if such Party has not complied with its obligations under this Agreement to use commercially reasonable best efforts to contest, appeal and remove such Order or if the issuance of such Order or occurrence of such other action was primarily due to the failure of such Party to perform its obligations under this Agreement (which failure constitutes a material breach of this Agreement);

54

      (c)     by Purchaser or Seller, if the Closing shall not have been consummated prior to September 1, 2022 (as such date may be extended pursuant to the second proviso below or pursuant to <u>Section 10.15</u>, the "<u>Outside Termination Date</u>"); provided that a Party shall not have the right to terminate this Agreement pursuant to this <u>Section 9.1(c)</u> if the failure of the Closing to occur on or before such date was primarily due to the failure of such Party to perform any of its obligations under this Agreement (which failure constitutes a material breach of this Agreement); provided, further, that, if on a date that would have been the Outside Termination Date the conditions set forth in <u>Section 6.1(c)</u> are the only conditions in <u>Article VI</u> (other than those conditions that by their nature are to be satisfied at the Closing) that shall not have been satisfied or waived on or before such date, Seller or Purchaser may unilaterally extend the Outside Termination Date to December 31, 2022, in which case the Outside Termination Date shall be deemed for all purposes to be such later date;

      (d)     by Purchaser, if (i) there has been a breach by Seller of any representation, warranty, covenant or agreement set forth in this Agreement that would, individually or in the aggregate, result in a failure of a condition set forth in <u>Section 6.3(a)</u> or <u>Section 6.3(b)</u> if continuing on the Closing Date and (ii) such breach cannot be or has not been cured (or is not capable of being cured) by the earlier of (A) 60 days after the giving of written notice to Seller of such breach and (B) the Outside Termination Date; provided that Purchaser shall not have the right to terminate this Agreement pursuant to this <u>Section 9.1(d)</u> if Purchaser is then in material breach of any of its representations, warranties, covenants or agreements set forth in this Agreement;

      (e)     by Seller, if (i) there has been a breach by Purchaser of any representation, warranty, covenant or agreement set forth in this Agreement that would, individually or in the aggregate, result in a failure of a condition set forth in <u>Section 6.2(a)</u> or <u>Section 6.2(b)</u> if continuing on the Closing Date and (ii) such breach cannot be or has not been cured (or is not capable of being cured) by the earlier of (A) 60 days after the giving of written notice to Purchaser of such breach and (B) the Outside Termination Date; provided that Seller shall not have the right to terminate this Agreement pursuant to this <u>Section 9.1(e)</u> if Seller is then in material breach of any of its representations, warranties, covenants or agreements set forth in this Agreement;

      (f)     by Purchaser pursuant to <u>Section 4.11</u>; or

      (g)     by Purchaser or Seller if there shall have been a CFIUS Turndown.

The Party desiring to terminate this Agreement pursuant to this <u>Section 9.1</u> (other than clause (a) hereof) shall give written notice of such termination to the other Party in accordance with <u>Section 10.3</u>, specifying the provision or provisions hereof pursuant to which such termination is effected.

      Section 9.2    <u>Effect of Termination</u>.

      (a)     In the event of termination of this Agreement by either Seller or Purchaser as provided in <u>Section 9.1</u> or if the Closing does not occur prior to the Down Payments Repayment Date, Seller shall, no later than the date that is 14 days after the earlier to occur of (x) the Down Payments Repayment Date and (y) after the date of termination of this Agreement, repay to Purchaser an aggregate amount equal to the Down Payments, plus interest accruing on such

4834-8099-7884.32
2021TW-L-K-5359    `2

amount, at an annual interest rate of five percent, from the date of funding of the applicable Down Payment until the date of such repayment.

(b)     In the event of termination of this Agreement pursuant Section 9.1(g) as a result of a CFIUS Turndown described in clause (b) of the definition thereof, Purchaser shall pay Seller a termination fee of $2,300,000 (the "CFIUS Termination Fee") as soon as reasonably as practicable and in any event no later than fifteen (15) Business Days after such termination of this Agreement; provided, that if the Secured Obligations have not been repaid to Purchaser on the date the CFIUS Termination Fee is payable by Purchaser hereunder, in lieu of Purchaser making a payment of the CFIUS Termination Fee to Seller, the amount of Secured Obligations repayable to Purchaser shall instead automatically be reduced by the amount of the CFIUS Termination Fee.

(c)     In the event of termination of this Agreement by either Seller or Purchaser as provided in Section 9.1, this Agreement shall forthwith become void and have no effect, without any liability or obligation on the part of Purchaser or Seller, except that (a) the provisions of Section 4.6, the last paragraph of Section 8.2, this Section 9.2 and Article X shall survive termination and (b) nothing herein shall relieve any Party from liability for any Willful Breach of this Agreement or for Fraud.

ARTICLE X
MISCELLANEOUS

Section 10.1    Expenses. Except as otherwise contemplated by Section 2.6, Section 4.3(c), Section 4.8(a), Section 4.9(b), Section 6.3 and Section 8.6, and except that all fees, costs and expenses associated with the Title Commitments and the Title Policies shall be paid by Seller each Party shall bear its own fees and expenses with respect to the transactions contemplated hereby.

Section 10.2    Amendment and Waiver. Except as provided in this Article X, the failure of a Party at any time to require performance of any provision hereof or claim damages with respect thereto shall in no manner affect its right to enforce the same at a later time. Unless otherwise provided herein, this Agreement may not be amended or waived except in a written instrument signed by the Parties and which references the specific section of this Agreement which is to be amended or waived. No waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty. All other attempted amendments or waivers shall be of no effect, regardless of their formality, consideration or detrimental reliance.

Section 10.3    Notices. Any notice, request, instruction or other document to be given hereunder by a Party shall be in writing and shall be deemed to have been given, (a) when received if given in person or by courier or a courier service or (b) on the date of transmission if sent by facsimile transmission (receipt confirmed) or electronic mail (read receipt requested, with confirmation not to be unreasonably withheld, conditioned or delayed) on a Business Day during or before the normal business hours of the intended recipient, and if not so sent on such a day and at such a time, on the following Business Day:

(i)     If to Purchaser, addressed as follows:

Foxconn EV Technology, Inc.
4568 Mayfield Rd
Ste 204
Cleveland, OH 44121
Attention:  Jerry Hsiao and Steven Yu
Emails:  jerry.hsiao@foxconn.com; stevenyu@foxconn.com

with a copy to (which shall not constitute notice):

Paul Hastings LLP
200 Park Avenue
New York, New York 10166
Attention: Mike Huang
Email: mikehuang@paulhastings.com

(ii)    If to Seller, addressed as follows:

Lordstown Motors Corp.
2300 Hallock Young Road
Lordstown, Ohio 44481
Attention: CEO
Email: dan.ninivaggi@lordstownmotors.com

with a copy to (which shall not constitute notice):

Baker & Hostetler LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Attention: Melissa Leonard
Email: mleonard@bakerlaw.com

or to such other individual or address as a Party may designate for itself by notice given as herein provided.

     Section 10.4   <u>Payments in Dollars.</u> All payments pursuant hereto shall be made by wire transfer in Dollars in immediately available funds without any set-off, deduction or counterclaim whatsoever except as expressly provided herein.

     Section 10.5   <u>Assignment.</u> This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns; provided that no assignment of this Agreement or any rights or obligations hereunder, by operation of law or otherwise, may be made by any Party without the written consent of the other Party, other than to an Affiliate of the assigning Party (but no such assignment shall relieve the assigning Party of its obligations hereunder). Any purported assignment in violation of this Agreement shall be null and void *ab initio*.

<div align="center">57</div>



Section 10.6 <u>No Third Party Beneficiaries or Admissions.</u> This Agreement is solely for the benefit of the Parties and their respective successors and permitted assigns and, to the extent provided herein, their respective Affiliates, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement or constitute or be construed as an admission, concession or waiver by any of the Parties as to Persons that are not party to this Agreement. Without limiting the preceding sentence, no provision of <u>Article V</u> or any other provision of this Agreement shall create any third party beneficiary or other rights in any person employed at any time by any of the Parties (including any beneficiary or dependent of any such person) in respect of continued employment with either Purchaser or any of its Affiliates; and no provision of <u>Article V</u> or any other provision of this Agreement shall create any such rights in any such Person in respect of any benefits that may be provided, directly or indirectly, under any Seller Benefit Plan or any Purchaser Benefit Plan; and no term, provision or definition set forth in this Agreement shall constitute or be construed as an admission, concession or waiver by any of the Parties in relation to any charge, complaint, grievance, lawsuit or other Proceedings of any kind between any of the Parties or their Affiliates and any person employed at any time by any of the Parties or their Affiliates (including any beneficiary or dependent of any such person).

Section 10.7 <u>Publicity.</u> No public announcement or other publicity regarding the existence of this Agreement or the Related Agreements or its or their contents or the transactions contemplated hereby or thereby shall be made by either Party or any of its Representatives without the prior written consent of the other Parties (in their sole and absolute discretion), including as to form, content, timing and manner of distribution or publication. Each Party agrees, and shall cause its Representatives, to hold confidential the terms and provisions of this Agreement and the Related Agreements and the terms of the transactions contemplated hereby or thereby. Notwithstanding the foregoing, nothing in this <u>Section 10.7</u> shall prevent a Party or any of its Affiliates or any other Person from making any public announcement or disclosure required by Law or the rules of any stock exchange. If a Party or any of its Affiliates determines on the written advice of counsel that it (or its Affiliate) is required to make such an announcement or disclosure, then such Party will so notify the other Parties a minimum of 48 hours prior to the announcement or disclosure and (a) consult with such other Parties on the form and content of the announcement or disclosure; (b) if applicable, seek (or allow such other Parties to seek) confidential treatment for part or all of the announcement or disclosure; and (c) announce or disclose only those matters that are legally required to be announced or disclosed.

Section 10.8 <u>Further Assurances.</u> On and after the Closing, each Party shall execute and deliver to any other Party such assignments and other instruments as may be reasonably requested by such other Party and are required to effectuate the transactions contemplated by this Agreement.

Section 10.9 <u>Severability.</u> If any provision of this Agreement shall be held invalid, illegal or unenforceable, the validity, legality or enforceability of the other provisions hereof shall not be affected thereby, and there shall be deemed substituted for the provision at issue a valid, legal and enforceable provision as similar as possible to the provision at issue.

Section 10.10 <u>Entire Understanding.</u> This Agreement and the Related Agreements set forth the entire agreement and understanding of the Parties with respect to the transactions

contemplated hereby and supersede and replace any and all prior agreements, arrangements and understandings, written or oral, between the Parties relating to the subject matter hereof.

Section 10.11  <u>Language.</u> The Parties agree that the language used in this Agreement is the language chosen by the Parties to express their mutual intent, and that no rule of strict construction is to be applied against any Party. The Parties and their respective counsel have reviewed and negotiated the terms of this Agreement.

Section 10.12  <u>Intentionally Omitted.</u>

Section 10.13  <u>Applicable Law.</u> This Agreement shall be governed exclusively by and construed and enforced exclusively in accordance with the internal laws of the State of Delaware, including its statute of limitations, without regard to any laws or rules, including any borrowing statute, that would result in the application of the laws, rules or provisions of any jurisdiction other than the State of Delaware.

Section 10.14  <u>Jurisdiction of Disputes; Waiver of Jury Trial.</u>

(a)  Each Party hereby: (i) agrees that any Proceeding in connection with or relating to this Agreement or any matters contemplated hereby shall be brought exclusively in a court of competent jurisdiction located in the State of Delaware, sitting in Wilmington, Delaware, whether a state or federal court; (ii) consents and submits to personal jurisdiction in connection with any such Proceeding in any such court described in <u>clause (a)</u> of this <u>Section 10.14</u> and to service of process upon it in accordance with the rules and statutes governing service of process; (iii) waives to the full extent permitted by Law any objection that it may now or hereafter have to the venue of any such Proceeding in any such court or that any such Proceeding was brought in an inconvenient forum; and (iv) agrees that nothing herein shall affect the rights of any Party to effect service of process in any other manner permitted by Law.

(b)  Each Party irrevocably and absolutely waives the right to a trial by jury in any dispute in connection with, arising under or relating to this Agreement, any Related Agreement or any matters contemplated hereby or thereby and agrees to take any and all action necessary or appropriate to effect such waiver.

Section 10.15  <u>Equitable Relief.</u> Each of the Parties acknowledges that, in the event of any non-performance or breach of this Agreement, the non-performing or non-breaching Party, as the case may be, would be immediately and irreparably harmed by such non-performance or breach and could not be made whole by monetary damages. It is accordingly agreed that, with respect to any such non-performance or breach, each Party (a) shall waive, in any action for equitable relief (including specific performance, injunctive relief and any other equitable remedy), the defense of adequate remedy at law and (b) shall, in addition to any other right or remedy to which any Party may be entitled, at law or in equity (including monetary damages), be entitled to equitable relief (including the compelling of specific performance of this Agreement, injunctive relief and any other equitable remedy) with no obligation to prove actual damages or post any bond in connection therewith, in any action instituted in accordance with <u>Section 10.14</u>. Without limiting the generality of the foregoing, the Parties agree that Seller shall be entitled to enforce specifically Purchaser's obligation to consummate the transactions contemplated by this Agreement (including

4834-8099-7884.32
2021TW-L-K-5359           `2

the obligation to consummate the Closing and to pay the Closing Payment and the Closing Reimbursement Payment). The Parties agree that they will not contest the appropriateness of specific performance as a remedy. If, prior to the Outside Termination Date, any Party brings any Proceeding to prevent a breach or breaches of this Agreement, the Outside Termination Date shall be automatically extended (i) for the period during which such Proceeding is pending, plus ten Business Days after the termination of such Proceeding (or of any appeal from, or of the right to appeal from, any judgment entered in such Proceeding, if such period is longer) or (ii) by such other time period established by the court presiding over such Proceeding.

Section 10.16 <u>Counterparts.</u> This Agreement may be executed in any number of counterparts (including by .pdf file exchanged via email or other electronic transmission), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 10.17 <u>Brokers.</u> Each Party shall indemnify the other Party and its Affiliates against, be liable to the other Party and its Affiliates for and hold the other Party and its Affiliates harmless from, any and all Losses incurred or suffered by each such Person for any brokers' or finders' fees or other commissions arising with respect to brokers, finders, financial advisors or other Persons retained or engaged by such indemnifying Party or any of its Affiliates (or claiming to have been retained or engaged thereby) in respect of the transactions contemplated by this Agreement.

Section 10.18 <u>Guaranty of Purchaser's Obligations.</u>

(a) Guarantor hereby unconditionally and irrevocably guarantees to Seller the due and punctual payment, performance and observance by Purchaser (and any permitted assignees thereof) of any and all of Purchaser's (or such permitted assignee's) obligations pursuant to this Agreement (collectively, the "<u>Purchaser Guaranteed Obligations</u>"). The liability of Guarantor under this guaranty will not be released or diminished by any variation of the Purchaser Guaranteed Obligations or by any delay by Seller in seeking performance of the Purchaser Guaranteed Obligations or by any granting of time for such performance.

(b) This is a guarantee of payment and performance. Should Purchaser default in the discharge or performance or observance of all or any portion of the Purchaser Guaranteed Obligations, Guarantor shall immediately pay or perform and satisfy the Purchaser Guaranteed Obligations so that the same benefits are conferred on Seller as it would have received if the Purchaser Guaranteed Obligations had been duly paid, performed and satisfied by Purchaser.

(c) Seller shall not be obligated to file any claim relating to the Purchaser Guaranteed Obligations in the event that Purchaser becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of Seller to so file shall not affect Guarantor's obligations hereunder. In the event that any payment to Seller in respect of the Purchaser Guaranteed Obligations is rescinded or otherwise returned for any reason whatsoever, Guarantor shall remain liable hereunder with respect to the Purchaser Guaranteed Obligations as if such payment had not been made.

4834-8099-7884.32
2021TW-L-K-5359            `2

(d)     This guaranty is a continuing guarantee and accordingly is to remain in force until all the Purchaser Guaranteed Obligations have been performed or satisfied.

(e)     As a separate and independent stipulation, Guarantor acknowledges, confirms and agrees that any Purchaser Guaranteed Obligation that is or becomes unenforceable against, or not capable of recovery from, Purchaser by reason of any legal limitation, disability or incapacity on or of Purchaser or any other facts or circumstances will nevertheless be enforceable against and recoverable from Guarantor as though the same had been incurred by Guarantor and Guarantor was the sole or principal obligor in respect of that Purchaser Guaranteed Obligation, and Guarantor shall immediately pay or perform the Purchaser Guaranteed Obligations. Without limiting the generality of the foregoing, Guarantor hereby waives: (A) notice of acceptance of this guaranty, and of the creation or existence of any of the Purchaser Guaranteed Obligations and of any action by Seller in reliance hereon or in connection herewith; (B) presentment, demand for payment, notice of dishonor or nonpayment, protest and notice of protest with respect to the Purchaser Guaranteed Obligations; and (C) any requirement that suit be brought against, or any other action by Seller be taken against, Purchaser or any other Person, or that any other action be taken or not taken as a condition to such Guarantor's liability for the Purchaser Guaranteed Obligations or as a condition to the enforcement of this guaranty or the Purchaser Guaranteed Obligations against Guarantor, including, without limitation, any right for exclusion or separation of Purchaser's assets, other than as contemplated in this Agreement.

(f)     Guarantor represents and warrants to Seller as follows: (a) Guarantor is an exempted company validly existing and in good standing under the laws of the Cayman Islands and has the requisite organizational power and authority to execute and deliver this Agreement and to perform its obligations hereunder; (b) the execution, delivery and performance of this Agreement by Guarantor has been duly authorized by all necessary organizational action, and no other proceedings or actions on the part of Guarantor are necessary therefor; (c) this Agreement constitutes the legal, valid and binding obligation of Guarantor, and is enforceable against Guarantor in accordance with its terms, subject to Enforceability Limitations; and (d) it has sufficient funds available to pay and perform all of the Purchaser Guaranteed Obligations. Guarantor agrees that it will maintain sufficient funds available to pay and perform all of the Purchaser Guaranteed Obligations and it will not make any distribution to any of its equityholders to the extent that at the time of the distribution, after giving effect to the distribution, the liabilities of Guarantor exceed the fair value of the assets of Guarantor.

Section 10.19   Guaranty of Seller's Obligations.

(a)     Parent hereby unconditionally and irrevocably guarantees to Purchaser the due and punctual payment, performance and observance by Seller (and any permitted assignees thereof) of any and all of Seller's (or such permitted assignee's) obligations pursuant to this Agreement (collectively, the "Seller Guaranteed Obligations"). The liability of Parent under this guaranty will not be released or diminished by any variation of the Seller Guaranteed Obligations or by any delay by Purchaser in seeking performance of the Seller Guaranteed Obligations or by any granting of time for such performance.

(b)     This is a guarantee of payment and performance. Should Seller default in the discharge or performance or observance of all or any portion of the Seller Guaranteed

2021TW-L-K-5359                  ^2

Obligations, Parent shall immediately pay or perform and satisfy the Seller Guaranteed Obligations so that the same benefits are conferred on Purchaser as it would have received if the Seller Guaranteed Obligations had been duly paid, performed and satisfied by Seller.

(c)     Purchaser shall not be obligated to file any claim relating to the Seller Guaranteed Obligations in the event that Seller becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of Purchaser to so file shall not affect Parent's obligations hereunder. In the event that any payment to Purchaser in respect of the Seller Guaranteed Obligations is rescinded or otherwise returned for any reason whatsoever, Parent shall remain liable hereunder with respect to the Seller Guaranteed Obligations as if such payment had not been made.

(d)     This guaranty is a continuing guarantee and accordingly is to remain in force until all the Seller Guaranteed Obligations have been performed or satisfied.

(e)     As a separate and independent stipulation, Parent acknowledges, confirms and agrees that any Seller Guaranteed Obligation that is or becomes unenforceable against, or not capable of recovery from, Seller by reason of any legal limitation, disability or incapacity on or of Seller or any other facts or circumstances will nevertheless be enforceable against and recoverable from Parent as though the same had been incurred by Parent and Parent was the sole or principal obligor in respect of that Seller Guaranteed Obligation, and Parent shall immediately pay or perform the Seller Guaranteed Obligations. Without limiting the generality of the foregoing, Parent hereby waives: (A) notice of acceptance of this guaranty, and of the creation or existence of any of the Seller Guaranteed Obligations and of any action by Purchaser in reliance hereon or in connection herewith; (B) presentment, demand for payment, notice of dishonor or nonpayment, protest and notice of protest with respect to the Seller Guaranteed Obligations; and (C) any requirement that suit be brought against, or any other action by Purchaser be taken against, Seller or any other Person, or that any other action be taken or not taken as a condition to such Parent's liability for the Seller Guaranteed Obligations or as a condition to the enforcement of this guaranty or the Seller Guaranteed Obligations against Parent, including, without limitation, any right for exclusion or separation of Seller's assets, other than as contemplated in this Agreement.

(f)     Parent represents and warrants to Purchaser as follows: (a) Parent is a corporation validly existing and in good standing under the laws of the State of Delaware and has the requisite organizational power and authority to execute and deliver this Agreement and to perform its obligations hereunder; (b) the execution, delivery and performance of this Agreement by Parent has been duly authorized by all necessary organizational action, and no other proceedings or actions on the part of Parent are necessary therefor; and (c) this Agreement constitutes the legal, valid and binding obligation of Parent, and is enforceable against Parent in accordance with its terms, subject to Enforceability Limitations. Parent agrees that it will not make any distribution to any of its equityholders to the extent that at the time of the distribution, after giving effect to the distribution, the liabilities of Parent exceed the fair value of the assets of Parent.

*     *     *     *     *

62

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered as of the date first above written.

FOXCONN EV TECHNOLOGY, INC.

By: _____

Name:   Jerry Hsiao

Title:   Chief Product Officer


By: _____

Name:

Title:

[Signature Page to Asset Purchase Agreement]

LORDSTOWN EV CORPORATION

By: _____

Name: Daniel Ninivaggi
Title: Chief Executive Officer

[Signature Page to Asset Purchase Agreement]

Solely for purposes of <u>Section 4.7</u> and
<u>Section 10.19</u>:

LORDSTOWN MOTORS CORP.

By: _____

Name:   Daniel Ninivaggi
Title:   Chief Executive Officer

[Signature Page to Asset Purchase Agreement]

Solely for purposes of <u>Section 10.18</u>:

FOXCONN (FAR EAST) LIMITED

By: _____

Name: Huang Teh-Tsai
Title: Authorized Signatory

[Signature Page to Asset Purchase Agreement]

Case: 4:23-cv-00144 Doc. #: 31-3 Filed: 06/27/23 Page: 109 of 35 PageID #: 955

**EXHIBIT C**

**MANUFACTURING SUPPLY AGREEMENT**

**between**

**Lordstown EV Corporation ("Company")**

**and**

**Foxconn EV System LLC ("Supplier")**

## Table of Contents

|  |  |  | Page |
|---|---|---|---|
| 1. | | Definitions. | 1 |
| 2. | | Manufacturing Services. | 5 |
| | a. | Engagement | 5 |
| | b. | Manufacturing Schedule; Capacity. | 5 |
| | c. | Procurement of Components | 6 |
| | d. | Testing. | 8 |
| | e. | Completion of Manufacture; Inspection. | 8 |
| | f. | Non-Satisfaction of Acceptance Standards. | 9 |
| | g. | Packaging and Shipping. | 9 |
| | h. | Other Items to be Supplied by Company. | 9 |
| | i. | Equipment. | 9 |
| | j. | Company Inspection. | 10 |
| | k. | Launch Responsibilities. | 10 |
| | l. | Post-Delivery Services. | 10 |
| | m. | Post-Sale Responsibilities. | 10 |
| | n. | Service Parts. | 10 |
| | o. | Future Vehicles. | 10 |
| 3. | | Certain Covenants. | 10 |
| | a. | Compliance with Law. | 11 |
| | b. | Reporting Obligations. | 11 |
| | c. | Materials Declaration. | 12 |
| | d. | Permits. | 12 |
| | e. | Incentives. | 12 |
| | f. | On-Site Component Providers. | 12 |
| 4. | | Quality; Warranty and Remedy. | 12 |
| | a. | Quality Assurance. | 12 |
| | b. | Supplier Warranty. | 12 |
| | c. | Company Warranty. | 13 |
| | d. | Warranty Liability. | 13 |
| | e. | Vehicle Warranty. | 13 |
| | f. | Allocation of Warranty Claim Responsibility. | 13 |
| | g. | Repair or Replacement of Defective Vehicle. | 14 |
| | h. | Exclusive Warranty. | 14 |
| 5. | | Recall and Other Service Campaigns. | 14 |
| | a. | Supplier Obligations. | 14 |
| | b. | Corrective Actions. | 15 |
| 6. | | Payment. | 15 |

Case 23-50414 Doc 31-3 Filed 06/29/23 Page 40 of 35

a. Vehicle Invoice. 15
b. Other Invoices 15
c. Invoice Payment. 15
d. Disputes. 16
e. Setoff. 16
f. Taxes. 16
g. Liens. 16
7. US Government Contracting Requirements. 16
8. Import and Export. 16
9. Changes and Obsolescence 16
a. Changes to Manufacturing Services, Packaging Specifications and Test Procedures. 16
b. Engineering Changes 17
c. Treatment of Obsolete/End-of-Life Material/Part Change Notification. 17
10. Term. 17
11. Termination for Cause 17
a. Termination for Breach. 17
b. Termination for Bankruptcy/Insolvency. 17
12. Obligations at Termination. 18
a. Existing Rights and Obligations. 18
b. Termination Claim. 18
c. Company Purchase 18
d. Duty to Mitigate Costs. 19
13. Property of the Parties. 19
a. Property of the Supplier: 19
b. Property of Company. 19
c. No License 19
d. Return of Company Property. 19
14. Confidentiality. 19
a. Confidentiality Obligations. 19
b. Employees, Agents, and Representatives. 20
c. Term and Enforcement. 20
d. Return of Proprietary Information and Technology 20
15. Intellectual Property Rights; Assignment 20
a. Company Existing Intellectual Property. 20
b. Goodwill and Acquired Rights 20
c. Protection of Intellectual Property 20
d. Prohibited Acts. 21
e. Supplier Existing Intellectual Property. 21
f. Inventions and Improvements Made by Supplier. 21

2022TW-L-K-2412 2

| 16. | | Indemnification. | 21 |
| | a. | Third Party Indemnification. | 21 |
| | b. | Indemnification Procedure | 21 |
| 17. | | Limitation of Damages. | 22 |
| | a. | LIMITATIONS | 22 |
| | b. | CAP ON AGGREGATE LIABLITY. | 22 |
| | c. | EXCEPTIONS. | 23 |
| 18. | | Insurance. | 23 |
| 19. | | Relationship of Parties. | 23 |
| 20. | | Publicity. | 23 |
| 21. | | Force Majeure. | 23 |
| 22. | | Governance. | 24 |
| | a. | Steering Committee: | 24 |
| | b. | Project Management: | 24 |
| 23. | | Dispute Resolution/Arbitration. | 24 |
| | a. | Negotiation. | 24 |
| | b. | Arbitration. | 24 |
| | c. | Procedure. | 24 |
| | d. | Enforcement. | 25 |
| 24. | | Miscellaneous. | 25 |
| | a. | Notices. | 25 |
| | b. | Good Faith. | 25 |
| | c. | Cumulative Remedies; Specific Performance. | 26 |
| | d. | Attorneys' Fees and Costs. | 26 |
| | e. | Amendment. | 26 |
| | f. | Partial Invalidity. | 26 |
| | g. | Monies. | 26 |
| | h. | Further Assurances. | 26 |
| | i. | Severability. | 26 |
| | j. | Entire Agreement. | 26 |
| | k. | Binding Effect; Assignment. | 27 |
| | l. | Waiver. | 27 |
| | m. | No Third-Party Beneficiaries. | 27 |
| | n. | Headings; Rules of Interpretation. | 27 |
| | o. | Section References. | 28 |
| | p. | Business Day. | 28 |
| | q. | Other Documents. | 28 |
| | r. | Counterparts. | 28 |
| | s. | Governing Law and Jurisdiction. | 28 |

2022TW-L-K-2412                   `2

t.      Survival..................................................................................................................................... 28

iv

# MANUFACTURING SUPPLY AGREEMENT

This Manufacturing Supply Agreement ("**Agreement**") is entered into by and between Foxconn EV System LLC, a Ohio limited liability company, having offices at 4568 Mayfield Road, Suite 204, Cleveland, Ohio 44121, and Lordstown EV Corporation, a Delaware corporation, having its offices at 2300 Hallock Young Road, Lordstown, Ohio 44481. Supplier and Company are each referred to herein as a "**Party**" and, collectively, as the "**Parties**".

## RECITALS

A.   Supplier is in the business of manufacturing products of various types.

B.   Company is in the business of designing, developing, manufacturing, distributing, marketing, selling and servicing electric light duty commercial vehicles, including the vehicle currently expected to be marketed under the "Endurance" trade name.

C.   The Parties desire that with respect to the Vehicle (as defined below), Supplier: (i) manufacture the Vehicle from Components sourced by Company based on the design and development activities performed or to be performed by Company; (ii) procure Components for the manufacture and assembly of the Vehicle; and (iii) perform additional responsibilities as the Parties may subsequently agree in writing.

D.   The scope of this Agreement is limited to the Vehicle, however, the Parties further desire to work collaboratively and in good faith toward the possible design, development, and manufacture of other vehicles (including later models of the Endurance and other vehicles in addition to the Endurance), as the Parties may subsequently agree.

E.   The Parties acknowledge that, in order to successfully undertake the work which is the subject of this Agreement, they will need to work together in good faith and in the spirit of cooperation.

F.   The Parties desire to perform the activities described in Recital C pursuant to the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## TERMS

1.   **Definitions.**

In addition to terms defined elsewhere in this Agreement, the capitalized terms set forth below shall have the following meaning:

"**12 Week Quantity Build Schedule**" means a manufacturing schedule provided to Supplier by Company in writing on a 12-week rolling basis that specifies the total quantity of Vehicles to be delivered and, within agreed upon quantity variances, the quantities of Vehicle types (e.g., by applicable options, trim levels, or other configuration variables), as well as identification number, shipping instructions, and requested delivery date.

"**4 Week Quantity/Option Build Schedule**" means a manufacturing schedule provided to Supplier by Company in writing on a four-week rolling basis that specifies the Vehicles to be delivered, including the exact quantities of each Vehicle type (e.g., by applicable options, trim levels, or other configuration variables), as well as identification number, shipping instructions, and requested delivery date.

2022TW-L-K-2412          `2

"**52 Week Rolling Forecast**" means the weekly forecast provided to Supplier by Company, in writing, of quantity requirements of each Vehicle that Company anticipates requiring during the next 12-month period, as updated by Company from time to time on the frequency agreed to by the Parties.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such Person. For purposes of this definition "controls" (and with correlative meanings, "controlled by" and "under common control with") means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of another Person, whether through the ownership or voting securities, by contract, or otherwise. For clarity, (i) a Subsidiary of a Party shall be an Affiliate of such Party; and (ii) neither Party shall be an Affiliate of the other.

"**Asset Purchase Agreement**" means the agreement entitled "Asset Purchase Agreement By And Among Foxconn EV Technology, Inc., Lordstown EV Corporation And Lordstown Motors Corp. Dated As Of November 10, 2021."

"**Build Schedule**" means, collectively, the 12 Week Quantity Build Schedule and the 4 Week Quantity/Option Build Schedule.

"**Commercially Reasonable Efforts**" means, with respect to any action, an affirmative duty to act in good faith and to make substantial efforts to cause such action to be taken, provided that: (1) a Party is not required to take any action which it reasonably believes would be contrary to its own material business interests; and (2) a Party's failure to use Commercially Reasonable Efforts shall constitute a material breach of the Agreement only if it materially harms the other Party. "Substantial efforts" means the same level of effort that a Party would have taken on its own behalf in the same situation.

"**Company**" and "**Lordstown EV Corporation**" means Lordstown EV Corporation and shall be defined to include any Company Subsidiary to which a right is assigned, or a duty delegated, to the extent permitted under this Agreement.

"**Company Intellectual Property**" means all Intellectual Property of Company.

"**Component Lead-time**" means the mutually agreed upon minimum amount of time (or, in the absence of agreement, 12 weeks), in advance of delivery requested in a Build Schedule, that Supplier must receive in order to obtain the Components necessary to deliver the Vehicle on the requested delivery date.

"**Component Provider**" means a supplier, including a Directed Provider, which supplies or is contractually bound to supply Components.

"**Component Purchase Order**" means a document (whether titled "Purchase Order" or otherwise) that identifies, at a minimum, the Component and Component Provider, and which authorizes or obligates the Component Provider to deliver the Components.

"**Components**" means all production (including prototype) parts, assemblies, materials, or related services used in the manufacturing of the Vehicle.

"**EDI**" means electronic data interchange.

"**Effective Date**" means the date upon which the terms and conditions of this Agreement shall become effective by and between the Parties. The Parties have agreed that the Effective Date of this Agreement shall be May 11, 2022, or if no date is entered here, the last date of signature.

"**Engineering Change**" means a change to the design, Specifications, engineering level, manufacturing process, materials or Components of the Vehicle.

2



"**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction.

"**In writing**" means written documents, files contained on Company secured FTP, notice of which is provided electronically to Supplier, EDI with confirmation, and emails successfully transmitted and confirmed electronically or otherwise as received.

"**Intellectual Property**" means the intellectual property rights, including patents, patent applications, potentially patentable inventions, utility models, industrial models, drawings, designs, design models, trade secrets, know-how, processes, computer programs, data collections, databases, copyrights, copyrightable works, including software source code, copyright registrations, registerable mask works, mask work registrations, trade secrets, moral rights, and any other intellectual property or proprietary rights, applications, certificates of invention, divisions, continuations, patents of addition, reissues, renewals, extensions, certificates of reexamination, foreign counterparts, international counterparts, and any application claiming priority to or the benefit of any of the foregoing.

"**Laws**" means all applicable statutes, acts, codes, laws, rules, regulations, orders, constitutions, conventions, treaties, standards, ordinances, common law, or other requirements of any Governmental Authority, including those relating to the Manufacturing Services or the Manufacturing Plant.

"**Loaned Equipment**" means capital equipment (including Tooling) which is loaned or bailed to Supplier by or on behalf of Company to be used by Supplier to perform the Manufacturing Services.

"**Losses**" means losses, claims, damages, liabilities, deficiencies, losses resulting from actions or judgments, interest, settlements, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right hereunder and the cost of pursuing any insurance providers.

"**Manufacturing Plant**" means Supplier's manufacturing plant located at 2300 Hallock Young Road, Lordstown, Ohio 44481.

"**Manufacturing Process**" means, with respect to the Vehicle, the process employed to assemble the Vehicle.

"**Manufacturing Services**" include but are not limited to, each of the following: assembling, manufacturing, testing, configuring, and packaging of the Vehicle prior to acceptance by Company, (but excluding Company Inspection, as defined in Section 2.e) as well as Post-Delivery Services, the provision of service parts and the performance of warranty obligations. Except as provided in Section 2.c.ii, the Manufacturing Services include the procurement of Components to be used in the assembly and manufacture of the Vehicle.

"**Master BOM**" means a document which lists, at a minimum, all Components of a Vehicle, including part numbers, quantities, unit price, vendor, and the currency in which the Component is being purchased (if other than US Dollars).

"**Materials Declaration Requirements**" means any material disclosure requirements under any environmental, product composition, and/or materials declaration or similar Laws.

"**NHTSA**" means the National Highway Traffic Safety Administration.

"**NRE Costs**" shall consist of non-recurring expenses incurred by Supplier under this Agreement, including design, engineering, testing, fixturing and tooling, other out-of-pocket and internal costs, so long as such activities are authorized by Company in writing.

"**Packaging Specifications**" means the packaging specifications supplied and/or approved by Company.

2022TW-L-K-2412 `2



"**Permits**" means permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances, and similar rights obtained or required to be obtained, from any Governmental Authority.

"**Person**" means any corporation, business entity, natural person, firm, joint venture, limited or general partnership, limited liability entity, limited liability partnership, trust, unincorporated organization, association, government, or any department or agency of any government.

"**Post-Delivery Services**" include all services following the acceptance of the Vehicle by Company to be performed by Supplier, as specified in Section 2.l.

"**Proprietary Information and Technology**" means software, firmware, hardware, technology and know-how, and other proprietary information or Intellectual Property embodied therein that is known, owned, or licensed by and proprietary to either Party and not generally available to the public, including plans, analyses, trade secrets, patent rights, copyrights, trademarks, inventions, fees and pricing information, operating procedures, procedure manuals, processes, methods, computer applications, programs and designs, and any processed or collected data (including Intellectual Property). The failure to label any of the foregoing as "confidential" or "proprietary" shall not mean it is not Proprietary Information and Technology.

"**Specifications**" means the technical specifications (including specifications, drawings, samples, descriptions, and quality standards) for the Vehicle and Manufacturing Services supplied and/or approved by Company in writing and accepted by Supplier. Specifications may be amended from time to time under Section 9 by written Engineering Change orders agreed to by the Parties.

"**Subsidiary(ies)**" means any corporation, partnership, joint venture, limited liability entity, trust, association, or other business entity of which a Party or one or more of its Subsidiaries, owns or controls more than 50% of the voting power for the election of directors, managers, partners, trustees, or similar parties.

"**Supplier Existing Intellectual Property**" means any discoveries, inventions, technical information, procedures, manufacturing or other processes, software, firmware, technology, know-how, or other intellectual property rights owned or developed by Supplier outside of this Agreement, or owned or controlled by Supplier prior to the execution of this Agreement and all Transferred Intellectual Property as defined in the Asset Purchase Agreement.

"**Supplier Personnel**" means the employees, independent contractors, workers, and subcontractors of Supplier who will perform services on behalf of Supplier.

"**Supplier**" and "**Foxconn EV Technology System**" means Foxconn EV Technology System LLC and shall be defined to include any Supplier Subsidiary to which a right is assigned or a duty delegated, to the extent permitted under this Agreement.

"**Test Procedures**" means the finished Vehicle testing specifications, standards, procedures and parameters supplied and/or approved by Company and accepted by Supplier in writing.

"**Tooling**" means, collectively, all tooling, dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, and documentation (including engineering specifications and test reports) as are required for the manufacture of the Vehicle for which Company has issued a tooling authorization or purchasing document, together with any accessions, attachments, parts, accessories, substitutions, replacements, and appurtenances thereto.

"**TREAD Act**" means the Transportation Recall Enhancement, Accountability and Documentation Act.

"**Vehicle**" means the launch edition model (or "Version 1.0") of the vehicle Company plans, as of the Effective Date, to bring to market under the name "Endurance" as contemplated in Company's 2022 operating plan and scheduled to be launched in the third quarter of 2022, as the same may be modified during the term of this Agreement, but excluding new models or editions of the Endurance.

"**Vehicle Acceptance Standards**" means the mutually agreed and documented criteria standards regarding



whether a completed Vehicle is to be accepted by Company.

"**Vehicle Payment**" means for each Vehicle the sum of: (i) the cost of the Vehicle Components, calculated per the Master BOM, and Component transportation incurred by Supplier; (ii) a Manufacturing Value Add Payment as described in Section 6.a; and (iii) any other amounts as agreed in writing by the Parties, which amounts shall be itemized in the Vehicle Purchase Order.

"**Vehicle Purchase Order**" means a purchase order issued by Company to Supplier for the Vehicle, which shall, at a minimum, contain: (i) the amount of the Vehicle Payment; and (ii) an internal Vehicle identification number and Vehicle type (e.g., by applicable options, trim levels, or other configuration variables) corresponding to the information in the 4 Week Quantity/Option Build Schedule.

2. **Manufacturing Services.**

   a. <u>Engagement</u>. During the term of this Agreement, and pursuant to and in accordance with the terms and conditions set forth in this Agreement, Company hereby engages Supplier to provide, and Supplier hereby agrees to provide to Company, the Manufacturing Services. Supplier agrees to provide Manufacturing Services, and Company agrees to purchase Manufacturing Services for that quantity of Vehicles set forth in the Build Schedule. The Manufacturing Process shall include specific process and inspection plans and targets of achievement, including Key Performance Indicators ("KPIs") (collectively the "Performance Standards"), as mutually agreed to by the Parties. Company shall be responsible for defining and managing all Vehicle-related Performance Standards. Supplier shall be responsible for defining and managing production and manufacturing-related Performance Standards.

   b. <u>Manufacturing Schedule; Capacity</u>.

      i. Company shall provide Supplier on a rolling weekly basis the 12 Week Quantity Build Schedule, which shall be used for the purposes of Component acquisition. The total quantity of Vehicles set forth in any 12 Week Quantity Build Schedule shall be binding on Company, although the quantities of Vehicle types (e.g., by applicable options or other configuration variables) within that 12 Week Quantity Build Schedule may be varied by Company within a range to be determined by the Parties through good faith negotiations.

      ii. Company shall also provide Supplier 4 Week Quantity/Option Build Schedules, which shall be used for purposes of production. The quantities of Vehicles, including Vehicle types, in any 4 Week Quantity/Option Build Schedule shall be binding in all respects on Company, and Company shall be obligated to purchase and pay for all Vehicles satisfying the Vehicle Acceptance Standards delivered to Company by Supplier consistent with the 4 Week Quantity/Option Build Schedule, as well as any additional quantities of Vehicles produced in accordance with Section 2.b.iv.

      iii. Supplier shall determine a production schedule for the Vehicle based on the 52 Week Rolling Forecast, the 12 Week Quantity Build Schedule, and the 4 Week Quantity/Option Build Schedule. In the event Supplier determines that it cannot deliver to Company in accordance with the 4 Week Quantity/Option Build Schedule, Supplier shall notify Company as promptly as feasible, and not less than 21 days in advance of any anticipated shortfall in production, in which case the Parties shall work in good faith to mutually determine a revised final production schedule. Supplier shall use best efforts to deliver Vehicles in accordance with the 4 Week Quantity/Option Build Schedule. If Supplier fails to timely notify Company that Supplier cannot deliver Vehicles in accordance with the 4 Week Quantity/Option Build Schedule, the 4 Week Quantity/Option Build Schedule shall be deemed accepted.

      iv. Notwithstanding anything to the contrary in this Agreement, Company may, subject to (1) the availability of Components and other inputs; and (2) the available capacity of the Manufacturing Plant, increase weekly volumes for weeks 5-12 of the 12 Week Quantity Build Schedule by up to 20% from the volume stated when the calendar week first entered the 12 Week Quantity Build Schedule . Supplier shall use Commercially Reasonable Efforts to satisfy any other requested volume increases from Company.

2022TW-L-K-2412 `2



Supplier shall reserve, on a priority basis, for Company sufficient capacity at the Manufacturing Plant to meet Company's 52 Week Rolling Forecast. However, subject to Company's consent, not to be unreasonably withheld, Supplier may reduce or reconfigure capacity if there is a material shortfall in Company's actual requirements from the 52 Week Rolling Forecast.

c. <u>Procurement of Components</u>.

    i. <u>Generally</u>. Except as provided in Section 2.c.ii, Supplier shall manufacture or purchase from Component Providers specified by Company (each a "Directed Provider") all Components. Any Components to be purchased by Supplier from Directed Providers shall be purchased through purchase orders issued by Supplier on its own account, paid for and owned by Supplier pursuant to the terms and conditions (including price) agreed to by the Directed Provider and Company ("Directed Provider Terms"). Neither Party may make any amendments to the Directed Provider Terms as they exist as of the Effective Date that materially affect the other Party without the other Party's consent. Notwithstanding the foregoing, in the event any Directed Provider refuses to accept a purchase order or other comparable document for the purchase of Components from Supplier on the Directed Provider Terms, Supplier shall issue such documents on behalf of Company and shall in all other respects be subject to this Section 2.c. Company shall compensate Supplier for all amounts paid by Supplier to Component Providers in accordance with the provisions of Section 6.a. If the Parties agree in writing that any Components should be paid for and owned by Company, the Parties shall negotiate in good faith to determine the value and any reduction in the Vehicle Payment for any Component inventory owned by Company. The Parties shall negotiate in good faith to determine the value and any reduction in the Vehicle Payment for any Component inventory owned by Company as of the start of the Manufacturing Services.

    ii. <u>Company Purchases</u>. Company shall directly purchase from Component Providers for its own account in the following circumstances:

        (1). All Components to be purchased during the Transition Period;

        (2). All Components which are subject to a non-assignable contract between Company and the Component Provider, provided that the Parties will use Commercially Reasonable Efforts to obtain any necessary consents to assignment; and

        (3). As agreed in writing between the Parties.

If Company directly purchases a Component on its own behalf, Supplier's possession thereof shall be deemed a bailment. Supplier shall bear the risk of loss of and damage to such Component until such time as the Vehicle is accepted by Company. Supplier shall use any such Components solely to produce Vehicles hereunder. Sections 2.c.iv through 2.c.vii shall not apply to such Components. Instead, the Parties will negotiate alternate procedures to minimize disruptions and inefficiencies when Company is the direct purchaser.

    iii. <u>Transition Period</u>. The Parties shall use Commercially Reasonable Efforts to transition the purchase of all Components (except those identified in Section 2.c.ii(2) and 2.c.ii(3)) to Supplier as expeditiously as possible and on a rolling basis as circumstances deem appropriate, or as otherwise agreed to by the Parties. Supplier shall use Commercially Reasonable Efforts to complete such transition no later than October 15, 2022. The period from the Effective Date until such time as the purchase of any Component is, or all applicable Components are, as context requires, transitioned to Supplier shall be the "Transition Period." During the Transition Period, Supplier shall use Commercially Reasonable Efforts to (1) support Company's purchasing efforts in relation to the Components so as to minimize disruptions and inefficiencies; (2) assist Company in managing and communicating with Component Providers (including the resolution of any dispute as to price changes, maintaining the continuity of supply, and addressing other material changes to the terms of supply); and (3) assist Company in improving the commercial terms of procurement with Component Providers. Supplier shall timely provide any information reasonably requested by Company to permit Company to effectively purchase any Component on its own account. Company acknowledges that prior to becoming an approved provider in Supplier's vendor management system (i.e., such provider is designated as an approved Supplier

6

provider subject to Supplier's generally applicable terms and conditions and Supplier and any of its Affiliates may purchase from such provider), any Directed Provider would be required to satisfy Supplier's generally applicable supplier requirements; provided that the failure of any Directed Provider to satisfy such requirements shall in no way impact Supplier's ability or obligation to purchase from such Directed Provider in accordance with this Section 2.c. The Parties shall agree in advance on the applicable terms and conditions prior to any Components being purchased by Supplier from such an approved Directed Provider on terms other than the Directed Provider Terms.

iv. Alignment of Directed Provider Rights and Obligations. The Parties shall use Commercially Reasonable Efforts to contractually align the rights and obligations of the Directed Provider, Supplier, and Company to those set forth in this Agreement, such that, by way of example, Supplier's sole contractual responsibility to Directed Provider is to pay the contract price for Components as set forth in Section 2.c.xii, and that Directed Provider and Company are otherwise directly contractually accountable to each other with respect to their respective rights and obligations under the Directed Provider Terms. These Commercially Reasonable Efforts may include Company designating Supplier as a "Designated Purchaser" as defined in the Directed Provider Terms, the Parties seeking to enter into three party contracts with specified Directed Providers identified on Schedule 2.c.iv, or as otherwise agreed to by the Parties in writing.

v. Pricing. Supplier shall purchase and pay Directed Provider for Components in accordance with the Directed Provider Terms. If any Directed Provider demands or imposes a price higher than that provided in the Directed Provider Terms, or imposes or threatens a supply cutoff unless that higher price is paid (or demands or imposes any other term of sale more favorable than that provided for in the Directed Provider Terms), Supplier shall promptly notify Company. Supplier shall use Commercially Reasonable Efforts to assist Company in resolving the dispute with the Directed Provider and maintaining continuity of supply, but Company shall be responsible for the resolution, or the consequences of failing to resolve, the dispute.

vi. Sourcing Communications. The Parties shall negotiate in good faith a process for best communicating and managing any actual or proposed Directed Provider pricing and Component sourcing changes in accordance with Section 9. Each Party shall promptly notify the other if it learns that any Directed Provider has made or proposes to make a price change or other material contract change for a Component. Any purchase by Supplier of Components subject to such revised Directed Provider Terms, including those subject to Section 2.c.v, must be authorized in advance by Company. The Parties shall negotiate in good faith to determine a process to ensure availability of supply of such Component while Company negotiates pricing with the Directed Provider.

vii. Cost Reductions. Supplier agrees to use Commercially Reasonable Efforts to assist Company to improve the commercial terms of procurement with Directed Providers and otherwise take advantage of sourcing synergy opportunities, including those Directed Providers listed on Schedule 2.c.iv, which shall be specifically targeted by the Parties. Further, the Parties shall together in good faith attempt to reduce Master BOM costs, which may include Supplier directly participating in Company's value analysis and value engineering ("VAVE") and sourcing activities. During the term of the Agreement, Company shall retain any contract price reduction realized as a result of the Parties' efforts, less any time or material costs incurred by Supplier. The Parties also anticipate that for vehicles other than the Endurance Launch Edition, the Parties will negotiate a savings sharing agreement.

viii. Ordering. The Parties agree to negotiate in good faith an order/release approval process for Supplier's purchase of Components to ensure that appropriate quantities of Components are ordered for the anticipated production timeline. Supplier shall order Components consistent with the 12 Week Quantity Build Schedule and 4 Week Quantity/Option Build Schedule or as otherwise appropriate to reflect Component Lead-times. The Parties will work together to determine the appropriate level of inventory of Components, which shall be based on anticipated Component Lead-times, minimum order quantities, production variability, and other relevant factors. Each Party shall use best efforts to avoid the build-up of excess inventory of Components. In addition, the Parties shall negotiate in good faith a process for communication between the Parties as it relates to any Component for which an Engineering Change is

7

being considered by Company. Company shall provide Supplier reasonable notice that a Component is in Company's Engineering Change process (but has not yet been approved). Any such Engineering Change shall be in accordance with Section 9.

ix.  <u>Scheduling</u>. Supplier shall be responsible for managing all inbound logistics activities associated with Components, which costs shall be charged without mark-up to Company. Supplier shall use Commercially Reasonable Efforts to schedule the delivery of Components so as to maintain the production schedule and mitigate any scheduling impacts. Supplier shall use Commercially Reasonable Efforts to minimize the inbound transportation and logistics costs for Components. In the event of any material delivery delays, a root cause analysis shall be conducted to determine the Party responsible for such delay, which Party shall ultimately bear the cost of Supplier's efforts to maintain the production schedule. Supplier shall be responsible for direct communication with Component Providers on all delivery issues. Company shall support such discussions as reasonably requested by Supplier. The Parties shall negotiate in good faith to develop a process by which potential expedited shipping arrangements are to be employed in a commercially reasonable manner, as well as an approval process for delivery continuity and fiscal management, which process shall include a mechanism for accelerated approvals in the event of a significant impact on production.

x.  <u>Inspection of Components</u>. Supplier shall inspect Components for material defects and non-conformities in accordance with a mutually agreed written control plan. Supplier shall notify Company if it identifies potential beneficial modifications of the inspection procedures within the control plan, which modifications will be subject to the Engineering Change process in Section 9. The Parties shall mutually agree upon reporting criteria for Component defects and non-conformities identified by Supplier.

xi.  <u>Liability of Company</u>. Except as provided in Section 2.c.xii, as between Company and Supplier, Company shall bear sole responsibility for Directed Components, including their design, quality, conformity, and fitness for purpose, as well as the Directed Provider's performance of its contractual, tort law, and other legal obligations, including Directed Provider's compliance with quality and manufacturing processes as established by Company. Further, except as set forth in 2.c.xii, Company shall be directly responsible to the Directed Provider for performance of all obligations to the Directed Provider under the Directed Provider Terms. Company shall be solely responsible for the enforcement of claims against and the defense of claims brought by the Directed Provider that are subject to this Section 2.c.xi. Except as set forth in Section 2.c.xii, Company shall hold Supplier harmless for any claim or cost Supplier incurs arising out of the performance of such Component or of the Directed Provider, or Company's failure to fulfill contractual responsibilities to the Directed Provider.

xii.  <u>Liability of Supplier</u>. Supplier's sole responsibility with respect to Components are to perform those duties specifically undertaken in this Section 2.c. Supplier shall be responsible for the payment of the contract purchase price solely for Components needed to satisfy Company's production requirements as set forth in the Build Schedules, and not for any minimum purchase quantities or other purchase obligations to Direct Provider beyond actual production requirements. Supplier shall hold Company harmless for any claim or cost Company incurs arising out of Supplier's failure to pay any Directed Provider or otherwise perform its obligations with respect to Components under this Section 2.c. Supplier shall be solely responsible for the enforcement of claims against and the defense of claims brought by the Directed Provider subject to this Section 2.c.xii.

d.  <u>Testing</u>. Supplier will test the Vehicle in accordance with the Test Procedures. Company shall be solely responsible for the sufficiency and adequacy of the Test Procedures and shall defend, indemnify, and hold Supplier harmless for any claim or costs arising therefrom, except to the extent such claim or costs result from Supplier's negligence or failure to perform the Test Procedures. In addition, Company shall reimburse and hold Supplier harmless for any costs Supplier reasonably incurs as a result of a Vehicle's failure to satisfy the Test Procedures, unless and only to the extent that any cost results directly from Supplier's breach of its obligations with respect to the Manufacturing Services.

e.  <u>Completion of Manufacture; Inspection</u>. If at any point during the production of any Vehicle, Supplier discovers any defects or discrepancies in the Vehicle that may impact Supplier's ability to deliver the Vehicle



in accordance with the 4 Week Quantity/Option Build Schedule, it shall give immediate notice (not to exceed 24 hours) to Company. The Parties shall agree upon Vehicle Acceptance Standards. After the completion of the manufacture of Vehicles, Supplier shall inspect the Vehicle to confirm compliance with those standards ("**Supplier Inspection**"), and, if compliance is confirmed, it shall move the Vehicle to a location as mutually agreed upon in writing by the Parties, at which time Company (or its designee) may, but is not obligated to, conduct its own inspection ("**Company Inspection**"). The Vehicles will be deemed accepted unless Company notifies Supplier in writing within one business day of when the Vehicle is made available for inspection that the Vehicle Acceptance Standards have not been satisfied, identifying the basis for non-acceptance ("**Non-Acceptance Notice**"). If the Parties disagree in good faith as to whether the Vehicle Acceptance Standards have been met, it shall be resolved in accordance with Section 23. Upon acceptance, Supplier shall have earned the Vehicle Payment for such Vehicle. At this point, control, title, and possession of the Vehicle shall pass from Supplier to Company, subject to Section 2.l.

f.  Non-Satisfaction of Acceptance Standards. If Supplier discovers any defect or discrepancy or otherwise determines during the Supplier Inspection that the Vehicle Acceptance Standards have not been satisfied, Supplier shall promptly repair or correct any defects or discrepancies in Vehicles before designating the Vehicle as compliant. If Company identifies such defects or discrepancies during Company Inspection or at any time prior to the sale to the retail purchasers, Company shall have the right to repair or correct the defects or discrepancies; or to return the Vehicle to Supplier to do so. Company and Supplier shall determine the responsible Party who shall bear the cost that is related to the repair or correction of the defects and discrepancies on a case by case basis pursuant to the allocation of responsibility between the Parties contained in Section 4.d.

g.  Packaging and Shipping. Company will have sole responsibility to ship the Vehicle. Supplier will package the Vehicle in accordance with Packaging Specifications. Company shall be solely responsible for the sufficiency and adequacy of the Packaging Specifications and shall defend, indemnify, and hold Supplier harmless for any claim or cost arising therefrom, except to the extent such claim or costs result from Supplier's negligence or failure to comply with the Packaging Specifications. Supplier shall cooperate with Company, at Company's request and cost, in connection with the shipping of Vehicles.

h.  Other Items to be Supplied by Company. Company shall supply to Supplier, according to the terms and conditions specified herein, Company Proprietary Information and Technology and, if applicable, the Loaned Equipment necessary for Supplier to perform the Manufacturing Services. Company will also provide to Supplier all Specifications, Test Procedures, Packaging Specifications, Vehicle design drawings, approved vendor listings, bill of materials, Component descriptions (including approved substitutions), and Manufacturing Process requirements of Company, if any, necessary for Supplier to perform the Manufacturing Services. Company shall be solely responsible for delay in delivery, defects and enforcement of warranties related to the Loaned Equipment and shall hold Supplier harmless for any claim or cost arising therefrom.

i.  Equipment. Supplier shall maintain and repair all machinery, equipment, tooling, computers, and information technology equipment necessary for the manufacture of the Vehicles ("**Plant Machinery**") used by Supplier in the manufacture of the Vehicles, including any Tooling and Loaned Equipment located in the Manufacturing Plant. The list of Plant Machinery as of the Effective Date is set forth on Schedule 2.i, which shall be periodically updated by Company from time to time with any material changes. Supplier shall purchase, own, and maintain such inventories of replacement parts and materials for Plant Machinery used for the production of Vehicles ("**Maintenance Items**") according to the machinery specifications and in reasonable quantities in relation to the production schedule. The maintenance and repair costs, including the on-going replenishment of the inventory of Maintenance Items, shall be paid by Supplier with respect to Supplier-owned Plant Machinery and by Company with respect to Company-owned Plant Machinery, except as provided in the following sentence. Company, in its sole discretion, shall determine whether the Plant Machinery owned by Company should undergo a major refurbishment or replacement or be removed from service, the cost of which shall be paid by Company, provided that Supplier shall (1) promptly notify Company of any non-conformities or inefficiencies directly resulting from Company's decision not to refurbish or replace Plant Machinery; and (2) not be responsible for any incremental expenses arising from non-conformities or inefficiencies to the extent due to Company's decision to not refurbish or replace.

Company-owned Plant Machinery shall be used by Supplier exclusively for the manufacture of Vehicles, unless otherwise agreed to by Company. Company shall be responsible for the disposal of any obsolete Tooling. To the extent that the enforcement of any lien, claim, encumbrance, interest, or other right of a third party in any Plant Machinery ("**Plant Machinery Lien**") materially prevents Supplier from performing its obligations under this Section 2, Supplier shall be released from its obligation to perform under this Section 2 solely to the extent of the impact of such enforcement. Supplier shall not be obligated to pay any amounts to release any Plant Machinery Lien on behalf of Company. Supplier shall reasonably comply with any request by Company for a waiver or estoppel letter as it relates to any Plant Machinery Lien.

j.  Company Inspection. Company shall have the right at any time during normal business hours and at its expense to inspect, review, monitor, and oversee the Manufacturing Services, provided that such inspection shall not unreasonably disrupt Supplier's normal business operations. Supplier shall have the right to take all necessary steps and impose all necessary restrictions on inspection to protect all Proprietary Information and Technology of Supplier and the confidential or proprietary information and technology of Supplier's other customers. If the Parties are unable to agree necessary conditions and restrictions on such inspection, the dispute shall be resolved in accordance with Section 23. Before conducting such an inspection, Company shall cause each of its employees, agents, and representatives who have access to Supplier's facilities, to agree in writing to maintain, preserve, and protect all Proprietary Information and Technology of Supplier and the confidential or proprietary information and technology of Supplier's other customers.

k.  Launch Responsibilities. Supplier shall use its Commercially Reasonable Efforts to support Company with respect to the timing of the launch of the Vehicle, including bringing to the attention of the Steering Committee any issues that may impact the proposed launch date.

l.  Post-Delivery Services. Supplier shall provide Post-Delivery Services, which consist of storage, preparation for shipment, yard management, facilitation of Vehicle loading onto carriers for delivery, and delivery to the designated carrier of the Vehicles, in accordance with the commercially reasonable Post-Delivery Services specifications provided by Company. Upon Company's acceptance of a Vehicle, Supplier's possession thereof, and during the performance of the Post-Delivery Services, shall be deemed a bailment. Supplier shall bear the risk of loss of and damage to such Vehicle until such time as the Vehicle is delivered to the carrier arranged by Company; provided, however, that in the event the Vehicle is not transported from the Manufacturing Plant within 10 days after Company's acceptance thereof, the bailment shall end, and the risk of loss of and damage to such Vehicle shall transfer to Company as of such date.

m.  Post-Sale Responsibilities. Supplier shall have no responsibility or liability with respect to service of the Vehicles after Company's acceptance thereof, except for the provision of Post-Delivery Services, service parts, warranty services in accordance with Section 4, and recall obligations under Section 5, unless such service is caused by a breach of this Agreement. Company shall hold Supplier harmless for any claim or cost Supplier incurs arising out of the provision of post-sale service, unless such service is caused by a breach of this Agreement by Supplier or a result of the Manufacturing Services. Supplier shall not sell or deliver the Vehicle to any Person other than Company or as Company may direct in writing.

n.  Service Parts. Company shall provide Supplier with a list of serviceable items on the Vehicle ("**Service Parts**"), forecasted demand for Service Parts, and Component Lead-time requirements for Service Parts inventory. Supplier shall maintain stock of Service Parts according to the forecasted demand provided by Company and Component Lead-times. Supplier's Service Part obligations shall not survive termination of the Agreement, provided that prior to the effective date of termination, Supplier will use Commercially Reasonable Efforts to offer to Company an opportunity to purchase Service Parts for Company's anticipated future needs on a "one-time buy" basis.

o.  Future Vehicles. The Parties contemplate that Supplier will manufacture future models of the Vehicle and other vehicle models of Company. The manufacture and supply of any such future vehicles shall be pursuant to a separate agreement to be negotiated in good faith by the Parties.

3.  **Certain Covenants.**

10



a. <u>Compliance with Law</u>. Each Party shall at all times comply with all Laws applicable to this Agreement and in the manufacture of the Vehicle, the operation of the Party's business, and the exercise of its rights and performance of its obligations hereunder.

  i. Supplier shall cooperate with Company's requests for information to facilitate Company's compliance with and fulfillment of all Governmental Authority reporting obligations.

  ii. In the case of Supplier, this includes Laws regarding the operation of the Manufacturing Plant, and Laws applicable with respect to Supplier Personnel, including Laws relating to equal opportunity, safety, wages and hours, sexual harassment, and immigration. If required by Company to comply with its obligations under Law, upon Company's reasonable request, Supplier shall provide Company with a written certification of Supplier's compliance with Laws and any additional information regarding the Vehicle requested by Company. Supplier shall be solely liable for any violation of these Laws, except to the extent caused by Company's breach of its obligations under this Agreement, in which case liability shall be equitably allocated.

  iii. In the case of Company, this includes compliance with all vehicle safety Laws, including those arising under NHTSA, the TREAD Act and Federal Motor Vehicle Safety Standards, all Laws relating to the marketing or distribution of the Vehicles, including dealership Laws, and consumer protection, unfair trade practice and similar Laws. Company shall be solely liable for any violation of these Laws, except to the extent caused by Supplier's breach of its obligations under this Agreement, in which case liability shall be equitably allocated.

b. <u>Reporting Obligations</u>. The Parties acknowledge the existence of certain vehicle safety information reporting obligations pursuant to applicable Law (including the TREAD Act and the Federal Motor Vehicle Safety Standard), including those described in this Section 3.b. For purposes of this Agreement, the Parties agree that:

  i. Company will be responsible for making any required reports to NHTSA, including information about fatalities or injuries, on behalf of Company and Supplier. Supplier will immediately forward to Company, or its designee, a complete copy of any claim or notice received by Supplier regarding a Vehicle manufactured by Supplier which involves (1) one or more deaths regardless of whether the death occurred in the United States or a foreign country and despite whether or not the notice alleges that a defect in the Vehicle caused the death; (2) one or more injuries that occurred in the United States whether or not the notice alleges that a defect in the Vehicle caused the injury or injuries; or (3) a complaint or property damage claim. For purposes of this Section 3.b.i, "immediately" shall mean within three (3) business days following the day of receipt of such notice or claim. Company will provide Supplier with contact information to receive such claims and notices and agrees to keep the contact information current.

  ii. Supplier shall cause to be affixed permanently to each Vehicle manufactured by Supplier for Company a label or placard identified on a parts list, part drawing, assembly drawing or other technical information provided by Company. In the case of any label or placard which must contain vehicle specific information, Company will provide the technical information necessary to determine the vehicle-specific content and Supplier shall be responsible for ensuring that the label or placard is matched to the correct vehicle. Company shall be responsible for the content of the label or placard.

  iii. Vehicles manufactured by Supplier for Company have been designed and developed solely by Company and therefore are attributed to Company fleet for purposes of compliance with any Federal Motor Vehicle Safety Standard including any phase-in of such Standards. In the event that Company, or its designee, determines that the attribution of the Vehicles manufactured by Supplier for Company must be reported to NHTSA pursuant to 49 C.F.R. Part 585 in connection with the phase-in of any Standards, Company and Supplier agree to memorialize this attribution agreement in a separate, stand-alone written contract that can be filed with NHTSA.

  iv. The Parties will make reasonable efforts to amend this Agreement to accommodate any changes made by NHTSA or other Governmental Authority in the future, if such changes affect the Vehicles.

2022TW-L-K-2412 `2



    v.  Supplier's obligations under this Section 3.b are subject to Supplier's reporting and compliance obligations to Governmental Authorities under applicable Law.

c.  <u>Materials Declaration</u>.  Company understands and agrees that:

    i.  Company is responsible for notifying Supplier in writing of the specific Materials Declaration Requirements that Company determines to be applicable to the Vehicle and shall be solely liable for the adequacy and sufficiency of such determination and information;

        (1).  Any information regarding Materials Declaration Requirements compliance of parts, Components, packaging or materials used in the Vehicle shall come from the relevant Component Provider. Supplier does not test, certify or otherwise warrant component, part, packaging or materials compliance, on a homogenous material level or any other level, with Materials Declaration Requirements; and

        (2).  Company is ultimately and solely responsible for ensuring that any Components and the Vehicle itself, are compliant with applicable Materials Declaration Requirements.

d.  <u>Permits</u>. Supplier shall, at its sole cost and expense, obtain and maintain in full force and effect any and all Permits, including all environmental Permits, necessary for the exercise of its rights and performance of Supplier's obligations under this Agreement, including any Permits required for the operation of the Manufacturing Plant, Permits required under Section 8, the shipment of hazardous materials, and the manufacture of the Vehicles, as applicable.

e.  <u>Incentives</u>. The Parties shall cooperate with one another and apply for and maximize the utilization of such state and local economic and tax incentives which may be provided by the State of Ohio, the City of Lordstown or other third parties, as a result of the activities engaged in by the Parties in connection with or during the performance of this Agreement or the manufacture of Vehicles (collectively, the "**Incentives**" and individually an "**Incentive**"). If Supplier receives, or receives the benefit of, any Incentives resulting from the activities which are the subject of this Agreement, Supplier shall provide notice of same to Company, and the Parties shall discuss and negotiate in good faith the sharing of the Incentive.

f.  <u>On-Site Component Providers</u>. In the event Company identifies any Component Provider that Company desires to have manufacture a Component at the Manufacturing Plant, Supplier agrees to consider such request in good faith and negotiate in good faith with such Component Provider the terms of a reasonable agreement with such Component Provider for the Component Provider's use of space at the Manufacturing Plant.

4.  **Quality; Warranty and Remedy.**

a.  <u>Quality Assurance</u>. The responsibilities for quality assurance shall be allocated between Supplier and Company as provided in the Roles, Accountability, and Responsibility Matrix ("Matrix"), the initial version of which is attached as Schedule 4.a. The Parties acknowledge that it is expected that the actual roles and responsibilities are likely to change during the pre-launch planning and production periods, and agree to modify the Matrix as needed to reflect those changes. Supplier shall be responsible for administrative tasks associated with any Component Provider quality issues, including routine communications with Components Providers regarding quality matters. The Parties shall agree on an escalation process to be used if routine communications with the Component Provider do not resolve the quality issues. Company shall support such escalation as reasonably requested by Supplier.  Supplier shall be responsible for all quality assurance associated with the Manufacturing Plant, the Plant Machinery (subject to Company's calibrations), and the Manufacturing Services, all subject to the Matrix.

b.  <u>Supplier Warranty</u>. Supplier warrants that, except to the extent that a breach of Supplier's warranty was caused by Company's breach of its obligations under this Agreement:



    i.    Supplier shall manufacture and assemble the Vehicles in accordance with the Specifications and the Vehicle type identified on the 4 Week Quantity/Option Build Schedule.

    ii.    The Vehicles shall be merchantable and free of defects in materials and workmanship arising out of the performance of the Manufacturing Services, and not from the causes covered by Company's warranties under Sections 4.c.i or 4.c.ii.

    iii.    Supplier shall comply with all Laws in the performance of its obligations hereunder.

    iv.    The Manufacturing Services will be provided by appropriately qualified and trained personnel, in a professional manner with the level of professional care customarily observed by appropriately skilled personnel rendering similar services as provided hereunder.

    v.    Subject to Section 6.d, the Vehicles shall be free and clear of all liens, claims, encumbrances, interests, or other rights and delivered by Supplier to Company with good title on Company's acceptance thereof.

c.    <u>Company Warranty</u>. Company warrants that, except to the extent that a breach of Company's warranty was caused by Supplier's breach of its obligations under this Agreement:

    i.    The Components purchased from Directed Suppliers will conform to the specifications (as established by Company), be merchantable, be fit for their intended purpose, and be free of defects in design or quality.

    ii.    The Vehicle will be free of defects in design, quality, conformity, and fitness for purpose.

    iii.    Company shall comply with all Laws in the performance of its obligations hereunder.

d.    <u>Warranty Liability</u>. To the extent that a Party breaches its warranties under this Section 4 and such breach could have been prevented or mitigated by the other Party's performance of its obligations under this Agreement, there will be an equitable adjustment to any liability (except as provided in Section 4.f) arising from the Party's breach of such warranty and the Parties agree to negotiate such adjustment in good faith.

e.    <u>Vehicle Warranty</u>. Company or its Affiliate will warrant to its retail purchasers of Vehicles in accordance with its usual and customary warranty policies. To the extent Supplier is determined to be responsible for such warranty claims in accordance with Section 4.f below, Company shall invoice Supplier and Supplier shall pay for such warranty claims. The cost of a warranty claim will be determined in accordance with Company's then-current Supplier Quality Assurance Manual or, if not addressed in such manual, usual and customary industry warranty policies. Company, or its designee, shall have the right to handle any claim, action, or proceeding allegedly based on such warranty. In connection with any alleged defect in Vehicles and the parts thereof, including "off-warranty" costs and "vehicle buy-backs," Company may make such repair or replacement of Vehicles and the parts thereof, or pay such compensation directly or indirectly to the retail purchasers who purchased such Vehicles if it is not covered by the aforementioned warranty, recall campaign, or other service campaign pursuant to Section 5. Any costs and expenses incurred in making such repair, replacement, or compensation shall be either (i) borne by the respective Party in accordance with the principles of responsibility allocation under Section 4.f; or (ii) as agreed upon by the Parties.

f.    <u>Allocation of Warranty Claim Responsibility</u>. Any costs, expenses, and liabilities relating to warranty claims as mentioned in Section 4.e shall be borne by the responsible Party or Parties in accordance with and subject to the following principles of responsibility allocation:

    i.    Company shall be responsible for the defects or consequences attributable to: (1) the development or design of Vehicles and the Components; (2) the transportation, delivery, or distribution of Vehicles; (3) defective Components purchased from Directed Providers, subject to Supplier's obligations under this Agreement; or (4) any other breach of its obligations under this Agreement.

2022TW-L-K-2412      `2


     ii.  Supplier shall be responsible for defects or consequences attributable to the Manufacturing Services, including any Component manufactured by Supplier, or any other breach of its obligations under this Agreement.

  g.  <u>Repair or Replacement of Defective Vehicle</u>. On Company's request, Supplier shall repair, exchange, or replace any defective Component or Manufacturing Service. Company shall use Commercially Reasonable Efforts to notify Supplier promptly after its discovery of a defect. The Parties shall mutually determine whether repair, exchange, or replacement is the appropriate remedy. Liability for the costs of repair, exchange, or replacement shall be determined in accordance with the principles of Section 4.d.

  h.  <u>Exclusive Warranty</u>. THE WARRANTIES GIVEN BY THE WARRANTOR (COMPANY OR SUPPLIER, AS THE CASE MAY BE) IN THIS SECTION 4 ARE THE WARRANTOR'S EXCLUSIVE WARRANTIES, AND THE WARRANTOR EXPRESSLY DISCLAIMS, AND WARRANTEE EXPRESSLY WAIVES, ALL OTHER WARRANTIES AND REPRESENTATIONS OF ANY KIND WHATSOEVER WHETHER EXPRESS, IMPLIED, STATUTORY, ARISING BY COURSE OF DEALING OR PERFORMANCE, CUSTOM, USAGE IN THE TRADE OR OTHERWISE, ANY IMPLIED WARRANTY OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR INFRINGEMENT OR MISAPPROPRIATION OF ANY RIGHT, TITLE, OR INTEREST. NO ORAL OR WRITTEN STATEMENT OR REPRESENTATION BY EITHER PARTY, ITS AGENTS, OR EMPLOYEES SHALL CONSTITUTE OR CREATE A WARRANTY OR EXPAND THE SCOPE OF ANY WARRANTY HEREUNDER.

5.  **<u>Recall and Other Service Campaigns</u>.**

  a.  <u>Supplier Obligations</u>. In the event that any request, allegation, or inquiry from, or any initial or final determination by, any Governmental Authority concerning suspected, alleged, or so-determined safety or emissions defects, or noncompliance with any governmental safety or emissions control standard or regulation relating to any of the Vehicles or the parts or Components thereof, is made or notice thereof is given directly or indirectly to either of the Parties hereto:

     i.  If Supplier receives such request, allegation, inquiry, or determination, Supplier shall immediately notify Company or its designee and provide all relevant or requested information and documents. Company, either directly or through its designee, shall represent the interests of the Parties in connection with such request, allegation, inquiry, or determination and shall have the sole right to determine (1) whether to conduct a recall campaign, and (2) whether to challenge the determination of a Governmental Authority before such Governmental Authority or in court. Supplier will fully cooperate in any such recall campaign or challenge. For purposes of this Section 5.a.i, "immediately" shall mean within three (3) business days following the day of receipt of such request, allegation, inquiry, or determination.

     ii.  If, as a result of field experience, test data or otherwise, Supplier believes it may be necessary or desirable to conduct a recall campaign or other service campaign relating to any Vehicles or the parts thereof, then (1) Supplier shall immediately notify Company to that effect; (2) Company shall decide whether to conduct a recall campaign or other service campaign; and (3) Supplier will fully cooperate in any such recall campaign or other service campaign. For purposes of this Section 5.a.ii, "immediately" shall mean within three (3) business days following the day on which Supplier believes a recall campaign or other service campaign is necessary or desirable.

     iii.  If, as a result of field experience, test data or otherwise, Company believes it may be necessary or desirable to conduct a recall campaign or other service campaign relating to any Vehicles or the parts thereof, then (1) Company shall immediately notify Supplier to that effect; (2) Company shall decide whether to conduct a recall campaign or other service campaign; and (3) Supplier will fully cooperate in any such recall campaign or other service campaign. For purposes of this Section 5.a.iii, "immediately" shall mean within three (3) business days following the day on which Company believes a recall campaign or other service campaign is necessary or desirable.

     iv.  Supplier's obligations under this Section 5.a and under Section 5.b.i are subject to Supplier's reporting



and compliance obligations to Governmental Authorities under applicable Law.

b. <u>Corrective Actions</u>.

    i.    In the event of either Section 5.a.i or Section 5.a.ii, Company shall decide the nature of the corrective action to be taken and shall cause the required reports to be filed with the relevant Governmental Authority. However, to the extent feasible, Company shall confer with Supplier before making such decision. In the event that any recall campaign or other service campaign is required, Company, or its designee, shall issue notification letters and shall administer any such campaign. Company and Supplier shall cooperate in exchanging information and otherwise for purposes of responding to requests for information from a Governmental Authority.

    ii.    Unless otherwise agreed upon, all costs and expenses incurred by each Party in connection with this Section 5 shall be borne by such Party; provided, however, that if a recall campaign or other service campaign is conducted or if a penalty, fine, or other assessment is levied relating to any Vehicles and the parts thereof, the costs and expenses for said campaign and said penalty, fine, or other assessment shall be initially borne by Company and, except as otherwise agreed to by the Parties, shall be reimbursed by Supplier where Supplier is responsible therefor in accordance with and subject to the principles of responsibility allocation under Section 4.

    iii.    Supplier shall make a record of all safety related parts required to be tracked by Governmental Authority and the manufacturer's codes of the tires on each Vehicle. Supplier shall maintain such information as required by Law or, if not required by Law, as agreed by the Parties. All records relating to such tracking maintained by either Party shall be provided to the other Party as reasonably requested or as required by Law. Any records or information necessary for the appropriate tire manufacturer to conduct a tire recall campaign shall be furnished to such tire manufacturer by Company in such manner and content as agreed upon by Company and Supplier.

6. **Payment.**

a. <u>Vehicle Invoice</u>. Upon acceptance of a Vehicle, Supplier shall issue to Company one or more invoices for the Vehicle Payment. For each Vehicle accepted by Company in accordance with Section 2.e, Supplier shall be entitled to a "Manufacturing Value Add Payment" in the amount of $8,000, provided that if actual Vehicle production volumes materially vary from expected volumes (500 Vehicles in 2022 and 2,000 Vehicles in 2023), the Parties will negotiate in good faith a possible adjustment, up or down, of the Manufacturing Value Add Payment. The form and content (including the number of invoices) shall be agreed to by the Parties.

b. <u>Other Invoices</u>. Supplier shall issue to Company an invoice for:

    i.    Service Parts, upon delivery to Company. During the production period of the Vehicle, Service Parts prices shall be equal to the then current BOM price, plus any incremental costs to Supplier of providing service parts. Following the production period, Service Parts prices shall be equal to the service prices charged by Component Providers, plus incremental costs to Supplier of providing service parts.

    ii.    Amounts owed to Supplier under the allocation principles set forth in Section 4.d, when determined;

    iii.    Amounts due to Supplier under the Agreement, including under Section 9, when determined;

    iv.    Termination-related amounts, in accordance with the provisions of Section 12.b; and

    v.    Any other amounts due to Supplier under the Agreement, as mutually agreed to in writing by the Parties.

c. <u>Invoice Payment</u>. All sales of Vehicle by Supplier shall be to Company (although Vehicle may be shipped to Subsidiaries of Company), and Company shall pay Supplier all monies when due. Payment of all invoices shall be net 30 days from date of invoice. Payment to Supplier shall be in U.S. dollars and in immediately

2022TW-L-K-2412      `2



available funds.

d. <u>Disputes</u>. If there is any good faith dispute over an invoice, Company shall pay the undisputed amount and the Parties shall negotiate in good faith to resolve any issues regarding any amounts still in dispute in accordance with Section 23. Each Party shall continue to perform its obligations under this Agreement during the continuation of any such dispute and Company's partial payment hereunder shall not constitute a breach of its obligations herein, provided that if the amount in dispute exceeds $5,000,000, then Supplier may suspend performance, further provided that Supplier will resume performance if Company pays the amount in dispute in excess of such threshold, even under protest.

e. <u>Setoff</u>. All amounts due from one Party to the other under this Agreement are net of any indebtedness and subject to setoff or recoupment in accordance with UCC §2-717.

f. <u>Taxes</u>. Company shall be responsible for all federal, foreign, state and local sales, use, excise and other taxes relating to the Vehicles (except taxes based on Supplier's income), all delivery, shipping, and transportation charges and all foreign agent or brokerage fees, document fees, custom charges, and duties.

g. <u>Liens</u>. In the event any applicable Law permits the creation of a lien in any Vehicle accepted by Company, Company hereby grants Supplier a lien in any such Vehicle to secure payment of the Vehicle Payment; provided, however, that Supplier shall take any and all actions necessary or desirable to release such lien at the time Company offers such Vehicle for sale. As a condition of such release, Company hereby grants Supplier a lien in any receivable associated with such Vehicle. Supplier specifically waives any and all other reservations, liens, security interests, or similar encumbrance in any Vehicle which it might acquire by operation of Law, by judicial process, by judgment, or otherwise.

7. **US Government Contracting Requirements.** Supplier acknowledges that Company may sell certain Vehicles manufactured by Supplier to the United States government pursuant to agreements that require Company to flow down certain requirements to Supplier. Supplier agrees to comply with any requirements that Company is required by law or such government contracts to flowdown to Supplier, which, notwithstanding Section 24.e, may be attached hereto and incorporated herein by Company on notice to Supplier.

8. **Import and Export.** All transactions subject to this Agreement shall be made in compliance with all applicable U.S. export control, economic sanctions, customs, and import laws and regulations. The Company shall be responsible for obtaining any licenses or other authorizations required under the U.S. export control and trade sanctions laws and regulations, including the Export Administration Regulations administered by the U.S. Department of Commerce's Bureau of Industry and Security, and the economic sanctions regulations administered by the U.S. Department of Treasury's Office of Foreign Assets Control, and any military related uses regulated by the Department of State's, International Traffic in Arms (ITAR). The Company shall not export the Vehicle to any country other than Canada without prior notification to the Supplier. The Supplier shall be responsible for clearing through customs administration (into the United States and out of any country of export) supplies relating to the Vehicle (including parts, materials, components, and assemblies) that are ordered by the Supplier and the Company shall be responsible for the customs administration for any supplies relating to the Vehicle (including parts, materials, components, and assemblies) that are ordered directly by the Company. Each Party shall ensure that the imports of supplies relating to the Vehicle that are directly ordered by that Party are made in compliance with U.S. Customs laws and regulations, and other U.S. and state regulatory requirements necessary for import into the United States. Each Party shall be responsible for paying or ensuring payment of all applicable duties and fees for imports of supplies relating to the Vehicle that are directly ordered by that Party. Each Party shall take all reasonable actions at the request of the other Party so each Party can comply with its obligations in this Section.

9. **Changes and Obsolescence.**

a. <u>Changes to Manufacturing Services, Packaging Specifications and Test Procedures</u>. Company may, in writing, request a change to the Manufacturing Services, Packaging Specifications and Test Procedures at any time. Supplier will analyze the requested change and provide Company with an assessment of the effect that the requested change will have on cost, manufacturing, scheduling, delivery, implementation, or other

material aspects of its performance. Company will be responsible for all costs associated with any accepted changes, and in return Company shall also receive all benefits associated with any such accepted changes, except if the change has been initially suggested to Company by Supplier, in which case Supplier and Company will negotiate in good faith a sharing of the benefits and costs. Any such change shall be documented in a written change order and shall become effective only upon mutual written agreement of both Parties to the terms and conditions of such change order, including changes in time required for performance, cost, and applicable delivery schedules.

b.   Engineering Changes. Company may request Engineering Changes to the Vehicle in writing at any time (a "**Change Request**"). Supplier will analyze the Change Request and inform Company within a reasonable time, not to exceed 10 business days, if it can satisfy the Change Request, and if it can, a good faith estimate of the time and cost required to implement the Engineering Change, and if it cannot, the reasons preventing Supplier from satisfying the Change Request. Any such change shall be documented in writing and shall become effective only upon mutual written agreement of both Parties of the terms and conditions of such change, including changes in time required for performance, cost (including cost of materials on hand or on order in accordance with original Build Schedule), and applicable delivery schedules.

c.   Treatment of Obsolete/End-of-Life Material/Part Change Notification. If a Component becomes obsolete as a result of an Engineering Change or otherwise, Company shall be liable to Supplier or the Component Provider, as the case may be, for all costs of the obsolete materials, provided that Supplier will collaborate with Company and otherwise use Commercially Reasonable Efforts to minimize the volume and value of obsolete materials, whether held by Supplier or a Component Provider, by taking the following steps:

   i.   Use all Components and materials to the extent possible.

   ii.   As soon as is commercially practical, reduce or cancel component and material orders to the extent contractually permitted.

   iii.   Return all Components and materials to the extent contractually permitted.

   iv.   Subject to Company's written consent, make all Commercially Reasonable Efforts to sell Components and materials to third parties.

   v.   Assist Company to determine whether current work in progress should be completed, scrapped or shipped "as is".

10.   **Term.** The term of this Agreement shall begin on the Effective Date and, unless earlier terminated pursuant to Section 11, it shall continue for a minimum period of eighteen (18) months thereafter ("Initial Term"). It shall thereafter continue on a month to month basis, provided that either Party may terminate this Agreement by written notice issued by its senior executive ("Termination Notice"), effective upon the later of 12 months from the expiration of the Initial Term or 12 months from the issuance of the Termination Notice. During the period between the issuance of the Termination Notice and the effective date of termination, this Agreement shall remain in full force and effect.

11.   **Termination for Cause.** The Agreement may be terminated for cause as follows:

   a.   Termination for Breach. Either Party may terminate this Agreement based on the material breach by the other Party of the terms of this Agreement, provided that the Party alleged to be in material breach receives written notice setting forth the nature of the breach at least 30 days prior to the intended termination date. During such time the Party in material breach may cure the alleged breach and if such breach is cured within such 30-day period, no termination will occur, and this Agreement will continue in accordance with its terms. If such breach shall not have been cured, termination shall occur upon the termination date set forth in such notice.

   b.   Termination for Bankruptcy/Insolvency. Upon the happening of any of the following events with respect to a



Party, this Agreement may be terminated immediately.

    i.    The appointment of a receiver or custodian to take possession of any or all of the assets of a Party, or should a Party make an assignment for the benefit of creditors, or should there be an attachment, execution, or other judicial seizure of all or a substantial portion of a Party's assets, and such attachment, execution, or seizure is not discharged within 30 days.

    ii.    A Party becomes a debtor, either voluntarily or involuntarily, under Title 11 of the United States Code or any other similar law and, in the case of an involuntary proceeding, such proceeding is not dismissed within 30 days of the date of filing.

    iii.    The dissolution or termination of the existence of a Party whether voluntarily, by operation of law or otherwise.

12.  **Obligations at Termination.**  This Section 12 shall apply if this Agreement terminates (which for purposes of this Section, includes expiration, cancellation, or termination) for any reason, whether pursuant to Section 10, Section 11, or otherwise. On termination:

    a.    <u>Existing Rights and Obligations</u>. Neither Party shall be excused from its obligations or liabilities under this Agreement which have accrued prior to the effective date of termination of the Agreement, including payment for all monies due Supplier.

    b.    <u>Termination Claim</u>. Within 90 days following the effective date of termination, (as determined under Sections 10 or 11, as the case may be), Supplier shall submit to Company its claim for amounts due to it arising out of the termination ("**Termination Claim**"). Company shall pay the Termination Claim within 30 days of submittal. Supplier will provide to Company all information reasonably necessary to confirm the Termination Claim. Subject to Section 12.d, Company shall pay the charges claimed by Supplier as follows:

        i.    All amounts due for Vehicle which Supplier has completed manufacture prior to the effective date of termination pursuant to an issued 4 Week Quantity/Option Build Schedule for which payment has not been made;

        ii.    Supplier's actual cost of Components, materials, and work-in-process on hand or on order as of the effective date of termination pursuant to an issued 12 Week Quantity Build Schedules or the applicable Component Lead-time, whichever is longer;

        iii.    Supplier's other reasonable out of pocket amounts paid or to be paid to Directed Providers or other providers incurred as a result of the termination;

        iv.    Supplier's other reasonable costs actually incurred as a result of the termination;

        v.    Any unrecaptured NRE Costs; and

        vi.    Except in the event of termination at Supplier's election under Section 10 or termination by Company for cause under Section 11, depreciation on equipment idle up to 6 months after the Termination Effective Date.

    In addition, if Supplier holds Vehicles, Components, materials, or work-in-process in excess of the volumes for which Company is obligated to purchase, Company may elect to purchase them on the same terms.

    c.    <u>Company Purchase</u>. All Components, Vehicles, materials, and work in process for which Company shall have paid one hundred percent (100%) of the amount due under Section 12.b shall be held by Supplier for Company's account and Company may take possession of them on an AS-IS, WHERE-IS basis, not later than thirty days after full payment.



d. <u>Duty to Mitigate Costs</u>. Both Parties shall, in good faith, undertake Commercially Reasonable Efforts to mitigate the costs of termination, expiration, or cancellation. Supplier (or Company, if it is the direct purchaser) shall make Commercially Reasonable Efforts to cancel all applicable Component Purchase Orders and reduce component inventory through return for credit programs or allocate such Components and materials for alternate Company programs if applicable, or other customer orders provided the same can be used within 30 days of the termination date.

13. **Property of the Parties.**

a. <u>Property of the Supplier</u>: All Property used by Supplier in performing under this Agreement which is not Company Property shall be and remain the property of Supplier and, if in the possession of Company, shall be deemed a bailment.

b. <u>Property of Company</u>. All Tooling and other machinery, equipment, transportation equipment, systems, technology, and other similar items that are provided by Company to Supplier without charge, or for which Supplier has been reimbursed by or on behalf of Company and are kept by Supplier in the Manufacturing Plant ("**Company Property**"), shall be and remain the property of Company and, as applicable, be deemed a bailment, provided that, for purposes of clarity, Transferred Assets as defined in the Asset Purchase Agreement shall not be Company Property. Supplier shall bear the risk of loss of and damage to all Company Property, unless caused by Company's breach of its obligations under this Agreement. Company Property shall be used solely by Supplier to perform under this Agreement and not for any other purpose. Company Property may not be moved from the Manufacturing Plant or substituted with any other property without the written consent (which may be withheld) of Company, provided that if and to the extent that Company's failure to consent to any transfer of or substitution of Company Property requested by Supplier and necessary for the performance of the Manufacturing Services materially interferes with Supplier's ability to perform the Manufacturing Services, Supplier shall be relieved of such obligations. Company Property must be stored and maintained and clearly identified as Company Property through tagging or other commercially reasonable means to avoid comingling of Company's Property with Supplier's Property or the property of any third party, free and clear of Supplier-created liens and encumbrances, and in good condition. If this Section and Section 2.i conflict, Section 2.i shall prevail.

c. <u>No License</u>. Performance by either Party under the Agreement will not transfer any rights of ownership in, or license of, or constitute permission granted by to the owning Party to the other Party to use the owning Party's property except (i) if otherwise consented to by the owning Party; or (ii) as relates to license rights only, to the extent necessary for the non-owning Party to fulfill its obligations under this Agreement.

d. <u>Return of Company Property</u>. Upon the request of Company, all Company Property (except Company Property that has been consumed or otherwise disposed of with Company's consent) must be immediately released or returned to Company or delivered by or on behalf of Supplier to Company or its designee, in accordance with Company requirements and this Agreement and at Company's expense. Supplier hereby waives any statutory or other lien or lien rights it may have against or in any property or rights of Company (including any Company Property). When any Company Property is no longer reasonably necessary for Supplier to perform under this Agreement, Supplier will return all such Company Property (except Company Property that has been consumed or otherwise disposed of with Company's consent) to Company or its designee at Company's expense. If and to the extent that Company's repossession of Company Property materially interferes in any material respect with Supplier's ability to perform the Manufacturing Services, Supplier shall be relieved of such obligations.

14. **Confidentiality.**

a. <u>Confidentiality Obligations</u>. In order to protect both Parties' Proprietary Information and Technology, the Parties agree that each Party shall use the same degree of care, but no less than a commercially reasonable degree of care, as such Party uses with respect to its own similar information to protect the Proprietary Information and Technology of the other Party and to prevent any use of the other's Proprietary Information and Technology other than for the purposes of this Agreement. This Section 14 imposes no obligation upon a Party with respect to Proprietary Information and Technology which: (a) was known to such Party

before receipt from the disclosing Party; (b) is or becomes publicly available through no fault of the receiving Party; (c) is rightfully received by the receiving Party from a third party without a duty of confidentiality; (d) is independently developed by the receiving Party without a breach of this Agreement or in reliance on the Proprietary Information and Technology of the Disclosing Party; or (e) is disclosed by the receiving Party with the disclosing Party's prior written approval. If a receiving Party is required by Law or a Governmental Authority to disclose Proprietary Information and Technology, this Agreement or any portion hereof, then such receiving Party agrees to give the disclosing Party prompt notice of such requirements, and, except as required by Law or a Governmental Authority, neither the receiving Party nor its representatives shall disclose the Proprietary Information and Technology until the disclosing Party has had a reasonable opportunity to seek a protective order or other appropriate relief to contest the disclosure.

b.  <u>Employees, Agents, and Representatives</u>. Each Party represents and warrants to the other that it has adopted policies and procedures consistent with the Party's obligations under this Section 14 with respect to the receipt and disclosure of confidential or proprietary information, such as the Proprietary Information and Technology, with its employees, agents, and representatives. Each Party represents and warrants to the other Party that it will cause each of its employees, agents, and representatives to maintain and protect the confidentiality of the other Party's Proprietary Information and Technology and shall be responsible for any breach thereof by any of its employees, agents, or representatives.

c.  <u>Term and Enforcement</u>. The confidentiality obligation set forth in this Agreement shall be observed during the term of the Agreement and for a period of five years following the termination of this Agreement. Each Party acknowledges that a breach of any of the terms of this Section 14 may cause the non-breaching Party irreparable damage, for which the award of damages would not be adequate compensation. Consequently, the non-breaching Party may institute an action to enjoin the breaching Party from any and all acts in violation of those provisions, which remedy shall be cumulative and not exclusive, and shall be in addition to any other relief to which the non-breaching Party may be entitled at law or in equity. Such remedy shall not be subject to the arbitration provisions set forth in Section 23.

d.  <u>Return of Proprietary Information and Technology</u>. Upon the termination, cancellation, or expiration of this Agreement all Proprietary Information and Technology shall, upon written request, be returned to the respective Party, or at the respective Party's discretion, destroyed by the receiving Party.

15.  **Intellectual Property Rights; Assignment.**

a.  <u>Company Existing Intellectual Property</u>. Company does not transfer to Supplier any Company Intellectual Property or any right, title, or interest therein, other than the limited right to use such Company Intellectual Property strictly and solely in connection with the manufacture of the Vehicle pursuant to the terms of this Agreement and any related parts and Components thereof as may be authorized in writing by Company and Supplier shall not, without the prior written consent of Company, use, or permit the use of, any Company Intellectual Property, or any materials or information supplied by or on behalf of Company, for any other purpose. Any such use of Company Intellectual Property by Supplier shall be subject to the confidentiality provisions in Section 14. All Company Intellectual Property shall be and remain the sole and exclusive property of Company. Without limiting the generality of the foregoing, Supplier shall not reproduce, distribute, disclose, or sell to any Person or third party other than Company any of Company Intellectual Property or derivation thereof or any materials or information supplied by or on behalf of Company or its applicable Affiliate without the prior written consent of Company or the applicable Affiliate in each instance.

b.  <u>Goodwill and Acquired Rights</u>. Any goodwill derived from the use by Supplier of Company Intellectual Property shall inure to the benefit of Company. If Supplier acquires any rights in or relating to any Company Intellectual Property, by operation of law or otherwise, these rights are deemed and are hereby irrevocably assigned to Company without cost or further action by either Party. Supplier agrees to take any and all actions in the future, including executing and delivering any and all requested documents, to assign all right, title, and interest in and to any such Company Intellectual Property.

c.  <u>Protection of Intellectual Property</u>. Each Party shall use the same degree of care, but no less than a commercially reasonable degree of care, as such Party uses with respect to its own similar Intellectual

2022TW-L-K-2412 `2



Property and to prevent any use of the other's Intellectual Property other than for the purposes of this Agreement.

d. <u>Prohibited Acts</u>. Supplier shall not: (i) take any action that may interfere with any Company's rights in or to Company Intellectual Property, including Company's ownership or exercise thereof; (ii) challenge any right, title, or interest of company in or to Company Intellectual Property; or (iii) make any claim or take any action adverse to Company's ownership of Company Intellectual Property, unless in good faith protection of its own rights under this Agreement.

e. <u>Supplier Existing Intellectual Property</u>. Supplier shall retain all right, title, and ownership to any Supplier Existing Intellectual Property. Upon full payment of all monies due and owing under this Agreement, Supplier will grant to Company a worldwide, non-exclusive, irrevocable, fully paid-up, royalty-free, right and license under Supplier's intellectual property rights to the Supplier Existing Intellectual Property only insofar as is required for Company to use, sell, or distribute the Vehicle provided as part of the Manufacturing Services performed by Supplier pursuant to this Agreement.

f. <u>Inventions and Improvements Made by Supplier</u>. Except for Supplier Existing Intellectual Property (including manufacturing processes and/or manufacturing process improvements), in the event that during the Term, Supplier or Supplier Personnel make any inventions or improvements relating to the Vehicle or the Manufacturing Process ("**Inventions and Improvements**"), Supplier shall immediately furnish Company with all information in connection with such inventions or improvements, and any Intellectual Property rights derived from such inventions or improvements shall insure to the benefit of Company. If Supplier acquires any rights in or relating to such Inventions or Improvements, by operation of law or otherwise, these rights are deemed and are hereby irrevocably assigned to Company without cost or further action by either Party, except that Inventions and Improvements to the Manufacturing Processes shall remain Supplier Existing Intellectual Property, subject to the license set forth in Section 15.e. Supplier agrees to take any and all actions in the future to assign, including executing any and all requested documents, all right, title, and interest in and to any such Inventions and Improvements. Further, Company and its Affiliates shall have the right to apply for a patent in their own name or their employee's name in any country on such Inventions and Improvements without any payment to Supplier or Supplier Personnel, and Supplier shall immediately comply with any reasonable requests made by Company or its Affiliate in connection with such patent application.

16. **Indemnification.**

a. <u>Third Party Indemnification</u>. Except as otherwise provided herein, each Party ("**Indemnifying Party**") shall indemnify, defend, and hold the other Party and its directors, officers, employees, agents, contractors, successors, and assigns (individually, an "**Indemnified Party**" and, collectively, the "**Indemnified Parties**") harmless from and against any and all Losses from third party claims (a "Third party Loss") for property damage and personal injury or death asserted against an Indemnified Party, to the extent arising out of, or resulting from, directly or indirectly, the other Party's (i) performance or failure to perform any of its obligations under, or breach of, the terms of this Agreement; (ii) negligent acts or willful or intentional misconduct; or (iii) violation of any Laws, in each case except to the extent resulting directly from an Indemnified Party's gross negligence or willful or intentional misconduct. Third Party Losses shall also include all Losses arising from Intellectual Property infringement, with Supplier to be the Indemnifying Party if the infringement arises out of the Manufacturing Services and Company to be the Indemnifying Party otherwise. Neither Party shall be entitled to indemnification except as expressly provided in this Agreement.

b. <u>Indemnification Procedure</u>.

i. Indemnified Party shall promptly notify Indemnifying Party in writing of any Third party Losses and cooperate with Indemnifying Party at the Indemnifying Party's sole cost and expense. Except as provided in Section 16.b.ii:

(1). Indemnifying Party shall immediately take control of the defense and investigation of such Losses and shall employ counsel of its choice to handle and defend the same, at Indemnifying Party's sole



cost and expense.

(2). Indemnifying Party shall not settle any Losses in a manner that adversely affects the rights of any Indemnified Party without such Indemnified Party's prior written consent, which shall not be unreasonably withheld or delayed.

(3). Indemnified Party may participate in and observe the proceedings at its own cost and expense, provided that if such counsel is necessary because of a conflict of interest with Indemnifying Party or its counsel or because Indemnifying Party does not assume control of the defense of a claim for which Indemnifying Party is obligated to indemnify an Indemnified Party hereunder, Indemnifying Party shall bear such expense to a reasonable extent.

ii. Notwithstanding anything to the contrary in this Section 16.b, for any Third Party Loss brought or based on the alleged product liabilities of Vehicles or Components resulting in alleged injury to person or property ("**PL Claims**") (i) Supplier agrees that Company shall have full power and control over the negotiation and defense thereof, including sole authority to retain attorneys and experts, establish defense strategies, and settle or take to trial PL Claims, without consultation with or consent of Supplier (subject to the final sentence of this subpart); and (ii) Supplier shall fully cooperate with Company, at Supplier's expense, for the effective defense of such PL Claims to the fullest extent possible in investigation into the facts or circumstances surrounding such PL Claims, including responding to discovery requests, providing technical support and witnesses for deposition or trial, and otherwise fully cooperating in the defense and trial of the matter. Company shall not settle any PL Claims in a manner that materially adversely affects the rights of Supplier without Supplier's prior written consent, which shall not be unreasonably withheld or delayed (the Parties agreeing that the payment of any amount as a result of such settlement shall not be deemed to adversely affect Supplier).

iii. An Indemnified Party's failure to perform any obligations under this Section 16.b shall not relieve Indemnifying Party of its obligations under this Section 16.b except to the extent that Indemnifying Party can demonstrate that it has been materially prejudiced as a result of such failure.

iv. If the Parties disagree as to which (if either) Party is entitled to indemnity, it shall be resolved in accordance with Section 23. If it is determined that one Party has been wrongfully identified by the other Party as an Indemnifying Party, the other Party shall be liable for all such Losses.

17. <u>**Limitation of Damages.**</u>

a. <u>LIMITATIONS</u>. EXCEPT AS OTHERWISE PROVIDED IN SECTION 17.c, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY OTHER PERSON OR ENTITY UNDER ANY CONTRACT, TORT, STRICT LIABILITY, NEGLIGENCE, OR OTHER LEGAL OR EQUITABLE CLAIM OR THEORY FOR ANY SPECIAL, CONSEQUENTIAL, INDIRECT, EXEMPLARY, MULTIPLE, OR PUNITIVE DAMAGES WHETHER SUCH PARTY WAS INFORMED OR WAS AWARE OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. THE FOREGOING SHALL NOT EXCLUDE OR LIMIT EITHER PARTY'S LIABILITY FOR DEATH OR PERSONAL INJURY RESULTING FROM ITS NEGLIGENCE TO THE EXTENT THAT SUCH LIABILITY CANNOT BY LAW BE LIMITED OR EXCLUDED. FOR CLARITY, THE FOLLOWING SHALL BE DIRECT DAMAGES: (1) WITH RESPECT TO RECALLS, LMC's REASONABLE COSTS OF ADMINISTRATION AND ISSUING NOTICE AND THE REASONABLE LABOR AND MATERIAL COSTS (INCLUDING THROUGH THIRD PARTY SERVICE PROVIDERS) OF REPAIRING OR REPLACING THE COMPONENT(S) AND ANY OTHER COMPONENT(S) IMPACTED THEREBY; AND (2) WITH RESPECT TO WARRANTY CLAIMS, LMC's REASONABLE LABOR AND MATERIAL COSTS (INCLUDING THROUGH THIRD PARTY SERVICE PROVIDERS) OF REPAIRING OR REPLACING THE COMPONENT(S) AT ISSUE AND ANY OTHER COMPONENT(S) IMPACTED THEREBY.

b. <u>CAP ON AGGREGATE LIABLITY</u>. EXCEPT AS OTHERWISE PROVIDED IN SECTION 17.c, IN NO EVENT SHALL SUPPLIER'S AGGREGATE LIABILITY IN ANY CALENDAR YEAR UNDER THIS

2022TW-L-K-2412 `2



AGREEMENT ENTERED INTO PURSUANT HERETO EXCEED THE GREATER OF (I) $6,000,000 AND (II) 100% OF THE TRAILING TWELVE MONTH'S MANUFACTURING VALUE ADD PAYMENT FROM THE FIRST FULL MONTH PRIOR TO THE DATE THE CLAIM OCCURRED.

c.  **EXCEPTIONS**. SECTIONS 17.a AND 17.b SHALL NOT APPLY TO DAMAGES OR LIABILITIES ARISING FROM (i) THE INDEMNITIES SET FORTH HEREIN (PROVIDED THAT THE UNINSURED PORTION OF SUPPLIER'S INDEMNITY LIABILITY SHALL BE SUBJECT TO SECTION 17.b); (ii) LIABILITY FOR BREACH OF SECTION 14; (iii) LIABILITY FOR FRAUD OR WILFULL MISCONDUCT OR VIOLATION OF LAW; OR (iv) A PARTY'S OBLIGATION TO PAY ATTORNEYS' FEES AND COURT COSTS IN ACCORDANCE WITH SECTION 24.d.

18.  **Insurance.** Each Party shall procure and maintain at all times during the term of this Agreement and at its own cost (unless otherwise indicated on Schedule 18) with an insurer of good financial standing and repute insurance policies meeting the coverage and requirements specified on Schedule 18; provided that: with respect to Product Recall and Product Liability insurance, the Parties shall: (i) have a commercially reasonable time (but not later than the start of production) to procure insurance; and (ii) if such insurance is not commercially available on mutually acceptable terms (provided that neither Party shall unreasonably withhold its consent to such terms), the Parties shall confer in good faith on any needed amendment to the Agreement and provided, further that for any joint insurance policies, neither Party shall be required to pay its portion of the premium prior to the date that such premium is due. Each Party shall provide the other Party upon request with sufficient proof that it has procured and maintained insurance coverage in accordance with this Section.

19.  **Relationship of Parties.** Supplier shall perform its obligations hereunder as an independent contractor. Nothing contained herein shall be construed to imply a partnership or joint venture relationship between the Parties. The Parties shall not be entitled to create any obligations on behalf of the other Party, except as expressly provided by this Agreement. The Parties will not enter into any contracts with third parties in the name of the other Party without the prior written consent of the other Party.

20.  **Publicity.** Without the consent of the other Party, neither Party shall refer to this Agreement in any publicity or advertising or disclose to any third party any of the terms of this Agreement. Notwithstanding the foregoing, neither Party will be prevented from, at any time, furnishing any information to any governmental or regulatory authority, including the United States Securities and Exchange Commission or any other foreign stock exchange regulatory authority, that it is by law, regulation, rule or other legal process obligated to disclose. A Party may disclose the existence of this Agreement and its terms to its attorneys and accountants, Component Providers, customers, and others only to the extent necessary to perform its obligations and enforce its rights hereunder.

21.  **Force Majeure.** Any delay or failure of either Party to perform its obligations under this Agreement (other than the payment of money) shall not constitute a breach or default under this Agreement if, and only to the extent that, the delay or failure to perform is caused by unforeseen circumstances beyond the reasonable control of the Party that failed to perform or whose performance was delayed, including acts of God; blackouts; power failures; inclement weather; fire; explosions; floods; hurricanes; typhoons; tornadoes; earthquakes; epidemics; component shortages or material shortages; sabotage; accidents; destruction of production facilities; riots or civil disturbances; acts of government or governmental agencies, including changes in law or regulations that materially and adversely impact the Party; provided that the non-performing Party was not a cause of such event or otherwise at fault or negligent and that such cause could not have been prevented or mitigated through Commercially Reasonable Efforts (each such event, a "Force Majeure Event"). The Party declaring a Force Majeure Event shall make Commercially Reasonable Efforts to continue to meet its obligations throughout the duration of the Force Majeure Event and shall notify the other Party promptly (in no event more than five business days of discovery of the event) when the Force Majeure Event begins (including an explanation of the nature of the Force Majeure Event) and when such Force Majeure Event has terminated. The suspension of any obligations shall only last during the time the Force Majeure Event continues and such reasonable time thereafter to allow said Party to respond to such Force Majeure Event. The Party affected by a Force Majeure Event shall have the duty and obligation to mitigate the effects of the Force Majeure Event by making Commercially Reasonable Efforts to limit or prevent any delay or non-performance of any obligation under this Agreement. If the force majeure event can be eliminated or mitigated by a change to the Component or Vehicle or other changes, Section 9 shall apply. If the delay or failure of a Party to perform its obligations caused by the Force Majeure Event lasts (or is

23

reasonably believed by both Parties that it shall last) more than sixty (60) days, the Party not declaring the Force Majeure Event may immediately, in its sole discretion, (a) cancel or modify any performance affected by the Force Majeure Event and seek alternate performance elsewhere; or (b) terminate this Agreement, provided that such action shall not give rise to a claim for damages against the Party unable to perform its obligations. Notwithstanding anything in this Section 21 to the contrary, no delay or failure of Supplier to perform its obligations under this Agreement will be considered a Force Majeure Event, and such delay or failure to perform will not be excused, if and to the extent that it is caused by labor problems of Supplier such as, by way of example and not by way of limitation, lockouts, strikes, and slowdowns.

22. <u>**Governance.**</u>

   a. <u>Steering Committee</u>: The Parties will establish a steering committee as the top management body for the Parties' cooperation on all relevant matters related to the Vehicle and to facilitate resolution of any disputes that may arise from time to time ("**Steering Committee**"). The Steering Committee shall be comprised of members appointed by Company from time to time and members appointed by Supplier from time to time. Either Party may convene a meeting of the Steering Committee on at least 10 business days advance notice unless each Party agrees to a different notice period. Each Party shall use Commercially Reasonable Efforts to identify in advance topics to be addressed at a Steering Committee Meeting.

   b. <u>Project Management</u>: The Parties shall each appoint a project manager as the daily responsible officer for each Party's team. Each project manager shall be the contact person for the respective other Party. Each project manager shall be entitled to bring any issues forward to the Steering Committee.

23. <u>**Dispute Resolution/Arbitration.**</u>

   a. <u>Negotiation</u>. The Parties shall use good faith efforts to resolve disputes, within 20 business days of written notice of such dispute. Such efforts shall include escalation of such dispute to the Steering Committee. All negotiations, statements, and communications pursuant to this Section for the resolution of Disputed Claims will be confidential and shall be treated as compromise and settlement negotiations and no such statements shall be deemed to be admissions of a Party. The Parties shall not rely on, or introduce as evidence in the arbitration or other judicial proceeding: (i) views expressed or suggestions made by a Party with respect to a possible settlement of the dispute; (ii) admissions made by a Party in the course of the settlement discussions; or (iii) the fact that a Party had or had not indicated a willingness to accept a proposal for settlement. There shall be no stenographic or audio record of the settlement discussions.

   b. <u>Arbitration</u>. Any and all claims, counterclaims, demands, cause of action, disputes, controversies, and other matters in question arising out of or under this Agreement or the alleged breach of any provision hereof (all of which are referred to herein as "**Disputed Claims**"), whether such Disputed Claims arise at law or in equity, under state or federal law, for damages or any other relief, shall be resolved by binding arbitration in Cuyahoga County, Ohio, USA, by the American Arbitration Association ("**AAA/ ICDR**") in accordance with its International Arbitration Rules (the "**Rules**") then in effect. The arbitration shall be administered by the AAA/ ICDR and shall be conducted by the International Centre for Dispute Resolution, which is a Division of the American Arbitration Association. If the AAA/ ICDR is unable or legally precluded from administering the arbitration, then the parties shall agree upon an alternative arbitration organization, provided that, if the parties cannot agree, such organization shall be selected by the Chief Judge of the United States Federal District Court of the Northern District of Ohio.

   c. <u>Procedure</u>. The arbitration shall be conducted by a tribunal of three arbitrators. Within ten days after arbitration is initiated pursuant to the Rules, the initiating Party (the Claimant) shall send written notice to the other Party or Parties (the Respondent), with a copy to the office of the ICDR designating the first arbitrator (who shall not be a representative or agent of any Party but may or may not be an ICDR panel member and, in any case, shall be reasonably believed by the Claimant to possess the requisite experience, education, and expertise in respect of the matters to which the claim relates to enable such person to competently perform arbitral duties. With fifteen days after receipt of such notice, the Respondent shall send written notice to the Claimant, with a copy to the office of the ICDR and to the first arbitrator, designating the second arbitrator who shall not be a representative or agent of any Party but may or may not be an ICDR panel member and,

in any case, shall be reasonably believed by the Respondent to possess the requisite experience, education and expertise in respect of the matters to which the claim relates to enable such person to competently perform arbitral duties. Within fifteen days after such notice from the Respondent is received by the Claimant, the Respondent and the Claimant shall cause their respective designated arbitrators to select any mutually agreeable ICDR panel member as the third arbitrator. If the respective designated arbitrators of the Respondent and the Claimant cannot so agree within said fifteen-day period, then the third arbitrator will be determined pursuant to the Rules. Prior to commencement of the arbitration proceeding, each arbitrator shall have provided the Parties with a resume outlining such arbitrator's background and qualifications and shall certify that such arbitrator is not and has not been a representative or agent of any of the parties. If any arbitrator shall die, fail to act, resign, become disqualified or otherwise cease to act, then the arbitration proceeding shall be delayed for 15 days and the Party by or on behalf of whom such arbitrator was appointed shall be entitled to appoint a substitute arbitrator (meeting the qualifications set forth in this Section 23.c within such 15-day period; provided, however, that if the Party by or on behalf of whom such arbitrator was appointed shall fail to appoint a substitute arbitrator within such 15-day period, the substitute arbitrator shall be a neutral arbitrator appointed by mutual consent by the remaining two arbitrators within 15 days thereafter.

d. <u>Enforcement</u>. Notwithstanding the provisions of this Section, a Party may file a complaint limited to: (i) compelling arbitration; (ii) enforcing an arbitral award; or (iii) seeking a preliminary injunction or similar provisional judicial relief pending the outcome of arbitration. Such a proceeding shall be filed either (1) in any state court of competent jurisdiction located in the State of Ohio; or (2) in the United States District Court for the Northern District of Ohio, and the parties expressly consent, and waive any objections, to subject matter jurisdiction, personal jurisdiction, and venue in such courts. In addition, nothing herein shall be construed to require arbitration of a claim or dispute brought by a Person who is not a Party to this Agreement, or affect the ability of any Party to interplead or otherwise join another Party in a proceeding brought by a Person who is not a Party to this Agreement.

24. **<u>Miscellaneous.</u>**

a. <u>Notices</u>. All notices, demands, consents, and other communications required under this Agreement shall be in writing and shall be given either by personal delivery, by nationally recognized overnight courier (with charges prepaid), by facsimile, email, or EDI (with telephone confirmation) addressed to the respective Parties at the following addresses:

| <u>Notice to Supplier</u>: | Foxconn EV System LLC<br>4568 Mayfield Road, Suite 204<br>Cleveland, OH 44121<br>Attn: Liting Cai |
|---|---|
| <u>with a copy to</u>: | Butzel Long<br>201 W. Big Beaver, Suite 1200<br>Troy, MI 48084<br>Attn: Sheldon Klein |
| <u>Notice to Company</u>: | Lordstown EV Corporation<br>38555 Hills Tech Drive<br>Farmington Hills, MI 48331<br>Attn: Daniel Ninivaggi |
| <u>with a copy to</u> | Baker & Hostetler LLP<br>127 Public Square, Suite 2000<br>Cleveland, OH 44114<br>Attn: Ronald Stepanovic |

b. <u>Good Faith</u>. The Parties agree to (a) act in good faith towards each other in performing under this Agreement; and (b) negotiate in good faith all matters, issues, or provisions which arise under or are related to this Agreement that require the parties to reach a consensus, understanding, or agreement ("**Negotiated Matter"**).

2022TW-L-K-2412          `2



If Company and Supplier cannot agree on the resolution of a Negotiated Matter after discussion and negotiation, and as a matter of last resort, the Parties shall submit such Negotiated Matter for resolution pursuant to Section 23.

c.   <u>Cumulative Remedies; Specific Performance</u>. All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties, or otherwise.

d.   <u>Attorneys' Fees and Costs</u>. In the event that attorneys' fees or other costs are incurred to enforce payment or performance of any obligation, agreement, or covenant between the Parties or to establish damages for the breach of any obligation, agreement, or covenant under this Agreement, or to obtain any other appropriate relief under this Agreement, whether by way of prosecution or defense, the prevailing Party shall be entitled to recover from the other Party its reasonable attorneys' fees and costs, including any appellate fees and the costs, fees, and expenses incurred to enforce or collect such judgment or award and any other relief granted.

e.   <u>Amendment</u>. No course of dealing between the Parties hereto shall be effective to amend, modify, or change any provision of this Agreement. This Agreement may not be amended, modified, or changed in any respect except by an agreement in writing signed by an authorized officer or representative of each Party. The Parties may, subject to the provisions of this Section 24.e, from time to time, enter into supplemental written agreements for the purpose of adding any provisions to this Agreement or changing in any manner the rights and obligations of the Parties under this Agreement or any Schedule hereto. Any such supplemental written agreement executed by the Parties shall be binding upon the Parties.

f.   <u>Partial Invalidity</u>. Whenever possible, each provision of this Agreement shall be interpreted in such a way as to be effective and valid under applicable law. If a provision is prohibited by or invalid under applicable law, it shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

g.   <u>Monies</u>. All references to monies in this Agreement shall be deemed to mean lawful monies of the United States of America.

h.   <u>Further Assurances</u>. Following the Effective Date, each of the Parties shall, and shall cause its respective Affiliates, as applicable, to execute such further documents and perform such further acts, as may be reasonably necessary to effect or complete the agreements and the transactions set forth herein.

i.   <u>Severability</u>. If any provision of this Agreement is determined to be invalid, prohibited, or unenforceable in any applicable jurisdiction, then as to such jurisdiction, and provided the essential terms of this Agreement for the Parties remain valid, binding, and enforceable, this Agreement shall be ineffective only to the extent of such invalid, prohibited, or unenforceable provisions without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provisions in any other jurisdiction. Upon such determination that any provision is invalid, prohibited, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

j.   <u>Entire Agreement</u>. This Agreement, the Schedules and any addenda attached hereto or referenced herein, constitute the complete and exclusive statement of the agreement of the Parties with respect to the subject matter of this Agreement, and replace and supersede all prior agreements and negotiations by and between the Parties, provided that this Agreement does not supersede the Asset Purchase Agreement. Each Party acknowledges and agrees that no agreements, representations, warranties, or collateral promises or inducements have been made by any Party to this Agreement except as expressly set forth herein or in the Schedules and any addenda attached hereto or referenced herein, and that it has not relied upon any other agreement or document, or any verbal statement or act in executing this Agreement. These acknowledgments and agreements are contractual and not mere recitals. In the event of any inconsistency between the provisions of this Agreement and any Schedule and any addenda attached hereto or referenced herein, the provisions of

2022TW-L-K-2412       `2



this Agreement shall prevail unless expressly stipulated otherwise, in writing executed by the Parties. If there is a conflict between this Agreement and pre-printed language on each Party's forms, for example, purchase orders, this Agreement shall prevail.

k.  Binding Effect; Assignment. This Agreement shall be binding on the Parties and their successors and assigns; provided, however, that except as allowed in this sub-section, neither Party shall assign, delegate, or transfer, in whole or in part, this Agreement or any of its rights or obligations arising hereunder without the prior written consent of the other Party, which shall not be unreasonably withheld. Any purported assignment without such consent shall be null and void. Notwithstanding the foregoing:

  i.  Supplier shall have the right to assign its rights to receive monies hereunder without the prior written consent of Company; and

  ii.  Supplier shall have the right to delegate its duties under this Agreement to one or more Subsidiaries, in which case the Subsidiary shall be solely responsible for performance of the delegated duty. Supplier will inform Company in writing within ten business days after exercising such right or assignment or delegation.

l.  Waiver. Waiver by either Party of any breach of any provision of this Agreement shall not be considered as or constitute a continuing waiver or a waiver of any other breach of the same or any other provision of this Agreement. No waiver shall be effective unless in writing and signed by the waiving Party.

m.  No Third-Party Beneficiaries. Except as expressly set forth in this Section 24.m, this Agreement benefits solely the parties to this Agreement and their respective permitted successors and permitted assigns, and nothing in this Agreement, express or implied, confers on any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. The Parties hereby designate each Indemnified Party as a third-party beneficiary of Section 16 having the right to enforce such Sections.

n.  Headings; Rules of Interpretation. The captions and headings in this Agreement are inserted only as a matter of convenience and for reference and in no way define the scope or content of this Agreement or the construction of any provision hereof or of any document or instrument referred to herein. In the event of an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument (or any portion thereof to be drafted. For all purposes of this Agreement, unless otherwise expressly provided or unless the context requires otherwise:

  i.  definitions are equally applicable to both the singular and plural forms of the terms defined, and references to the masculine, feminine, or neuter gender include each other gender;

  ii.  the words "hereof," "herein," and "hereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document;

  iii.  references to an "Attachment," "Exhibit," "Schedule," "Appendix," or "Section" refer to the corresponding Attachment, Exhibit, Schedule, Appendix, or Section of this Agreement;

  iv.  whenever the words "include," "includes," and "including" and other words of similar import are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation";

  v.  references to "days" shall mean calendar days, unless the term "business days" shall be used, in which case "business day" shall mean any calendar day other than a Saturday, Sunday or U.S. national, legal or bank holiday;

  vi.  any reference to a Law means such Law as amended from time to time and includes any successor legislation thereto and all regulations, rulings, and other Laws promulgated thereunder;

27



      vii. references to any document, instrument, or agreement mean such document, instrument, or agreement as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and

      viii. whenever the word "or" is used in this Agreement, it shall be deemed to be used in the inclusive sense.

o.   <u>Section References</u>. All references to Sections or Schedules shall be deemed to be references to Sections of this Agreement and Schedules attached to this Agreement, except to the extent that any such reference specifically refers to another document. All references to Sections shall be deemed to also refer to all subsections of such Sections, if any.

p.   <u>Business Day</u>. If any time period set forth in this Agreement expires upon a Saturday, Sunday or U.S. national, legal, or bank holiday, such period shall be extended to and through the next succeeding business day.

q.   <u>Other Documents</u>. The Parties shall take all such actions and execute all such documents that may be necessary to carry out the purposes of this Agreement, whether or not specifically provided for in this Agreement.

r.   <u>Counterparts</u>. This Agreement may be executed by facsimile and delivered in one or more counterparts, each of which shall be deemed to be an original and all of which, taken together, shall be deemed to be one agreement.

s.   <u>Governing Law and Jurisdiction</u>. This Agreement and the interpretation of its terms shall be governed by the laws of the State of Ohio, inclusive of the Uniform Commercial Code as adopted in that state, without application of conflicts of law principles. The provisions of the United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

t.   <u>Survival</u>. The provisions of this Agreement which by their very nature are intended to survive the expiration or termination of this Agreement, including Sections 3.a.i, 4, 5, 12, 14, 15, 16, 17, 18 (for purposes of any tail coverage to be maintained by a Party), 23, 24.a, 24.c, 24.d, 24.n, 24.s, and 24.t, shall survive the expiration, cancellation or termination of this Agreement for any reason.

*[Signate page follows.]*

2022TW-L-K-2412       `2



**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorizedrepresentatives.

COMPANY:

**LORDSTOWN EV CORPORATION**

By: _____
     (Signature)

Name: Melissa Leonard
     (Print)

Title: EVP, General Counsel & Secretary

Date: 05/11/2022

SUPPLIER:

**FOXCONN EV SYSTEM LLC**

By: _____
     (Signature)

Name: Liting Cai
     (Print)

Title: Authorized Officer

Date: 05/11/2022

2022TW-L-K-2412     `2

**EXHIBIT D**

EXECUTION VERSION

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## MIH EV DESIGN LLC

THE EQUITY INTERESTS ISSUED PURSUANT TO THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH EQUITY INTERESTS MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR AN EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** .................................................................................1
    Section 1.1    Definitions. ................................................................................1
    Section 1.2    Rules of Construction. .............................................................10

**ARTICLE II GENERAL PROVISIONS**..............................................................12
    Section 2.1    Formation of the Company; Term ............................................12
    Section 2.2    Limited Liability Company Agreement....................................12
    Section 2.3    Name.......................................................................................12
    Section 2.4    Purpose, Scope and Powers ....................................................12
    Section 2.5    Principal Office, Registered Office and Agent .........................12
    Section 2.6    Qualification in Other Jurisdictions ........................................12
    Section 2.7    Business Plan ..........................................................................13
    Section 2.8    Annual Budget. .......................................................................13
    Section 2.9    Company Interests; Units.........................................................14
    Section 2.10   Intellectual Property. ...............................................................14

**ARTICLE III CAPITAL COMMITMENTS; CAPITAL CONTRIBUTIONS** ....................15
    Section 3.1    Commitments, Capital Contributions and Issuance of Company
                      Interests .................................................................................15
    Section 3.2    Default Funding ......................................................................18
    Section 3.3    Pre-Emptive Right ...................................................................18
    Section 3.4    Refinancing of FX Financing Notes. .......................................19

**ARTICLE IV DISTRIBUTIONS**.......................................................................19
    Section 4.1    Distributions............................................................................19
    Section 4.2    Tax Withholding .....................................................................20

**ARTICLE V MANAGEMENT**...........................................................................21
    Section 5.1    Authority of Board ..................................................................21
    Section 5.2    Composition of the Board........................................................21
    Section 5.3    Meetings..................................................................................23
    Section 5.4    Officers ...................................................................................26

**ARTICLE VI MEMBERS**.................................................................................27
    Section 6.1    Lack of Authority of Individual Members.................................27
    Section 6.2    No Right of Partition................................................................27
    Section 6.3    Members Right to Act...............................................................27

**ARTICLE VII BOOKS OF ACCOUNT**.............................................................28
    Section 7.1    Records and Accounting...........................................................28
    Section 7.2    Bank Accounts ........................................................................29
    Section 7.3    Fiscal Year ..............................................................................29
    Section 7.4    Reports; Access; Accountants..................................................29
    Section 7.5    Certain Tax Matters ................................................................30

i

**ARTICLE VIII DISSOLUTION AND LIQUIDATION** ...................................................**34**
    Section 8.1    Dissolution..........................................................................34
    Section 8.2    Liquidation...........................................................................35

**ARTICLE IX TRANSFERS OF COMPANY INTERESTS; VALUATION** ........................**36**
    Section 9.1    Transfer In General .............................................................36
    Section 9.2    Void Transfers ....................................................................36
    Section 9.3    Permitted Transfers of Company Interests ..........................37
    Section 9.4    Covenants in Respect of Permitted Transfers .....................38
    Section 9.6    Right of First Refusal..........................................................38
    Section 9.7    Tag-Along Right. .................................................................39
    Section 9.8    Regulatory Approvals .........................................................41

**ARTICLE X ADMISSION OF MEMBERS** ...................................................................**42**
    Section 10.1    Admission of Members ......................................................42

**ARTICLE XI MEMBER COVENANTS; LIMITATION OF LIABILITY** ..........................**42**
    Section 11.1    Fiduciary Duty Waiver; Limitation of Liability. .................42
    Section 11.2    Investment Opportunities and Conflicts of Interest ............44
    Section 11.3    Use of Member Names and Marks .....................................45
    Section 11.4    Certain Independent Compliance Obligations of the Members.................45

**ARTICLE XII INDEMNIFICATION** ..............................................................................**46**
    Section 12.1    Right to Indemnification ....................................................46
    Section 12.2    Non-Exclusive Right...........................................................47
    Section 12.3    Insurance.............................................................................47
    Section 12.4    No Personal Liability .........................................................47
    Section 12.5    Severability ........................................................................47

**ARTICLE XIII MISCELLANEOUS** ...............................................................................**48**
    Section 13.1    Further Assurances .............................................................48
    Section 13.2    Title to Company Assets .....................................................48
    Section 13.3    Creditors.............................................................................48
    Section 13.4    Amendment........................................................................48
    Section 13.5    Assignment ........................................................................49
    Section 13.6    No Third Party Beneficiaries .............................................49
    Section 13.7    Governing Law ...................................................................49
    Section 13.8    Dispute Resolution.............................................................49
    Section 13.9    Severability; Equitable Relief ............................................52
    Section 13.10    Counterparts; Electronic Delivery ....................................52
    Section 13.11    Notices..............................................................................53
    Section 13.12    Entire Agreement ..............................................................54
    Section 13.13    Confidentiality ..................................................................54
    Section 13.14    Survival ............................................................................55
    Section 13.15    No Partnership or Affiliation ............................................55
    Section 13.16    Certain Relationships .......................................................55
    Section 13.17    Waivers ............................................................................55

2022TW-L-K-2444      ˋ1

## <u>INDEX OF EXHIBITS AND SCHEDULES</u>

<u>**Exhibits**</u>

| | |
|---|---|
| Exhibit A | FX Financing Agreement |
| Exhibit B | Pre-Development Activities |
| Exhibit C | Business Plan |
| Exhibit D | Minimum Monthly Contributions Expenditures |
| Exhibit E | Certain U.S. Tax Provisions |

<u>**Schedules**</u>

| | |
|---|---|
| Schedule 3.1 | Schedule of Members |

2022TW-L-K-2444 `1

# LIMITED LIABILITY COMPANY AGREEMENT
## of
## MIH EV DESIGN LLC

This LIMITED LIABILITY COMPANY AGREEMENT (as amended, restated, supplemented or otherwise modified in accordance with <u>Section 13.4</u>, this "<u>Agreement</u>"), dated as of May 11, 2022, by and among MIH EV Design LLC, a Delaware limited liability company (the "<u>Company</u>"), Foxconn EV Technology, Inc., an Ohio corporation ("<u>FX</u>"), and Lordstown EV Corporation**,** a Delaware corporation ("<u>LMC</u>" and, together with FX and any additional Person who is admitted as a member of the Company in accordance with this Agreement, the "<u>Members</u>" or each a "<u>Member</u>"). Capitalized terms used herein shall have the respective meanings ascribed to such terms in <u>Article I</u>.

**WHEREAS,** the Company was formed on May 11, 2022 as a Delaware limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act, as the same may be further amended, supplemented or otherwise modified from time to time (the "<u>Delaware Act</u>"); and

**WHEREAS,** the undersigned desire to enter into this Agreement to, among other things, govern the organization, operation and governance of the Company, including the conduct of the In-Scope Business.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants made herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1 <u>Definitions</u>.

"<u>Accountants</u>" has the meaning set forth in <u>Section 7.4(a)</u>.

"<u>Affiliate</u>" means, in respect of a Person, any other Person who Controls, is Controlled by or is under common Control with such Person; <u>provided</u> that the Company shall not be deemed an Affiliate of any Member.

"<u>Agreement</u>" has the meaning set forth in the preamble hereto.

"<u>Annual Budget</u>" means, with respect to a Fiscal Year, the annual operating budget of the Company for such Fiscal Year (displaying anticipated statements of income and cash flows); provided, that the Board may approve an Annual Budget for a period of less than a Fiscal Year and, if it does, the provisions of this Agreement referring to an Annual Budget shall be modified as appropriate to reflect such shorter period.

"<u>Anti-Bribery Laws</u>" means any of the following: (a) the FCPA, (b) the Organization for Economic Cooperation and Development Convention against Bribery of Foreign Public Officials in International Business Transactions and legislation implementing such convention, (c)

international anti-bribery conventions (other than the convention described in clause (b)), and (d) local anti-corruption and anti-bribery Laws of any other applicable country or jurisdiction.

"Board" means, as of any date, the then-current board of managers of the Company, which shall have the power and authority described in this Agreement.

"Board Deadlock" has the meaning set forth in Section 5.3(a)(v).

"Business Day" means a day, other than a Saturday or a Sunday, on which commercial banks located in Cleveland, Ohio or New York, New York are not required or authorized by Law to close.

"Business Opportunities" has the meaning set forth in Section 11.2.

"Business Plan" has the meaning set forth in Section 2.7.

"Capital Commitments" means the FX Capital Commitment and the LMC Capital Commitment.

"Capital Contribution" means any cash, cash equivalents or the fair market value (as reasonably determined by the Board in good faith) of other tangible or intangible assets that a Member contributes or is deemed to contribute to the Company each pursuant to Article III and net of any Liabilities of such Member assumed by the Company in connection with such contribution and net of any other Liabilities to which the assets contributed by such Member are subject.

"Certificate of Formation" means the certificate of formation of the Company filed with the State of Delaware on May 11, 2022, as may be amended by the Board in accordance with this Agreement and the Delaware Act from time to time.

"Chairperson" has the meaning set forth in Section 5.2(g).

"Change of Control" means, at any time, (a) the acquisition by any Person or any group of Persons acting together which would constitute a "group" (a "Group") for purposes of Section 13(d) of the Exchange Act, or any successor provision thereto, other than FX and its respective Permitted Transferees, of beneficial ownership of such Company Interests representing more than 50% of the aggregate voting power of all classes of voting securities of the Company, (b) any transaction or series of related transaction pursuant to which the Persons who were the respective beneficial owners of the voting securities of the Company immediately prior to such transaction or series of related transactions do not, following such transaction or series of related transactions, beneficially own, directly or indirectly more than 50% of the aggregate voting power of all classes of voting securities of the Company resulting from such transaction or series of related transactions, (c) the direct or indirect sale or other disposition, in one or a series of transactions, of assets representing all or substantially all of the assets of the Company to any Person or Group or (d) any transaction or series of related transactions pursuant to which following such transaction or series of related transactions FX does not have the power to appoint at least a majority of the Managers of the Company.

2022TW-L-K-2444 `1


"Claim" means any and all claims (including any cross-claims or counterclaims), causes of action, allegations, charges, complaints, demands, inquiries, investigations, audits, disputes and other assertions of Liability, whenever or however arising.

"Code" means the U.S. Internal Revenue Code of 1986, as amended, or any successor to such statute.

"Company" has the meaning set forth in the preamble hereto.

"Company Interest" means a membership interest of the Company issued to a Member, including those represented by Units.

"Competing Business Opportunity" means undertaking any of the development services described in the Business Plan (other than contract manufacturing) with respect to EC Vehicles to be built and designed utilizing the MIH open platform and for sale in North America.

"Confidential Information" means all confidential and proprietary information (irrespective of the form of communication) obtained by or on behalf of a Member from the Company or its Representatives, other than information which (a) was or becomes generally available to the public other than as a result of a breach of this Agreement by such Member, (b) was or becomes available to such Member on a nonconfidential basis prior to disclosure to the Member by the Company or its Representatives (other than as a result of any breach by a Member or its Representatives of the confidentiality provisions of this Agreement), (c) was or becomes available to the Member from a source other than the Company and its Representatives, provided, that such source is not known by such Member to be bound by a confidentiality agreement with the Company, or (d) is independently developed by such Member without the use of any such information received under this Agreement.

"Contract" means any contract, agreement, purchase order, modification, obligation, promise, commitment or undertaking (whether written, electronic or oral) that is, or purports by its written terms to be, legally binding.

"Control" (including the terms "Controlled by," "Controlling" and "under common Control with") means, as used with respect to any Person, possession of the power or authority, directly or indirectly, to direct or cause the direction of management or policies of such Person, whether through ownership of voting securities, as trustee or executor, by Contract or otherwise, including by virtue of having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

"Covered Person" has the meaning set forth in Section 12.1.

"Damages" has the meaning set forth in Section 12.1.

"Default Contribution" has the meaning set forth in Section 3.2(a).

"Default Funding" has the meaning set forth in Section 3.2(a).

"Defaulting Member" has the meaning set forth in Section 3.2(a).

3



"Default Notice" has the meaning set forth in Section 3.2(a).

"Delaware Act" has the meaning set forth in the recitals hereto.

"Distribution" means each distribution made by the Company pursuant to this Agreement to a Member in respect of such Member's Company Interest, whether in cash, securities or other assets of the Company and whether by liquidating distribution or otherwise.

"EC Vehicle" means all-electric commercial vehicles designed by the Company.

"Electing Member" has the meaning set forth in Section 3.2(a).

"Emergency Funding" has the meaning set forth in Section 3.1(b)(i).

"Equity Interest" means, with respect to any Person (a) any unit, capital stock, partnership, membership or limited liability company interests or other equity interests in such Person or a successor, (b) obligations, notes or other indebtedness or other securities or interests convertible or exchangeable into units, capital stock, partnership interests, membership or limited liability company interests or other equity interests in such Person or a successor, and (c) warrants, options, certificates of interest or participation in any profit sharing agreement, or other rights to purchase or otherwise acquire units, capital stock, partnership interests, membership or limited liability company interests or other equity interests in such Person or a successor.

"Excess Cash" means, with respect to any Fiscal Year (or any other applicable period) with a positive budgeted net cash flow as set forth in the applicable Annual Budget, all cash revenues generated by the Company in excess of such budgeted net cash flow for such Fiscal Year, subject to (a) any mandatory provisions of applicable Law, (b) restrictions on distributions set forth in any agreement referenced in any credit or other agreement that is binding on the Company, and (c) any reserve amounts necessary to fund expenditures contemplated in the Annual Budget for the immediately succeeding Fiscal Year, as reasonably determined by the Board (subject to Section 5.3(a)(iv)) in good faith.

"Export Control Laws" means (a) all statutory and regulatory requirements under the Arms Export Control Act (22 U.S.C. 2778), the International Traffic in Arms Regulations (22 C.F.R. §120, et. seq.), the Export Administration Regulations (15 C.F.R. §730, et. seq.) as well as the anti-boycott and embargo regulations and guidelines issued thereunder, and associated executive orders, and the statutes implemented by the Office of Foreign Assets Controls and the U.S. Department of the Treasury and (b) any Laws of any jurisdiction outside the U.S. regulating the disclosure, shipment, transfer or transmission of commodities, goods, services, technology, information and technical data to any Person outside such jurisdiction.

"FCPA" means the U.S. Foreign Corrupt Practices Act of 1977 (15 U.S.C. § 78dd-1, et seq.).

"Fiscal Year" means the Company's annual accounting period established pursuant to Section 7.3.

2022TW-L-K-2444 `1


"<u>Fully-Participating ROFR Purchasing Member</u>" has the meaning set forth in <u>Section 9.6(c)</u>.

"<u>FX</u>" has the meaning set forth in the preamble hereto.

"<u>FX Background IP License</u>" has the meaning set forth in <u>Section 2.10(a)</u>.

"<u>FX Capital Commitment</u>" means $55,000,000.

"<u>FX Advance</u>" means an advance by the FX Lender to LMC under an FX Financing Note.

"<u>FX Lender</u>" has the meaning set forth in <u>Section 3.1(a)(v)</u>.

"<u>FX Financing Note</u>" means a note in substantially the form attached hereto as <u>Exhibit A</u>, to be entered into between FX Lender and LMC to evidence each FX Advance.

"<u>FX Parent</u>" means Hon Hai Precision Industry Co., Ltd.

"<u>GAAP</u>" means United States generally accepted accounting principles.

"<u>Governmental Authority</u>" means the United States and any other sovereign nation or city-state, and any state or other political subdivision thereof and any other individual, body or entity exercising or having the authority to exercise under the Laws thereof any executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, organization, department, bureau, office (including any public international, multinational or transnational authority, as well as the European Commission or any other competent body of the European Union and corresponding entities or agencies in any other jurisdiction), board, commission or instrumentality, and any arbitrator or arbitration panel with proper authority and jurisdiction under such Laws.

"<u>Governmental Authorization</u>" means any permit, consent, license, ratification, waiver, permission, variance, clearance, registration, qualification, approval or authorization issued, granted, given or otherwise made available by or under the lawful authority of any Governmental Authority or pursuant to any Law.

"<u>ICC</u>" has the meaning set forth in <u>Section 13.8(d)(i)</u>.

"<u>ICC Rules</u>" has the meaning set forth in <u>Section 13.8(d)(i)</u>.

"<u>Imputed Underpayment</u>" has the meaning set forth in <u>Section 7.5(f)(ii)</u>.

"<u>Initial Budget</u>" has the meaning set forth in <u>Section 2.8(a)</u>.

"<u>In-Scope Business</u>" means the businesses of (a) designing, developing, manufacturing, assembling, testing, certifying, marketing, selling, distributing and delivering EC Vehicles and their hardware and software components, (b) maintaining, sustaining and supporting, and providing other aftermarket services for, EC Vehicles, including parts distribution and other



logistics, maintenance, repair and overhaul services, modifications and training, and (c) any combination of any aspects of any of the foregoing clauses (a) and (b).

"<u>Indebtedness</u>" means, with respect to a Person and without duplication, (a) all obligations of such Person for borrowed money (or issued in substitution for or exchange of indebtedness for borrowed money), including all principal, interest and fees, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid (other than any Taxes), (d) all guarantees, whether direct or indirect, by such Person of Indebtedness of any other Person or Indebtedness of any other Person secured by any assets of such Person, whether such guarantees are in the form of letters of credit or other forms of security, surety or guaranty and (e) all finance lease obligations of such Person, but in all such cases excluding trade payables.

"<u>Initial Business Plan End Date</u>" means December 31, 2024.

"<u>Initial Business Plan Timeline</u>" has the meaning set forth in <u>Section 2.7</u>.

"<u>Initial Capital Contribution</u>" means $30,000,000.

"<u>Initial Expenditures</u>" means, individually and collectively, (a) expenditures in respect of Pre-Development Activities, including (i) direct third party expenditures incurred or to be incurred by the Company or incurred or to be incurred by LMC on behalf of the Company (including IT expenditures), and (ii) reimbursement to LMC, at agreed upon rates, for time spent by LMC personnel working on Company activities, (b) expenditures in respect of payroll for Company employees and (c) expenditures in respect of Company organizational and administrative activities.

"<u>Initial Notice</u>" has the meaning set forth in <u>Section 3.3</u>.

"<u>Intellectual Property</u>" means all intellectual property and industrial property rights arising under the Laws of any jurisdiction, including: (a) patents, patent applications and statutory invention registrations, (b) copyrights and all rights in any original works of authorship that are within the scope of any applicable copyright Law, together with all registrations and applications associated with any of the foregoing, (c) trade secrets and all other intellectual property rights in confidential or proprietary information, processes, technology, designs, formulae, algorithms, procedures, methods, discoveries, specifications, inventions, compositions, and know-how, and (d) any trademarks, service marks, trade names, service names, trade dress, logos, domain names, and other identifiers of source or origin, together with all registrations, applications and goodwill associated with any of the foregoing (the items set forth in clause (d), collectively, "<u>Trademarks</u>").

"<u>Investment</u>" as applied to any Person means (a) any direct or indirect purchase or other acquisition by such Person of any notes, obligations, instruments, stock, securities or ownership interests (including partnership interests and joint venture interests) of any other Person, other than cash and cash equivalents and (b) any capital contribution by such Person to any other Person.

"<u>IRS</u>" has the meaning set forth in <u>Section 7.5(f)(i)</u>.

6

2022TW-L-K-2444 `1


"Law" means any and all laws (including common laws), constitutions, statutes, ordinances, standards, guidelines, regulations, rules, codes and any other legislation enacted, promulgated or prescribed by or under the authority of any Governmental Authority, and including all Orders and the terms of any Governmental Authorizations, whether in effect on the date of this Agreement or coming into effect thereafter.

"Legal Proceeding" means any Claim commenced, brought, conducted or heard by or before any Governmental Authority.

"Liability" means any and all debts, liabilities, guarantees, assurances, commitments and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due and whenever or however arising.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien or charge of any kind.

"Liquidation Statement" has the meaning set forth in Section 8.2(a)(iii).

"LMC" has the meaning set forth in the preamble hereto.

"LMC Capital Commitment" means $45,000,000.

"LMC Parent" means Lordstown Motors Corp.

"Management Incentive Units" has the meaning set forth in Section 2.9.

"Manager" means a current member of the Board, who, for purposes of the Delaware Act, shall be deemed a "manager" as defined in the Delaware Act but who shall be subject to the rights and obligations set forth in this Agreement and, to the extent not inconsistent with the rights and obligations set forth in this Agreement, to the rights and obligations set forth in the Delaware Act.

"Maturing FX Note" has the meaning set forth in Section 3.4.

"Member" has the meaning set forth in the preamble hereto.

"Member Loan" has the meaning set forth in Section 3.1(b)(iii).

"Member Names and Marks" means, with respect to a Member and its Affiliates, the Trademarks which such Member or one of its Affiliates owns or otherwise has the right to use.

"Minimum Monthly Contribution" means $4,000,000.00.

"Model C and E Designs" means the designs for each of the following electric vehicles developed under the Foxtron brand and built on the MIH software and hardware open platform for electric vehicles: (a) the Model C crossover utility vehicle (CUV); and (b) the Model E sedan.

7



"<u>Non-Defaulting Member</u>" has the meaning set forth in <u>Section 3.2</u>.

"<u>OFAC</u>" means the U.S. Treasury Department's Office of Foreign Assets Control.

"<u>Offered Units</u>" has the meaning set forth in <u>Section 9.6(a)</u>.

"<u>Official</u>" has the meaning set forth in <u>Section 11.4(b)(i)(C)</u>.

"<u>Order</u>" means any order (other than an order constituting an approval), writ, judgment, injunction, decree, stipulation, determination or award entered, rendered, issued or made by any Governmental Authority.

"<u>Overallotment Notice</u>" has the meaning set forth in <u>Section 9.6(c)</u>.

"<u>Ownership Percentage</u>" means, as to each Member, at any time of determination, a number (expressed as a percentage) equal to the quotient obtained by dividing: (a) all of such Member's Units by (b) the aggregate Units held by all Members; provided, that prior to the making of the Capital Contributions contemplated by Section 3.1(a)(i), FX's Ownership Percentage shall be deemed to be fifty-five percent (55)% and LMC's Ownership Percentage shall be deemed to be forty-five percent (45%).

"<u>Participating Member</u>" has the meaning set forth in <u>Section 3.1(b)(i)</u>.

"<u>Partnership Representative</u>" means the "partnership representative" of the Company within the meaning of and for the purposes set forth in Code Section 6223(a) and as otherwise set forth in this Agreement.

"<u>Permitted Transfer</u>" has the meaning set forth in <u>Section 9.3</u>.

"<u>Permitted Transferee</u>" has the meaning set forth in <u>Section 9.3</u>.

"<u>Person</u>" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company or other entity, including any Governmental Authority.

"<u>Pre-Development Activities</u>" means the initial pre-development activities described on <u>Exhibit B</u>.

"<u>Prohibited Persons</u>" means (a) any Person that (i) is named as a "Specially Designated National or Blocked Person" under OFAC; or (ii) is otherwise the target of any economic sanctions program administered by a Governmental Authority, including those administered by OFAC, Her Majesty's Treasury, the European Union and the Bureau of Industry Security of the U.S. Department of Commerce; or (b) any Person that is an Affiliate of any Person identified in of clause (a).

"<u>Pro Rata Share</u>" means, as to each Member, at any time of determination, a number (expressed as a percentage) equal to the quotient obtained by dividing: (a) such Member's

2022TW-L-K-2444 `1

remaining unfunded Capital Commitment at such time by (b) the remaining unfunded Capital Commitments of all Members at such time.

"Representative" means, with respect to a particular Person, any director, manager, member, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors, in their respective capacities as such.

"ROFR Purchasing Member" has the meaning set forth in Section 9.6(b).

"Schedule of Members" has the meaning set forth in Section 3.1(d).

"Selling Member" has the meaning set forth in Section 9.6(a).

"Shortfall Amount" has the meaning set forth in Section 3.2(a).

"Specified Persons" has the meaning set forth in Section 11.2.

"Subsidiary" means, with respect to any given Person, any corporation, limited liability company, partnership, association or other entity, more than 50% of the Equity Interests of which are owned, directly or indirectly, by that Person (except for any Equity Interests issued or transferred to "nominee" equityholders (or the equivalent) as necessary or desirable under the Laws of the jurisdiction of formation of such corporation, limited liability company, partnership, association or other entity).

"Tagging Person" has the meaning set forth in Section 9.7(a).

"Tag-Along Acceptance Period" has the meaning set forth in Section 9.7(a).

"Tag-Along Company Interests" has the meaning set forth in Section 9.7(a).

"Tag-Along Offered Company Interests" has the meaning set forth in Section 9.7(a).

"Tag-Along Right" has the meaning set forth in Section 9.7(a).

"Tag-Along Sale" has the meaning set forth in Section 9.7(a).

"Tag-Along Seller" has the meaning set forth in Section 9.7(a).

"Tag Exercise Notice" has the meaning set forth in Section 9.7(a).

"Tag Notice" has the meaning set forth in Section 9.7(a).

"Tax" or "Taxes" (and, with correlative meaning, "Taxable" or "Taxation") means all national, federal, state, local, municipal and foreign income, capital gains, profits, franchise, gross receipts, margin, capital, net worth, sales, use, withholding, payroll, estimated, goods and services, value added, ad valorem, alternative or add-on, registration, custom, general business, employment, social security (or similar), disability, workmen's compensation, business, occupation, unemployment, premium, real property, personal property (tangible and intangible), capital stock, stamp, customs, transfer (including real property transfer or gains), conveyance,

9



severance, production, excise, unclaimed property, escheat, environmental, windfall profits and other taxes (including Section 59A of the Code) or charges of any kind whatsoever in the nature of or in lieu of a tax, including any and all fines, penalties, assessments, and additions attributable to or otherwise imposed on or with respect to any such taxes, and interest thereon, whether disputed or not, computed on a separate or consolidated, unitary or combined basis, imposed by or on behalf of any Tax Authority.

"<u>Tax Authority</u>" means any Governmental Authority having the power to regulate, impose or collect Taxes, including the IRS and any state or local department of revenue.

"<u>Tax Proceeding</u>" has the meaning set forth in <u>Section 7.5(e)</u>.

"<u>Taxable Year</u>" has the meaning set forth in <u>Section 7.5(b)</u>.

"<u>Tax-Related Costs</u>" has the meaning set forth in <u>Section 7.5(g)(i)</u>.

"<u>Third Party</u>" means any Person who is not a party hereto or an Affiliate of a party hereto.

"<u>Third Party Purchaser</u>" means any Person other than a Member or a Permitted Transferee.

"<u>Transfer</u>" has the meaning set forth in <u>Section 9.1</u>.

"<u>Transferring Member</u>" has the meaning set forth in <u>Section 9.3</u>.

"<u>Transfer Notice</u>" has the meaning set forth in <u>Section 9.6(a)</u>.

"<u>Treasury Regulations</u>" means the U.S. federal income Tax regulations promulgated under the Code and effective as of the date hereof, as amended, and including any successor regulations.

"<u>U.S.</u>" or "<u>United States</u>" means the United States of America.

"<u>Unfunded Emergency Funding Amount</u>" has the meaning set forth in <u>Section 3.1(b)(i)</u>.

"<u>Vehicle Foreground IP</u>" has the meaning set forth in <u>Section 2.10(b)</u>.

Section 1.2    <u>Rules of Construction</u>.

(a)    The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.

(b)    Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms.

(c)    The use of the word "include" and "including" and variations thereof in this Agreement shall be by way of example rather than by limitation and interpreted as though followed by the words "without limitation," and shall not be construed to restrict the meaning of

10



any preceding word or statement to the specific or similar items or matters immediately following it.  The use of the words "or," "either" and "any" shall not be exclusive.  The word "extent" in the phrase "to the extent" shall convey the concept of degree, and such phrase shall not mean simply "if".  The terms "hereof," "hereunder," "herein" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to "writing," "written" and variations thereof include any manner of representing or manifesting words in a legible form (including on an electronic or visual display screen) or other non-transitory form.

(d)     Except as otherwise indicated, all references in this Agreement to "Schedules," "Articles," "Sections" and "Exhibits" are intended to refer to Schedules, Articles, Sections and Exhibits to this Agreement.

(e)     Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof.

(f)     All references to "days" herein shall be to calendar days unless Business Days are specified.   When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in the beginning or at the end of the calculation of such period shall be excluded (for example, if an action is to be taken within two (2) days after a triggering event and such event occurs on a Tuesday, then the action must be taken by Thursday or if an action is to be taken within two (2) days of a target date and the target date is a Thursday, the action must be taken by Tuesday); if the last day of any period referenced herein is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(g)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement, which parties hereto acknowledge is the result of extensive negotiations between the parties.

(h)     References to any Person are also to such Person's successors and permitted assigns.

(i)     If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any of parties hereto by virtue of the authorship of any of the provisions of this Agreement.

(j)     All amounts of currency in this Agreement are expressed in, and all payments pursuant to this Agreement will be made in, United States Dollars unless otherwise expressly provided.

(k)     Reference to any Law means such Law as in effect from time to time, including all past and future amendments, all successor Laws, and all rules and regulations promulgated thereunder.

11



## ARTICLE II
## GENERAL PROVISIONS

Section 2.1     Formation of the Company; Term.  The Company was formed on May 11, 2022 as a Delaware limited liability company under the Delaware Act and shall continue in existence until the dissolution and liquidation of the Company in accordance with the provisions of Article VIII hereof.  Effective upon the execution of this Agreement, the rights and Liabilities of the Members shall be determined pursuant to the Delaware Act and this Agreement; provided, that to the extent of any inconsistency between this Agreement and waivable or non-mandatory provisions of the Delaware Act, then this Agreement shall govern.

Section 2.2     Limited Liability Company Agreement.  The Members have entered into this Agreement for the purpose of establishing the organization and governance of the Company and the conduct of its business.  The Members hereby agree that, during the term of the Company set forth in Section 2.1, the rights and obligations of the Members with respect to the Company shall be determined in accordance with the terms and conditions of this Agreement, the Certificate of Formation and non-waivable provisions of the Delaware Act.

Section 2.3     Name.  The name of the Company shall be "MIH EV Design LLC" or such other name or names as may from time to time be determined by the Board.

Section 2.4     Purpose, Scope and Powers.  The Company has been duly formed for the sole object and purpose of engaging in such lawful transactions and business activities (including through its Subsidiaries) as are in furtherance of and in connection with conducting the In-Scope Business as contemplated by the Business Plan.  Subject to the terms and conditions set forth herein, the Company and its Subsidiaries shall have any and all powers necessary to carry out the purposes of the Company and the conduct of the In-Scope Business as specified in this Section 2.4.

Section 2.5     Principal Office, Registered Office and Agent.  The principal office of the Company shall be located at 26555 Evergreen Rd, Suite 1540, Southfield, Michigan, 48076-4206, or at such other place (whether inside or outside the State of Delaware) in the United States as the Board may from time to time designate.  The Company may have such other offices (whether inside or outside the State of Delaware) in the United States and/or any other country as the Board may from time to time designate.  The registered office and registered agent of the Company in the State of Delaware shall be the office of the initial registered office and registered agent set forth in the Certificate of Formation or such other office as the Board may from time to time designate.  The Board may change the registered office and/or registered agent from time to time by (a) filing the address of the new registered office and/or the name of the new registered agent with the Delaware Secretary of State pursuant to the Delaware Act and (b) giving notice of such change to each of the Members.

Section 2.6     Qualification in Other Jurisdictions.  Subject to the limitations set forth herein regarding situations in which the approval of the Members is required by the terms of this Agreement, (a) the Board shall cause the Company to be qualified or registered under foreign entity related statutes or assumed or fictitious name statutes or similar Laws in any jurisdiction in which the Company owns property or transacts business to the extent such qualification or

2022TW-L-K-2444          `1


registration is necessary or advisable in order to protect the limited liability of the Members or to permit the Company lawfully to own property or transact business and (b) in connection with the immediately foregoing, any officer appointed pursuant to <u>Section 5.4</u> may execute, deliver and file any certificates (and any amendment and/or restatement thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company is permitted to conduct business pursuant to this Agreement.

Section 2.7    <u>Business Plan</u>.  The "<u>Business Plan</u>" is the business plan of the Company that shall apply from the date hereof through the Initial Business Plan End Date (the "<u>Initial Business Plan Timeline</u>"), as set forth on <u>Exhibit C</u>.  On at least an annual basis during the Initial Business Plan Timeline, the Board, with the assistance of the Officers, will review the Business Plan in conjunction with its review of the Annual Budget.  Any proposed changes to the Business Plan during the Initial Business Plan Timeline shall be reviewed and shall require the approval of the Board.  Following the period covered by the Initial Business Plan Timeline, any new Business Plans shall be adopted and approved by the Board. Subject to the then effective Initial Budget or Annual Budget, as applicable, (or if no Initial Budget or Annual Budget is then in effect, the cash and other resources then available to the Company), the Board shall cause the Company to operate in a manner consistent with the principals and objectives set forth in the Business Plan as the same is approved from time to time by the Board.

Section 2.8    <u>Annual Budget</u>.

(a)    Following the date hereof, each of FX and LMC shall use its commercially reasonable efforts to prepare and agree to a Fiscal Year 2022 budget to design and develop its first EC Vehicle, which budget shall (i) be prepared to reflect expenditures on a monthly basis, (ii) include the timing and amounts of funding of the Capital Commitments (<u>provided</u>, that Capital Commitments shall be funded no more frequently than monthly and each Capital Contribution shall be no less than $7,500,000) and (iii) include all anticipated Company expenditures for Fiscal Year 2022, including the Initial Expenditures and any licensing fees payable under the FX Background IP License (the "<u>Initial Budget</u>").  Not later than sixty (60) days prior to (A) the end of the period covered by the Initial Budget and (B) each Fiscal Year thereafter, the Officers shall prepare and submit to the Board for approval the Annual Budget for such Fiscal Year (or portion thereof).  If the Board fails to adopt and approve an Annual Budget for a Fiscal Year, then until an Annual Budget for such Fiscal Year (or portion thereof) is adopted and approved by the Board, the Company shall operate on the Annual Budget for the immediately preceding Fiscal Year (or portion thereof) (or, in the case of there are no Annual Budgets for the immediately preceding Fiscal Year, the Initial Budget), with (x) all recurring ordinary course line items (other than applicable costs for the relevant upcoming Fiscal Year governed by contracts that by their terms provide for fixed amounts or annual escalations or increases in such costs, which shall be based on such applicable contract provisions) increased by up to five percent (5%) in the aggregate, and (y) any nonrecurring or non-ordinary course line items excluded entirely.

(b)    No expenditures or commitments for expenditures may be made by the Company, or any Member on behalf of the Company, if such expenditure individually or in the aggregate with other expenditures or commitments results in a deviation from any Initial Budget or Annual Budget, as applicable, then in effect that increases the costs and expenses incurred by

the Company in the applicable period covered by the Initial Budget or Annual Budget, as applicable, by an amount equal to or greater than five percent (5%) of the aggregate projected costs and expenditures set forth in such Initial Budget or Annual Budget, as applicable.

Section 2.9    <u>Company Interests; Units</u>.  The Company Interests shall be represented by units ("<u>Units</u>").  The total Units and the number of Units of each class or series which the Company has authority to issue shall be determined by the Board from time to time (which determination the Board shall cause to be reflected on the Schedule of Members) and as of the date hereof shall consist of 100,000,000 Units, all of which shall be voting Units.  The Units shall not be certificated, <u>provided</u> the Board may in its discretion cause the Company to issue certificates representing Units from time to time.  The Company may issue fractional Units. The Members hereby agree that the Units shall be securities governed by Article 8 of the Uniform Commercial Code of the State of Delaware (and the Uniform Commercial Code of any other applicable jurisdiction). The Company is authorized to issue up to an additional 5,000,000 Units (the "<u>Management Incentive Units</u>") to employees, consultants and other services providers of the Company or any Subsidiary, which will have the rights and obligations set forth herein and in a management incentive plan adopted by the Board and will be subject to the terms of applicable award agreements (including with respect to vesting), in each case as determined by the Board from time to time.  On or prior to the adoption of a management incentive plan by the Board, the Board shall cause such amendments to this Agreement as necessary to be entered into so that the Management Incentive Units will be structured as "profits interests" as that term is used in Revenue Procedures 93-27 and 2001-43 or, to the extent Revenue Procedures 93-27 and 2001-43 are superseded by the proposed regulations referenced in IRS Notice 2005-43, then to the extent such regulations are applicable, if at all, to such Management Incentive Units.

Section 2.10    <u>Intellectual Property</u>.

(a)    As promptly as practicable following the date hereof (but in no event later than thirty (30) days after the date hereof), FX shall cause access to be granted to the Company of all information and data for the Model C and Model E Designs necessary for the Company to commence the Pre-Development Activities.  FX shall use its commercially reasonable efforts to cause to be granted to the Company within sixty (60) days of the date hereof, a perpetual, irrevocable, non-exclusive, worldwide, license to the Intellectual Property that FX or one or more of its Affiliates owns or has the right to use with respect to the Model C and Model E Designs (the "<u>FX Background IP</u>") for use by the Company in conducting the In-Scope Business (the "<u>FX Background IP License</u>") on terms and conditions acceptable to the Company, including the right to sublicense the FX Background IP to the Members in connection with the licenses granted pursuant to <u>Section 2.10(c)</u>.

(b)    The Company will exclusively own all right, title and interest in and to all Intellectual Property conceived, developed, or reduced to practice by the Company that describes, embodies or protects any EC Vehicle designed by the Company or is conceived, developed or reduced to practice by any employee of any Member that describes, embodies or protects any EC Vehicle within the In-Scope Business and is based on the MIH platform (the "<u>Vehicle Foreground IP</u>").

14

(c)     The Company will exclusively license any Vehicle Foreground IP (i) to LMC or any of its Affiliates for use in the North American commercial market, subject to terms and conditions, including customary and reasonable licensing fees, that are agreed upon by the Board and LMC, and (ii) to FX or any of its Affiliates for use outside of North America, subject to terms and conditions, including customary and reasonable licensing fees, that are agreed upon by the Board and FX.


## ARTICLE III
## CAPITAL COMMITMENTS; CAPITAL CONTRIBUTIONS

Section 3.1     <u>Commitments, Capital Contributions and Issuance of Company Interests</u>.

(a)     <u>Capital Commitments and Capital Contributions</u>.  In furtherance and support of the Company, each of FX and LMC hereby agrees to make Capital Contributions to the Company as follows:

(i)     Within forty-five (45) days of the date hereof (and subject to the Company having established the required banking account), each of FX and LMC shall fund its Pro Rata Share of the Initial Capital Contribution by wire transfer of immediately available funds to an account specified by the Board.  The Company shall utilize the Initial Capital Contribution to fund the Initial Expenditures.

(ii)     Thereafter, each of FX and LMC shall fund its Pro Rata Share of additional Capital Contributions in such amounts and at such times as set forth in the Initial Budget or Annual Budget in effect at such time, by wire transfer of immediately available funds to an account specified by the Board; <u>provided</u>, that in the event no Initial Budget has been approved by the Board by sixtieth (60th) day following the date of this Agreement, then on the fifth (5th) Business Day of each calendar month thereafter until the earlier to occur of (x) each Member having funded aggregate Capital Contributions equal to its Capital Commitment and (y) approval of the Initial Budget by the Board, each of FX and LMC shall fund Capital Contributions to the Company in an amount equal to its Pro Rata Share of the Minimum Monthly Contribution by wire transfer of immediately available funds to an account specified by the Board.  So long as the Initial Budget has not been approved, proceeds from the Minimum Monthly Contributions may only be used to fund expenditures within the categories set forth on <u>Exhibit D</u> attached hereto and Initial Expenditures.

(iii)     Notwithstanding anything to the contrary contained herein, in no event shall any Member be required to make aggregate Capital Contributions to the Company in excess of its Capital Commitment.

(iv)     Each Member that makes a Capital Contribution pursuant to this <u>Section 3.1(a)</u> shall receive a number of Units equal to (A) the aggregate amount of such Capital Contribution divided by (B) $1.00 (the "<u>Unit Price</u>").

(v)     Notwithstanding anything to the contrary in the foregoing, FX and LMC acknowledge and agree that LMC's obligations to make any Capital Contributions

15



pursuant to this Section 3.1(a) is subject to the satisfaction of the following conditions: (A) FX or one of its Affiliates (the "FX Lender") shall have delivered to LMC a duly executed copy of an FX Financing Note in the aggregate principal amount equal to the amount of such Capital Contributions required to be made by LMC; and (B) following the due execution and delivery of such FX Financing Note by the parties thereto, the FX Lender shall not have breached its obligation to make the advance to LMC required under such FX Financing Note in accordance with the terms and conditions thereof. For the avoidance of doubt, LMC will not be deemed a Defaulting Member under Section 3.2 if it does not make a Capital Contribution otherwise required under this Section 3.1(a) as a result of the conditions set forth in clauses (A) and (B) in the immediately preceding sentence not being satisfied.

(b)     Emergency Funding.

(i)     The Members shall also have the right, but not the obligation, to make Member Loans, pro rata in accordance with their respective Ownership Percentages, of the amounts determined necessary by the Board to fund emergency expenditures to (A) prevent imminent risk to health and safety to employees or others Persons, (B) prevent imminent damage to Company property, (C) replace Company property damaged due to casualty (but only to the extent of any shortfall in insurance proceeds), or (D) avoid or cure a default under any Indebtedness of the Company or any of its Subsidiaries to an unrelated third party (such amounts, "Emergency Funding"). Upon the Board making such a determination that an Emergency Funding is necessary, the Company shall provide each Member with notice not less than ten (10) Business Days prior to the requested funding date of such Member Loans, which notice shall include (i) the requested funding date of such Member Loans, (ii) the aggregate amount of funding the Company is seeking from all Members in respect of such Emergency Funding, (iii) the amount that may be loaned by such Member (pro rata in accordance with their respective Ownership Percentages), (iv) the account to which such Member Loans shall be paid and (v) the purpose for which such Emergency Funding will be used. If any Member elects not to make its pro rata portion (in accordance with their respective relative Ownership Percentages) of such Member Loans or fails to timely make such Member Loans (such amount of unfunded Member Loans, the "Unfunded Emergency Funding Amount"), the Company shall notify any other Member making its full pro rata portion (in accordance with its Ownership Percentage) of such Member Loan (a "Participating Member") of such Unfunded Emergency Funding Amount, which notice shall include (i) the requested funding date for such Unfunded Emergency Funding Amount (which shall not be less than ten (10) Business Days following such notice), (ii) the aggregate Unfunded Emergency Funding Amount and (iii) the account to which such Unfunded Emergency Funding Amount shall be paid. Each Participating Member shall have the right, but not the obligation, to make additional Member Loans equal to the Unfunded Emergency Funding Amount; provided, that if more than one Participating Member elects to make additional Member Loans that collectively exceed the Unfunded Emergency Funding Amount, each such Participating Member's additional Member Loans shall be reduced ratably (in accordance with their respective relative portions of the Member Loans such Participating Members committed (and did not fail to timely fund) prior to any Unfunded Emergency Funding Amount) by an amount equal to such excess.

(ii)     Notwithstanding the foregoing, the Company may, without complying with the notice procedures set forth in Section 3.1(b)(i), accept a Member Loan from

16



any Member if the Board determines that the funding of such Emergency Funding on an expedited basis (relative to the procedures set forth in Section 3.1(b)(i)) is necessary in exigent circumstances to prevent an imminent material and adverse impact on the business or operations of the Company or any of its subsidiaries; provided, that promptly (and in any event within ten (10) Business Days) following the funding of such Member Loan, such Member shall offer to each other Member the right to purchase, at par value (without any accrual for interest thereon), such other Member's pro rata amount (in accordance with their respective relative Ownership Percentages) of such Member Loan, which offer shall remain open for at least 30 days before terminating and specify in reasonable detail the circumstances giving rise to such Member Loan, together with wire instructions for purposes of such purchase, and to accept such offer the other Member shall fund its pro rata amount (in accordance with its Ownership Percentage) thereof (or such lesser amount as such Member shall elect, in its sole discretion) while such offer remains open and upon any such acceptance and funding, the other Member shall be deemed to have purchased its funded portion of such Member Loan (and thereafter hold such portion of the Member Loan in lieu of the offering Member).

(iii)      A "Member Loan" is a loan that shall (i) be unsecured, (ii) bear interest at a per annum interest rate (accruing daily and compounding annually, to the extent not paid in cash) equal to three percent (3%), (iii) have no stated maturity or scheduled amortization, but be mandatorily repaid by the Company solely out of Distributable Cash (and shall, upon such payment, reduce Distributable Cash correspondingly) before any distributions are made to the Members pursuant to Section 4.1 or Section 8.2, (iv) not be subject to any rights of acceleration of maturity, notwithstanding the occurrence of any event of default in connection with such loan, (v) have no up-front, commitment, arrangement, prepayment, breakage, "make-whole" or other fees (apart from the interest described in clause (ii) above), (vi) be non-Transferrable, except in connection with a Permitted Transfer or Transfer of Membership Interests (with any Transfer of Member Loans by a Member that is not a Permitted Transfer to be in the same percentage of the aggregate outstanding amount of Member Loans held by such Member as the percentage of the Membership Interests held by such Member being so Transferred), (vii) not be deemed to be a Capital Contribution and not be convertible into Membership Interests, (viii) at the option of the Member making the Member Loan, be represented by a promissory note in customary form consistent with this Section 3.1(b)(iii).

(c)      Additional Issuances of Equity Interests.  Subject to Section 3.3 and Section 5.3(a)(iv), the Board shall have the right at any time and from time to time to cause the Company to create and/or issue Equity Interests at such price and on such other terms and conditions as shall be determined and approved by the Board (including other classes, groups or series thereof having such relative rights, powers, and/or obligations as may from time to time be established by the Board, including rights, powers, and/or obligations different from, senior to or more favorable than existing classes, groups and series of Equity Interests), in which event, notwithstanding anything herein to the contrary, the Board shall have the power, subject to Section 5.3(a)(iv), to amend this Agreement to reflect such creation and/or additional issuances and dilution and to make any such other amendments as it deems necessary or desirable (in its sole discretion) to reflect such creation and/or additional issuances and dilution (including amending this Agreement to increase the authorized number of Equity Interests of any class, group or series, to create and authorize a new class, group or series of Equity Interests and to add the terms of such new class, group or series of Equity Interests including economic and

17

governance rights which may be different from, senior to or more favorable than the other existing Equity Interests), in each case without the approval or consent of any other Person.

(d) <u>Schedule of Members</u>. The Company shall create and maintain a Schedule of Members, setting forth the name and address of each Member, the number and class of Units held by each such Member, each Member's Ownership Percentage, the aggregate Capital Contributions of each Member and the aggregate Capital Commitment of each Member (the "<u>Schedule of Members</u>"). A copy of the Schedule of Members, as of the date hereof, is attached hereto as <u>Schedule 3.1</u>. Upon any additional Capital Contribution or change in the number, amount or ownership of outstanding Units, the Company shall update the Schedule of Members. Any update to the Schedule of Members made in accordance with this Agreement shall not be deemed an amendment to this Agreement. Any reference in this Agreement to the Schedule of Members shall be deemed to be a reference to the Schedule of Members as validly updated and in effect from time to time.

Section 3.2 <u>Default Funding</u>.

(a) <u>Right to Fund Shortfall Amounts</u>. If a Member fails to fund all or any portion of its Capital Commitment when due pursuant to Section 3.1(a) (such Member failing to fund, a "<u>Defaulting Member</u>"), the Company shall promptly, and in any case within five (5) Business Days after such funding default, provide written notice (a "<u>Default Notice</u>") to each Member setting forth: (i) the name of the Defaulting Member; (ii) the aggregate amount required to have been funded by such Defaulting Member for such contribution; (iii) the amount actually funded (if any) by such Defaulting Member for such contribution; and (iv) the shortfall amount calculated by subtracting the amount described in <u>clause (iii)</u> from the amount described in <u>clause (ii)</u> (such amount, the "<u>Shortfall Amount</u>"). Any other Member that is not identified as a Defaulting Member in such Default Notice (each, a "<u>Non-Defaulting Member</u>"), shall have the option to fund all or any portion of the Shortfall Amount set forth in the Default Notice by delivering written notice thereof to the Company within ten (10) Business Days after receipt of the Default Notice. If a Non-Defaulting Member elects to fund all or a portion of the Shortfall Amount within such time period (if so elected, a "<u>Default Funding</u>" and such Member, an "<u>Electing Member</u>"), then such Default Funding, when paid to the Company, shall constitute a Capital Contribution (a "<u>Default Contribution</u>").

(b) <u>Issuance of Company Interests</u>. The Company shall issue to each Non-Defaulting Member that has funded a Default Contribution additional Units equal to (A) the aggregate amount of such Default Contribution funded by such Electing Member divided by (B) the Unit Price.

Section 3.3 <u>Pre-Emptive Right</u>. If the Company or any of its Subsidiaries proposes (following approval by the Board) to sell any Equity Interest in the Company or any of its Subsidiaries to any Person in a transaction or transactions other than (a) Equity Interests issued to another entity or its owners in connection with the acquisition of all or a portion of such entity or its assets that is approved in accordance with the terms of this Agreement, (b) Equity Interests offered to employees of the Company or any Subsidiary pursuant to employee benefit plans, equity incentive plans or arrangements approved by the Board in accordance with the terms of this Agreement (including upon the exercise of employee equity options granted pursuant to any

18

such plans or arrangements) or (c) Equity Interests issued by a Subsidiary of the Company to the Company or another Subsidiary of the Company, each Member shall have the right to purchase directly or through any Affiliate a percentage of such Equity Interests equal to such Member's Ownership Percentage.  Any participation pursuant to this <u>Section 3.3</u> shall be on the same terms and conditions as applied to all offerees in the respective offering.  In the event of a proposed transaction or transactions, as the case may be, that would give rise to preemptive rights of the Members, the Company shall provide notice (the "<u>Initial Notice</u>") to the Members no later than ten (10) Business Days prior to the expected consummation of such transaction or transactions. Each Member shall provide notice of its election to exercise such rights within five (5) Business Days after delivery of such Initial Notice from the Company.  The failure of a Member to respond to the Initial Notice and affirmatively exercise its preemptive right in accordance with the terms of this Agreement shall be deemed an election not to exercise its preemptive right in connection with such proposed transaction or transactions.  If a Member fails to exercise its preemptive right with respect to all or any portion of the Equity Interests subject to that preemptive right and any other Member(s) exercise their preemptive rights in full, the Company shall give the exercising Member(s) notice and the exercising Member(s) shall have the right to elect to purchase their pro rata share (calculated based on the exercising Member(s) Ownership Percentage) of the Equity Interests subject to the unexercised preemptive right, all in accordance with the procedure set forth above in this <u>Section 3.3</u>.

Section 3.4     <u>Refinancing of FX Financing Notes</u>.  On or prior to the date that any FX Financing Note matures in accordance with its terms (a "<u>Maturing FX Note</u>"), so long as no Event of Default (as defined in such Maturing FX Note) has occurred and is continuing, FX shall provide an FX Advance to LMC in the aggregate principal amount necessary to repay all obligations due at maturity on such Maturing FX Note; <u>provided</u>, that FX's obligations under this <u>Section 3.4</u>  shall not apply to any FX Financing Note that matures on or after December 31, 2025.

<div align="center">

ARTICLE IV
DISTRIBUTIONS

</div>

Section 4.1     <u>Distributions</u>.

(a)     Subject to applicable Laws and the provisions of <u>Section 4.1(b)</u> and <u>Section 4.1(d)</u>, the Company shall make Distributions of Excess Cash to the Members in respect of their Units at any time and from time to time (i) as approved by the Board or (ii) after the Company's first commercial launch of an EC Vehicle, as requested by a Member in writing, <u>provided</u> that a Member may not request a Distribution more than once per Fiscal Year.

(b)     Subject to applicable Laws and <u>Section 8.2</u>, all Distributions shall be made to the Members pro rata in accordance with their respective Ownership Percentages at the time such Distribution is approved by the Board or is otherwise required to be made pursuant to <u>Section 4.1(a)</u>.

(c)     If the Company has, pursuant to any clear and manifest accounting or similar error, paid any Member an amount in excess of the amount to which it is entitled pursuant to this <u>Article IV</u>, such Member shall reimburse the Company to the extent of such

<div align="center">19</div>



excess, without interest, within thirty (30) days after demand by the Company, and, upon receipt of such funds, the Company shall redistribute such funds in accordance with Section 4.1(b).

(d) For the avoidance of doubt, any Distributions to be made to the Members following the dissolution of the Company shall be made in accordance with Section 8.2.

Section 4.2 Tax Withholding. As further described below in this Section 4.2, where withholding is required by Law, the Company shall be responsible for withholding any and all Taxes in relation to payments made pursuant to this Agreement, including payments made with respect to any Distributions. The Company shall remit the Taxes withheld to the relevant Tax Authority and provide the applicable Member with the withholding Tax receipt or reasonable supporting document and/or evidence of such remittance in a timely manner.

(a) Documentation. Promptly upon request, each Member shall provide the Partnership Representative with any information related to such Member necessary to (i) allow the Company to comply with any Tax reporting, Tax withholding or Tax payment obligations of the Company, or (ii) establish the Company's legal entitlement to an exemption from, or reduction of, withholding Tax, including U.S. federal withholding Tax under Sections 1471 and 1472 of the Code. The withholdings referred to in this Section 4.2(a) shall be made at the maximum applicable statutory rate under applicable Tax Law unless the Company and the Partnership Representative receive documentation, satisfactory to the Partnership Representative, to the effect that a lower rate is applicable, or that no withholding is applicable. Without limiting the generality of the foregoing, if requested by the Partnership Representative, each Member shall, if legally entitled to do so, deliver to the Company: (x) an affidavit in form satisfactory to the Partnership Representative that the applicable Member (or its partners or members, as the case may be) is not subject to withholding under the provisions of any U.S. federal, state, or local, foreign or other Law; (y) any certificate that the Company or the Partnership Representative may reasonably request with respect to any such Laws; and/or (z) any other form, instrument, declaration or other document reasonably requested by the Company or the Partnership Representative relating to any Member's status under such Law.

(b) Authorization. The Company is hereby authorized at all times to make payments with respect to each Member in amounts required to discharge any obligation of the Company (as reasonably determined by the Partnership Representative, which may be based on the advice of legal or Tax counsel to the Company) to withhold or make payments to any U.S. federal, state, local or foreign Tax Authority with respect to any Distribution or allocation by the Company to such Member and to withhold the same from Distributions to such Member. In the event that the Partnership Representative determines that withholding is required with respect to any Distribution or allocation by the Company to a Member, the Partnership Representative shall use its best efforts to notify such Member promptly so that the Member may have the opportunity to establish an exemption or reduced rate of withholding with respect to such Tax. The Company is further authorized to make payments with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Partnership Representative, which may be based on the advice of legal or Tax counsel to the Company) to withhold or make payments to a Tax Authority with respect to any payments made to the Company. In the event that the Distributions or proceeds to the Company are reduced on account of Taxes withheld at the source or any Taxes are otherwise required to be paid by the

Company and such Taxes are imposed on or with respect to one or more, but not all of the Members in the Company, the amount of the reduction shall be borne by the relevant Members. Any amounts paid to a Tax Authority pursuant to this <u>Section 4.2(b)</u> shall be deemed distributed to the applicable Member with respect to which such amounts were withheld for all purposes of this Agreement, and taken into account in determining the amount of future Distributions to such Member pursuant to <u>Section 4.2(c)</u>.

    (c) <u>Deemed Loan</u>. Any withholding pursuant to <u>Section 4.2(b)</u> made by the Company to a Tax Authority on behalf of a Member and not simultaneously withheld from a Distribution or payment to that Member shall, with interest thereon accruing from the date of payment at a rate equal to the floating rate of the one-year LIBOR Rate plus 2.0% per annum, be treated as a loan, and: (i) be repaid by reducing the amount of the next succeeding Distribution or Distributions to be made to such Member; or (ii) at the reasonable discretion of the Partnership Representative, be promptly repaid to the Company, in whole or in part, by the Member on whose behalf the withholding was made (which repayment by the Member shall not be treated as a Capital Contribution for purposes of <u>Article III</u> and shall not reduce the amount of such Member's unfunded Capital Commitment). Interest shall cease to accrue from the time the Member on whose behalf the withholding was made repays such withholding (and all accrued interest) by either method of repayment described above. A Member's obligation to repay any amount treated as a loan and any accrued but unpaid interest thereon pursuant to the foregoing shall survive the winding up and dissolution of the Company and any Transfer of such Member's Company Interests, and the Company may pursue and enforce all rights and remedies it may have against each such Member under this <u>Section 4.2(c)</u> notwithstanding such winding up, dissolution or Transfer.

<div align="center">

ARTICLE V
MANAGEMENT

</div>

   Section 5.1 <u>Authority of Board</u>. Except for situations in which (a) the approval of the Members or any specific Member is required by this Agreement or the Delaware Act or (b) the authority of the Board is otherwise limited by the terms of this Agreement, and in each case subject to the other provisions of this <u>Article V</u>, the Board shall direct and exercise full supervisory control over all activities of the Company, and have the power to bind or take any action on behalf of the Company within its scope and in accordance with this Agreement. For the avoidance of doubt, no individual Manager acting in his capacity as a "manager" shall have the authority to bind the Company except as a member of the Board acting collectively as the Board, and all actions by the Managers shall be taken collectively as the Board, subject to the other provisions of this Agreement.

   Section 5.2 <u>Composition of the Board</u>.

    (a) The initial authorized number of Managers on the Board shall be five (5). FX's initial Manager shall be Jerry Hsiao and LMC's initial Manager shall be Edward Hightower.

<div align="center">

21

</div>



(b)     The number of Managers serving on the Board at any time shall be adjusted from time to time in accordance with Section 5.2(c).  Each Manager shall hold office until his or her death, disability, retirement, resignation or removal.

(c)     Each Member shall take all necessary action to effectuate fully the provisions in this Section 5.2 to ensure that the Board consists of the Managers that are duly designated, elected or appointed in accordance with this Section 5.2, including by promptly calling and/or voting, as the case may be, in any annual or special meetings or promptly participating in an action by written consent such that the Board shall be composed as follows:

(i)     Each initial Member shall be entitled to appoint a number of Managers equal to the total number of Managers multiplied by its Ownership Percentage, round up or down, as applicable, to the nearest whole number. If at any time LMC owns less than 20% but 10% or more of the Ownership Percentages, then LMC shall be entitled to designate a board observer who shall be entitled to notice of all meetings and distributions of all materials in the same manner and at the same time as such notices and materials are provided to the Managers, and shall be entitled to attend all meetings of Managers (but not to vote on any matters thereat).

(ii)     If at any point the number of Managers that a Member is entitled to appoint is reduced pursuant to the preceding, the other Member may remove as a Manager the appropriate number of such Member Manager(s) and fill the vacancy or vacancies caused by such removal.

(d)     Subject to Section 5.2(c), the removal of any Manager from the Board may be effected only by the Member entitled to appoint such Manager.

(e)     If any Manager ceases to serve as a member of the Board during such Manager's term of office by reason of death, disability, resignation or removal, the resulting vacancy on the Board shall be filled by the Member entitled to appoint such Manager pursuant to Section 5.2(c).

(f)     The Managers (including the Chairperson) shall not be compensated for their services as members of the Board.  Each Member shall be solely responsible for all out-of-pocket fees and expenses incurred by the Managers appointed by such Member in connection with their service on the Board, including, in each case, attending any meeting of the Board.

(g)     FX shall be entitled to designate one (1) of its Manager appointees to serve as Chairperson of the Board (the "Chairperson").  The Chairperson's duties shall be strictly limited to convening meetings of the Board and establishing meeting agendas.  The Chairperson shall not in this capacity have the authority contractually or legally to bind the Company.  The Chairperson shall not be entitled to vote on any matter submitted to the Board, other than in such individual's capacity as a Manager and, for the avoidance of doubt, the Chairperson shall not have a casting vote to break any tie among the Managers that may arise on matters submitted to a vote of the Board.

(h)     A Member shall be entitled to appoint a number of Managers to any committee of the Board formed by the Board in proportion to the number of Managers such Member is entitled to appoint to the Board; provided, that absent a specific grant of authority

22



from the Board, no committee of the Board shall have any authority to bind the Board or the Company and no act of any committee shall be deemed to be the act of the Board.

Section 5.3    Meetings.

(a)    Votes per Manager; Quorum; Required Vote for Board Action.

(i)    Each Manager shall have one vote; provided that if any FX Manager or LMC Manager is absent or if there is a vacancy in the FX Managers or LMC Managers at any time when there is at least one (1) FX Manager or LMC Manager, as the case may be (for example, if FX has only designated one (1) of its initial three (3) Managers), the vote of each Manager appointed by such Member present at a meeting (or consenting to any written consent) shall be automatically multiplied by a fraction, the numerator of which is the total number of Managers that may be appointed by such Member pursuant to Section 5.2(c)(i) and the denominator of which is the number of Managers that may be appointed by such Member pursuant to Section 5.2(c)(i) that is present or consenting.

(ii)    Unless otherwise provided in this Agreement, at least one (1) Manager appointed by each of FX and LMC, either present (in person or by teleconference) or represented by proxy, shall constitute a quorum for the transaction of business at a meeting of the Board; provided that if (A) two (2) consecutive Board meetings with respect to the same subject matter are duly called and (B) there is not at least one (1) Manager appointed by a Member in attendance at either of those meetings, then attendance by such Member's Managers will not be required for a quorum at a third duly called meeting of the Board with respect to such subject matter.  The Company shall provide copies of the minutes of each meeting of the Board to any Managers not in attendance promptly following such meeting.

(iii)    Unless otherwise provided in this Agreement, any action (including the giving of consent, waivers or approvals) by the Board shall require the affirmative vote of, or written consent signed by, the Managers holding a majority of the number of votes held by all Managers then entitled to be appointed.

(iv)    Without the approval of the Board, which approval shall include at least one (1) Manager designated by LMC for so long as LMC's Ownership Percentage is at least thirty percent (30%), none of the Board or any Manager shall have the power or authority to cause the Company to engage in any of the following:

(A)    any merger, consolidation or other business combination involving the Company;

(B)    any sale of all or substantially all of the assets of the Company;

(C)    any reorganization or transaction or series of transactions resulting in a Change of Control;

(D)    the Company entering into a new line of business that is outside of the In-Scope Business;

23



(E)     licensing any EC Vehicles or any Vehicle Foreground IP or other Company owned Intellectual Property, except pursuant to Section 2.10(c);

(F)     any material change to the Company's accounting policies and practices, other than as required to comply with GAAP or applicable Laws, and the selection of the Accountants or any auditor;

(G)     any material amendments or deviations from the Business Plan (or the adoption of any new Business Plan for any period following the Initial Business Plan Timeline);

(H)     any approval of the Initial Budget or an Annual Budget and any amendments or modifications thereto;

(I)     amendment, supplement or modification of this Agreement or the Certificate of Formation;

(J)     increasing or decreasing the size of the Board;

(K)     an initial public offering of any Units or other Equity Interests in the Company;

(L)     a transaction (whether by merger, consolidation or issuance of equity interest or otherwise) whereby a special purpose acquisition company that is not an Affiliate of the Company or any Member acquires Equity Interests of the Company (or any surviving successor or resulting company);

(M)     any election to dissolve, wind-up or liquidate the Company or any of its Subsidiaries and the appointment of any liquidator in connection therewith;

(N)     the entry into or the amendment or termination of any Contract or transaction between the Company, on the one hand, and any Manager or Member (or its Affiliates), on the other hand, other than expiration of any Contract according to its scheduled term or failure to renew, and other than those Contracts specifically contemplated by this Agreement (including Member Loans, licenses contemplated by Section 2.10(c) (but subject to clause (P) below) and any other agreements entered into pursuant to and in compliance with the indemnification provisions in Article XII);

(O)     the terms of any license contemplated by Section 2.10(c), or any amendment, supplement or modification to any such license;

(P)     making material Tax elections;

(Q)     making Distributions, except as requested by a Member in accordance with Section 4.1(a) or making any determination as to the amount of Excess Cash;

(R)     any authorization or issuance of any Company Interest or other Equity Interest in the Company, including any additional Units;

24



(S)     except for Member Loans, the incurrence of any Indebtedness by the Company in excess of the amounts contemplated in the Annual Budget then in effect;

(T)     any declaration of bankruptcy or insolvency of, or any failure to oppose any involuntary insolvency proceeding initiated against the Company;

(U)     adoption of a management incentive plan and associated award agreements (including the terms thereof) with respect to the issuance by the Company of up to 5,000,000 Units to employees, consultants and other services providers of the Company and any Subsidiary as contemplated by <u>Section 2.9</u>; and

(V)     entering into any agreement, arrangement or understanding to do any of the foregoing.

(v)     Except as expressly set forth herein, including in <u>Section 2.8(a)</u>, if the Board is unable to obtain the requisite the affirmative vote or written consent pursuant to this Agreement (a "<u>Board Deadlock</u>"), any Member may refer such matter to the chief executive officers of the Members for resolution thereof by providing written notice to the other Members. If such Board Deadlock remains unresolved for more than thirty (30) days after such referral, then no decision or action shall be taken by the Company (and the Company shall not be authorized to take any action) with respect such matter unless and until such Board Deadlock is subsequently resolved by (A) the Board obtaining the affirmative vote or written consent pursuant to this Agreement or (B) agreement between the chief executive officers of the Members.

(b)     <u>Place of Meetings; Order of Business</u>.  The Board may hold its meetings telephonically or in such place or places within the United States, either inside or outside the State of Delaware, as the Board may from time to time determine by resolution.  At all meetings of the Board, business shall be transacted in such order as shall from time to time be determined by resolution of the Board.

(c)     <u>Regular Meetings</u>.   Regular meetings of the Board shall be held telephonically or at such times and places within the United States as shall be determined from time to time by resolution of the Board.  Such regular meetings shall be held at least as frequently as once per calendar quarter.  Notice of such regular meetings shall not be required if held at the times and places set forth in the relevant resolution and such resolution has been provided to each Manager.

(d)     <u>Special Meetings</u>.  Special meetings of the Board may be called by the Chairperson or any Managers having at least two (2) votes (in the aggregate) on at least five (5) Business Days personal, written or electronic notice to each Manager, which notice must include appropriate dial-in information to permit each Manager to participate in such meeting by means of telephone conference.  Such notice need not state the purpose or purposes of such meeting, except as may otherwise be required by the Delaware Act.

(e)     <u>Action Without a Meeting; Telephone Meeting</u>.

25



(i)     Notwithstanding <u>Section 5.3(a)</u> hereof, any action required or permitted to be taken at any meeting of the Board may be taken without a meeting if a consent in writing, setting forth the action so taken shall be signed by all Managers and, when so signed, such written consent shall constitute Board approval of such action. The Company shall provide copies of executed consents to all Members promptly following execution of such consents.

(ii)     Subject to the requirement for notice of meetings, Managers may participate in a meeting by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting.

(f)     <u>Attendance</u>.  Each Member shall use its reasonable best efforts to cause the Managers appointed by it to attend all regular meetings of the Board and all special meetings of the Board for which notice has been given in accordance with <u>Section 5.3(d)</u>.

(g)     <u>Waiver of Notice Through Attendance</u>.  Attendance of a Manager at any meeting of the Board (including by telephone or similar communication) shall constitute a waiver of notice of such meeting, except where such Manager attends the meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called or convened and notifies the other Managers at such meeting of such purpose.

(h)     <u>Reliance on Books, Reports and Records</u>.  In accordance with <u>Article XI</u> each Manager shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or reports made to the Company by any of its officers or by an independent certified public accountant or by an appraiser selected with reasonable care by the Board, or in relying in good faith upon other records of the Company.

Section 5.4     <u>Officers</u>.

(a)     <u>General</u>.  Subject to the terms set forth in this Agreement, the Board may, from time to time, approve the appointment, employment, replacement and removal of individuals as may be necessary or appropriate for the conduct of the Company's business (subject to the supervision and control of the Board), including individuals who may be designated as officers of the Company, with titles including "general manager," "president," "vice president," "treasurer," "secretary," "chief executive officer," "chief financial officer" "chief operating officer," "chief compliance officer," and "chief technology officer," as and to the extent authorized by the Board and the Delaware Act.  Any number of offices may be held by the same individual; <u>provided</u> that the chief executive officer and the chief financial officer shall always be different individuals.  Subject to the terms set forth in this Agreement, the Board may, in its discretion, remove any officers or choose not to fill any office for any period as it may deem advisable, subject to the requirements of the Delaware Act.  Officers need not be residents of the United States or any other particular jurisdiction.  Subject to the requirements of the Delaware Act, any officers so designated shall have such authority and perform such duties as the Board may, from time to time, delegate to them.  The salaries or other compensation, if any, of the officers of the Company shall be fixed from time to time by the Board.

2022TW-L-K-2444                    `1



(b)    <u>Chief Executive Officer</u>.   The chief executive officer, subject to the powers of the Board, shall have general charge of the business, affairs and property of the Company, and control over its officers, agents and employees, and shall see that all orders and resolutions of the Board are carried into effect.   The chief executive officer shall have such other powers and perform such other duties as may be prescribed by the Board.   FX shall have the right to approve the appointment, employment, replacement and removal of the chief executive officer that is reasonably acceptable to LMC without the approval of the Board.

(c)    <u>Chief Financial Officer</u>.   The chief financial officer of the Company, subject to the powers of the Board, shall be responsible for all financial and accounting matters and for the direction of the offices of treasurer and controller, if any.   The chief financial officer shall have such other powers and perform such other duties as may be prescribed by the Board. FX shall have the right to approve the appointment, employment, replacement and removal of the chief financial officer that is reasonably acceptable to LMC without the approval of the Board.

(d)    <u>Resignation/Removal</u>.   Subject to the terms set forth in this Agreement, each officer shall hold office until his or her successor shall be duly designated and qualified or until his or her death or until he or she shall resign or shall have been removed by the Board. Any officer may resign as such at any time.   Such resignation shall be made in a written notice to the Board and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Board.   The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

ARTICLE VI
MEMBERS

Section 6.1    <u>Lack of Authority of Individual Members</u>.   No Member shall in its capacity as a Member have the authority or power to act for or on behalf of the Company in any manner, to do any act that would be (or could be construed as) binding on the Company or to make any expenditure on behalf of the Company (except to the extent specifically approved by the Board or included in the approved Initial Budget or an approved Annual Budget).

Section 6.2    <u>No Right of Partition</u>.   Except as set forth in <u>Section 8.2</u> or pursuant to a license granted to a Member pursuant to <u>Section 2.10</u>, no Member shall have the right to seek or obtain partition by court decree or operation of law of any of the Company's property, or the right to own or use particular or individual assets of the Company.

Section 6.3    <u>Members Right to Act</u>.   For situations in which the approval of the Members is required pursuant to this Agreement or a non-waivable provision of the Delaware Act, the Members shall act through written consent or meetings as set forth in <u>Section 6.3(a)</u> and <u>Section 6.3(b)</u>.   Unless otherwise provided in this Agreement, any action (including the giving of consent, waivers or approvals) by the Members shall require the affirmative vote of, or written consent signed by, the Members holding a majority Ownership Percentage.   Except for the voting, approval and consent rights of the Members expressly provided in this Agreement and the non-waivable provisions of the Delaware Act, none of the Members shall have any voting, approval or consent rights under this Agreement or the Delaware Act, and each Member

27



expressly waives (a) any consent, approval or voting rights that are not expressly provided in this Agreement and (b) any other rights to participate in the governance of the Company, whether such rights may be provided under the Delaware Act or otherwise. For the avoidance of doubt, if an action requires approval of LMC pursuant to <u>Section 5.3(a)(iv)</u> of this Agreement, such action shall not be taken even if approved by Members holding a majority Ownership Percentage unless such action is also approved by LMC notwithstanding any other provision of this Agreement.

(a)    <u>Action by the Members at Meetings; Meetings by Telephone Conference</u>.

(i)    The actions taken by the Members at any meeting (as opposed to by written consent), however called and however notice has been given, shall be as valid as though taken at a meeting duly held after regular call and notice if (but not until), either before, at or after the meeting, the Members as to whom it was improperly held sign a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes thereof.

(ii)    Subject to the requirements of the Delaware Act, the Certificate of Formation and this Agreement, the Members may participate in and hold a meeting of the Members by means of a conference telephone or similar communications equipment by means of which all individuals participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Member participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(b)    <u>Action by the Members via Written Consent</u>.   Any action permitted or required by the Delaware Act, the Certificate of Formation, or this Agreement to be taken at a meeting of the Members may be taken without a meeting, without notice and without a vote if a consent in writing, setting forth the action to be taken, is signed by such Members as would be required to take the applicable action at a meeting of the Members and, when so signed, such written consent shall constitute Member approval of such action, and notice of any such action taken shall be provided to those Members who have not consented in writing promptly following the taking of such action.   Such consent shall have the same force and effect as a vote at a meeting and may be stated as such in any document or instrument filed with the Delaware Secretary of State, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Members.

## ARTICLE VII
## BOOKS OF ACCOUNT

Section 7.1    <u>Records and Accounting</u>.

(a)    The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required to be provided pursuant to <u>Section 7.4</u> or applicable Law.

(b)    All matters concerning accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Board.

28



Section 7.2     <u>Bank Accounts</u>.  The Company may establish accounts for the deposit of Company funds, in such types and at such institutions as shall be determined from time to time by the Board.

Section 7.3     <u>Fiscal Year</u>.  The Fiscal Year of the Company shall be the 12-month period ending on the 31st day of December of each calendar year, except for: (a) the first Fiscal Year of the Company, which shall begin on the date hereof and shall end on the 31st day of December of the same year; and (b) the last Fiscal Year of the Company, which shall begin on the first day of January and shall end on the date of the Company's dissolution.

Section 7.4     <u>Reports; Access; Accountants</u>.

(a)     The Company shall, and the Members shall use their respective reasonable efforts to cause the Company to, have its and its Subsidiaries' financial statements reviewed in accordance with GAAP, by any nationally recognized accounting firm that is approved by the Board pursuant to <u>Section 5.3</u> ("<u>Accountants</u>"); provided, that if the ownership of the Company Interest of any Member requires that Member to have the Company's financial statements audited, then such Member shall notify the Company and the Board will select a nationally recognized auditor to conduct an audit of the Company's financial statements in accordance with GAAP.

(b)     The Company shall, at its sole cost and expense, prepare and deliver to each Member:

(i)     as soon as practicable after the end of each Fiscal Year of the Company, and in any event upon the earlier of ninety (90) days after the end of each Fiscal Year and ten (10) Business Days prior to the date required by any securities exchange upon which such Member or any of its Affiliates' securities are listed for a Member to comply with its or any of its Affiliates' reporting obligations with respect to the Company on such exchange, consolidated statements of income and cash flows of the Company and its Subsidiaries for such Fiscal Year and consolidated balance sheets of the Company and its Subsidiaries as of the end of such Fiscal Year and, in each case along with comparisons to the preceding Fiscal Year, all prepared in accordance with GAAP and, if such financial statements are audited statements, accompanied by (A) an opinion of the auditors and (B) a copy of the auditors' annual management letter to the Board;

(ii)     as soon as practicable after the end of each quarter of each Fiscal Year and in any event upon the earlier of forty-five (45) days after the end of each quarter and ten (10) Business Days prior to the date required by any securities exchange upon which such Member or any of its Affiliates' securities are listed for a Member to comply with its or any of its Affiliates' reporting obligations with respect to the Company on such exchange, unaudited consolidated balance sheets of the Company and its Subsidiaries as of the end of such period and unaudited consolidated statements of income and cash flows of the Company and its Subsidiaries for such period and for the current Fiscal Year to date and, in each case along with comparisons to the equivalent period from the preceding Fiscal Year, in each case prepared in accordance with GAAP, subject to the absence of footnote disclosures and changes resulting from normal year-end audit adjustments;

2022TW-L-K-2444

(iii)    promptly upon receipt thereof, any other reports, management letters or other detailed information concerning significant aspects of the Company's operations or financial affairs given to the Company by the Accountants; and

(iv)    with reasonable promptness, such other information and financial data concerning the Company and its Subsidiaries as any Member may reasonably request.

(c)    If it is determined by a Member that the Company shall be consolidated with any Affiliate of such Member, in order to comply with GAAP, the Company shall prepare and provide any financial statements and supplemental data as reasonably requested by such Member in respect of such consolidation.

(d)    The Company shall keep and maintain its books and records of account at its principal office or such other place as the Board shall designate.  Each Member and its authorized Representatives (including legal, Tax and accounting advisors) shall, at the sole cost and expense of such Member, have the right to (i) meet with the Board and the Officers to discuss the business and affairs of the Company, (ii) meet with the Company's Accountants and other Representatives and (iii) receive other information reasonably requested by such Member in order to evaluate the Company's internal financial and other controls, procedures and compliance, in the case of <u>clauses (i)</u> through <u>(iii)</u>, upon reasonable advance notice and during regular business hours; <u>provided</u> that, (A) the Company shall not be obligated to provide such information or access to the extent prohibited under applicable Law (including any Laws in respect of national security to which any Member may be subject) and (B) such information or access shall be subject to <u>Section 13.13</u>.

(e)    Without limiting the foregoing, the Company shall (i) retain all books and records with respect to Tax matters until the expiration of any applicable statute of limitations for the Company and the Members of their respective Tax periods (and, to the extent notified by a Member any extensions thereof), and (ii) give the Members reasonable written notice prior to transferring, destroying or discarding any such books and records and, if a Member so requests, the Company shall allow such Member to take possession of such books and records to the extent they would otherwise be destroyed or discarded.

Section 7.5    <u>Certain Tax Matters</u>.

(a)    <u>Partnership Solely for U.S. Tax Purposes</u>.  The Members intend and agree that the Company shall be characterized as a "partnership" for United States federal, state and local income Tax purposes and that the Company be operated in a manner consistent with its treatment as a partnership for such purposes.  The Members shall not take any position on any Tax return or any action or make any election that is inconsistent with such characterization.  Consistent with the foregoing, notwithstanding <u>Section 5.3(a)(iv)(P)</u>, the Partnership Representative shall take all appropriate actions to ensure that the Company shall be treated as a partnership for federal, state and local income Tax purposes, including the making of available Tax elections.  Neither the Company nor any Member shall take any action inconsistent with the express intent of the parties as set forth in this <u>Section 7.5(a)</u>.  Pursuant to the foregoing, the provisions of <u>Exhibit E</u> shall be applicable solely for purposes of U.S. federal, state and local Taxes and shall not affect, or in any way be taken into account in computing, any Member's

30



Company Interest or share of Distributions pursuant to any provision of this Agreement or the manner in which the Members report their share of the Company's results for financial accounting or any other non-U.S. Tax purposes. In the event the Partnership Representative desires to make an election to characterize the Company for U.S. federal, state or local income Tax purposes as other than a partnership or change the Tax classification of a Subsidiary, the Partnership Representative, prior to causing the Company to make such election, shall obtain the approval of the Board.

(b)     Taxable Year.  The Taxable year of the Company (the "Taxable Year") shall be the Fiscal Year.  Each Member shall provide such information as may be needed in order to determine the Taxable Year of the Company.

(c)     Tax Returns; Tax Compliance.  The Company shall prepare, or cause to be prepared, in accordance with applicable Law, all income and other Tax returns and other similar Tax reports and filings of the Company and shall cause the same to be filed in a timely manner (including extensions) with the appropriate Tax Authorities.  In addition, the Company shall take, or cause to be taken, any other action required for it to be in compliance with applicable Law in relation to Tax and accounting matters, including withholding Tax and paying that Tax to the appropriate Tax Authority as required by applicable Law.  The Company shall provide the Members with copies of the draft material income Tax returns to be filed by the Company for review and comment at least thirty (30) days prior to the scheduled filing thereof, and the Company shall cooperate in good faith with any Member to ensure that such Member's comments are reasonably taken into account in any such Tax returns.  Within fourteen (14) days after the filing of each such return, the Company shall provide the Members with a copy of all the material income Tax returns filed.  The Company shall also provide the Members promptly after receipt thereof, any Tax receipts or related evidence of payments related to such Tax returns.  The Partnership Representative may cause the Company to retain a "Big Four" or other nationally recognized accounting firm to prepare any required United States Tax returns, information returns or other filings, which shall be signed by the Partnership Representative.  Each Member is responsible for the preparation and filing of its own income and other Tax returns.  The Partnership Representative shall timely prepare and furnish all books and records of the Company reasonably necessary for any Member to prepare and file its Tax returns in compliance with applicable Tax Law and shall timely furnish copies of Tax elections and Tax workpapers.

(d)     Tax Cooperation.  Upon request, the Company shall provide commercially reasonable assistance with respect to (i) any claim for benefits by a Member under an applicable Tax treaty or any exemption from or reduction in Taxes with respect to such Member's Investment and/or interest in the Company (including (A) filing any forms or applications necessary to obtain any exemptions from or reductions in Taxes to the extent the Company is required to make such filings under applicable Law, and (B) providing the Members with such other information or documentation as is available to the Company and is relevant to the Members' application for a Tax refund); and (ii) any Tax returns that are required to be filed by a Member as a result of, or that are required to take into account, such Member's Investment and/or Company Interests, and for such Member to otherwise comply with applicable Tax Laws. For the avoidance of doubt, the Company shall use reasonable efforts to distribute all necessary

31

Tax information to each Member as soon as practicable after the end of each Taxable Year but not later than six months after the end of each Taxable Year.

(e)     Partnership Representative.  A Manager or other individual designated by the Board shall be the Partnership Representative.  The Partnership Representative is authorized and required to represent the Company in connection with all examinations, audits and Claims in respect of the Company's affairs by U.S. federal, state or local Tax Authorities, including any resulting administrative and judicial proceedings (each such examination or Claim, a "Tax Proceeding"), and to expend funds for professional services and other expenses reasonably incurred in connection therewith.  The Partnership Representative shall keep the Members fully apprised of any action required to be taken or which may be taken by the Partnership Representative for the Company with respect to any such Tax Proceeding.  The Partnership Representative shall keep the Board and the Members reasonably informed of the progress of any Tax Proceeding with respect to Taxes of the Company or any Subsidiary of the Company and shall not settle or compromise any such Tax Proceeding without obtaining each of the Members' prior written consent thereto, which shall not be unreasonably withheld.  The Partnership Representative shall use commercially reasonable efforts to (a) provide the Members an opportunity to participate in all material developments involved in such Tax Proceeding, (b) give the Members prompt notice of, and provide the Members an opportunity to provide comments to, any material submission to a Tax Authority, or to any court in connection with any such Tax Proceedings, (c) give prompt notice to the Members of its intention to meet with any representative of a Tax Authority prior to such meeting, and (d) provide the Members or their agents, legal counsel, employees or accountants with an opportunity to participate in such meeting.  Except as otherwise provided in this Agreement, all elections by the Company for income and franchise Tax purposes, all determinations for Tax purposes and any other Tax decisions and actions with respect to the Company, including in connection with any Tax Proceeding, and all other matters relating to all Tax returns (including amended returns) filed by the Company, shall be made by the Partnership Representative in its reasonable discretion.  Each Member shall upon request supply promptly any information necessary to give proper effect to any election made by the Company.

(f)     Company Level Tax Adjustments.

(i)     Subject to the provisions of this Section 7.5(f), the Partnership Representative is authorized to make any available election related to Code Sections 6221 through 6241 and take any action it reasonably deems necessary to comply with the requirements of the Code and conduct the Company's affairs under Code Sections 6221 through 6241.  The Partnership Representative shall direct the defense and administration of any claims made by the U.S. Internal Revenue Service (the "IRS") to the extent that such claims relate to the adjustment of Company items at the Company level and, in connection therewith, shall cause the Company to retain and to pay the fees and expenses of counsel and other advisors, such counsel or advisors chosen by the Partnership Representative.  At all times, the Partnership Representative shall promptly deliver to the Board a copy of all notices, communications, reports and writings received from the IRS relating to or potentially resulting in an adjustment of Company items. The Partnership Representative shall provide to the Board a copy of any correspondence or filing to be submitted by the Company in connection with any administrative or judicial proceedings relating to the determination of Company items at the Company level.

32

(ii)    The Partnership Representative shall, with respect to any "imputed underpayment" of the Company as determined under Code Section 6225 ("Imputed Underpayment"), notify each Member of its share of such Imputed Underpayment, and each Member agrees to contribute cash to the Company for its portion of the Imputed Underpayment at such time as the Partnership Representative shall reasonably determine.  Each Member shall only bear the portion of such Imputed Underpayment that is attributable to a net increase in the amount of Company Taxable income that would have been allocated to the Member under this Agreement for the Taxable Year to which such Imputed Underpayment relates and each Member agrees to contribute cash to the Company for its portion of any payment described in this Section 7.5(f)(ii), whether or not such Member is a member of the Company at the time of any such payment by the Company, and each Member agrees and acknowledges that its obligations in this Section 7.5(f)(ii) shall survive the date when the Member no longer holds a Company Interest or the Company's liquidation or dissolution.  Amounts owed by the Member to the Company pursuant to this Section 7.5(f)(ii) and not paid to the Company within ten (10) days of the Partnership Representative's request for such amount shall be treated as a withholding amount subject to the provisions of Section 4.2.  The Partnership Representative shall use its reasonable best efforts to obtain a reduction pursuant to Section 6225(c) of the Code for any Imputed Underpayment that is allocable to a Member, and such Member shall be entitled to all of the economic benefit associated with any such reduction.

(iii)    Each Member shall provide the Company with any information reasonably requested by the Company and necessary for the Partnership Representative to comply with this Section 7.5(f).  If any Member withdraws or disposes of its Company Interests, it shall keep the Company advised of its contact information until released in writing by the Company from its obligations under this Section 7.5(f).

(iv)    Notwithstanding the foregoing, the Partnership Representative shall not take any of the following actions without the consent of the Members who are not the Partnership Representative, such consent not to be unreasonably withheld, conditioned or delayed:

(A)    extend the statute of limitations for assessing or computing any Tax Liability against the Company (or the amount or character of any Company Tax item);

(B)    settle any audit with the IRS (or similar Governmental Authority) concerning the adjustment or readjustment of any Company Tax item;

(C)    initiate or settle any judicial review or action concerning the amount or character of any Company Tax item;

(D)    fail to elect out of the application of the U.S. federal income Tax partnership audit procedures under Code Sections 6221 through 6241 (and any similar procedures established by a state, local, or non-U.S. Tax Authority that assess and collects Tax at the Company level) for any year in which the Company is eligible to elect out;

(E)    make any election related to Code Sections 6221 through 6241; or

33



(F)     take any action in any audit with the IRS (or similar Governmental Authority) that might reasonably be expected to affect the material Tax Liability (including all Taxes imposed by U.S. federal, state, local or foreign jurisdictions) of the Company, any of its Affiliates, or any of the Members.

(g)     <u>Costs of Tax Reporting and Tax Controversies</u>.

(i)     All Liabilities, losses, damages, reasonable out-of-pocket costs and expenses incurred by the Company or the Partnership Representative, including any reasonable fees and expenses of any Tax advisor retained by any such Person, relating to the preparation and provision of any Tax return or Tax report (including, for the avoidance of doubt, the Company's preparation and maintenance of computations and records and any other actions necessary to implement the particular provisions of <u>Exhibit E</u> required solely for U.S. federal income Tax purposes), any Tax Proceeding, including any communications with foreign, federal, local or state Tax Authorities regarding such Tax Proceedings (collectively, "<u>Tax-Related Costs</u>"), shall be borne by the Company.  The Company shall reimburse the Partnership Representative for all such Tax-Related Costs incurred in serving as the Partnership Representative for the Company.

(ii)     Nothing herein shall be construed to restrict the Company from engaging an accounting firm or a law firm to assist the Partnership Representative in discharging its duties hereunder.

(h)     <u>Election to Adjust the Tax Basis of the Company's Assets</u>.  A Member who acquires an Equity Interest in the Company in a transaction that gives rise to a basis adjustment pursuant to Code Section 743(b) shall furnish to the Company and the Partnership Representative such information reasonably requested to enable the computation of the adjustments required by Code Section 755 and the Treasury Regulations thereunder.

<div align="center">

ARTICLE VIII
DISSOLUTION AND LIQUIDATION

</div>

Section 8.1     <u>Dissolution</u>.

(a)     The Company shall be dissolved, and its affairs shall be wound up and terminated, upon:

(i)     the election of the Board; or

(ii)     an administrative dissolution or the entry of a decree of judicial dissolution of the Company under the Delaware Act.

(b)     Upon an election to dissolve the Company by the Board pursuant to <u>Section 8.1(a)</u>, the Members agree to use reasonable efforts to obtain any Governmental Authorizations required by each of them to effectuate the dissolution and liquidation of the Company pursuant to this <u>Article VIII</u>.

<div align="center">

34

</div>



Section 8.2      Liquidation.

      (a)      Upon dissolution, the Company shall be liquidated in an orderly manner in accordance with the Delaware Act and the provisions of this Section 8.2. The Board shall act (or it may appoint any of the Members, Managers, officers, or other Persons to act) as the liquidators to wind up the affairs of the Company pursuant to this Agreement and terminate the Company. The costs of liquidation shall be borne by the Company. Prior to final Distribution and termination, the liquidators shall continue to operate the Company and its assets with all of the power and authority of the Board subject to the terms, conditions and limitations set forth in this Agreement. The steps to be accomplished by the liquidators shall include the following:

      (i)      the liquidators shall cause the Company to pay, satisfy and discharge all Liabilities and expenses of the Company incurred by it in connection with the liquidation;

      (ii)      after payment or provision for payment of all of the Company's Liabilities has been made in accordance with clause (i), the liquidators shall cause the Company to pay, satisfy and discharge all other Liabilities of the Company or otherwise make adequate provision for payment and discharge thereof (including establishing cash reserves to be held in escrow for contingent or unforeseen Liabilities of the Company, in such amounts and for such holding periods as the liquidators may reasonably determine), including any amounts owed to any Member;

      (iii)      after payment or provision for payment of all of the Company's Liabilities has been made in accordance with clauses (i) and (ii), (A) the liquidators shall make, or cause to be made, a final allocation of all items of income, gain, loss, and expense for U.S. Tax purposes in accordance with Exhibit E, and (B) following the determination of the final allocation set forth in the immediately preceding clause (A), the remaining assets of the Company shall be sold by the Company to any Person (including to any Member) that provides the highest bid for such asset. The Company shall distribute the value of its remaining assets to the Members in accordance with their Ownership Percentages. If the Company is unable to sell any such remaining assets within a reasonable time and following reasonable effort to do so, then the liquidators may distribute to one or more Members each such remaining asset in as equitable a manner as the liquidators may reasonably determine. Any non-cash assets distributed to the Members shall first be written up or down to their fair market value (as determined by the liquidators). Following the sale of assets of the Company in accordance with this Section 8.2(a)(iii), the liquidators shall deliver to each Member a statement (a "Liquidation Statement") setting forth the amounts, type and recipients of the Distributions to be made to the Members pursuant to this Section 8.2(a)(iii) and a determination of the fair market value (as determined by the liquidators) of the assets, if any, that are distributed to the Members pursuant to the immediately preceding three sentences. Such Liquidation Statement shall be final and binding on all of the Members. The Company and the Members shall consider any proposals to structure any transfer of assets to the Members under this Section 8.2 to minimize Taxes to the maximum extent reasonably practicable, including taking advantage of Tax-free distributions under Section 731 of the Code.

35

(b)     The Distribution of cash and/or property to a Member in accordance with the provisions of this <u>Section 8.2</u> constitutes a complete return to such Member of its Capital Contributions and a complete Distribution to the Member of its interest in the Company and the Company's property.

(c)     Upon completion of the Distribution of the Company's assets as provided herein, the Company shall be terminated (and the Company shall not be terminated prior to such time), and the Board shall file (or cause to be filed) with the Delaware Secretary of State and any other applicable Governmental Authorities such applications or other documents as may be required to terminate the commercial registration of the Company and shall cancel any other filings made pursuant to this Agreement that are or should be canceled and take all such other actions as may be necessary to terminate the Company.  The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this <u>Section 8.2(c)</u>.

(d)     A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets and discharge of its Liabilities pursuant to this <u>Section 8.2</u> in order to minimize any losses otherwise attendant upon such winding up.

(e)     The liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to any Member (it being understood that any such return shall be made solely from Company assets).

<div align="center">

ARTICLE IX
TRANSFERS OF COMPANY INTERESTS; VALUATION

</div>

Section 9.1     <u>Transfer In General</u>.  No Member shall sell, assign, pledge or otherwise dispose of or transfer, or permit any Lien on, any Company Interest, directly or indirectly (including through a direct or indirect Change in Control or of transfer of an interest in a Member), owned by such Member or any right or interest therein, whether with or without consideration and whether voluntarily or involuntarily or by operation of Law (each, a "<u>Transfer</u>") for a period of three (3) years from and after the date hereof (the "<u>Transfer Restriction Period</u>"), except for (i) a Permitted Transfer in accordance with <u>Section 9.3</u> and (ii) Liens granted pursuant to the FX Financing Agreement.  Following the Transfer Restriction Period, after compliance with the other provisions of this <u>Article IX</u>, a Member may Transfer any or all of its Company Interests, <u>provided</u> that notwithstanding anything to the contrary in this Agreement, a Member may not Transfer any of its Company Interests to a Prohibited Person without the consent of the Board.

Section 9.2     <u>Void Transfers</u>.  Any direct or indirect Transfer by any holder of any Company Interests to (i) a transferee other than a Permitted Transferee before the end of the Transfer Restriction Period, or (ii) a Prohibited Person shall be null, void and ineffective *ab initio* and shall not bind or be recognized by the Company or any Member.  No purported transferee that obtains any Equity Interest in violation of the first sentence of this <u>Section 9.2</u> shall have any rights under this Agreement (including any right to vote on any matter, nominate

<div align="center">36</div>



or appoint any Manager or officer of the Company, receive any Distributions, receive reports or other information or inspect the books or records of the Company) or in respect of the Company.

Section 9.3    Permitted Transfers of Company Interests.

(a)    Each Member may, in its discretion, Transfer all or any portion of its Company Interests in a Permitted Transfer (such Member, a "Transferring Member"). For purposes of this Agreement, a "Permitted Transfer" shall mean any Transfer from a Transferring Member to FX Parent or LMC Parent, to any Affiliate of such Transferring Member that is a Subsidiary of FX Parent or LMC Parent, or to any other Affiliate of such Transferring Member of which FX Parent or LMC Parent holds, directly or indirectly, more than fifty percent (50%) of the economic interests and which is not a Prohibited Person (each such Person, a "Permitted Transferee"). In connection with a Permitted Transfer, all the restrictions, conditions, and obligations applicable with respect to such Company Interests under this Agreement shall continue to apply after the Permitted Transfer, and the Transferring Member shall remain fully responsible for, and hereby irrevocably guarantees, the Liabilities of its Permitted Transferee under this Agreement and, following such Permitted Transfer, remain subject to the same restrictions, conditions and obligations hereunder as those restrictions, conditions and obligations to which it was subject immediately prior to such Permitted Transfer. Not less than thirty (30) days prior to a Permitted Transfer, the Transferring Member shall deliver a written notice thereof to the Company, which notice shall be binding on the Transferring Member and its Permitted Transferee and shall (i) include the identity of the proposed Permitted Transferee, (ii) state the basis on which it qualifies as a Permitted Transferee, (iii) identify the Company Interests being Transferred, (iv) designate a single Person as the representative of all holders of such Transferring Member's Company Interests after the Permitted Transfer is completed (whether held by the Transferring Member or any Permitted Transferee thereof), and (v) specifically state that all references herein to the Transferring Member or the Company Interests held by the Transferring Member shall be deemed to collectively reference the Transferring Member (so long as such Transferring Member continues to hold any Company Interests) and all Permitted Transferees of such Transferring Member's Company Interests or their respective Company Interests in the aggregate, respectively, and the Permitted Transferee shall certify in writing to the Company its agreement to the matters set forth in the preceding clauses (i) through (v) prior to the effectiveness of such Permitted Transfer. If a Transferring Member desires to Transfer the Equity Interests of a Permitted Transferee holding a Company Interest, the Transferring Member shall cause all Company Interests held by a Permitted Transferee to be Transferred back to such Member, free and clear of all Liens, prior to such Permitted Transferee ceasing to be a Permitted Transferee of such Member. In furtherance of the preceding, the Members agree that for so long as FX and LMC are Members, FX and LMC shall act on behalf of all of their respective Permitted Transferees and the other Members shall be entitled to rely on such actions of FX and LMC as if the actions were directly taken by all of their respective applicable Permitted Transferees, including with respect to appointing Managers and matters requiring Member approval under Section 6.3 or otherwise.

(b)    The Members agree that the Transfer restrictions in this Agreement shall not be capable of being avoided by the holding of Company Interests indirectly through a Permitted Transferee and then either (i) Transferring Control (directly or indirectly and whether by operation of law or otherwise) of such Permitted Transferee to any Person that is not a

37



Permitted Transferee, or (ii) permitting such Permitted Transferee to Transfer Company Interests to any Person that is not a Permitted Transferee. Notwithstanding anything to the contrary in the foregoing, no Transfers of any Equity Interests in FX Parent or LMC Parent shall constitute a Transfer of Company Interests hereunder.

Section 9.4    Covenants in Respect of Permitted Transfers.    In connection with any Permitted Transfer, the Members hereby covenant and agree to take any and all actions required or reasonably requested in order to give effect to such Permitted Transfer in accordance with the terms hereof, including to cause its duly authorized Representatives to sign such instruments and documents as may be necessary to give effect to such Transfer.  The Members shall not take any action or omit to take any action that could reasonably be expected to frustrate or delay any Permitted Transfer.

Section 9.6    Right of First Refusal.

(a)    Following the expiration of the Transfer Restriction Period, if a Member proposes to Transfer any portion of such Member's Company Interests (a "Selling Member") to a Third Party Purchaser, then the Selling Member shall promptly give each other Member written notice of the Selling Member's intention to make the Transfer (the "Transfer Notice"). The Transfer Notice shall include (i) a description of the Company Interests to be transferred ("Offered Units"), (ii) the name(s) and address(es) of the prospective transferee(s), (iii) the consideration, and (iv) the material terms and conditions upon which the proposed Transfer is to be made.  The Transfer Notice shall certify that the Selling Member has received a bona fide offer from the prospective transferee(s) and in good faith believes a binding agreement for the Transfer is obtainable on the terms set forth in the Transfer Notice.  The Transfer Notice shall also include a copy of any written proposal, term sheet or letter of intent or other agreement relating to the proposed Transfer unless the Selling Member is prohibited from providing a copy.

(b)    Each Member (who is not a Selling Member) shall have an option for a period of fifteen (15) Business Days from the delivery of the Transfer Notice from the Selling Member to elect to purchase its respective pro rata share of the Offered Units at the same price and subject to the same material terms and conditions as described in the Transfer Notice.  Each such Member may exercise such purchase option and purchase all or any portion of such Member's pro rata share of the Offered Units (a "ROFR Purchasing Member"), by notifying the Selling Member in writing, before expiration of the fifteen (15) Business Day period as to the number of such Offered Units that such Member wishes to purchase.  Each such Member's pro rata share of the Offered Units shall be a fraction of the Offered Units rounded to the nearest Unit, the numerator of which shall be the number of Units held by such Member on the date of the Transfer Notice and denominator of which shall be the total number of Units held by all Members (excluding for the purposes of such calculation the Units held by Selling Member) on the date of the Transfer Notice.

(c)    In the event any Member does not elect to purchase its full pro rata share of the Offered Units within the time period set forth therein, then the Selling Member shall promptly give written notice (the "Overallotment Notice") to each ROFR Purchasing Member that has elected to purchase its full pro rata share of the Offered Units (each a "Fully-Participating ROFR Purchasing Member"), which notice shall set forth the number of Offered



Units not purchased by the other Members, and shall offer the Fully-Participating ROFR Purchasing Members the right to acquire the unsubscribed Offered Units. Each Fully-Participating ROFR Purchasing Member shall have five (5) Business Days after delivery of the Overallotment Notice to deliver a written notice to the Selling Member (of its election to purchase its pro rata share of the unsubscribed Offered Units on the same terms and conditions as set forth in the Transfer Notice and indicating the maximum number of the unsubscribed Offered Units that it will purchase in the event that any other Fully-Participating ROFR Purchasing Member elects not to purchase its pro rata share of such Units. For purposes of this <u>Section 9.6(c)</u>, each Fully-Participating ROFR Purchasing Member's pro rata share shall be determined by applying a fraction, the numerator of which shall the total number of Units held by such Member on the date of the Transfer Notice and the denominator of which shall be the total number of Units held by all Fully-Participating ROFR Purchasing Members on the date of the Transfer Notice. Each Fully-Participating ROFR Purchasing Member shall be entitled to apportion the Offered Units to be purchased among its partners and Affiliates (including in the case of a private equity fund other private equity funds affiliated with such fund).

(d) The ROFR Purchasing Members shall effect the purchase of the Offered Units with payment by check or wire transfer, against delivery of the Offered Units to be purchased at a place agreed upon between the parties and at the time of the scheduled closing therefor, which shall be no later than forty-five (45) days after delivery to the Members of the Transfer Notice, unless the Transfer Notice contemplated a later closing with the prospective third party transferee(s). Should the purchase price specified in the Transfer Notice be payable in property other than cash or evidences of indebtedness, the ROFR Purchasing Members shall have the right to pay the purchase price in the form of cash equal in amount to the fair market value of such property.

Section 9.7    <u>Tag-Along Right.</u>

(a) Following the expiration of the Transfer Restriction Period, if a Member (the "<u>Tag-Along Seller</u>") proposes to Transfer all or any portion of its Company Interests that is greater than ten percent (10%) of the Company's then issued and outstanding Company Interests (the "<u>Tag-Along Offered Company Interests</u>") to a Third Party Purchaser (the "<u>Tag-Along Sale</u>"), and ROFR Purchasing Members have not exercised their rights under <u>Section 9.6</u> to purchase all of the Tag-Along Offered Company Interests, the Tag-Along Seller shall deliver written notice to each other Member of such proposed Transfer (the "<u>Tag Notice</u>"), which Tag Notice shall make reference to each other Member's tag-along right under this <u>Section 9.6</u> and include the material terms and conditions on which the Tag-Along Seller would Transfer the Tag-Along Offered Company Interests, including the identity of the Third Party Purchaser, the purchase price to be paid for the Tag-Along Offered Company Interests in such Transfer, the terms for payment, conditions precedent for consummation of such Transfer, the expected timing for consummation of such Transfer and a copy of any agreement executed, or form of agreement proposed to be executed, in connection with such Transfer. Upon receipt of a Tag Notice, each other Member shall have the right to participate with the Tag-Along Seller in such sale to the Third Party Purchaser (a "<u>Tag-Along Right</u>") and to Transfer its Ownership Percentage of the Tag-Along Offered Company Interests (the "<u>Tag-Along Company Interests</u>") to the Third Party Purchaser in accordance with this <u>Section 9.6</u>, which Tag-Along Right may be exercised only if the other Member delivers written notice thereof (the "<u>Tag Exercise Notice</u>") to the Tag-Along

39

Seller within twenty (20) Business Days after the delivery of the Tag Notice ("Tag-Along Acceptance Period") (each such exercising other Member, a "Tagging Person"). The failure by any other Member to deliver a Tag Exercise Notice within the Tag-Along Acceptance Period shall be deemed an irrevocable waiver by such other Member of its Tag-Along Right to participate in such Transfer and the Tag-Along Seller shall be free to sell to a Third Party Purchaser the Tag-Along Offered Company Interests and any additional Company Interests owned by the Tag-Along Seller.

        (b)    If the Tagging Person timely delivers a Tag Exercise Notice to the Tag-Along Seller in accordance with this Section 9.6, then:

        (i)    such Tag Exercise Notice shall include wire transfer or other instructions for payment of any consideration for the Tag-Along Company Interests and shall constitute such Tagging Person's binding agreement to Transfer to such Third Party Purchaser the Tag-Along Company Interests free and clear of any and all encumbrances and on the same terms and conditions with respect to the Transfer of Company Interests as applicable to the Tag-Along Seller (including for the same purchase price per Company Interest); provided that the Tag-Along Seller shall have no liability to any Tagging Person or any other Person if the purchase of the Tag-Along Offered Company Interests from the Tag-Along Seller and the purchase of the Tag-Along Company Interests from a Tagging Person are not consummated for any reason;

        (ii)    any Transfer by the Tag-Along Seller of the Tag-Along Offered Company Interests to the Third Party Purchaser shall be conditioned on the concurrent purchase by the Third Party Purchaser of the Tag-Along Company Interests from the Tagging Person on the same terms and conditions as the purchase of the Tag-Along Offered Company Interests from the Tag-Along Seller and the Company shall not give effect to or record in the corporate books any Transfer by the Tag-Along Seller of the Tag-Along Offered Company Interests to the Third Party Purchaser unless the Transfer by the Tagging Person of the Tag-Along Company Interests to the Third Party Purchaser is consummated at the same time; provided that if the Tag-Along Seller is ready, willing and able to consummate its Transfer of the Tag-Along Offered Company Interests and notifies the Tagging Person of its intention to consummate such Transfer, the Tagging Person shall use reasonable best efforts to consummate the Transfer of the Tag-Along Company Interests as soon as reasonably practicable; provided, further, that the Tag-Along Seller shall be entitled to consummate the Transfer of the Tag-Along Offered Company Interests as if the Tagging Person had failed to deliver a Tag Notice within the Tag-Along Acceptance Period if the Tagging Person does not consummate the Transfer of the Tag-Along Company Interests within five (5) days of such notice, including the right to Transfer additional Company Interests as provided in Section 9.7(a);

        (iii)    The Tagging Person shall (A) make such representations, warranties and covenants, provide such indemnities and enter into such definitive agreements on the same terms as the Tag-Along Seller (taking into account each Member's proportionate share of the Company Interests); provided that if the Tagging Person is required to provide any representations or indemnities in connection with such Transfer, liability for misrepresentation or indemnity shall (as to the Tagging Person) be expressly stated to be several but not joint and the Tagging Person shall not (other than with respect to representations and indemnities concerning

40

the Tagging Person's title to its Company Interests and authority, power and right to enter into and consummate the Transfer without contravention of any Law or agreement) be liable for more than its pro rata share (based on the proportion of its Tag-Along Company Interests to the aggregate Company Interests to be Transferred by all Members) of any liability for misrepresentation or indemnity or be liable for any representations or warranties made by the Tag-Along Seller or any other Tagging Person with respect to such Person's title to its Company Interests and authority, power and right to enter into and consummate the Transfer without contravention of any Law or agreement (or any other individual seller representations); (B) contribute to and participate in any escrow or holdback arrangements, adjustments in purchase price and transaction expenses proportionally on the basis of the proportion of its Tag-Along Company Interests to the aggregate Company Interests to be Transferred by all Members and (C) not be required to enter into or agree to any non-compete or similar restrictive covenant; and

(iv)    Promptly after the consummation of the Tag-Along Sale, the Tag-Along Seller shall (A) notify the Tagging Person thereof; (B) if not remitted directly to the Tagging Person, remit to the Tagging Person the total consideration for the Company Interests of the Tagging Person Transferred pursuant thereto less the Tagging Persons' pro rata share of any escrows, holdbacks or adjustments in purchase price and any transaction expenses as determined in accordance with this <u>Section 9.6</u>, with the cash portion of the purchase price paid by wire transfer of immediately available funds in accordance with the wire transfer instructions in the applicable Tag Exercise Notices; and (C) furnish such other evidence of the completion and the date of completion of such transfer and the terms thereof as may be reasonably requested by the Tagging Person.  The Tag-Along Seller shall promptly remit to the Tagging Person, if not remitted directly to the Tagging Person, any additional consideration payable upon the release of any escrows, holdbacks or adjustments in purchase price.

(c)    If any other Member fails to, or declines to, exercise its Tag-Along Right, the Tag-Along Seller shall have 12 months from the expiration of the Tag-Along Acceptance Period to Transfer the Tag-Along Offered Company Interests to the Third Party Purchaser described in the Tag Notice, on substantially the same terms and conditions set forth in the Tag Notice.  If at the end of such period, the Tag-Along Seller has not completed such Transfer, Tag-Along Seller may not effect a Transfer of the Tag-Along Offered Company Interests without complying with the provisions of this <u>Section 9.6</u>.

(d)    For purposes of this <u>Section 9.6</u>, all references to "Tag-Along Seller," "Tagging Person" and "other Member" shall include their respective Permitted Transferees; <u>provided that</u> for so long as LMC and FX are Members, LMC and FX shall each have the sole right to exercise the Tag-Along Right and deliver the Tag Exercise Notice on behalf of itself and all of its Permitted Transferees and otherwise act on their behalf under this <u>Section 9.6</u>. The Tag-Along Seller and each Tagging Person shall each be responsible for (and shall ensure) their respective Permitted Transferees' compliance with this <u>Section 9.6</u>.

Section 9.8    <u>Regulatory Approvals</u>.    If any Transfer of Company Interests contemplated in this Agreement is subject to prior receipt of any Governmental Authorization, the terms under this Agreement for completion of such Transfer shall be automatically extended for thirty (30) days following the end of the maximum period provided by Law for the obtaining of any such Governmental Authorization.

41



ARTICLE X
ADMISSION OF MEMBERS

Section 10.1    Admission of Members.

(a)    The Company shall not recognize for any purpose any purported Transfer of any Company Interests or other Equity Interests of the Company unless and until (i) the provisions of Article IX have been satisfied, if applicable, and (ii) the Company has received (A) a signed written joinder to this Agreement from the transferee that is satisfactory in form and substance to the Board, and such admission shall be shown on the books and records of the Company and (B) such other documents or instruments as may be necessary or appropriate in the Board's sole discretion to effect such transferee's admission as a Member.  Each Transfer and, if applicable, admission, complying with the provisions of this Section 10.1 and the applicable provisions of Article IX is effective against the Company as of the effective date of the Transfer, which effective date shall not be earlier than the date of compliance with or waiver of the conditions to such Transfer, including receipt of the documents set forth in clause (ii) above.

(b)    Additional Persons, including transferees, may be admitted to the Company as additional Members or substituted Members as provided under the terms of this Section 10.1.  Any transferee of any Company Interest pursuant to a Transfer made in accordance with Article IX or a non-Member recipient of newly issued Equity Interests in the Company that are issued after compliance with Section 3.3 shall be admitted automatically as an additional Member or substituted Member, as applicable, upon compliance with the applicable provisions of Section 10.1(a) with respect to such Transfer, but without the consent or approval of any other Person.  Any transferee that is not already a Member at the time of the Transfer and acquires a Company Interest by foreclosure shall not be admitted as a Member without the approval of the Board.

(c)    Unless and until a transferee is admitted as a Member, such transferee shall have no rights under this Agreement, whether as a Member or otherwise, except as required under the Delaware Act.

ARTICLE XI
MEMBER COVENANTS; LIMITATION OF LIABILITY

Section 11.1    Fiduciary Duty Waiver; Limitation of Liability.

(a)    Except as otherwise expressly provided herein (including as set forth in the last sentence of Section 11.2) and to the maximum extent permitted by the Delaware Act, no present or former Manager or Member shall (i) have any duty (including fiduciary duty), or any Liability for breach of duty (including fiduciary duty) to the Company, any Member, any other Manager or any other Person (including any creditor of the Company), and no implied duties, covenants or obligations shall be read into this Agreement against any Manager or Member in his, her or its capacity as such or (ii) be liable to the Company or to any Member for any act or omission performed or omitted by such Person in his, her or its capacity as Manager or Member; provided that, except as otherwise expressly provided herein, such limitation of Liability shall not apply to the extent the act or omission was attributable to such Person's breach of the terms

42



of this Agreement or of the implied covenant of good faith and fair dealing (in each case, as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected)). Each Manager shall be entitled to rely upon the advice of legal counsel, independent public accountants and other experts, including financial advisors, and any act of or failure to act by such Manager's good faith reliance on such advice shall in no event subject such Manager or the Member that appointed such Manager to Liability to the Company or the other Members.

(b)     In furtherance, and not by way of limitation, of <u>Section 11.1(a)</u>, whenever in this Agreement or any other agreement contemplated herein or to which the Company is a party, the Board (or any committee thereof) is permitted or required to take any action or to make a decision or determination, (i) the Board (or any committee thereof) shall take such action or make such decision or determination in its sole discretion, unless another standard is expressly set forth herein or therein, or (ii) in its "sole discretion" or "discretion," with "complete discretion" or under a grant of similar authority or latitude, each Manager shall be entitled to consider such interests and factors as such Manager desires (including, the interests of the Member that appointed such Manager or such Manager's employer and their Affiliates).

(c)     Each Manager (in such Person's capacity as a Manager) may rely, and shall incur no Liability in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, paper, document, signature or writing reasonably believed by it to be genuine, and may rely on a certificate signed by a Representative of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge, in each case unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such reliance, action or inaction, such Manager engaged in bad faith, fraud or willful or intentional misconduct or criminal wrongdoing.

(d)     In furtherance, and not by way of limitation, of <u>Section 11.1(a)</u>, to the maximum extent permitted by applicable Law, the Company and each Member hereby waives any Claim against each Manager and each Member and their respective Representatives and Affiliates for any breach of any duty (including any fiduciary duty) to the Company or its Members or any of its Subsidiaries by any such Person, including any Claim as may result from any conflict of interest, including any conflict of interest between such Person and the Company or its Members or any of its Subsidiaries or otherwise; <u>provided</u> that with respect to actions or omissions by a Manager, such waiver shall not apply to the extent the act or omission was attributable to such Manager's breach of the implied covenant of good faith and fair dealing, in each case as determined by a final nonappealable Order; <u>provided</u> that the exercise by a Member of any of its rights as a Member (including under this Agreement) shall not be deemed to constitute a lack of good faith, a breach of fiduciary duties or unfair dealing.

(e)     Notwithstanding anything in this <u>Article XI</u> to the contrary, the Officers of the Company shall have such fiduciary duties that such officers of the Company would have if the Company were a corporation organized under the laws of the State of Delaware; <u>provided</u> that such fiduciary duties in all cases shall be owed to the Company and not the Members.

2022TW-L-K-2444 `1


(f)    The Liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the Liabilities of the Company, and subject to the obligation of Members to return certain Distributions under <u>Section 4.1(c)</u>, none of the Members or Managers shall be obligated personally for any such Liability of the Company solely by reason of being a Member or Manager.  Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or legal requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal Liability on any Member or Manager for the Liabilities of the Company.

Section 11.2    <u>Investment Opportunities and Conflicts of Interest</u>.  In furtherance, and not by way of limitation, of <u>Section 11.1(a)</u>, each Member expressly acknowledges and agrees that (a) (x) such Member and its Affiliates and (y) its and their respective Representatives (collectively, the Persons described in <u>clauses (x)</u> and <u>(y)</u> and, with respect to those Persons described in <u>clause (y)</u> in their respective capacities as such, the "<u>Specified Persons</u>") are permitted (i) to have and develop, and may presently or in the future have and develop, investments, transactions, business ventures, contractual, strategic or other business relationships, prospective economic advantages or other opportunities (the "<u>Business Opportunities</u>") in businesses that are and may be competitive or complementary with the In-Scope Business, for their own account or for the account of any Person other than the Company or any of its Subsidiaries or the other Member, and (ii) to direct any such Business Opportunities to any other Person, in each case, regardless of whether such Business Opportunities are presented to a Specified Person in his, her or its capacity as a Member, Manager or manager on the board of directors or managers of any Subsidiary of the Company or officer of the Company or any of its Subsidiaries or otherwise, (b) none of the Specified Persons shall be prohibited by virtue of their investments in the Company or any of its Subsidiaries or his or her service as a Manager or service on the board of directors or managers of any Subsidiary of the Company or as an officer of the Company or any of its Subsidiaries or otherwise from pursuing and engaging in any such activities, (c) none of the Specified Persons shall be obligated to inform or present the Company or any of its Subsidiaries or the Board (or any committee established by the Board) or the board of directors or managers of any of the Subsidiaries or the other Member of or with any such Business Opportunity, (d) neither the Company nor any of its Subsidiaries or the other Members shall have or acquire or be entitled to any interest or expectancy or participation (such right to any interest, expectancy or participation, if any, being hereby renounced and waived) in any Business Opportunity as a result of the involvement therein of any of the Specified Persons, and (e) the involvement of any of the Specified Persons in any Business Opportunity shall not constitute a conflict of interest, breach of fiduciary duty, or breach of this Agreement by such Persons with respect to the Company or any of its Subsidiaries or the other Members.  This <u>Section 11.2</u> shall not in any way affect, limit or modify any Liabilities, duties (including fiduciary duties) or responsibilities of any Person in its role as an officer of the Company or any of its Subsidiaries or under any employment agreement, consulting agreement, confidentiality agreement, noncompete agreement, nonsolicit agreement or any similar agreement with the Company or any of its Subsidiaries.  Notwithstanding the preceding provisions of this <u>Section 11.2</u>, neither any Member nor any Permitted Transferee of such Member shall engage in any Competing Business Opportunity unless (i) such Member has presented such Competing Business Opportunity to the Board and the Board does not approve pursuing such Competing Business Opportunity, or (ii) if the Board approves pursuing such Competing Business

44

Opportunity, the Company is unable to reach definitive agreement with respect to such Competing Business Opportunity within ninety (90) days after such Board approval; provided, that with respect to Permitted Transferees (other than the FX Parent or the LMC Parent) that are publicly listed entities, the obligations of each Member under this Section 11.2 shall be to vote, or caused to be voted, shares (to the extent such Member or any of its Permitted Transferee has the authority to direct the vote of such shares) and use its commercially reasonable efforts to cause the representatives on the board of directors or similar governing body of such Permitted Transferee appointed by such Member or its Permitted Transferees (in each case subject to applicable fiduciary or corporate law considerations), to act in accordance with such Member's obligations hereunder.

Section 11.3 Use of Member Names and Marks. The Company and the Members acknowledge and agree that, as between the parties hereto, all right, title and interest in and to the Member Names and Marks are and shall be owned exclusively by the applicable Member or its respective Affiliates. Each of the Members and its respective Affiliates shall not be permitted to, and each Member shall use its respective reasonable efforts to cause the Company and its Subsidiaries not to, reference, use or incorporate any Member Names and Marks of the other Member or its respective Affiliates into any Third Party communication or marketing material (including websites) either in connection with the In-Scope Business or for any other purpose without the express prior written consent of such other Member, except as required by Law (and in such case upon the reasonable prior written notice to such other Member) or otherwise approved under a trademark license agreement between the Company and a Member. This Section 11.3 shall not affect any Person's rights or obligations under any other Contracts.

Section 11.4 Certain Independent Compliance Obligations of the Members.

(a) Export Control.

(i) No Member shall (or permit any of its respective Controlled Affiliates to) transfer any controlled items for the In-Scope Business of the Company directly or indirectly to any Third Party outside the United States without specific authorization from the submitting party and in compliance with applicable Laws.

(ii) Notwithstanding anything else herein to the contrary, (A) no Member or Affiliate of a Member shall be obligated to provide or make available to any Person (including non-U.S. companies and U.S. Persons employed by non-U.S. companies) any technology, commodities or other items controlled by the Export Control Laws unless the appropriate license or other Governmental Authorization from the applicable Governmental Authorities has been obtained, (B) no Member or Affiliate of a Member shall be required to, in connection with the In-Scope Business of the Company or the transactions contemplated hereby, take or refrain from taking any actions to the extent such actions or omissions would violate (1) the terms or conditions of any Governmental Authority-approved export license or other Contract, including any limitations or provisos that may be attached thereto or (2) any Export Control Laws to which such Member or any of its Affiliates are subject, and (C) no Member or Affiliate of a Member shall be required to make any transfers of any commodities, software, or technology upon any change in policy announced by any Governmental Authority restricting the export of such commodities, software or technology regardless of effective date.

45

2022TW-L-K-2444 `1



(b)     Anti-Bribery and Anti-Corruption.

(i)     No Member shall (or permit any of their respective Controlled Affiliates to), in connection with the In-Scope Business of the Company, (x) violate any Anti-Bribery Laws or any applicable anti-money laundering Law or (y) without limiting the generality of the foregoing clause (x), directly or indirectly, as contemplated by the FCPA:

(A)     offer, promise or give a financial or other advantage to another person intending the advantage to induce or reward improper performance of a relevant function or activity in violation of the FCPA, or where acceptance of the advantage itself constitutes such impropriety;

(B)     request, agree to or accept a financial or other advantage intended to induce improper performance of a relevant function or activity in violation of the FCPA, or where a request, agreement, or acceptance of an advantage itself amounts to such improper performance, or where the advantage is paid as a reward for, or in anticipation of, or as a consequence of, the improper performance;

(C)     offer, promise or give a financial or other advantage to a foreign government or international public official (an "Official") or a Third Party, with intent to influence the Official in his or her official capacity and to obtain or retain business, or a business advantage, including making or receiving any bribe, rebate, pay-off, influence payment, kick-back or other contribution, or gifts, or thing of value in violation of the FCPA; or

(D)     fail to implement adequate procedures to prevent bribery by a Representative, or its employees or agents, in order to obtain or retain business or secure an improper business advantage.

(ii)     Each of the Members agrees that it shall not retain (and shall not permit their respective Controlled Affiliates to retain) any Representatives or other intermediaries for the promotion or advancement of the In-Scope Business of the Company without the express, prior written approval of the other Member.  For the avoidance of doubt, this Section 11.4(b)(ii) shall not prohibit a Member from retaining any Representatives or other intermediaries in the ordinary course of business, but only to the extent that such Representatives or other intermediaries are not retained for the purposes promoting or advancing the In-Scope Business of the Company.

ARTICLE XII
INDEMNIFICATION

Section 12.1     Right to Indemnification.  Except as otherwise required by Law or by this Agreement, the Company shall indemnify and hold harmless each Person (each, a "Covered Person") to the fullest extent permitted under the Delaware Act, as the same now exists or may hereafter be amended, substituted, or replaced (but, in the case of any such amendment, substitution, or replacement only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the Company is providing immediately prior to such amendment), against any losses, liabilities, damages, and expenses (including amounts paid for attorneys' fees, judgments, settlements, fines, excise taxes, or

46

penalties in connection with any threatened, pending, or completed action, suit, or proceeding) (collectively, "Damages") incurred or suffered by such Person (or one or more of such Person's Affiliates) by reason of the fact that such Person (i) is or was serving as a Manager of the Company or any of its Subsidiaries or, while serving as a Manager of the Company or any of its Subsidiaries, is an employee of the Company or any of its Subsidiaries (and any Person that is or was serving at the request of the Company or its Subsidiaries as a representative, officer, director, principal, member, employee, or agent of another partnership, corporation, joint venture, limited liability company, trust, or other enterprise), or (ii) is or was a Member, but only to the extent not prohibited by applicable law; provided, however, no such Person shall be indemnified for any such Damages suffered that are attributable to such Person's (x) fraud, willful misconduct or gross negligence, (y) breach of this Agreement or any other agreement between such Covered Person or any of its Affiliates, on the one hand, and the Company or any of its Subsidiaries, on the other hand or (z) violation of the implied contractual covenant of good faith and fair dealing. The Company shall pay the expenses incurred by any such Covered Person indemnifiable hereunder, as such expenses are incurred, in connection with any proceeding in advance of the final disposition, so long as the Company receives an undertaking by such Covered Person to repay the full amount advanced if there is a final determination that such Covered Person failed the applicable standards set forth above or that such Covered Person is not entitled to indemnification as provided herein for other reasons.

Section 12.2    Non-Exclusive Right.  The right to indemnification and the advancement of expenses conferred in Section 12.1 shall not be exclusive of any other right which any Covered Person may have or hereafter acquire under any statute, agreement, by Law, vote of the Board, or otherwise.

Section 12.3    Insurance. The Company shall maintain insurance, at its or any of its Subsidiaries' expense, to protect any Covered Person against any loss, liability, damage, or expense described in Section 12.1, whether or not the Company would have the power to indemnify such Covered Person against such loss, liability, damage, or expense under the provisions of Section 12.1.

Section 12.4    No Personal Liability. Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in Section 12.1 shall be provided out of and to the extent of Company assets only, and none of the Members (unless such Member otherwise agrees in writing or is found in a final decision by a court of competent jurisdiction to have personal liability on account thereof) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity of the Company.

Section 12.5    Severability. If Section 12.1 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to Section 12.1 to the fullest extent permitted by any applicable portion of Section 12.1 that shall not have been invalidated and to the fullest extent permitted by applicable Law.

47

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1 <u>Further Assurances</u>. The Members shall execute and deliver all documents, instruments, and certificates (including any additional notarized and legalized powers of attorney or other authorizations that may be necessary or appropriate), and take or refrain from taking all such further actions as may be reasonably necessary to effect the provisions hereof, in each case as may be reasonably determined in good faith from time to time by the Board.

Section 13.2 <u>Title to Company Assets</u>. The Company's assets shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in any Company asset or any portion thereof, except by virtue of its ownership of Company Interests upon liquidation of the Company in accordance with this Agreement or except as otherwise set forth in this Agreement.

Section 13.3 <u>Creditors</u>. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any of its Affiliates (unless such creditor is a Member, in its capacity as such, or FX Parent in its capacity as indirect equityholder and beneficiary of the indemnity under <u>Article XII</u> hereof), and no creditor who makes a loan to the Company or any of its Affiliates may have or acquire at any time as a result of making the loan any direct or indirect interest in Distributions, capital or property other than as a creditor.

Section 13.4 <u>Amendment</u>.

(a) Each Member agrees that the Board may, in accordance with and subject to the limitations contained in <u>Articles V</u> and <u>VI</u>, amend this Agreement to reflect:

(i) a change in the name of the Company; and

(ii) admission or substitution of Members whose admission or substitution has already received the requisite approval in accordance with this Agreement.

The Board is further authorized to update the Schedule of Members and effectuate such technical and other amendments, supplements and modifications to this Agreement as may be required to, inter alia, implement the admission of new or substituted Members and/or effect the issuance of additional Equity Interests in the Company pursuant to <u>Section 3.1</u> or other similar matters so long as the applicable underlying change or action giving rise to the amendment was consummated in accordance with the terms of this Agreement and received the requisite approvals.

(b) Except as provided in <u>Section 13.4(a)</u>, no amendment, supplement or modification of this Agreement or the Certificate of Formation shall be effective unless previously approved by the Board. If <u>Section 5.3(a)(iv)(J)</u> is not applicable and a proposed amendment, supplement or modification of this Agreement or the Certificate of Formation could reasonably be expected to have a disproportionate adverse effect on any right of LMC as compared to FX, then such amendment by shall require the consent of LMC in addition to the

48



Board.  Any purported amendment, supplement or modification that fails to comply with the foregoing shall be null and void *ab initio*.

Section 13.5    Assignment.  Except as permitted herein, neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned or delegated by the Company or any of the Members (whether by merger, operation of Law or otherwise) without the prior written consent of the Company and any purported assignment or delegation in violation of this Section 13.5 shall be void.

Section 13.6    No Third Party Beneficiaries.  Except as otherwise expressly provided in Article XII with respect to the Persons entitled to be indemnified as described therein (who shall be express Third Party beneficiaries with respect to Article XII), this Agreement is solely for the benefit of the Company and the Members and their successors and permitted assigns, and no provision of this Agreement shall be deemed to confer upon any other Person, including any equityholders of any Member, any remedy, Claim, Liability, reimbursement, cause of action or other right.

Section 13.7    Governing Law.  This Agreement and all disputes arising out of or relating hereto shall be governed by and construed in accordance with the Laws of the State of Delaware applicable to contracts made and performed entirely with the State of Delaware, without giving effect to any Laws or principles of conflicts of laws that would cause the Laws of any other jurisdiction to apply.

Section 13.8    Dispute Resolution.

(a)    General Provisions.  The Members shall use commercially reasonable efforts to settle amicably any and all disputes, controversies or Claims (whether sounding in contract, tort, common law, statutory law, equity or otherwise), other than a Board Deadlock, arising out of or relating to this Agreement, including any question regarding its existence or scope, the meaning of its provisions, or the proper performance of any of its terms by either Member, or its breach, termination or invalidity (each such dispute, controversy or Claim, a "Dispute").  Except as otherwise expressly provided herein, any Dispute shall be resolved in accordance with the procedures set forth in this Section 13.8.  For the avoidance of doubt, a Board Deadlock shall not be deemed to be a Dispute governed by this Section 13.8, and shall, instead, be governed by Section 5.3(a)(v).

(b)    Resolution by Senior Executives.  If a Dispute cannot be resolved at an operational level, the disputing party may give written notice to the other party or parties, requesting that senior management or senior representatives of each applicable party attempt to resolve the Dispute and setting forth such party's position and a summary of reasons supporting that position.  Within fifteen (15) Business Days after the request, the other party shall provide a written response.  The notice and the response shall designate such party's senior executive and provide a statement of the party's position and a summary of reasons supporting that position. The designated senior executives or representatives shall meet in person at a mutually acceptable place, or by telephone, within ten (10) Business Days after receiving the response to seek a resolution.  If no resolution is reached by the expiration of thirty (30) calendar days from the date

49

of the notice of Dispute, any disputing party may submit the Dispute to resolution as further provided herein.

(c) <u>Mediation</u>. If the applicable parties' senior executives or representatives are unable to resolve the Dispute in the time period provided above, the disputing parties may submit the Dispute for resolution to non-binding mediation by providing written notice to each other party. The mediation shall take place in New York, New York. Within twenty (20) calendar days of receiving the written notice of a request for mediation, the applicable parties shall mutually select a mediator. The mediation shall take place within 45 calendar days after the initial request for mediation. Within ten (10) Business Days of the conclusion of mediation, the mediator shall provide an evaluation of the Dispute and the parties' hereto relative positions.

(d) <u>Arbitration</u>.

(i) If the parties hereto are unable to reach a resolution pursuant to <u>Section 13.8(c)</u>, any disputing party may submit the Dispute for resolution by binding arbitration under the administration of the International Chamber of Commerce ("ICC") in accordance with its Rules for Arbitration (the "ICC Rules") in effect at the time of the arbitration, subject to such modifications set forth in this Agreement.

(ii) In any Dispute in which the aggregate value of the Claims and any counterclaims is less than $5,000,000.00, the arbitral tribunal shall consist of a single arbitrator whom the International Court of Arbitration of the ICC shall appoint pursuant to its applicable rules pertaining to the selection of a single arbitrator. In any Dispute in which the aggregate value of the Claims and any counterclaims is $5,000,000.00 or more, the arbitral tribunal shall be composed of three arbitrators. In the case of a tribunal of three arbitrators: (A) each party shall designate one arbitrator within twenty (20) calendar days after the request for arbitration is filed; (B) if there are more than two disputing parties, FX shall designate one (1) arbitrator and LMC shall designate one (1) arbitrator; (C) the first two arbitrators shall select the third arbitrator within thirty (30) calendar days after the last of the first two arbitrators has been nominated, and shall not be affiliated with any disputing party; and (D) in the event that the initial two arbitrators fail to agree to a third arbitrator, the third arbitrator shall be chosen by the International Court of Arbitration of the ICC. The arbitration proceedings shall be conducted in the English language, and all documents not in English submitted by any party shall be accompanied by an English translation. The arbitration shall be conducted in New York, New York, which shall be the seat of the arbitration. Each party shall be permitted to present its case, witnesses and evidence, if any, in the presence of the other party. Either party can request a written transcript of the proceedings at that party's cost. The arbitral tribunal shall determine the Dispute consistent with the substantive law described in <u>Section 13.7</u>, and shall apply this Agreement according to its terms.

(iii) The parties agree that any Disputes resolved pursuant to this <u>Section 13.8</u> are commercial in nature. The parties agree to be bound by any award or order resulting from arbitration conducted hereunder notwithstanding any country's laws or treaties with the United States to the contrary. The parties agree that in the context of an attempt by any disputing party to enforce an arbitral award or order, any defenses relating to any other parties' capacity or the validity of this Agreement or any related agreement under any Law are waived.

2022TW-L-K-2444 ʻ1


Any judgment on an award or order resulting from an arbitration conducted under this <u>Section 13.8</u> may be entered and enforced in any court, in any country, having jurisdiction over any of the disputing parties or their assets.  For the purposes of enforcement of an award or order as described in the preceding sentence, the Parties submit to the non-exclusive jurisdiction of the state and federal courts of New York and Delaware.

     (iv) Each party shall bear its own fees and expenses, including fees and expenses of financial and legal advisors and other outside consultants, in connection with any arbitration conducted under this <u>Section 13.8</u>.

     (e) <u>Admissibility into Evidence</u>.  All offers of compromise or settlement among the parties hereto or their Representatives in connection with the attempted resolution of any Dispute (i) shall be deemed to have been delivered in furtherance of a Dispute settlement, (ii) shall be exempt from discovery and production and (iii) shall not be admissible into evidence (whether as an admission or otherwise) in any proceeding for the resolution of the Dispute.

     (f) <u>Proceedings Confidential</u>.  Except to the extent necessary to enforce any arbitral award, to enforce other rights of the parties, or as required by applicable Law or the applicable rules of any stock exchange, each party shall ensure that it and its Representatives and expert witnesses, shall maintain as confidential the existence of the arbitration proceedings, the arbitral award, all filings and submissions exchanged or produced during the arbitration proceedings and briefs, memorials, witness statements or other documents prepared in connection with such arbitration; provided, however, that a party may disclose such information to its Representatives and expert witnesses; it being understood that such Representatives will be informed of the confidential nature of the existence of any such arbitration proceedings, arbitral award, filings and submissions, briefs, memorials, witness statements and other documents and will be directed to treat the foregoing as confidential in accordance with the terms of this Agreement and each party will be responsible for the compliance by its Representatives and expert witnesses with this <u>Section 13.8(f)</u>.  This <u>Section 13.8</u> shall survive the termination of the arbitral proceedings.

     (g) <u>Privilege</u>.  Legal professional privilege, including privileges protecting attorney-client communications and attorney work product of each party from disclosure or use in evidence, as recognized by applicable Laws governing each party's relationship with its counsel, including in-house counsel, shall apply to and be binding in any arbitration proceeding under this <u>Section 13.8(g)</u>.

     (h) <u>Provisional Remedies</u>. Nothing in this Agreement shall limit the right of a party hereto to seek, and each such party shall have the right to seek, interim, injunctive or other temporary equitable relief, in support of and before any final arbitral award is delivered in any court having jurisdiction.  In any such action, each party irrevocably and unconditionally (i) consents and agrees to the exclusive jurisdiction of any state or federal court located in the County of New Castle in the State of Delaware; (ii) waives, to the fullest extent it may effectively do so, any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens or any right of objection to jurisdiction on account of its place of incorporation or domicile, which it may now or hereafter have to the bringing of any such action or proceeding in any such court; (iii)  consents to service of process in the manner

2022TW-L-K-2444

provided for notices in <u>Section 13.11</u>, or in any other manner permitted by applicable law; and (iv) WAIVES ANY RIGHT TO TRIAL BY JURY. Without prejudice to such provisional remedies as may be available under the jurisdiction of a court, the arbitral tribunal, or the emergency arbitrator (as provided in the ICC Rules), shall have full authority to grant provisional remedies and to direct the parties to request that any court modify or vacate any temporary or preliminary relief issued by such court, and the arbitral tribunal shall have the power to award damages for the failure of any party to respect its or the emergency arbitrator's orders to that effect.

Section 13.9  <u>Severability; Equitable Relief</u>.  If any provision of this Agreement or the application of any provision hereof to any circumstances is held invalid, unenforceable, or otherwise illegal, the remainder of this Agreement and the application of such provision to other circumstances shall not be affected.  Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Company and the Members shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Company and the Members, as expressed in the terms hereof, as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.  The parties hereto recognize, acknowledge and agree that the breach or violation of this Agreement by a party hereto would cause irreparable damage to the other parties hereto and that none of the parties hereto has an adequate remedy at Law.  Subject to the following sentence, the parties hereto acknowledge and agree that each party hereto shall be entitled, in addition to any other remedies that may be available, to obtain injunctive relief, specific performance of the terms of this Agreement or other equitable relief, to redress breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions hereof without proof of damages or otherwise and the right of specific performance is an integral part of the transactions contemplated by this Agreement and without that right, none of the parties hereto would have entered into this Agreement.  A party hereto seeking an Order or injunction to prevent breaches of this Agreement or to enforce specifically the terms and provisions hereof shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such Order or injunction, and each party hereto hereby irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security.  If any Legal Proceeding is brought by any party hereto to enforce this Agreement, the other parties hereto shall waive the defense that there is an adequate remedy at Law.

Section 13.10  <u>Counterparts; Electronic Delivery</u>.  This Agreement may be executed and delivered in two or more separate counterparts, each of which when executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  This Agreement, the agreements referred to herein, and each other agreement, consent or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a photographic, portable document format (.pdf), facsimile or similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of either Member with respect to this Agreement or any such agreement, consent or instrument, the other

Member with respect to this Agreement or any such agreement, consent or instrument shall re-execute originals thereof and deliver them to the Member that made such request.

Section 13.11 <u>Notices</u>. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made (a) as of the date delivered if delivered personally, (b) one (1) Business Day after deposit with a reputable overnight courier service (providing proof of delivery), (c) four (4) Business Days after deposit in the United States Mail, registered or certified mail (postage prepaid, return receipt requested) or (d) as of the date transmitted if sent by electronic transmission with receipt confirmed, in each case to the addresses and attention parties indicated below (or at such other address or electronic mail address for a party as shall be specified by like notice):

<u>To FX</u>:

Foxconn EV Technology, Inc.
4568 Mayfield Rd
Ste 204
Cleveland, OH 44121
Attention: Jerry Hsiao and Steven Yu
E-mail: <u>jerry.hsiao@foxconn.com</u>; <u>stevenyu@foxconn.com</u>

with a copy (which shall not constitute notice) to:

Paul Hastings LLP
200 Park Avenue
New York, New York 10166
Attention: Mike Huang
E-mail: <u>mikehuang@paulhastings.com</u>

<u>To LMC</u>:

Lordstown Motors Corp.
38555 Hills Tech Dr.
Farmington Hills, Michigan 48331
Attention: CEO
Email: <u>dan.ninivaggi@lordstownmotors.com</u>

with a copy (which shall not constitute notice) to:

Baker & Hostetler LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Attention: Ronald Stepanovic
E-mail: <u>RStepanovic@bakerlaw.com</u>



To the Company:

MIH EV Design LLC
c/o Foxconn EV Technology, Inc.
4568 Mayfield Rd
Ste 204
Cleveland, OH 44121
Attention: Jerry Hsiao and Steven Yu
E-mail: jerry.hsiao@foxconn.com; stevenyu@foxconn.com

with a copy (which shall not constitute notice) to:

Lordstown Motors Corp.
38555 Hills Tech Dr.
Farmington Hills, Michigan 48331
Attention: Edward Hightower
Email: edward.hightower@lordstownmotors.com

and

Paul Hastings LLP
200 Park Avenue
New York, New York 10166
Attention: Mike Huang
E-mail: mikehuang@paulhastings.com

or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.

Section 13.12 <u>Entire Agreement</u>. This Agreement (including all Exhibits and Schedules) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, by and among the Company and the Members with respect to the matters set forth in this Agreement. The Company and each Member agrees and acknowledges that: (a) it is entering into this Agreement in reliance solely on the statements made or incorporated in this Agreement and the documents expressly referred to herein and therein; and (b) it is not relying on any other statement, representation, warranty, assurance or undertaking made or given by any person, in writing or otherwise, at any time prior to the date of this Agreement. Notwithstanding the foregoing, nothing in this <u>Section 13.12</u> limits or excludes any Liability for fraud and fraudulent misrepresentation. There are no conditions precedent to the effectiveness of this Agreement other than those expressly stated in this Agreement.

Section 13.13 <u>Confidentiality</u>. Each Member agrees that all Confidential Information shall be kept confidential by such Member and shall not be disclosed by such Member in any manner whatsoever; <u>provided</u>, <u>however</u>, that (a) any of such Confidential Information may be disclosed to such Member's Affiliates and to their respective Representatives, each of which Representatives shall be bound by the provisions of this <u>Section 13.13</u> or substantially similar terms, (b) any disclosure of Confidential Information may be made to the extent to which the

54



Company consents in writing, (c) any disclosure may be made of the terms of a Member's investment in the Company pursuant to this Agreement and the performance of that investment to the extent in compliance with applicable Law (whether in the Member's fundraising materials or otherwise), (d) Confidential Information may be disclosed by a Member, its Affiliates or their respective Representatives to the extent reasonably necessary in connection with such Member's enforcement of its rights under this Agreement and (e) Confidential Information may be disclosed by any Member, its Affiliates or their respective Representatives to the extent that the Member, its Affiliates or their respective Representatives have received advice from its counsel that it is legally compelled to do so, provided, that, prior to making such disclosure, such Member, Affiliate or Representative, as the case may be, uses reasonable efforts to preserve the confidentiality of the Confidential Information, including consulting with the Company regarding such disclosure and, if reasonably requested by the Company, assisting the Company, at the Company's expense, in seeking a protective order to prevent the requested disclosure, and provided, further, that the Member, its Affiliate or their respective Representatives, as the case may be, discloses only that portion of the Confidential Information as is, based on the advice of its counsel, legally required. The provisions of this Section 13.13 shall survive any expiration or termination of this Agreement and each Member shall continue to be bound by its terms after such Member ceases to be a Member, in each case for a period of eighteen (18) months from the date of such expiration or termination of this Agreement or such Person ceasing to be a Member, as applicable.

Section 13.14  Survival.  The provisions of Article XII and Section 13.3 through Section 13.16 and all definitions used in those provisions shall survive and continue in full force in accordance with their terms notwithstanding any termination of this Agreement or the termination of the Company.

Section 13.15  No Partnership or Affiliation.  The Members intend that the Company not be a partnership (including a limited partnership), association, joint venture or other co-operative entity, and that no Member be a partner or joint venturer of any other Member by virtue of this Agreement (provided that, solely for U.S. federal income Tax purposes, the Company shall be classified as a partnership), and neither this Agreement nor any other document entered into by the Company or any Member relating to the subject matter hereof shall be construed to suggest otherwise.  The Members understand, acknowledge and agree that LMC is not an Affiliate of FX, and FX is not an Affiliate of LMC.

Section 13.16  Certain Relationships.  Notwithstanding anything to the contrary contained herein, each of the Company and the Members acknowledges and agrees that nothing in this Agreement (including any terminology used herein) and no action taken by the Company and/or the Members under this Agreement is intended to, or shall be deemed to, establish any partnership, association or agency relationship or other co-operative entity between any of the Members or constitute any Member the agent of another Member for any purpose.

Section 13.17  Waivers.  Any failure by the Company or either Member to comply with any obligation, covenant, agreement or condition herein may be waived by the Company and/or the other Member, as applicable, entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, and such waiver or failure to insist upon strict


2022TW-L-K-2444

compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure to comply.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

56

2022TW-L-K-2444　　　　　`1



The undersigned have entered into this Limited Liability Company Agreement effective as of the date first written above.

**MIH EV DESIGN LLC**

By: _Jerry Hsiao_ _____
Name: Jerry Hsiao
Title: Manager

**FOXCONN EV TECHNOLOGY, INC.**

By: _Jerry Hsiao_ _____
Name: Jerry Hsiao
Title: Director

**LORDSTOWN EV CORPORATION**

By: _____
Name:
Title:

*[Signature Page to the Limited Liability Company Agreement]*

2022TW-L-K-2444                    `1

The undersigned have entered into this Limited Liability Company Agreement effective as of the date first written above.

**MIH EV DESIGN LLC**

By:_____
Name:
Title:

**FOXCONN EV TECHNOLOGY, INC.**

By:_____
Name:
Title:

**LORDSTOWN EV CORPORATION**

By:
Name:    Melissa Leonard
Title:      General Counsel

[*Signature Page to the Limited Liability Company Agreement*]

2022TW-L-K-2444                `1

**EXHIBIT E**

Execution Version

INVESTMENT AGREEMENT

by and between

LORDSTOWN MOTORS CORP.

and

FOXCONN VENTURES PTE. LTD.

Dated as of November 7, 2022

# TABLE OF CONTENTS

**Page**

## Article I

### Definitions

Section 1.01   Definitions   1

## Article II

### Purchase and Sale

Section 2.01   Purchase and Sale   10
Section 2.02   Initial Closing   11
Section 2.03   Subsequent Common Closing   11
Section 2.04   Subsequent Preferred Closings   12

## Article III

### Representations and Warranties of the Company

Section 3.01   Organization; Standing   13
Section 3.02   Capitalization   14
Section 3.03   Authority; Noncontravention   15
Section 3.04   Governmental Approvals   16
Section 3.05   Company SEC Documents; Undisclosed Liabilities   17
Section 3.06   Absence of Certain Changes   18
Section 3.07   Legal Proceedings   18
Section 3.08   Compliance with Laws; Permits   18
Section 3.09   Tax Matters   20
Section 3.10   No Rights Agreement; Anti-Takeover Provisions   20
Section 3.11   Brokers and Other Advisors   20
Section 3.12   Sale of Securities   20
Section 3.13   Listing and Maintenance Requirements   21
Section 3.14   Certain Material Indebtedness   21
Section 3.15   Ability to Pay Dividends   21
Section 3.16   IP; Security   21
Section 3.17   Environmental Matters   21
Section 3.18   Employee Matters   22
Section 3.19   Real and Personal Property   22
Section 3.20   Insurance   23
Section 3.21   Investment Company Status   23
Section 3.22   No Other Company Representations or Warranties   23
Section 3.23   No Other Investor Representations or Warranties   24

## Article IV

### Representations and Warranties of the Investor

4895-3943-6092.13

LEGAL_US_E # 166563239.19



2022TW-L-K-5967    `1

| | | |
|---|---|---|
| Section 4.01 | Organization; Standing | 24 |
| Section 4.02 | Authority; Noncontravention | 24 |
| Section 4.03 | Governmental Approvals | 25 |
| Section 4.04 | Sufficiency of Funds | 25 |
| Section 4.05 | Ownership of Company Stock | 26 |
| Section 4.06 | Brokers and Other Advisors | 26 |
| Section 4.07 | Non-Reliance on Company Estimates, Projections, Forecasts, Forward-Looking Statements and Business Plans | 26 |
| Section 4.08 | Purchase for Investment | 26 |
| Section 4.09 | No Other Investor Representations or Warranties | 27 |
| Section 4.10 | No Other Company Representations or Warranties | 27 |

**Article V**

**Additional Agreements**

| | | |
|---|---|---|
| Section 5.01 | Negative Covenants | 28 |
| Section 5.02 | Regulatory Filings | 29 |
| Section 5.03 | Corporate Actions | 31 |
| Section 5.04 | Public Disclosure | 32 |
| Section 5.05 | Confidentiality | 33 |
| Section 5.06 | Nasdaq Listing of Shares | 33 |
| Section 5.07 | Standstill | 34 |
| Section 5.08 | Legend | 36 |
| Section 5.09 | Election of Directors | 36 |
| Section 5.10 | Voting | 39 |
| Section 5.11 | Tax Matters | 40 |
| Section 5.12 | Use of Proceeds | 41 |
| Section 5.13 | Participation Rights. | 41 |
| Section 5.14 | Additional Rights | 44 |
| Section 5.15 | Available Registration Statement | 44 |
| Section 5.16 | Section 16 Matters | 45 |
| Section 5.17 | Information Rights | 45 |
| Section 5.18 | Exclusivity | 46 |
| Section 5.19 | Investor Information | 47 |
| Section 5.20 | EV Program. | 48 |

**Article VI**

**Conditions to ClosingS**

| | | |
|---|---|---|
| Section 6.01 | Conditions to the Obligations of the Company and the Investor | 48 |
| Section 6.02 | Conditions to the Obligations of the Company | 48 |
| Section 6.03 | Conditions to the Obligations of the Investor | 49 |
| Section 6.04 | Additional Conditions to the Obligations of the Company and the Investor to Effect the Subsequent Common Closing | 49 |
| Section 6.05 | Additional Conditions to the Obligations of the Investor to Effect the Second Preferred Closing and the Third Preferred Closing | 50 |

# Article VII

## Termination; Survival

Section 7.01   Termination                                                          50
Section 7.02   Effect of Termination                                                51
Section 7.03   Survival                                                             51

# Article VIII

## Miscellaneous

Section 8.01   Amendments; Waivers                                                  51
Section 8.02   Extension of Time, Waiver, Etc.                                       51
Section 8.03   Assignment                                                           52
Section 8.04   Counterparts                                                         52
Section 8.05   Entire Agreement; No Third-Party Beneficiaries                       52
Section 8.06   Governing Law; Jurisdiction                                          52
Section 8.07   Specific Enforcement                                                 53
Section 8.08   WAIVER OF JURY TRIAL                                                 53
Section 8.09   Notices                                                              54
Section 8.10   Severability                                                         55
Section 8.11   Expenses                                                             55
Section 8.12   Interpretation                                                       55

## ANNEXES

Annex I    –    Form of Certificate of Designations
Annex II   –    Form of Registration Rights Agreement

INVESTMENT AGREEMENT, dated as of November 7, 2022 (this "Agreement"), by and between Lordstown Motors Corp., a Delaware corporation (the "Company"), and Foxconn Ventures Pte. Ltd., a private company limited by shares established under the laws of Singapore (the "Investor").

WHEREAS, the Company desires to issue, sell and deliver to the Investor, and the Investor desires to purchase and acquire from the Company, pursuant to the terms and conditions set forth in this Agreement, an aggregate of (a) 39,772,727 shares of the Company's Class A common stock, par value $0.0001 per share (the "Common Stock") and (b) 1,000,000 shares of the Company's Series A Convertible Preferred Stock, par value $0.0001 per share (the "Series A Preferred Stock"), having the designation, preferences, conversion or other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms and conditions, as specified in the form of Certificate of Designation, Preferences and Rights attached hereto as Annex I (the "Certificate of Designations");

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01    Definitions.

(a)    As used in this Agreement (including the recitals hereto), the following terms shall have the following meanings:

"25% Beneficial Ownership Requirement" means that the Investor Parties continue to beneficially own at all times shares of Common Stock, shares of Series A Preferred Stock and/or shares of Common Stock that were issued upon conversion of shares of Series A Preferred Stock that represent, on an as-converted basis, at least 25% of the number of shares of Common Stock, on an as-converted basis, acquired by the Investor Parties under this Agreement.

"50% Beneficial Ownership Requirement" means that the Investor Parties continue to beneficially own at all times shares of Common Stock, shares of Series A Preferred Stock and/or shares of Common Stock that were issued upon conversion of shares of Series A Preferred Stock that represent, on an as-converted basis, at least 50% of the number of shares of Common Stock, on an as-converted basis, acquired by the Investor Parties under this Agreement.

"Acquired Shares" means, with respect to any Closing, any Common Stock and Series A Preferred Stock acquired by the Investor at such Closing.

"Acquisition Proposal" means any proposal or offer from any Person relating to any direct or indirect (i) sale, lease or other disposition directly or indirectly by merger, consolidation, business combination, share exchange, joint venture or otherwise of assets of the Company or any of its Subsidiaries representing 30% or more of the consolidated assets of the Company (other than sales of inventory in the ordinary course of business and consistent with

past practice); (ii) issuance, sale or other disposition, directly or indirectly (including by way of merger, consolidation, business combination, share exchange, joint venture or any similar transaction), of securities (or options, rights or warrants to purchase, or securities convertible into or exchangeable for, such securities) representing 15% or more of any class of outstanding voting securities of the Company (other than grants of Series A Preferred Stock, Company Stock Options and Company RSUs, Company PSUs and Company Restricted Shares under the Company Stock Plans in the ordinary course of business to employees, officers or directors of the Company or any of its Subsidiaries); (iii) tender offer or exchange offer as defined pursuant to the Exchange Act that, if consummated, would result in any Person beneficially owning 15% or more of any class or series (or the voting power of any class or series) of equity securities of the Company or any other transaction in which any Person shall acquire beneficial ownership or the right to acquire beneficial ownership, of 15% or more of any class or series (or the voting power of any class or series) of equity securities; (iv) merger, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving the Company or any of its Subsidiaries representing 30% or more of the consolidated assets of the Company; or (v) combination of the foregoing (in each case, other than the Transactions).

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, controls, or is controlled by, or is under common control with, such Person; provided, however, that the Company and its Subsidiaries shall not be deemed to be Affiliates of the Investor or any of its Affiliates. For this purpose, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise.

"as-converted basis" means, with respect to a Person or Persons, all outstanding shares of Common Stock beneficially owned by such Person or Persons, calculated on a basis in which all shares of Common Stock issuable upon conversion of the outstanding shares of Series A Preferred Stock (at the Conversion Rate in effect on such date as set forth in the Certificate of Designations and without regard to any of the limitations on convertibility contained in Sections 6 and 8(f) of the Certificate of Designation) are assumed to be outstanding as of such date.

Any Person shall be deemed to "beneficially own", to have "beneficial ownership" of, or to be "beneficially owning" any securities (which securities shall also be deemed "beneficially owned" by such Person) that such Person is deemed to "beneficially own" within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act; provided that any Person shall be deemed to beneficially own any securities that such Person has the right to acquire, whether or not such right is exercisable immediately (including assuming conversion of all Series A Preferred Stock, if any, owned by such Person to Common Stock).

"Available Registration Statement" shall mean, with respect to a Registration Statement as of a date, that (i) as of such date such Registration Statement is effective for an offering to be made on a delayed or continuous basis, there is no stop order with respect thereto and the Company reasonably believes that such Registration Statement will be continuously available for the resale of Registrable Securities for the next ten (10) Business Days and (ii) as of such date and continuously for the next ten (10) Business Days, (a) there is not in effect a Postponement

2

Period or Quarterly Blackout Period (as each such term is defined in the Registration Rights Agreement) and (b) the Investor Parties are not restricted by the holdback provision of Section 9(a) of the Registration Rights Agreement or any related "lock-up" agreement.

"Board" means the Board of Directors of the Company.

"Business Day" means any day except a Saturday, a Sunday or other day on which the SEC or banks in the City of New York, Taipei, or Singapore are authorized or required by Law to be closed.

"CFIUS" means the U.S. government's Committee on Foreign Investment in the United States.

"CFIUS Clearance" means the Company and the Investor have received from CFIUS a written communication that (a) CFIUS has concluded that the Transactions are not a "covered transaction" and not subject to review under applicable Law or (b) CFIUS has concluded the review of the Transactions under Section 721 and determined that there are no unresolved national security concerns with respect to the Transactions.

"CFIUS Turndown" means (a) CFIUS has informed the Company and the Investor in writing that it has unresolved national security concerns with respect to the Transactions and that it intends to refer the matter to the President of the United States unless the Company and the Investor abandon the Transactions or (b) CFIUS has informed the Company and the Investor in writing that mitigation that would have a Regulatory Material Adverse Effect is required to address national security concerns with respect to the Transactions and the Investor does not agree to such mitigation.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Common Stock" means the Class A common stock, par value $0.0001 per share, of the Company.

"Company Charter" means the Company's certificate of incorporation, as amended to the date of this Agreement.

"Company Charter Documents" means the Company Charter and the Company's bylaws, as amended to the date of this Agreement.

"Company Plan" means each plan, program, policy, agreement or other arrangement covering current or former employees, directors or consultants, that is (i) an employee welfare plan within the meaning of Section 3(1) of ERISA, (ii) an employee pension benefit plan within the meaning of Section 3(2) of ERISA, other than any plan which is a "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA), (iii) a stock option, stock purchase, stock appreciation right or other stock-based agreement, program or plan, (iv) an individual employment, consulting, severance, retention or other similar agreement or (v) a bonus, incentive, deferred compensation, profit-sharing, retirement, post-retirement, vacation, severance or termination pay, benefit or fringe-benefit plan, program, policy, agreement or other arrangement, in each case that

3

LEGAL_US_E # 166563239.19

2022TW-L-K-5967    `1

is sponsored, maintained or contributed to by the Company or any of its Subsidiaries or to which the Company or any of its Subsidiaries contributes or is obligated to contribute to or has or may have any liability, other than any plan, program, policy, agreement or arrangement mandated by applicable Law.

"Company PSU" means a restricted stock unit of the Company that is initially subject to both time-based and performance-based vesting conditions.

"Company Restricted Share" means a share of Common Stock that is subject to forfeiture conditions.

"Company RSU" means a restricted stock unit of the Company subject solely to time-based vesting conditions.

"Company Stock Option" means an option to purchase shares of Common Stock.

"Company Stock Plans" means the 2020 Equity Incentive Plan, as amended from time to time, or any successor plan.

"Conversion Rate" has the meaning set forth in the Certificate of Designations.

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions thereof or related or associated epidemics, pandemic or disease outbreaks.

"DGCL" means the Delaware General Corporation Law, as amended, supplemented or restated from time to time.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"EV Program" means the planning, designing, engineering, developing, testing, industrializing, homologating, certifying, and launching of the electric and autonomous vehicles contemplated under the Product Development and Engineering Services Agreement and the EV Program Agreement.

"EV Program Agreement" means that certain EV Program Agreement to be entered into between the Company and the counterparty named in the Product Development and Engineering Services Agreement entered into by the Company on or about the date hereof.

"EV Program Budget" means a budget for the EV Program, which budget shall be prepared to reflect expenditures on a monthly basis.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"First Investor Board Seat Fall-Away" means the first day on which the 50% Beneficial Ownership Requirement is not satisfied.

4

 "Fraud" means actual common law fraud in the making of a representation, warranty, or other statement committed by a Person making such representation, warranty, or statement with the intent to deceive another Person, and to induce any Person to enter into this Agreement or any Transaction Document and requires (a) a false representation, warranty, or statement of material fact; (b) actual knowledge or belief that such representation, warranty, or statement is false; (c) an intention to induce such other Person to whom such representation, warranty, or statement was made to act or refrain from acting in reliance upon it; (d) causing that Person, in justifiable reliance upon such false representation, warranty, or statement to take or refrain from taking action; and (e) causing such Person or any party hereto to suffer damage by reason of such reliance.  For clarity, a claim for Fraud may only be made against such Person committing such Fraud, it being understood that if a Representative of a party hereto commits Fraud, then such party shall be deemed to have committed such Fraud.

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Governmental Authority" means any government, court, regulatory or administrative agency, arbitrator (public or private), commission or authority or other legislative, executive or judicial governmental entity (in each case including any self-regulatory organization), whether federal, state or local, domestic, foreign or multinational.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Intellectual Property" means all intellectual property rights of any type in any jurisdiction, including any trademarks, service marks, trade names, Internet domain names, logos, slogans, patents, copyrights and copyrightable works, rights in computer software (including source code and object code) data, databases, and documentation thereof, trade secrets and confidential information, and know-how, technology, and inventions (whether patentable or not) (together with all goodwill associated therewith and including any registrations or applications for registration of any of the foregoing).

"Investor Designee" means an individual designated in writing by the Investor to be nominated by the Company for election to the Board pursuant to Section 5.09(c) or elected to the Board pursuant to Sections 5.09(a) or 5.09(d), as applicable, and following reasonable satisfaction by such individuals of customary background checks.

"Investor Director" means a member of the Board who was elected to the Board as an Investor Designee.

"Investor Material Adverse Effect" means any effect, change, event or occurrence that has or would reasonably be expected to prevent or materially delay, interfere with, hinder or impair (i) the consummation by the Investor of any of the Transactions on a timely basis or (ii) the compliance by the Investor with its obligations under this Agreement.

"Investor Parties" means the Investor and each Affiliate of the Investor to whom shares of Series A Preferred Stock or Common Stock are transferred.

5

LEGAL_US_E # 166563239.19
2022TW-L-K-5967            `1

"IT Assets" means all hardware, software, code, systems, networks, websites, applications, databases and other information technology assets and equipment.

"Knowledge" means, with respect to the Company, the actual knowledge, as of the date of this Agreement, of the individuals listed on Section 1.01 of the Company Disclosure Letter.

"Liens" means any mortgage, pledge, lien, charge, encumbrance, security interest, adverse ownership interest or other restriction of any kind or nature, whether based on common law, statute or contract.

"Mandatory Conversion" has the meaning set forth in the Certificate of Designations.

"Material Adverse Effect" means any effect, change, event or circumstance that, individually or in the aggregate, has had, or would reasonably be expected to (i) have a material adverse effect on the business, assets, properties, financial condition or results of operation of the Company and its Subsidiaries, taken as a whole; provided, however, that any changes or events resulting from the following items shall not be considered when determining whether a Material Adverse Effect has occurred: (a) changes in economic, political, regulatory, financial or capital market conditions generally or in the industries in which the Company and its Subsidiaries operate, (b) any acts of war, sabotage, terrorist activities or changes imposed by a Governmental Authority associated with national security, (c) effects of epidemics, pandemics or disease outbreaks (including the COVID-19 virus) or weather or meteorological events, (d) any change of Law, accounting standards, regulatory policy or industry standards after the date of this Agreement, (e) the announcement, execution or delivery of this Agreement or the consummation of the Transactions (it being understood that this clause (e) shall not apply to a breach of any representation or warranty set forth in Section 3.01, Section 3.03 or Section 3.04), (f) any actions taken by, or at the written request of, Investor or the Investor Parties and (g) any failure by the Company to meet projections or forecasts or revenue or earnings predictions for any period (but, for the purposes of clarity, not the underlying cause of such failure), except, solely with respect to clauses (a), (b), (c) and (d), to the extent the Company and its Subsidiaries, taken as a whole, are materially and disproportionately affected thereby relative to other participants in the industry or industries in which the Company and its Subsidiaries operate (in which case only the incremental material and disproportionate effect or effects may be taken into account in determining whether there has been a Material Adverse Effect) or (ii) prevent or materially delay, interfere with, hinder or impair (a) the consummation by the Company or its Subsidiaries of any of the Transactions on a timely basis or (b) the compliance by the Company or its Subsidiaries with its respective obligations under this Agreement.

"MIH JV" means MIH EV Design LLC, a Delaware limited liability company.

"MIH JV LLC Agreement" means the Limited Liability Company Agreement of MIH JV, dated as of May 11, 2022, as amended.

"Nasdaq" means the NASDAQ Global Select Market.

4895-3943-6092.13

"<u>Person</u>" means an individual, corporation, limited liability company, partnership, joint venture, association, trust, unincorporated organization or any other entity, including a Governmental Authority.

"<u>Preferred Funding Milestones</u>" shall mean the EV Program milestones and deliverables required to be achieved by the Company before funding of each of the Second Tranche Preferred Purchase and the Third Tranche Preferred Purchase.

"<u>Purchase</u>" means, collectively, the Initial Purchase, the Subsequent Common Purchase, the Second Tranche Preferred Purchase and the Third Tranche Preferred Purchase.

"<u>Purchase Price</u>" means the Initial Purchase Price, the Subsequent Common Purchase Price and the Subsequent Preferred Purchase Price.

"<u>Registrable Securities</u>" has the meaning set forth in the Registration Rights Agreement.

"<u>Registration Rights Agreement</u>" means that certain Registration Rights Agreement to be entered into by the Company and the Investor on the Initial Closing Date, the form of which is set forth as <u>Annex II</u> hereto, as it may be amended, supplemented or otherwise modified.

"<u>Registration Statement</u>" has the meaning set forth in the Registration Rights Agreement.

"<u>Representatives</u>" means, with respect to any Person, its officers, directors, principals, partners, managers, members, employees, consultants, agents, financial advisors, investment bankers, attorneys, accountants, other advisors, Affiliates and other representatives.

"<u>SEC</u>" means the Securities and Exchange Commission.

"<u>Second Investor Board Seat Fall-Away</u>" means the first day on which the 25% Beneficial Ownership Requirement is not satisfied.

"<u>Section 721</u>" means Section 721 of the Defense Production Act of 1950, as amended, and regulations that implement such provision.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"<u>Subsidiary</u>", when used with respect to any Person, means any corporation, limited liability company, partnership, association, trust or other entity of which (x) securities or other ownership interests representing more than 50% of the ordinary voting power (or, in the case of a partnership, more than 50% of the general partnership interests) or (y) sufficient voting rights to elect at least a majority of the board of directors or other governing body are, as of such date, owned by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.

"<u>Tax</u>" means any and all United States federal, state, local or non-United States taxes, fees, levies, duties, tariffs, imposts, and other similar charges (together with any and all interest,

7

LEGAL_US_E # 166563239.19

2022TW-L-K-5967                `1

penalties and additions to tax) imposed by any Governmental Authority, including taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation or net worth; taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value added or gains taxes; license, registration and documentation fees; and customs duties, tariffs and similar charges, together with any interest or penalty, in addition to tax or additional amount imposed by any Governmental Authority.

"Tax Return" means returns, reports, claims for refund, declarations of estimated Taxes and information statements, including any schedule or attachment thereto or any amendment thereof, with respect to Taxes filed or required to be filed with any Governmental Authority, including consolidated, combined and unitary tax returns.

"Transaction Documents" means this Agreement, the Certificate of Designations, the Registration Rights Agreement and all other documents, certificates or agreements executed in connection with the transactions contemplated by this Agreement, the Certificate of Designations and the Registration Rights Agreement.

"Transactions" means the Purchase and the other transactions contemplated by this Agreement and the other Transaction Documents.

(b)     In addition to the terms defined in Section 1.01(a), the following terms have the meanings assigned thereto in the Sections set forth below:[1]

| Term | Section |
|---|---|
| Action | 3.07 |
| Agreement | Preamble |
| Balance Sheet Date | 3.05c) |
| Bankruptcy and Equity Exception | 3.03(a) |
| Capitalization Date | 3.02(a) |
| Certificate of Designations | Recitals |
| Closing | 2.04(a) |
| Closing Date | 2.04(a) |
| Company | Preamble |
| Company Disclosure Letter | Article III |
| Company Preferred Stock | 3.02(a) |
| Company SEC Documents | 3.05(a) |
| Company Securities | 3.02(b) |
| Confidential Information | 5.05 |
| Contract | 3.03(b) |
| Draft CFIUS Notice | 5.02(b) |
| Environmental Laws | 3.17 |
| Excluded Issuance | 5.14(a) |
| Filed SEC Documents | Article III |

---

[1] Note to Draft: To be updated once Agreement is final.

8

LEGAL_US_E # 166563239.19

2022TW-L-K-5967                                    `1

| Term | Section |
|------|---------|
| Initial Acquired Shares | 2.01 |
| Initial Closing | 2.02(a) |
| Initial Closing Date | 2.02(a) |
| Initial Common Purchase Price | 2.01 |
| Initial Preferred Purchase Price | 2.01 |
| Initial Purchase | 2.01 |
| Initial Purchase Price | 2.01 |
| International Trade Laws | 3.08(b) |
| Investor | Preamble |
| IRS | 5.11 |
| Judgments | 3.07 |
| Laws | 3.08 |
| OFAC | 3.08(b) |
| Permits | 3.08 |
| Proposed Securities | 5.13(b)(i) |
| Regulatory Material Adverse Effect | 5.02(c) |
| Restraints | 6.01(a) |
| Sanctions | 3.08(b) |
| Sanctioned Jurisdiction | 3.08(b) |
| Second Preferred Closing | 2.04(a) |
| Second Preferred Closing Date | 2.04(a) |
| Second Tranche Preferred Purchase | 2.01(c) |
| Second Tranche Preferred Purchase Price | 2.01(c) |
| Second Tranche Preferred Shares | 2.01(c) |
| Series A Preferred Stock | Recitals |
| Subsequent Common Closing | 2.03(a) |
| Subsequent Common Closing Date | 2.03(a) |
| Subsequent Common Purchase | 2.01(b) |
| Subsequent Common Purchase Price | 2.01(b) |
| Subsequent Common Shares | 2.01(b) |
| Subsequent Preferred Closing | 2.04(a) |
| Subsequent Preferred Closing Dates | 2.04(a) |
| Subsequent Preferred Purchase | 2.01(d) |
| Subsequent Preferred Purchase Price | 2.01(d) |
| Subsequent Preferred Shares | 2.01(d) |
| Termination Date | 7.01(b) |
| Third Preferred Closing | 2.04(a) |
| Third Preferred Closing Date | 2.04(a) |
| Third Tranche Preferred Purchase | 2.01(d) |
| Third Tranche Preferred Purchase Price | 2.01(d) |
| Third Tranche Preferred Shares | 2.01(d) |

9

LEGAL_US_E # 166563239.19
2022TW-L-K-5967                    `1

## ARTICLE II

## PURCHASE AND SALE

Section 2.01    Purchase and Sale.

(a)    On the terms of this Agreement and subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by the party entitled to the benefit thereof) of the conditions set forth in Article VI, at the Initial Closing, the Investor shall purchase and acquire from the Company, and the Company shall issue, sell and deliver to the Investor, (i) 12,917,274 shares of Common Stock (the "Initial Common Shares") for a purchase price per share equal to $1.76  and an aggregate purchase price for the Initial Common Shares of $22,734,402 (such aggregate purchase price, the "Initial Common Purchase Price") and (ii) 300,000 shares of Series A Preferred Stock (the "Initial Preferred Shares", together with the Initial Common Shares, the "Initial Acquired Shares") for a purchase price per share equal to $100 and an aggregate purchase price for the Initial Preferred Shares of $30,000,000 (such aggregate purchase price, the "Initial Preferred Purchase Price").  The aggregate purchase price for the Initial Acquired Shares shall be $52,734,402 (such aggregate purchase price, the "Initial Purchase Price").  The purchase and sale of the Initial Acquired Shares pursuant to this Section 2.01(a) is referred to as the "Initial Purchase".

(b)    On the terms of this Agreement and subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by the party entitled to the benefit thereof) of the conditions set forth in Article VI, at the Subsequent Common Closing, the Investor shall purchase and acquire from the Company, and the Company shall issue, sell and deliver to the Investor, 26,855,453 shares of Common Stock (the "Subsequent Common Shares") for a purchase price per share equal to $1.76 and an aggregate purchase price for the Subsequent Common Shares of $47,265,597 (such aggregate purchase price, the "Subsequent Common Purchase Price").  The purchase and sale of the Subsequent Common Shares pursuant to this Section 2.01(b) is referred to as the "Subsequent Common Purchase".

(c)    On the terms of this Agreement and subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by the party entitled to the benefit thereof) of the conditions set forth in Article VI, at the Second Preferred Closing, the Investor shall purchase and acquire from the Company, and the Company shall issue, sell and deliver to the Investor, 300,000 shares of Series A Preferred Stock (the "Second Tranche Preferred Shares") for a purchase price per share equal to $100 and an aggregate purchase price for the Second Tranche Preferred Shares of $30,000,000 (such aggregate purchase price, the "Second Tranche Preferred Purchase Price").  The purchase and sale of the Second Tranche Preferred Shares pursuant to this Section 2.01(c) is referred to as the "Second Tranche Preferred Purchase".

(d)    On the terms of this Agreement and subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by the party entitled to the benefit thereof) of the conditions set forth in Article VI, at the Third Preferred Closing, the Investor shall purchase and acquire from the Company, and the Company shall issue, sell and deliver to the Investor, 400,000 shares of Series A Preferred Stock (the "Third Tranche Preferred Shares", together with

the Second Tranche Preferred Shares, the "Subsequent Preferred Shares") for a purchase price per share equal to $100 and an aggregate purchase price for the Third Tranche Preferred Shares of $40,000,000 (such aggregate purchase price, the "Third Tranche Preferred Purchase Price", together with the Second Tranche Preferred Purchase Price, the "Subsequent Preferred Purchase Price").  The purchase and sale of the Third Tranche Preferred Shares pursuant to this Section 2.01(d) is referred to as the "Third Tranche Preferred Purchase" (and together with the Second Tranche Preferred Purchase, the "Subsequent Preferred Purchase").

Section 2.02    Initial Closing.

(a)    On the terms of this Agreement, the closing of the Initial Purchase (the "Initial Closing") shall occur at 10:00 a.m. (New York City time) on November 22, 2022, provided that all of the conditions to the Initial Closing set forth in Article VI of this Agreement have been satisfied or, to the extent permitted by applicable Law, waived by the party entitled to the benefit thereof (other than those conditions that by their nature are to be satisfied at the Initial Closing, but subject to the satisfaction or waiver of those conditions at such time) on or before such date or if such conditions are not satisfied or waived on or before such date, then on the first Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of such conditions by the party entitled to the benefit thereof (other than those conditions that by their nature are to be satisfied at the Initial Closing, but subject to the satisfaction or waiver of those conditions at such time).  The Initial Closing shall be conducted remotely via the electronic exchange of documents and signatures, or at such other place, time or date as shall be agreed between the Company and the Investor. The date on which the Initial Closing occurs is referred to herein as the "Initial Closing Date".

(b)    At the Initial Closing:

(i)    the Company shall deliver to the Investor (1) the Initial Acquired Shares, free and clear of all Liens, except restrictions imposed by the Certificate of Designations, applicable securities Laws and this Agreement and (2) the Registration Rights Agreement, duly executed by the Company; and

(ii)    the Investor shall (1) pay the Initial Purchase Price to the Company, by wire transfer in immediately available U.S. federal funds, to the account designated by the Company in writing and (2) deliver to the Company the Registration Rights Agreement, duly executed by the Investor.

Section 2.03    Subsequent Common Closing.

(a)    On the terms of this Agreement, the closing of the Subsequent Common Purchase (the "Subsequent Common Closing") shall occur at 10:00 a.m. (New York City time) on the tenth (10th) Business Day after all of the conditions to the Subsequent Common Closing set forth in Article VI of this Agreement have been satisfied or, to the extent permitted by applicable Law, waived by the party entitled to the benefit thereof (other than those conditions that by their nature are to be satisfied at the Subsequent Common Closing, but subject to the satisfaction or waiver of those conditions at such time) and shall be conducted remotely via the electronic exchange of documents and signatures, or at such other place, time or date as shall be

11

LEGAL_US_E # 166563239.19
2022TW-L-K-5967                    `1

agreed between the Company and the Investor (the date on which the Subsequent Common Closing occurs, the "<u>Subsequent Common Closing Date</u>").

(b)      At the Subsequent Common Closing:

(i)      the Company shall deliver to the Investor the Subsequent Common Shares, free and clear of all Liens, except restrictions imposed by the Certificate of Designations, applicable securities Laws and this Agreement; and

(ii)      the Investor shall pay the Subsequent Common Purchase Price to the Company, by wire transfer in immediately available U.S. federal funds, to the account designated by the Company in writing.

(c)      The respective obligations of the Company and the Investor to effect the Subsequent Common Purchase pursuant to <u>Section 2.01(b)</u> may be terminated at any time prior to the Subsequent Common Closing:

(i)      by either the Company or the Investor upon written notice to the other, if the Subsequent Common Closing has not occurred on or prior to the first anniversary of the date of this Agreement; <u>provided</u> that the right to terminate the respective obligations of the Company and the Investor to effect the Subsequent Common Purchase under this <u>Section 2.03(c)(i)</u> shall not be available to any party if the breach by such party of its representations and warranties set forth in this Agreement or the failure of such party to perform any of its obligations under this Agreement has been a principal cause of or resulted in the events specified in this <u>Section 2.03(c)(i)</u>; or

(ii)      by either the Company or the Investor if there shall have been a CFIUS Turndown.

Section 2.04      <u>Subsequent Preferred Closings</u>.

(a)      On the terms of this Agreement, the closing of the Second Tranche Preferred Purchase (the "<u>Second Preferred Closing</u>") and the Third Tranche Preferred Purchase (the "<u>Third Preferred Closing</u>", together with the Second Preferred Closing, the "<u>Subsequent Preferred Closings</u>"; Subsequent Preferred Closings together with the Initial Closing and the Subsequent Common Closing, the "<u>Closings</u>", and each, a "<u>Closing</u>") shall occur at 10:00 a.m. (New York City time) on the tenth (10th) Business Day after all of the conditions to the Second Preferred Closing or the Third Preferred Closing, as applicable, set forth in <u>Article VI</u> of this Agreement have been satisfied or, to the extent permitted by applicable Law, waived by the party entitled to the benefit thereof (other than those conditions that by their nature are to be satisfied at such Subsequent Preferred Closing, but subject to the satisfaction or waiver of those conditions at such time) and shall be conducted remotely via the electronic exchange of documents and signatures, or at such other place, time or date as shall be agreed between the Company and the Investor.  The date on which the Second Preferred Closing or the Third Preferred Closings occurs shall be referred to herein as the "<u>Second Preferred Closing Date</u>" and the "<u>Third Preferred Closing Date</u>", respectively, and collectively as the "<u>Subsequent Preferred</u>

<p style="text-align:center">12</p>

Closing Dates" (the Subsequent Preferred Closing Dates, together with the Subsequent Common Closing Date and the Initial Closing Date, the "Closing Dates", and each, a "Closing Date").

    (b)    At each Subsequent Preferred Closing:

        (i)    the Company shall deliver to the Investor the Subsequent Preferred Shares for such Subsequent Preferred Closing, free and clear of all Liens, except restrictions imposed by the Certificate of Designations, applicable securities Laws and this Agreement; and

        (ii)    the Investor shall pay the Subsequent Preferred Purchase Price for such Subsequent Preferred Closing to the Company, by wire transfer in immediately available U.S. federal funds, to the account designated by the Company in writing.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to the Investor as of the date of this Agreement and as of each Closing (except to the extent made only as of a specified date, in which case such representation and warranty is made as of such date) that, except as (A) set forth in the confidential disclosure letter delivered by the Company to the Investor prior to the execution of this Agreement (the "Company Disclosure Letter") (it being understood that any information, item or matter set forth on one section or subsection of the Company Disclosure Letter shall be deemed disclosure with respect to, and shall be deemed to apply to and qualify, the section or subsection of this Agreement to which it corresponds in number and each other section or subsection of this Agreement to the extent that it is reasonably apparent on its face that such information, item or matter is relevant to such other section or subsection) or (B) disclosed in any report, schedule, form, statement or other document (including exhibits) filed with, or furnished to, the SEC (and remaining publicly available) after January 1, 2021 and prior to the date hereof (the "Filed SEC Documents"), other than any risk factor disclosures in any such Filed SEC Document contained in the "Risk Factors" section thereof or any forward-looking statements within the meaning of the Securities Act or the Exchange Act thereof (it being acknowledged that nothing disclosed in the Filed SEC Documents shall be deemed to qualify or modify the representations and warranties set forth in Sections 3.01, 3.02, 3.03, 3.10 and 3.11):

    Section 3.01    Organization; Standing.

    (a)    The Company is a corporation duly organized and validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and corporate authority necessary to carry on its business as it is now being conducted, except (other than with respect to the Company's due organization and valid existence and good standing) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Company is duly licensed or qualified to do business and is in good standing (where

such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. True and complete copies of the Company Charter Documents are included in the Filed SEC Documents.

(b)     Each of the Company's Subsidiaries is duly organized, validly existing and in good standing (where such concept is recognized under applicable Law) under the Laws of the jurisdiction of its organization, except where the failure to be so organized, existing and in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each of the Company's Subsidiaries is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.02     Capitalization.

(a)     As of the date hereof, the authorized capital stock of the Company consists of 450,000,000 shares of Common Stock and 12,000,000 shares of preferred stock, par value $0.0001 per share ("Company Preferred Stock"). At the close of business on November 7, 2022 (the "Capitalization Date"), (i) 216,976,245 shares of Common Stock were issued and outstanding (including 188,068 Company Restricted Shares), (ii) 5,558,316 shares of Common Stock were reserved and available for issuance pursuant to the Company Stock Plans, (iii) 5,970,764 shares of Common Stock were subject to outstanding Company Stock Options, (iv) 6,216,322 Company RSUs were outstanding pursuant to which a maximum of 6,216,322 shares of Common Stock could be issued, (v) 682,500 Company PSUs were outstanding pursuant to which a maximum of 682,500 shares of Common Stock could be issued (assuming maximum achievement of all applicable performance conditions), (vi) 500,000 shares of Class A common stock may be issued in lieu of cash payment of annual bonus/performance unit awards under the Company Stock Plans, (vii) warrants to purchase 5,663,907 shares of Common Stock were issued and outstanding and (viii) no shares of Company Preferred Stock were issued or outstanding.

(b)     Except as described in this Section 3.02, as of the Capitalization Date, there were (i) no outstanding shares of capital stock of, or other equity or voting interests in, the Company, (ii) no outstanding securities of the Company convertible into or exercisable or exchangeable for shares of capital stock of, or other equity or voting interests in, the Company, (iii) no outstanding obligations, options, warrants, rights, pledges, calls, puts, phantom equity, preemptive rights, or other rights, commitments or agreements to acquire from the Company, or that obligate the Company to issue, any capital stock of, or other equity or voting interests in, or any securities convertible into or exercisable or exchangeable for shares of capital stock of, or other equity or voting interests in, the Company other than obligations under the Company Plans in the ordinary course of business, (iv) no obligations of the Company to grant, extend or enter

14

LEGAL_US_E # 166563239.19

2022TW-L-K-5967                    `1

into any subscription, warrant, right, convertible or exchangeable security or other similar agreement or commitment relating to any capital stock of, or other equity or voting interests in, the Company (the items in clauses (i), (ii), (iii) and (iv) being referred to collectively as "Company Securities") and (v) no other obligations by the Company or any of its Subsidiaries to make any payments based on the price or value of any Company Securities. There are no outstanding agreements of any kind which obligate the Company or any of its Subsidiaries to repurchase, redeem or otherwise acquire any Company Securities (other than pursuant to the cashless exercise of Company Stock Options or the forfeiture or withholding of Taxes with respect to Company Stock Options, Company Restricted Shares, Company RSUs or Company PSUs), or obligate the Company to grant, extend or enter into any such agreements relating to any Company Securities, including any agreements granting any preemptive rights, subscription rights, anti-dilutive rights, rights of first refusal or similar rights with respect to any Company Securities. None of the Company or any Subsidiary of the Company is a party to any stockholders' agreement, voting trust agreement, registration rights agreement or other similar agreement or understanding relating to any Company Securities or any other agreement relating to the disposition, voting or dividends with respect to any Company Securities. All outstanding shares of Common Stock have been duly authorized and validly issued and are fully paid, nonassessable and were not issued in violation of any purchase option, call option, right of first refusal, subscription right, preemptive or similar rights of a third Person, the Company Charter Documents or any agreement to which the Company is a party. All of the outstanding shares of capital stock or equity interests of the Company's Subsidiaries have been duly authorized, validly issued, fully paid and non-assessable and none of such capital stock or equity interests are subject to or were issued in violation of any applicable Laws and are not subject to and have not been issued in violation of any stockholders agreement, proxy, voting trust or similar agreement, or any preemptive rights, rights of first refusal or similar rights of any Person, except as would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

(c) As of each Closing, all of the Acquired Shares at such Closing, and the shares of Common Stock issuable upon conversion of any of such Acquired Shares that are Series A Preferred Stock and any accrued dividends, will be, when issued, duly authorized by all necessary corporate action on the part of the Company, validly issued, fully paid and nonassessable and issued in compliance with all applicable federal and state securities Laws and will not be subject to preemptive rights of any other stockholder of the Company, and will be free and clear of all Liens, except restrictions imposed by the Certificate of Designations, the Securities Act, any applicable securities Laws and this Agreement. The respective rights, preferences, privileges, and restrictions of the Series A Preferred Stock and the Common Stock are as stated in the Company Charter Documents (including the Certificate of Designations) or as otherwise provided by applicable Law. As of each Closing, all of the Acquired Shares acquired at such Closing and the shares of Common Stock issuable upon conversion of any of such Acquired Shares that are Series A Preferred Stock (including any unpaid accrued dividends thereon) have been duly reserved for issuance.

Section 3.03    Authority; Noncontravention.

(a) The Company has all necessary corporate power and corporate authority to execute and deliver this Agreement and the other Transaction Document and to perform its

<div align="center">15</div>

LEGAL_US_E # 166563239.19
2022TW-L-K-5967                `1

obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance by the Company of this Agreement and the other Transaction Documents, and the consummation by it of the Transactions, have been duly authorized and approved by the Board and no other corporate action on the part of the Company is necessary to authorize the execution, delivery and performance by the Company of this Agreement and the other Transaction Documents and the consummation by it of the Transactions. This Agreement has been, and at the Closing the other Transaction Documents to which the Company is party will be, duly executed and delivered by the Company and, assuming due authorization, execution and delivery hereof or thereof, as applicable, by the Investor, constitutes (or in the case of such other Transaction Documents, at the Closing will constitute) a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (the "Bankruptcy and Equity Exception").

(b)     Neither the execution and delivery of this Agreement or the other Transaction Documents by the Company, nor the consummation by the Company of the Transactions, nor performance or compliance by the Company with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of (A) the Company Charter Documents or (B) the similar organizational documents of any of the Company's Subsidiaries or (ii) assuming that the authorizations, consents and approvals referred to in Section 3.04 are obtained prior to such Closing Date and the filings referred to in Section 3.04 are made and any waiting periods thereunder have terminated or expired prior to such Closing Date, (x) violate any Law or Judgment applicable to the Company or any of its Subsidiaries or (y) violate or constitute a default (or constitute an event which, with notice or lapse of time or both, would violate or constitute a default) under, result in the termination of or a right of termination or cancellation under, result in the loss of any benefit or require a payment or incur a penalty under, any of the terms or provisions of any loan or credit agreement, indenture, debenture, note, bond, mortgage, deed of trust, lease, sublease, license, contract or other agreement (each, a "Contract") to which the Company or any of its Subsidiaries is a party or accelerate the Company's or, if applicable, any of its Subsidiaries' obligations under any such Contract, except, in the case of clause (i)(B) and clause (ii), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.04     Governmental Approvals.  Except for (a) the filing of the Certificate of Designations with the Secretary of State of the State of Delaware, (b) filings required under, and compliance with other applicable requirements of the HSR Act, if required, (c) filings contemplated by Section 5.02(b), and (d) compliance with any applicable state securities or blue sky laws, no consent or approval of, or filing, license, permit or authorization, declaration or registration with, any Governmental Authority is necessary for the execution and delivery of this Agreement and the other Transaction Documents by the Company, the performance by the Company of its obligations hereunder and thereunder and the consummation by the Company of the Transactions, other than such other consents, approvals, filings, licenses, permits or authorizations, declarations or registrations that, if not obtained, made or given, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

16

Section 3.05     Company SEC Documents; Undisclosed Liabilities.

(a)     The Company has filed with the SEC, on a timely basis, all required reports, schedules, forms, statements and other documents required to be filed by the Company with the SEC pursuant to the Exchange Act since January 1, 2021 (collectively, the "Company SEC Documents").  As of their respective SEC filing dates, the Company SEC Documents complied in all material respects with the requirements of the Securities Act, the Exchange Act or the Sarbanes-Oxley Act of 2002 (and the regulations promulgated thereunder), as the case may be, applicable to such Company SEC Documents, and none of the Company SEC Documents as of such respective dates (or, if amended prior to the date hereof, the date of the filing of such amendment, with respect to the disclosures that are amended) contained any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(b)     The consolidated financial statements of the Company (including all related notes or schedules) included or incorporated by reference in the Company SEC Documents complied as to form, as of their respective dates of filing with the SEC, in all material respects with the published rules and regulations of the SEC with respect thereto, have been prepared in all material respects in accordance with GAAP (except, in the case of unaudited quarterly statements, as permitted by Form 10-Q of the SEC or other rules and regulations of the SEC) applied on a consistent basis during the periods involved (except (i) as may be indicated in the notes thereto or (ii) as permitted by Regulation S-X) and fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown (subject, in the case of unaudited quarterly financial statements, to normal year-end adjustments, which are not reasonably expected to be materially adverse individually or in the aggregate to the Company and its Subsidiaries, taken as a whole).

(c)     Neither the Company nor any of its Subsidiaries has any liabilities of any nature (whether accrued, absolute, contingent or otherwise) that would be required under GAAP, to be reflected on a consolidated balance sheet of the Company (including the notes thereto) except liabilities (i) reflected or reserved against in the balance sheet (or the notes thereto) of the Company and its Subsidiaries as of June 30, 2022 (the "Balance Sheet Date") included in the Filed SEC Documents, (ii) incurred after the Balance Sheet Date in the ordinary course of business and that do not arise from any material breach of a Contract, (iii) as expressly contemplated by this Agreement or otherwise incurred in connection with the Transactions, (iv) as relate to Taxes, (v) that have been discharged or paid prior to the date of this Agreement or (vi) as would not, individually or in the aggregate, have had or reasonably be expected to have, a Material Adverse Effect.

(d)     The Company has established and maintains, and at all times since January 1, 2021 has maintained, disclosure controls and procedures and a system of internal controls over financial reporting (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 under the Exchange Act) as required by Rule 13a-15 under the Exchange Act relating to the Company and its consolidated Subsidiaries sufficient to provide reasonable assurance that (a) transactions are executed in accordance with Company

17

management's general or specific authorization, (b) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP, consistently applied, and to maintain accountability for assets, (c) access to assets is permitted only in accordance with Company management's general or specific authorization and (d) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences. There are no "significant deficiencies" or "material weaknesses" (as defined by the Public Company Accounting Oversight Board) in the design or operation of the Company's internal controls over, and procedures relating to, financial reporting which would reasonably be expected to adversely affect in any material respect the Company's ability to record, process, summarize and report financial data, in each case which has not been subsequently remediated. Since January 1, 2021, to the Knowledge of the Company, there has not been any Fraud, whether or not material, that involves management or other employees of the Company or any of its Subsidiaries who have a significant role in the Company's internal controls over financial reporting. As of the date of this Agreement, to the Knowledge of the Company, there is no reason that its outside auditors and its chief executive officer and chief financial officer will not be able to give the certifications and attestations required pursuant to the rules and regulations adopted pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, without qualification, when next due.

(e)     There is no transaction, arrangement or other relationship between the Company and/or any of its Subsidiaries and an unconsolidated or other off-balance sheet entity that is required by applicable Law to be disclosed by the Company in its Filed SEC Documents and is not so disclosed.

Section 3.06     <u>Absence of Certain Changes</u>.  Since the Balance Sheet Date through the date of this Agreement, there has not been any Material Adverse Effect or any event, change or occurrence that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.07     <u>Legal Proceedings</u>.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there is no (a) pending or, to the Knowledge of the Company, threatened legal, regulatory or administrative proceeding, suit, proceeding, dispute, investigation, arbitration or action (an "<u>Action</u>") against the Company or any of its Subsidiaries or any of their respective assets, or (b) outstanding order, judgment, injunction, ruling, writ or decree of any Governmental Authority ("<u>Judgments</u>") imposed upon the Company or any of its Subsidiaries, in each case, by or before any Governmental Authority.

Section 3.08     <u>Compliance with Laws; Permits</u>.

(a)     The Company and each of its Subsidiaries are, and since January 1, 2021 have been, in compliance with all state or federal laws, common law, statutes, ordinances, codes, rules or regulations or other similar requirement enacted, adopted, promulgated, or applied by any Governmental Authority ("<u>Laws</u>") or Judgments, applicable to the Company or any of its Subsidiaries, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  The Company and each of its Subsidiaries holds or is in the process of obtaining all licenses, franchises, permits, certificates, approvals and authorizations

18

from Governmental Authorities ("Permits") necessary for the lawful conduct of their respective businesses, except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  For the avoidance of doubt, this Section 3.08(a) does not apply to International Trade Laws matters, such matters being the exclusive subject of Section 3.08(b).

      (b)    None of the Company, any of its Subsidiaries, any of their respective directors and executive officers, nor, to the Knowledge of the Company, any Affiliates, non-executive officers and other employees, or agents (i) is the target of any sanctions administered by U.S. Governmental Authorities (including, but not limited to the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), U.S. Department of State and the U.S. Department of Commerce), the United Nations Security Council, HM Treasury, the European Union or relevant member states of the European Union, or any other relevant Governmental Authority (collectively, the "Sanctions"); (ii) is named in any Sanctions-related list maintained by the U.S. Department of State; the U.S. Department of Commerce, including the Bureau of Industry and Security's Entity List and Denied Persons List; or the U.S. Department of the Treasury, including the OFAC Specially Designated Nationals and Blocked Persons List, the Sectoral Sanctions Identifications List, and the Foreign Sanctions Evaders List; or any similar list maintained by the United Nations Security Council, the European Union, HM Treasury or any other relevant Governmental Authority; (iii) is located, organized or resident in a country, territory or geographical region which is itself the subject or target of any territory-wide Sanctions (currently, Cuba, Iran, North Korea, Syria, and the Crimea and so-called Donetsk People's Republic and Luhansk People's Republic regions of Ukraine (each, a "Sanctioned Jurisdiction"); or (iv) is owned or controlled by any Person or Persons described in the foregoing clauses (i)–(iii).  The Company and its Subsidiaries and, to the Knowledge of the Company, their respective directors, officers, employees, and agents (to the extent such persons are acting for or on behalf of the Company or any of its Subsidiaries) are, and since the date of their respective formations have been at all times, in compliance with (i) Sanctions; (ii) U.S. export control Laws (including, without limitation, the International Traffic in Arms Regulations (22 CFR §§ 120–130, as amended), the Export Administration Regulations (15 CFR §§ 730–774, as amended) and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws); (iii) Laws pertaining to imports and customs, including those administered by the Bureau of Customs and Border Protection in the U.S. Department of Homeland Security (and any successor thereof) and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws; (iv) the anti-boycott Laws administered by the U.S. Department of Commerce and the U.S. Department of the Treasury; and (v) export, import and customs Laws of other countries in which the Company has conducted and/or currently conducts business (collectively, "International Trade Laws").

      (c)    The Company and its Subsidiaries, and, to the Knowledge of the Company, their respective directors and officers acting on behalf of or for the Company's or any Subsidiary's benefit are, and since the January 1, 2021 have been, in compliance with the U.S. Foreign Corrupt Practices Act of 1977 or similar law of a jurisdiction in which the Company or any of its Subsidiaries conduct their respective businesses and to which they are lawfully subject, in each case, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No part of the proceeds of the Purchase Price paid hereunder

4895-3943-6092.13

LEGAL_US_E # 166563239.19

2022TW-L-K-5967 `1

shall be used to make any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

Section 3.09    Tax Matters.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect: (a) the Company and each of its Subsidiaries has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all Tax Returns required to be filed by any of them, and all such filed Tax Returns (taking into account all amendments thereto) are true, complete and accurate, (b) all Taxes owed by the Company and each of its Subsidiaries that are due (whether or not shown on any Tax Return) have been timely paid, except for Taxes that are being contested in good faith by appropriate proceedings and that have been adequately reserved against in accordance with GAAP, (c) no examination or audit of any Tax Return relating to any Taxes of the Company or any of its Subsidiaries or with respect to any Taxes due from the Company or any of its Subsidiaries by any Governmental Authority is currently in progress or threatened in writing, (d) none of the Company or any of its Subsidiaries has liabilities for any other Person (other than the Company and its Subsidiaries under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, or by contract and (e) none of the Company or any of its Subsidiaries has engaged in any "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b)(2).

Section 3.10    No Rights Agreement; Anti-Takeover Provisions.

(a)    As of the date of this Agreement, the Company is not party to a stockholder rights agreement, "poison pill" or similar anti-takeover agreement or plan.

(b)    The Board has taken all necessary actions to ensure that no restrictions included in any "control share acquisition," "fair price," "moratorium," "business combination" or other state anti-takeover Law (including Section 203 of the DGCL) are, or as of each Closing will be, applicable to the Transactions, including the Company's issuance to Investor of shares of Common Stock of the Company, including shares issuable upon conversion of the Series A Preferred Stock (to the extent convertible) and any issuance pursuant to Section 5.13.

Section 3.11    Brokers and Other Advisors.  Except for Jefferies LLC, no broker, investment banker, financial advisor or other Person, the fees and expenses of which will be paid by the Company, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of the Company or any of its Subsidiaries.

Section 3.12    Sale of Securities.  Assuming the accuracy of the representations and warranties set forth in Section 4.08, the offer, sale and issuance of the shares of Series A Preferred Stock pursuant to this Agreement is exempt from the registration and prospectus delivery requirements of the Securities Act and the rules and regulations thereunder.  Without limiting the foregoing, neither the Company nor any other Person authorized by the Company to act on its behalf, has engaged in a general solicitation or general advertising (within the meaning of Regulation D of the Securities Act) of investors with respect to offers or sales of Series A Preferred Stock, and neither the Company nor any Person acting on its behalf has made any

offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause the offering or issuance of Series A Preferred Stock under this Agreement to be integrated with prior offerings by the Company for purposes of the Securities Act that would result in none of Regulation D or any other applicable exemption from registration under the Securities Act to be available, nor will the Company take any action or steps that would cause the offering or issuance of Series A Preferred Stock under this Agreement to be integrated with other offerings by the Company.

Section 3.13    <u>Listing and Maintenance Requirements</u>.  The Common Stock is registered pursuant to Section 12(b) of the Exchange Act and listed on the Nasdaq, and the Company has taken no action designed to, or which to the Knowledge of the Company is reasonably likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act or delisting the Common Stock from the Nasdaq, nor has the Company received any written notification that the SEC or the Nasdaq is contemplating terminating such registration or listing.

Section 3.14    <u>Certain Material Indebtedness</u>.  Neither the Company nor any of its Subsidiaries is, as of the date of this Agreement, in default in the payment of any material indebtedness or in default under any agreement relating to its material indebtedness.

Section 3.15    <u>Ability to Pay Dividends.</u>  The Company is not party to any material Contract, and is not subject to any provision in the Company Charter Documents or resolutions of the Board that, in each case, by its terms prohibits or prevents the Company from paying dividends in form and the amounts contemplated by the Certificate of Designations.

Section 3.16    <u>IP; Security</u>.  Except for Liens granted in favor of Foxconn EV Technology, Inc., the Company and its Subsidiaries (i) exclusively own their proprietary Intellectual Property and IT Assets, free and clear of all Liens; (ii) do not infringe the Intellectual Property of any Person; and (iii) take commercially reasonable actions to protect the integrity, continuous operation, redundancy and security of the IT Assets used in their business (and all data, including personal data, processed thereby), in each case, except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect. Since January 1, 2021, there have been no violations, breaches, outages, corruptions or unauthorized uses of, or unauthorized access to same, except for instances that were resolved without material cost, liability or the duty to notify any other Person, except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 3.17    <u>Environmental Matters</u>.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) the Company and each of its Subsidiaries have complied since the dates of their respective formation with and is in compliance with all applicable Laws relating to pollution or the protection of the environment or natural resources ("<u>Environmental Laws</u>"), and as of the date hereof the Company has not received any written notice since the January 1, 2021 alleging that the Company is in violation of or has liability under any Environmental Law, (b) the Company and its Subsidiaries possess and have complied since the dates of their respective formation with and are in compliance with all Permits required under Environmental Laws for the operation of their respective businesses, (c) as of the date hereof, there is no Action under or pursuant to any Environmental Law or

21

LEGAL_US_E # 166563239.19

2022TW-L-K-5967                    `1

environmental Permit that is pending or, to the Knowledge of the Company, threatened in writing against the Company or any of its Subsidiaries, (d) as of the date hereof, neither the Company nor any of its Subsidiaries has become subject to any Judgment imposed by any Governmental Authority under which there are uncompleted, outstanding or unresolved obligations on the part of the Company or its Subsidiaries arising under Environmental Laws, (e) neither the Company nor any of its Subsidiaries has any liabilities or obligations arising from the Company's or any of its Subsidiaries' management disposal or release of, or exposure of any Person to, any hazardous or toxic substance, or any owned or operated property or facility contaminated by any such substance and (f) as of the date hereof, neither the Company nor any of its Subsidiaries has by contract or operation of law assumed responsibility or provided an indemnity for any liability of any other Person relating to Environmental Laws.

Section 3.18    Employee Matters.

(a)    Except where the failure to comply has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company and its Subsidiaries are in compliance with all applicable Laws relating to labor, employment, fair employment practices, terms and conditions of employment, and wages and hours, and with the terms of the Company Plans, and each such Company Plan is in compliance with all applicable requirements of ERISA.

(b)    As of the date hereof, none of the Company or any of its Subsidiaries Company is a party to or bound by any collective bargaining agreement or other agreement with a labor union or like organization, and to the Knowledge of the Company, no labor organization or labor union is actively seeking signed authorization cards or other written expressions of support from the Company's or its Subsidiaries' employees.

(c)    There is no, and has not been since January 1, 2021, any strike, lockout, slowdown, work stoppage, unfair labor practice or other material labor dispute, or material arbitration or grievance pending or, to the Knowledge of the Company, threatened, that may interfere in any material respect with the respective business activities of the Company and its Subsidiaries. As of the date hereof, the Company has not incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or any similar state or local Law that remains unsatisfied.

(d)    To the Knowledge of the Company as of the date hereof, since January 1, 2021, no material allegations of sexual harassment have been made to the Company against any executive-level employee in his or her capacity as a director, employee or other service provider of the Company.

(e)    To the Company's Knowledge as of the date hereof, no member of the executive leadership team of the Company has indicated an intention in writing to terminate employment with the Company.

Section 3.19    Real and Personal Property.  The Company and its Subsidiaries have good and insurable title in fee simple to (in the case of real property), or have valid rights to lease or otherwise use, all items of real and personal property that are material to the respective

22

LEGAL_US_E # 166563239.19

2022TW-L-K-5967    `1

businesses of the Company and its Subsidiaries taken as a whole, in each case free and clear of all Liens and defects and imperfections of title, except those that (i) do not materially interfere with the use made and proposed to be made of such property by the Company and its Subsidiaries or (ii) would not, individually or in the aggregate, have a Material Adverse Effect. As of the date hereof, neither the Company nor any of its Subsidiaries has received actual written notice that any of the Company's real property is subject to any governmental decree or order to be sold or is being condemned, expropriated or otherwise taken by any public authority with or without payment of compensation therefor. As of the date hereof, the real property of the Company and its Subsidiaries is in good operating condition and repair, reasonable wear and tear excepted, and is structurally sound and free of any defects and is suitable and sufficient for its current and contemplated uses, except as has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.20    Insurance.    The Company and its Subsidiaries have insurance covering their respective properties, operations, personnel and businesses, including business interruption insurance, which insurance is in amounts and insures against such losses and risks as are reasonably deemed by the Company and its Subsidiaries to be adequate to protect the Company and its Subsidiaries and their respective businesses, taken as a whole in a commercially reasonably manner; and as of the date hereof neither the Company nor any of its Subsidiaries (i) has received written notice from any insurer or agent of such insurer that material capital improvements or other material capital expenditures are required or necessary to be made in order to continue such insurance or (ii) believes that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain materially similar coverage from similar insurers as may be necessary to continue its business.

Section 3.21    Investment Company Status.    Neither the Company nor any of its Subsidiaries is, and immediately after the sale of the Acquired Shares hereunder, none of the Company nor any of its Subsidiaries will be, required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

Section 3.22    No Other Company Representations or Warranties.    Except for the representations and warranties made by the Company in this Article III, neither the Company nor any other Person acting on its behalf makes any other express or implied representation or warranty with respect to the Series A Preferred Stock, the Common Stock, the Company or any of its Subsidiaries or their respective businesses, operations, properties, assets, liabilities, condition (financial or otherwise) or prospects, notwithstanding the delivery or disclosure to the Investor or any of its Representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing, and the Investor acknowledges the foregoing.  In particular, and without limiting the generality of the foregoing, except for the representations and warranties made by the Company in this Article III, neither the Company nor any other Person makes or has made any express or implied representation or warranty to the Investor or any of its Representatives with respect to (a) any financial projection, forecast, estimate, budget or prospect information relating to the Company, any of its Subsidiaries or their respective businesses or (b) any oral or written information presented to the Investor or any of its Representatives in the course of its due diligence investigation of the Company, the negotiation

23

of this Agreement or the course of the Transactions or any other transactions or potential transactions involving the Company and the Investor.

Section 3.23    No Other Investor Representations or Warranties.  Except for the representations and warranties expressly set forth in Article IV, the Company hereby acknowledges that neither the Investor, nor any other Person, (a) has made or is making any other express or implied representation or warranty with respect to the Investor or any of its Affiliates or their respective businesses, operations, assets, liabilities, condition (financial or otherwise) or prospects, including with respect to any information provided or made available to the Company or any of its Representatives or any information developed by the Company or any of its Representatives in connection with the Transactions or (b) will have or be subject to any liability or indemnification obligation to the Company resulting from the delivery, dissemination or any other distribution to the Company or any of its Representatives, or the use by the Company or any of its Representatives, of any information, documents, estimates, projections, forecasts or other forward-looking information, business plans or other material developed by or provided or made available to the Company or any of its Representatives, including in due diligence materials, "data rooms" or management presentations (formal or informal), in connection with the Transactions.  The Company, on behalf of itself and on behalf of its Affiliates, expressly waives any such claim relating to the foregoing matters, except with respect to Fraud.


# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE INVESTOR

The Investor represents and warrants to the Company, as of the date hereof and as of each of Closing (except to the extent made only as of a specified date, in which case such representation and warranty is made as of such date):

Section 4.01    Organization; Standing.  The Investor is a private company limited by shares duly established under the Laws of Singapore and has all requisite power and authority necessary to carry on its business as it is now being conducted and is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have an Investor Material Adverse Effect.

Section 4.02    Authority; Noncontravention.

(a)    The Investor has all necessary power and authority to execute and deliver this Agreement and the other Transaction Documents, to perform its obligations hereunder and thereunder and to consummate the Transactions.  The execution, delivery and performance by the Investor of this Agreement and the other Transaction Documents and the consummation by the Investor of the Transactions have been duly authorized and approved by all necessary action

24

on the part of the Investor, and no further action, approval or authorization by any of its stockholders, partners, members or other equity owners, as the case may be, is necessary to authorize the execution, delivery and performance by the Investor of this Agreement and the other Transaction Documents and the consummation by the Investor of the Transactions. This Agreement has been, and at the Initial Closing the other Transaction Documents will be, duly executed and delivered by the Investor and, assuming due authorization, execution and delivery hereof or thereof, as applicable, by the Company, constitutes (or in the case of the other Transaction Documents, at the Initial Closing will constitute) a legal, valid and binding obligation of the Investor, enforceable against it in accordance with its terms, subject to the Bankruptcy and Equity Exception.

(b)     Neither the execution and delivery of this Agreement or the other Transaction Documents by the Investor, nor the consummation by the Investor of the Transactions, nor performance or compliance by the Investor with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of the certificate or articles of incorporation, bylaws or other comparable charter or organizational documents of the Investor or (ii) assuming that the authorizations, consents and approvals referred to in Section 4.03 are obtained prior to each of the Closing Dates and the filings referred to in Section 4.03 are made and any waiting periods with respect to such filings have terminated or expired prior to each of the Closing Dates, (x) violate any Law or Judgment applicable to the Investor or any of its Subsidiaries or (y) violate or constitute a default (or constitute an event which, with notice or lapse of time or both, would violate or constitute a default) under any of the terms, conditions or provisions of any Contract to which the Investor or any of its Subsidiaries is a party or accelerate the Investor's or any of its Subsidiaries', if applicable, obligations under any such Contract, except, in the case of clause (ii), as would not, individually or in the aggregate, reasonably be expected to have an Investor Material Adverse Effect.

Section 4.03    Governmental Approvals.  Except for (a) filings required under, and compliance with other applicable requirements of the HSR Act, if required, and (b) filings contemplated by Section 5.02(b), no consent or approval of, or filing, license, permit or authorization, declaration or registration with, any Governmental Authority is necessary for the execution and delivery of this Agreement and the other Transaction Documents by the Investor, the performance by the Investor of its obligations hereunder and thereunder and the consummation by the Investor of the Transactions, other than such other consents, approvals, filings, licenses, permits, authorizations, declarations or registrations that, if not obtained, made or given, would not, individually or in the aggregate, reasonably be expected to have an Investor Material Adverse Effect.

Section 4.04    Sufficiency of Funds.  At each of the Closings, the Investor will have available funds necessary to consummate the Purchase at such Closing and pay the Purchase Price for such Closing and to pay any fees and expenses of or payable by the Investor, on the terms and conditions contemplated by this Agreement.  As of the date of this Agreement, the Investor is not aware of any reason why the funds sufficient to pay the applicable Purchase Price at each Closing will not be available on such Closing Date.

4895-3943-6092.13

Section 4.05    Ownership of Company Stock.  Other than 7,248,163 shares of Common Stock and warrants to acquire 1,700,000 shares of Common Stock, in each case owned by Affiliates of the Investor, neither the Investor nor any of its Affiliates owns any capital stock or other securities of the Company.

Section 4.06    Brokers and Other Advisors.  No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of the Investor or any of its Subsidiaries, except for Persons, if any, whose fees and expenses will be paid by the Investor.

Section 4.07    Non-Reliance on Company Estimates, Projections, Forecasts, Forward-Looking Statements and Business Plans.  In connection with the due diligence investigation of the Company by the Investor and its Representatives, the Investor and its Representatives have received and may continue to receive from the Company and its Representatives certain estimates, projections, forecasts and other forward-looking information, as well as certain business plan information, regarding the Company and its Subsidiaries and their respective businesses and operations.  The Investor hereby acknowledges that there are uncertainties inherent in attempting to make such estimates, projections, forecasts and other forward-looking statements, as well as in such business plans, with which the Investor is familiar, that the Investor is making its own evaluation of the adequacy and accuracy of all estimates, projections, forecasts and other forward-looking information, as well as such business plans, so furnished to the Investor (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, forward-looking information or business plans), and that except for the representations and warranties made by the Company in Article III of this Agreement (as the same may be modified by the Company Disclosure Letter), the Investor is not relying on any representations and warranties or other statements made by the Company or any of its Representatives and Investor will have no claim against the Company or any of its Subsidiaries, or any of their respective Representatives, with respect thereto, except with respect to Fraud.

Section 4.08    Purchase for Investment.  The Investor acknowledges that the Common Stock, the Series A Preferred Stock and the Common Stock issuable upon the conversion of the Series A Preferred Stock have not been registered under the Securities Act or under any state or other applicable securities Laws.  The Investor (a) acknowledges that it is acquiring the Common Stock, the Series A Preferred Stock and the Common Stock issuable upon the conversion of the Series A Preferred Stock pursuant to an exemption from registration under the Securities Act solely for investment with no intention to distribute any of the foregoing to any Person, (b) will not sell, transfer, or otherwise dispose of any of the Common Stock, the Series A Preferred Stock or the Common Stock issuable upon the conversion of the Series A Preferred Stock, except in compliance with this Agreement and the registration requirements or exemption provisions of the Securities Act and any other applicable securities Laws, (c) has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of its investment in the Common Stock, the Series A Preferred Stock and the Common Stock issuable upon the conversion of the Series A Preferred Stock and of making an informed investment decision, (d) is an "accredited investor" (as that term is defined by Rule 501 of the Securities Act) and (e)(1) has been furnished with or has had access to all the information

26

LEGAL_US_E # 166563239.19
2022TW-L-K-5967                                    `1

that it considers necessary or appropriate to make an informed investment decision with respect to the Common Stock, the Series A Preferred Stock and the Common Stock issuable upon the conversion of the Series A Preferred Stock, (2) has had an opportunity to discuss with the Company and its Representatives the intended business and financial affairs of the Company and to obtain information necessary to verify any information furnished to it or to which it had access and (3) can bear the economic risk of (i) an investment in the Common Stock, the Series A Preferred Stock and the Common Stock issuable upon the conversion of the Series A Preferred Stock indefinitely and (ii) a total loss in respect of such investment. The Investor has such knowledge and experience in business and financial matters so as to enable it to understand and evaluate the risks of, and form an investment decision with respect to its investment in, the Common Stock, the Series A Preferred Stock and the Common Stock issuable upon the conversion of the Series A Preferred Stock and to protect its own interest in connection with such investment.

Section 4.09   No Other Investor Representations or Warranties.  Except for the representations and warranties made by the Investor in this Article IV, in connection with the Transactions, neither the Investor nor any other Person acting on its behalf makes any other express or implied representation or warranty with respect to the Investor or any of its Affiliates or their respective businesses, operations, properties, assets, liabilities, condition (financial or otherwise) or prospects, notwithstanding the delivery or disclosure to the Company or its Representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing, and the Company acknowledges the foregoing. In particular, and without limiting the generality of the foregoing, except for the representations and warranties made by the Investor in this Article IV, neither the Investor nor any other Person makes or has made any express or implied representation or warranty to the Company or its Representatives with respect to (a) any financial projection, forecast, estimate, budget or prospect information relating to the Investor, any of its Affiliates or their respective businesses or (b) any oral or written information presented to the Company or its Representatives in connection with this Agreement or the Transactions.

Section 4.10   No Other Company Representations or Warranties.  Except for the representations and warranties expressly set forth in Article III (as the same may be modified by the Company Disclosure Letter and the Filed SEC Documents), the Investor hereby acknowledges it is not relying on any other representations and warranties and that neither the Company nor any of its Subsidiaries, nor any other Person, (a) has made or is making any other express or implied representation or warranty with respect to the Company or any of its Subsidiaries or their respective businesses, operations, assets, liabilities, condition (financial or otherwise) or prospects, including with respect to any information provided or made available to the Investor or any of its Representatives or any information developed by the Investor or any of its Representatives or (b) will have or be subject to any liability or indemnification obligation to the Investor resulting from the delivery, dissemination or any other distribution to the Investor or any of its Representatives, or the use by the Investor or any of its Representatives, of any information, documents, estimates, projections, forecasts or other forward-looking information, business plans or other material developed by or provided or made available to the Investor or any of its Representatives, including in due diligence materials, "data rooms" or management presentations (formal or informal), in anticipation or contemplation of any of the Transactions or

27

any other transactions or potential transactions involving the Company and the Investor. The Investor, on behalf of itself and on behalf of its Affiliates, expressly waives any such claim relating to the foregoing matters, except with respect to Fraud. The Investor hereby acknowledges (for itself and on behalf of its Affiliates and Representatives) that it has conducted, to its satisfaction, its own independent investigation of the business, operations, assets and financial condition of the Company and its Subsidiaries and, in making its determination to proceed with the Transactions, the Investor and its Affiliates and Representatives have relied on the results of their own independent investigation.

## ARTICLE V

## ADDITIONAL AGREEMENTS

Section 5.01  Negative Covenants.  Except as required by applicable Law, Judgment or to comply with any notice from a Governmental Authority, as expressly contemplated, required or permitted by this Agreement or as described in Section 5.01 of the Company Disclosure Letter, during the period from the date of this Agreement until the Initial Closing Date (or such earlier date on which this Agreement may be terminated pursuant to Section 7.01), (1) unless the Investor otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditions), the Company shall, and shall cause its Subsidiaries to, use their commercially reasonable efforts to maintain and preserve in all material respects its existing relationships with its customers, employees, independent contractors and other business relationships having material business dealings with the Company or any of its Subsidiaries and (2) unless the Investor otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), the Company shall not, and shall not permit any of its Subsidiaries to:

(a)  other than the authorization and issuance of the Series A Preferred Stock to the Investor, authorize, issue, sell or grant any Parity Stock or Senior Stock (as such terms are defined in the Certificate of Designations);

(b)  redeem, purchase or otherwise acquire any of its outstanding shares of capital stock or other equity or voting interests, or any rights, warrants or options to acquire any shares of its capital stock or other equity or voting interests (other than pursuant to the cashless exercise of Company Stock Options or the forfeiture or withholding of Taxes with respect to Company Stock Options, Company Restricted Shares, Company RSUs or Company PSUs);

(c)  establish a record date for, declare, set aside for payment or pay any dividend on, or make any other distribution in respect of, any shares of its capital stock or other equity or voting interests;

(d)  split, combine, subdivide or reclassify any shares of its capital stock or other equity or voting interests;

(e)  amend or supplement the Company Charter Documents or make any material amendments to the organizational documents of any of the Company's Subsidiaries, in each case, in a manner that would affect the Investor in an adverse manner either as a holder of Series A Preferred Stock or with respect to the rights of the Investor under this Agreement;

28

(f) increase the size of the Board; or

(g) agree or commit to do any of the foregoing.

Section 5.02 <u>Regulatory Filings</u>.

(a) The Company and the Investor shall, and shall cause their ultimate parent entities to, (i) make an appropriate filing of a Notification and Report Form pursuant to the HSR Act if a filing under the HSR Act is required for any Closing (which shall request, if legally available, the early termination of any waiting period applicable to such Closing under the HSR Act) and, which filing shall be made as promptly as reasonably practicable following any request thereof from the Investor, and (ii) supply as promptly as reasonably practicable any additional information and documentary material that may be requested pursuant to the HSR Act, and use reasonable best efforts to promptly take any and all steps necessary to avoid or eliminate each and every impediment and obtain all consents that may be required pursuant to the HSR Act. For the avoidance of doubt, from and after the date of this Agreement, the Investor may require the cooperation of the Company under this <u>Section 5.02</u> at any time, and from time to time and on multiple occasions, prior to the final Closing. The Investor and the Company shall each be responsible for the payment of one-half of all filing fees associated with any filings under the HSR Act.

(b) The Company, on the one hand, and the Investor, on the other hand, shall use reasonable best efforts to work cooperatively together to, as promptly as reasonably practicable, complete governmental processes pursuant to Section 721 in connection with the Subsequent Common Purchase.  The Company and the Investor shall: (1) as promptly as reasonably practicable, and in any event within twenty (20) Business Days from date of this Agreement, submit a draft joint voluntary notice ("<u>Draft CFIUS Notice</u>") to CFIUS and complete the consultation process contemplated by 31 C.F.R. § 800.501(g) with respect to the contemplated Subsequent Common Purchase; (2) as promptly as practicable and, in any event, within five (5) Business Days of CFIUS notification that the Draft CFIUS notification meets the requirements of 31 C.F.R. § 800.502 and is, accordingly, complete, file with CFIUS  the formal Joint Voluntary Notice as contemplated by 31 C.F.R. § 800.501(a); (3) provide CFIUS with additional or supplemental information responsive to any requests from CFIUS or its member agencies during the CFIUS process within the time frame designated by CFIUS; and (4) use their respective reasonable best efforts to, as promptly as practicable, obtain CFIUS Clearance and to prevent impediments to the consummation of the Transactions.

(c) Notwithstanding anything to the contrary set forth in this <u>Section 5.02</u> or elsewhere in this Agreement, the Investor's "reasonable best efforts" shall not require Investor to take any action, or refrain from taking any action, if doing so would, individually or in the aggregate, have a "Regulatory Material Adverse Effect".  Solely for purposes of this <u>Section 5.02(c)</u>, a "<u>Regulatory Material Adverse Effect</u>" means CFIUS mitigation terms or other actions pursuant to any Antitrust Law that require:

(i) selling or otherwise disposing of, or holding separate and agreeing to sell or otherwise dispose of, key assets or key categories of assets or businesses

4895-3943-6092.13

of the Investor or its Affiliates that are material to the Investor's or its Affiliates' investments and operations in electric vehicle manufacturing;

(ii)     terminating any existing key relationships, contractual rights or obligations of the Investor or its Affiliates that are material to the Investor's or its Affiliates' investments and operations in electric vehicle manufacturing;

(iii)     terminating any existing or contractually planned key venture or other arrangement of the Investor or its Affiliates that are material to the Investor's or its Affiliates' investments and operations in electric vehicle manufacturing; or

(iv)     restricting or adversely impacting in a material manner a key business line or business opportunity of the Investor or any of its Affiliates that is not focused on electric vehicle manufacturing.

(d)     Each of the Company and the Investor shall promptly notify the other party of any substantive communication it or any of its Affiliates receives from any Governmental Authority relating to the matters that are the subject of this Agreement and permit the other party to review in advance any proposed communication by such party to any Governmental Authority to the extent that it does not contain confidential business information, the Governmental Authority has requested or directed that the communication not be shared, or sharing of the information would waive a privilege.  Subject to the requirements of applicable Law, the Company and the Investor will provide each other with copies of all substantive correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the Transactions so long as they do not contain confidential business information or information that the Governmental Authority has requested or directed that they not be shared, or sharing of the information would waive a privilege (provided, however, that the Company and the Investor shall use reasonable efforts to provide alternative, redacted or substitute documents or information to the greatest extent possible and in a manner that would not result in the loss of the ability to assert attorney-client privilege, attorney work product protection or other legal privileges or otherwise violate the requirements of applicable Law or any Governmental Authority request or direction not to share information).  The Company and the Investor shall each be responsible for the payment of one-half of all filing fees in connection with the submission of the Draft CFIUS Notice.

(e)     The Investor agrees that it will not exercise the warrants it holds as of the date of this Agreement at any time prior to CFIUS Clearance or CFIUS Turndown.

(f)     Notwithstanding anything to the contrary contained in this Agreement or the Certificate of Designations, the Company and the Investor agree that as of and following the Initial Closing and until the CFIUS Clearance is received, neither the Investor nor any of its Affiliates shall obtain (i) control (as defined in 31 C.F.R. § 800.208) of the Company, including the power to determine, direct or decide any important matters for LMC; (ii) access to any material nonpublic technical information (as defined in 31 C.F.R. § 801.208) in the possession of the Company (which shall not include financial information about the Company), including

30

LEGAL_US_E # 166563239.19
2022TW-L-K-5967                    `1

access to any information not already in the public domain that is necessary to design, fabricate, develop, test, produce, or manufacture the Company's products, including processes, techniques, or methods, other than the information provided by the Company to the Investor or its Affiliates under the Manufacturing Supply Agreement used for the purpose of manufacturing the Company's Endurance® vehicle; (iii) membership or observer rights on the board of directors of the Company or the right to nominate an individual to a position on the board of directors of the Company; or (iv) any involvement (other than through voting of shares, subject to the other limitations set forth herein and in the Certificate of Designations) in substantive decision-making of the Company regarding the use, development, acquisition, or release of any of the Company's critical technologies (as defined in 31 C.F.R. § 801.204). To the extent that any term in this Agreement or the Certificate of Designations would grant any of the rights described in clauses (i)-(iv) of the foregoing sentence to the Investor or its Affiliates, that term shall have no effect until such time as the CFIUS Clearance is received.

Section 5.03     <u>Corporate Actions</u>.

(a)     At any time that any Series A Preferred Stock is outstanding, the Company shall:

(i)     from time to time take all lawful action within its control to cause the authorized capital stock of the Company to include a sufficient number of authorized but unissued shares of Common Stock to satisfy the conversion requirements of all shares of the Series A Preferred Stock then outstanding and all accrued and unpaid dividends thereon; and

(ii)     not effect any voluntary deregistration under the Exchange Act or any voluntary delisting of the Common Stock from Nasdaq other than in connection with a Change of Control (as defined in the Certificate of Designations) pursuant to which the Company agrees to satisfy, or will otherwise cause the satisfaction, in full of its obligations under Section 9(a) of the Certificate of Designations or is otherwise consistent with the terms set forth in Section 9(i) of the Certificate of Designations.

(b)     Prior to or upon the Initial Closing, the Company shall file with the Secretary of State of the State of Delaware the Certificate of Designations in the form attached hereto as <u>Annex I</u>.

(c)     If any occurrence since the date of this Agreement until the Initial Closing would have resulted in an adjustment to the Conversion Rate pursuant to the Certificate of Designations if the Series A Preferred Stock had been issued and outstanding since the date of this Agreement, the Company shall adjust the Conversion Rate, effective as of the Initial Closing, in the same manner as would have been required by the Certificate of Designations if the Series A Preferred Stock had been issued and outstanding since the date of this Agreement.

(d)     The Company agrees, following the Subsequent Common Closing, to consider in good faith, but will not be obligated to nominate, any recommendations made by the Investor for any non-executive nominees to the Board.

31

(e)     At any time that any Series A Preferred Stock is outstanding, the Company shall not adopt any stockholder rights agreement, "poison pill" or similar anti-takeover agreement or plan that is applicable to the Investor Parties unless the Company has excluded the Investor Parties from the definition of "acquiring person" (or such similar term) as such term is defined in such anti-takeover agreement to the extent of the Investor Parties' beneficial ownership of Series A Preferred Stock or Common Stock that had been acquired from the Company and is owned as of the date any such agreement or plan is adopted by the Company.

(f)     Prior to or upon the Initial Closing, (i) the Company and the Investor shall have: (A) amended, or caused to be amended, the MIH JV LLC Agreement to terminate all obligations of Lordstown EV Corporation and Foxconn EV Technology, Inc. thereunder, including any obligations to make capital contributions and (B) terminated or cause to be terminated the Note, Guaranty and Security Agreement, dated June 24, 2022, issued by Lordstown EV Corporation and guaranteed by the Company and Lordstown EV Sales LLC (the "Note") and (ii) the Investor shall have released or cause to be released all Liens on assets of Lordstown EV Corporation or the Company and paid Lordstown EV Corporation the sum of (x) $436,150 for services provided by Lordstown EV Corporation from May 11, 2022 through September 30, 2022 and (y) $144,291 for reimbursement of expenses. Promptly following the Initial Closing, the Company and the Investor shall take all such actions as necessary or reasonably desirable to (i) cause MIH JV to distribute all remaining funds held by it to Foxconn EV Technology, Inc. (as a distribution for amounts contributed by it and as a repayment in full of any loans advanced by it to Lordstown EV Corporation under the Note) and (ii) liquidate, wind up and dissolve the MIH JV. Despite the liquidation of the MIH JV, it is the Company's and the Investor's continued intent that the Investor and its Affiliates will utilize Lordstown Motors Corp. as their preferred North American vehicle development partner for customers and partners who are seeking full or partial vehicle product development, engineering, industrialization, and launch support capabilities, beyond contract manufacturing, in North America, subject in each case to customer and partner specific requirements and approval.

Section 5.04   Public Disclosure.  The Investor Parties and the Company shall, and shall cause their Affiliates to, consult with each other before issuing, and give each other the opportunity to review and comment upon, any press release or other public statements with respect to the Transaction Documents or the Transactions, and shall not, and shall cause their Affiliates not to, issue any such press release or make any such public statement prior to such consultation, except as may be required by applicable Law, Judgment, court process or the rules and regulations of any national securities exchange or national securities quotation system. Notwithstanding the forgoing, this Section 5.04 shall not apply to any press release or other public statement made by the Company or the Investor Parties (a) which does not contain any information relating to the Transactions that has not been previously announced or made public in accordance with the terms of this Agreement or (b) is made in the ordinary course of business and does not relate specifically to the signing of the Transaction Documents or the Transactions. Notwithstanding anything to the contrary in this Agreement, in no event shall this Section 5.04 limit disclosure by any Investor Party and their respective Affiliates of ordinary course communications regarding this Agreement and the Transactions to its existing or prospective equityholders, members, managers and investors of any Affiliates of such Person.

4895-3943-6092.13

Section 5.05   Confidentiality.  The Investor Parties will, and will direct their Affiliates and Representatives who actually receive Confidential Information to, keep confidential any information (including oral, written and electronic information) concerning the Company, its Subsidiaries or its Affiliates that may be furnished to any Investor Party, its Affiliates or its or their respective Representatives by or on behalf of the Company or any of its Representatives pursuant to this Agreement, including any such information provided pursuant to Section 5.17 of this Agreement ("Confidential Information") and to use the Confidential Information solely for the purposes of monitoring, administering or managing the Investor Parties' investment in the Company made pursuant to this Agreement; provided that Confidential Information will not include information that (a) was or becomes available to the public other than as a result of a breach of any confidentiality obligation in this Agreement by any Investor Party or its Affiliates or their respective Representatives, (b) was or becomes available to any Investor Party or its Affiliates or their respective Representatives from a source other than the Company or its Representatives; provided that such source is reasonably believed by such Investor Party or its Affiliates not to be subject to an obligation of confidentiality (whether by agreement or otherwise), (c) at the time of disclosure is already in the possession of an Investor Party or its Affiliates or their respective Representatives or (d) was independently developed by any Investor Party or its Affiliates or their respective Representatives without reference to, incorporation of, or other use of any Confidential Information; provided that an Investor Party may disclose Confidential Information (i) to its attorneys, accountants, consultants and financial and other professional advisors to the extent necessary to obtain their services in connection with its investment in the Company, (ii) to any prospective purchaser of Acquired Shares from such Investor Party, as long as such prospective purchaser agrees to be bound by similar confidentiality or non-disclosure terms as are contained in this Agreement (with the Company as an express third party beneficiary of such agreement), (iii) to any Affiliate of such Investor Parties and their Affiliates and their respective directors, officers, employees, consultants and representatives, in each case in the ordinary course of business (provided that the recipients of such confidential information are directed to abide by the confidentiality and non-disclosure obligations contained herein), (iv) as may be reasonably determined by such Investor Party to be necessary in connection with such Investor Party's enforcement of its rights in connection with this Agreement or its investment in the Company, or (v) as may otherwise be required by Law or legal, judicial or regulatory process; and provided, further, that (x) any breach of the confidentiality and use terms herein by any Person to whom such Investor Party may disclose confidential information pursuant to clauses (i) and (iii) of the preceding proviso shall be attributable to such Investor Party for purposes of determining such Investor Party's compliance with this Section 5.05, except those who have entered into a separate confidentiality or non-disclosure agreement or obligation with the Company and (y) that such Investor Party takes commercially reasonable steps (at the Company's sole expense) to minimize the extent of any required disclosure described in clause (v) of the preceding proviso.

Section 5.06   Nasdaq Listing of Shares.  To the extent the Company has not done so prior to the date of this Agreement, the Company shall promptly submit a Listing of Additional Shares Notification Form to Nasdaq with respect to the shares of Common Stock issued to the Investor pursuant to this Agreement and the shares of Common Stock issuable upon the conversion of the Series A Preferred Stock issued to the Investor pursuant to this Agreement and pursuant to the Certificate of Designations.  From time to time following the Initial Closing Date,

33

LEGAL_US_E # 166563239.19
2022TW-L-K-5967                    `1

as necessary, the Company shall submit additional Listing of Additional Shares Notification Forms to Nasdaq in order to cover the full number of shares of Common Stock issuable upon conversion of the then outstanding shares of Series A Preferred Stock.

Section 5.07    Standstill.  The Investor agrees that until the date that is the later of (i) December 31, 2024 and (ii) 90 days after the first day on which no Investor Designee serves on the Board and the Investor has no rights (or has irrevocably waived its right) under Section 5.09 (except for Section 5.09(f)), without the prior written approval of the Board, the Investor will not, directly or indirectly, and will cause its Affiliates and its and their respective principals, directors, officers, employees and agents and other Representatives acting on its behalf, acting alone or in concert with others, not to:

(a)    acquire, offer or seek to acquire, agree to acquire or make a proposal to acquire, by purchase or otherwise, any equity securities or direct or indirect rights to acquire any equity securities of the Company, any securities convertible into or exchangeable for any such equity securities, any options or other derivative securities or contracts or instruments in any way related to the price of shares of Common Stock (solely to the extent that, after giving effect to such acquisition, the Investor Parties and their Affiliates would beneficially own, in the aggregate (A) prior to Subsequent Common Closing, an amount greater than nine and ninety-nine-one-hundredths percent (9.99%) of the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of the Company; (B) prior to the Requisite Stockholder Approval (as defined in the Certificate of Designations) being obtained, an amount greater than nineteen and ninety-nine-one-hundredths percent (19.99%) of the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of the Company; and (C) at all times following the Subsequent Common Closing and the Requisite Stockholder Approval being obtained, an amount greater than twenty-four percent (24)% of the capital stock of the Company that is entitled to vote generally in any election of directors of the board of directors of the Company (which calculation shall, in each case, include the notional or other number of shares of Common Stock specified in the documentation for any Contract to which any of the Investor Parties are party which is designed to produce economic benefits and risks to any of the Investor Parties that correspond substantially to the ownership by the Investor Parties of shares of Common Stock, except in the case of any such Contract which is settled only in cash));

(b)    make any public announcement with respect to, or offer, seek, propose or indicate an interest in (in each case with or without conditions), any merger, consolidation, business combination, tender or exchange offer, recapitalization, reorganization or purchase of more than 50% of the assets, properties or securities of the Company or any Subsidiary of the Company, or any other extraordinary transaction involving the Company or any Subsidiary of the Company or any of their respective securities, or enter into any discussions, negotiations, arrangements, understandings or agreements (whether written or oral) with any other Person regarding any of the foregoing;

(c)    make any proposal or statement of inquiry or disclose any intention, plan or arrangement inconsistent with any of the foregoing;

4895-3943-6092.13

2022TW-L-K-5967                        `1

(d) advise, assist, knowingly encourage or direct any Person to do, or to advise, assist, knowingly encourage or direct any other Person to do, any of the foregoing;

(e) take any action that would, in effect, require the Company to make a public announcement regarding the possibility of a transaction or any of the events described in this Section 5.07(a);

(f) enter into any agreements, arrangements or understandings with any third party (including security holders of the Company, but excluding, for the avoidance of doubt, any Investor Party) with respect to any of the foregoing, including, forming, joining or in any way participating in a "group" (as defined in Section 13(d)(3) of the Exchange Act) with any third party in connection with any of the foregoing.

(g) make or in any way encourage or participate in any "solicitation" of "proxies" (whether or not relating to the election or removal of directors), as such terms are used in the rules of the SEC, to vote, or knowingly seek to advise or influence any Person with respect to voting of, any voting securities of the Company or any of its Subsidiaries, or call or seek to call a meeting of the Company's stockholders or initiate any stockholder proposal for action by the Company's stockholders, or seek election to or to place a representative on the Board or seek the removal of any director from the Board;

(h) request the Company or any of its Representatives, directly or indirectly, to amend or waive any provision of this Section 5.07, provided that this clause shall not prohibit the Investor Parties from making a confidential request to the Company seeking an amendment or waiver of the provisions of this Section 5.07, which the Company may accept or reject in its sole discretion, so long as any such request is made in a manner that does not require public disclosure thereof by any Person;

(i) contest the validity of this Section 5.07 or make, initiate, take or participate in any demand, Action (legal or otherwise) or proposal to amend, waive or terminate any provision of this Section 5.07; or

(j) enter into a voting trust, voting agreement or similar voting arrangement with respect to any shares of Common Stock or Series A Preferred Stock (in each case, other than in accordance with Section 5.10).

provided, however, that nothing in this Section 5.07 will limit (1) the Investor Parties' ability to vote (subject to Section 5.10), transfer or convert (subject to Section 6 (Right of the Holders to Convert) of the Certificate of Designations) any Series A Preferred Stock or Common Stock, privately make and submit to the Board any proposal that is intended by such Investor Party to be made and submitted on a non-publicly disclosed or announced basis (and would not reasonably be expect to require public disclosure by any Person), participate in rights offerings made by the Company to all holders of its Common Stock, receive any dividends or similar distributions with respect to any securities of the Company held by such Investor Party, tender shares of Common Stock or Series A Preferred Stock into any tender or exchange offer, effect an adjustment to the Conversion Rate pursuant to of the Certificate of Designations) or otherwise exercise rights under its Common Stock or Series A Preferred Stock or (2) the ability of any

35

LEGAL_US_E # 166563239.19

2022TW-L-K-5967 `1

Investor Director to act in his or her capacity as a member of the Board including, but not limited to, his or her ability to vote or otherwise exercise his or her fiduciary duties.

Section 5.08    Legend.

(a)    All certificates or other instruments representing the Common Stock, the Series A Preferred Stock or Common Stock issued upon conversion of the Series A Preferred Stock will bear a legend substantially to the following effect:

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

THE SECURITIES REPRESENTED BY THIS INSTRUMENT ARE SUBJECT TO OWNERSHIP AND OTHER RESTRICTIONS SET FORTH IN THE INVESTMENT AGREEMENT, DATED NOVEMBER 7, 2022, BY AND BETWEEN LORDSTOWN MOTORS CORP. AND THE INVESTOR PARTY THERETO, AS MAY BE AMENDED FROM TIME TO TIME, COPIES OF WHICH ARE ON FILE WITH AND AVAILABLE FROM THE SECRETARY OF THE ISSUER, WITHOUT COST.

(b)    Upon request of the applicable Investor Party, upon receipt by the Company of an opinion of counsel reasonably satisfactory to the Company to the effect that such legend is no longer required under the Securities Act and applicable state securities laws, the Company shall promptly cause the first paragraph of the legend to be removed from any certificate for Series A Preferred Stock or Common Stock.

Section 5.09    Election of Directors.

(a)    At or prior the Subsequent Common Closing, the Board shall have taken all action necessary to cause two (2) Investor Designees to be appointed as members of the Board, effective as of the Subsequent Common Closing provided the Investor shall have designated such Investor Designees at least ten (10) Business Days prior to the Subsequent Common Closing.  If the Investor's designation of such Investor Designees occurs less than ten (10) Business Days prior to the Subsequent Common Closing, then the Board shall take all action necessary to cause such two (2) Investor Designees to be appointed as members of the Board, as promptly as reasonably practicable following the Subsequent Common Closing (but in no event later than ten (10) Business Days thereafter).

(b)    Upon the occurrence of the First Investor Board Seat Fall-Away, at the written request of the Board, one of the Investor Directors shall immediately resign, and the Investor Parties shall cause one of the Investor Directors immediately to resign, from the Board effective as of the date of the First Investor Board Seat Fall-Away.  Upon the occurrence of the Second Investor Board Seat Fall-Away, at the written request of the Board, the remaining

36

Investor Directors shall immediately resign, and the Investor Parties shall cause such Investor Directors immediately to resign, from the Board effective as of the date of the Second Investor Board Seat Fall-Away, and the Investor Parties shall no longer have any rights under this Section 5.09, including, for the avoidance of doubt, any designation and/or nomination rights under Section 5.09(c).

(c)     Following the Subsequent Common Closing and until the occurrence of Second Investor Board Seat Fall-Away, at any annual meeting of the Company's stockholders at which the term of an Investor Director shall expire, the Investor shall have the right to designate an Investor Designee for each Investor Director whose term is expiring at such annual meeting for election to the Board at such annual meeting.  The Company shall include the Investor Designees designated by the Investor in accordance with this Section 5.09(c) in the Company's slate of nominees for the applicable annual meeting of the Company's stockholders and shall recommend that the Company's stockholders vote in favor of such Investor Designees and shall support the Investor Designees in a manner no less rigorous and favorable than the manner in which the Company supports its other nominees in the aggregate.  Without the prior written consent of the Investor, so long as the Investor is entitled to designate an Investor Designee for election to the Board in accordance with this Section 5.09, the Board shall not remove any Investor Director from his or her directorship (except for "cause" within the meaning of Section 141 of the DGCL, as required by Law, the Certificate of Designations or the Company Charter Documents).

(d)     In the event of the death, disability, resignation or removal of any Investor Director as a member of the Board (in each case other than resignation pursuant to Section 5.09(b)), the Investor may designate an Investor Designee to replace such Investor Director, as applicable, and, subject to Section 5.09(e), the Company shall cause such Investor Designee to fill such resulting vacancy.

(e)     The Company's obligations to have any Investor Designee elected to the Board or nominate any Investor Designee for election as a director at any meeting of the Company's stockholders pursuant to this Section 5.09, as applicable, shall in each case be subject to such Investor Designee's satisfaction of all requirements regarding service as a director of the Company under applicable Law and stock exchange rules regarding service as a director of the Company and all other criteria and qualifications for service as a director applicable to all directors of the Company.  The Investor Parties will cause each Investor Designee to make himself or herself reasonably available for interviews and to consent to such reference and background checks or other investigations as the Board may reasonably request to determine the Investor's nominee's eligibility and qualification to serve as a director of the Company.  No Investor Designee shall be eligible to serve on the Board if he or she has been involved in any of the events enumerated under Item 2(d) or (2) of Schedule 13D under the Exchange Act or Item 401(f) of Regulation S-K under the Securities Act or is subject to any Judgment prohibiting service as a director of any public company.  As a condition to any Investor Designee's election to the Board or nomination for election as a director of the Company at any meeting of the Company's stockholders, the Investor Parties and the Investor Designee must provide to the Company:

(i)      all information requested by the Company that is required to be or is customarily disclosed for directors, candidates for directors and their respective Affiliates and Representatives in a proxy statement or other filings in accordance with applicable Law, any stock exchange rules or listing standards or the Company Charter Documents or corporate governance guidelines, in each case, relating to such Investor Designee's election as a director of the Company or the Company's operations in the ordinary course of business;

(ii)      all information requested by the Company in connection with assessing eligibility and other criteria applicable to directors or satisfying compliance and legal or regulatory obligations, in each case, relating to such Investor Designee's nomination or election, as applicable, as a director of the Company or the Company's operations in the ordinary course of business;

(iii)      an undertaking in writing by such Investor Designee:

(A)      to be subject to, bound by and duly comply with the code of conduct in the form agreed upon by the other directors of the Company; provided that no such code of conduct shall restrict any transfer of securities by the Investor Parties or their Affiliates (other than with respect to the Investor Director solely in his or her individual capacity), impose confidentiality obligations on the Investor Director other than those specified in Section 5.05 or as mandatorily applicable under applicable Law, or impose any share ownership requirement for the Investor Director; and

(B)      to recuse himself or herself from any deliberations or discussion of the Board or any committee thereof (i) regarding any Transaction Document, the Transactions or any other transactions with or the Investor or any of its Affiliates.

(f)      The Company shall indemnify each Investor Director and provide each Investor Director with director and officer insurance to the same extent as it indemnifies and provides such insurance to other members of the Board, pursuant to the Company Charter Documents, the DGCL or otherwise.  The Company acknowledges and agrees that it (1) is the indemnitor of first resort (i.e., its obligations to each Investor Director are primary and any obligation of the Investor Parties or their Affiliates to advance expenses or to provide indemnification for the same expenses or liabilities incurred by any Investor Director are secondary), (2) shall be required to advance the amount of expenses incurred by any Investor Director and shall be liable for the amount of all expenses and liabilities incurred by such Investor Director, in each case to the same extent as it indemnifies and provides such insurance to other members of the Board, pursuant to the Company Charter Documents, the DGCL or otherwise, without regard to any rights such Investor Director may have against any Investor Parties or their Affiliates and (3) to the extent permitted by Law, it irrevocably waives, relinquishes and releases the Investor and its Affiliates  from any and all claims against them for contribution, subrogation or any other recovery of any kind in respect thereof.  The Company

38

further agrees that no advancement or payment by the Investor any of its Affiliates on behalf of the Company with respect to any claim for which any Investor Director have sought indemnification from the Company shall affect the foregoing and the Investor and its Affiliates shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of any Investor Director against the Company. These rights shall be a contract right.

(g) Prior to the Second Investor Board Seat Fall-Away, the Company shall not decrease the size of the Board without the consent of the Investor if such decrease would require the resignation of any Investor Designee.

(h) No Investor Director who is an employee of the Investor or any of its Affiliates shall be entitled to any compensation from the Company for his or her position on the Board (other than reimbursement of expenses pursuant to the Company's reimbursement policies for non-executive directors).

(i) The Investor Directors shall be permitted to share information received in his or her capacity as such with the Investor Parties so long as the Investor remain subject to the confidentiality provisions of this Agreement as provided in Section 5.05.

(j) The Investor Parties and the Company hereby agree, notwithstanding anything to the contrary in any other agreement or at Law or in equity, that, to the maximum extent permitted by Law, when the Investor Parties take any action under this Agreement to give or withhold their consent, the Investor Parties shall have no duty (fiduciary or other) to consider the interests of the Company or the other stockholders of the Company and may act exclusively in their own interest; provided, however, that the foregoing shall in no way affect the obligations of the parties hereto to comply with the provisions of this Agreement. For the avoidance of doubt, the foregoing sentence shall not limit or otherwise affect the fiduciary duties of the Investor Directors.

Section 5.10   Voting.  The Investor agrees that until the date that is the later of (i) December 31, 2024 and (ii) 90 days after the first day on which no Investor Designee serves on the Board and the Investor has no rights (or has irrevocably waived its right) under Section 5.09 (except for Section 5.09(f)):

(a) at each meeting of the stockholders of the Company and at every postponement or adjournment thereof, the Investor shall, and shall cause the Investor Parties to, take such action as may be required so that all of the shares of Series A Preferred Stock or Common Stock beneficially owned, directly or indirectly, by the Investor Parties and entitled to vote are voted in favor of (i) each director nominated and recommended by the Board (or a duly authorized committee thereof) for election at any such meeting, (ii) against any stockholder nominations for directors that are not approved and recommended by the Board (or a duly authorized committee thereof) for election at any such meeting, (iii) against any proposals or resolutions to remove any member of the Board and (iv) in accordance with recommendations by the Board on all other proposals or business that may be the subject of stockholder action at such meetings or written consents; provided, however, that the Investor and its Affiliates shall be permitted to vote in their sole discretion on any proposal directly related to any merger or other

39

business combination transaction involving the Company, the sale of all or substantially all of the assets of the Company and its Subsidiaries or any other change of control transaction involving the Company; and

(b)     the Investor shall, and shall (to the extent necessary to comply with this Section 5.10) cause the Investor Parties to, be present, in person or by proxy, at all meetings of the stockholders of the Company so that all shares of Series A Preferred Stock or Common Stock beneficially owned by the Investor or the Investor Parties may be counted for the purposes of determining the presence of a quorum and voted in accordance with Section 5.10(a) at such meetings (including at any adjournments or postponements thereof).

Section 5.11     Tax Matters.

(a)     The Company and any applicable withholding agent shall be entitled to deduct and withhold from any amounts otherwise payable with respect to the Series A Preferred Stock or Common Stock or other securities issued upon conversion of the Series A Preferred Stock to the extent required by applicable Law.  If the Company or any applicable withholding agent determines that any deduction or withholding is required in respect of a payment pursuant to this Agreement and the transactions contemplated herein, the Company shall use its commercially reasonable efforts to provide notice to the Investor Parties at least five (5) Business Days prior to the date on which such payment is to be made, with a written explanation substantiating the requirement to withhold, and shall cooperate with the Investor Parties to reduce or eliminate such deduction or withholding to the extent allowed by applicable Law.  Any amounts that are so withheld shall be timely paid over to the appropriate Tax authority and shall be treated for all purposes of the applicable Transaction Documents and Company Charter Documents as having been paid to the Person in respect of which such deduction and withholding was made.  Promptly following the date of this Agreement or, in the case of a transferee, the date such transferee first acquires any Series A Preferred Stock or Common Stock issued upon conversion of the Series A Preferred Stock, each Investor Party shall deliver to the Company or its paying agent a duly executed, accurate and properly completed Internal Revenue Service ("IRS") Form W-9 or an appropriate IRS Form W-8, as applicable. If the information on any such form provided by such Investor Party changes, or upon the Company's reasonable request, such Investor Party shall provide the Company with an updated version of such form.

(b)     Absent a change in law or a contrary "determination" (as defined in Section 1313(a) of the Code), the Investor Parties and the Company agree (i) not to treat the Series A Preferred Stock as "preferred stock" within the meaning of Section 305 of the Code and Treasury Regulation Section 1.305-5 for United States federal income Tax and withholding Tax purposes, and shall not take a position inconsistent with such treatment and (ii) to not take a reporting position that the holders of Series A Preferred Stock are required to include as dividend income any amounts in respect of the Series A Preferred Stock unless and until dividends on the Series A Preferred Stock are paid in cash or other property, in each case, for United States federal income Tax and withholding Tax purposes.

(c)     The Company shall pay any and all United States documentary, stamp and similar issue or transfer Tax due on (x) the issue of the Series A Preferred Stock and (y) the issue

40

LEGAL_US_E # 166563239.19
2022TW-L-K-5967                    `1

of shares of Common Stock upon conversion of the Series A Preferred Stock.  However, in the case of conversion of Series A Preferred Stock, the Company shall not be required to pay any Tax or duty that may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock or Series A Preferred Stock in a name other than that of the holder of the shares to be converted, and no such issue or delivery shall be made unless and until the person requesting such issue has paid to the Company the amount of any such Tax or duty, or has established to the satisfaction of the Company that such Tax or duty has been paid.

Section 5.12   <u>Use of Proceeds</u>.  The Company shall use the proceeds from the issuance and sale of the Series A Preferred Stock hereunder solely as follows: (i) prior to the time that the EV Program Agreement has been executed and delivered by the prospective parties thereto, to fund expenditures in respect of pre-development activities and related overhead and support in connection with the Company carrying out the services described in the draft Product Development and Engineering Services Agreement delivered to the Investor prior to the date of this Agreement,  but only to the extent such expenditures are not directly paid by the counterparty in accordance the terms thereof  and (ii) following execution and delivery of the EV Program Agreement by the prospective parties thereto, to fund the design, development and production of the covered program in accordance with the terms and conditions set forth in the EV Program Agreement.  Until the Product Development and Engineering Services Agreement has been entered into or if the EV Program is abandoned, the Company may use the proceeds from the issuance and sale of the Series A Preferred Stock hereunder to fund expenditures contemplated to be expended in connection with the EV Program (including those contemplated by the draft Product Development and Engineering Services Agreement delivered to the Investor prior to the date of this Agreement) or any substitute or replacement electric vehicle program as agreed to by the Investor and the Company. The Company shall use the proceeds from the issuance and sale of the Common Stock hereunder for general corporate purposes as determined by the Board (which Board determination for the proceeds from the Subsequent Common Closing shall be made following the appointment of the Investor Designees to the Board).

Section 5.13   <u>Participation Rights</u>.

(a)      For the purposes of this <u>Section 5.13</u>, "<u>Excluded Issuance</u>" shall mean (i) the issuance of any shares of equity securities that is subject to Section 10 (Anti-Dilution Adjustments) of the Certificate of Designations, (ii) the issuance of shares of any equity securities (including upon exercise of options) to directors, officers, employees, consultants or other agents of the Company as approved by the Board, (iii) the issuance of shares of any equity securities pursuant to an employee stock option plan, management incentive plan, restricted stock plan, stock purchase plan or stock, ownership plan or similar benefit plan, program or agreement, (iv) the issuance of shares of equity securities as consideration in any "business combination" (as defined in the rules and regulations promulgated by the SEC) or as consideration in bona fide acquisitions of securities or substantially all of the assets of another Person, business unit, division or business, (v) securities issued pursuant to the conversion, exercise or exchange of Series A Preferred Stock issued to the Investor, (vi) shares of a Subsidiary of the Company issued to the Company or a wholly owned Subsidiary of the Company, (vii) securities of a joint venture (<u>provided</u> that no Affiliate (other than any Subsidiary of the Company) of the Company acquires any interest in such securities in connection with such

41

4895-3943-6092.13

issuance) or (viii) the issuance of bonds, debentures, notes or similar debt securities convertible into Common Stock into the public market pursuant to a bona-fide broadly distributed public offering or a private placement under Rule 144A, if the conversion or exercise price is at least the greater of (x) the then applicable Conversion Price (as defined in the Certificate of Designations) and (y) the Current Market Price (as defined in the Certificate of Designations) as of the date the Company would have been required to give the Investor notice of such issuance if it were not an Excluded Issuance.

(b)     From and after the Subsequent Common Closing Date and until the occurrence of the Second Investor Board Seat Fall-Away, if the Company proposes to issue equity securities of any kind (the term "equity securities" shall include for these purposes Common Stock and any warrants, options or other rights to acquire, or any securities that are exercisable for, exchangeable for or convertible into, Common Stock or any other class of capital stock of the Company), other than in an Excluded Issuance, then the Company shall:

(i)     give written notice to the Investor (no less than five (5) Business Days prior to the closing of such issuance (or, in the case of a registered public offering, at least two (2) Business Days prior to the commencement of such registered public offering) or, if the Company reasonably expects such issuance to be completed in less than five (5) Business Days, such shorter period, which shall be as long as commercially practicable setting forth in reasonable detail (A) the designation and all of the terms and provisions of the securities proposed to be issued (the "Proposed Securities"), including, to the extent applicable, the voting powers, preferences and relative participating, optional or other special rights, and the qualification, limitations or restrictions thereof and interest rate and maturity; (B) the price and other terms of the proposed sale of such securities; and (C) the amount of such securities proposed to be issued; and

(ii)     offer to issue and sell to the Investor Parties, on such terms as the Proposed Securities are issued and upon full payment by the Investor Parties, a portion of the Proposed Securities equal to a percentage determined by dividing (A) the number of shares of Common Stock the Investor Parties beneficially own (on an as-converted basis) by (B) the total number of shares of Common Stock then outstanding (on an as-converted basis); provided, however, that the Company shall not be required to offer or sell to the Investor Parties (or to any of them) a number of the Proposed Securities that would require the Company to obtain stockholder approval either in respect of the issuance of any Proposed Securities or in connection with any securities issued pursuant to this Agreement under the listing rules of the Nasdaq or any other securities exchange or any other applicable Law.

(c)     The Investor will have the option, on behalf of the applicable Investor Parties, exercisable by written notice to the Company, to accept the Company's offer and irrevocably commit to purchase any or all of the equity securities offered to be sold by the Company to the Investor Parties, which notice must be given within five (5) days after receipt of such notice from the Company (or such shorter period if the notice by the Company was sent in

42

LEGAL_US_E # 166563239.19
2022TW-L-K-5967                    `1

accordance with the preceding paragraph less than five (5) Business Days prior to the proposed issuance date, and in no event less than one (1) Business Day) (the failure of the Investor to respond within such time period shall be deemed a waiver of the Investor Parties' rights under this <u>Section 5.13</u> with respect to the applicable issuance of equity securities).  If the Company offers two (2) or more securities in units to the other participants in the offering, the Investor Parties must purchase such units as a whole and will not be given the opportunity to purchase only one (1) of the securities making up such unit.  The closing of the exercise of such subscription right shall take place simultaneously with the closing of the sale of the Proposed Securities giving rise to such subscription right; <u>provided</u>, <u>however</u>, that (x) if such closing is prior to the tenth (10th) Business Day following the date on which the Investor has notified the Company that the Investor Parties have elected to exercise their subscription right, then each Investor Party shall purchase the new equity securities within ten (10) Business Days following delivery of notice of exercise by the Investor and (y) the closing of any purchase by any such Investor Party may be extended beyond the closing of the sale of the Proposed Securities giving rise to such preemptive right to the extent necessary to obtain required approvals from any Governmental Authority.  Upon the expiration of the offering period described above, the Company will be free to sell such Proposed Securities that the Investor Parties have not elected to purchase during the ninety (90) days following such expiration on terms and conditions no more favorable to the purchasers thereof than those offered to the Investor Parties in the notice delivered in accordance with <u>Section 5.13(b)</u>.  Any Proposed Securities offered or sold by the Company after such ninety (90)-day period must be reoffered to issue or sell to the Investor Parties pursuant to this <u>Section 5.13</u>; <u>provided</u>, <u>however</u>, that the Company shall not be required to reoffer to the Investor Parties (or to any of them) a number of the Proposed Securities that would require the Company to obtain stockholder approval in respect of the issuance of any Proposed Securities under the listing rules of the Nasdaq or any other securities exchange or any applicable Law.

(d)      The election by any Investor Party not to exercise its subscription rights under this <u>Section 5.13</u> in any one instance shall not affect their right as to any subsequent proposed issuance.

(e)      Notwithstanding anything in this <u>Section 5.13</u> to the contrary, the Company will not be deemed to have breached this <u>Section 5.13</u> if not later than thirty (30) Business Days following the issuance of any Proposed Securities in contravention of this <u>Section 5.13</u>, the Company or the transferee of such Proposed Securities offers to sell a portion of such equity securities or additional equity securities of the type(s) in question to each Investor Party so that, taking into account such previously-issued Proposed Securities and any such additional Proposed Securities, each Investor Party will have had the right to purchase or subscribe for Proposed Securities in a manner consistent with the allocation and other terms and upon same economic and other terms provided for in <u>Section 5.13(b)</u> and <u>Section 5.13(c)</u>.

(f)      In the case of an issuance subject to this <u>Section 5.13</u> for consideration in whole or in part other than cash, including securities acquired in exchange therefor (other than securities by their terms so exchangeable), the consideration other than cash shall be deemed to be the fair value thereof as determined in good faith by the Board.

<div align="center">43</div>

(g)     In the event any Proposed Securities are issued by the Company following the date of this Agreement but prior to the Subsequent Common Closing Date (the "Prior Issuance"), within thirty (30) Business Days after the Subsequent Common Closing Date, the Company shall offer to sell such Proposed Securities to each Investor Party so that, taking into account the Proposed Securities in the Prior Issuance and such Proposed Securities, each Investor Party will have had the right to purchase or subscribe for Proposed Securities in a manner consistent with the allocation and other terms (including the limitations therein) and upon same economic and other terms (including the limitations therein) provided for in Section 5.13(b) and Section 5.13(c) as if the Prior Issuance occurred on or after the Subsequent Common Closing Date.

(h)     In the event that the Investor Parties are not entitled to acquire any Proposed Securities pursuant to this Section 5.13 because such issuance would require the Company to obtain stockholder approval in respect of the issuance of such Proposed Securities under the listing rules of the Nasdaq or any other securities exchange or applicable Law, the Company shall, upon the Investor's reasonable request delivered to the Company in writing within seven (7) Business Days following its receipt of the written notice of such issuance to the Investor pursuant to Section 5.13(b), at the Investor's election, (i) consider and discuss in good faith modifications proposed by the Investor Parties to the terms and conditions of such portion of the Proposed Securities that would otherwise be issued to the Investor Parties such that the Company would not be required to obtain stockholder approval in respect of the issuance of such Proposed Securities as so modified, and/or (ii) solely to the extent that stockholder approval is required in connection with the issuance of Proposed Securities to Persons other than the Investor Parties and the Company elects to seek such stockholder approval in connection with such issuance to Persons other than the Investor Parties, use reasonable best efforts to seek stockholder approval in respect of the issuance of any Proposed Securities to the Investor Parties.

Section 5.14     Additional Rights.  If between the date of this Agreement and the Subsequent Common Closing the Company issues shares of Common Stock (including any warrants, options or other rights to acquire, or any securities that are exercisable for, exchangeable for or convertible into, Common Stock), other than in an Excluded Issuance, then the Company shall, as promptly as practicable after the Subsequent Common Closing, provide the Investor the participation rights in Section 5.13 as if such issuance occurred after the Subsequent Common Closing Date.

Section 5.15     Available Registration Statement.  The Company will not effect a Mandatory Conversion (as defined in the Certificate of Designations) if any Investor Party holds or would hold upon such Mandatory Conversion (or any earlier conversion following the dates of the Notice of Mandatory Conversion (as defined in the Certificate of Designations)) shares of Common Stock that are Registrable Securities unless as of the date of Notice of Mandatory Conversion and as of the Mandatory Conversion Date (as defined in the Certificate of Designations) there is either an Available Registration Statement covering resale of such shares of Common Stock by the Investor Parties or such shares may be freely sold immediately upon receipt without volume or manner of sale restrictions pursuant to Rule 144 under the Securities Act.

44

4895-3943-6092.13

Section 5.16    Section 16 Matters.  If the Company becomes a party to a consolidation, merger or other similar transaction, or if the Company proposes to take or omit to take any other action under Section 5.13 (including granting to the Investor Parties or their respective Affiliates the right to participate in any issuance of securities) or otherwise or if there is any event or circumstance that may result in the Investor Parties, their respective Affiliates and/or any Investor Director being deemed to have made a disposition or acquisition of equity securities of the Company or derivatives thereof for purposes of Section 16 of the Exchange Act (including the purchase by the Investor Parties of any securities under Section 5.13), and if any Investor Director is serving on the Board at such time or has served on the Board during the preceding six (6) months (i) the Board or a committee thereof composed solely of two or more "non-employee directors" as defined in Rule 16b-3 of the Exchange Act will pre-approve such acquisition or disposition of equity securities of the Company or derivatives thereof for the express purpose of exempting the Investor Parties', their respective Affiliates' and such Investor Director's interests (for the Investor and/or their respective Affiliates, to the extent such persons may be deemed to be "directors by deputization") in such transaction from Section 16(b) of the Exchange Act pursuant to Rule 16b-3 thereunder and (ii) if the transaction involves (A) a merger or consolidation to which the Company is a party and the Common Stock is, in whole or in part, converted into or exchanged for equity securities of a different issuer, (B) a potential acquisition or deemed acquisition, or disposition or deemed disposition, by the Investor Parties, the Investor's Affiliates, and/or any Investor Director of equity securities of such other issuer or derivatives thereof and (C) an Affiliate or other designee of the Investor Parties or their Affiliates will serve on the board of directors (or its equivalent) of such other issuer pursuant to the terms of an agreement to which the Company is a party (or if the Investor Parties notify the Company of such service a reasonable time in advance of the closing of such transactions), then if the Company requires that the other issuer pre-approve any acquisition of equity securities or derivatives thereof for the express purpose of exempting the interests of any director or officer of the Company or any of its subsidiaries in such transactions from Section 16(b) of the Exchange Act pursuant to Rule 16b-3 thereunder, the Company shall require that such other issuer pre-approve any such acquisitions of equity securities or derivatives thereof for the express purpose of exempting the interests of the Investor Parties', their respective Affiliates' and any Investor Director (for the Investor Parties and/or their respective Affiliates, to the extent such persons may be deemed to be "directors by deputization" of such other issuer) in such transactions from Section 16(b) of the Exchange Act pursuant to Rule 16b-3 thereunder.

Section 5.17    Information Rights.  Following the Initial Closing and so long as the 25% Beneficial Ownership Requirement is satisfied, in order to facilitate (i) the Investor Parties' compliance with legal and regulatory requirements applicable to the beneficial ownership by the Investor Parties and its Affiliates of equity securities of the Company and (ii) the Investor Representative's oversight of the Investor Parties' investment in the Company, the Company agrees to provide each of the Investor Parties with the following:

(a)    within 90 days after the end of each fiscal year of the Company, (A) an audited, consolidated balance sheet of the Company and its Subsidiaries as of the end of such fiscal year, (B) an audited, consolidated income statement of the Company and its Subsidiaries for such fiscal year and (C) an audited, consolidated statement of cash flows of the Company and its Subsidiaries for such fiscal year; provided that this requirement shall be deemed to have been

45

LEGAL_US_E # 166563239.19

2022TW-L-K-5967          `1

satisfied if and when the Company files its annual report on Form 10-K for the applicable fiscal year with the SEC within the required time period therefor;

(b)     within 45 days after the end of each of the first three quarters of each fiscal year of the Company, (A) an unaudited, consolidated balance sheet of the Company and its Subsidiaries as of the end of such fiscal quarter, (B) an unaudited, consolidated income statement of the Company and its Subsidiaries for such fiscal quarter and (C) an unaudited, consolidated statement of cash flows of the Company and its Subsidiaries for such fiscal quarter; <u>provided</u> that this requirement shall be deemed to have been satisfied if and when the Company files its quarterly report on Form 10-Q for the applicable fiscal quarter with the SEC within the required time period therefor; and

(c)     reasonable access, to the extent reasonably requested by the Investor Parties, to the offices and the properties of the Company and its Subsidiaries, including its and their books and records, and to discuss its and their affairs and finances and matters relating to capital structure and financing, all upon reasonable notice and at such reasonable times and as often as the Investor Parties may reasonably request; <u>provided</u> that any investigation pursuant to this <u>Section 5.17</u> shall be conducted at the sole cost and expense of the Investor Parties and in a manner as not to interfere unreasonably with the conduct of the business of the Company and its Subsidiaries;

<u>provided</u> that the Company shall not be obligated to provide such access or materials if the Company determines, in its reasonable judgment, that doing so would reasonably be expected to (i) result in the disclosure of trade secrets or competitively sensitive information to third parties, (ii) violate applicable Law, an applicable Judgment or a Contract or obligation of confidentiality owing to a third party, (iii) jeopardize the protection of an attorney-client privilege, attorney work product protection or other legal privilege (provided, however, that the Company shall use reasonable efforts to provide alternative, redacted or substitute documents or information in a manner that would not result in the loss of the ability to assert attorney-client privilege, attorney work product protection or other legal privileges), or (iv) expose the Company to risk of liability for disclosure of personal information; <u>provided</u> that the parties shall use their commercially reasonable efforts to disclose such information in a manner that would not violate the foregoing. In addition, notwithstanding anything to the contrary contained herein, neither the Company nor any of its Subsidiaries will be required to provide any information or material that relates to, contains or reflects any analyses, studies, notes, memoranda and other information related to or prepared in connection with any Transaction Document or the Transactions or any matters relating thereto or any transactions with or matters relating to the Investor Parties or any Affiliates of the Investor.

Section 5.18     <u>Exclusivity</u>.

(a)     Prior to the Subsequent Common Closing (or such earlier date as the Investor's obligations to effect the Subsequent Common Purchase is terminated pursuant to <u>Section 2.03(c)</u>), without the Investor's prior written consent, neither the Company nor any of its Subsidiaries shall, directly or indirectly, take (and the Company shall not authorize or permit any directors, officers or employees of the Company or, to the extent within the Company's control,

46

other Affiliates or representatives of the Company or any of its Subsidiaries to take) any action to (i) encourage (including by way of furnishing non-public information), solicit, initiate or facilitate any Acquisition Proposal, (ii) enter into any agreement with respect to any Acquisition Proposal or enter into any agreement, arrangement or understanding requiring it to abandon, terminate or fail to consummate any of the Transactions or (iii) participate in any way in discussions or negotiations with, or furnish any information to, any Person in connection with, or take any other action to facilitate any inquiries or the making of any proposal that constitutes, or would reasonably be expected to lead to, any Acquisition Proposal. Prior to the Initial Closing, the Company shall use reasonable best efforts to take all actions reasonably necessary to ensure that the directors, officers and employees of the Company or any of its Subsidiaries and, to the extent within the Company's control, other Affiliates or representatives of the Company or any of its Subsidiaries, do not take or do any of the actions referenced in the immediately foregoing sentence. Upon execution of this Agreement and prior to the Subsequent Common Closing, unless the Investor otherwise consents in writing, the Company shall, if applicable, cease immediately and cause to be terminated any and all existing discussions or negotiations with any parties conducted heretofore with respect to an Acquisition Proposal and promptly request that all confidential information with respect thereto furnished on behalf of the Company be returned.

(b)     Prior to the Subsequent Common Closing (or such earlier date as the Investor's obligations to effect the Subsequent Common Purchase is terminated pursuant to Section 2.03(c)), the Company shall, as promptly as practicable (and in no event later than one business day after receipt thereof), advise the Investor of any Acquisition Proposal, potential Acquisition Proposal, or any inquiry received by it relating to any potential Acquisition Proposal and of the material terms of any proposal or inquiry, including, but not limited to, the identity of the Person and its Affiliates making the same, the consideration that it may receive in respect of any such Acquisition Proposal, potential Acquisition Proposal, or inquiry, or of any information requested from it or of any negotiations or discussions being sought to be initiated with it, shall furnish to the Investor a copy of any such proposal or inquiry, if it is in writing, or a reasonably accurate written summary of any such proposal or inquiry, if it is not in writing, and shall keep the Investor informed on a reasonably prompt basis with respect to any developments with respect to the foregoing.

(c)     Notwithstanding the preceding provisions of this Section 5.18, this Section 5.18 shall not apply to any equity issuances or transactions entered into by the Company pursuant to any at-the-market distribution program that the Company may implement from time to time or any equity line of credit program providing for the issuance by the Company from time to time of Common Shares or similar issuances or transactions initiated by the Company in connection with its efforts to raise capital through equity issuances.

Section 5.19     Investor Information.  At all times during which the Investor or its Affiliates owns any Common Stock or Preferred Stock it will, or will cause its Affiliates to, from time to time upon the request of the Company, provide the Company with such information as is required by the Company or deemed reasonably necessary by the Company in order to permit the Company to comply with any regulatory requirements or know your customer type information, including those imposed by the OFAC, the U.S. Department of State, the United Nations

47

Security Council, HM Treasury, the European Union or relevant member states of the European Union.

Section 5.20    EV Program.  The Investor and the Company each agrees to use commercially reasonable good faith efforts to agree upon the Preferred Funding Milestones and the EV Program Budget no later than the 6-month anniversary of the date of this Agreement.

# ARTICLE VI

# CONDITIONS TO CLOSINGS

Section 6.01    Conditions to the Obligations of the Company and the Investor.  The respective obligations of each of the Company and the Investor to effect each Closing shall be subject to the satisfaction (or waiver, if permissible under applicable Law) on or prior to the Closing Date for such Closing of the following conditions:

(a)    no Judgment enacted, promulgated, issued, entered, amended or enforced by any Governmental Authority or any applicable Law (collectively, "Restraints") shall be in effect enjoining or otherwise prohibiting consummation of the Transactions; and

(b)    if a filing under the HSR Act is required for such Closing, then the applicable waiting periods, together with any extensions thereof, under the HSR Act shall have expired or been terminated.

Section 6.02    Conditions to the Obligations of the Company.  The obligations of the Company to effect each Closing shall be further subject to the satisfaction (or waiver, if permissible under applicable Law) on or prior to the Closing Date for such Closing of the following conditions:

(a)    the representations and warranties of the Investor set forth in this Agreement shall be true and correct as of the date of this Agreement and as of such Closing Date with the same effect as though made on and as of such date (except to the extent expressly made as of an earlier date, in which case as of such earlier date), except where the failure to be true and correct has not had and would not, individually or in the aggregate, reasonably be expected to have an Investor Material Adverse Effect;

(b)    the Investor shall have complied with or performed in all material respects its obligations required to be complied with or performed by it pursuant to this Agreement at or prior to such Closing; and

(c)    the Company shall have received a certificate, signed on behalf of the Investor by an executive officer thereof, certifying that the conditions set forth in Section 6.02(a) and Section 6.02(b) have been satisfied.

4895-3943-6092.13

Section 6.03    Conditions to the Obligations of the Investor.  The obligations of the Investor to effect each Closing shall be further subject to the satisfaction (or waiver, if permissible under applicable Law) on or prior to the Closing Date for such Closing of the following conditions:

(a)    the representations and warranties of the Company (i) set forth in Sections 3.01, 3.02, 3.03(a), 3.03(b)(i)(A), 3.06, 3.10, 3.11, 3.12, and 3.13 shall be true and correct (disregarding all qualifications or limitations as to "materiality," "Material Adverse Effect" and words of similar import set forth therein) in all but *de minimis* respects as of the date hereof and as of such Closing Date with the same effect as though made on and as of such date (except to the extent expressly made as of an earlier date, in which case as of such earlier date), and (ii) set forth in this Agreement, other than in Sections 3.01, 3.02, 3.03(a), 3.03(b)(i)(A), 3.06, 3.10, 3.11, 3.12, and 3.13 shall be true and correct (disregarding all qualifications or limitations as to "materiality", "Material Adverse Effect" and words of similar import set forth therein) as of the date hereof and as of such Closing Date with the same effect as though made on and as of such date (except to the extent expressly made as of an earlier date, in which case as of such earlier date), except, in the case of this clause (ii), where the failure to be true and correct has not had and would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(b)    the Company shall have complied with or performed in all material respects its obligations required to be complied with or performed by it pursuant to this Agreement at or prior to such Closing;

(c)    the Investor shall have received a certificate, signed on behalf of the Company by an executive officer thereof, certifying that the conditions set forth in Section 6.03(a) and Section 6.03(b) have been satisfied;

(d)    prior to the Initial Closing, the Company shall have duly adopted and filed with the Secretary of State of the State of Delaware the Certificate of Designation, and a certified copy thereof shall have been delivered to the Investor;

(e)    prior to or upon the Subsequent Common Closing, to the extent that the initial Investor Designees designated to be Investor Directors have been designated at least fifteen (15) Business Days prior to such Closing and such Investor Designees otherwise meet the requirements set forth in Section 5.09(e), the Board shall have taken all actions necessary and appropriate to cause to be elected or appointed to the Board, effective immediately following the Subsequent Common Closing, such initial Investor Designees; and

(f)    any shares of Common Stock issued at such Closing and any shares of Common Stock issuable upon conversion of the Series A Preferred Stock issued at such Closing at the Conversion Rate specified in the Certificate of Designations as in effect on the date hereof, in each case shall have been covered by a Listing of Additional Shares Notification Form submitted to Nasdaq.

Section 6.04    Additional Conditions to the Obligations of the Company and the Investor to Effect the Subsequent Common Closing.  The respective obligations of each of the Company

49

and the Investor to effect the Subsequent Common Closing shall be further subject to the satisfaction (or waiver, if permissible under applicable Law) on or prior to the Subsequent Common Closing Date of the following condition: CFIUS Clearance shall have been obtained.

Section 6.05    <u>Additional Conditions to the Obligations of the Investor to Effect the Second Preferred Closing and the Third Preferred Closing</u>.  The obligations of the Investor to effect the Second Preferred Closing or the Third Preferred Closing, as applicable shall be further subject to the satisfaction (or waiver, if permissible under applicable Law) on or prior to the Second Preferred Closing Date or the Third Preferred Closing Date, as applicable, of the following conditions:

(a)    the Company and the Investor shall have agreed to the EV Program Budget and the Preferred Funding Milestones; and

(b)    the Preferred Funding Milestone for such Closing shall have been satisfied.

# ARTICLE VII

# TERMINATION; SURVIVAL

Section 7.01    <u>Termination</u>.  This Agreement may be terminated and the Transactions abandoned at any time prior to the Initial Closing:

(a)    by the mutual written consent of the Company and the Investor;

(b)    by either the Company or the Investor upon written notice to the other, if the Initial Closing has not occurred on or prior to November 7, 2023 (the "<u>Termination Date</u>"); <u>provided</u> that the right to terminate this Agreement under this <u>Section 7.01(b)</u> shall not be available to any party if the breach by such party of its representations and warranties set forth in this Agreement or the failure of such party to perform any of its obligations under this Agreement has been a principal cause of or resulted in the events specified in this <u>Section 7.01(b)</u>;

(c)    by either the Company or the Investor if any Restraint enjoining or otherwise prohibiting consummation of the Transactions shall be in effect and shall have become final and nonappealable; <u>provided</u> that the party seeking to terminate this Agreement pursuant to this <u>Section 7.01(c)</u> shall have used the required efforts to cause the conditions to Closing to be satisfied in accordance with <u>Section 5.02</u>;

(d)    by the Investor if the Company shall have breached any of its representations or warranties or failed to perform any of its covenants or agreements set forth in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in <u>Section 6.03(a)</u> or <u>Section 6.03(b)</u> and (ii) is incapable of being cured prior to the Termination Date, or if capable of being cured, shall not have been cured within thirty

<div align="center">50</div>

(30) calendar days (but in no event later than the Termination Date) following receipt by the Company of written notice of such breach or failure to perform from the Investor stating the Investor's intention to terminate this Agreement pursuant to this <u>Section 7.01(d)</u> and the basis for such termination; <u>provided</u> that the Investor shall not have the right to terminate this Agreement pursuant to this <u>Section 7.01(d)</u> if the Investor is then in material breach of any of its representations, warranties, covenants or agreements hereunder; or

(e)     by the Company if the Investor shall have breached any of its representations or warranties or failed to perform any of its covenants or agreements set forth in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in <u>Section 6.02(a)</u> or <u>Section 6.02(b)</u> and (ii) is incapable of being cured prior to the Termination Date, or if capable of being cured, shall not have been cured within thirty (30) calendar days (but in no event later than the Termination Date) following receipt by the Investor of written notice of such breach or failure to perform from the Company stating the Company's intention to terminate this Agreement pursuant to this <u>Section 7.01(e)</u> and the basis for such termination; <u>provided</u> that the Company shall not have the right to terminate this Agreement pursuant to this <u>Section 7.01(e)</u> if the Company is then in material breach of any of its representations, warranties, covenants or agreements hereunder.

Section 7.02     <u>Effect of Termination</u>.  In the event of the termination of this Agreement as provided in <u>Section 7.01</u>, written notice thereof shall be given to the other party, specifying the provision hereof pursuant to which such termination is made, and this Agreement shall forthwith become null and void (other than <u>Article I</u>, <u>Section 5.05</u>, this <u>Section 7.02</u> and <u>Article VIII</u>, all of which shall survive termination of this Agreement), and there shall be no liability on the part of the Investor or the Company or their respective directors, officers and Affiliates, except that no such termination shall relieve any party from liability for damages to another party resulting from a knowing or intentional breach of this Agreement or from Fraud.

Section 7.03     <u>Survival</u>.  Except in the case of Fraud, the representations and warranties of the parties set forth in this Agreement and in any document delivered in connection herewith shall not survive the Closing.  All of the covenants or other agreements of the parties contained in this Agreement shall survive until fully performed or fulfilled, unless and to the extent that non-compliance with such covenants or agreements is waived in writing by the party entitled to such performance.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01     <u>Amendments; Waivers</u>.  Subject to compliance with applicable Law, this Agreement may be amended or supplemented in any and all respects by written agreement of the parties hereto.

Section 8.02     <u>Extension of Time, Waiver, Etc.</u>  The Company and the Investor may, subject to applicable Law, (a) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered pursuant hereto, (b) extend the time for the performance of any of the obligations or acts of the other party or (c) waive compliance

by the other party with any of the agreements contained herein applicable to such party or, except as otherwise provided herein, waive any of such party's conditions. Notwithstanding the foregoing, no failure or delay by the Company or the Investor in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right hereunder. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

Section 8.03    Assignment. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned, in whole or in part, by operation of Law or otherwise, by any of the parties hereto without the prior written consent of the other party hereto; provided, however, that (a) the Investor or any Investor Party may assign its rights, interests and obligations under this Agreement, in whole or in part, to one or more Investor Parties and (b) in the event of such assignment, the assignee shall agree in writing to be bound by the provisions of this Agreement, including the rights, interests and obligations so assigned; provided that no such assignment will relieve the Investor of its obligations hereunder prior to or at each of the Closing; provided, further, that no Investor Party shall assign any of its obligations hereunder with the primary intent of avoiding, circumventing or eliminating such Investor Party's obligations hereunder.

Section 8.04    Counterparts. This Agreement and any other Transaction Documents may be executed in one or more counterparts (including by facsimile and electronic mail), each of which shall be deemed to be an original but all of which taken together shall constitute one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto (including by electronic signature) and delivered to the other parties hereto (including electronically, e.g., in PDF format).

Section 8.05    Entire Agreement; No Third-Party Beneficiaries. This Agreement, including the Company Disclosure Letter, together with the other Transaction Documents, constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, among the parties and their Affiliates, or any of them, with respect to the subject matter hereof and thereof. No provision of this Agreement shall confer upon any Person other than the parties hereto and their permitted assigns any rights or remedies hereunder.

Section 8.06    Governing Law; Jurisdiction.

(a)    This Agreement and all matters, claims or Actions (whether at law, in equity, in Contract, in tort or otherwise) based upon, arising out of or relating to this Agreement, execution or performance of this Agreement, shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts executed in and to be performed entirely within that State, regardless of the laws that might otherwise govern under any applicable conflict of Laws principles.

(b)    All Actions arising out of or relating to this Agreement shall be heard and determined in the Chancery Court of the State of Delaware (or, if the Chancery Court of the State of Delaware declines to accept jurisdiction over any Action, any state or federal court within the State of Delaware) and the parties hereto hereby irrevocably submit to the exclusive jurisdiction

52

and venue of such courts in any such Action and irrevocably waive the defense of an inconvenient forum or lack of jurisdiction to the maintenance of any such Action.  The consents to jurisdiction and venue set forth in this Section 8.06 shall not constitute general consents to service of process in the State of Delaware and shall have no effect for any purpose except as provided in this paragraph and shall not be deemed to confer rights on any Person other than the parties hereto.  Each party hereto agrees that service of process upon such party in any Action arising out of or relating to this Agreement shall be effective if notice is given by overnight courier at the address set forth in Section 8.09 of this Agreement.  The parties hereto agree that a final judgment in any such Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law; provided, however, that nothing in the foregoing shall restrict any party's rights to seek any post-judgment relief regarding, or any appeal from, a final trial court judgment.

Section 8.07    Specific Enforcement.  The parties hereto agree that irreparable damage for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if the parties hereto fail to take any action required of them hereunder to cause each of the Closings to occur, and that time is of the essence.  The parties acknowledge and agree that (a) the parties shall be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (including, for the avoidance of doubt, the right of the Company to cause the purchases contemplated by Section 2.01 to be consummated on the terms and subject to the conditions set forth in this Agreement) in the courts described in Section 8.06 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement and (b) the right of specific enforcement is an integral part of the Transactions and without that right, neither the Company nor the Investor would have entered into this Agreement.  The parties hereto agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to Law or inequitable for any reason, and agree not to assert that a remedy of monetary damages would provide an adequate remedy or that the parties otherwise have an adequate remedy at law.  The parties hereto acknowledge and agree that any party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 8.07 shall not be required to provide any bond or other security in connection with any such order or injunction.

Section 8.08    WAIVER OF JURY TRIAL.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH

4895-3943-6092.13

OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVER AND CERTIFICATIONS IN THIS <u>SECTION 8.08</u>.

Section 8.09   <u>Notices</u>.  All notices, requests and other communications to any party hereunder shall be in writing and shall be deemed given if delivered personally, by facsimile (which is confirmed), emailed (which is confirmed) or sent by overnight courier (providing proof of delivery) to the parties at the following addresses:

(a)   If to the Company, to it at:

Lordstown Motors Corp.
2300 Hallock Young Road
Lordstown, Ohio 44481
Attention:  CEO and General Counsel
Email: edward.hightower@lordstownmotors.com;
melissa.leonard@lordstownmotors.com

with a copy (which shall not constitute notice) to:

Baker & Hostetler LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Attention:  Ronald Stepanovic
Email:     rstepanovic@bakerlaw.com

(b)   If to the Investor or any Investor Party, to the Investor at:

Foxconn Ventures Ptd. Ltd.
c/o Hon Hai Precision Industry Co., Ltd.
No. 66, Zhongshan Road
Tucheng Industrial Zone
Tucheng District
New Taipei City
23680
Taiwan
Attention: Jerry Hsiao
Email: jerry.hsiao@Foxconn.com

with a copy (which shall not constitute notice) to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166

2022TW-L-K-5967                    `1

Attention: Mike Huang
Email: mikehuang@paulhastings.com

or such other address, email address or facsimile number as such party may hereafter specify by like notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of actual receipt by the recipient thereof if received prior to 5:00 p.m. local time in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

Section 8.10 <u>Severability</u>. If any term, condition or other provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, provisions and conditions of this Agreement shall nevertheless remain in full force and effect. Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the fullest extent permitted by applicable Law.

Section 8.11 <u>Expenses</u>. Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the Transactions shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

Section 8.12 <u>Interpretation</u>.

(a) When a reference is made in this Agreement to an Article, a Section, Exhibit or Schedule, such reference shall be to an Article of, a Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The words "date hereof" when used in this Agreement shall refer to the date of this Agreement. The terms "or", "any" and "either" are not exclusive. The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if". The word "will" shall be construed to have the same meaning and effect as the word "shall". The words "made available to the Investor" and words of similar import refer to documents delivered in Person or electronically to the Investor or its respective Representatives. All accounting terms used and not defined herein shall have the respective meanings given to them under GAAP. All terms defined in this Agreement shall have the defined meanings when used in any document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. In the event that the Common Stock is listed on a national securities exchange other than the Nasdaq, all references herein to the Nasdaq

4895-3943-6092.13

shall be deemed to be references to such other national securities exchange. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Unless otherwise specifically indicated, all references to "dollars" or "$" shall refer to the lawful money of the United States. References to a Person are also to its permitted assigns and successors. When calculating the period of time between which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded (and unless if otherwise required by Law, if the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day).

(b)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.

*[Remainder of page intentionally left blank]*

4895-3943-6092.13

LEGAL_US_E # 166563239.19
2022TW-L-K-5967                `1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

**LORDSTOWN MOTORS CORP.**

By: _____

Name: Edward T. Hightower
Title:  CEO and President

**FOXCONN VENTURES PTE. LTD.**

By: _____

Name:  Jerry Hsiao
Title: Authorized signatory

[*Signature Page to Investment Agreement*]

4895-3943-6092.13

**EXHIBIT F**

# AMENDMENT NO. 1 TO
# INVESTMENT AGREEMENT

This AMENDMENT NO. 1 TO INVESTMENT AGREEMENT (this "Amendment") is made and entered into as of November 15, 2022, by and between Lordstown Motors Corp., a Delaware corporation (the "Company"), and Foxconn Ventures Pte. Ltd., a private company limited by shares established under the laws of Singapore (the "Investor" and together with the Company, the "Parties").

## RECITALS

A.      The Parties entered into an Investment Agreement, dated as of November 7, 2022 (the "Investment Agreement"), and now wish to amend the Investment Agreement as provided herein.

NOW THEREFORE, in consideration of the covenants, representations and warranties set forth herein, and for other good and valuable consideration, the Parties, intending to be legally bound, agree as follows:

1.      Amendment.   Section 5.12 of the Investment Agreement is amended by (a) deleting "and" at the end of clause (i) and inserting in lieu thereof ";" and (b) inserting the following at the end of clause (ii) "; and (iii) at any time, to fund pre-development activities and related overhead and support or other expenditures as set forth on Exhibit A, or as otherwise mutually agreed upon by the Investor and the Company from time to time.

2.      Miscellaneous.   The provisions of Article VIII of the Investment Agreement are incorporated herein, *mutatis mutandis*, as if a part hereof.


**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed and delivered as of the date first written above.

**LORDSTOWN MOTORS CORP.**

By: _____

Name: Edward T. Hightower

Title: CEO & President

**FOXCONN VENTURES PTE. LTD.**

By: _____

Name: Jerry Hsiao

Title: Chief Product Officer

**EXHIBIT G**

## AMENDMENT NO. 1 TO
## INVESTMENT AGREEMENT

This AMENDMENT NO. 1 TO INVESTMENT AGREEMENT (this "Amendment") is made and entered into as of December 22, 2022, with an effective date as of November 15, 2022 (the "Effective Date"), by and between Lordstown Motors Corp., a Delaware corporation (the "Company"), and Foxconn Ventures Pte. Ltd., a private company limited by shares established under the laws of Singapore (the "Investor" and together with the Company, the "Parties").

### RECITALS

A.     The Parties entered into an Investment Agreement, dated as of November 7, 2022 (the "Investment Agreement").

B.     The Parties further entered into an Amendment No. 1 to Investment Agreement, dated as of November 15, 2022 (the "Rescinded Amendment"), pursuant to which the Parties agreed to amend Section 5.12 of the Investment Agreement.

C.     The Parties desire to rescind, cancel and terminate *ab initio* the Rescinded Amendment and to replace it in its entirety with this Amendment.

NOW THEREFORE, in consideration of the covenants, representations and warranties set forth herein, and for other good and valuable consideration, the Parties, intending to be legally bound, agree as follows:

1.     Rescission.     The Rescinded Amendment is hereby rescinded, cancelled and terminated for any and all purposes in its entirety, and shall be void ab initio, such that the Amendment shall be cancelled, unwound and voided, in each case, as if the Rescinded Amendment was never entered into by the Parties.

2.     Amendment. As of the Effective Date, Section 5.12 of the Investment Agreement is amended by (a) deleting "and" at the end of clause (i) and inserting in lieu thereof ";" and (b) inserting the following at the end of clause (ii) "; and (iii) at any time, to fund pre-development activities and related overhead and support or other expenditures as set forth on Exhibit A, or as otherwise mutually agreed upon by the Investor and the Company from time to time.

3.     Miscellaneous.

(a)     At the Investor's election, the Investor and the Company shall have weekly meetings during which the Company shall update the Investor on the status of the vehicle program.

(b)     The provisions of Article VIII of the Investment Agreement are incorporated herein, *mutatis mutandis*, as if a part hereof.

### [REMAINDER OF PAGE INTENTIONALLY BLANK]

1



IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed and delivered as of the date first written above.

**LORDSTOWN MOTORS CORP.**

By: _____

Name: Edward T. Hightower

Title: CEO & President

**FOXCONN VENTURES PTE. LTD.**

By: _____
2022/12/23

Name: Jerry Hsiao

Title: Authorized Signatory

2

**EXHIBIT H**

Nasdaq Regulation 

*Sent via Electronic Delivery to:* Melissa.leonard@lordstownmotors.com; jspreen@bakerlaw.com

April 19, 2023

Ms. Melissa Leonard
General Counsel
Lordstown Motors Corp.
2300 Hallock Young Road
Lordstown, Ohio 44481

Re:     Lordstown Motors Corp. (the "Company")
         Nasdaq Security:  Common Stock
         Nasdaq Symbol:  RIDE

Dear Ms. Leonard:

As we discussed, our Listing Rules (the "Rules") require listed securities to maintain a minimum bid price of $1 per share.  Based upon the closing bid price for the last 30 consecutive business days, the Company no longer meets this requirement.[1]  However, the Rules also provide the Company a compliance period of 180 calendar days in which to regain compliance.

If at any time during this 180 day period the closing bid price of the Company's security is at least $1 for a *minimum* of ten consecutive business days, we will provide you written confirmation of compliance and this matter will be closed.  Please note that if the Company chooses to implement a reverse stock split, it must complete the split no later than ten business days prior to the expiration date in the table below, in order to regain compliance.[2]

In the event the Company does not regain compliance with the Rule, the Company may be eligible for additional time.[3]  To qualify, the Company must submit, no later than the expiration date, an on-line Transfer Application[4] and submit a non-refundable $5,000 application fee in accordance with the instructions provided on the attached "Check Payment Form".[5]  The Company will be required to meet the continued listing requirement for market value of publicly held shares and all other initial listing standards, with the exception of the bid price requirement, and will need to provide written notice of its intention to cure the deficiency during the second compliance period by effecting a reverse stock split if necessary.  As part of its review process, Staff will make a determination of whether we believe the Company will be able to cure this deficiency.  Should

---

[1] For online access to all Nasdaq Rules, please see "Nasdaq Online Resources," included with this letter.
[2] For additional information with respect to compliance periods please see the "Nasdaq Online Resources" on the attached page and access the link "Frequently Asked Questions" related to "continued listing."
[3] Listing Rule 5810(c)(3)(A)(ii).
[4] The online Transfer Application can be accessed at listingcenter.nasdaq.com.
[5] Listing Rule 5920(a)(11)

Ms. Melissa Leonard
April 19, 2023
Page 2

Staff conclude that the Company will not be able to cure the deficiency, or should the Company determine not to submit a transfer application or make the required representation, we will provide notice that its securities will be subject to delisting.[6]

Our Rules require that the Company promptly disclose receipt of this letter by either filing a Form 8-K, where required by SEC rules, or by issuing a press release. The announcement needs to be made no later than four business days from the date of this letter and must include the continued listing criteria that the Company does not meet, and a description of each specific basis and concern identified by Nasdaq in reaching the determination.[7]

The Company must also submit the announcement to Nasdaq's MarketWatch Department.[8] If the public announcement is made between the hours of 7:00 AM and 8:00 PM Eastern Time, the Company must submit the announcement to Nasdaq's MarketWatch Department at least ten minutes prior its public release. If the public announcement is made outside of these hours, the Company must submit the announcement prior to 6:50 A.M. Eastern Time. Please note that if you do not make the required announcement trading in your securities will be halted.[9]

The following table summarizes the critical dates and information related to this matter:

| Period below $1.00 bid price | Expiration of 180 calendar day compliance period | Public Announcement Due Date | Relevant Listing Rules |
|---|---|---|---|
| March 7, 2023 to April 18, 2023 | October 16, 2023 | April 25, 2023 | 5450(a)(1) – bid price 5810(c)(3)(A)[10] – compliance period 5810(b) – public disclosure 5505 – Capital Market criteria |

Finally, an indicator will be displayed with quotation information related to the Company's securities on NASDAQ.com and NASDAQTrader.com and may be displayed by other third party providers of market data information. Also, a list of all non-compliant Nasdaq companies and the basis for such non-compliance is posted on our website at listingcenter.nasdaq.com. The Company will be included in this list commencing five business days from the date of this letter.

If you have any questions, please do not hesitate to contact me at +1 301 978 8072.

---

[6] At that time, the Company may appeal the delisting determination to a Hearings Panel.
[7] Listing Rule 5810(b). See FAQ #428 available on the Nasdaq Listing Center.
[8] The notice must be submitted to Nasdaq's MarketWatch Department through the Electronic Disclosure submission system available at nasdaq.net/ED/IssuerEntry.
[9] Listing IM-5810-1.
[10] Listing Rule 5810(c)(3)(A)(iii) states in part: "if during any compliance period specified in this Rule 5810(c)(3)(A) a Company's security has a closing bid price of $0.10 or less for ten consecutive trading days, the Listing Qualifications Department shall issue a Staff Delisting Determination under Rule 5810 with respect to that security."

Ms. Melissa Leonard
April 19, 2023
Page 3

Sincerely,

Rachel Scherr
Listing Analyst
Nasdaq Listing Qualifications

## NASDAQ ONLINE RESOURCES

All of our listing information and forms are available electronically on the Listing Center. In addition to facilitating electronic submission of forms, you can also use the Listing Center to access Nasdaq's Reference Library containing hundreds of frequently asked questions and Governance Clearinghouse containing the latest updates on corporate governance and listing standards.

To help you navigate the deficiency process, we have provided links to some our most viewed resource materials.

- Board Composition and Committee Requirements

- Governance Clearinghouse

- Hearings Process

- How to Transfer to Nasdaq Capital Market

- Information about Application of Shareholder Approval Rules

- Initial Listing Process

- Listing Fees

- Listing of Additional Shares Process

- MarketWatch Electronic Disclosure Submissions

- Nasdaq Listing Rules:  Initial and Continued Listing

- Reference Library: Frequently Asked Questions, Staff Interpretations and Listing Council Decisions

# Check Payment Form

If paying by check, please complete this form and include it along with your payment.  If paying by wire, please click here for instructions.

All checks should be made payable to The Nasdaq Stock Market LLC at the following address:

**For payments sent by regular mail:**

The Nasdaq Stock Market LLC—LBX 780700
PO Box 780700
Philadelphia, PA 19178-0700

**For payments sent by overnight mail:**

The Nasdaq Stock Market LLC—LBX 780700
Wells Fargo Bank
MAC Y1372-045
401 Market Street
Philadelphia, PA  19106

COMPANY NAME _____ SYMBOL _____

ADDRESS _____

ADDRESS _____

REMITTER NAME (if different than Company Name) _____

AMOUNT _____ CHECK NO _____

PLEASE INDICATE REASON FOR PAYMENT BY CHECKING ONE OF THE FOLLOWING BOXES:

☐ **New Company Application and Entry:** The application fee is $25,000 for the Global or Global Select Market, $5,000 for the Capital Market, and $1,000 for companies applying to list Closed End Funds, Exchange Traded Funds, Index Fund Shares or other structured products. The remainder of the entry fee is due prior to the first day of trading.  Nasdaq will credit all application fees paid by the Company in connection with an application that has not been closed towards the Entry Fee payable upon listing.

☐ **Application Renewal Fee:** If a Company does not list within 12 months of submitting its application, it will be assessed an additional non-refundable $5,000 application fee each 12 months thereafter to keep its application open.

☐ **Hearing Request**:  The fee in connection with a hearing request is $20,000.

☐ **Appeal Request:** The fee in connection with an appeal of a Hearing Panel decision to the NASDAQ Listing and Hearing Review Council is $15,000.

☐ **Transfer Application:**  The fee for companies transferring from the Global or Global Select Market to the Capital Market is $5,000.

**EXHIBIT I**

FOXCONN VENTURES PTE. LTD
c/o Hon Hai Precision Industry Co., Ltd.
No. 66, Zhongshan Road, Tucheng Industrial Zone
Tucheng District, New Taipei City, 23680, Taiwan

<u>BY EMAIL</u>
Lordstown Motors Corp.
2300 Hallock Young Road
Lordstown, Ohio 44481
Attention: CEO and General Counsel
Email: edward.hightower@lordstownmotors.com;
melissa.leonard@lordstownmotors.com

April 21, 2023

> Re:   Investment Agreement, dated as of November 7, 2022, (the "<u>Agreement</u>") by and between Lordstown Motors Corp., a Delaware corporation (the "<u>Company</u>"), and Foxconn Ventures Pte. Ltd., a private company limited by shares established under the laws of Singapore (the "<u>Investor</u>"). Capitalized terms used and not otherwise defined in this letter have the meanings given to such terms in the Agreement

Dear Edward and Melissa:

We write to you regarding the written notice from the Listing Qualifications Department of Nasdaq that the Company received on April 19, 2023 wherein the Nasdaq indicated that the Company was no longer in compliance with the $1.00 Minimum Bid Price requirement set forth in Nasdaq Listing Rule 5450(a)(1) and, therefore, the Company is at risk of being delisted from such exchange. Such written notice by the Nasdaq constitutes a breach of the Company's representation in <u>Section 3.13</u> of the Agreement, which results in a failure of the condition set forth in <u>Section 6.03(a)(i)</u> of the Agreement.

We understand that the Company is currently evaluating various courses of action to cure such breach. If the Company, however, fails to cure such breach on or before May 21, 2023 (the "<u>Termination Date</u>"), then without further notice, the Agreement is hereby terminated pursuant to <u>Section 7.01(d)</u> of the Agreement by the Investor as of the Termination Date, unless the Investor shall have previously notified the Company in writing of its election, in its sole discretion, to extend the Termination Date.

In the meantime, we remain open to continuing our discussions and to work together to reach a mutually acceptable outcome that benefits our respective stakeholders.

This letter, including the description of the Company's breach contained herein, is not intended to be and shall not be interpreted as a waiver by the Investor of any other defaults that may now or hereafter exist under the terms of the Agreement, nor shall this letter confer on the Investor any right to other or further notice or cure periods with respect to any default under the Agreement.

If you have any questions concerning the foregoing, please contact the undersigned at jerry.hsiao@Foxconn.com.

[No further text on this page; signature page follows]

Sincerely,

**FOXCONN VENTURES PTE. LTD**

By: _____*jerry hsiao*_____

Name: Jerry Hsiao
Title: Authorized Signatory

cc:    Baker & Hostetler LLP
       127 Public Square, Suite 2000
       Cleveland, Ohio 44114
       Attention: Ronald Stepanovic
       Email: rstepanovic@bakerlaw.com

       Paul Hastings LLP
       200 Park Avenue
       New York, NY 10166
       Attention: Mike Huang
       Email: mikehuang@paulhastings.com

**EXHIBIT J**



1(212) 318-6662
mikehuang@paulhastings.com

June 5, 2023

**VIA E-MAIL**

Thomas Lauria
White & Case LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131-2352

Re:     LMC's Public Statements re: Subsequent Common Closing

Dear Mr. Lauria:

I am writing concerning certain public statements made by your client, Lordstown Motors Corp. ("LMC"), regarding the purchase rights of my client, Foxconn Ventures Pte. Ltd. ("Foxconn"), under the Investment Agreement by and between LMC and Foxconn dated as of November 7, 2022 (the "Investment Agreement") following LMC's announced reverse stock split. LMC's disclosure incorrectly suggests that Foxconn's purchase right in the Subsequent Common Closing is limited to ten percent of LMC's outstanding common stock following LMC's reverse stock split.

The Subsequent Common Closing is clearly defined in the Investment Agreement. So long as LMC satisfies all conditions precedent, Foxconn:

> . . . shall purchase and acquire from the Company, and the Company shall issue, sell and deliver to the Investor, 26,855,453 shares of Common Stock (the "Subsequent Common Shares") for a purchase price per share equal to $1.76 and an aggregate purchase price for the Subsequent Common Shares of $47,265,597 (such aggregate purchase price, the "Subsequent Common Purchase Price").

Inv. Agr't § 2.01(b). The Subsequent Common Closing is intentionally silent on the impact of any stock split on Foxconn's purchase right. This reflects the parties' intent that a stock split not have any impact on Foxconn's purchase right as part of the Subsequent Common Closing. Accordingly, the Subsequent Common Closing does not speak in terms of the percentage of outstanding common stock that Foxconn is entitled to purchase at the closing. Rather, the Investment Agreement very directly states that "the Company shall issue, sell and deliver to the Investor, 26,855,453 shares of Common Stock . . . for a purchase price per share equal to $1.76" without any limitation or condition.

Nevertheless, when discussing the reverse stock split in its Form 8-K filed on May 23, 2023, LMC made reference to "Foxconn's purchase of approximately 10% of the [LMC's] common stock for $47.3 million." See Form 8-K at 4 (May 23, 2023) (https://investor.lordstownmotors.com/static-files/5df8b761-dce3-4a8f-a5ce-650fbe6094cc). There is no basis to suggest, as the 8-K does, that the Investment Agreement contains an implied adjustment term to account for LMC's reverse stock split. This is particularly so because the parties have otherwise shown their ability to incorporate such an adjustment term elsewhere in their contract. For example, in Section 10(a)(i) of the Certificate of Designation for the Preferred Stock, LMC and Foxconn explicitly agreed to and set forth a means by which the applicable stock Conversion



Thomas Lauria
June 5, 2023
Page 2


Ratio would be adjusted in the event of a stock split. In contrast, LMC and Foxconn did not incorporate any adjustment language into Section 2.01(b) in connection with the Subsequent Common Closing.

Please promptly identify whether LMC intends to take the position that Foxconn's purchase right under the Subsequent Common Closing should be adjusted in light of LMC's reverse stock split and, if LMC intends to take the position that it should be adjusted, further identify the basis for such position. Foxconn reserves all rights.


Sincerely,

/s/ Mike Huang



Mike F. Huang
of PAUL HASTINGS LLP

**EXHIBIT K**



Nasdaq Regulation

*By Electronic Delivery to: Melissa.leonard@lordstownmotors.com; jspreen@bakerlaw.com*

June 7, 2023

Ms. Melissa Leonard
General Counsel
Lordstown Motors Corp.
2300 Hallock Young Road
Lordstown, Ohio 44481

Re:     Lordstown Motors Corp. (the "Company")
        Nasdaq Symbol:  RIDE

Dear Ms. Leonard:

On April 19, 2023, Staff notified the Company that its common stock failed to maintain a minimum bid price of $1.00 over the previous 30 consecutive business days as required by the Listing Rules of The Nasdaq Stock Market.  Since then, Staff has determined that for the last 10 consecutive business days, from May 24 to June 7, 2023, the closing bid price of the Company's common stock has been at $1.00 per share or greater.  Accordingly, the Company has regained compliance with Listing Rule 5450(a)(1) and this matter is now closed.

If you have any questions, please contact me at + 1 301 978 8082.

Sincerely,

Rachel Scherr
Director
Nasdaq Listing Qualifications

Case: 4:23-cv-01454-BYP  Doc #: 31-1  Filed:  12/29/23  309 of 309.  PageID #: 1136

Lordstown Motors Corp. et al v. Hon Hai Precision Industry Co., Ltd et al, Docket No. 1:23-ap-50414 (Bankr. D.

# General Information

| | |
|---|---|
| **Case Name** | Lordstown Motors Corp. et al v. Hon Hai Precision Industry Co., Ltd et al |
| **Court** | U.S. Bankruptcy Court for the District of Delaware |
| **Date Filed** | Tue Jun 27 00:00:00 EDT 2023 |
| **Judge(s)** | Mary F. Walrath |
| **Federal Nature of Suit** | Recovery of money/property - other [14] |
| **Docket Number** | 1:23-ap-50414 |
| **Parties** | Foxconn EV System LLC; Official Committee of Equity Security Holders; Foxconn (Far East) Limited; Foxconn EV Technology, Inc.; Foxconn Ventures Pte. Ltd.; Lordstown Motors Corp.; Hon Hai Precision Industry Co., Ltd; Lordstown EV Corporation; Kurtzman Carson Consultants LLC |

Bloomberg Law®

© 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service